**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ALAN CHRISTOPHER REDMOND | Bankruptcy No.<br><br>Involuntary Chapter 11 |

## <u>EMERGENCY MOTION FOR SPECIAL RELIEF</u>

NOW COMES, Petitioners, who move the Court for special relief on an emergent basis and offer the following in support:

## <u>INTRODUCTION</u>

Alan Christopher Redmond has, for more than 10 years, engaged in a repeated pattern of violating Pennsylvania insurance laws and regulations, defrauding others and concealing his assets, while actually aided and abetted, we regret to inform the Court, by at least one member of the Bar of this Court, Norman M. Valz, Esquire. In 2014, Redmond froze out his business partner, Jason Scott Jordan, in the management and profits of their insurance producer business, National Brokers of America, Inc. ("NBOA"). During the pendency of Jordan's lawsuit for breach of fiduciary duty in the Berks County Court of Common Pleas and with the assistance of Attorney Valz, Redmond transferred all the assets of NBOA, including NBOA's book of business, accounts receivable, employees, and equipment, into a new entity that Redmond owned, Bene Market, LLC, and then repeatedly caused NBOA to file for bankruptcy before this Court on the eve of trial in Common Pleas. After Jordan obtained relief from the automatic stay and after trial was held in Common Pleas, Redmond decided to get married and transfer all his real estate investments into the name of himself and his wife as tenants by the entirety. His wife, an unemployed homemaker, then obtained financing and purchased in her own name a $2,800,000.00 real property that is <u>not</u>

owner-occupied. Two weeks after she married Redmond, Common Pleas rendered a verdict in favor of Jordan with findings that Redmond misappropriated $15,496,492.00 from NBOA and illegally ran his personal expenses through NBOA and Bene Market, LLC. After computing Jordan's share of the profits, and awarding punitive damages, Common Pleas entered a judgment against Redmond for $13,105,197.20.

Attorney Valz took an appeal from the judgment in the Jordan Case, and convinced a newly-assigned judge (after the first judge retired) and over Jordan's objection, that Redmond should not have to post any supersedeas bond to stay execution pending appeal. Valz then helped Redmond create a Pennsylvania nonprofit organization, the Alan Redmond Charitable Foundation, and a new business entity, Benefits Now, LLC, a Michigan limited liability company. In 2019, during the pendency of Jordan's suit, Valz also helped Redmond create a "fallback" entity, Seguro Medico, LLC, a Delaware limited liability company. During the appeal, Jordan filed a new suit in the Berks County Court of Common Pleas against Bene Market, LLC, bringing a veil-piercing claim and seeking the appointment of a receiver with similar duties as a Bankruptcy Trustee. With the assistance of Valz and others, Redmond then transferred all the assets of Bene Market, LLC, including its book of business, accounts receivable, employees, and software, to Benefits Now, LLC and Seguro Medico, LLC. To further conceal what he did, Redmond entered into a sham agreement with an older man, having no experience or licensure in the insurance industry, named Arthur W. Walsh, Jr. Walsh's name is held out to the public as the "owner" of the businesses, as well as the name, "Jesus Barrios," whose identity has not yet been confirmed if an actual person. But in reality the businesses are operated and controlled by Redmond. This Emergency Motion includes an affidavit from creditor Ethan Shalter, a former employee of Seguro Medico, LLC, who describes Redmond's control of the company and repeated violations of insurance laws, to wit,

hiring unlicensed employees to solicit future policyholders, underwriting policies without a license, and conducting the business under the name of another person.

The businesses pay Redmond a "consultancy" income, but in practice Redmond personally guaranteed the business loans for Seguro Medico, LLC, including a $500,000.00 Promissory Note by World Business Lenders, LLC. A genuine consultant does not do that; only an owner does that.

Meanwhile, the Superior Court of Pennsylvania affirmed Jordan's judgment against Redmond, finding that all of Redmond's appellate issues were waived for failure to preserve before the trial court by timely objection. When Jordan propounded interrogatories in aid of execution, Attorney Valz assisted Redmond in giving false answers and materially omissions under oath. Redmond objected and refused to disclose the sources of his income while claiming he had a negative net worth of $-6,703,613.56. Redmond asserted he doesn't own any bank accounts and his income is paid to him in cash only. Redmond did not disclose his ownership with his wife in ARC Realty, LLC, which holds title to Redmond's real estate investments. Redmond did not disclose Seguro Medico, LLC or Benefits Now, LLC, even though the interrogatories directed him to disclose any entity where he had control or a managerial interest. After stripping Bene Market, LLC of its assets — including the proceeds of $35,293,618.31 in loans from Complete Business Solutions Group, LLC ("CBSG") — Redmond then defaulted on his personal guarantees to CBSG and World Business Lenders, LLC. The U.S. Internal Revenue Service filed income tax liens against Redmond in at least $49,303.67 for unpaid taxes, and the U.S. Department of Labor commenced a suit against Redmond for repeated violations of the Fair Labor Standards Act on behalf of 318 former employees.

CBSG, likewise, filed suit against Redmond in the Philadelphia Court of Common Pleas. Redmond, after having denied liability for veil-piercing of Bene Market, LLC in the Berks County

Court of Common Pleas, then had Valz file a Joinder Complaint in the CBSG action, bringing a veil-piercing claim *against Bene Market, LLC* and claiming that Jason Scott Jordan should pay Redmond's debts, despite the fact that these debts occurred after Jordan was frozen out of the business since 2014.

In essence, whenever a creditor or tort victim would file suit against an entity controlled by Redmond, he would promptly rely on Attorney Valz to both defend against the action while taking advance of that delay in judicial process to help Redmond move assets into a new entity, designed to render Redmond judgment-proof while falsely asserting he's too poor to pay his debts. As the Court reads this paper, CBSG submitted loan papers in the Philadelphia Court of Common Pleas, documentation that $35,293,618.31 was loaned to NBOA and Bene Market, LLC, and completely missing—no accounting has been given by Redmond. Redmond is also a multi-national with a U.S. passport, having a documented history of transferring assets outside the Untied States and to members of his family in the British Isles.

Without emergency, ex parte relief, the moment Redmond becomes informed that an Involuntary Petition has been filed against him, he will surely repeat his behavior with the added threat of reducing assets to cash so the same can be removed outside the United States, thereby committing fraud on the Court and defeating the remedial bankruptcy purposes of this proceeding, and prior to the ability for a Chapter 11 trustee to become appointed. This Emergency Motion, in the nature of a temporary restraining order, asks this Court to preserve the status quo and direct the U.S. Trustee Program to immediately appoint an interim trustee. Once the interim trustee is able to gain control of the situation, he or she may come back to Court to determine if the emergency order should be modified in whole or in part.

## **GROUNDS**

I.    **Debtor is Regularly Lying under Oath, with the Assistance of Attorney Norman Valz, to Conceal and Fraudulently Transfer Assets to Avoid Creditors, Repeatedly Defeating State-Law Process.**

    A.    **While Acting in a Fiduciary Capacity, Debtor Misappropriates $15,496,492 and Transfers Business Assets into a New, Competing Business and Repeatedly Caused Business Bankruptcy Filings for His Personal Benefit.**

A bench trial was held on September 20 and 21, 2021, in the case of <u>National Brokers of America, Inc. and Alan Christopher Redmond v. Jason Scott Jordan</u>, C.A. No. 14-17117 (the "Jordan Case") in the Berks County Court of Common Pleas ("Common Pleas").[1] On December 20, 2021, Common Pleas entered findings of fact and rendered a verdict in favor of Jason Scott Jordan and against Alan Christopher Redmond ("Debtor") for $13,105,197.20. [Exhibit A, at 15]. Common Pleas found that Jordan was a 50% shareholder of National Brokers of America, Inc. ("NBOA") and had equal managerial rights in NBOA as the Debtor but, beginning on August 4, 2014, Debtor froze out Jordan from management and took all profits from the business for himself. [<u>Id.</u>, Findings of Fact ¶¶ 11-29]. Common Pleas specifically found the following:

(1)    At some point after Jordan's freeze out, Debtor formed a new, competing business, Bene Market, LLC, in which he was the 96% owner, and transferred NBOA's book of business, employees, equipment, and liquid assets ($361,782.72) to Bene Market, LLC. [<u>Id.</u> ¶¶ 59-70]. Bene Market, LLC was engaged "in selling the same products, using the same office space and same furniture and equipment," and was "a mere continuation of NOBA for purposes of ownership interest and rights as between Redmond and Jordan." [<u>Id.</u> ¶ 70].

(2)    During Jordan's freeze out, Debtor ran "his personal (and extravagant) expenses" directly through NBOA, including his strip-club membership and $118,907.27 in Neiman Marcus designer

---

[1] Exhibit B, Docket Entry for Oct. 29, 2021 (noting lodging of trial transcripts for Sept. 20-21, 2021).,

clothing. [Id. ¶ 51]. Debtor continued the same pattern of behavior as to Bene Market, LLC, which included running his personal travel expenses through the business, which amounted to $186,747.00 over the course of three years. [Id. ¶ 79].

(3)     While acting in a fiduciary capacity, Debtor "misappropriated from NBOA and Bene Market, LLC," and refused to share with Jordan a total sum of money that "equals $15,496,492." [Id. ¶ 78]. In computing damages, Common Pleas took that figure and divided it in half and awarded Jordan compensatory damages in the amount of $8,105,197.20, and then imposed punitive damages in the amount of $5,000,000.00. [Id., Verdict Slip at 15].

(4)     Debtor uses his family members to help him conceal these transfers, including where he wired $56,000.00 from NBOA to his mother in the British Isles. [Id., Findings of Fact ¶¶ 57-58].

Common Pleas also found that Debtor hired "professionals," where he lies to them regarding material facts, or they actively assist him in the wrongdoing, or both. Debtor, for instance, hired an accountant, C. Malcolm Smith, to prepare all tax returns for NBOA but, "Redmond knowingly and intentionally lied to C. Malcolm Smith to induce the materially false statement on the 2014-2017 NBOA returns that Redmond was the owner of 100% of the NBOA shares." [Id. ¶¶ 49-50]. Common Pleas discounted the testimony of these same "professionals" and found they were complicit in the wrongdoing:

> Testimony by Redmond's accountant, C. Malcolm Smith, that Redmond's Personal Expenses were somehow subsumed within Redmond's claimed capital gains income was not credible when year after year from 2014 through 2017 he permitted Redmond to continue to run all of Redmond's personal expenses through the NBOA books without changing or stopping this clearly improper conduct and with no documentation from C. Malcolm Smith to support such assertion.

[Id. ¶¶ 53-54]. Common Pleas, therefore, found that Debtor had fraudulently concealed the profits of the business through this scheme.

As part of the award of punitive damages, Common Pleas found that Debtor repeatedly

caused NBOA to file for bankruptcy in this Court on the eve of trial, for no other purpose than to help shield Debtor, individually, from liability. This created a "seven year pendency of this litigation so that he could hold Jordan at arm's length while he drained NBOA's coffers and then moved all assets over to Bene Market, LLC." [Id. ¶¶ 71, 80]. This Court may judicially notice its own docket that the first NBOA petition was filed on February 20, 2019, at Case No. 19-11045-JKF, and dismissed on April 4, 2019 for Debtor's failure to file documents required by court order. NBOA filed a second petition on September 3, 2019, at Case No. 19-15488-JKF. On January 1, 2021, at Case No. 20-00016-PMM, this Court entered a lift-stay order as to the Jordan Case so that it may proceed against Debtor personally.

Throughout the Jordan Case, Debtor was represented by Attorney Norman Valz. [Exhibit B (entry of appearance on Apr. 13, 2021)]. This Court may judicially notice the docket and court papers in the Jordan Case, in addition to those attached as Exhibits A and B.

**B.    With the Assistance of Attorney Norman Valz, Debtor Creates the "Alan Redmond Charitable Foundation," Uses Marriage as a New Debt Avoidance Strategy, and Lies under Oath to Hide His Assets from Execution.**

On December 2, 2021, Debtor took an appeal to the Superior Court of Pennsylvania from the judgment in the Jordan Case. [Exhibit B (docket entry for Dec. 2, 2021)]. Judge Timothy J. Rowley, who had issued the Verdict in the Jordan Case, retired and the case became reassigned to Judge Jeffrey K. Sprecher. [Exhibit B (docket entry for Jan. 14, 2022)]. During the pendency of appeal, despite having a history of causing delay so that business coffers could be drained and misappropriated, Debtor convinced Judge Sprecher to stay execution of the judgment without any supersedeas bond. [Exhibit B (docket entry for Oct. 21, 2022)]. On November 29, 2023, Superior Court affirmed the judgment in a published opinion, finding nearly all of the issues on appeal to be waived for failure to preserve the same in the trial court. National Brokers of America, Inc. v. Jordan, 307 A.3d 1206 (Pa.Super. 2023). Meanwhile, on July 28, 2022, at C.A. No. 22-11757,

Jordan filed suit in the Berks County Court of Common Pleas against Debtor and Bene Market, LLC, seeking the appointment of a receiver over the latter that would exercise duties similar to a Bankruptcy Trustee (the "Bene Market, LLC Litigation"). [Exhibit C]. Debtor and Bene Market, LLC, under Valz's representation, filed an Answer, denying liability for veil-piercing. [Id.].

At this point, Debtor rolled out new asset concealment strategies with the assistance of Attorney Norman Valz and others. On January 9, 2023, despite having a civil judgment against him for $13,105,197.20, Debtor decided it was time to start giving his money away and filed articles of incorporation with the Pennsylvania Department of State for a new nonprofit organization, the Alan Redmond Charitable Foundation (the "Foundation"). [Exhibit D]. As shown in Exhibit D, Attorney Valz assisted Debtor in drafting and filing the articles. Attorney Valz is the registered agent for the Foundation at 8 Morgan Drive, Reading, PA 19608. [Id.]. That address is significant and further discussed below because it is owned by Debtor's real estate holding company, ARC Realty, LLC, and is regularly used for business operations that are violating Pennsylvania insurance laws and regulations.

News reports in the *Reading Eagle* have confirmed that the Foundation is giving away thousands of dollars. On information and belief, the Foundation's primary purpose is to help Debtor avoid his civil judgment to Jordan and his liability to other creditors discussed in Part III, while indirectly funneling the money back to himself, or to his wife, through third parties.

At the same time, Debtor also got married and start giving away his assets to his bride. After trial but before verdict in the Jordan Case, Debtor applied for and obtained a marriage license from the Berks County Register of Wills and Clerk of the Orphans' Court. On December 4, 2021, Debtor married Shannon Kroemmelbein ("Debtor's Wife"). [Exhibit E]. Debtor's Wife is a full-time mother and does not work outside the home. Yet, on August 31, 2022, a deed was recorded

with the Berks County Recorder of Deeds Office for the property at 2 High Road, Wyomissing, PA 19610. [Exhibit F]. It is titled in Shannon Kroemmelbein's name only and she managed to finance the transaction for the sale price of $2,800,000.00. [Id.]. On information and belief, this transaction was done to help Debtor avoid his creditors and that Shannon Kroemmelbein is a straw party while Debtor is paying the mortgage or the mortgage is paid by third parties through conduit transfers from the Debtor, either directly or indirectly.

After the Superior Court of Pennsylvania lifted the stay on the judgment in the Jordan Case, Debtor suddenly became too poor to pay it, repeatedly lied under oath regarding his assets, and claimed that his Wife owned all sorts of things that were previously owned by himself. Before Debtor became married to Shannon Kroemmelbein, he solely owned a real estate holding company, ARC Realty, LLC, a Delaware limited liability company. On March 3, 2021, Debtor signed a Memorandum Agreement with another company and filed with the same with the Berks County Recorder of Deeds Office. The Memorandum recites that Debtor is "President and CEO" of ARC Realty, LLC. [Exhibit G]. By deed recorded on June 18, 2019, for property at 2005 Regency Drive, Wyomissing, PA 19610, Debtor signed the same as "Sole Owner" of ARC Realty, LLC. [Exhibit H].

In accordance with Pennsylvania law, Jordan propounded interrogatories in aid of execution on Debtor ("Interrogatories"). With the assistance of Attorney Valz, Debtor provided answers on March 19, 2024, which are attached as Exhibit I. The answers are so deficient as to show intentional concealment. No. 13 asked, "Identify all of your current sources of income, including self-employment, rental income, general intangible, payment intangible, proceeds, noncash proceeds." Debtor answered, "Rental income. Consulting income." [Exhibit I at 5]. Debtor refused to identify the source of the income — no names or addresses are provided. Debtor

did the same thing in his answer to No. 14, which asked him to identify all sources of income since August 4, 2014. [See id.]. For Nos. 16 and 17, Debtor objected and refused to disclose his financial assets. [Id. at 6-7]. For Nos. 18 and 19, Debtor objected and refused to disclose his accounts. [Id. at 7-8]. Despite having the assistance of Attorney Valz, some of these objections were predicated on "Redmond's layperson understanding," which is patently frivolous. [See id. at 7-8 (Answers to Nos. 18 and 19)].

Significantly, Interrogatory No. 22 directed Debtor to identify "all entities anywhere in the world in which you have an ownership interest, or managerial rights, or where you exercise control, or any of the foregoing." Debtor objected that he didn't understand any of those terms, and then disclosed: National Brokers of America, Inc., Bene Market, LLC, The Redmond Group, LLC, and Redmond Marking, LLC. [Exhibit I, at 9]. Debtor lied under oath by not disclosing, among any other entities that discovery may find: (1) ARC Realty, LLC; (2) Seguro Medico, LLC; (3) Benefits Now, LLC; and (4) QuickHealth Care, which may be a fictitious name for Seguro Medico, LLC. Additionally, for the entities that were disclosed, Debtor refused to provide their business addresses.

As shown in Exhibit K, Ethan Shalter was an employee of Seguro Medico, LLC ("Seguro") and was interviewed and directly hired by Debtor, the latter holding himself out as "President" of Seguro. As shown in Part II, Debtor was regularly violating Pennsylvania insurance laws and regulations through Seguro, including, but not limited to, the fact that Debtor operated Seguro under the name of another person, "Arthur W. Walsh, Jr." Seguro operated from the office building at 8 Morgan Drive, Reading, PA 19608, which is owned by ARC Realty, LLC, and Mr. Shalter had observed Attorney Valz visit the office building and perform work there during normal business hours, thereby showing Attorney Valz's knowledge of Debtor's falsity. Mr. Shalter

further demonstrates that Debtor has repeated the same behavior and is operating, under the name

of other persons, the businesses called "Benefits Now" and "QuickHealth Care."

Mr. Shalter's testimony is corroborated by additional evidence. The Court may judicially

notice that Attorney Norman M. Valz represents the plaintiff in <u>Seguro Medico, LLC dba Quick</u>

<u>Health v. Suffolk Administrative Services, LLC et al.</u>, C.A. No. 5:23-CV-02495, in the U.S.

District Court for the Eastern District of Pennsylvania. On March 27, 2023, a Michigan limited

liability company, Benefits Now, LLC, registered with the Pennsylvania Department of State,

being File No. 3614919 and having a registered address of 8 Morgan Drive, Sinking Spring, PA

19608—the same property owned by ARC Realty, LLC. As shown in Exhibit AA, there is a

functional website, https://benefitsnow.us/our-story

It contains the following script:

> We were founded on the idea of the American dream, where our founder, Arthur
> Walsh, opened the first center in Pennsylvania in December of 2019.
>
> He recognized the insurance crisis with the lack of coverage and the ever-increasing
> premiums. By using a brokerage, we force price competition between carriers and
> cause a competitive decrease in premiums—enabling us to get you the best
> insurance for less.

[Exhibit AA]. In the 2024 Annual Statement for Benefits Now, LLC, filed with the Michigan

Secretary of State, the "Authorized Agent" is Norman M. Valz. [Exhibit BB]. On January 12,

2023, Norman Valz filed a Certificate of Assumed Name on behalf of Benefits Now, LLC, for the

business name, "Dentame." [Exhibit CC].

By filing a Certificate of Assumed Name, Attorney Valz is actively aiding and abetting

Redmond's continued violation of Pennsylvania's Insurance Department Act of 1921 by

conducting licensed activities in Pennsylvania under the name of another person and without a

license from the Department of Insurance. 40 <u>P.S.</u> §§ 310.1 (definition of "insurance producer")

and 310.3(a).

From the NBOA bankruptcy proceeding at Case No. 19-15488-PMM, Debtor is currently litigating whether the automatic stay was violated or not,[2] despite the fact that the Court lifted the automatic stay as applied to Debtor individually. Debtor, in other words, wants the benefit of NBOA's automatic stay for himself but without having to file a bankruptcy petition. Instantly relevant, however, is that Debtor represented to this Court in the NBOA case that he (the Debtor) is paying attorneys' fees on behalf of NBOA. The Court may judicially notice that Debtor represented the following to the Court on June 27, 2024, "Mr. Valz's payment arrangements are that he is paid a flat rate on a bi-weekly basis for thirty hours of billable work, which amounts to an hourly rate of $183.33." [Exhibit Z; see also, ECF No. 201 ¶ 19, at 3, Case No. 19-15488-PMM for all exhibits with the Certification]. At a flat-fee, payable on a biweekly schedule, we believe and therefore aver that Attorney Valz is an employee of Seguro and of other entities controlled by Debtor, and is therefore a material witness in the instant case.

On May 10, 2024, Debtor filed Supplemental Answers to the Interrogatories. [Exhibit J]. He did not cure any of the above-noted deficiencies. In particular, he still did not disclose the sources of his income. [See id., No. 13-14 at 5]. He didn't add Seguro Medico, LLC, or any other business entity, to the list of entities that he owned, had managerial rights, or exercised control. [See id., No. 22, at 11]. Where it has been judicially determined in Common Pleas that Debtor lives an extravagant lifestyle with extravagant spending, Debtor asserted in his answers to

---

[2] Through a ministerial error, the Berks County Prothonotary inadvertently entered judgment in the Jordan Case against Debtor *and NBOA*. NBOA, however, remained stealthily silent and never moved to correct the judgment. Even though Jordan did not cause the error, he nevertheless filed a motion to correct the judgment on June 17, 2024 and NBOA (again, through Attorney Valz) filed an opposition [Exhibit B (entry for July 9, 2024)] while frivolously complaining to this Court and demanding that *Debtor's judgment* be vacated. The matter is assigned to Judge Mayer, fully briefed by the parties to that case, and is awaiting a decision.

Interrogatories that he owned a 2017 Cadillac Escalade. [Exhibit I at 13; Exhibit J at 15]. As shown in the Ethan Shalter Affidavit, however, Debtor is regularly seen driving to his workplace in a Mercedes-Benz. [Exhibit K ¶ 8]. Debtor therefore lied under oath as to that as well.

Instantly relevant, however, Debtor disclosed for the first time, "Mr. Redmond does not own a bank account." [Exhibit J, No. 15, at 6]. However, Debtor submitted a Personal Financial Statement ("PFS") to Jordan, representing that he has $2,432.17 "Cash in Bank" and $2,400.00 "Cash on hand." [Exhibit O at 1, 3]. In the same PFS, Debtor made no disclosures concerning the Alan Redmond Foundation or the $2,800,000.00 real property in his wife's name at 2 High Road, Wyomissing. [See id. at 3]. The Court may also find: (1) Debtor represented himself as having a Negative Net Worth of "$-6,703,613.56," i.e., his aggregate debt to other persons; (2) Debtor asserts he has no "Salary," but manages to receive an annual income of $64,000 in "Commissions/Bonuses" and $50,000.00 in "Real Estate Income." [Id. at 2].

On December 8, 2023, in the Bene Market, LLC Litigation, Common Pleas declined to grant Jordan's special request to appoint a temporary receiver over Bene Market, LLC during the pendency of the litigation. [Exhibit L]. In the Jordan Case, Jordan filed a motion to compel full and complete answers to interrogatories on May 8, 2024 and, as of now, Common Pleas has provided any relief. [See Exhibit B]. The inability of Common Pleas to act promptly is, inadvertently, giving Redmond the opportunity to circumvent State judicial process.

Jordan also filed a motion for a charging order as applied to ARC Realty, LLC, Bene Market, LLC, and Redmond Group Investments, LLC. In response to ARC Realty, Debtor answered that he "possesses no individual interest in ARC Realty, LLC," because it "is has been (sic) held with his wife as 'Tenants in the Entirety.'" [Exhibit M ¶ 1]. That, however, does not excuse Debtor's failure to truthfully answer interrogatories and disclose the existence of the asset,

because Jordan has a right whether to proceed under the Pennsylvania Uniform Voidable Transactions Act, 12 Pa.C.S. § 5105 et seq.

Having defeated Jordan's effort for a temporary receiver over Bene Market, LLC, Debtor now freely admitted, "Bene Market is not presently an operational company." [Exhibit N ¶ 3]. Despite disclosing Redmond Group, LLC as one of his entities (without providing any address or means of serving process), Debtor asserted he has no interest in "Redmond Group Investments, LLC." [Id. ¶ 14]. We therefore believe, and aver, that Debtor has repeated his same behavior of transferring assets from one company into a new company. As further shown in the Ethan Shalter Affidavit, during his employment with Seguro Medico, LLC, Shalter used equipment and proprietary software that belonged to Bene Market, LLC.

**C.    Common Pleas Enters Judgment in Favor of Cornerstone Law Firm, LLC after Finding that Debtor Pervasively Refused to Truthfully Testify by Deposition Regarding His Personal Assets and Wealth.**

Debtor has been sanctioned and judicially determined in Common Pleas to knowingly refuse to give truthful answers under oath regarding his assets and personal wealth while hiding behind the shadow of his hired "professionals." Because Jordan was seeking punitive damages against Debtor in the Jordan Case, Common Pleas granted a request and compelled Debtor to submit to a deposition regarding his assets and wealth. On August 28, 2019, Debtor appeared for a deposition without his tax returns, and apparently had temporary amnesia on his own personal income and assets:

Q. How about [your earnings from NBOA for] 2016?

A. Not exactly sure. It's three and a half years ago.

Q. What would you need to look at to know?

A. I would need to contact my accountant. * * *

[Exhibit P, at 52:9-13 (alterations added)].

Q. What is your total annual income for the year 2018?

A. I'll have to check with my accountant. I'm not sure.

[Id. at 85:4-7].

Q. What was your monthly income for July, 2019?

A. Unsure. I'll need to check with my accountant.

[Id. at 87:8-11]. Redmond claimed he didn't know if he had ownership in any other businesses without checking with his accountant:

Q. What business or professional or joint venture are you an owner of or own any interest in?

A. I'll need to check that for you. I'm not sure.

Q. You don't know of any businesses that you own any—

A. NBOA and Bene Market.

Q. Do you know of any other businesses?

A. I'll need to check with my accountant.

[Id. at 83:16-25].

Common Pleas compelled Debtor to appear for another deposition as a result of his pervasive refusal to answer questions in the deposition, as shown above. After Debtor refused to appear, Common Pleas entered sanctions against him, inter alia, that he pay $10,484.50 to Jordan's counsel, Cornerstone Law Firm, LLC, within five business days. [Exhibit Q, Order ¶ 6]. After Debtor refused to do that, Common Pleas directed the Prothonotary to enter judgment against Debtor, and in favor of Cornerstone Law Firm, for that amount and the Prothonotary entered judgment on November 22, 2021. [Exhibit R].

**II.    Debtor is Dissipating Assets and Actively Violating Insurance Laws and Regulations, with the Assistance of Attorney Norman Valz, by Doing Business under the Name of Another Person and Hiring Unlicensed Employees.**

Debtor has a long-standing history of violating insurance laws and is now repeating that behavior. In 2018, NBOA, while under the control of Debtor, was repeatedly adjudicated by government regulators for hiring unlicensed employees who sell insurance policies under the name of another person. On June 8, 2018, the Nebraska Department of Insurance revoked the license of Robert M. Bell for such conduct while in the employ of NBOA. [Exhibit T]. On March 13, 2018, the South Dakota Department of Labor and Regulation revoked NBOA's insurance license. [Exhibit U]. On August 19, 2016, the Pennsylvania Insurance Commissioner issued findings of fact regarding NBOA employee, Isaiah J. Thomas:

> Respondent, ***at the direction of management and staff at National Brokers of America***, made false statements and misrepresentations to prospective policyholders and engaged in other dishonest acts to include misrepresenting he was employed by the National Enrollment Center rather than National Brokers of America; would search every database in the country to provide the best rates; and embellished the qualifications of himself and co-workers in order to generate sales for National Brokers of America.
>
> * * *
>
> Respondent told investigators he voluntarily terminated his employment with National Brokers of America because he was uncomfortable with sales practices, to include false statements and misrepresentations being made to prospective policyholders by employees of National Brokers of America which were systemic and resulted in harm to consumers.

[Exhibit V ¶ 3(d), (g) (emphasis added)]. The "management" of NBOA was Debtor, himself.

Attached to this Emergency Motion is an Affidavit by Ethan Shalter, in Exhibit K. Such Affidavit provides further details than what is summarized here and he is available to testify if the Court holds an evidentiary hearing. From April through mid-July of 2024, Mr. Shalter was hired by Debtor to work for Seguro Medico, LLC ("Seguro"). Shalter's job title was Manager for the Reporting Department. In the Spanish language, "Seguro Medico" means *medical insurance*. From

his interaction with other employees at Seguro, Shalter discovered that the company was regularly selling health and dental insurance using unlicensed employees. "In fact, I observed the Seguro Vice President falsely state his name while answering phone calls to sell or resell insurance policies to purchasers." [Exhibit K ¶ 13]. Shalter observed that Debtor, himself, is not licensed but held himself out as "President" of Seguro and exercised control over the business. Debtor, in particular, hired and fired employees and provided direct training and instruction on selling, soliciting, and negotiating insurance contracts. Shalter also observed Debtor engage in writing and rewriting insurance products. These unlicensed activities are contrary to the statute of 40 P.S. §§ 310.1 (definition of "insurance producer") and 310.3(a). [Exhibit K ¶ 6].

Shalter also received his paychecks, periodically, under the signature of a man named "Arthur W. Walsh, Jr." [Exhibit K ¶¶ 9-10]. Debtor approached Shalter and asked him to transfer his employment to a new company, Benefits Now, LLC, which involved a pay cut. Shalter learned that Debtor is operating Benefits Now, and another company called QuickHealth Care, under the name of other persons, such as Arthur W. Walsh, Jr. [Id.]. There are no insurance licenses of any kind for Arthur W. Walsh, Jr., in Pennsylvania.

The Court may judicially notice its own docket that Attorney Heim, George Bochetto, Esquire, and the firm of Bochetto & Lentz represent Debtor, personally, as an intervenor in the NBOA bankruptcy petition, Case No. 19-15488-PMM (ECF Nos. 189 and 190). Despite submitting a Personal Financial Statement, claiming he was too poor to pay Jordan's civil judgment, Debtor manages to have assets to pay Attorney George Bochetto $825 an hour. The Court may judicially notice this fact from its own docket, based on Debtor's Certification, at Case No. 19-15488-PMM, ECF No. 201 (Exhibit C), being an invoice from Bochetto & Lentz.

In addition to insurance laws and regulations, Debtor is actively violating Pennsylvania's

Wage Payment and Collection Law, 43 P.S. § 260.1, et seq. Shalter had a contract to be paid $25.00 an hour, and Debtor regularly gave him less than that amount without any explanation. Shalter's Affidavit also establishes that Debtor is regularly violating the Law relative to overtime pay compensation. As shown below, this also is not the first time Debtor has engaged in such conduct. We believe, and therefore aver, that Debtor is dissipating assets by exposing the Debtor's Estate to serious civil sanctions if Debtor is permitted to remain in possession.

**III.     Debtor is Regularly Failing to Pay Taxes.**

On June 17, 2024, the Pennsylvania Department of Revenue submitted a Certified Lien against Alan Christopher Redmond and Shannon Kroemmelbein for $49,303.67 in unpaid personal taxes, at Docket No. 24-11072 in the Berks County Court of Common Pleas. [Exhibit S]. On March 16, 2022, the U.S. Internal Revenue Service filed a Notice of Federal Tax Lien against Alan Christopher Redmond and Bene Market, LLC for $332,388.45, at Docket No. 22-33 in the Berks County Court of Common Pleas. [Exhibit S].

**IV.     Judicial Process has No Deterrence for Debtor and He Has a Material Risk of Transferring Assets outside the United States.**

By his answers to Interrogatories, Debtor admits that he has dual-citizenship with the United Kingdom and refused to provide any information regarding his passports. [Exhibit J, Nos. 2-3, at 2]. In the Jordan Case, Common Pleas found that Debtor owns businesses in Ireland, where he grew up, and had misappropriated NBOA funds by wiring moneys to his mother overseas. [Exhibit A, Findings of Fact ¶¶ 57-58, 67]. Debtor, therefore, has misappropriated millions of dollars and possesses the means and motive to flee the United States to avoid judicial process. As further shown below, Debtor presents a serious risk of flight if emergent relief is not granted.

Debtor is a party to multiple actions and proceedings which the Court may judicially notice. The complaints (without any exhibits) are hereby attached as Exhibits V through Y.

In the U.S. District Court for the Eastern District of Pennsylvania, at C.A. No. 5:20-CV-4265, the U.S. Secretary of Labor has brought an action against Debtor, NBOA, and Bene Market, LLC for repeated violations of the Fair Labor Standards Act on behalf of 318 former employees. The U.S. Secretary of Labor alleges that Debtor regularly violated minimum wage and overtime pay requirements. [Exhibit V].

In the Philadelphia County Court of Common Pleas, at C.A. No. 220202794, Complete Business Solutions Group, Inc. ("CBSG") filed suit against Debtor, personally. CBSG alleges that it issued over $35.2 million in aggregate loans to Bene Market, LLC and NBOA, which Debtor personally guaranteed, and the same are in default. [Exhibit W]. On August 19, 2024, and under the representation of Attorney David Heim of Bochetto & Lentz, Debtor filed an Amended Joinder Complaint, raising a veil-piercing claim against Bene Market, LLC and claiming that Jason Scott Jordan should pay Debtor's debts. [Exhibit DD, Count II at 8-9].

In the Berks County Court of Common Pleas, at C.A. No. 23-13390, a plaintiff, WBL SPO II, LLC (an assignee for World Business Lender), has filed a mortgage foreclosure action against the only real estate Debtor owns in his real name, at 2005 Regency Drive, Wyomissing, PA 19610. Seguro Medico, LLC was the mortgagor on the Business Promissory Note and Security Agreement, attached to the Complaint, and that it was personally guaranteed by Debtor and Debtor's Wife. The mortgage is in default and the plaintiff alleges that it is owed $401,257.52. [Exhibit X].[3]

In the U.S. District Court for the Middle District of Pennsylvania, at C.A. No. 1:23-CV-02081-JPW, American Workers Insurance Services, Inc. ("AWIS"), filed suit against Debtor, Bene Market, LLC, and Stephanie Miller. AWIS alleges that it is an insurance and marketing entity

---

[3] The exhibits to that Complaint exceed 80 pages but can be submitted to the Court upon request.

and, in 2018, had an agency contract with Bene Market, LLC and paid advances on commission.

AWIS alleges:

> Less than a year after the execution of the Agent Contract, AWIS began to receive notices from state and federal regulatory agencies of complaints made by customers who purchased Plans from Bene Market. Furthermore, AWIS was also made aware that Bene Market agents were apparently selling products on AWIS's behalf from an entity not approved by AWIS. Due to risks running afoul with state and federal regulations on account of these customer complaints, AWIS terminated the Agent Contract by letter dated August 2, 2019.

[Exhibit Y, Am. Compl. ¶ 15]. Then Bene Market, LLC, under Debtor's management and direction, allegedly contacted all of AWIS' customers and resold them new plans with a different entity. AWIS has raised claims under the Pennsylvania Voidable Transfer Act for the monies and assets that were diverted from Bene Market, LLC to Debtor, personally.

Based on the foregoing, we believe and aver that Debtor cannot be permitted to remain in possession of the Estate during the pendency of this case. The Court should further order Debtor to surrender his passport to the Clerk of Court, and direct for Debtor to be added to the U.S. Department of State's Passport Lockout Program as provided in the Argument Section.

## ARGUMENT

### I.    Emergency, *Ex Parte* Relief until a Hearing is Held.

#### A.    The Merits.

Under Bankruptcy Rule 1018, contested involuntary petitions are treated as the equivalent of an adversary proceeding and governed by Part VII of the Federal Rules of Bankruptcy Procedure as well as the Federal Rules of Civil Procedure. Fed. R. Bankr. P. 1018. Accordingly, temporary restraining orders and preliminary injunctions may be requested under Civil Rule 65. *In re* Rukavina, 227 B.R. 234, 239-40 (Bankr. S.D.N.Y. 1998); Fed. R. Bankr. P. 7001. Ordinarily, the Debtor has 21 days after service to file any defenses or objections to the Involuntary Petition, Fed. R. Bankr. P. 1011(b), which is more than enough time for the Debtor to transfer, hide, or dissipate

assets of the estate to the irrevocable harm to creditors. Because Petitioners satisfy the criteria under Civil Rule 65, particularly a likelihood of irrevocable harm and a likelihood of success on the merits of obtaining an order for relief, the remedies under the Code provisions, as well as the Court's equity powers under 11 U.S.C. § 105(a), are available during the gap period to prevent the dissipation of assets and ameliorate any other harms until a Bankruptcy Trustee is appointed under ordinary Code procedures.

"Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a temporary restraining order ('TRO') or preliminary injunction." MCS Indus v. At Home Stores, LLC, 2022 U.S. Dist. LEXIS 161874, at *2 (E.D. Pa. Sept. 8, 2022) (citation omitted). A party seeking such relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in favor of granting rather than refusing preliminary relief, and (4) an injunction is in the public interest. Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id. at 24 (quotation omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id. (quotation omitted).

Based on the Grounds, viewed in their entirety, all elements are met here. Debtor is failing to pay income taxes. Debtor is hiring unlicensed employees and is operating businesses under the name of other persons, contrary to the Insurance Department Act of 1921. 40 P.S. §§ 310.1 (definition of "insurance producer") and 310.3(a). For violations of the Act, insurance entities may cancel agency agreements and refuse to pay commissions, damaging the book of business and Debtor's ability to repay his debts, and injunctive relief by the Insurance Commissioner can

disqualify the businesses from engaging in the sale of insurance, which many courts regard as the "corporate death penalty." See, e.g., Jake & Ella's v. Dep't of Business Regulation, 2002 R.I. Super. LEXIS 56, at *19. The Insurance Commissioner may also assess a civil penalty of $5,000 for each and every violation. 40 P.S. § 310.901(d). Debtor is incompetent to manage these businesses in that he lacks licensure under Pennsylvania law to be engaged in the insurance business, and has violated and is continuing to violate insurance laws and regulations and directing employees to do the same. Debtor is not deterred even when he lost the South Dakota insurance license for the National Brokers of America, Inc. (NBOA). Debtor is intentionally and repeatedly violating Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1, et seq., exposing the assets of the estate to serious civil penalties, as well as class action lawsuits. The fact that he is being sued by the U.S. Department of Labor for violations of the Fair Labor Standards Act does not appear to be any deterrent for Debtor. Debtor is repeatedly lying under oath, with the assistance of Attorney Norman Valz, and fraudulently concealing his assets from creditors. Debtor opens and closes businesses, and transfers assets from one to another for no substantial consideration, regularly to avoid judicial process. Debtor has, literally, misappropriated millions of dollars, has dual-citizenship and a passport, and the means, motive, and opportunity to reduce assets to cash and transfer the same outside of our country at a moment's notice.

The foregoing establish a likelihood of irreparable injury in the absence of emergency relief. One "does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impeding, that is enough." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quotation omitted).

Petitioners have a likelihood of success on obtaining an order for relief on our Involuntary Chapter 11 Petition under 11 U.S.C. § 303. In particular, the Court must determine a likelihood

"whether the petitioning creditors have standing and whether the putative debtor is not paying its debts as they become due." *In re* VitaminSpice, 472 B.R. 282, 289 (Bankr. E.D. Pa. 2012) (citing 11 U.S.C. § 303(b) & (h)(1)). Under 11 U.S.C. § 303(b), the following are required for standing: (1) noncontingent, undisputed claims must aggregate at least $18,600[4] or more; and (2) the Petition is filed by at least one creditor having such claim (if the Debtor has fewer than 12 creditors with qualified claims) or, alternatively, at least three creditors join the Petition if their claims are noncontingent and not the subject of "a bona fide dispute as to liability or amount."

Here, all the foregoing elements are met. Debtor has fewer than 12 creditors having a qualified "claim" within the meaning of 11 U.S.C. § 303(b)(1) and Petitioner Jason Scott Jordan meets the statutory criteria. His claim is noncontingent and undisputed, where reduced to civil judgment, for $13,105,197.20. That exceeds the statutory threshold of $18,600. Furthermore, this Court expressly held that the pendency of an appeal from the judgment does not defeat the creditor's standing unless there is a stay pending appeal. *In re* Raymark Indus., Inc., 99 B.R. 298, 300 (Bankr. E.D. Pa. 1989). Here, Redmond has filed a petition for allocatur with the Supreme Court of Pennsylvania but did not obtain any stay pending appeal. The Superior Court had lifted the stay after it affirmed the judgment. [Exhibit EE].

For purposes of determining whether the Debtor has fewer than 12 creditors with qualified claims, the Code provision requires the exclusion of "any employee or insider" of the Debtor "and any transferee or a transfer that is voidable" under the Code. 11 U.S.C. § 303(b)(2). The Code further excludes any claim where the Debtor has "a bona fide dispute as to liability or amount." Id. § 303(b)(1). Congress "intended to disqualify a creditor whenever there is any legitimate basis

---

[4] Adjusted under the Consumer Price Index by the Judicial Conference of the United States, *in* Notice, 87 FED. REG. 6625 (Feb. 4, 2022).

for the debtor not paying the debt, whether that basis is factual or legal." <u>Riverview Trenton R.R.</u>
<u>v. DSC, Ltd. (<i>In re</i> DSC, Ltd.)</u>, 486 F.3d 940, 945 (6th Cir. 2007). While the Grounds Section
referenced many suits in which Debtor is a party, in each of those cases the Debtor filed an answer
to the complaint, denying liability, the amount, or both. Debtor is therefore judicially estopped
from relying on those claims in order to establish that he exceeds 12 creditors. To show judicial
estoppel, "there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3)
a showing that estoppel addresses the harm and no lesser sanction is sufficient." <u>G-I Holdings, Inc.</u>
<u>v. Reliance Ins. Co.</u>, 586 F.3d 247, 262 (3d Cir. 2009) (internal quotations omitted). Unless the
Debtor would like to now make judicial admissions as to liability and amount in those cases —
and retract his answer in those cases so judgments may issue — he is estopped.

In the alternative, if the Debtor would hypothetically aver the existence of more than 12
creditors with qualified claims and comply with Bankruptcy Rule 1003(b) by fully and completely
disclosing all creditors, then the Petition still meets the requirements of 11 <u>U.S.C.</u> § 303(b) because
joined by three creditors. Petitioner, Cornerstone Law Firm, LLC, has a noncontingent, undisputed
claim for $10,484.50 reduced to civil judgment. Petitioner, Ethan Shalter, has a claim under
Pennsylvania's Wage Payment and Collection Law, 43 <u>P.S.</u> § 260.1, <u>et seq.</u> Under that statute, an
"employer" includes "every person . . . employing any person in the Commonwealth," and "any
agent or officer" thereof. <u>Id.</u> § 260.2a. As such, "corporate officers are personally liable for unpaid
wages" and claimants may "hold the Debtor personally liable," and bankruptcy courts allow such
claims. <u><i>In re</i> Konidaris</u>, 87 B.R. 846, 853 (Bankr. E.D. Pa. 1988).

None of the Petitioners have been paid by Debtor, and Debtor's attorneys have represented,
through the Personal Financial Statement shown in Part I.B of the Grounds, that Debtor is insolvent
and unable to pay the civil judgment in favor of Jason Scott Jordan. Based on the foregoing, the

commencement of this involuntary, Chapter 11 proceeding is proper under 11 U.S.C. § 303 and Petitioners have a likelihood of success on the merits of trial.

The equities favor the grant of preliminary relief. Jason Scott Jordan, in particular, was the victim of Debtor's tortious misappropriation of assets while in a fiduciary capacity, and for nearly 10 years has been unable to obtain any payment by Debtor for the resulting loss.

The public interest is furthered, rather than hindered, in the grant of emergency relief, particularly where the remedies are seeking to prevent Debtor from violating substantive law in the operation of his businesses, particularly the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq.

**B.      Certification for TRO without Notice.**

Temporary restraining orders (TROs) may issue without notice to the adverse party if (A) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and (B) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). Conversely, if notice is given to the adverse party, then a preliminary injunction may issue. Fed. R. Civ. P. 65(a)(1).

Consistent with Civil Rule 65(b)(1), this Motion is supported by the affidavit of Ethan Shalter. Undersigned counsel certifies the following: With this Motion, Petitioners have filed a Motion to Seal the Record with this Court. After the Court renders a decision, the Court may unseal the record on the application of the Interim Trustee that the Court's emergency order had been carried out and there is no longer any need for the Seal Order. Sealing the record, and emergency ex parte relief without notice, are absolutely essential given that Debtor and his cohorts will continue to take measures to hide their golden eggs before a Bankruptcy Trustee can be appointed under ordinary Code provisions. An emergency exists whether Debtor will immediately begin

transferring or hiding assets, move the same outside of the country, use third persons to assist him in any of the forgoing, or any combination thereof. Accordingly, a TRO should immediately issue without any notice to the Debtor or his counsel and the Court should set the matter "for hearing at the earliest possible time, taking precedence over all other matters . . ." Fed. R. Civ. P. 65(b)(3).

### C.  Remedies as to the Debtor, Alan Christopher Redmond.

#### 1.  Order the U.S. Trustee to Immediately Appoint an Interim Trustee and Examiner, and Impose Provisional Controls over Cash and Certain Other Transactions.

Here, Debtor is engaged in the insurance industry, as well as real estate investments, both involve the payment of commissions (by insurance entities) and rents (by tenants in real estate leases). By answers to interrogatories in aid of execution in the Jordan Case, Debtor maintains he's insolvent but does not own any bank accounts, indicating that Debtor is paying himself in cash in order to avoid any records of the source of such income. Where Debtor is pervasively hiding his assets and refusing to disclose the sources of his income even where under oath, we humbly ask the Court for emergency relief. Additionally, any delay in obtaining relief may enable Debtor to continue to defraud other persons.

For contested involuntary petitions, the Debtor in possession may continue to operate any business and use, acquire, or dispose of property unless "the court orders otherwise." 11 U.S.C. § 303(f). Likewise, a trustee, once appointed, may operate the Debtor's business unless the court orders otherwise. Id. § 1108. In the case of _In re_ Bishop, Baldwin, Rewald, Dillingham & Wong, Inc., 779 F.2d 471, 474-75 (9th Cir. 1985), the Bankruptcy Court appointed an interim trustee the same day the Involuntary Petition was filed. Id. at 473 (same day filing at August 4, 1983). In that case, the facts showed "that the Debtor's business constituted a 'Ponzi scheme' in which earlier investors were being paid off with new investors' funds," which was an emergency that warranted the bankruptcy court, the same day the Involuntary Petition was filed, to exercise its Section 303(f)

of the Code to appoint an interim trustee. Id. at 473-74. Courts construe Section 303(f) of the Code as an independent basis for the appointment of an emergency, interim trustee, if the Court can tailor the interim trustee's directives to minimize disruption to the operations of the Debtor's businesses. 9 COLLIER ON BANKRUPTCY ¶ 1013.02 (16th ed., 2024 cum. supp.).

While some bankruptcy courts appoint the interim trustee directly, we believe the Code, where construed as a whole, is better understood to mean the Court may compel the U.S. Trustee to immediately appoint the interim trustee until a full hearing is held and a subsequent meeting of creditors to elect the trustee and examiner. Petitioners are likely to succeed on the merits of 11 U.S.C. § 1104 for the appointment of a Chapter 11 trustee and examiner. That provision allows such appointments (1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by the current management, either before or after the commencement of the case, or similar cause," and (2) "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate," 11 U.S.C. § 1104(a).[5] We're likely to meet that standard on the same grounds stated in Subpart A, supra. Also, Debtor is failing to pay taxes, which this Court recognized is a form of gross mismanagement, warranting the appointment of a trustee. In re Sullivan, 108 B.R. 555, 556 (Bankr. E.D. Pa. 1989). Debtor is hiring unlicensed employees and is operating the business under the name of another person. Debtor is incompetent in that he lacks licensure under Pennsylvania law to be engaged in the insurance business, and has violated and is continuing to violate insurance laws and regulations and directing employees to do the same. Debtor is intentionally and repeatedly violating Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1, et seq., exposing the assets

---

[5] Then, within 30 days, the U.S. Trustee convenes a meeting of creditors to elect "one disinterested person" to serve as the trustee. 11 U.S.C. § 1104(b)(1). As stated, 30 days is more than enough time for this Debtor to dissipate assets in the absence of emergent relief.

of the estate to serious civil penalties. Debtor is lying under oath and fraudulently concealing his assets from creditors.

Once an order for relief is entered, bankruptcy courts have recognized that they are authorized by Section 102 to dispense with a hearing under 11 U.S.C. § 1104, if necessitated by the circumstances of the case, and direct the U.S. Trustee to proceed with a hearing of creditors for the election of a trustee. *In re* Cloudeeva, Inc., 2014 Bankr. LEXIS 4771, at *16-25 (Bankr. D. N.J. Nov. 18, 2014) (trustee appointed sua sponte). Notice "is flexible and depends, in part, on the egregiousness of the cause motivating the appointment." Id. at *18 (citation omitted). On this authority, the Court may order Debtor to promptly disclose a list of his creditors and provide for notice to be given and advance a hearing under 11 U.S.C. § 1104 to co-occur with the hearing on the merits of the Involuntary Petition under Bankruptcy Rule 1013(a). That list of creditors is necessary for the U.S. Trustee to hold a meeting to elect a trustee.  As an attorney for the U.S. Trustee Program observes:

> Oftentimes, the debtor does not willingly comply and the case languishes. Without at least the list of creditors, the meeting of creditors cannot be noticed and no trustee election held.

Richard C. Friedman, Handling Involuntary Bankruptcies: Top Twenty Tips for Petitioners, Judges, Alleged Debtors, Assignees, Secured Creditors and Trustees at 3 (n.d.). Until that meeting of creditors has occurred, the interim trustee would remain in place.

Under 11 U.S.C. § 303(f), the Court also has authority to directly order the Debtor in the conduct of his businesses. In the case of *In re* Plaza de Diego Shopping Center, Inc., 911 F.2d 820 (1st Cir. 1990), it was held the bankruptcy courts have authority to grant "provisional remedies" in emergency cases, such as directing all tenants to deposit their rents into a designated Chapter 11 account, prohibiting the payment of rent in cash (rather than by check or direct wire), and

prohibiting the Debtor from paying any debts in cash. *In re* Plaza de Diego Shopping Center, Inc., 911 F.2d at 832 n.19. Courts can impose "interim controls on the debtor to prevent further deterioration of the debtor's estate until a trustee or an examiner could be appointed." Id. at 832.

The foregoing authorities give more than enough guidance on directives the Court can task the interim trustee with rolling out to minimize any risk of disrupting the Debtor's businesses while preventing fraud and dissipation of assets. Accordingly, we humbly ask the following emergent relief:

(1)    Order the U.S. Trustee to immediately appoint an interim Chapter 11 trustee and examiner. A conflict of interest exists with the Bankruptcy Trustee in the case of *In re* National Brokers of America, No. 19-15488-PMM, by reason of having negotiated and approved settlements with Redmond and Bene Market, LLC in that proceeding, and therefore Mr. Robert H. Holber should not be appointed.

(2)    Order the Debtor to immediately disclose on the docket, within seven days, a full and complete list of all creditors, together with their addresses, so that notice can be effected on such creditors under 11 U.S.C. § 1104 and schedule a hearing under that statute to co-occur with the Rule 1013(a) hearing.

(3)    Give limiting directives to the interim trustee as follows:

(a)    Cause the Debtor to immediately close all pre-petition bank accounts, including business bank accounts, and open new "debtor in possession" bank accounts and deposit all money of the estate in the same and adopt any necessary controls, in the judgment of the interim trustee, to prevent fraud or dissipation of such property and in the conduct of Debtor's businesses and personal expenses, regardless of whether Debtor is characterized as an owner, officer, employee, or consultant.

(b)    Hire a qualified person who is licensed under appliable insurance laws and regulations to bring Debtor's businesses in compliance with the same.

(c)    Hire a qualified person to bring Debtor's businesses into compliance with Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1, et seq. and Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 et seq. ("UTPCPL").

(d)    Consult with independent counsel and redetermine, in good faith, Debtor's employment, or whether Debtor's employment responsibilities can be reassigned, or both, to avoid any entanglements with insurance laws and regulations and Pennsylvania's Wage Payment and Collection Law and the UTPCPL.

(e)    Immediately begin investigation, with the interim examiner, whether relief under 11 U.S.C. §§ 541 to 562, including avoidance and fraudulent transfer claims, needs to be commenced.

(f)    Immediately begin investigation, with the interim examiner, whether the Debtor is running his personal expenses through any of his businesses.

(g)    Give a copy of the Court's order to any person that pays Debtor any income, regardless of amount, including Arthur W. Walsh, Jr., Jesus Barrios, Alan Redmond Charitable Foundation, National Brokers of America, Inc., Bene Market, LLC, ARC Realty, Inc., the Leads House, Seguro Medico, LLC, The Redmond Group, LLC, Redmond Marking, LLC, Redmond Group Investments, LLC, Benefits Now, and QuickHealth Care.

(4)    Order the Debtor to cooperate with the interim trustee and interim examiner to the same as if they had been appointed under 11 U.S.C. § 1104, and to abide by 11 U.S.C. §§ 521, 1107, and any other provision of the Code applicable to a debtor-in-possession, and to immediately disclose true and correct copies of his federal income tax returns from the past six years to the interim

trustee and interim examiner.

(5)    Prohibit Debtor from accepting any income in cash, regardless of how that income is characterized by Debtor or his counsel, and that all such income be directly deposited into the designated Chapter 11 debtor-in-possession account.

(6)    Without obtaining written leave from the interim trustee and having made full disclosure of all material facts, prohibit Debtor from paying in cash any expenses or debts of his businesses or any personal debts of himself or of any other person.

(7)    Without obtaining written leave from the interim trustee and having made full disclosure of all material facts, prohibit Debtor from, directly or indirectly through third persons, engaging in any transfer outside of the ordinary course of business of the estate or of any businesses in which he has an ownership interest, managerial authority, or control or formed a partnership. The "ordinary course of business" should be given the same meaning as judicially construed in 11 U.S.C. § 363(b).

(8)    Without obtaining written leave from the interim trustee and having made full disclosure of all material facts, prohibit Debtor from, directly or indirectly through third persons (including Arthur W. Walsh, Jr. and Jesus Barrios), engaging in any transfer of property relating to Alan Redmond Charitable Foundation, Bene Market, LLC, ARC Realty, Inc., The Leads House, Seguro Medico, LLC, The Redmond Group, LLC, Redmond Marking, LLC, Redmond Group Investments, LLC, Benefits Now, and QuickHealth Care.

> **2.    Order Debtor and Interim Trustee to Obtain Court Approval before Engaging Counsel for the Debtor or for Any of His Businesses.**

Under the Code provisions of 11 <u>U.S.C.</u> §§ 327(a) (court approval needed for trustee to hire attorneys), 541(a) ("The commencement of a case . . . creates an estate."), 1107(a) (debtor is subject to same duties as trustee), bankruptcy courts, as well as the U.S. Trustee Program, have

taken the position that persons are automatically a "debtor in possession" upon the filing of the

Involuntary Petition against them, and, like the trustee, cannot hire their own counsel without Court

approval — even during the "gap" period between the filing of the petition and the trial under Rule

1013(a). Rushton v. Woodbury & Kesler, P.C. (In re C. W. Mining Co.), 440 B.R. 878, 885-87

(Bankr. D. Utah 2010) (involuntary chapter 11). Any contrary view "would allow debtors in

possession to employ attorneys who may not be disinterested or may represent an interest adverse

to the estate and pay their fees without any court oversight or approval." Id. at 887. This risk is

even worse in for involuntary cases:

> In an involuntary chapter 11 case, the debtor in possession has little or no interest
> in being in bankruptcy and may have little incentive to act openly and candidly with
> a court and parties in interest. The court and parties in interest in an involuntary
> case have a great interest in seeing that debtors in possession fulfill their fiduciary
> duties. Due to the lack of alignment of incentives, a court must ensure compliance
> by all parties with the Bankruptcy Code.

Id. Court approval under Section 327 is also intended "to deprive accountants and attorneys of the

leverage that they have . . . to receive payment in full ahead of other creditors when the information

they have is necessary to the administration of the estate." In re Lewis C. Bowers & Sons, Inc.,

1990 U.S. Dist. LEXIS 4808, at *13 (D. N.J. Apr. 18, 1990).

These difficulties are even more acute in the instant case, where Debtor constantly hires

numerous attorneys for the same matter and pays exorbitant rates of $825 an hour, while claiming

to be insolvent. Additionally, Debtor should be precluded from hiring counsel, such as Norman

Valz, who has a demonstrated history of helping him commit perjury and avoid judicial process.

At the same time, it's readily apparent that Debtor requires the services of a disinterested attorney

in this case. Judicial supervision on this item is essential and Petitioners will be irreparably harmed

if Debtor engages counsel that is not disinterested and continues to enable Debtor, in the same

manner as did Norman Valz, in concealing assets and avoiding process. The Court should

immediately order Debtor and the interim trustee to seek the Court's approval, on notice to the

parties, before engaging a disinterested attorney for the Debtor in the instant case, and to direct the

interim trustee to promptly assist the Debtor, should Debtor deem it advisable for his interests, to

obtain such counsel and request such approval.

> ### 3.    Order Debtor to Surrender His Passport to the Clerk of Court and Submit a Qualified Directive to the U.S. Department of State to Place Debtor in the Passport Lockout Database.

As shown in the Grounds Section, Debtor has dual citizenship and a passport, as well as a

history of transferring assets outside the United States. Where he has misappropriated millions of

dollars, he has the means, motive, and opportunity to reduce assets to cash and transport the same

outside of the United States. Petitioners will be irreparable harmed without emergent relief in the

nature of ordering Debtor to surrender his passport to the clerk until he has complied with full

disclosure of all schedules, financial statements and other documents required to be submitted and

complied with all examinations under the meeting of creditors, 11 U.S.C. §§ 341(a), 343, and all

Rule 2004 examinations.

Because the Court's equity powers under 11 U.S.C. § 105(a) include everything necessary

to prevent dissipation of assets, it also embraces a limited power to order the debtor to surrender

his passport to the Clerk of Court for a time certain. The Seventh Circuit upheld a court order that

a bankruptcy debtor had to surrender his passport to the clerk until he fully and truthfully identified

all his assets in the bankruptcy proceeding. The Seventh Circuit reasoned, "Just as a litigant held

in civil contempt has the keys in his own pocket—for he will be released as soon as he

cooperates—so [debtor] can get his passport back whenever he pleases. All he needs to do is

complete the examination, fully disclosing all of his assets." Herbstein v. Bruetman, 241 F.3d 586,

589 (7th Cir. 2001). Generally, federal courts have recognized in similar, nonbankruptcy contexts

that the power to order a litigant to temporarily surrender their passport is within the same

"authority to enter a wide variety of orders to ensure that usable assets are located, seized, and—where appropriate—applied to the judgment," being "necessary to protect the court's ability to enforce the underlying order and prevent the loss of assets." <u>Bank of America, N.A. v. Veluchamy</u>, 643 F.3d 185, 189 (7th Cir. 2011). Where "the party subject to the order demonstrates a risk of flight," then "[i]n that limited circumstance, a concomitant order exercising some minimal control (in the form of a passport seizure) is permissible." <u>Id.</u> at 189. The facts of this case are equally compelling and within the Court's equity powers.

We further request the Court to send a qualified directive to the U.S. Department of State, in accordance with their instructions to the judiciary, for the Debtor to be placed in the passport lockout database. The U.S. Department of State, Office of Adjudication, voluntarily cooperates with all State and federal courts which enter an order for a litigant to surrender their passport during the pendency of a case, whether on the grounds of material risk of flight, unlawful movement of children or property, or child support arrears. The Department requires Debtor's Social Security Number, date of birth, place of birth, and U.S. passport number, which the Court may compel him to disclose to the Clerk of Court. The Department provides instructions, with a sample letter for the Court, on its website:

https://travel.state.gov/content/travel/en/passports/legal-matters/family-law.html

### 4.    Immediately Begin the Clock for Debtor to Prepare Schedules, Financial Statements, and Other Documents Required by Law.

Ordinarily, after the Court holds trial and enters an order for relief under Rule 1013(a), the Debtor has seven days to file a list containing the name and address of each entity included or to be included on Schedules D, E/F/, G, and H as prescribed by Official Forms. Fed. R. Bankr. P. 1007(a)(2). And, after the order for relief under Rule 1013(a), the Debtor ordinarily has 14 days to file all other schedules, financial statements, and other documents required by law under

Bankruptcy Rule 1007. See Fed. R. Bankr. P. 1007(c). The Code does not fix the time for the

Debtor to submit this information, thereby permitting this Court under Bankruptcy Rule 1001 to

modify or dispense with the normal time periods under the rules of court if necessary "to secure

the just, speedy, and inexpensive determination of every case and proceeding." 9 COLLIER ON

BANKRUPTCY ¶ 1001.01[1] (16th ed., 2024 cum. supp.) (Rule 1001 has been cited by courts "as a

basis for flexibility in scheduling and disposing of matters without unnecessary formalities.").

Here, because Petitioners have a likelihood of success on the merits of the Involuntary

Petition and will suffer irreparable harm if the Debtor were to transfer, hide, or dissipate assets

during the gap period, the Debtor will likely have to provide such information anyway. Debtor was

already improperly concealing such information and lying under oath in the Jordan Case in his

answers to interrogatories in aid of execution. Because Jason Jordan, as a judgment creditor, was

already entitled to discover Debtor's assets under State law, Pa. R.C.P. 3117, Debtor is not harmed

by having to disclose similar information on the official forms of this Court and prior to the order

for relief. Therefore, the Court may immediately enter an order to the Debtor, providing that the

clock under Bankruptcy Rule 1007 begins immediately as of the Court's order. This will obligate

the Debtor to begin assembling his financial information and opens the door for the Court's

contempt power if, without legal excuse, Debtor repeats his history of noncompliance.

    **D.**    **Remedies as to the Nondebtor Parties.**

It is well-accepted under 11 U.S.C. § 105 that third-party injunctions can be sought to

"enjoin the distribution of assets by a third party when those assets may be subject to avoiding

powers actions or other recovery. Upon demonstrating the factors traditionally used for an

injunction, including specifically irreparable harm and a likelihood of success on the merits,

section 105 can be used to enjoin temporarily the transfer of the asset until a full termination can

be made." 2 COLLIER ON BANKRUPTCY ¶ 105.04[5][a] (16th ed., 2024 cum. supp.). Similarly, once

actual notice is given, Civil Rule 65 restraining orders or preliminary injunctions also bind the

Debtor's officers, agents, servants, employees, and attorneys, and "other persons who are in active

concert or participation" with any of the foregoing persons. Fed. R. Civ. P. 65(d)(2).

## 1. Employers.

To reinforce the effectiveness of the remedies in Subpart C, above, we humbly ask the

Court for similar provisional controls against any employer of Debtor, regardless of whether

Debtor is characterized as an employee or independent contactor:

(1)    Order all persons in which Debtor has an ownership interest, exercise managerial authority,

or has control over, or formed a partnership with, to cooperate with the interim trustee until further

order of the Court, including Alan Redmond Charitable Foundation, National Brokers of America,

Inc., Bene Market, LLC, ARC Realty, Inc., the Leads House, Seguro Medico, LLC, The Redmond

Group, LLC, Redmond Marking, LLC, Redmond Group Investments, LLC, Benefits Now, and

QuickHealth Care.

(2)    Order that any person that receives notice of the Court's Order and makes any payment of

money to Debtor is prohibited from paying him in cash and from paying in cash to any member of

his family or any person acting on his behalf.

## 2. All Officers, Agents, Servants, Employees, and Attorneys.

The Court should order all officers, agents, servants, employees, and attorneys of Debtor,

who receive notice of the Court's order, to refrain from the following:

(1)    Knowingly aiding or assisting the Debtor, directly or indirectly, in violating the Court's

Order.

(2)    Knowingly aiding or assisting the Debtor in operating any business under the name of

another person, including Arthur W. Walsh, Jr.

(3)    Knowingly aiding or assisting the Debtor in operating any business which violates

minimum wage and overtime payment laws and regulations, State or federal.

(4)    Knowingly aiding or assisting the Debtor in licensed activities under the Insurance Department Act of 1921 without first obtaining an applicable license.

### 3.    Shannon Kroemmelbein and Alan Redmond Charitable Foundation.

Petitioners will suffer irreparable harm if Debtor's Wife, Shannon Kroemmelbein, is able to transfer a $2,800,000.00 asset before an adversary proceeding is adjudicated, namely, the real property situated at 2 High Road, Wyomissing, PA 19610. Similarly, Petitioners will suffer irreparable harm if the Alan Redmond Foundation continues to give away assets before an adversary proceeding is adjudicated. The Court should restrain such transfers until further order of court. Therefore:

(1)    Without obtaining written leave from the interim trustee and having made full disclosure of all material facts, prohibit Shannon Kroemmelbein from transferring, or further encumbering, the real property situated at 2 High Road, Wyomissing, PA 19610, and from directly or indirectly assisting the Debtor in violating the Court's Order, until further order of court.

(2)    Without obtaining written leave from the interim trustee and having made full disclosure of all material facts, prohibit the Alan Redmond Charitable Foundation from transferring any assets, until further order of court.

### 4.    Attorney Norman Valz and Records Subject to Turnover.

As shown in the Grounds Section, Attorney Norman Valz has serious liability in this case, where employed in Debtor's business and where his services were used to aid and abet the Debtor's continued violations of the Pennsylvania Insurance Department Act and to help Debtor transfer assets to avoid creditors. That includes the creation of the Alan Redmond Charitable Foundation. Under Pa.R.P.C. 1.2(d), a lawyer may not assist a client in avoiding payment to a creditor in violation of the Uniform Voidable Transactions Act, 12 Pa.C.S. § 5101(a). Kruse v. Repp, 543 F.

Supp. 3d 654, 692 (S.D. Iowa 2021) (discussing Professional Conduct Rule 1.2(d)). In that context,

the attorney-client privilege is properly overridden under the crime-fraud exception: "[W]hen a

client uses the prepetition services of an attorney to hide assets from creditors," then "that attorney

may testify about the hidden assets because the crime-fraud exception to the privilege applies."

Levin v. DeLoreto (In re DiLoreto), 2002 Bankr. LEXIS 2049, at *42 (Bankr. E.D. Pa. May 3,

2002) (discussing United States v. Ballard, 779 F.2d 287, 292-93 (5th Cir. 1986)), see also, In re

Investigating Grand Jury, 593 A.2d 402, 406-07 (Pa. 1991); United States v. Richard Roe, Inc. (In

re Richard Roe, Inc.), 68 F.3d 38, 40 (2d Cir. 1995). Therefore, "the crime-fraud exception to the

privilege may arise in a bankruptcy case." Levin, 2002 Bankr. LEXIS 2049, at *42. "The

admissibility of the evidence does not turn on the lawyer's complicity in the wrongful transaction."

Id. at *42-43 (quotation omitted). Thus, "The crime-fraud exception is applicable even when the

client alone is guilty." In re Investigating Grand Jury, 593 A.2d 402, 407 (Pa. 1991).

Here, Petitioners intend to subpoena Valz in order to testify at the preliminary injunction

hearing that the Court may schedule under Civil Rule 65. Valz is a member of the Bar of this

Court. We ask the Court to override the attorney-client privilege as to Valz. Additionally, the

trustee, once appointed, may need to seek relief against Valz under several Code provisions,

including Valz's duty to turn over records, including the client file, for the trustee's investigation

under 11 U.S.C. § 542(e) as to the extent that Debtor has hidden or transferred assets or is

conducting his businesses in violation of civil law licensure requirements. Any destruction of these

records during the gap period, at the direction of Debtor or any other person, would work

irrevocable harm to Petitioners and other creditors. The same harm applies to all of Debtor's

current and former counsel—and the Court's TRO would simply give the trustee time to

investigate.

Therefore, we ask the TRO to:

(1)    Order Norman M. Valz, Esquire, to appear at the Court's preliminary injunction hearing.

(2)    Order Norman M. Valz, Esquire, to preserve, until further order of court and to the extent of his possession or control, Debtor's client file and any other records, including financial records, of the Debtor and any entity in which the Debtor has an ownership interest, managerial authority, or control or formed a partnership, regardless of whether title is under the name of another person.

(3)    Order all current or former counsel of the Debtor, who receive notice of the Court's order and until further order of court and to the extent of their possession or control, to preserve Debtor's client file and any other records, including financial records, of the Debtor and any entity in which the Debtor has an ownership interest, managerial authority, or control or formed a partnership, regardless of whether title is under the name of another person.

### E.    No Bond is Required by Law.

Under Fed. R. Bank. P. 7065, Petitioners are exempt from the bonding requirement under Civil Rule 65(c). See Fed. R. Bankr. P. 1018 (Part VII of the Rules of Bankruptcy Procedure apply to contested involuntary petitions). Even if that was not so, when the balance of equities favors the injunction claimant, "a district court has the discretion to waive the Rule 65(c) bond requirement." Elliott v. Kiesewetter, 98 F.3d 47, 60 (3rd Cir. 1996).

### F.    Reasons for the TRO.

Under Civil Rule 65(d), the Court's order must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Petitioners have submitted a proposed order which meets these requirements.

## II.    Scheduling of Evidentiary Hearing on the Preliminary Injunction.

If the Court grants a TRO, it may not exceed 14 days unless the Court, "for good cause,

extends it for a like period or the adverse party consents to a longer extension." Fed. R. Civ. P. 65(b)(2). Similarly, if a TRO issues without notice, then a hearing must be set "at the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character." Fed. R. Civ. P. 65(b)(3). Petitioners humbly request that the Court hold a hearing within 14 days of granting the TRO, compelling the Debtor to attend and affording the Debtor an opportunity to be heard, and then enter a Preliminary Injunction, continuing the special relief in Part I until the Court holds a trial on the merits until Bankruptcy Rule 1013 whether an order for relief should be entered, and enters an order for relief and until the U.S. Trustee can hold a creditors' meeting to elect a trustee and examiner under 11 U.S.C. § 1104(b).

**III. Direct Debtor to Answer the Involuntary Petition prior to the Preliminary Injunction Hearing, and Advance a Full Hearing on the Merits at the Earliest Practicable Time under Rule 1013(a) and Fix a Short Deadline for Joinder at or before Such Hearing.**

Bankruptcy Rule 1011 "calls for simplified litigation procedure consistent with expedition." Liberty Tool v. Vortex Fishing Sys. (*In re* Vortex Fishing Sys.), 277 F.3d 1057, 1071 (9th Cir. BAP 2001). Only "[t]he debtor named in an involuntary petition may contest the petition." Fed. R. Bankr. P. 1011(a). "It is well-established that a creditor, in contrast, does not have standing to contest an involuntary bankruptcy filing." *In re* QDN, LLC, 363 F. App'x 873, 875-76 (3d Cir. 2010). Ordinarily, (1) the Debtor has 21 days after service to file any defenses or objections to the Involuntary Petition, Fed. R. Bankr. P. 1011(b), and (2) Bankruptcy Rule 1003(b) obligates the Court to give reasonable notice to other creditors if they should desire to join the involuntary petition prior to holding a hearing on the merits. But in both instances the Court is mandated to hold a hearing on a contested petition "at the earliest practicable time," and Fed. R. Bankr. P. 1013(a) and is authorized under Rule 1001 to modify or dispense with procedural rules of court if necessary "to secure the just, speedy, and inexpensive determination of every case and proceeding." 9 COLLIER ON BANKRUPTCY ¶ 1001.01[1] (16th ed., 2024 cum. supp.) (Rule 1001

has been cited by courts "as a basis for flexibility in scheduling and disposing of matters without

unnecessary formalities."). As courts and well-respect treatises observe:

> In effect, Federal Rule of Bankruptcy Procedure 1013(a) recognizes that the
> interests of both the debtor and the creditors are best served by prompt resolution
> of the issues raised by an involuntary bankruptcy petition. If the debtor contests the
> petition, the petition and delay represent a substantial interference with the debtor's
> operations and will likely adversely affect the debtor's reputation in the trade.

9 COLLIER ON BANKRUPTCY, *supra*, ¶ 1013.02.

In Liberty Tool, it was held that limiting or dispensing with joinder under Rule 1003(b) is

not affected by the provision in 11 U.S.C. § 303(c), because the purpose of the latter is "to moot a

defense of insufficiency in the number of petitioners" if an involuntary petition is filed by "fewer

than three petitioners," Liberty Tool, 227 F.3d at 1071. But where, as here, three or more creditors

file the involuntary petition, the bankruptcy courts retain "judicial discretion [on] the question of

how much opportunity to afford other creditors to exercise" the joinder right, or to dispense with

the same, which "is measured in the context of the Rule 1013(a) mandate that the court resolve the

merits of the involuntary petition 'at the earliest practicable time.'" Id.

Here, where Petitioners have a likelihood of success on the merits of the involuntary

petition and given the emergency to prevent dissipation of assets which would harm all creditors

(not simply the Petitioners), the earliest practicable time of holding the hearing under Rule 1013(a)

predominates over the discretionary provisions of Rules 1011(b) and 1003(b). The Court can fix a

short deadline for joinder to coincide at or before the full hearing under Rule 1013(a), and the

Court can schedule such hearing after the Debtor complies with disclosure of the list of creditors

so notice can be effected.

Additionally, the Court retains the power to shorten the time for Debtor to file an answer

or responsive motion to be less than 21 days under Rule 1011(b). Where Civil Rule 65 requires

the Court to hold a hearing on the preliminary injunction within 14 days of the TRO, unless extended for good cause, the Court may either for good cause, extend the TRO for 21 days until Debtor files an answer or responsive motion under Rule 1011(b) or, alternatively, shorten the Debtor's time to file an answer or responsive motion in order to occur before the hearing on the preliminary injunction. Petitioners, as well as the Court, are entitled to know Debtor's position and contentions, if any, in regards to the Involuntary Petition prior to such hearing. Because Petitioners have a likelihood of success on the merits, the Debtor is not prejudiced if the Court shortens the 21-day period for response under Bankruptcy Rule 1011(b).

**CONCLUSION**

**WHEREFORE**, based on the foregoing, the Plaintiff's Motion should be granted and the Court enter the within Special Relief and Temporary Restraining Order, which is incorporated by reference, and, in conformity with Fed. R. Bank. P. 7065 and Fed. R. Civ. P. 65, hold an evidentiary hearing, compel the Debtor to attend and afford the Debtor an opportunity to be heard, and then grant a preliminary injunction and such other relief as the Court deems necessary, just or appropriate.

Respectfully submitted,

**CORNERSTONE LAW FIRM, LLC**

Dated: September 9, 2024     By:     /s/ Joel A. Ready
                                     Joel A. Ready, Esquire
                                     PA Attorney I.D. # 321966
                                     8500 Allentown Pike, Suite 3
                                     Blandon, PA 19510
                                     (610) 926-7875