# Exhibit A

# Exhibit A

UNITED STATES BANKRUPTCY COURT
IN THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                        )   Bankruptcy No.:
                              )   24-13093-PMM
ALAN CHRISTOPHER REDMOND      )
                              )
                              )
                              )
                              )   Reading PA
                              )   September 18, 2024
                              )   10:02 a.m.

TRANSCRIPT OF MOTION TO DISMISS HEARING
BEFORE THE HONORABLE PATRICIA M. MAYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:          NICOLE M. NIGRELLI, ESQUIRE
                         CIARDI, CIARDI & ASTIN
                         1905 Spruce Street
                         Philadelphia, PA  19103

For Tonya Hatmaker:      DAVID P. HEIM, ESQUIRE
                         BOCHETTO & LENTZ, P.C.
                         1524 Locust Street
                         Philadelphia, PA  19102

For Cornerstone:         JOEL READY, ESQUIRE
                         BENJAMIN J. LEWIS, ESQUIRE
                         CORNERSTONE LAW FIRM, LLC
                         8500 Allentown Pike # 3
                         Blandon, PA  19510

Audio Operator:          KEITH BORZILLO

Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, NJ 08026
                         Office: (856) 435-7172
                         Fax:    (856) 435-7124
                         Email:  dianadoman@comcast.net

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

---

3

I N D E X

| EXHIBITS | IDENT | EVID |
|---|---|---|
| PD-1  Paycor pay stub Re: Ethan Shalter | | 151 |
| PD-2  Affidavit of Tonya Hatmaker | | 151 |
| PD-3  Verification of Debtor w/ creditor list | | 151 |
| PD-4  Amended Verification of Debtor w/ creditor list | | 151 |
| PD-5  Affidavit of Ethan Shalter | | 151 |
| PD-6  Chapter 11 Involuntary Petition | | 151 |
| PC-1  Debtor's Objections/Answers to Interrogatories | | 161 |
| PC-2  Supplement to Debtor's Objections/Answers | | 161 |
| PC-3  Personal financial statement | | 161 |

---

2

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For Debtor | | | | |
| Ethan Shalter | 6 | 26 | 30 | 31 |
| Tonya Hatmaker | 34(Nig) | 43 | | 53 |
| | 52(Hei) | | | |
| Alan C. Redmond | 61 | 72 | 118 | 127 |
| For Cornerstone | | | | |
| Jason Jordan | 138 | 139 | | |
| Ethan Shalter | 140 | 142 | | |

| ARGUMENTS | PAGE |
|---|---|
| By Ms. Nigrelli | 162 |
| By Mr. Heim | 171 |
| By Mr. Ready | 172 |

| RULING BY THE COURT | PAGE |
|---|---|
| By Judge Mayer | 178 |

---

Colloquy                                                    4

(The following was heard in open court at 10:02 a.m.)

COURTROOM DEPUTY:  All rise.  The United States Bankruptcy Court in and for the Eastern District of Pennsylvania is now in session, the Honorable Patricia M. Mayer presiding.

THE COURT:  Good morning.

ALL COUNSEL:  Good morning, Your Honor.

COURTROOM DEPUTY:  You may be seated.  I'll call matter number two, Alan Christopher Redmond, expedited motion to dismiss case, failure to name the statutory requirements and a bad faith filing.

THE COURT:  Okay.  Let's get everybody's appearances.  Ms. Nigrelli?

MS. NIGRELLI:  Good morning, Your Honor, Nicole Nigrelli, Ciardi, Ciardi and Astin, for the putative debtor, Alan Christopher Redmond.

THE COURT:  Okay.

MR. READY:  Good morning, Your Honor, Joel Ready, and with me, Ben Lewis, both from Cornerstone Law Firm for Jason Jordan, Cornerstone Law Firm and Ethan Shalter.

THE COURT:  Okay.  So, Ms. Nigrelli, it is your motion -- oh, I'm sorry, Mr. Heim, you're here.

MR. HEIM:  I apologize, Judge.

THE COURT:  You're here, okay.

Colloquy 5

MR. HEIM: Just for the third-party witness, who is in the witness room, Ms. Hatmaker.

THE COURT: Got it, okay. Well, I will allow you to move forward.

MS. NIGRELLI: Your Honor, just as a preliminary matter, if acceptable, I'm just going to give a very brief opening statement and then call my first witness?

THE COURT: That's fine.

MS. NIGRELLI: Good morning, Your Honor. As you're aware, we're here today on a very simple threshold question, and that is whether or not the petitioning creditors have met the statutory requirements of Section 303 and the numerosity requirements that are set forth in that Section. Since there is a bonafide dispute as to one of the petitioning creditors as to the liability regarding Ethan Shalter's alleged claim against Alan Christopher Redmond.

While the putative debtor has also alleged in this motion to dismiss a bad faith basis for the filing, we are not intending on going forward with that, as we discussed at our status hearing yesterday. We are only here to discuss the jurisdictional issue at this case, which, again, goes to the simple threshold question, did they meet the statutory requirements.

And, Your Honor, with that, I would call to the stand, Ethan Shalter, which is one of the petitioning

Shalter - Direct 6

creditors.

THE COURT: Okay. Mr. Shalter?

ETHAN SHALTER, DEBTOR'S WITNESS, SWORN

COURTROOM DEPUTY: State your name and spell your whole name for the record.

THE WITNESS: Ethan Shalter, E-T-H-A-N, S-H-A-L-T-E-R.

THE COURT: Okay. You can have a seat.

THE WITNESS: Thank you.

MS. NIGRELLI: Your Honor, is it acceptable if I question from here?

THE COURT: Yes, that's fine.

DIRECT EXAMINATION

BY MS. NIGRELLI:

Q   Good morning, Mr. Shalter.

A   Good morning.

Q   My name is Nicole Nigrelli. As you hear me say to the Court, I am the -- excuse me -- the attorney for the alleged debtor, Alan Christopher Redmond. I'm just going to ask you a few questions about some of the filings, do you understand that?

A   Yes.

Q   And is there any reason why the testimony you are going to give today will not be truthful?

A   No.

Shalter - Direct 7

Q   So, Mr. Shalter, are you familiar with the involuntary petition that you filed against Alan Christopher Redmond?

A   Yes.

Q   And how did you become familiar with that document?

A   Which? The document that I filed?

Q   Correct, the involuntary petition. Your Honor, may I put this --

THE COURT: Yes.

BY MS. NIGRELLI:

Q   Does this document --

MS. NIGRELLI: Your Honor, may I?

THE COURT: Yes. Oh, he has a screen.

MS. NIGRELLI: Oh.

THE WITNESS: Oh, mine is blank, I'm sorry.

THE COURT: Oh, yours is blank? Well, that can't be good.

MS. NIGRELLI: I saw him looking over.

THE COURT: Oh, okay.

THE WITNESS: There we go.

THE COURT: Okay. You can see now? You can see it now?

THE WITNESS: Yes.

THE COURT: Okay.

BY MS. NIGRELLI:

Q   Do you recognize this document?

Shalter - Direct 8

A   Correct. This is the one I filed in Cornerstone.

Q   And is this your signature here?

A   Correct.

Q   And you signed that involuntary petition, correct?

A   Yes.

Q   And you signed that voluntary petition under the penalty of perjury, that the information contained in there was true and correct to the best of your information, knowledge and belief, correct?

A   Yes.

Q   Do you know what it means to sign under the penalty of perjury?

A   It means I could be held at fault?

Q   Right. And you understand that any false statement, under oath, is a crime, correct?

A   Correct.

Q   And you understand that when you signed this, there is an actual statement in there that says, "A false statement can lead up to $250,000 or five years of imprisonment or both," is that correct, right up here?

A   Yes.

Q   Do you understand that you're under oath today?

A   Yes.

Q   And did you authorize the filing of this involuntary petition against Mr. Redmond?

Shalter - Direct                    9

A    Yes.

Q    And you stated, under oath, that you were an undisputed creditor, is that correct?

A    I don't understand that terminology.

Q    What did you understand you were signing when you filed this petition?

A    A petition against Redmond for the amount that I was owed.

Q    And you believed that you were owed money from Mr. Redmond directly, is that correct?

A    From Quick Health, which he owns, yes.

Q    So, from a company?  You believed you were owed money from a company, is that correct?

A    With Alan Redmond, correct.

Q    Did you -- you would agree that you were employed by Seguro Medico, LLC, correct?

MR. READY:  I'm going to object, Your Honor, to agreed.  It's not clear.  Does she mean employed under the (inaudible) of collection law or in some other definition?

THE COURT:  Do you want to clarify?

MS. NIGRELLI:  Sure.

BY MS. NIGRELLI:

Q    By whom were you employed?

A    What do you mean by that question?  I'm sorry.

Q    Where did you go to work every day?

---

Shalter - Direct                    10

A    Quick Health.

Q    And what was the address of Quick Health?

A    8 Morgan Drive.

Q    And Quick Health, is that a company?

A    Correct.

Q    It is?

A    I believe so.

Q    Did Quick Health sign your paycheck?

A    No.

Q    Did Quick Health issue your paycheck?

A    No.

Q    Did Quick Health give you your W-2?

A    No.

Q    Okay.  Who were your paychecks drawn from?

A    What do you mean by drawn from?  I'm sorry.

Q    Did Seguro Medico pay you every week when you got paid?

A    Yes.

Q    So, you would agree if they're paying you, they're not paying you gratuitously, correct?

A    I don't understand the word gratuitously.

Q    You would agree that if you're getting paid by a company, you must have been doing a job?

A    Yes.

Q    Okay.  And what is the address listed on there for Seguro Medico, LLC?

---

Shalter - Direct                    11

A    8 Morgan Drive.

Q    Is that the place you went to work every day?

A    Yes.

Q    And you never received a check from Alan Redmond, did you?

A    No, not directly.

MS. NIGRELLI:  Your Honor, I'd strike the rest of his answer as non-responsive.

MR. READY:  I don't think it's non-responsive.  He qualified his answer.  He said, not directly.

THE COURT:  I'm going to strike it.

BY MS. NIGRELLI:

Q    You never were provided a W-2 from Alan Redmond, were you?

A    No.

Q    When was the last day you were employed by Seguro Medico, LLC, do you recall?

A    July 25th.

Q    After July 25th, did you make a demand on Seguro for any money or amounts that were due and owing from the company to you?

A    I had brought it up prior.

Q    That wasn't my question.  Did you make a demand for any amount due and owing after you were fired from Seguro Medico?

A    No.

---

Shalter - Direct                    12

Q    You never asked them for any money, did you?

A    No.

Q    You didn't make any demand on Alan Redmond, either, did you, after you were fired from Seguro Medico?

A    What do you mean make a demand on Alan Redmond?

Q    Did you ask Alan Redmond -- did you tell Alan Redmond that he owed you money in connection with Seguro Medico?

A    I was not allowed back in the building.

Q    So, you never wrote him, emailed him, telephoned him that there was any amount due and owing, is that correct?

A    Correct.

Q    So, this was solely a belief that you were owed money, that was only in your head, is that correct?  No one else knew it?

A    No, that is not correct.

Q    It's not?  Who else knew that you had this belief that someone owed you money?

A    Tonya Hatmaker, Zeus Marrero, Arthur, Alan.  I had brought it up to him prior.

Q    After July 25th, you just testified that you never brought it up to anyone that you were owed money.

A    I had zero access to any of them.

Q    So, just to clarify, again, after July 25th, you never told anyone that you were owed money, is that correct?

A    Just my attorney.

Shalter - Direct                                13

Q   So, you had no confirmation from Redmond saying, oh, yeah, I owe you money; I'm liable to you, is that correct?

A   I'm sorry, can you repeat that?

Q   So, if you never told Alan Redmond that he owed you money, he couldn't have agreed, is that correct?  He never agreed that he owed you money?

A   Correct.

Q   And you knew that if you sued Alan Redmond, he would defend any claim that he owed you money, is that correct?

        MR. READY:  I object, it calls for speculation.

        THE COURT:  Sustained.

BY MS. NIGRELLI:

Q   Did you believe that Alan Redmond would ever agree that he owed you any money based on your interaction with him?

        MR. READY:  Same objection, Your Honor.

        THE COURT:  Sustained.

BY MS. NIGRELLI:

Q   So, Mr. Shalter, I'm going to take you back to the pains and penalties of perjury.  When you signed this involuntary petition, you alleged that Alan Christopher Redmond owed you a debt.  Do you still believe that after your testimony that you just gave today?

A   Yes.

Q   You believe that Alan Christopher Redmond owes you a debt even though you never told him about any money owed, and

Shalter - Direct                                14

that you were employed by another company?

A   Yes.

Q   And you're testifying to that under oath?

A   Yes.

Q   And are you familiar that you signed an affidavit with your involuntary filing, as well, in relation to another motion with the court?

A   An affidavit?

Q   Do you recall filing an affidavit?

A   With my attorneys?

Q   No, with the Court.

A   I'm not sure.  Can I see what one may look like?.

Q   Sure, but in a second.  Did someone approach you about filing this involuntary petition?

A   No.

Q   So, how did the involuntary petition come up?  Did you just go to Cornerstone Law Group and ask them to represent you?

A   No.  When I was handed a piece of paper on a pay reduction, I was on the phone with my attorney, and I was given no chance whatsoever to even read this piece of paper, because I was going over it with my attorney, and as I was on the phone with my attorney, I was terminated right there on the spot, on the phone with my attorney.

Q   Did you hand this piece of paper over to your attorney?

Shalter - Direct                                15

A   Yes.

Q   And is this piece of paper that you're referring to the relief that Seguro Medico had given to you on your last day?

A   The paper I originally handed the first time was the pay reduction, without warrant, which already had taken place.

Q   And did you inform your attorneys to start an action against Seguro Medico?

A   Yes.

Q   You did?

A   Yeah.  I asked them if there was anything we could do about this.

Q   And how did your attorneys -- strike that.  Did -- do you recall having an exit interview?

A   No, I did not.

Q   Did -- how did you receive your last paycheck?

A   I was handed it.

Q   By whom?

A   Tonya Hatmaker.

Q   And, at that time, you did not have any exit interview with her?

A   I did not.

Q   And you didn't sign any papers?

A   I did not.

Q   And I'm showing you -- did you ask your attorneys to start suit against Seguro Medico based on your belief that

Shalter - Direct                                16

there was something that could be done about your reduction in pay?

A   No.  I asked them before I signed it, if this was right, that this could be done, if he could reduce my pay.  I was asking them a question.

Q   And do you have a retainer with your attorney?

        MR. READY:  I'm going to object, Your Honor.

        MS. NIGRELLI:  A retainer?

        THE COURT:  Relevance.

        MS. NIGRELLI:  I don't understand how this involuntary was filed, how -- if they're getting paid, if there's any other ulterior motive, because Cornerstone Law Group is also an involuntary petitioning creditor.  So, there is some belief right now that maybe this is fortuitous.

        THE COURT:  Okay.  I'll allow it.

        MR. READY:  Your Honor, I'm just going to object on the basis of privilege.

        THE COURT:  Well, I think that the existence or non-existence of a retainer doesn't necessarily infringe on privilege.  The existence of a retainer, you're saying is privileged?

        MR. READY:  Yes.

        THE COURT:  Why?

        MR. READY:  I think a discussion with pay structure with the client is privileged.  We don't have to disclose

Shalter - Direct                    17

that.

THE COURT:  Well, I'm not sure she is asking what the retainer says.  I think she is asking if there is a retainer, if there is a relationship, based on a retainer.

MR. READY:  I see, Your Honor.  If the question is just whether there is a representation agreement with him, I have no objection.

THE COURT:  Okay.  I think that is what the question is, is it not?

MS. NIGRELLI:  And I want to know -- that's the first question.

THE COURT:  Okay.  Well, I'll let you ask the first question.  Go ahead.

THE WITNESS:  Is there a retainer?

BY MS. NIGRELLI:

Q   Yes.

A   Does that mean, I'm paying them?

Q   Yes.

MR. READY:  I'm going to object, Your Honor.

THE COURT:  The question that is currently being asked is whether or not you have an employment contract with your attorney, meaning you hired your attorney to represent you?

THE WITNESS:  I believe so.

THE COURT:  Okay.

---

Shalter - Direct                    18

THE WITNESS:  I'm not really -- I don't really fully understand the question.

BY MS. NIGRELLI:

Q   Did you sign any paper that said that they represent you?

A   Yes.

Q   Okay.

THE COURT:  Okay.

BY MS. NIGRELLI:

Q   And, in connection with it -- you don't need to look at them.  You can look at me.

A   I am.

Q   In connection with that, did you -- I'm not asking you what you paid -- but did you pay any money --

MR. READY:  I'm going to object, Your Honor.

BY MS. NIGRELLI:

Q   -- or promise to pay any money for their services?

MR. READY:  I'm just going to object, Your Honor.

MS. NIGRELLI:  That is not protected by any attorney/client privilege.

MR. READY:  Certainly, it is, and what our pay structure --

MS. NIGRELLI:  Whether or not services are being provided for free or for a dollar amount is not protected by attorney/client privilege.  I'm not asking the amount.  I'm

---

Shalter - Direct                    19

asking whether or not he paid --

THE COURT:  She's not asking the structure.

MS. NIGRELLI:  Correct.

THE COURT:  She's asking if there is a pro bono representation or a paid representation.

MR. READY:  I maintain our objection.

THE COURT:  I'm going to allow it, on that limited basis.

THE WITNESS:  I'm sorry, but I fully don't understand the question.

THE COURT:  Is your attorney representing you for free or is your attorney representing you to get paid?

THE WITNESS:  I mean, everybody gets paid.

THE COURT:  Okay, well, that's the question.  Is the relationship and the contract for employment between you and your attorney is not one in which he is representing you for free?

THE WITNESS:  Yeah, no, not for free.

THE COURT:  Okay.

BY MS. NIGRELLI:

Q   Okay.  So, you did agree to pay them for their services in connection with this involuntary petition?

A   I believe so, yes.

Q   Okay.  And have you -- are they representing you in any other matter?

---

Shalter - Direct                    20

A   Currently, at the moment, no.

Q   Okay.  Have you received any bills from your attorney?

MR. READY:  I'm just going to object, Your Honor, again, relevance and privilege.

MS. NIGRELLI:  I just want to understand if he's regularly being invoiced for services they're providing, that's all.

MR. READY:  Your Honor --

THE COURT:  I'm not going to allow that.

MS. NIGRELLI:  Okay.

BY MS. NIGRELLI:

Q   So, let's go to your affidavit you had asked -- so, you don't recall whether or not you signed an affidavit, is that correct?

A   Correct.

Q   Does this document look familiar to you?  I mean, I'm just going to show you -- it's several pages long.

A   Correct.

Q   Did you draft this affidavit?

A   What do you mean by draft?  Did I write it?

Q   Did you write it?

A   No.

Q   Who wrote this affidavit?

A   My attorney.

Q   Okay.  Before signing it, did you realize you were

Shalter - Direct                    21

signing it under the pains and penalties of perjury?

A   Yes.

Q   Okay.  Did you understand everything that was contained in this affidavit?

A   For the most part.

Q   So, that means, some of it you didn't understand?

A   Correct.  There's some verbiage in there I don't understand.

Q   Okay.  And even though there was verbiage you didn't understand, you were okay with signing it under the pains and penalties of perjury, is that correct?

A   Yes.  I have full trust in my attorneys.

Q   Sort of like when you signed an involuntary petition saying that you were an undisputed creditor of Alan Christopher Redmond, is that correct?

A   Wait.  I'm sorry, say that again?

Q   Withdrawn.  Do you know Jason Scott Jordan?

A   No.

Q   Have you ever met him before?

A   No.

Q   Did he approach you about signing the involuntary petition?

A   No, I have no idea who he is.

Q   How did you determine who the other two petitioning creditors were going to be on this?

Shalter - Direct                    22

A   I didn't ask.

Q   Oh.  So, who was the one that actually brought up filing the involuntary to you, then?

MR. READY:  I'm going to object, Your Honor, to the degree this is calling for attorney/client privileged communications.

MS. NIGRELLI:  Well, you can't be an attorney and also -- there is a Rule here.  Cornerstone is a petitioning creditor.  I am entitled to discover whether or not -- that is not protected.

MR. READY:  Your Honor, he testified earlier that his course of conduct, after bringing this issue to his attorney's attention was led by his attorneys advising him what to file.  He's already testified to that.  To the degree, we're now seeking conversations between him and his attorney, that is privileged.

MS. NIGRELLI:  I'm not asking for conversations, Your Honor.

THE COURT:  I do think that the testimony, so far, has been surrounding the conversation that he had with his attorney when he got the pay reduction.  I don't think we've had testimony that talked about specifically the filing of the petition, and so, with parameters, I think, being quite careful about what you are asking him, I will allow the generalized question with regard to how the involuntary came

Shalter - Direct                    23

to be with respect to his participation in it, but understanding that I don't want specific questions directed at attorney/client conversations.

MR. READY:  Your Honor bifurcated the bad faith issue, so that we could have a discussion today about whether there are 12 creditors or not, and so that this -- whether he signed something that would change what he was entitled to could be had.  So, these questions, I think, are geared at some sort of allegation of wrongdoing by -- by us.  That's, really, part of the bad faith, and I don't believe that needs to be explored here today.

THE COURT:  I don't know that it's aimed at that. In my mind, what we are trying to get to is how he became a petitioning creditor in this bankruptcy, and I think that that is relevant to today.  And, again, I'm going to allow this question.  I'm not going to allow a long litany of questions regarding the attorney/client relationship and what the attorney did or didn't do.

MS. NIGRELLI:  I understand, Your Honor.

THE COURT:  Okay.

BY MS. NIGRELLI:

Q   Mr. Shalter, did you indicate, again, just going back, you had said that you had a conversation with your attorney. You said you never met Jason Scott Jordan, is that correct?

A   Correct.

Shalter - Direct                    24

Q   And you said that you were upset at Alan Christopher Redmond because of a pay reduction from Seguro Medico, is that correct?

A   I wouldn't say upset.

Q   Okay.  So, how did you determine to file a voluntary petition -- excuse me -- how did you determine to file an involuntary petition against Alan Christopher Redmond?

A   I put full trust in them as a team, and as a blue color-minded person, I trust what information and advice they give me, so I followed the best approach that was given to me. So, when I signed something in that situation, it's because I trusted them as individuals.  As far as the other verbiage that you're using, I really don't understand what you're trying to say to me, but I put full trust in them, which is why I chose to sign it.

Q   Thank you.

MS. NIGRELLI:  I'm going to leave that, Your Honor, with your instruction --

THE COURT:  Yes.

MS. NIGRELLI:  -- to tread carefully.

BY MS. NIGRELLI:

Q   And I guess, along with that trust, would you say, Mr. Shalter, that you did or didn't understand everything that was contained in the information in support of your involuntary petition?

Shalter - Direct                    25

A    As much as an average individual would understand it.

Q    Okay.  So, did you understand that you were asking this Honorable Court to oust the putative debtor, which is Mr. Alan Christopher Redmond, from his possessions and assets and to immediately appoint an interim trustee?

A    Yes, I understand that.

Q    Okay.  And where do you see that request in this document?

A    Here, at the top, seven.

Q    Okay.  And did you understand, again, that you were asking the Court to employ special powers to injunctively prohibit the debtor's right to continue to operate his effects?

A    Correct.

Q    Okay.  And you understood that by signing this document, you were instituting or commencing a proceeding in the Bankruptcy Court against Mr. Alan Christopher Redmond?

A    Yes.

Q    And lastly, you understood that, by signing your name to that involuntary petition, you were stating to the best of your information, knowledge and belief that you had a claim that was not subject to any dispute against Alan Christopher Redmond, is that correct?

A    I don't understand that question.

MS. NIGRELLI:  Your Honor, I'm going to rest on

---

Shalter - Cross                    26

that.

THE COURT:  Okay.  Mr. Ready?

MR. READY:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. READY:

Q    Ethan, a couple of questions.  You were asked about paychecks and who paid you.  Could you tell the Court some of the different people and entities that paid your checks?

A    Yeah.  Arthur Zeus --

MS. NIGRELLI:  Objection, Your Honor, there is no evidence of any paycheck, other than Paycor, the pay company, making payments.  If the question is, who signed the checks, that's a very different question.  I just want to be very clear.

THE COURT:  Understood.  Mr. Ready, did you want to rephrase?

MR. READY:  Sure.

BY MR. READY:

Q    Ethan, how -- can you go back to the beginning of your employment relationship, do you recall who the checks came from?  Do you remember --

A    Who handed the check, who wrote the check?

Q    Yeah.  Let's start with who wrote the checks, to your knowledge?

A    Several people.

---

Shalter - Cross                    27

Q    Okay.  And who would those people be?

A    Arthur, Guya, Guy Oseary, Tonya, Zeus.

Q    Who is Zeus?

A    Zeus is, like, the right-hand man.

Q    Would that be Jesus?

A    Yes.

Q    And do you recall if those checks all came out of Seguro Medico's account or other accounts?

MS. NIGRELLI:  Objection, Your Honor.  I think he wouldn't know what accounts.  I think --

THE WITNESS:  They came out of M&T Bank in (inaudible).

THE COURT:  I understand your objection.  I think the question is a little fuzzy, however, as I understand his answer, he's not labeling who owns the account.

MS. NIGRELLI:  Correct.

THE COURT:  He's simply giving the bank.  Okay, you can proceed, Mr. Ready.

BY MR. READY:

Q    Did you also receive payments at times that were not paychecks?

A    Correct.

Q    And where did those come from?

A    Zeus, Tonya.

Q    In what form?

---

Shalter - Cross                    28

A    CashApp or Apple Pay.

Q    I want to ask you about, you said prior to July of 2025 (sic), you had communicated with several people about the money that you were owed.  Can you just convey to the Court what those conversations were like?

A    Yes.  I directed that my paychecks were short.  They don't seem accurate.  There's no hourly.  There's no times on them.  You can't track anything on your paycheck.  Everybody's taxes were always the same, no matter what the amount was.  They were always the same.  Yeah.

Q    Did you, at any point, tell them that you believed you had been shorted paychecks?

A    Yes.

Q    And who did you tell that to?

A    Zeus, Alan, Arthur, Tonya, Guya.

Q    At one point, were you asked to do work outside of work for additional pay?

A    Yes.

Q    And what work were you asked to do?

A    Building maintenance, basically fixing things, hanging things, call in to fix a door because they couldn't shut the door on the front of the building after hours, mowing the property, weeding the property.

Q    And what were you promised in exchange for that extra work?

Shalter - Cross                                29

A   Cash.

Q   Okay.  And were you ever paid in cash?

A   I was paid on CashApp, and I received one check that had Seguro Medico on it.

Q   Did you receive all of the money that you were promised for those jobs?

A   Yes.

Q   Okay.  I want to ask you about -- you were asked, and I'm going to, also, tread lightly -- but you were asked about whether you had a preexisting relationship with Cornerstone Law Firm prior to this lawsuit.  Did you have such a relationship?

A   Yes.

Q   And, without any details, would you tell the Court what you had previously retained our firm for?

A   An arbitration.

Q   And what was the subject of that arbitration?

A   Owed commissions that were never paid.

Q   And this is unrelated to Alan Redmond, correct?

A   Correct.

Q   I think you had made me aware that your last termination date may have been different than you originally thought, is that correct?

A   Correct.

Q   Well, do you know today what your last date of work was

---

Shalter - Redirect                             30

at Seguro Medico?

A   Yes, July 25th.

Q   Okay.

        MR. READY:  Your Honor, that's all I have for him, at this time, but I reserve the right to recall him for rebuttal.

        THE COURT:  Any redirect?

        MS. NIGRELLI:  Just a couple of questions, Your Honor.

                    REDIRECT EXAMINATION

BY MS. NIGRELLI:

Q   Mr. Shalter, you just spoke about hiring Cornerstone Law Group for an arbitration.  Was that arbitration -- who was that arbitration against?

A   Momentum Solar.

Q   So, it wasn't against Alan Christopher Redmond, is that correct?

A   Correct.

Q   And you testified that the -- your date -- your last date of employment is, you are testifying, is different than what was in your affidavit, is that correct?

A   Correct.  I made a mistake.

Q   What made you change to July 25th?

A   After going back and fully looking over everything, I realized I made a mistake and let them know.

---

Shalter - Recross                              31

Q   And what did you look over to determine you made a mistake?

A   Paystubs and prior texts that I had.

Q   And --

A   And the phone call that we had together, when I was on the phone with them when I was terminated.

Q   Prior texts with whom?

A   My fiancé, letting her know that I was just terminated.

        MS. NIGRELLI:  That's it, Your Honor.

        THE COURT:  Okay.  Anything further?

                    RECROSS-EXAMINATION

BY MR. READY:

Q   Ethan, the affidavit that you signed, you said it was written by someone else, but you provided the information that was the subject of that affidavit?

A   Correct, I just didn't write --

        MS. NIGRELLI:  Your Honor, this is not from the redirect that I just gave, so it's outside the scope.

        MR. READY:  Your Honor, she just asked about the affidavit again.  I'm just clarifying something for the record.  If we need to call him on rebuttal to establish that, we can.

        THE COURT:  You can certainly do that.

        MR. READY:  Okay.

        THE COURT:  Okay.  You can step down.

---

Colloquy                                       32

        THE WITNESS:  Thank you.

        THE COURT:  Thank you.

        (Witness excused.)

        MS. NIGRELLI:  Your Honor, I'm going to call Tonya Hatmaker.

        THE COURT:  Okay.  While we have a minute, I just wanted to give you guys sort of the schedule for today.  We're going to go until about 12:30, and then we're going to break, because I do have some things at 1:00, but they should be quick.  And then, we'll come back at 2:00.  That presumes that we're not going to be done by 12:30, but if we are, that's great.  If not, I just wanted to give you a head's up.

        MS. NIGRELLI:  Thank you, Your Honor.

        MR. READY:  Your Honor, before we begin, I have our process server here.  Are there any objections to any of the service of process at this time?  If not, I'm going to dismiss him.

        MS. NIGRELLI:  Your Honor, I'm just talking about the numerosity requirement of 303.

        THE COURT:  Right.

        MS. NIGRELLI:  So, I don't think that anything about process-serving really comes into play.

        THE COURT:  Okay.  I mean, I don't believe that we're doing anything with regard to the motion to quash today, specifically, since that hearing is Monday.  If you

Colloquy                                              33

want to take that up this afternoon, we can do that, and, perhaps, that is the reason that your process server is here, I assume?

MR. READY:  That is why he's here.  If Your Honor doesn't -- if we don't need him, I'll dismiss him, but if we should hang on to him, he can stay.

THE COURT:  Okay.  My plan was to get through this.

MR. READY:  Okay.

THE COURT:  And then, to the extent that we need to deal with the motion to quash, we can do that, but it would be this afternoon, so if you want to dismiss him, and then if we are going to do it this afternoon, if he needs to be here, he can come back then.  I don't want him to sit all day.

MR. READY:  Yeah.  .

THE COURT:  You can come up but just stand for a few minutes.

COURTROOM DEPUTY:  Please remain standing and raise your right hand.

TONYA HATMAKER, DEBTOR'S WITNESS, SWORN

COURTROOM DEPUTY:  State your name and spell your whole name for the record.

THE WITNESS:  Tonya Hatmaker, T-O-N-Y-A, H-A-T-M-A-K-E-R.

THE COURT:  Okay, you can have a seat.

THE WITNESS:  Thank you.

---

Hatmaker - Direct                                    34

DIRECT EXAMINATION

BY MS. READY:

Q   Good morning, Ms. Hatmaker.

A   Good morning.

Q   My name is Nicole Nigrelli, and I represent the putative debtor, Alan Christopher Redmond.  I know you weren't in the courtroom, so I just want to tell you who I am.

A   Okay.

Q   I'm going to ask you a few questions.  I appreciate you coming today.  I'm going to ask you about your employment, and we'll go from there.

A   Okay.

Q   If you don't understand any question I'm asking, please let me know, and I will rephrase it.

A   Absolutely.

Q   Mrs. Hatmaker, where are you employed?

A   Seguro Medico.

Q   And how long have you worked for Seguro Medico?

A   Two years today.

Q   Oh, happy anniversary.

A   Thank you.

Q   And can you tell me your duties at Seguro Medico.

A   So, I have several.  I participate in onboarding new employees, training, exit interviews, a little bit of everything actually.

---

Hatmaker - Direct                                    35

Q   And do -- in one of those duties, do you conduct exit interviews with former employees?

A   I do.

Q   And is that standard procedure for any employee that leaves or is terminated?

A   It is.

Q   Do you know Ethan Shalter?

A   I do.

Q   And how do you know him?

A   He's an ex-employee of Seguro Medico.

Q   And do you know when Mr. Shalter ceased being an employee for Seguro Medico?

A   July 25th, 2024.

Q   And how do you know that?

A   I conducted his exit interview and supplied his last, final paycheck.

Q   And is this the final paycheck that was given to Mr. Shalter?

A   It is.

Q   And you said that you conducted his exit interview, is that correct?

A   It is.

Q   Is that standard procedure to conduct an exit interview?

A   It is.

Q   And what is discussed at an exit interview?

---

Hatmaker - Direct                                    36

A   Just, we go over anything that is on the documentation, as well as conduct -- we review the last and final paycheck.

Q   And are you familiar with an affidavit that you signed in connection with this matter?

A   Yes, I am.

Q   And, on connection with this affidavit, you state that you conducted an exit interview with Mr. Shalter, is that correct?

A   That is correct.

Q   And, in connection with that exit interview, do you hand him any paperwork?

A   I did.

Q   And what paperwork did you hand him?

A   The exit interview paperwork and his final paycheck.

Q   Okay.  And what consists of the exit interview paperwork?

A   It's a release form to release himself and the company, as well as --

MR. READY:  I'm going to object, Your Honor, and move to strike unless there is the actual document here.

MS. NIGRELLI:  There is.  It's attached to the affidavit.

MR. READY:  No, Your Honor.  I'm asking about the original, which we had asked for.  The original document under the Best Evidence Rule would have to be produced, given

Hatmaker - Direct                    37

that the signature is in doubt.

MS. NIGRELLI: Your Honor, one, we'll go into the best evidence that we have, but, number two, that document was not asked previous. In fact, the only request I got yesterday was to say that they didn't know what documents they were producing, and they were relying on anything that they have actually filed in the past ten years since this litigation commenced for the judgment, so I'm not really sure what they're talking about.

THE COURT: Well, but you're going to ask about the substance of the document?

MS. NIGRELLI: I am.

THE COURT: And, I presume that your client would be the one that would have the original.

MS. NIGRELLI: Well, you know what, let me lay some more foundation, Your Honor.

THE COURT: Why don't you do that?

BY MS. NIGRELLI:

Q   Ms. Hatmaker, tell me, when you conduct an exit interview, and you hand out paperwork, tell me -- kind of lead us through how that works. You're meeting for the last time. Tell us what occurs.

A   So, we have the original documentation, and then I make a copy, and it's sitting on my desk, and I have two piles, one with the paycheck. So, I hand one pile to, obviously,

Hatmaker - Direct                    38

the employee that's leaving, and then, I take a second pile. And then I take that paperwork, put it in the employee file and file in the employee cabinet. In this case, I do believe Mr. Shalter had exited the building with the original paperwork with the final paycheck.

Q   And does that ever happen?

A   It has happened often, actually.

Q   And can you explain to us, these papers look -- do they look the same?

A   They're identical pages.

Q   Is it the exact replica of what was -- are they two separate --

A   It's the exact copy of the original, because it went through the copy machine that's also in my office.

Q   And when did you determine that you didn't have the original of that document?

A   When I needed to scan it to send it to the attorneys.

Q   And that was a couple of days ago?

A   It was.

Q   And was that in connection with writing your affidavit?

A   It was.

MS. NIGRELLI: Your Honor, at this point, I'm also going to say that I requested a notice of this deposition in connection with this, requesting documents and deposition testimony from Ethan Shalter, which was not obtained.

Hatmaker - Direct                    39

Included in those documents would have been the original for the Best Evidence Rule.

THE COURT: Okay.

MR. READY: So, Your Honor, we're here today, and the testimony, now, is that they have lost the original?

MS. NIGRELLI: That was not the testimony.

THE COURT: No. I think the testimony is that it's in your client's possession, I think, is what the testimony is.

MR. READY: So, Your Honor, same objection, to the degree that what they're going to testify to, though, is still a photocopy of the one that she says she has. In fact, it's not even a photocopy. It's a photo. What we have here are apparently iPhone photos of this original. If they have a document that they are purporting that is this significant that they are purporting they have, they need to have it here.

MS. NIGRELLI: Your Honor, while I disagree with everything that he just said, I don't need this document to make my case.

THE COURT: Okay.

MS. NIGRELLI: So, I am not even going to address it at this point --

THE COURT: Okay.

MS. NIGRELLI: -- for the numerosity requirement.

Hatmaker - Direct                    40

THE COURT: Okay. We'll move forward then.

BY MS. NIGRELLI:

Q   And let's go back. So, with respect to Mr. Shalter ceased being an employee of Seguro Medico, you knew that -- the date, you said it was July 25th, 2024, correct?

A   Correct.

Q   And tell me, again, how you knew that it was that date?

A   I was present when he exited Seguro.

Q   And can you explain what happened at the exit interview, again, just so we're clear, did anything out of the ordinary happen?

A   No.

Q   And did Mr. Shalter have any questions for you at the exit interview?

A   He did not. There were no questions and no objections or no concerns.

Q   Did Mr. Shalter ever say that Seguro Medico owed him money?

A   He did not.

Q   Did he ever say that his paycheck had less than the amount that it was supposed to have?

A   He did not.

Q   Did he ever say that there was missing hours --

A   He did not.

Q   -- on his paycheck?

Hatmaker - Direct                              41

A    He did not.

Q    Did he ever say that he had any problem relating to pay?

A    He did not.

Q    After the exit interview, did you ever hear from Mr. Shalter again?

A    No.  Oh, actually, I did one time, he had -- the same day, he had requested that I remove him from the Paycor system, because he was receiving text messages from the Paycor system.

Q    So, you did receive communication from him after the exit interview?

A    One time.

Q    Did he, at that point, say that you owed him money?

A    No.  No, Ma'am.

Q    And how did he communicate with you?

A    With a text message.

Q    And do you still have your text messages?

A    I do.

Q    And anything else contained in those text messages?

A    No, just that, "Will you please remove me from notifications from Paycor."

Q    And did you respond to him?

A    I did.  I did.

Q    And what was your --

A    I believe I said, yes, sir or absolutely or something

Hatmaker - Direct                              42

along those lines.  It was one answer, one response.

Q    And did you, in fact, take him off the Paycor?

A    I did.  I did.

Q    And other than that communication, you never heard from Mr. Shalter again?

A    I have not.

Q    And did you ever receive any letter or correspondence from him?

A    I did not.

Q    Are you aware of any letter or correspondence sent to the office from Mr. Shalter?

A    No.

Q    And, just to be clear, I believe you testified you provided Mr. Shalter with his last paycheck, is that correct?

A    It is correct.

Q    And when you handed him that last payment, there was nothing said to you about the amount of that paycheck?

A    That is correct.

Q    Okay.  And, just, again, for reference, was this the paycheck that you, in fact, handed to him?

A    That is.

Q    And he didn't question the hourly, and he didn't question the current rate?  He didn't question anything, did he?

A    No, he did not.

Hatmaker - Cross                               43

Q    He took the paycheck, and he left?

A    That is correct.

     MS. NIGRELLI:  No further questions, Your Honor.

     THE COURT:  Okay, Mr. Ready?

          CROSS-EXAMINATION

BY MR. READY:

Q    Ms. Hatmaker --

A    Yes, sir?

Q    -- my name is Joel Ready, and I am representing Mr. Shalter.

A    Yes, sir.

Q    The check that you gave him was owed, correct?

A    Absolutely.

Q    This was not additional pay that you were offering him for any reason?

A    No, it was his paycheck.

Q    And you said that you reviewed the final paycheck with him?

A    Correct.

Q    What does that mean?.

A    I handed him his paycheck and asked if there were any questions.

Q    Okay.  You handed it to him, and he took it, correct?

A    Correct.

Q    You said -- you described earlier, a signing.  There's,

Hatmaker - Cross                               44

people sign, there's originals, did he sign physically with a pen?

A    Yes.

Q    Do you remember what kind of pen, blue, black?

A    I do not.

Q    But he signed?  It wasn't like an electronic signature of some sort, correct?

A    No.

Q    Is it typical for you to give the original document to someone, rather than to keep it for the company's records?

A    It has happened, because there is two sets of papers on my desk, so when -- in an exit interview, people are upset, and it happens.

Q    You said that there was -- you said you make a copy of the original.  Are you telling the Court that there is a document that's being photocopied repeatedly and being given to people or that it's being printed off each time?

     MS. NIGRELLI:  Objection to the question.  I don't know understand what he's asking.

     MR. READY:  I can rephrase.

     THE COURT:  Go ahead.

BY MR. READY:

Q    You described making a copy -- and, now, I'm asking you, generally, when you're in exit interviews.  You make a copy -- you print something for people to sign, is that correct?

Hatmaker - Cross                        45

A    That is correct.

Q    Okay.  You're not taking the same document that's in there and just photocopying and handing a new photocopy.

A    I still don't understand your question.  Can you rephrase that?

Q    Sure.  Do you have a master or physical copy that you are photocopying for each person to sign or are you --

A    It's a new document each time.

MR. HEIM:  Objection, Judge, that's confusing.

THE COURT:  I'm trying to parse your question.

MR. READY:  Okay.  I'm asking --

THE COURT:  I think I know where you're going, but I think that maybe you just need to ask it differently.

MR. READY:  Sure, I'm sorry.  Let me try to do a better job.

THE WITNESS:  Okay.

BY MR. READY:

Q    I'm asking you a technology question.  I don't mean to be intimidating with it.  I think it -- but what I am asking is, when you go to get a copy, a fresh, clean, unsigned copy for a person to sign in an exit interview, do you print it off the computer or do you have a hard copy somewhere that you are photocopying on a photocopier?

A    I print it off the computer.

Q    Okay.  You're using a Word document or something.

Hatmaker - Cross                        46

You're just printing it --

A    Correct.

Q    -- off the computer?

A    Correct.

Q    And you do that every time, is that right?

A    That is correct.

Q    Okay, thank you.  Sorry that was so confusing.

A    Nope, that's fine.

Q    You were subpoenaed to appear today, correct?

A    That is correct.

Q    And you saw that there were some documents you were supposed to bring?

A    I did.

Q    Okay.  And one of those was the original documents that was allegedly signed by Ethan Shalter.

MS. NIGRELLI:  I object.

MR. HEIM:  Objection, Judge.  The subpoena that Ms. Hatmaker received was specifically for purposes of the preliminary injunction hearing, which is not -- my understanding based on the status call yesterday, that was not happening today.  So, Ms. Hatmaker and myself and Seguro and myself did not make any effort to gather documents or even respond to them, because to -- for purposes of today.  I just wanted to make that clear for the record.

THE COURT:  Understood.

Hatmaker - Cross                        47

MR. HEIM:  Secondly, I think the testimony is, is that the witness is saying that the original documents that Mr. Shalter signed are in the possession of Mr. Shalter.

THE COURT:  Okay.  With respect to this issue, for today's purposes, I think it's correct that the subpoena was really about the TRO, which has gotten moved, now, to Monday. However, with respect to what you need to elicit for their motion to dismiss, as far as numerosity is concerned, I don't know that her having the document or not having the document is something that needs to go forward today with respect to your argument.  But I will -- I will allow you to, at least, question her with regard to what that document is, where it is, et cetera, but I think that the fact that she doesn't have it, and I'm not going to allow you to make the inference today.

MR. READY:  Okay.  I understand, Your Honor.

THE COURT:  Okay.

MS. NIGRELLI:  And, Your Honor, I would just ask that he tread lightly, just, for the whole point that you just made.  We are here only for the purposes of 303.

THE COURT:  Understood.

MS. NIGRELLI:  And that is it.

MR. READY:  I'm always very light on my feet.

THE COURT:  I understand.   We all are.

BY MR. READY:

Hatmaker - Cross                        48

Q    Ms. Hatmaker, when you -- when -- I'll ask you another general question.

A    Absolutely.

Q    When people are done signing, do you scan it into a computer server or database?

A    I do not.

Q    Okay.  Instead, there is a hard file that's holding those documents somewhere, is that right?

A    That is correct.

Q    And that's in your office, is that correct?

A    Correct.

Q    Okay.  Mr. Heim is your attorney, is that right?

A    That is correct.

Q    And are you paying his fee or is somebody else paying it?

A    The company is.

Q    Okay.  That would be Seguro Medico, correct?

A    I assume, yes.

Q    How long did this discussion with Ethan Shalter happen? How long was it?

A    Just a couple of minutes.

Q    How many minutes?

A    Just a couple.  It's not long.

Q    People use a couple to mean a lot of different things. Do you mean --

Hatmaker - Cross 49

A   Under five minutes.

MS. NIGRELLI:  Asked and answered, Your Honor.

MR. READY:  I'd like a little more clarity on whether this is 30 seconds or five minutes.

THE COURT:  Well, I think she just said under five, and I'll allow that.

MR. READY:  Oh, I'm sorry.  Okay, I didn't hear that.

BY MR. READY:

Q   Was there anything else discussed, other than you handing him the check?

A   No.  Well, yes, we discussed the exit interview paperwork, but I've already stated that.

Q   And what did you say about that paperwork?

A   Can you please review this paperwork; let me know if you understand it.  If you have any questions, I'm here to answer them for you.

Q   Okay.

MR. READY:  Thank you, Your Honor.  I have no further questions.

MR. HEIM:  Your Honor, as the witness's counsel, I just want to have some questions for clarity concerning the documents that were signed on August 6th, which I think will help the Court in terms of what the status is of the documents and why she only has a copy, if I may?

Hatmaker - Cross 50

THE COURT:  Well, I think that she has testified to that.  I don't --

MR. HEIM:  Understood.  I want -- here is the point -- here is my point.

THE COURT:  Go ahead.

MR. HEIM:  And, you know, the Best Evidence Rule, as esoteric as it is, and as many copies and dissertations exist in today's society, it doesn't come up that much.  But, there is a Rule, Judge, that says that copies are admissible, so long as there is no evidence that the proponent of the copy destroyed it or did so in bad faith, and I would like to establish --

THE COURT:  And, so, you want to question her with regard to that?

MR. HEIM:  I would, Judge --

MR. READY:  But, Your Honor --

MR. HEIM:  -- because I think it will aid the Court in determining whether or not that document, which is attached to her affidavit, the exit documents, which she said Mr. Shalter signed in front of her, would ultimately be admissible, and Your Honor could rely upon it.

MR. READY:  Your Honor, the rule he -- first of all, the Rule at 1003 is that, if the document, itself, is at issue, if the signature on it or the validity of the underlying document is at issue, the original is required.

Hatmaker - Cross 51

The exception to that would be if it were destroyed or lost, through no fault of their own.  I mean, that's, certainly, not been the testimony.  There is a hard copy that exists.  What we have is, again, I'm going to assume, an iPhone photo, here, that's attached.

So, if Your Honor doesn't want to get into that today, and if we're not going in that direction, I understand, but if we're going to go here, I have more questions and more questions about document storage and where it is, and why it wasn't produced and all of that, so --

THE COURT:  Understood.  Mr. Heim, do you still want to ask your questions, because I will allow Mr. Ready --

MR. HEIM:  Cross.

THE COURT:  --- to, then, ask further.

MR. HEIM:  Yes.  I understand.  I want the Court to understand that the reason why -- and I think this is the case -- the reason why Seguro doesn't have a copy of it --

THE COURT:  Well, I don't want you to testify.

MR. READY:  Well, Your Honor, let's -- yeah.

THE COURT:  But I will allow you to ask questions.

MR. HEIM:  Okay.  Just very briefly, Judge, and we'll get into the Rules and all of it, but I think Rule 1004, Judge, is probably going to provide our answer here.

THE COURT:  Okay.

MR. HEIM:  But, we'll get into that, you know, in

Hatmaker - Direct (Hei) 52

terms of whether or not this document is ultimately admissible.

DIRECT EXAMINATION

BY MR. HEIM:

Q   Ms. Hatmaker, good morning.  I just have a couple of questions, just so I want to -- I want to make sure the record and your testimony is clear.

A   Yes, sir.

Q   Okay.  Is it your belief, Ma'am, that the copy of the exit interview document that was attached to your affidavit were copies of the original documents that Mr. Shalter signed?

A   That is correct.

Q   Okay.  And do you believe Mr. Shalter left the building on August 6th, 2024 with the actual original documents that he signed?

A   That is correct.

Q   Okay.  You didn't destroy the original documents, did you?

A   No, sir.

Q   To your knowledge, did anybody at Seguro destroy the original documents of the exit interview documents that Mr. Shalter signed?

A   No, sir.

Q   Okay.  And your belief is that Mr. Shalter took the

Hatmaker - Recross                          53

original documents with him out of the building at that time?

A    That is correct.

Q    Okay.  Is there any doubt in your mind that the copy of the exit interview documents, which were attached to your affidavit are true and correct copies of the original documents that Mr. Shalter signed?

A    I don't -- they are the actual copies of the original document, correct.

Q    Okay.  And you, personally, saw Mr. Shalter sign those exit interview documents?

A    Yes, sir.

Q    Did anybody else at Seguro see Mr. Shalter sign those exit interview documents?

A    Yes, sir.

Q    Who?

A    Arthur Walsh.

Q    Okay.

        MR. HEIM:  That's all I have.

        THE COURT:  Mr. Ready?

                RECROSS-EXAMINATION

BY MR. READY:

Q    So, Ms. Hatmaker, so, the documents, where is the original document right now?

A    At Seguro.  The original document?

Q    Yes.

Hatmaker - Recross                          54

A    I don't know.  I am thinking Shalter has the original.

Q    I'm sorry, let me rephrase.  The copy that Seguro has --

A    Yes?

Q    -- where is that document?  That's what I meant to ask you.

A    At Seguro in the filing cabinet in his employee file.

Q    Okay.  And where is that filing cabinet?

A    In my office.

Q    Okay.  And you said he has an employee file, is that correct?

A    Correct.

Q    Okay.  So, if asked, you would be able to produce it for the Court, is that right?

A    That's correct.

Q    The photo that's attached here, did you take this photo?

A    Yes.

Q    Okay.  Did you take it with your phone?

A    Yes.

Q    What kind of phone do you have?

A    iPhone.

Q    Okay.  And do you know when you took that photo?

A    When I was asked to send it to my attorney.

Q    Who asked you to send it?

A    My attorney.

Q    That would be Mr. Heim?

Hatmaker - Recross                          55

A    Correct, yes.

Q    So, Seguro Medico's attorney asked you to send it to him?

A    Correct.

Q    Who asked you about this document to begin with?

A    My attorney.

Q    Your photos, do you still have them on your phone?

A    I should, yes.

Q    Okay.  You didn't delete the picture that you took, correct?

A    It wasn't a picture.  I scanned it.  So, it's not a picture.  I scanned it.

Q    Okay.  This, that's attached, was not a photo you took with your phone?

A    It is a scan from my phone, sir.

Q    Okay.  So, you used your phone's camera app to do a scan process, is that right?

A    It's a feature on my phone, correct.

Q    Okay.  Do you remember what app you used to do it?

A    It's a feature on the phone.  It's not an app.  It's literally on the phone to scan, and you scan it.

Q    Okay.  And so, that photo or scan, you still have on your phone, correct?

A    Correct.

Q    Okay.

Hatmaker - Recross                          56

        MR. READY:  Thank you, Your Honor, I have no further questions.

        THE COURT:  Okay.  Is there anything further, Ms. Nigrelli?

        MS. NIGRELLI:  No, Your Honor.

        THE COURT:  Okay.  You can step down.  Thank you.

        (Witness excused.)

        MS. NIGRELLI:  Your Honor, at this time, I want to call Mr. Alan Redmond to the stand.

        MR. READY:  Your Honor, I'm not sure if we're going to need Ms. Hatmaker's testimony for the motion to quash this afternoon, if we do get to that.

        THE COURT:  I'm sorry, you said you will or you won't?

        MR. READY:  We may, depending on what we're getting into there, this afternoon.

        THE COURT:  Okay.  Then, if you can have her available after 2:00?

        MS. NIGRELLI:  Wait, come again?  I'm sorry.  I was getting --

        THE COURT:  For the motion to quash, Mr. Ready is saying he may need Ms. Hatmaker.

        MR. HEIM:  For purposes of service?

        MS. NIGRELLI:  I'm not sure why he would --

        THE COURT:  That's what I presume?  It's for

Hatmaker - Recross                                57

purposes of service?

MR. READY:  Correct, yes.

MR. HEIM:  Well, let me --

THE COURT:  Unless, of course --

MS. NIGRELLI:  Right.

THE COURT:  -- you're all in agreement that she got served?

MR. HEIM:  I think she may have been served.  There was some weird issues with service, with subpoenas that weren't -- the right subpoenas went to different places, so I can talk to her.

THE COURT:  Well, then -- then --

MR. HEIM:  I don't think service is an issue with her, Judge.

THE COURT:  Okay.  After you talk to her, before we get into the next witness, I'd like to just speak briefly about whether or not we're going to need the process server, because, obviously, that's a service argument, as well, so we might as well find that out all at one time.  So, speak to your client, first.

MR. HEIM:  Yeah.

THE COURT:  And, I'm sorry, just hang on for just a second.

MR. REDMOND:  Sorry I was late.  I apologize.  I went to the wrong courtroom.

---

Colloquy                                          58

THE COURT:  Oh, that's okay.  You're here.  As long as you're here.

(Pause in proceedings.)

THE COURT:  Okay.  So, Ms. Hatmaker, we won't need?  Is that --

MR. HEIM:  Judge, just for purposes of Ms. Hatmaker, I don't think she was actually properly served.  I think there was a server that went out to her house and left it somewhere on her doorstep, and then she got something in the mail, but she doesn't want people coming to her house and trying to, you know, find her or whatever, so she's not going to contest service of her subpoena.  Okay?

THE COURT:  Okay.

MR. HEIM:  So, I released Ms. Hatmaker.

THE COURT:  So, we won't need her?

MR. READY:  Correct.

THE COURT:  Okay.  We may still need the process server, because there are others, correct?

MR. READY:  Apparently, yes, that's what I'm hearing.

THE COURT:  Okay.

MS. NIGRELLI:  Your Honor, I think one of the issues is, we don't even know what's out there, and I'm speaking for myself.  I don't know what was served.  I know that there might have been -- I know there was a flurry of

---

Colloquy                                          59

certificate of services filed last night, but I did not look at them.

THE COURT:  Okay.

MS. NIGRELLI:  And I am not suggesting that there is a service issue or not.

THE COURT:  Okay.

MS. NIGRELLI:  I'm just saying I have no idea, because that wasn't on for today, and it, really, was the last thing on my mind was the subpoenas of third parties.

THE COURT:  Okay.  And as I understand it, the motion to quash is Mr. Heim's.

MS. NIGRELLI:  Correct.

MR. HEIM:  Correct, Judge, and I moved on what I knew were Seguro related, which were four.

THE COURT:  Right.  That's what I saw.

MS. HEIM:  One was to the company.  Tonya was one.

THE COURT:  Right.

MR. HEIM:  Tonya Hatmaker.

THE COURT:  Shannon Kroemmelbein was one?

MR. HEIM:  Yeah, Shannon Kroemmelbein and --

THE COURT:  And Stephanie Miller.

MR. HEIM:  -- and Stephanie Miller, right.

THE COURT:  Okay.  So, they're the four that are up in the air or three that are up in the air, because Tonya is okay.

---

Colloquy                                          60

MR. HEIM:  They're the three that I moved on, Judge.  And I think they were attempt -- service was attempted in multiple ways for all of them.

THE COURT:  Okay.

MR. HEIM:  But, really, the basis of our motion, the thrust of the motion was, we don't think all of these subpoenas are necessary, because we don't think --

THE COURT:  It depends on what I say today?

MR. HEIM:  Yeah, correct, Judge.

THE COURT:  Okay, understood.  Okay.  So, we're ready to go back to it.  Mr. Ready, are you okay?

MR. READY:  Yes, Your Honor.

THE COURT:  All right.  Why don't you stand up, and we'll get you sworn in.

COURTROOM DEPUTY:  Please raise your right hand.

ALAN CHRISTOPHER REDMOND, DEBTOR, SWORN

COURTROOM DEPUTY:  State your name and spell your whole name for the record.

THE WITNESS:  Alan Christopher Redmond, A-L-A-N, R-E-D-M-O-N-D.

THE COURT:  Okay.  You can have a seat.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MS. NIGRELLI:

Q   Good morning, Mr. Redmond.

Redmond - Direct                    61

A   Good morning.  Sorry I was late.

Q   It's nice to finally meet you in person and not just hear you over the phone.

A   Yes, Ma'am.  I'm sorry I was late.  I went to the wrong courthouse, as you know, so my apologies.

Q   No problem.  We didn't need to start with you.  So, I'm going to ask you a few questions about the involuntary petition that was filed against you.

A   Yes, Ma'am.

Q   Are you aware that there was an involuntary petition filed against you?

A   Yes, I was.

Q   And do you recall the three petitioning creditors that signed the involuntary petition?

A   Yes, Ma'am, I do.

Q   And who were they?

        MR. READY:  I'll stipulate, Your Honor, to the three.

        THE COURT:  Okay.

        MR. READY:  I don't think that's in dispute.

        THE COURT:  Okay.

BY MS. NIGRELLI:

Q   Okay, so you can say, the three were?

A   Joel Ready, Cornerstone Law; Ethan Shalter; and Jason Jordan.

---

Redmond - Direct                    62

Q   And are you familiar with the three creditors?

A   I am.

Q   And how did you become familiar with Jason Scott Jordan?

A   That's a long story.

Q   The short version.

        MR. READY:  I'm just going to object, based on relevance, Your Honor.

        THE COURT:  I was going to ask if that was necessary, given that we are talking about whether or not there's a dispute, so let's just try and truncate that a bit.

        MS. NIGRELLI:  Sure.

BY MS. NIGRELLI:

Q   Mr. Redmond, did you prepare a list of creditors in connection with this involuntary petition?

A   Yes, Ma'am.

Q   Did you verify the list of creditors that you filed?

A   Yes, Ma'am.

Q   I'm going to show you a verification of creditors dated September 16th, 2024, is that your signature?

A   It is.

Q   And that was filed at Docket 33, and this is your list of creditors, as you knew it, on Monday, is that correct?

A   Correct.

Q   Okay.

        THE COURT:  This is the second one that got filed?

---

Redmond - Direct                    63

        MS. NIGRELLI:  No, I'm going to get there.

        THE COURT:  Okay.  I'm sorry.  I just wanted to make sure I was looking at the right one.

        MS. NIGRELLI:  Yes.

        THE COURT:  Okay.

BY MS. NIGRELLI:

Q   Jumping ahead, was there -- did we amend this document?

A   We did.

Q   Okay.  And why did we amend Document 33?

A   Well, as we were going through this exercise, there's a lot of creditors, so there were two other creditors that we needed to add.

Q   Okay.  And did you add Bochetto and Lentz as an additional creditor?

A   Yes, Ma'am.

Q   And did you also change the designation of number ten, All Web Leads?

A   I did.

Q   And you changed it from disputed to undisputed, is that correct?

A   Correct.

Q   And why did you do that?

A   Well, as I was (inaudible) the disputed and undisputed creditors from my attorneys, I realized that I had said that All Web was a disputed creditor, but after getting educated

---

Redmond - Direct                    64

on it, I realized that they were undisputed, based on the fact that I have a personal guarantee with All Web Leads, and therefore, I am fully responsible for the debt.

Q   And did you commence payments on that debt with All Web Leads?

A   We've been doing our best, but, yes, All Web has been in a payment plan with installment payments for the last year or so, maybe a little bit longer, a year/a year and a half.

Q   So, you agree to the amount of the $667,413.87?

A   Yes, Ma'am.

Q   All right.  So, I want to just take you through this list, and I'm going to take you through the original list, because I don't have the amended on me, but knowing that we just went over the one that we changed --

A   Sure.

Q   -- and the last one is Bochetto and Lentz, and we'll get to that later.

A   Sure.

Q   But let's start with number one, Jason Scott Jordan.  That's listed as disputed.  Is there a judgment?  Does Mr. Jordan have a judgment against you?

A   He actually does, yes.

Q   Okay.  And did you dispute that because you don't agree with the amount?

A   I don't agree with the amount, and I don't agree with

Redmond - Direct                65

the judgment.

Q    Okay.  Moving onto number two, Cornerstone Law Firm. That is another one of the petitioning creditors.  Do they have a judgment against you?

A    Yes.

Q    Okay.  And you disputed it?

A    Yes.

Q    Do you not agree with the amount?

A    I don't.  Jason was originally represented by Smith Law Group.  So, you know, if there was a judgment, I would assume it would be from Smith Law Group.

Q    Okay.  Let's go to number three, Complete Business Solutions Group, Inc., which also, it does business as Par Funding.  You listed that as disputed.  Do you agree that you owe any money to Complete Business Solutions Group, Inc.?

A    I do not.

Q    Okay.  You completely dispute liability and the amount, is that correct?

A    Yes.  I believe that the contracts that we entered into with CBSG, Par Funding, were fraudulent, and I believe the owners were also fraudulent.

Q    Okay.  So, let's go to number four.  That is WBLFBO 2, LLC, you list that as disputed, is that correct?

A    That is correct.

Q    Do you owe them any amount of money?

Redmond - Direct                66

A    We do -- I do, excuse me.

Q    Okay.  So, you dispute as to amount, is that correct?

A    Yes, Ma'am.

Q    You acknowledge that you owe them some debt, though?

A    Absolutely.

Q    U.S. Department of Labor is number five.  You list them as disputed.  Do you dispute the amount?

A    I do.

Q    Do you dispute that you owe them money?

A    I do not.

Q    So, you owe them some amount of money?

A    Correct.

Q    You just don't agree with the amount being assessed against you, is that correct?

A    That is correct.

Q    Number six, CardFlex, Inc.  You listed them as undisputed, is that correct?

A    That is correct.

Q    You don't dispute liability or amount, is that correct?

A    Correct.  We entered into settlement agreements with CardFlex.

Q    The Internal Revenue Service, you list that as disputed. Do you dispute the amount?

A    I do not.  Excuse me, could you repeat that?  I lost my train of thought.

Redmond - Direct                67

Q    Do you dispute the liability?  Let's start with liability.  Do you dispute that you owe the Internal Revenue Service some amount of money?

A    I do owe them money.

Q    But you're disputing the amounts that they have listed or assessed against you, is that correct?

A    Correct.

Q    Number eight, Producer Advance, LLC, also listed as disputed?

A    Yes.

Q    Do you dispute that you owe them money?

A    No.

Q    Do you dispute the amounts that they have alleged that you owe?

Q    I'd have to be honest, I wasn't sure whether to list that as disputed or undisputed.  The amount there is what the settlement agreement is for, Nicole, but they have said, if we pay the minimum sum, they'll reduce that to between five and $600,000, so I just want to be clear.

Q    So, for number eight, which is the Producer --

A    Producer Advance, LLC.

Q    -- Producer Advance, LLC, you are saying that you agree that you owe some amount of liability --

A    Yes, Ma'am.

Q    -- but, perhaps, not the amount that they have assessed?

Redmond - Direct                68

A    Correct.

Q    Okay.

A    We definitely owe Producer Advance money.

Q    Okay.  Number nine, which is American Workers Insurance Services, Inc., AWIS, do you dispute that you owe them any money?

A    I do.

Q    You dispute liability, and you dispute the amount of that claim, is that correct?

A    Correct.

Q    Okay.  Number ten, which we discussed to begin with, as part of the amendment --

A    Yes.

Q    -- All Web Leads, we change that to undisputed.  You have entered into a settlement agreement with them?

A    Yes, Ma'am.

Q    Number 11, Santander Bank, you list that as undisputed, is that correct?

A    Correct, and I had to amend the figure, originally, on Joel's -- Attorney Ready's interrogatories (inaudible), but I had to get, obviously, more specific on this, so I got more specific and contacted the bank.

Q    Okay.  And so you owe them some amount of money?

A    Yes, Ma'am.

Q    So, the amount might be slightly off, but you agree that

Redmond - Direct                                    69

you owe them?

A   Yes, $7,602.93.

Q   Okay.  Duane, Morris, LLP, legal fees, you list them as undisputed is that correct?

A   Yes, that is correct.

Q   And you owe them legal fees for work that they did for you personally?

A   Correct.

Q   Number 13, Rush Law Group, you list them as undisputed with legal fees owed, is that correct?

A   That is correct.

Q   And that is for legal fees that you owe personally?

A   Correct.

Q   Pennsylvania U.C. Tax Services, number 14, you list them as undisputed.  You agree that you owe them $103,589 personally, is that correct?

A   That is correct.

Q   Have you commenced any payments on that?

A   We have.

Q   The Pennsylvania Department of Revenue, this is for income tax, you don't dispute that you owe some amount to the PA Department of Revenue for your 2022 tax returns, is that correct?

A   That is undisputed, correct.

Q   And that amount is undisputed, is that correct?

---

Redmond - Direct                                    70

A   Yes, Ma'am.

Q   Number 16, Berks County Tax Claim is listed as undisputed.  You don't dispute that you owe them, the County, a certain amount for taxes, with respect to 2005 Regency Drive, is that correct?

A   That is correct.

Q   So, you don't dispute liability or amount with respect to that claim?

A   Correct.

Q   And then we added Bochetto and Lentz with --

MS. NIGRELLI:  I'm sorry, Your Honor, but it was filed this morning, and I don't have a copy.

BY MS. NIGRELLI:

Q   Do you recall us adding an additional creditor, Bochetto and Lentz, last night?

A   Yes.  I just need (inaudible).  David was the representative for Par Funding, and (inaudible), based on Joel's representation and TRO, that was actually (inaudible), he was the attorney, so Joel has a way of confusing me sometimes.

Q   So, you forgot that you owed legal fees in the approximate amount of $40,000 to Bochetto & Lentz?

A   That is correct.

Q   And they're still outstanding, is that correct?

A   Yes, Ma'am.

---

Redmond - Direct                                    71

Q   And after going through your creditors for, again, the third or fourth time, to the best of your knowledge, information and belief, this is your list of your creditors, as of today?

A   That's right, Nicole.

Q   And these would have been the same creditors that would have been due and owed money on the date of the involuntary petition, which was filed on September 3rd, 2024, is that correct?

A   That is correct, Nicole.

Q   None of these are new debts that have --

A   No.

Q   -- just recently been acquired?

A   No, excuse me.

MS. NIGRELLI:  Your Honor, with that, I have no additional questions.

THE COURT:  Okay, Mr. Ready.

THE WITNESS:  Your Honor, could I get a glass of water?

THE COURT:  Yes.

THE WITNESS:  Thank you.  I have a little bit of a cold.

(Pause in proceedings.)

THE COURT:  When you're ready.

MR. READY:  Thank you.

---

Redmond - Cross                                    72

CROSS-EXAMINATION

BY MR. READY:

Q   Mr. Redmond, let's start with your answers earlier about Jason Scott Jordan and Cornerstone Law Firm.

A   Sure.  It's nice to meet you Joel, finally.

Q   Sure.  Other than just not agreeing with the judgments that were entered, you don't have any other reason for disputing those judgments, correct?

A   Multiple.  Are you talking about Jason Jordan, Joel, is that correct?

Q   Sure.

A   Multiple.

Q   Okay.  It's a final judgment entered by a Court and affirmed by the Superior Court, you know that, correct?

A   I understand that.  I believe that my position and my attorney's position is that judgment was entered fraudulently by your former (inaudible) as the sole (inaudible) partner, David Crossett.  It was brought in front of the Court as Jason Jordan.

Q   Okay.  That's --

A   You know that, though, right?

MS. NIGRELLI:  Your Honor, for the purposes of this proceeding, and for the purposes of numerosity, we're not going to contest that Jason Scott Jordan or Cornerstone, who both have judgements, are creditors.

Redmond - Cross                73

THE COURT:  Okay.  That makes your job a little bit easier, Mr. Ready.

MR. READY:  Okay.  So, all right, I just want to make sure I am clear.  We have a stipulation that there is not disputes as to those two?

THE COURT:  As to those two, correct.

MR. READY:  Okay.

MS. NIGRELLI:  For purposes of --

THE COURT:  Numerosity, correct.

MS. NIGRELLI:  -- numerosity.

MR. READY:  Okay.

BY MR. READY:

Q   I'm going to show you a document that's marked Alan Redmond's objections and answers to first interrogatories in aid of execution of judgments.

A   Sure.

Q   Do you --

MS. NIGRELLI:  Objection, Your Honor, to any document.  I didn't discuss this on direct, and we're just talking about the verification of a creditor list and numerosity.  None of these -- it's outside the scope of direct, and, in addition, it's not relevant to today's proceeding on numerosity of creditors.

MR. READY:  Your Honor, it's directly relevant, because this contradicts something he just said.

Redmond - Cross                74

MS. NIGRELLI:  Unless these were filed on September 3rd, the same time that this was filed, it is not relevant, Your Honor.

MR. READY:  Well, Your Honor, if they want to explain the changes, I'm sure he can attempt to do so, but I think for cross-examination, the fact that he said something different under oath before is directly relevant.

THE COURT:  It goes to credibility.

MS. NIGRELLI:  Your Honor, these documents, which I understand --

THE COURT:  If he lays the proper foundation.

MS. NIGRELLI:  Correct, Your Honor, and, again, we're not here on anything else other than the amount of creditors of the -- whether there is 12 or more or there's three -- and three petitioning or whether there is 12 or less.  So, I mean, if he lays a proper foundation, but with respect to the fact that these were filed months ago, I don't know how it's relevant.

MR. READY:  So --

THE COURT:  Well, I think if he lays a proper foundation, he can certainly question his credibility on cross, and that's what I understand that you are looking to do so I would ask you to, certainly, lay your foundation so that I know what this is that you're questioning him about.

MR. READY:  Yes, Your Honor, I'll do so.

Redmond - Cross                75

THE COURT:  Okay.

BY MR. READY:

Q   Mr. Redmond, you recognize the objections and answers, correct?

A   They're vaguely familiar, Joel.

Q   Okay.  I'll scroll down, and if you need me to go slower, let me know, but I'm just going to scroll through the page down here to the answers.  You'll see here there are questions, here, and then there are bold answers.  Do you remember answering these?

A   Vaguely, Joel.

Q   Okay.  I'll represent to you, you answered these in March of this year, does that sound accurate?

A   Yeah, I would trust you saying it's March, if the document is dated March.

Q   Sure.  Let me go down, and I'll show you this.  This is your verification page.  Is that your signature?

A   Yeah.

Q   And you'll agree that that's dated March 19th of this year?

A   Yeah.

Q   Okay.  No reason you would have dated that differently, for any reason, correct?

A   I don't under -- what's the question, Joel?

Q   You wouldn't have dated it incorrectly for any reason,

Redmond - Cross                76

right?

A   I still don't understand.  You've gotta do -- what's the question?  If you can be more specific, I would appreciate it, Joel.

Q   Sure.  It says here that you signed it on March 19th of 2024.  You don't have any reason to dispute that, correct?

A   That's my signature, and it says, 03/19, that's when I signed it, Joel.

Q   Okay.  I'm going to take you up to number -- excuse me one second -- sorry -- 28.  It says, identify your judgment creditors, including the names of their attorneys, the amount due and owing and the Court and Docket where the judgment issued.  It says, "Please refer to the PFS statement previously submitted by Attorney Bowles to Attorney Ready, as well as the plaintiff's counsel in" -- and there's a docket number there -- "in the Philadelphia Court of Common Pleas which was already sent to Jordan's counsel."  Did I read that accurately?

A   A really long sentence, Joel.  Please condense your sentence and ask the question.

Q   Well, I'll tell you what, why don't you read it for us, the answer to number 28, would you read it to the Court?

A   You want me to read the question?

Q   I want you to read the answer to number 28.

A   That's what we should say.  "Identify your judgment

Redmond - Cross 77

creditors, including the names of their attorney, the amount due and owing and the court and docket number where the judgment issued." I think you have a typo there, Joel, but where the judgment was issued, that's the question on the paper.

Q And what's the answer?

A "Please refer to the PFS," meaning personal financial statement, "previously submitted by Attorney Bowels to Attorney Ready" -- excuse me -- Ready -- "as well as the plaintiff's counsel and CBSG d/b/a Par Funding versus Redmond, Feb. Term 2022." There's a number, "02279, in Philadelphia Court of Common Pleas, which was already sent to Jordan's counsel."

Q And that was your answer to number 28, correct?

A Yeah, that's the answer that the attorney helped me prepare.

Q Okay. And it was true and correct when you send this in March of 2024, correct?

A I would assume it was.

Q Well, don't assume. You signed a verification under oath saying it was correct. Is there any reason that you think you would have lied about that answer?

A I would not have intentionally lied about an answer, Joel.

Q Okay. Number 29 --

Redmond - Cross 78

A Maybe I misspoke, but I would not have lied on interrogatories, Joel.

Q Okay. Number 29 says, "Identify all of your other obligations not referenced in the preceding interrogatories, including alimony payments, child support payments and delinquent tax liabilities." Would you read your answer there to the Court?

A "Please refer to the PFS," meaning personal financial statement, "previously submitted by Attorney Bowels to Attorney Ready" -- excuse me -- "as well as the plaintiff's counsel, CBSG, Inc. d/b/a Par Funding versus Redmond" -- we have the date, Feb. term, et cetera -- "in Philadelphia Court of Common Pleas, which is already sent to Jordan's counsel," alluding to you, Attorney Ready.

Q And --

MS. NIGRELLI: Your Honor, I'm going to just object, at this point. We both see what has been asked and answered. If there is not a question, I think he's admitted the truth of this for the purpose of March 19th. We don't have the personal financial statement, and --

MR. READY: Well, Your Honor --

MS. NIGRELLI: -- and we don't --

MR. READY: -- we can go to that next. That's fine. And, Your Honor, this is --

MS. NIGRELLI: There has to be a question --

Redmond - Cross 79

MR. READY: -- this is all part of --

MS. NIGRELLI: -- leading up to, again, numerosity.

THE COURT: I'm guessing that this is part of the foundation that I did ask --

MR. READY: Yes.

THE COURT: -- to be laid. It may be a large foundation, but it is a foundation nonetheless, so I will allow you to continue, with the understanding that, obviously, there is a question pending soon.

MR. READY: There is, Your Honor.

THE COURT: Okay.

MR. READY: I'm just going to show one more document, and then, give me one second.

BY MR. READY:

Q I'm going to show you a document labeled here at the top, personal financial statement, do you recognize this document?

A I can't see it, Joel, that document.

THE COURT: Your screen is not on?

THE WITNESS: It's not, Your Honor.

(Pause in proceedings.)

THE WITNESS: I can see it, now.

BY MR. READY:

Q Do you recognize this document?

A I do, yes.

Redmond - Cross 80

Q And is this the personal financial statement that you prepared with the help of your attorney, Norman Bowles?

A Yes, and I believe I also had some input from David Heim, as well.

Q Okay.

A If my memory serves me correctly seven months ago.

Q Okay. And I'm going to take you down here to what's listed as liabilities?

A Sure.

Q You will agree that these are the liabilities that you disclosed at that time, is that correct?

A At that time, correct, Joel.

Q Okay. And if I took you back one more time to number 24.

MR. READY: And then I will ask my question, Your Honor, I promise.

BY MR. READY:

Q Number 24, do you also recall answering this question, identify your mortgages, promissory notes, security agreements, surety agreements, personal guarantees or unsecured loans with the answer that is bold here? Do you recall --

A Could you recall that, Joel? I was just thinking about the question you're about to ask. Sorry. Go ahead.

Q Okay. Looking at number 24, was this your answer that

Redmond - Cross                    81

you provided to this question that's in bold?

A    It is, yes.

Q    Okay.  So, you've got a longer list of creditors, now, than you disclosed in March of this year, is that correct?

MS. NIGRELLI:  Objection, Your Honor, there were supplemental answers to these interrogatories that were filed, as well.  I don't think we're looking at the latest.

MR. READY:  Well, Your Honor, I'll be happy to lay more foundation.

MS. NIGRELLI:  Well, I don't think we need to lay more foundation, Your Honor, I think it's just, we need to be clear that these weren't the last answers to interrogatories that were given.

MR. READY:  Well, Your Honor, perhaps Mr. Redmond can answer that.  Perhaps, Mr. Redmond thinks he can tell us that he thinks he disclosed them later in a supplemental interrogatory if that's the issue.

THE COURT:  Okay.  I'll let you ask the question.

BY MR. READY:

Q    So, Mr. Redmond, did you disclose more creditors later?

A    So, we get your -- sorry, Your Honor, I apologize -- we get your question.  You know, the interrogatories were done when you sent us the interrogatories, by myself, Norman and David.  That's a pretty -- I don't want to call it general -- but what you just served on me is a lot of information.  You

Redmond - Cross                    82

have to be very specific in these involuntary bankruptcies.

Q    So, maybe my question wasn't clear --

A    But I'm going to finish, Joel, so --

Q    Well, let me try to ask my question again, and maybe I can make it more clear.

A    Why don't you ask your question, buddy.

Q    My question to you was, did you serve supplemental discovery that gave additional creditors that were not listed in what we just saw here?

A    I am unsure of that, Joel, honestly.

Q    Okay.  Perhaps, if I refresh your recollection.  I'll take you to the supplemental objections and answers.  Do you recognize this document?

A    Vaguely.

Q    Okay.  I'm going to scroll --

A    You served a lot of documents, Joel.

Q    Sorry?

A    You served a lot of documents.

Q    I'm going to scroll you all the way to the end here, and there is a verification.  You'll agree that's your signature?

A    It is, Joel.

Q    And you'll agree it's dated May 10th of 2024?

A    Yes, sir.

Q    And, once again, no reason to believe that's not the correct date of this document, correct?

Redmond - Cross                    83

A    Correct.

Q    All right.  So, I'm going to take you -- let me take you back to our numbers here again.  One moment.  Starting with number 24, can you read what's in bold and italics down here?

A    In italics or in bold?

Q    In bold and italics.

A    Okay.  Excuse me.  By way of supplemental answer, is that what you want, Joel?

Q    Yes.

A    "By way of supplemental answer, the PFS supplied identifies the only real property.  Mr. Redmond owns 2005 Regency Drive, Wyomissing," -- et cetera -- "and identifies the mortgage information concerning that property.  The PFS statement, therefore, provides the information requested in this interrogatory."

Q    All right.  I'm going to take you down to 28.  I'm going to ask you to read the italics and bold, starting with, "by way of supplemental answer."

A    "By way of supplemental answer, the PFS supplied identifies the only real property Mr. Redmond owns, 2005 Regency Drive and identifies the mortgage" -- excuse me -- "identifies the mortgage information concerning that property.  The PFS statement, therefore, provides the information requested in this interrogatory."

Q    And I'm going to show you number 29.  You'll agree there

Redmond - Cross                    84

is no italics, bold supplemental response there, correct?

A    Could you repeat -- is there any italics?  No.

Q    Okay.  And those, you believe, were true and correct answers in May of this year, is that right?

A    This was May?  Can you give me the date again, Joel?  I apologize.

Q    Sure.  I'll take you to the last page.

A    Yep.  So --

Q    You signed this on May 10th of 2024.  Did you believe this was true and correct, to the best of your knowledge?

A    At that time, I did.

Q    Okay.  So, my question, why did you remember all of these creditors between then and now --

A    Because you just --

MS. NIGRELLI:  Objection, Your Honor.  The question asked, specifically, for judgment creditors in '24, if I'm not mistaken.  I'm trying to look at this as he's scrolling back and forth.  But that's a very different question than creditors.

MR. READY:  And --

THE COURT:  Well, I think there was more than one question, though, so do you want to respond, Mr. Ready?

MR. READY:  Your Honor, number 29 is crystal clear.  "Identify all your other obligations not referenced in the proceeding, including," and we give examples.  So, I think

Redmond - Cross                85

this question certainly amounts for an explanation of why there is suddenly a proliferation of -- this is all filed under oath, these two, the one that was just filed two days ago, the one that was filed today.  His answer keeps changing, Your Honor, and this is significant.

MS. NIGRELLI:  Objection, Your Honor.  Now, Mr. Ready is trying to testify --

MR. READY:  I'm --

MS. NIGRELLI:  -- or give a colloquy to the Court --

MR. READY:  -- certainly not.

MS. NIGRELLI:  -- that the personal financial statement lists general liabilities.  I agree that it's not in the detail preferably requested in the interrogatory, but it does give general amounts, $6,000,000, and if these -- for instance, as we saw, Mr. Redmond has disputed almost every single amount that he has listed, even to Jason Scott Jordan, who I have just said, for purposes of numerosity, we agree is a judgment.  So, I guess, again, Your Honor, I'm not understanding exactly where he's going, and I don't think he's laid a proper foundation.

MR. READY:  Do you want more foundation, Your Honor?

THE COURT:  I do not.  I think that your foundation was fine, but why don't you respond to her underlying

Redmond - Cross                86

objection?

MR. READY:  Your Honor, this is directly relevant to several questions at issue in this case.  Number one, it's directly relevant to whether he has told the truth on the financial statement that he's filed, now, which has already changed in under a week.  He says, he remembered some additional creditors, but he also testified, on direct, that none of these are new debts.  He testified that these are debts that had been a long time, and he remembered them after further reflection.  He's had plenty of time to reflect, and he didn't put these on prior responses.

Number two, Your Honor, this goes to estoppel.  This goes to the question of, whether, after telling us he only had a certain number of creditors, he can, now, come back to this Court, after saying that under oath, and tell Your Honor that our petition has to be thrown out, because there are too many creditors.  We are entitled to rely on what he has said under oath, counsel said under oath.

MS. NIGRELLI:  Your Honor, he is now talking to bad faith.  We're talking about a simple numerosity, and that is not what the --

THE COURT:  Well, I think he's also speaking to numerosity, as well.  I think his argument is that, if these were the creditors that he's had for some time, they were the creditors, presumably, in March and in May, so --

Redmond - Cross                87

MS. NIGRELLI:  Your Honor --

THE COURT:  -- the fact that they weren't all identified, I think, is the problem?

MS. NIGRELLI:  No.  And, Your Honor, I don't disagree that these are inartfully answered, and that's what I would suggest.  And, really, what should have happened, the proper protocol would have been to file a motion in Berks County Court and ask for a more definite answer or a motion to compel or something else, but it's not to come to Court -- to this Court, a Court of Equity, and file an involuntary petition without doing that.

And, again, the personal financial statement, there is broad base -- not allegations -- broad base liabilities, which is numbers, Your Honor, and it doesn't break down. Again, inartfully drafted, absolutely, and could have been done better, yes, Your Honor, but that doesn't -- the incompleteness or the inartfullness of the answer is not grounds for estoppel or numerosity requirements.

Under the Bankruptcy Code, when you file an involuntary petition, there's only 30 cases in this -- about involuntary petitions, because they're not used, for the sole purpose of they're an extreme circumstances, that you need to make sure that you have all of your I's dotted and your T's crossed, because they are not looked upon, and they're actually frowned upon, in all Courts of Equity, unless there

Redmond - Cross                88

is a reason.

So, to answer an interrogatory from a judgment creditor that's owed $13,000,000 and to be vague, yeah, I get it.  Obviously, inartfully drafted.  But that does not go to what we're here today for, for a numerosity requirement where the Debtor did answer the petition.  He listed the creditors. Now, it's their burden of proof to prove that those creditors don't exist, and we're not listing any random creditors. We're listing Pennsylvania Department of Revenue, the Internal Revenue Service, a quick judgment/lien search would show all of that.  I mean, none of this is, like, a big surprise.  I don't have 80 creditors, Your Honor.  We've got 16/17 creditors, and some of them are disputed.

I mean, I just think that, Your Honor, for the purposes of what we're here for, again, today, I understand -- I understand that Your Honor can look at that to credibility, but it goes well beyond what we're here about, numerosity, and what their burden of proof is to come prove, with some evidence, that he does not have those 17 creditors that we allege he has.  That is his burden.

MR. HEIM:  Your Honor, just because I did, eventually, become counsel in this case from Berks County, there was a pending motion to compel that was scheduled to be heard in front of Judge Fudeman on September 12th, and that was Mr. Ready's motion to compel these very specific answers

Redmond - Cross                                  89

to interrogatories. Now, we never -- that never happened, because, a few short days before that, this involuntary was filed. But, they had moved in Berks County --

THE COURT: Understood.

MR. HEIM: -- for more specific information.

THE COURT: And so, I'll say this, with respect to this line of questioning, I understand -- well, I shouldn't say I understand. I should say that I believe that, with respect to credibility, I will give that its proper weight with respect to this line of questioning.

With respect to whether there are 16 not disputed, not contingent creditors or not is something that I need you to move forward one, because that is your burden under the statute, and to the extent that this doesn't help you do that, I'm not sure I'm going to allow you to go too much further with it.

So, what I would prefer is that you speak to the specific creditors that have been listed and whether they're disputed or not, whether they are contingent or not and whether they fall under 303-1 or 2, so that we can decide whether we need three creditors or whether we need one creditor.

MR. READY: Yes, Your Honor, I understand.

THE COURT: Okay.

Redmond - Cross                                  90

MR. READY: I understand. And I don't know if you want me to respond, now, to all of what I just heard or if you'd like me to save that for later.

THE COURT: You can save that for later.

MR. READY: Okay.

THE COURT: I know that's coming, so that's fine.

MR. READY: Okay.

THE COURT: And, if you need a minute, I understand, since I completely just changed your --

MR. READY: That's okay.

THE COURT: -- train of thought.

MR. READY: That's fine, Your Honor, thank you. I'm going to switch to the document camera, if that's all right?

THE COURT: Okay.

MR. READY: I'm just going to ask counsel to confirm, I believe this is the current list.

MS. NIGRELLI: Oh, look at you, you have the amended.

MR. READY: I found it.

MS. NIGRELLI: Yeah.

MR. READY: Just to make sure that's correct?

MS. NIGRELLI: I just want to make sure -- no, so there's one --

MR. READY: I want to make sure it's correct,

Redmond - Cross                                  91

before I go to the trouble with it.

MS. NIGRELLI: This was just filed today, so this should be -- yeah, it's -- and I just want to make sure that the one that I said was undisputed, I switched. Okay.

BY MR. READY:

Q   So, I want to run through this list with you, Mr. Redmond.

THE WITNESS: I'm sorry, Attorney Ready, Your Honor, do you mind if I use the bathroom real quick, Your Honor, just for two seconds? Okay, that's fine. I've got a bit of a flu.

THE COURT: I don't mean to be difficult, but while you're on the stand, I'm not going to let you leave. I'm sorry.

THE WITNESS: That's okay. I'll hold it.

BY MR. READY:

Q   Mr. Redmond, I'm just going to run through these one at a time. You haven't made any payments to Jason Scott Jordan, is that correct?

A   No, we have not, sir.

Q   You have not made any payments on this debt to Cornerstone Law Firm, is that correct?

A   I think it's Smith Law Group, but, no, I have not.

Q   Okay. And you haven't made any payments to Complete Business Solutions Group, Inc., is that correct?

Redmond - Cross                                  92

A   That debt it disputed. It's still with David Heim, the attorney.

Q   But my question is -- and I'm just going to be running through these one at a time -- you haven't made any payments to them, is that correct?

A   It is disputed, and we have not made any payments.

Q   Okay. Number four, have you made any payments to WBLSPO?

A   We have.

Q   You have? What payments have you made?

A   There was an installment agreement. Going off memory, because this case has been around for two to three years, so forgive me if I'm not specific, but we did make payments to the WBLSPO 2 loan over the course of a year and a half to two years. Sorry, I can't be more specific, but we have made payments, Joel.

Q   And who would have the information on how many payments you've made, if you don't recall?

A   Shannon would most likely have that.

Q   Who is that?

A   Shannon.

Q   Shannon? Is that Shannon Kroemmelbein?

A   That is correct.

Q   And that is your wife?

THE COURT: Can I -- I'm just going to interject

Redmond - Cross                                93

for a second, because I just want to understand who we are, when you ask, we made payments --

THE WITNESS:  I apologize.

THE COURT:  -- is it you or is it the company?

THE WITNESS:  It's just the way I talk.

THE COURT:  No, no, no, I just want to make sure I'm clear.

THE WITNESS:  It's an Irish thing.  I -- I can say, I.

THE COURT:  You made the payments?

THE WITNESS:  I made the payments, correct.

THE COURT:  Okay, thank you.

THE WITNESS:  Sorry, Your Honor.

THE COURT:  That's okay.

BY MR. READY:

Q   And you would say that Shannon would have the information on which payments you've made?

A   Yes, she would.

Q   And did those payments come from you individually or from you and Shannon?

A   It would have came, either, from me, individually.  Shannon might have given me money or it would have came from Shannon, so either/or, Joel.

Q   U.S. Department of Labor, have you made any payments on this claim?

---

Redmond - Cross                                94

A   We have not.

Q   Okay.

A   It's still disputed, Joel.

Q   CardFlex, Inc., have you made any payments on this claim?

A   Yeah.

Q   You have, you said?

A   I have.  Excuse me.

Q   You have?

A   Hmm-hmm.

Q   What payments did you make?

A   Towards the settlement of my -- it was approximately ten -- it was $10,000, not approximate.

Q   Okay.  And was that a one-time payment, multiple payments?

A   That was a one-time payment, approximately two weeks ago, yes.

Q   You said, approximately two weeks ago?

A   Correct, yes.

Q   Okay.  The IRS, have you made any payments on this amount?

A   I am not sure.  There is a lot of IRS debt on here.  To be honest, I get confused between the IRS and, you know, other -- other taxes.  Give me one second, Joel, please and thank you.

---

Redmond - Cross                                95

Yes, we have made some -- excuse me -- I have made some payments towards the IRS, and the accountant has also filed a reduction amount to try and reduce that debt.

Q   And who's the accountant?

A   Malcolm Smith.

Q   And do you know how much -- how many payments you have made?

A   I wasn't prepared to give you that, but I can certainly get it to you.

Q   Do you have any ballpark estimate on how much?

A   I really don't.

Q   When was the last time you made a payment to the IRS?

A   I am not exactly sure.

Q   Was it in the last year?

A   Yes, correct.

Q   Okay.  In the last six months?

A   Yes.

Q   Okay.  So recently, okay.  What about Producer Advance, have you made any payments on this amount?

A   I have.

Q   How much?

A   Are you asking the most recent payment?

Q   Yes.

A   There was -- I believe there was a $10,000 payment, approximately three weeks ago, Joel.

---

Redmond - Cross                                96

Q   Okay.  And when was the last payment before that?

A   It's an installment agreement that happens every month, so it would have been between 20 and 35/40 days.  Sometimes, it's early; sometimes, it's late.

Q   And those payments came from you, directly, you said?

A   I didn't say that.  I said that the payments came from me or Shannon lent me money or they came from Shannon.

Q   Okay.

A   It's a family thing.  We're married, Joel.

Q   When you say Shannon lent you money, is this a formal lending agreement or you're saying that she just gave you money to pay the debt?

A   We document everything for the accountant, so that there is a loan classification, so --

MS. NIGRELLI:  And I am going to object to any kind of questioning relating to payments and whether it was his wife or -- sticking to the direct, I think it is, again, we're getting off topic on whether or not payments were made; whether it was him or him and his wife, and I don't think, you know, he -- that's not relevant.

THE COURT:  Well, I think the only thing -- and, maybe, I mistakenly led you to believe that I needed to know who, specifically.  I only needed to clarify whether it was a business that was making the payments or whether it was the individual making the payments.  It -- I shouldn't say it

Redmond - Cross                          97

doesn't matter, but I will -- doesn't matter to me whether it's the wife or Mr. Redmond. I just needed to know whether it was a corporation making the payments or whether it was the individual. So, to the extent that you want to make those designations, I'm fine.

MR. READY: I'm just trying to establish the source of the payments, and that's really all I am asking.

THE COURT: Understood, okay. That's fine.

MS. NIGRELLI: Your Honor, may I just bring this up?

THE COURT: Yes.

MS. NIGRELLI: I'm just going to leave it up there.

(Pause in proceedings.)

BY MR. READY:

Q   I think we left off on Producer Advance, and you were telling me that you had made a $10,000 payment, I believe is what you told me, is that correct?

A   Yes.

Q   And I think you said that was three weeks ago, am I remembering correctly?

A   Yeah. Between three and four weeks ago, yeah.

Q   Okay. And when was your prior payment before that?

A   I -- as I said, Joel, I can't give you the exact estimation, because I don't -- I don't know what -- but I would imagine, it would between three and five weeks ago

Redmond - Cross                          98

before the last payment, Joel.

Q   Okay. Are you making those in regular installments?

A   We're doing our best.

Q   Okay.

A   We, as in myself and Shannon.

Q   Okay. American Workers Insurance Services, when was the last time you made payment on that?

A   AWIS, we have not made a payment on AWIS.

Q   Okay. Never?

A   Nope. It's in dispute, as you can see.

Q   Okay. How about number ten, All Web Leads, when was the last time you made a payment on that?

A   That was $5,000 -- excuse me -- I apologize -- that was $8,000 approximately seven to ten days ago. It was pretty recent, Joel.

Q   Okay. You think it was seven to ten days ago?

A   Seven to ten days ago.

Q   You don't remember what day of the week it was?

A   No, Joel, Monday, Tuesday, Wednesday, Thursday or Friday, one of the days.

Q   Okay. Of last week, this week?

A   I -- I believe it was --

MS. NIGRELLI: Objection, Your Honor, asked and answered. He said he doesn't know the exact date.

THE COURT: It was a little sarcastic, his

Redmond - Cross                          99

response.

MS. NIGRELLI: I understand.

THE COURT: So, I'm going to ask him to just be more specific. Was it last week or was it this week?

MS. NIGRELLI: I'm just going to say, if you don't know -- may I just say, Your Honor, if he doesn't know --

THE COURT: Yes, if you don't know, that's fine.

MS. NIGRELLI: -- you can stick with you don't know. Right.

THE COURT: But when you say seven to ten days?

THE WITNESS: I mean seven to ten days, right.

THE COURT: Okay, we'll leave it at that.

MR. READY: Okay, understood, Your Honor.

THE WITNESS: I'm not trying to be deceptive but it was, Joel, seven to ten days ago, sir. That's just what I remember. This list of debt, personally, you're doing your best to pay your debts, you know. You're trying to pay this down, and you lose -- you know, I don't know if it's a Monday; I don't know if it's a Wednesday, so I'm not trying to be facetious. I'm just giving you the best recollection that I have, sir.

BY MR. READY:

Q   What day were you served with this petition?

A   I found out about this petition on Sunday. I know that wasn't your question. I just need to think back. So, I

Redmond - Cross                          100

found out about this petition on Sunday from Mr. Heim. That was approximately -- I believe that was two Sundays ago, Joel.

Q   Okay. So, it was before you made the last payment on this, correct?

A   Before we made the last payment?

Q   On All Web Leads? So, seven to ten days ago, so you had the petition before you made that payment, correct?

A   Honestly, Joel, I understand what you are trying to do, but what was --

Q   I just need an answer. It's just a yes or a no question.

A   -- the dates, you know --

Q   Was it before you paid All Web Leads or not?

A   I'm not sure. I really am unsure. It's been a pretty crazy week with your involuntary bankruptcy petition, Joel.

Q   How about Santander Bank, when is that last time you made a payment to them?

A   I would imagine it was either 30 or 60 days ago.

Q   Okay. And do you remember how much it was for?

A   I believe the installment is for approximately $950.

Q   Is that just a regular car loan or is that something different?

A   That's a regular car loan. That's an auto loan in my name, sir.

Redmond - Cross                101

Q   Okay.  Duane, Morris, LLP, when was the last time you made payment on that?

A   Five to six weeks ago, maybe six to seven weeks ago, Joel.

Q   And how much did you pay them?

A   I believe it was $25,000, but, again, can provide you that information.  I don't have it on me.

Q   Rush Law Group, when was the last time you made a payment?

A   I believe we paid Rush Law Group, again, seven to ten days ago, Joel, approximately.

Q   And when was that last time before that you made a payment to Rush Law Group?

A   I would imagine it was probably a month prior, 30 days prior.

Q   Okay.  How long have you owed Rush Law Group that debt?

A   This has been a debt that's been sitting there for a number of months, if not six to seven months, and Bill Rush is very kind.  He understands that there's a lot of debt that I'm trying to clear up here, so --

Q   Did you owe that debt in May of this year?

A   I would imagine that I owed more of that debt, and I'd imagine the balance was higher.  I remember, at one point, Rush Law Group, we owed them 35 to $40,000, so this has obviously come down in the last number of months.

Redmond - Cross                102

Q   Pennsylvania U.C. Tax Services, when was the last time you made payment?

A   I believe about 60 days ago from my recollection.

Q   And how much did you pay?

A   It would have been $5,000.

Q   And Pennsylvania Department of Revenue, when was the last time you made payment?

A   Again, I believe it was a $2,500 payment, approximately 60 days ago.  Joel, let me restate that, between 30 and 60 days ago.

Q   Berks County Tax Claim, when was the last time you made payment?

A   I believe that was recently.  These taxes run into each other, to be perfectly frank, so they're hard to keep a track of, but I really -- I'm not sure when that was paid, whether -- the most recent day it was paid.

Q   Okay.  Bochetto & Lentz, when was the last time you made payment on that debt?

A   Approximately 21 days ago.

Q   Okay.  Going back through these 17, if you need to see them again, let me know --

A   Sure.

Q   -- I can put them back up -- were any of these debts, debts that you did not owe in May of this year?

A   Would you like me to attempt to go through them?

Redmond - Cross                103

(Transcriber change)

MS. NIGRELLI:  Objection, Your Honor.  Relevance.  Again, we're only here for numerosity.  He's trying to go back into credibility, I understand, but we're not here for that and it might not even be relevant if he doesn't have the necessary petitioning creditors and this case is dismissed.

MR. READY:  Well, of course that is the issue, isn't it?  And it's not just credibility, it's estoppel.  It's estoppel as to whether if these are -- any of these are new debts that have arisen since May or not.  Perhaps he can tell us that question.  I mean, I don't think that's a --

THE COURT:  That question is fine, but I wouldn't go too much further down this road because I think that perhaps you're missing what I need from you, so --

BY MR. READY:

Q   Are there any of these debts that have arisen since May of this year?

A   Put it back up on the screen, please, Joel --

Q   Sure.

A   -- so I can look at them.  As you can tell, I don't have the exact details so I appreciate you helping me out.  Could you repeat the question, please?

Q   Sure.  And I can go through the whole thing, I can scroll it for you if you need.  I'm asking which if any of these debts are new since May of this year.

Redmond - Cross                104

A   I believe that the Jordan judgment was entered in '22, this is going off of recollection --

MS. NIGRELLI:  Objection.  It's -- it's speculation if he doesn't have an answer.

THE COURT:  Well, I think the question was not going back as far as '22, I think he's asking if anything since May of 2024 is new.  I think a lot of this is an admission as to when it was --

THE WITNESS:  Sure.

THE COURT:  -- incurred.

THE WITNESS:  Yeah.

THE COURT:  So there were really only a few that don't already have dates on them, so perhaps if you want to go through those, that may be the better way to get an answer.

MR. READY:  Okay, sure.  As far as dates, Your Honor, actually I'm not sure -- most of these don't have --

THE COURT:  I think in terms of the amount, there are dates for at least a few of them --

MR. READY:  Okay.  Well, I'll ask it a slightly different way.

THE COURT:  -- so --

BY MR. READY:

Q   Complete Business Solutions Group, you knew about that debt in May of this year, correct?

Redmond - Cross          105

A   Yes.

Q   WBL, you knew of that debt in May of this year?

A   Yes, sir.

Q   U.S. Department of Labor, you knew of that one in May of this year?

A   Yes, sir.

Q   Cardflex, you knew of that in May of this year?

A   I knew that there was a potential lawsuit through a settlement, but it didn't happen, Joel, so I knew that I was going to have to owe them money.

Q   Well, in fact, you -- you said you signed that settlement agreement recently, is that correct?

A   Recently as in the last three-to-four weeks, I want to say.

Q   Okay.  And that lawsuit had been pending for some time?

A   They have been threatening the lawsuits.  I received -- excuse me while I go through my -- my memory, I had received -- I was served with that lawsuit -- we knew -- I believe that's -- I don't know which attorney it was but I think David Heim alerted me to that lawsuits (sic) and then we started to -- to talk about settlement and that was approximately three-to-four weeks ago, I believe.

Q   Okay.  So you knew about Cardflex though in May of this year, correct?

Redmond - Cross          106

A   I knew that there was going to be a -- a potential lawsuit, yes.

Q   You knew about the IRS debt in May of this year?

A   Yes.

Q   Producer Advance, you knew about that one in May of this year?

A   Before, yes.

Q   American Workers Insurance Services, you knew about that in May?

A   Yeah, that's been pending for a number of years so --

Q   All Web Leads, you knew about that in May?

A   Yes, sir.

Q   Santander Bank, you knew about that in May?

A   Yeah.  Yes.

Q   Duane Morris, LLP, you knew about that in May?

A   Correct.

Q   Rush Law Group, you've said you've known about that for a few years, correct?

A   The number has changed because we've been trying to pay bill down, but yes, that is correct, there was a debt to them.

Q   Pennsylvania Unemployment Compensation Tax Services, you knew of that one --

A   Yes.

Q   You knew about Pennsylvania Department of Revenue

Redmond - Cross          107

in May of this year?

A   Uh-huh.

Q   And the Berks County Tax Claim also?

A   Yes, sir.

Q   Bochetto and Lentz, you knew about that in May of this year?

A   I'm thinking the balance could be different to be specific, but yes --

Q   Okay.

A   -- we owed them money --

Q   And if I went through the same list --

A   -- but it does seem high.

Q   -- with you and asked about March, you knew about those in March as well, correct?

A   I would do my best to recall, but yeah.

Q   So I'd like to ask about are there any of your family members that own any of these creditors that are listed here?

A   There are some co-debtors, if I'm saying that correctly, yes.  Could you --

Q   Okay --

A   Mm-hmm.

Q   -- yes, slightly different question.  The actual companies, do you -- do you have family members who have ownership interest in any of these entities that you owe

Redmond - Cross          108

money to?

A   I would need to see the list again.

Q   Okay --

A   Yeah.

Q   -- sure.

A   I don't believe I do but --

Q   Tell me when I can move it up.

A   Please move it up.  Thank you.  Okay, none on that page, Joel.

Q   Give me one second, folks.

(Pause)

A   Can you move up a little bit, sir?  Thank you.  None on that page.  This -- this is what I owe Alan Redmond (phonetic).

Q   Some of these are listed as personal guarantees, and so I want to walk through those.

A   Mm-hmm.

Q   Give me just one moment.  So I'll start with Complete Business Solutions Group, Inc --

A   Mm-hmm.

Q   -- says it's personally guaranteed.

A   Sure.

Q   Has that not -- who -- who's the primary debtor on that?

A   The primary debtor was a combination of NBOA, the

Redmond - Cross                 109

company that I used to own, Joel, and Bene Markets, and it was -- I'm going to do my best here, undersigned with my personal guarantee.

Q    Okay.  So did NBOA or Bene Market contribute payment toward that, or they defaulted?

A    They have.  They -- they contributed payments multiple times.

Q    Okay.

A    Mm-hmm.

Q    Is that currently in default, that debt?

A    I'm not sure.  I would -- it's a question that I would ask my attorney.

Q    Okay.  Number 4 --

A    I -- I don't want to speculate per Nicole, but I believe it is.

Q    You believe it's in default?

A    I believe so, 90 -- I'm 98 percent sure, Joel.

Q    Okay.  I'd like to ask you about -- excuse me, Number -- sorry, Number 6, Cardflex.

A    Hmm.

Q    Who was the primary debtor on that?

A    I'm -- I'm not sure, but I can tell you some of the debtors on it, if that's --

Q    Sure.  Who -- who owes the debt?  Since you're a personal guarantor, who did you guarantee for?

Redmond - Cross                 110

A    I owe the debts, Shannon owes the debt also, Shannon (inaudible), my wife.

Q    And who else is signatory on that debt?

A    I believe it's just my signature and Shannon's signature, I believe so.

Q    Let me put it a different way.  Who did you --

A    Mm-hmm.

Q    -- who did you personally guarantee this for?

A    For Shannon.

Q    Okay.

A    She asked me to -- to be a signature -- well actually, let me retract that if you don't mind.  Cardflex is a merchant processor, Joel, and she was having a hard time with her merchant processor which is used to collect membership fees for sales, and when you get into a default with a company like Cardflex or Visa or MasterCard, they attach to everybody that's in that person's circle.  So Shannon owed the original debts and because I was her husband, they entered into the settlement, they wanted my personal guarantee also, which is a way to cover your liability.

Q    And what business was this doing the card processing for?

A    This is a -- a company called ABN, which Shannon owns.

Q    ABN?

A    ABN Network, correct.

Redmond - Cross                 111

Q    Okay.  And what does that company do?

A    It's a -- it's another marketing organization, but really what it does is it provides products to insurance agencies and it also provides technology like a CRN (phonetic), Joel, to be brief.

Q    Producer Advance, LLC, who's the primary debtor on that?

A    That would be me.

Q    So it says "personal guarantee" --

A    Mm-hmm.

Q    -- "for commission advances."  Who -- what company were these advanced for?

A    Well, we -- we had to take advances for NBOA and Bene Markets.  It was for NBOA and Bene Markets, from my recollection.

Q    And are they in default?

A    No.  Producer Advance is in a settlement.  I had told you that we -- we had made a recent payment the number of weeks ago.

Q    American Workers Insurance Services.  Who's the primary debtor?

A    The primary debtor is Bene Markets, a company that's -- that I own and I -- I have a -- I believe I have a personal guarantee, I believe so.

Q    Is Bene Market currently in bankruptcy?

Redmond - Cross                 112

A    It is not.

Q    Do you intend to file it for bankruptcy?

A    I would probably seek advice of my attorney so I'm not sure.

Q    So All Web Leads --

A    Mm-hmm.

Q    -- it says it's a personal guarantee.  Who is the company that's the primary debtor on -- on Number 10?

A    Who's the -- the company that is the primary -- oh, Bene Markets.

Q    Okay.

A    Mm-hmm.

Q    Is that in default?

A    No, it is not.  There's been late payments, but it's not in default.

THE COURT:  Can you clarify are you asking if Bene Markets is in default or are you asking if the debt itself is in default?  Because I think what he just answered is that the debt is not in default --

MR. READY:  So --

THE COURT:  -- so I don't know which question you're asking.

MR. READY:  Okay, sure, let me -- let me back up then, yeah.

BY MR. READY:

Redmond - Cross                                    113

Q   Is Bene Market currently in default on that debt?

A   No, it is not.

Q   Okay.

THE COURT:  Thank you.

BY MR. READY:

Q   The Unemployment Compensation Tax Services --

A   Mm-hmm.

Q   -- is Bene Market making payments on that?

A   I'm making the payments on that.

Q   You are personally, is that correct?

A   When I can and if I can't make the payment, Shannon makes the payment.

Q   So Bene Market is not paying on that debt?

A   Well, when it comes to -- to Bene Market, sometimes Shannon will put in $10,000 -- just to be specific, I'm not, you know -- reduce my credibility, there's 10,000 from Shannon into Bene Markets, and then Bene Market will make that payment, Joel.  But the origin of source which you're getting to is -- is Shannon.

Q   So I guess let me -- let me make sure, so Bene Market is making those payments, it's just doing so with an outside investment, is that what you're saying?

A   No, that's not what I'm saying.  Could you -- could you re-clarify --

Q   Who's sending --

---

Redmond - Cross                                    114

A   -- please?

Q   -- the check to Unemployment?

A   There's no check that goes to Unemployment.  That's usually a wire.

Q   Okay.  Who's sending the wire?  Is it --

A   Who's --

Q   -- Bene Market?

A   Who's clicking and sending the wire?  What do you --

Q   What -- what bank account is it coming from?  Who owns the bank account --

A   It's either --

Q   -- that's paying for it?

A   -- coming from one of Shannon's business accounts because she owns multiple businesses and she's not a housewife, per the TRO, or it's coming from Shannon directly.  It is not coming -- I think you're alluding to does it come from my bank account.  It does not.

Q   So I'm asking does it come from Bene Market's bank account.

A   It -- it can come from Bene Market's account, as I said, Shannon will transfer money into Bene Market sometimes and pay it.  If it's a little bit late then Shannon will -- will send the wire directly.  It's a timing thing.

Q   What --

THE COURT:  Can I ask -- I'm sorry --

---

Redmond - Cross                                    115

THE WITNESS:  Yes, Your Honor.

THE COURT:  -- I'm going to interrupt you --

MR. READY:  That's fine.

THE COURT:  -- the Pennsylvania Unemployment Tax itself, the account is for Bene Market, correct?

THE WITNESS:  It is, yes.

THE COURT:  Okay.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

MR. READY:  Yes, okay.

BY MR. READY:

Q   The Pennsylvania Department of Revenue, is this for your personal income tax or a business?

A   It's State income tax so I believe that is personal.  I believe so.

Q   Okay.

MR. READY:  Your Honor, I need just one minute.

THE COURT:  Sure.

(Pause)

BY MR. READY:

Q   For all of the creditors that we just discussed --

A   Mm-hmm.

Q   -- is there -- do -- do any of them -- are any of them partially or fully owned by Arthur Walsh?

A   Can --

---

Redmond - Cross                                    116

MS. NIGRELLI:  Objection.

THE WITNESS:  Can you re-ask the question again, Joel?  Sorry, Nicole.

MS. NIGRELLI:  Yeah, I need that question again --

MR. READY:  Sure, sure.

MS. NIGRELLI:  -- as well.

BY MR. READY:

Q   The 17 creditors that are -- that are listed here that we just went through --

A   Sure.

Q   -- are any of these creditors partially or fully owned by Arthur Walsh?

A   Partially --

THE COURT:  Owed?

MR. READY:  Owned, owned.

THE COURT:  Owned.

MR. READY:  Sorry, owned.

THE COURT:  Got it.

THE WITNESS:  I'm gonna --

MR. READY:  O-W-N-E-D.

THE COURT:  Thank you.

THE WITNESS:  Thank you.  So, I'm gonna -- I'm confused.  Are you saying are any of the creditors, Joel, that the actual companies that -- that I owe money to, Arthur's companies?  Is that what you're asking?

Redmond - Cross                                117

BY MR. READY:

Q   Correct.

A   Are any -- Producer Advance, is it Arthur's, is that what you're -- you're asking?  No.

Q   Producer Advance is Arthur Walsh's company.

A   No, I didn't say that, Joel, I'm just clarifying the question.  None of the companies, the creditors, are owned by Arthur Walsh.

Q   Okay.  Are any of these companies that are creditors owned by Shannon?

A   Can you put it up again?  I'd like to -- you're being tricky, Joel, I just want to make sure I give you the right answer.  Shannon does not own Jason Scott Jordan, Cornerstone Law Firm, CBSG.  She doesn't own WBL.  Department of Labor, no.  Cardflex, no.  Internal Revenue Service, no.  Producer Advance, she's not an owner.  Thank you -- does not own AWIS, All Web, she doesn't own Santander, Duane Morris, Rush, so the question is no.

Q   Okay.

A   Or the answer is no.  Excuse me, Joel.

Q   Arthur Walsh, Jr., is that the same as Arthur Walsh?

A   You gotta restate the question.

Q   Are there two Arthur Walshes?

A   You're being tricky, buddy, so I just want you to --

Redmond - Redirect                             118

Q   Are there two Arthur Walshes that work with you?

A   No, there's one Arthur Walsh, it's Arthur Walsh, Jr.

Q   Okay.

A   The (inaudible) he called him, he actually has a dual MBA, but go ahead.

Q   Jesus Barrios (phonetic) --

A   Ah-huh.

Q   -- does he own any of the companies that are on this creditor list?

A   No.  He works for Arthur and Shannon.  I believe his official title is Vice President.

Q   Okay.

MR. READY:  Thank you.  I have nothing further, Your Honor.

THE COURT:  Okay.

MS. NIGRELLI:  Some redirect, Your Honor?

THE COURT:  Yes.

REDIRECT EXAMINATION

BY MS. NIGRELLI:

Q   So I know we've been talking about this creditor list --

A   Sure.

Q   -- and I think you've given some conflicting testimony so I just want to be clear and --

A   Okay.

Redmond - Redirect                             119

MS. NIGRELLI:  -- can I --

MR. READY:  Yeah.

MS. NIGRELLI:  -- can I use yours --

MR. READY:  Sure.

MS. NIGRELLI:  -- just --

MR. READY:  Yeah, that's fine.

MS. NIGRELLI:  -- so that we're --

MR. READY:  Yeah.

MS. NIGRELLI:  -- looking at the latest and greatest.

BY MS. NIGRELLI:

Q   I'm going to show you again the --

A   Sure.

Q   -- amended -- I'm just going to start with --

A   Uh-huh.

Q   -- this --

A   Uh-huh, uh-huh.

Q   -- and I just want to go through this again because I think some -- some of your testimony was confused.  Complete Business Solutions Group --

A   Uh-huh.

Q   -- you dispute that you owe anything, is that correct?

A   Correct.

Q   Okay.  So whether you have a personal guarantee or

Redmond - Redirect                             120

not, you're -- you believe there's a bona fide dispute to that debt?

A   Yes, ma'am.

Q   Okay.

A   Mm-hmm.

Q   For WBL SPO --

A   Uh-huh.

Q   -- I believe you said that there was a settlement that was entered into, is that correct?

A   It was, and then we -- I defaulted on the settlement.

Q   Right.  And that settlement was entered into after a default was -- by the company, it says --

A   Mm-hmm.

Q   -- "personally guaranteed by A.R., which I'm assuming is you?

A   Yes.

Q   So was there a default in the underlying obligation for WBL SPO?

A   Yes, there was.

Q   So therefore, they came to you as personal guarantor to cure that default, is that correct?

A   Sure, correct.

Q   Okay.  Department of Labor, you already have a judgment against you --

A   Sure.

Redmond - Redirect                         121

Q   -- for liability with respect --

A   And, Nicole, I apologize.  Judge, can I use the bathroom for one second, please?  I've got the flu, I need to use the bathroom.  Is that okay, Joel?  Two seconds.

MS. NIGRELLI:  I defer to you, Your Honor.  I will stay in the courtroom and I --

THE COURT:  That's fine.  That's fine.

THE WITNESS:  Is that okay?

THE COURT:  Sure.

THE WITNESS:  Thank you, I appreciate it.  Excuse me, guys.  I apologize.

MS. NIGRELLI:  You don't have your phone with you, Alan?

THE WITNESS:  No, I can leave it right here.

MS. NIGRELLI:  Yes, leave it here.

THE COURT:  That would be great.

THE WITNESS:  No problem.

THE COURT:  Thank you.

THE WITNESS:  Thank you.  Sorry, Your Honor.  Be back in one second.

COURTROOM DEPUTY:  Do you want to go off the record?

THE COURT:  We can go off the record.

(Off the record, 12:17 to 12:20 p.m.)

THE COURT:  Okay, we can go back on the record.

Redmond - Redirect                         122

And just to remind you that you're still under oath, Mr. Redmond.

THE WITNESS:  Yup.

THE COURT:  Okay.  Ms. Nigrelli.

MS. NIGRELLI:  Okay.

BY MS. NIGRELLI:

Q   So, Mr. Redmond, we were just talking about your creditors --

A   Yeah.

Q   -- and we were on WBL SPO.

A   Uh-huh, uh-huh.

Q   I believe you just testified that there was an underlying liability and that there was a default --

A   Correct.

Q   -- and that they came after you --

A   Uh-huh.

Q   -- is that correct?

A   Yes, ma'am.

Q   And they called your personal guarantee, is that correct?

A   Correct.

Q   I believe you also stated that you made some payments with respect to the litigation --

A   Correct.

Q   -- is that correct?

Redmond - Redirect                         123

A   Yup.

Q   So is now it says "Berks County, 23-13390."  That case -- that case has -- has that case been settled?

A   It has not.  It's still in litigation.

Q   It still is in litigation --

A   Correct.

Q   -- but you're trying to settle it, correct?

MR. READY:  I object to the leading, Your Honor.  I don't mind pointing out that it's on the chart and I'm just going to object to --

MS. NIGRELLI:  I'll -- I'm sorry, I'll rephrase.

THE COURT:  You can rephrase.

MS. NIGRELLI:  Yeah.

BY MS. NIGRELLI:

Q   The litigation is still ongoing?

A   It is.

Q   And were you personally named?

A   I was.

Q   Okay.  For Cardflex --

A   Mm-hmm.

Q   -- Number 6 --

A   Yes.

Q   -- were you personally named in that litigation?

A   I was.

Q   Was there a dispute as to the underlying -- excuse

Redmond - Redirect                         124

me, was there a default as to the underlying creditor on that debt?

A   I don't believe there was a default -- sorry, it's just a lot of --

Q   I understand.

A   -- creditors, Nicole, so I hope you don't think (inaudible) it --

Q   Do you recall -- yeah, do you recall why you were sued?  It says that you were named as a personal defendant.  Do you know why they sued you?

A   Shannon's company, Seguro, Shannon and Arthur's company owed Cardflex money.

Q   And did they not pay the money?

A   They were falling behind in payments.

Q   Okay.  So they sued you?

A   As I said, the -- the Attorney Ready, these merchant processors could (inaudible).  They want to make sure that they capture everybody and I was one of those people obviously because I'm married to Shannon.

Q   And because you signed a personal guarantee.

A   Yeah, I wanted to -- to see if I could somehow reduce her liability, you know.

Q   So they came after you on your personal guarantee, is that correct?

A   Correct.

Redmond - Redirect                    125

Q    The Internal Revenue Service --

A    Mm-hmm.

Q    -- Number 7 --

A    Yeah.

Q    -- can you read what it says under "Comments"?

A    Could you move it up a little bit, Nicole?

Q    Sure.  Sorry.

A    Thank you.  "Combination of personal tax, Bene Market trust fund penalty, subject to processing of amended return reducing amount owed by $650,466.64."

Q    So some of this money owed to the Internal Revenue for your personal tax?

A    When you don't pay these taxes -- I believe these are a combination of personal payroll, so when you don't pay payroll taxes they assess it against you personally in a trust fund penalty.

Q    And do you owe any personal tax to the IRS that you're aware of in addition?

A    I do, and I believe it's on the next -- next page, Nicole.

Q    Producer Advance --

A    Mm-hmm.

Q    -- LLC --

A    Mm-hmm.

Q    -- was there a default under the original agreement

Redmond - Redirect                    126

with Producer Advance, LLC that -- and did --

A    Yeah.

Q    -- that they came after you?

A    I'm -- I don't believe there was.  I believe they moved immediately to settlement.

Q    How did you get involved?

A    I was using -- so when you're selling a product such as a health insurance product or a life insurance product or whatever, dental product, Producer Advance will provide an advance on your commissions.  So if you sell a product, a health insurance -- a Blue Cross/Blue Shield plan, you can receive a -- an advance which will help you with cash flow so you can do payroll, buy leads such as All Web Leads, et cetera.

Q    Did the company not pay for those leads?

A    I'm confusing you, Nicole.

Q    Yes, did the company not pay for those leads that they advanced?

A    The block of -- I'll try and make this as simple as possible, I apologize if I'm coming off facetious, the block of business, the -- the amount of clients within Bene Market wasn't enough to offset the advances and when that happens, you have to pay the advancer back because they're technically lending you money in the hopes that they recoup that money in a recurring revenue type of --

Redmond - Recross                     127

Q    So did -- did Bene Market not pay that money back and they came after you?

A    Correct.

Q    Okay.  All Web Leads, is that the same way, the company didn't pay the money and they came after you?

A    All Web Leads is the lead company, so the lead company provides you with leads and people to talk to --

Q    Mm-hmm.

A    -- I guess you could say, so we fell behind on -- I fell behind on bills with Bene Market and -- and All Web.  I had a good relationship with the owner, a guy called Bill Daniel, and we entered into settlement, personally guaranteed of course to avoid litigation.

MS. NIGRELLI:  I have no further redirect, Your Honor.

THE COURT:  Mr. Ready?

RECROSS-EXAMINATION

BY MR. READY:

Q    So a few of these, I believe you said on cross that these were not in default.  It sounds like now you're saying that maybe they are in default by the --

A    Yeah.  But honestly, Joel, I'm doing my best to remember this stuff, the accountant is -- you know, I'm not trying to be deceptive but the accountants put these figures together and the attorneys helped so I'm -- I'm doing my best to --

Redmond - Recross                     128

Q    So --

A    -- to explain whether -- I'm trying to remember, Joel, sorry to cut you off -- whether they're in default or whether they were in default or -- this is the situation now, sir --

Q    Okay.

A    -- respectfully.

Q    So it seems like at least for three or four of these, you are not currently sure if they're in default or not, is that correct?

A    Potentially, yes.

Q    Okay.  Who would be -- who would be the person who would know if these were in default?  Is that your accountant, Malcolm Smith?

A    I would say more the attorneys that -- my attorneys because they deal with the litigation.

Q    Okay.  You think that Mr. Heim or somebody else like him would know if it was in default?

A    Yeah, I would -- I would believe that they could, many of them have went the legal path, litigation, so they would know better than me.

Q    Okay.  So -- okay.  If we -- if we were looking for the person who had the best knowledge of your legal team, would that be Mr. Valz, would that be Mr. Heim in terms of whether -- whether these are in default?

A    Mr. Valz is -- is a staff attorney for Seguro Medico so

Redmond - Recross                                129

it wouldn't be Mr. Valz.  He handles Shannon and Arthur's day-to-day stuff.  I did communicate with Mr. Valz, you know --

Q    But he's not your attorney, is that correct?

A    He was.  I believe he entered an appearance in one case, but I can't recollect that.  But the dynamic there was Shannon allowed me to use Norman that week to see if our fees with Bochetto and Lentz were -- which were a little bit more expensive, so Mr. Valz I believe is in one case.  I believe it's with AWIS, American Workers Insurance Services.

Q    But as far as you know, he doesn't represent you on anything else?

A    I -- I don't know.  I -- I can't recall, Joel.  There's a lot of litigation going on.

Q    Okay.

MR. READY:  Thank you, Your Honor.  I have nothing further.

THE COURT:  Okay, I just want to clarify something really quickly.  All Web Leads is listed as undisputed on the amended, correct?

THE WITNESS:  Correct.

THE COURT:  Both of you, is that correct?

THE WITNESS:  Yes.

MS. NIGRELLI:  Yes, Your Honor --

THE WITNESS:  Yes.

---

Redmond - Recross                                130

MS. NIGRELLI:  -- I believe -- yes, it's undisputed on the amended.

THE COURT:  Okay.

MS. NIGRELLI:  The two changes on the amended were All Web Leads listed as undisputed and Number 17, Bochetto and Lentz.

THE COURT:  Got it.  Okay.

MS. NIGRELLI:  Those were the only two amendments.

THE COURT:  And then, Mr. Redmond --

THE WITNESS:  Yes.

THE COURT:  -- your testimony with regard to All Web Leads is that there's a settlement agreement that was roughly seven-to-ten days ago, a payment was made.

THE WITNESS:  I -- I can -- I believe it was --

THE COURT:  Okay.

THE WITNESS:  -- seven-to-ten days ago.  Things have been moving quickly, Your Honor --

THE COURT:  Okay.

THE WITNESS:  -- around these parts recently.

THE COURT:  Is that when the settlement agreement was entered or that's when the payment was --

THE WITNESS:  That was when the last payment was, approximately seven-to-ten -- the settlement agreement has been around for I believe two-to-three years, it's that the balance was over $1 million and, you know, I've been trying

---

Colloquy                                131

to -- to pay that down.

THE COURT:  Okay.  I'm sorry, if that brings up any questions from either of you --

MR. READY:  No, Your Honor.

THE COURT:  -- I'd gladly give you -- okay, all right, you can step down, Mr. Redmond.  Thank you.

THE WITNESS:  Okay, thank you.

(Witness excused)

THE COURT:  Okay, so we're going to adjourn for about an hour-and-a-half.  We can go off the record.  We'll come back at 2:00.  If you would like to handle the motion to quash and service issues first so that your service processor is not sitting around all afternoon, we can do that first before we get back into this.  I leave that to you to decide between the two of you and you can let me know when we come back.  Otherwise, we'll adjourn until 2:00.

MR. READY:  Okay.

MS. NIGRELLI:  Okay, thank you, Your Honor.

MR. READY:  Thank you, Your Honor.

THE COURT:  All right, thank you.

(Off the record, 12:30 to 2:00 p.m.)

COURTROOM DEPUTY:  All rise.  Court is now in session.  You may be seated.

THE COURT:  Okay, do we need to wait for anyone else?

---

Colloquy                                132

MS. NIGRELLI:  Your Honor, yes, they're --

THE COURT:  He might be being --

MS. NIGRELLI:  Yeah --

THE COURT:  Okay.

MS. NIGRELLI:  -- they might be still --

THE COURT:  In security.

MS. NIGRELLI:  Yeah.

THE COURT:  Yeah.

MS. NIGRELLI:  Check real quick?

MR. READY:  They told me the machine was being over-active, which is why all of us got dinged coming in this time.

MS. NIGRELLI:  And of course this time I didn't go off.

THE COURT:  Okay, that's --

MS. NIGRELLI:  I didn't go off --

THE COURT:  -- that's good.

MS. NIGRELLI:  -- I went off another time, yeah.

THE COURT:  Okay, that's good.

MS. NIGRELLI:  So maybe he --

THE COURT:  All right, so we'll -- we'll give him a minute or two.

(Pause)

MS. NIGRELLI:  So they're coming, but we are not necessarily waiting for anyone else.

Colloquy                                133

THE COURT: Oh.

MS. NIGRELLI: I think they're still going through security.

THE COURT: Okay. So let me ask the -- the first question, which is are we going to take up the motion to quash first to discuss whether or not we have an issue or --

MR. READY: Your Honor, counsel and I were discussing a couple of options.

I mean, I guess you're okay if I represent what we're --

MS. NIGRELLI: Yeah, so --

MR. READY: -- or do you want to talk about it first?

MS. NIGRELLI: Yeah. Can you give us a minute? We were just trying to --

THE COURT: I can, absolutely.

MS. NIGRELLI: Okay.

THE COURT: Absolutely.

MR. READY: Okay, sorry.

THE COURT: Go ahead.

Keith, we can go off the record for a minute, yeah.

(Pause)

THE COURT: Okay.

MR. READY: Your Honor, counsel and I have been in discussions about a -- a few things. I have a few witnesses

Colloquy                                134

to briefly present --

THE COURT: Mm-hmm.

MR. READY: -- just a quick bit of rebuttal, but also really primarily to talk about the bond issue --

THE COURT: Okay.

MR. READY: -- and ability to pay will be the testimony very briefly.

THE COURT: Okay.

MR. READY: Counsel was asking if you would rather that we -- I do -- Mr. Shalter's got a few things that would still go to the substance so I guess I could call him first and I think that would probably be the right next move, and we can then go into argument if the Court so desires.

THE COURT: Okay.

MR. READY: On the subpoena issues, what we have been discussing is potentially my going back through these subpoenas because I think that Mr. Heim is telling me that the main concern he has at this point is the amount of what we're asking for, and I don't want to speak for him but I -- I'm willing to take a second pass through those and see what I can trim down to simplify things.

THE COURT: Okay.

MR. READY: The possibility would be -- because I think there's still desire to do some additional discovery back and forth -- considering whether the Court would grant

Colloquy                                135

an extension of the TRO and we can move the hearing back long enough for them to do the discovery they want to do. In an agreement to extend the TRO for some period of time, there are a few things we would need including the schedules that were to be filed yesterday, we would need those as quick as we could and I do want the originals that Ms. Hatmaker testified to earlier. So I think that covers everything, but I'll let counsel fill in blanks if I missed any.

THE COURT: Okay.

MS. NIGRELLI: The only thing I would -- we -- we were quickly discussing this before after Court adjourned, Your Honor --

THE COURT: Mm-hmm.

MS. NIGRELLI: -- and the only thing I would add is I think -- and I think Mr. Ready knows this, I think none of that is necessary as I think that once we finish up with our numerosity requirement, that the motions to quash and everything becomes nullified. However, there still would be discovery and we did discuss extending that out.

We didn't know what that would look like at all, but we did discuss -- I said that I would be pressing a bond if that was the case and also a pare-down of the TRO for things that did not -- were not companies that Alan Redmond had any ownership interest in.

But again, I leave that all to the fact that if

Colloquy                                136

this does go forward on the TRO on Monday, Your Honor, I think the way we both saw it is there is additional discovery that needs to happen, and it's not going to happen on Thursday and Friday as Mr. Ready is on vacation. And even with the best of circumstances, it's a lot of information to go through.

THE COURT: Okay.

MS. NIGRELLI: Did I correctly --

THE COURT: Okay.

MR. READY: Yeah.

THE COURT: Okay. So what I'd like to do is finish up with this. I will probably take a brief recess because I'd like to give you my answer today on this particular proceeding because obviously that dictates what happens going forward. So -- so why don't we go forward with that and then we'll see what happens after that in terms of what we have to do in terms of scheduling.

MR. READY: And, Your Honor, we have some briefing that we've prepared which obviously I know the Court is not going to read in the next 20 minutes --

THE COURT: Probably not, right.

MR. READY: -- I don't know if the Court wants the benefit of briefing to -- to be filed on the docket today --

THE COURT: On this issue?

MR. READY: Yes, Your Honor.

Colloquy                              137

THE COURT:  I think this one is pretty cut and dry in -- in my mind, which is why I wanted to get through this, have a brief recess and then give you my decision, because I don't want to delay this because I'm conscious of timing --

MR. READY:  Mm-hmm.

THE COURT:  -- for an involuntary, so I don't think briefing is going to be necessary on this issue, not to say I won't need it later, but at least on this issue in terms of numbers --

MR. READY:  Mm-hmm.

THE COURT:  -- I think I'm okay.  So having said that, I will defer to you to call your next witness.

MR. READY:  Thank you, Your Honor.  We'll call Jason Jordan to the stand.

(Pause)

COURTROOM DEPUTY:  Remain standing and raise your right hand.

JASON SCOTT JORDAN, CORNERSTONE'S WITNESS, SWORN

COURTROOM DEPUTY:  State your name and spell your whole name for the record.

THE WITNESS:  Jason Scott Jordan, J-A-S-O-N, J-O-R-D-A-N.

THE COURT:  You can have a seat.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

---

Jordan - Direct                       138

BY MR. READY:

Q    Jason, are you the judgment creditor of Alan Redmond's who's referred to as Jason Scott Jordan?

A    Yes.

Q    And when -- when was the last time that you saw Alan Redmond?

A    Probably 2020 at the trial.

Q    Okay.  Do you know Ethan Shalter?

A    No, I met him in the elevator this morning for the first time.

Q    Okay.  Do you have any prior association with him of any kind?

A    No, I don't.

Q    The Court may consider later whether to impose a bond.  Could you tell the Court whether you have the capability to post a million-dollar bond?

A    No, I don't.

Q    Do you have the capability from your finances to post a half-a-million-dollar bond?

A    No, I don't.

Q    Would you have the capability to post a $100,000 bond?

A    No, I do not.

Q    Do you believe you have the capability to post a $10,000 bond?

---

Jordan - Cross                        139

A    No, I don't.

Q    Okay.  Could you tell the Court what you make in a year?

A    50 grand, 40, 50,000 a year.

Q    Okay.

MR. READY:  And, Your Honor, I have nothing further for Mr. Jordan.

THE COURT:  Okay.  Do you have anything that you would like to ask?

MS. NIGRELLI:  Very brief.

THE COURT:  Mm-hmm.

CROSS-EXAMINATION

BY MS. NIGRELLI:

Q    Good afternoon, Mr. Jordan.

A    Hello.

Q    Have you done any kind of research to determine if you could in fact obtain a bond?

A    No, I -- I know for -- for a fact that I cannot.

Q    But you haven't done any research, is that correct?

A    No.

Q    Okay.

MS. NIGRELLI:  That's it, Your Honor.

MR. READY:  Nothing, Your Honor.  Thank you.

THE COURT:  Okay.  You can step down.

THE WITNESS:  Thank you.

---

Shalter - Direct                      140

(Witness excused)

MR. READY:  And, Your Honor, we'll call Ethan Shalter.

THE COURT:  Okay.

(Pause)

COURTROOM DEPUTY:  Your Honor, does he need to be re-sworn?

THE COURT:  No.

COURTROOM DEPUTY:  Okay.

THE COURT:  I'm just going to remind you that you're under oath still.

THE WITNESS:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.

ETHAN SHALTER, CORNERSTONE'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. READY:

Q    Ethan, on August 6th, did you sign any documents to Seguro Medico?

A    I did not.

Q    Did you -- what did you -- did you leave the building with any documents other than your check?

A    No, I did not.

Q    Can you describe to the Court how you left the building?

Shalter - Direct                141

A   I left the building with nothing more than my paper check folded up into threes.

Q   I -- I had asked you earlier but I'm going to just follow up, you saw your affidavit earlier, correct?

A   Correct.

Q   And was that affidavit based on information that you provided?

A   Correct, it was information I provided that (inaudible) written up to put into (inaudible) -- lawyer terms.

Q   Was there anything in there that you believe was incorrect?

A   No.

Q   Ethan, if the Court required you to post a bond or you had to put money into Court or obtain financing to put money into Court, could you post a $10,000 bond?

A   I could not.

Q   Could you post a thousand-dollar bond?

A   I could not.

Q   Would you briefly describe to the Court your current financial circumstances?

A   About 35,000 a year.

Q   I'm sorry?

A   About 35,000 a year.

Q   Okay.  And are you currently employed?

A   Yes, part time.

Shalter - Cross                142

Q   Okay.  And that's where you get that figure of 35, correct?

A   Mm-hmm.

MR. READY:  Nothing further, Your Honor.

THE COURT:  Okay.  Do you have anything?

MS. NIGRELLI:  Just a couple of questions, Your Honor.

THE COURT:  Sure.

                CROSS-EXAMINATION
BY MS. NIGRELLI:

Q   Mr. Shalter, did you have any communication about your testimony during our recess?

A   I don't understand that question.

Q   When we broke from the morning until right now, did you speak to your attorneys or anyone else about your testimony earlier today?

A   No.

Q   So there was no discussion about anything that you testified under oath, is that correct?

A   No, telling the truth.

Q   And did you -- with respect to the bond, did you attempt to obtain any financing or look into any financing with respect to posting a bond with the Court?

A   Like research?

Q   Yes.

Colloquy                143

A   No, I did not.

Q   Okay.

MS. NIGRELLI:  Nothing further, Your Honor.

THE COURT:  Okay.

MR. READY:  Nothing, Your Honor.

THE COURT:  Okay.  You can step down.  Thank you.

(Witness excused)

THE COURT:  Anyone else?

MR. READY:  No, Your Honor.

THE COURT:  No one else.  Okay.  All right.  Well then I presume that you both want to make arguments so, Ms. Nigrelli?

MS. NIGRELLI:  Your Honor, yes, and I -- I think I can be very brief so however you want us to, if you want me to start I'm happy to start.

THE COURT:  Sure.

MS. NIGRELLI:  Your Honor, earlier today we came before you with one simple threshold question --

THE COURT:  Wait, before I have you do argument, I just realized, exhibits?

MS. NIGRELLI:  Oh --

THE COURT:  No one has moved any exhibits.

MS. NIGRELLI:  -- yes.

THE COURT:  Does anyone want to move exhibits before we do this?

Colloquy                144

MS. NIGRELLI:  Yes, Your Honor --

THE COURT:  Okay.

MS. NIGRELLI:  -- I absolutely do want to move exhibits.  Getting too excited.

THE COURT:  I know, I hear you.  It's riveting.

MS. NIGRELLI:  Your Honor, I'm going -- I'm going to move into evidence the Paycor pay stub check that was not controverted, I believe that was this -- oh, no, this is not --

THE COURT:  So what are we marking that as?

MS. NIGRELLI:  Do you want to do P -- P --

THE COURT:  PD-1?  Does that work?

MS. NIGRELLI:  Do you want me to mark it, Your Honor?

THE COURT:  Yes.

MS. NIGRELLI:  PD-1 --

THE COURT:  All right, so that's the paycheck.

MS. NIGRELLI:  Let me --

THE COURT:  Is there any objection?

MR. READY:  No objection, Your Honor.

THE COURT:  Okay.

MS. NIGRELLI:  Okay.  Your Honor, may I?

THE COURT:  Sure.

MS. NIGRELLI:  And, Your Honor, attached to the affidavit of Tonya Hatmaker are documents that we had some

Nigrelli - Argument                145

colloquy about under the best evidence rule. I'm not sure if it matters as to this particular question, however, the affidavit itself I certainly want to be marked in as evidence. I can -- in order to make it easier for Your Honor, I am happy to take out the exhibits.

THE COURT: Okay. Mr. Ready, what --

MS. NIGRELLI: Or else I can argue the best evidence, whichever direction Your Honor wants to go.

MR. READY: I always love a good best evidence argument so I'm afraid --

THE COURT: Of course you do.

MR. READY: -- that's the direction we'll have to go.

THE COURT: Of course you do. It's like being in law school all over again, isn't it?

MS. NIGRELLI: So, Your Honor, I mean, I think under best evidence we have had Ms. Tonya Hatmaker on the stand. She indicated that she physically watched Mr. Shalter sign the documents. There are other individuals that were there as well who have not testified.

She also said that she didn't destroy the document, that this is the document that is in the possession of Seguro Medico, that generally when she does these exit interviews she takes one set of documents, she has them signed by the exiting employee and then she in fact makes a photocopy and

---

Heim - Argument / Ready - Argument                146

they're in two exact piles, and this time she gave away the wrong pile, that the best evidence is no longer in the file. I think that satisfies the requirement that the documents be admitted into evidence along with her testimony.

Also, Your Honor, I note again that the punitive Debtor did request documents on not only Mr. Shalter but other petitioning creditors, but relevant to this, that would have been documents that would have been tained (phonetic) and also would have been discoverable under the notice of deposition as well as the trial subpoena had documents been produced, which they were not. Because we're only -- so, Your Honor, under those scenarios, I -- I think this is the best evidence and that the Court can accept this for the truth of what which it is purported to be.

MR. HEIM: Your Honor, since it is my client's document and Ms. Hatmaker is my client, I just want to call the Court's attention to Rule 104 -- Rule 1004 and the exceptions to the best evidence rule, the first one of which is "all the originals are lost or destroyed, and not by the proponent acting in bad faith."

At a minimum, what the record reflects is that the original has been lost or perhaps destroyed, but there is zero evidence that Ms. Hatmaker or Seguro were in any way acting in bad faith. So under 1004, the first exception to the best evidence rule, the copy, which Ms. Hatmaker

---

Ready - Argument / Ruling by the Court                147

identified and authenticated, should be admissible.

THE COURT: Okay. Mr. Ready.

MR. READY: Your Honor, this is a little bit of a catch 22 because they're asking you to accept Ms. Hatmaker's testimony that an original does exist. Whether this original exists and whether this signature is authentic is the central issue in this case, so they -- they're saying of course that while the original went into Mr. Shalter's possession, he's saying there was no such document.

The purpose of having it here today would be for it to be examined by the Court. Even if they don't have the original original, they have the copy of the original that they purport came in which was photographed on a phone. I understand it was scanned, it's the same thing, a camera on a phone took it and what we have around the edges is the background of something else.

We have something that -- that's limited in pixels. We cannot examine it and give this Court an appropriate ruling on whether it's his signature or not because we -- we can't -- can't examine it closely enough. The document itself I think bears marks of not being authentic. But I don't think we even get to that point because they didn't bring the copy that we did request, and this was put at issue in this hearing.

It was put at issue in our filing saying that he

---

Ready - Argument / Ruling by the Court                148

would testify today that that document was not real and he didn't sign it. So, Your Honor, the Court could of course take this all under advisement to allow them a chance to produce it, but I don't believe that it should be admitted on best evidence and because of the -- the testimony that Your Honor heard today.

THE COURT: Okay. Two things. One is I believe that with respect to Ms. Hatmaker's testimony and the affidavit itself, I'm not sure that I need anything beyond that. I do understand the parties' concerns about the document and I have the same concerns quite frankly because certainly the copy could have come in today. So what I'm going to do is I will allow her affidavit in and obviously her testimony, but I will not allow the documents in.

MR. READY: Your Honor, I just want to make sure that I'm clear that we --

THE COURT: Yes.

MR. READY: -- we do object to the affidavit just because it does describe --

THE COURT: Understood.

MR. READY: -- the document.

THE COURT: Understood.

MR. READY: As long as it's clear.

THE COURT: Understood.

MR. READY: Thank you, Your Honor.

Colloquy                    149

THE COURT: And we're going to make that 2.

MS. NIGRELLI: 2? And, Your Honor, would you like me to give you just the affidavit and I'll take out the other?

THE COURT: Yes. And I will note your objection to any part of the affidavit that describes the --

MR. HEIM: And, Your Honor --

THE COURT: -- additional documents.

MR. HEIM: -- just on that point, there is law, Third Circuit law that even despite the best evidence, witnesses can testify about documents, and I have a case --

THE COURT: Understood, and -- and --

MR. HEIM: Yup.

THE COURT: -- that's why I'm allowing her testimony, I'm allowing the affidavit to come in. I will give it the weight that it deserves.

MR. HEIM: Understood.

THE COURT: Okay, so those two. Are there any others?

MS. NIGRELLI: One second, Your Honor.

THE COURT: Okay.

MS. NIGRELLI: I think that is it.

(Pause)

MS. NIGRELLI: Your Honor, so the two other -- actually I should say there's -- I don't know if you want to

---

Colloquy                    150

-- these are documents that were filed on the docket --

THE COURT: Is this the list of creditors?

MS. NIGRELLI: Yes. So it would be Document 33, and then I believe it's Document 48 is the amended, as well as Ethan Shalter's affidavit which was attached to a pleading which was 10 -- Document -- Docket Number 10, I think it was 10-2, Your Honor.

THE COURT: Okay.

MS. NIGRELLI: And that would be it for --

THE COURT: So --

MS. NIGRELLI: -- the Punitive Debtor, it would be the original --

THE COURT: So 3 would be Document 33 which is the original list of creditors.

MS. NIGRELLI: Correct.

THE COURT: 4 would be Document 48 which is the amended, and then 5 would be --

MS. NIGRELLI: The affidavit.

THE COURT: -- Docket 10-2 which is --

MS. NIGRELLI: 10-2.

THE COURT: -- the affidavit.

MR. HEIM: Do you want to do the involuntary petition?

MS. NIGRELLI: Okay. And we can do the involuntary petition, Your Honor, why not.

---

Colloquy                    151

THE COURT: Okay.

MS. NIGRELLI: Started it all off.

MR. HEIM: It was referenced and shown to the witness.

THE COURT: Understood.

MR. READY: I don't have any objection to this.

THE COURT: Okay, so 1 through 6 you have no objection to other than the one we talked about which is the documents?

MR. READY: Correct, Your Honor.

THE COURT: Okay. All right, so they will be admitted.

Mr. Ready, do you have documents that you want admitted?

MR. READY: Yes, Your Honor. The first would be the Alan Redmond's Objections and Answers to Interrogatories in Aid of Execution, there's also a supplement, and then a financial statement, so those would be my proposed Exhibits 1, 2 and 3.

THE COURT: Do I have them anywhere?

MR. READY: They're attached to our petition --

THE COURT: Okay.

MR. READY: -- but I can print a copy perhaps for the Court.

THE COURT: Well --

---

Colloquy                    152

MR. READY: I -- I apologize, I don't have -- I don't think I have a physical copy with me.

THE COURT: Well, no, that's fine. What I would ask you to do is to separate them out from the document and label them and then you can email a PDF to Sara. I assume that you have them?

MS. NIGRELLI: I --

THE COURT: Or perhaps not.

MS. NIGRELLI: -- I'm sure I do, Your Honor.

THE COURT: But I --

MS. NIGRELLI: I'm just going to -- I mean, I'm going --

THE COURT: I know that you're going to object.

MS. NIGRELLI: Yeah, I'm going --

THE COURT: Yeah, I get it.

MS. NIGRELLI: -- to object to relevance, yes, but if he can email them to me as well --

THE COURT: Yes.

MR. READY: Yes.

MS. NIGRELLI: -- I can just keep that -- yes --

THE COURT: Got it.

MS. NIGRELLI: -- that would be fantastic.

MR. READY: I'll certainly do that.

MS. NIGRELLI: Thank you, Your Honor.

THE COURT: Okay. So P -- I'm going to call it PC-

Colloquy                                    153

1, is going to be what, Mr. Ready?

MR. READY:  Your Honor, that would be the March 19th Alan Redmond's Objections and Answers to Interrogatories.

THE COURT:  Okay.

MR. READY:  And then I guess PC-2 would be the -- excuse me, the May 10th supplement.

THE COURT:  Okay.

MR. READY:  PC-3 would be the personal financial statement referenced by both dockets.

THE COURT:  Okay.  Okay, that's 1, 2 and 3, Ms. Nigrelli, how about it, tell me what your objection is.

MS. NIGRELLI:  I'm just objecting, Your Honor, to relevance with respect to what we're here for today, which is numerosity.

MR. READY:  And, Your Honor, it's going to be relevant for two reasons.  One is it goes to credibility, as we discussed, and the second is quite apart from that, it goes to estoppel, that he's estopped from coming in and arguing he has excessive creditors when he's been swearing under oath that he does not.

THE COURT:  Okay.

MR. READY:  There is case law that -- that clearly says that a -- a punitive debtor who has -- who has lied under oath about his -- his number of creditors can't come

Colloquy                                    154

back, he's judicially estopped, can't come back now and say okay, I have too many for you to do the involuntary process.

MS. NIGRELLI:  Your Honor, I would suggest that, one, they went forward in the proper venue which was Berks County and they actually had a motion to compel and they had a hearing scheduled, and at that point in time which they -- they did not continue with.  Instead, they started an involuntary petition.  There's nothing in there that was a lie.  It was general.  And as I said, Your Honor, inartfully drafted.

But, you know, I -- I know we don't have a jury, I defer to Your Honor's -- but I object on the fact that it is not relevant to numerosity and it doesn't go to any kind of estoppel as he still hasn't -- he didn't finish what he needed to do in Berks County and if -- if he thought that those answers were too general, the correct move -- which he did, was to move the Court to compel more complete answers, and he just didn't -- he didn't -- he didn't finish that, Your Honor, he came here instead and now he's saying estoppel.

THE COURT:  Mr. Ready?

MR. READY:  Your Honor, I'd like to give two responses to that.  The first is the next time my wife tells me my three-year-old is lying about something, I'm going to say no, no, he's just inartfully responding.

Colloquy                                    155

THE COURT:  Okay.

MR. READY:  The second, Your Honor, is that when it comes to these documents, yes, we moved to compel.  We sent follow up letters, those were not -- you know, answered.  We moved to compel, the Court entered -- had a hearing, the Court entered an order with a follow up hearing for them to return with Mr. Redmond.

Between those hearings, my friend on the other side, Mr. Heim, filed an appeal of her order to the Superior Court and said that the Court lacked jurisdiction to continue, emailed me, emailed the Court, said that there was no need for a hearing, that the Court didn't have jurisdiction for that, so they continue to play this game where they say in State Court you can't do that here.

And -- and in fact, in Mr. Heim's pleadings, he urges them to defer to Your Honor's orders and to let Your Honor decide in the Bankruptcy matter for Bene Market whether some of this could go forward.  So they continue to say in other places, you can't do that here, you can't do that here, then when we come to Bankruptcy Court they say well, we should have gone to State Court.

There is no requirement that we had to exhaust some sort of remedy somewhere else before coming here.  The point of these documents is to show that he demonstrated he -- he swore to us under oath that he didn't have an excessive

Colloquy                                    156

number of creditors for us to pursue.

And I also want to respond because I -- I heard him say or I don't remember if it was counsel or -- or the witness who said well, there were -- there was publicly available information that showed there were more creditors.  That's certainly true, Your Honor.  We knew he was lying.

But even after looking at every publicly available creditor, I couldn't count more than I think six or seven that I could find lawsuits or information on, and of course any that he's disputing in a lawsuit and defending don't count.  So I emphasize this because those documents are directly relevant to the issue that they cannot now come in and say, well, there's excessive creditors, and we think we should win independently on that ground regardless of everything else that we're arguing.

THE COURT:  Mr. Heim.

MR. HEIM:  Your Honor, after that long speech which really doesn't -- a lot of it doesn't have anything to do with me, but I do take issue with the characterization of Mr. Ready that I made an argument that the Court in Berks County didn't have jurisdiction to entertain an answer or a -- or a motion to compel.  Totally not the issue, I'm shocked that Mr. Ready would describe that to you, Judge, as if that was our position.  It was not.

The Judge in Berks County entered what we thought

Colloquy   157

was a mandatory injunction and we thought she did not have jurisdiction in the summary proceedings or the supplemental proceedings in aid of execution and that was the issue; we took an appeal from that. We did not take an appeal from the Judge's decision or ability to entertain a motion to compel. That's ridiculous --

THE COURT: Did the --

MR. HEIM: -- we didn't do that.

THE COURT: -- appeal put off that hearing then?

MR. HEIM: It -- not on the -- not on the motion to compel, Judge. The -- the motion to compel was a totally separate document. What it did put off the hearing for was on the injunction or I guess you -- or the continuation of the injunction hearing, that that did, and we did take that position, but definitely not for the motion to compel. That clearly is not the case. I would have never have made that argument that the motion to compel was outside of her -- was outside of Judge (inaudible)'s jurisdiction.

THE COURT: And they weren't in the same hearing? Those weren't taken up at the same hearing?

MR. HEIM: They were supposed to be taken up at the same hearing but our point to the Judge is you can't proceed with the injunction part of this because of the appeal.

THE COURT: So when you did that --

MR. HEIM: Mm-hmm.

Colloquy   158

THE COURT: -- the Court take the hearing off completely from its calendar?

MR. HEIM: No, Mr. Ready filed a -- we were -- we were going to appear on the 12th and Mr. Ready filed his involuntary --

MR. READY: Your Honor --

MR. HEIM: -- and then notified the Judge that there was no need for a hearing and notified all the Courts that there was a stay.

MR. READY: Your Honor, Mr. Heim emailed me to say don't you agree now that this hearing can't go forward because there's no jurisdiction and it's been appealed to the Superior Court. It is -- it is --

MR. HEIM: On the injunction.

MR. READY: But and said we're going to let the Court know that there's no need for a hearing. It is true, Your Honor, that after that I filed the stay on the docket, I sent it to the Court out of an abundance of caution to make sure everybody was on the same page, but they were arguing that there was no need for a hearing to go forward on the motion to compel. I know this is something of a --

MR. HEIM: I challenge Mr. Ready to find that in my paperwork. When did I ever tell the Judge that she -- that the Judge could not proceed with the motion to compel hearing? I never did. That's -- that's --

Colloquy   159

THE COURT: Well, I'm going to make this easier. To the extent that the three documents are being offered for credibility, I assume that you have no objection to, so your objection is to the estoppel argument that they're being used for, correct?

MS. NIGRELLI: Correct, Your Honor. And also to -- I mean, it might not even matter, but to the estoppel argument, absolutely, Your Honor. Your Honor can put whatever weight it is. However, I note that with respect to this long history that has been going on --

THE COURT: Mm-hmm.

MS. NIGRELLI: -- it is very clear that nothing is clear --

THE COURT: Mm-hmm.

MS. NIGRELLI: -- and that the fact that I can't follow what's just happening and I was just retained, I can't even properly --

THE COURT: Mm-hmm.

MS. NIGRELLI: -- represent my client with what he's trying to purport these documents to be. I understand that Your Honor is a smart woman and that you can figure it all out, but my point is we're here for numerosity.

THE COURT: Mm-hmm.

MS. NIGRELLI: He's trying to make an argument on estoppel when we have documents that are entered in another

Colloquy   160

Court that he asked to have a motion to compel that was set for a hearing and he filed an involuntary bankruptcy which and then alerted the Court and other Courts to stay all the proceedings over nine days before the hearing was to take place.

So those simple facts, to me, that that speaks volumes and any estoppel argument should go out the window. I mean, what could have been produced or would have been produced or should have been produced or anything else was never determined.

MR. READY: As counter, I -- I don't want to get too far into -- into the closing argument here but one of the things I've -- I've heard several times, and I agree this is a court of equity, but the first rule of equity is you have to come with clean hands. They cannot come in here and say well, Alan Redmond lied and didn't correct it for six months between March and September, but it was on us somehow to force him to tell the truth despite appeals being taken and despite everything done to delay that and to try to interfere with that.

It's not my client's fault that he can't get correct answers out of Mr. Redmond. This is significant. This is one of the reasons why we think this process is necessary, is because we're not getting accurate answers, there is a history of obfuscation, of dissipation of assets,

Colloquy                                      161

and what we believe we will prove at a preliminary injunction hearing is that it is ongoing, and that is to the detriment of not only our clients but also to other creditors and that everyone would benefit from the opportunity to reorganize this.

MS. NIGRELLI:  Your Honor, he's making arguments that go well past the scope of this hearing --

THE COURT:  Understood.

MS. NIGRELLI:  -- and that --

THE COURT:  Understood.  Okay, with respect to these three documents, I'm going to admit them with respect to the credibility argument and give them the proper weight. With regard to estoppel, I'm going to say that I don't have the benefit of knowing whether or not the question of him having to exhaust everything in State Court impedes him from making that argument.

I don't know that to be true, but during our brief recess I will find that out.  So what I'll do with respect to right now is I will admit them with regard to credibility.  I will make the determination about estoppel during my recess and let you know at that point in time if I'm going to consider them for anything else.

But right now I'm not prepared to say yes or no to that because I don't know what the answer to that is, so to the extent that during our brief recess you want to come back

---

Nigrelli - Argument                          162

and make some argument before I make my determination, that's fine.  But I'm just giving you the heads up that I'm not right now making that determination but I will admit them for credibility purposes.

MS. NIGRELLI:  That's fine, Your Honor.

THE COURT:  Okay?  All right, is there anything else that you want to admit before we get to the actual argument?

MR. READY:  No, Your Honor, there's nothing else. Thank you.

THE COURT:  Okay.  And so now we can proceed to argument so, Ms. Nigrelli.

MS. NIGRELLI:  Thank you, Your Honor.  Your Honor, again, I'm going to emphasize that we were here for a very simple threshold question regarding numerosity.  And there's been lots of allegations that have been thrown around here today, but let's just go through some of the facts.  We had Mr. Shalter on the stand.

He testified very clearly that he was employed by Seguro Medico, his W-2 was Seguro Medico, his  paychecks were Seguro Medico, that Mr. Redmond owed him no money, that he never contacted anybody from Seguro Medico about owing them money.

That right there, Your Honor, that was in the first ten questions of what I asked and any review of the

---

Nigrelli - Argument                          163

transcript would show that Mr. Shalter's bona fide credit or his -- him being a bona fide creditor of Alan Redmond was false.  It was a lie.  It was a blatant lie and it started the day he signed that involuntary petition under oath.

He said that he trusts his -- his attorneys implicitly.  Okay, well, Your Honor, today again, we're only here for one simple threshold question.  We didn't go into any bad faith of perhaps if someone pushed him to file the involuntary; he said I just trust my -- my attorneys implicitly.  Well, let's see.  So there was three petitioning creditors.  Mr. Jordan has a judgment.  That's fair, Your Honor.  He testified to that; we're not disputing that he has a judgment.  He's --

THE COURT:  Are you disputing whether or not it's a disputed or undisputed debt?

MS. NIGRELLI:  No, Your Honor, I'm --

THE COURT:  Okay.

MS. NIGRELLI:  -- I'm making it --

THE COURT:  I just want to make sure --

MS. NIGRELLI:  Yes, for -- for the --

THE COURT:  -- I'm clear --

MS. NIGRELLI:  No --

THE COURT:  Okay.

MS. NIGRELLI:  -- for the Court's purpose of numerosity --

---

Nigrelli - Argument                          164

THE COURT:  Yes.

MS. NIGRELLI:  -- I am not disputing that he has a judgment and that would be considered --

THE COURT:  The qualified creditor.

MS. NIGRELLI:  -- a qualified creditor.

THE COURT:  Got it.  Okay.

MS. NIGRELLI:  And I'm not even going to -- to argue that Cornerstone isn't a qualified creditor --

THE COURT:  Okay.

MS. NIGRELLI:  -- because they have a judgment. I'm going to use the law, Your Honor, and I'm going to make it very simple for you, that without any doubt, Alan Redmond testified that he was sued or pursued by creditors where he was a personal guarantee, which by definition, Your Honor, means that they went to the primary debt holder and then came after Mr. Redmond.  Mr. Redmond inartfully -- not lied, but inartfully couldn't explain that because he is not an attorney.

So what was clear on redirect was that he, in fact -- that there was debts owed by other people that he was being pursued on.  Some of them, he was sued personally himself.  He also said he went through that list of creditors and amended creditors and went through every single creditor and he said very clearly, Your Honor, I agree to liability, I dispute the amount.

Nigrelli - Argument                165

Your Honor, I could go through that list with you and ask you do you have any questions and I can go through his testimony.  The two that were clear that he did dispute were Global (sic) which is doing business as Par Funding, and AWIS.  Those were the two creditors that he said I dispute -- his testimony said I dispute any liability, which means they could not be included in the numerosity requirement.

That was Complete Business Solutions Group and American Workers Insurance Services.  Other than that, Mr. Redmond testified each and every creditor, there was some amount due, that he might have disputed the amount -- most of them he started paying on already even though he disputes the amount, and that he was personally pursued on guarantees, the ones that had guarantees.

Your Honor, in order to be successful under Section 303, if there are 12 or more creditors, there needs to be three petitioning creditors.  The one thing I can say is through Ethan Shalter's testimony, he unequivocally agreed that he is not a creditor of Alan Redmond.  He's not a creditor of anyone.

He did not -- there is no bona fide dispute, there is no letter, there is no litigation, there is no nothing, he didn't do anything.  If he had any claim it's in his head and he told his attorneys who did nothing except for file this involuntary bankruptcy.  He is not a qualifying creditor

Nigrelli - Argument                166

under the Code.

And that takes us to Ms. Tonya Hatmaker's testimony which stated the same.  How did she know Ethan Shalter?  Well, she worked with him.  Where did she work?  Seguro Medico.  What was her position at Seguro Medico?  Well, she had the exit -- she wore many hats, if you will, as she did exit interviewing, she -- you know, she was ingrained in the business.

She had been there for two years.  She also testified, Your Honor, that she in fact conducted an exit interview.  She -- she also testified to what her procedures are in general every time she conducts an exit interview which is to give a release for both parties, she gives a paper and she gives a final paycheck.  She does that every single time.

There is a dispute as to the papers he may have signed, but there is no dispute that she testified that that is her protocol and that she witnessed his signature.  That is her testimony.

Your Honor, under 303, in order for us to -- in order for the petitioning creditors to be able to fulfill their obligation, their burden of proof is that they need to come to this Court after the Punitive Debtor files an answer with his list of creditors, they need to come to this Court and say why they're not creditors.  Instead, we had a side

Nigrelli - Argument                167

show.

We had the why-you-shouldn't-listen-to-anything-because-he's-a-liar, that's what they said.  We had a lot of false slinging.  Again, Your Honor, this is a court of equity.  There was an amended -- a creditor matrix and an amended creditor matrix that were filed.  We didn't have 50 creditors on that list.

Well, that would have been a hell of a lot easier, Your Honor, if we had more.  No, we had the -- the creditors that he actually owes money to, that is it.  There was 17 creditors on the amended list and, Your Honor, we went through every single one of them.  They came back with not one piece of evidence to suggest that they weren't.  And, Your Honor, I'm giving them two.

I'm -- I'm telling you that under oath, he said two of them were not qualifying creditors, so now we're at 15.  Your Honor, they have the burden by a preponderance of the evidence to show that these creditors are not in fact creditors.  Their arguments, all that they can argue going forward is well, he filed interrogatories back in March which he verified that he -- he did with his attorneys and he attached a personal financial statement that was broad.

It doesn't mean that he didn't have them.  One of the questions that was pointed out on cross was judgment creditors.  Well, there's only two judgment creditors, the

Nigrelli - Argument                168

way I read this list.  One of them is Jason Scott Jordan and the other is Cornerstone Law Group, and both of them, again, Mr. Redmond objects to and disputes, but they're judgments, they already knew about them.

So I'm not sure what in that particular interrogatory was such a blatant lie, and inartfully drafted?  Yes, Your Honor, because I have been around the block enough to know that there are attorneys that inartfully draft responses and that does matter.  Our words matter.  But, Your Honor, you have a gentleman that sat on here and actually said, I don't -- you know, I'm confused, I don't know, and we walked him through.

So if it was all about just getting a list of creditors, well let's go back again to, Your Honor, to Mr. Shalter's testimony and how they got him.  If there wasn't 12 creditors, why did they need three?  Why wouldn't they just stick with Jason Scott Jordan and Cornerstone?  What -- why get more?

Because, Your Honor, they know.  They -- they knew that there were more creditors.  We're not talking about obscure creditors -- the Department of Revenue, the IRS, Berks County.  I mean, Your Honor, this is -- this -- this isn't rocket science, this is -- this is -- what they're trying to do is to shift your focus on other issues which aren't before the Court today.

Nigrelli - Argument                            169

We are not here about any kind of bad faith or anything else, Your Honor, we're here on a very simple threshold question which we discussed yesterday in our status hearing.  If they wanted to bring this all up they could have said no, Your Honor, I'm -- I'm not going forward with just -- I'm not parsing the baby, I -- I want to take up their whole entire motion to dismiss.

I would have come a little bit prepared differently on the bad faith.  We're -- we're here for -- for one simple reason, do they have enough petitioning creditors based on the fact that we have 12 or more qualifying creditors, and the answer to that is very simple, they don't.  They know they don't, so now they're going to try and argue estoppel, that they didn't have enough information for these 17 attorneys, they didn't know who was representing Mr. Redmond in any of these litigations.

And, Your Honor, most of the litigation -- I mean, the two that they're referring to are two that are still ongoing.  There is no judgment and we contend that there's no judgment, and we contend that we dispute any liability at all, so I'm going to go back to my original argument when we were arguing about whether or not those documents are appropriately put in.  They're not at all.

I understand that they were attached to their self-serving motion.  We're here on a very simple and very

Nigrelli - Argument                            170

discreet issue.  They did not provide me with any documents that they were going to put before the Court today.  They did not provide anything.  I know that there was some brief filed when I was walking into Court this morning.  I didn't have the ability to read that yet, Your Honor.

I did provide them with the documents that I was going to file.  I gave them the document number and I said any amendments, so I had my three or four documents that I said I was going to rely on, so I'm not even going to get into -- surprise, that now they're relying on this and going to argue something entirely different when again, Your Honor, I tried to get discovery.

I tried to do that last Friday.  I was literally employed for maybe 36 hours.  I try to move as quickly as I can; I got nothing.  So, Your Honor, let's go back to this very, very narrow scope that we're supposed to look at and that is Bankruptcy Code Section 303 and let's see what the -- the definition says and if they met it.

And, Your Honor, when you're going through each of these creditors which were put on this amended creditor list, you'll note that they are in fact not contingent as to liability.  The ones that are on there are not contingent.  Under Mr. Redmond's testimony today, he testified that he owes an amount.

He's disputing the amount that maybe is alleged,

Heim - Argument                            171

but that does not make them a -- but that does not put their debt into a bona fide dispute.  That does make them a qualifying creditor.

And under that, Your Honor, I'm happy to walk the Court through any questions it may have, but I would also say to the extent that the Court will look at anything relating to estoppel, I would want an opportunity to not be surprised by their argument.  It's my understanding that that might have been in the brief this morning that was filed -- I --

THE COURT:  I didn't look at that either.

MS. NIGRELLI:  -- I don't -- yes, me neither, Your Honor, so that I would suggest that that's not proper and that if they knew that they were going to file this brief, Your Honor, then that should have been told to me that they were using these interrogatories, or at least given me something other than "anything that we filed" because they filed quite a bit of documents, one, most of which was at first Under Seal, and no one had the benefit of even reviewing until September 10th or 11th.  Thank you, Your Honor.

THE COURT:  Okay.  Mr. Ready.

MR. HEIM:  Your Honor, I do on -- on judicial estoppel, Judge, if -- if --

THE COURT:  Oh --

MR. HEIM:  -- if you wanted, I do have a case that

Ready - Argument                            172

I think is probably dispositive.  It may help you.

THE COURT:  Okay.

MR. HEIM:  It's a -- it's a United States Supreme Court case, Judge, New Hampshire vs. Maine, not cited by Mr. Ready, 532 U.S. 742, 2001, and I think that the -- the two points from it is that the prior position has to be clearly inconsistent with the current position.

THE COURT:  Okay.

MR. HEIM:  And the other thing that I -- the other element of the judicial estoppel according to the Supreme Court is that the party taking the prior position even if it was inconsistent had to have been successful with that Court.  We never had a hearing on the -- on the discovery, Judge.

THE COURT:  Okay.

MR. READY:  Your Honor, I want to just start with this.  I went to law school because I was promised there would be no math, but I can --

THE COURT:  Me too.

MR. READY:  -- I can count and they have nine undisputed creditors, which is less than 12.  The nine can be added to Jason Scott Jordan, to Cornerstone Law Firm and to Ethan Shalter, which makes 12, or it can be added to Cornerstone Law Firm and Jason Jordan, which makes 11.  Either way, we pass the barrier.

The statute, and I'm sure the Court has seen it,

Ready - Argument                173

I'm just going to pass up a copy just for simplicity with a highlight. The statute provides two doors, so to speak, into the courthouse. The first is if there are "three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability, or the subject of a bona fide dispute as to liability or amount," that last "or" being significant.

Door two, "is there" -- "if there are fewer than 12 such holders," referring back to the holders in the first sentence which means if there is a dispute as to liability or amount, then it does not count as a qualified claim. For that reason, they're nine undisputed plus two or three -- either way, either we have three and we're in or we have two and we're in. That's -- that's the very clear thing.

And of course I'm not -- this isn't a surprise, this is their list. This is their list of creditors. I'm -- I'm somewhat surprised to hear that there's a claim about surprise because the documents: first, were attached to what was filed; second, have been provided to counsel for Mr. Redmond for -- for six months.

They're his answers. It's strange to me to hear that they're surprised by their own client's answers, their own client's incorrect answers.

And I don't want to harp on this too much, but this whole thing about inartful versus incorrect, if I ask someone

Ready - Argument                174

how many creditors they have and they say five and the real answer is 17, that's not inartful, that's a lie. It is a lie of omission. I don't know the motive, I don't know that I care about the motive. The point is what he said is not true.

I don't think we have to get there, I think the Court can make the decision that there are less than 12 or that there are 12 with Mr. Shalter, either way, I totally disagree that Mr. Shalter testified that Alan Redmond didn't owe him money. He testified the opposite, he said that he did owe him money. I think that maybe some of the confusion comes from the fact that we are legally relying on the Wage Payment Collection Law which makes Mr. Redmond a correct defendant.

Under the definition of "employer," it includes not just the company you work for, not just the company that pays your check, but every officer, every major agent of the company is a proper defendant. That means that he owes him money. The case law is exceedingly clear that there does not have to be a demand upon him before filing for bankruptcy.

There's been some claim that we've done something pernicious by bringing in this into bankruptcy when well, maybe we could have pursued it's somewhere else. We don't have to. And, I know from personal experience representing another client with a large judgment against Mr. Redmond that

Ready - Argument                175

it will be very difficult to collect. I don't have to advise a different client well, we have to first go through the State Court process if he had a valid proper claim, which he did.

As far as this list, I'll also note to the degree there's any question, there are several other problems on this list. So they've said that he testified that, you know, these were all, you know, non-contingent. That's not what he said on cross. He changed it when he was redirected, but he said several of these that were listed as undisputed were contingent. He said that well, they're not defaults, this one I'm not sure if it's in default, then he was sure that it was, and he wasn't when I re-crossed him and, Your Honor, that's significant.

Again, they've had time to put this list together, they know the -- the basis of these, they can say whether they're contingent or not. I don't know that the Court has to reach all of that.

I do want to highlight though, the -- the Court has under -- under 303 -- I'm sorry, I'm going to pull the cite, 303(c) requires also the Court to give notice to creditors and the opportunity to join. So even if they are correct that there are more than 12, it can't be dismissed at this point on that. The court has to give notice to the creditors so that they have an opportunity to step in and say well, we

Ready - Argument                176

would join the petition.

From my review of the involuntary case law on this, it seems that actually happens quite frequently and I think there's probably a lot of reasons for that. The -- we actually had the opportunity to go all the way through the merits and all the way through trial on the merits and still pick up creditors who want to join as the petitioning creditors.

There are several on this list that I think may also qualify as insiders. Now, I will candidly say to the Court, I don't have case law to confirm this, but there are several attorneys that have represented him which I believe would qualify as fiduciaries or insiders under the language of the statute. Again, I'm not aware that has ever been decided as to regards as it regards attorneys specifically, but it has been dealt with with employees and other direct agents.

And so for that reason, I don't believe that two of these -- I think two of these may not qualify which is the Rush Law Group -- three, I'm sorry, Duane Morris, Rush Law Group and Bochetto and Lentz, I don't believe that those three would potentially qualify.

As for estoppel, I want to make sure that my position is clear. My friend on the other side, Mr. Heim, has said that there's a -- he's referencing judicial estoppel

Ready - Argument                    177

which is -- is one possibility for us, but estoppel can be broader. Estoppel does not have to be that the Court ruled in a certain direction, it can also be simply that you have taken a position that's inconsistent with what you're doing now.

It's the equivalent of the -- of the crime or tort of false swearing; you said A in one place, you said non-A in another. That can give rise to estoppel, and I want to emphasize that's where this Court's role as an equity bench I think is particularly appropriate. This is a situation where he has said things in the past, in the very recent past, not the distant past, that he is now admitting were materially untrue at the time that they were said. And I don't want to keep harping on it, it's not inartful, it was intentional deception.

He just didn't want to list all his creditors. He didn't think it was any of our business. That's why he answered the way that he did. Now he jumps up and down and says oh, there's more creditors than I told you about.

And, this has changed. This list has changed since it was filed two days ago. He continues to try to find new creditors who again, appear to be Insiders or borderline insiders, to try to fluff up that number, and we're still not at 12.

I -- I could say more, but I will try not to burden

Ruling by the Court                    178

the Court. I would just ask that if the court has questions or wants support for any of the positions I've just taken, that we've been briefing this, I'll be happy to file that if it will help the Court in resolving this.

Again, I think the Court at -- at a minimum should lead this to the merit stage so that we can move forward on this and see if other creditors wish to join. And if the Court has any other questions, I'm happy to answer those as well.

THE COURT: Okay, well I don't -- I don't think I need anything further. What I'd like to do, as I said, is to take a short recess and come back and issue my decision on this very limited question I have in front of me which is numerosity.

With regard to anything else that we have to deal with, we'll deal with it after that if we need to schedule anything. But if you could give me about an hour -- I'm not going to say ten minutes, I'm going to give myself an hour, and I will meet you back here and we will talk about my decision, okay?

MR. READY: Very good.

THE COURT: Thank you, everyone.

MS. NIGRELLI: Thank you, Your Honor.

MR. READY: Thank you, Your Honor.

(Off the record, 2:58 to 4:05 p.m.)

Ruling by the Court                    179

COURTROOM DEPUTY: All rise. Court is now in session.

THE COURT: Okay, have a seat. All right, so we're here on the motion to dismiss with respect to amount and numerosity under 303(b) and after considering the testimony and the documents as well as the arguments of the party, I find the following.

There are two qualified creditors, Jordan and Cornerstone. Based on the evidence presented, Mr. Shalter's claim I consider disputed, and therefore, does not meet the qualificating -- the qualifications should be a petitioning creditor under 303(b).

The list of creditors provided by Mr. Redmond and docketed at Number 33, dated 9/16/24, is an admission of the Punitive Debtor and contains nine non-contingent undisputed creditors as defined by Section 303(b), and 303(b)(2) only requires one qualifying creditor to meet the statutory requirements. As a result, the motion with regard to numerosity is denied.

The amended list of creditors filed on 9/18 does not negate the finding of eligibility. Although it was filed late and changes the number of qualified creditors by one, it still leaves in place eligibility, as there are only 11 qualified creditors.

The parties have made arguments regarding estoppel

Ruling by the Court                    180

with respect to the disclosure of creditors. However, I do not need to reach that determination with respect to the issue before me because the statutory requirements of 303(b)(2) are met.

And so an order is going to be entered requiring the posting of a bond in the amount of $200,000 by Monday, 9/23/24, failure to post the bond will result in the TRO being dissolved, the preliminary injunction being denied, and the bankruptcy being dismissed.

The motion for bad faith and the hearing to consider entry of an order for relief in this case will be held on Tuesday, October 1st, beginning at 10:00 a.m. All discovery is to be completed by 9/30/24 and notice pursuant to 303(c) shall be given to all creditors listed by the Punitive Debtor on Docket Number 48 which is the amended schedule, is to be provided by no later than 9/20/24 and a cert of service is to be filed by 9/23.

I think that disposes of everything from today and now we can talk about anything else that needs to be scheduled. I think that we're okay in that we have Monday still on the calendar, but I don't know what that does to your other issues that you had brought up previously.

MS. NIGRELLI: So I think, Your Honor, we had spoke about conducting discovery and since we have this additional time --

Ruling by the Court                    181

THE COURT:  Mm-hmm.

MS. NIGRELLI:  -- and the posting of the bond is already in place --

THE COURT:  Mm-hmm.

MS. NIGRELLI:  -- I think that leads -- and I'm going to kind of speak a little bit out of turn because I haven't talked to my client about this, but I would be willing to move that TRO hearing to also continue to the Tuesday, October 1st if we could perhaps just tailor it down to just Mr. Redmond.  I'm not sure if that's even on the table.

But I say that so that we actually can have an opportunity to exchange meaningful discovery and that if there is additional issues, we can come to the Court with them.  But I'm -- I'm actually hopeful that Mr. Ready said that he was going to look at his trial subpoenas.

That may -- that obviously would avoid me having to file any motion to quash as they exist right now, and then we can discuss what we're both looking for.  I think that might narrow things down.

I certainly -- he did not agree to tailor the TRO, I'm bringing that up just because I think it's awfully wide and all-encompassing and I would be happy to put some sort of verification on the docket that actually said there is no interest or -- or something to Your Honor so that people felt

Ruling by the Court                    182

comfortable that what we were saying is accurate and -- and true that there are certain entities included in that TRO that Mr. Redmond has no interest in and shouldn't be part of the TRO.

THE COURT:  Okay.  Mr. Ready.

MR. READY:  Your Honor, so we of course disagree that the entities -- excuse me, sorry -- that the entities are not owned by Mr. Redmond or that he doesn't have control over them.  As -- as I, you know, understand the TRO, most of it restricts them doing things for him, paying him in cash, things like that.  So it's hard to see how that could affect a company's ability to operate, that they can't pay a consultant in cash, I don't think that's going to be a problem.

And it does leave open -- the Court left open that they can petition the Court for a specific approval of a transaction, so I would ask that it be left in place.  I'm not opposed to a slight adjournment if we can agree to the TRO remaining in place for this kind of additional discovery period so that any documents can be exchanged and we can come back for the -- for the final injunction hearing.

MS. NIGRELLI:  So the only thing I would say to that, Your Honor, is if we're going to move forward then on Monday --

THE COURT:  Mm-hmm.

Ruling by the Court                    183

MS. NIGRELLI:  -- I'm entitled to discovery.  So now we're at Wednesday at 4:12, we have outstanding subpoenas.  Mr. Heim is on a plane to Chicago for another case and we have discovery and depositions that haven't been exchanged yet.  I'm just -- I'm only trying to make it meaningful so that there's an opportunity to actually conduct discovery and not sling things at each other, and to narrow the issues.

THE COURT:  Well, I mean, I -- while I understand that, the reason that I moved the motion to dismiss for bad faith to the same date as the -- basically the trial on -- on whether or not, you know, an order for relief should be entered is because I thought that your discovery really needed to be focused on that.

The TRO, to the extent that right now I think it's in place until Tuesday, I think that's the -- the ending date for it, I do think that it is narrow with respect to what can and can't be done, and the reason that I agreed to enter it the way it is was to look at what could potentially be dissipated, what could potentially be transferred, and any entities that could have been or are currently, have the potential to -- to do that.

And I don't know that taking any of the parties out of that does a whole lot and it doesn't change the -- the facts very much, but I understand that you want discovery, so

Ruling by the Court                    184

I would not want to push it to the October 1st date.

I think the only thing that I would do is to offer to -- I mean, I -- I could extend it, but you would have to agree on the terms.  Otherwise, we're going to have the hearing on Monday and there's just not a whole lot I can do about it.

MS. NIGRELLI:  I understand, Your Honor.  What -- and I'm looking for my phone which has my calendar.

THE COURT:  Okay.

MS. NIGRELLI:  What, I guess, before I speak to my client and -- and knowing full well that the TRO would remain in place just as it is --

THE COURT:  Mm-hmm.

MS. NIGRELLI:  -- what date -- I know that October 1st wouldn't work, what date would Your Honor be willing to move it to?  Would September 27th, the end of that week, work?  Could we -- I -- I don't know if Your Honor even sits or has the ability to sit on that day.

THE COURT:  Actually I don't.  I'm actually not here on the 27th so I know the 27th doesn't work.  That's why I struggled to get to the October 1st.

MS. NIGRELLI:  Would the 26th work?

THE COURT:  I am in Philadelphia that day, I believe.  Is that correct?

COURTROOM DEPUTY:  That's correct, Judge.

Ruling by the Court                185

THE COURT: So I could do it in the morning of the 26th in Philadelphia. That's probably my --

MS. NIGRELLI: Well, that -- that would --

THE COURT: -- only other option.

MS. NIGRELLI: -- be fantastic for me, Your Honor --

THE COURT: Do we have a really long --

MS. NIGRELLI: -- I'm not gonna lie.

THE COURT: Do we have a really long 9:30 list that day?

COURTROOM DEPUTY: Well, it's -- it's Attorney Haggins (phonetic), 97 matters for 9:30 but --

THE COURT: Oh, that's this Thursday?

COURTROOM DEPUTY: Yeah, that's a Thursday, the 26th.

THE COURT: Oh, then I can -- yeah, then I could do 9:30 or I could do 10:00 that day --

COURTROOM DEPUTY: 10:00?

THE COURT: -- right? Because she's going to do it by Zoom.

COURTROOM DEPUTY: Right. And then --

THE COURT: So yeah --

COURTROOM DEPUTY: -- you have 11:00 matters.

THE COURT: We can do this in an hour, right? Okay, all right, we'll just keep looking. I -- I mean, I --

Ruling by the Court                186

MS. NIGRELLI: I know the 25th, Your Honor, we're before you in a trial in Philadelphia. I -- I anticipate that's going to go I think the whole day so I don't want to suggest that.

COURTROOM DEPUTY: Did you say the 25th?

MS. NIGRELLI: Yes, the 25th and Louis Berry (phonetic).

THE COURT: Yes, yes, we have Louis Berry, that will take all day.

COURTROOM DEPUTY: There's other matters on that day too, Judge, but okay.

THE COURT: Stop it.

COURTROOM DEPUTY: Yeah, there's a whole list.

THE COURT: Yeah, I know. I'm -- I'm always optimistic at the beginning of the week.

MS. NIGRELLI: And I'm assuming the day before the 30th doesn't help. I only am trying to give extra time to actually conduct the discovery, that's really -- again, my client hasn't agreed to any of this but my thought is then it gives an opportunity to narrow down the subpoenas and actually maybe at least produce some documents and see what depositions are in fact necessary, which I know they will be necessary for the October 1st date.

THE COURT: Well, I mean, if we get to the 30th it -- it sort of becomes obsolete, doesn't it? Because if on

Ruling by the Court                187

the 1st I decide to enter an order for relief, that takes care of that and the injunction goes away, right, because it becomes a stay. If I decide not to and the case gets dismissed, it goes away anyway, so it seems if we're going to move it out that far, like we are making it less of an issue and more moot by the day, right?

MS. NIGRELLI: Well, you have to -- to some degree you're right, Your Honor. Not to some degree but it is --

THE COURT: I mean, just logically it --

MS. NIGRELLI: Yeah.

THE COURT: -- it then becomes sort of an issue --

MS. NIGRELLI: I mean --

THE COURT: -- for a day.

MS. NIGRELLI: -- so, Your Honor, I mean, again, I'm happy to go forward if to -- to the extent that we're just going forward on the 23rd on the injunction, I'm just trying to think of testimony that's going to be needed and the trial subpoenas and all of that and what that really entails, because I think we are going to need to figure that out with Your Honor before we start engaging in kind of discovery motions. And I -- I hadn't thought of this yet, but I'm thinking it's a legal standard and we would still be able to conduct discovery after that for the --

THE COURT: Right.

Ruling by the Court                188

MS. NIGRELLI: -- bad faith for the motion to dismiss --

THE COURT: Right.

MS. NIGRELLI: -- so while I don't want to impinge on my ability to get or to exchange to the extent that we can, are you -- are you going to be subpoenaing people for the --

MR. READY: October 1st?

MS. NIGRELLI: Not October 1st --

MR. READY: Oh.

MS. NIGRELLI: -- but the -- for Monday's hearing?

THE COURT: I think the only two that I've -- I have not seen your subpoenas. I know that the only two in the order are Mr. Valz and Mr. Redmond. I don't know about anybody else, I just know about those two.

MR. READY: We have subpoenaed some -- some other people. I will have to see what we have to do to contact them to -- to continue it from today to then. I think some of them may have --

MS. NIGRELLI: With respect to just the temporary injunction?

MR. READY: Right, right.

THE COURT: Yeah, and that is the only thing that's on for Monday --

MR. READY: Right, right.

Ruling by the Court                189

THE COURT: -- is -- is whether or not the TRO goes away and it's replaced by a preliminary injunction, and that injunction, honestly, is just until --

MR. READY: Two -- two weeks?

THE COURT: -- the 1st of October.

MR. READY: It's two weeks?

THE COURT: So --

MR. READY: Yeah.

THE COURT: -- I'm not -- I'm not trying to say that that should make your decision for you, I'm just trying to put it all in perspective.

MS. NIGRELLI: Right, it's only an additional seven days.

THE COURT: Correct.

MS. NIGRELLI: The real question is --

THE COURT: Correct.

MS. NIGRELLI: -- are we going to jump through all these hoops --

THE COURT: Right.

MS. NIGRELLI: -- for seven extra days --

THE COURT: Correct.

MS. NIGRELLI: -- and what I would like to say is I would like to tell my client save your money --

THE COURT: Right.

MS. NIGRELLI: -- and don't -- let's not jump

Ruling by the Court                190

through this hoop and --

THE COURT: Do you want a minute to like both of you --

MR. READY: Sure.

THE COURT: -- can talk and, I mean, I can --

MR. READY: Yes.

THE COURT: -- leave or you can go --

MS. NIGRELLI: I --

THE COURT: -- outside and --

MS. NIGRELLI: I can do that outside.

THE COURT: Okay.

MS. NIGRELLI: Thank you, Your Honor, that would be great.

THE COURT: All right. Let's go off the record.

MS. NIGRELLI: I appreciate that.

THE COURT: Okay.

(Off the record, 4:20 to 4:32 p.m.)

THE COURT: I just want to catch up.

COURTROOM DEPUTY: Okay.

THE COURT: Okay, questions.

MR. READY: Your Honor, counsel and I have discussed outside, I want to first clarify, I think Your Honor said that if the bond is not posted by Monday you would dismiss the entire case, not just the injunction? Okay.

THE COURT: Correct.

Ruling by the Court                191

MR. READY: So counsel and I have conferred on us withdrawing the request for a TRO if the case can continue without it, so the first thing I want to clarify is that the Court would permit that, and second, that within that, we would -- there's some I think misunderstanding between us. I believe the Schedules D, E or F and G were due yesterday, so we would ask for those immediately, post-haste, and that that -- we would then withdraw the TRO request as -- as part of receiving that --

THE COURT: Okay --

MR. READY: -- receiving that information --

THE COURT: Okay.

MR. READY: -- and what we --

MS. NIGRELLI: Just so I -- that new -- D, E and H is new but what I -- we were just talking about before is a hundred percent accurate with respect to the TRO, so in order to avoid posting the bond, they're willing to drop it and I'm willing -- for Your Honor's point, it's another week and my client --

THE COURT: Right.

MS. NIGRELLI: -- had already agreed that he would wait the additional week for the TRO, so whichever direction with respect to D, E and H --

THE COURT: And F? I think it's F --

MS. NIGRELLI: -- and F.

Ruling by the Court                192

THE COURT: -- right? D, E and F?

MR. READY: I have --

THE COURT: It should be the creditors, right?

MS. NIGRELLI: Correct.

MR. READY: I have D, E or F, and G, and I believe it's also the list of assets that's -- that's listed.

THE COURT: Well, G is -- is contracts --

MS. NIGRELLI: Yes.

THE COURT: -- secondary --

MS. NIGRELLI: H is co-debtor that's on anything.

THE COURT: Correct.

MS. NIGRELLI: E and F is any taxes or priority claims --

THE COURT: Yup.

MS. NIGRELLI: -- as well as --

THE COURT: And unsecured creditors.

MS. NIGRELLI: -- unsecured creditors, which I -- I'm not -- I'm going to be honest, Your Honor, I'm not a hundred percent sure if they're due now or not because an order for relief has not been granted --

THE COURT: Right, but the TRO, I think part of the TRO was a request that the time line for 10/07 start now --

MS. NIGRELLI: But now the TRO --

THE COURT: -- rather than --

MS. NIGRELLI: -- TRO is no longer an issue.

Ruling by the Court                    193

THE COURT: Well, I think that's why he's referring to it --

MS. NIGRELLI: Oh, that's -- okay --

THE COURT: -- the -- when it was entered --

MS. NIGRELLI: -- so gotcha.

THE COURT: -- they were due yesterday.

MS. NIGRELLI: And I missed that, Your Honor, my -- my mistake --

THE COURT: So I -- I think that's --

MS. NIGRELLI: -- because I would have filed --

THE COURT: -- where we are, so if the TRO is not an issue, then the only date we're looking at is October 1st, correct?

MR. READY: Correct, Your Honor.

MS. NIGRELLI: Correct.

THE COURT: Then I would -- I would still want the scheduled to be filed before October 1st --

MS. NIGRELLI: And I can do that --

THE COURT: -- because I --

MS. NIGRELLI: -- Your Honor.

THE COURT: -- I would definitely done --

MS. NIGRELLI: That's fine.

THE COURT: -- prior to.  Since we're only two weeks out, I don't know, do you want them by next Friday?

MR. READY: Sure.  Yes, Your Honor, yes.

Ruling by the Court                    194

THE COURT: Can you have them by next Friday?

MS. NIGRELLI: And I -- I believe we can --

THE COURT: Okay.

MS. NIGRELLI: -- do that, Your Honor, and I think that by us agreeing to this, it maybe frees up your calendar a little bit and focuses on just really the last part of the important --

THE COURT: Right.

MS. NIGRELLI: -- important part of --

THE COURT: Right.

MS. NIGRELLI: -- what's before Your Honor.

THE COURT: Right.  Okay.  All right.  So I will revise my order to take out the bond, and you want me to -- and you're okay with dissolving the TRO --

MR. READY: Yes, Your Honor.

THE COURT: -- as a result.

MR. READY: As part of that agreement, yes, Your Honor.

THE COURT: All right.  So I will -- I will do a separate order that dissolves the TRO, I will not put the bond in this order --

MR. READY: Mm-hmm.

THE COURT: -- I will still set the hearing for October 1st with discovery due -- or discovery being completed by the 30th, and Schedules D, E, F, G and H, I

Ruling by the Court                    195

think are what we're looking at, by -- what's that, 9/27 is Friday, next Friday, right?

COURTROOM DEPUTY: Correct, Judge.

THE COURT: 09/27.

MR. READY: And, Your Honor, I would just ask to put on -- I mean, we had discussed it earlier, we didn't quite agree, but I would just ask to put on the record agreement that my client, Jason Scott Jordan, can testify if -- if needed to be deposed, can testify by Zoom just because he's out of State?

THE COURT: Okay.

MR. READY: I wanted to make sure that that was still in agreement.

THE COURT: Is that fine?

MS. NIGRELLI: Your Honor, I'm -- I'm happy to make that --

THE COURT: Okay.

MS. NIGRELLI: -- that combination.

THE COURT: Okay.

MS. NIGRELLI: Your Honor, I know that --

THE COURT: Go ahead.

MS. NIGRELLI: -- we did talk about 9/30 discovery, but also I just want to make sure that I'm clear, notice to all creditors --

MR. READY: I believe you said by 9/20, Your Honor,

Ruling by the Court                    196

if I had that correct.

THE COURT: Yes --

MS. NIGRELLI: Okay.

THE COURT: -- because I assume that we have everybody --

MS. NIGRELLI: Right.

THE COURT: -- given what's on the docket so --

MS. NIGRELLI: And then cert of service, 9 --

THE COURT: Cert of service by Monday, 9/23.

MS. NIGRELLI: Okay.  And notice to all creditors of the filing by 9/20.

THE COURT: Correct.

MS. NIGRELLI: Okay.  And will this also be in your order, Your Honor?

THE COURT: Yes, it will.

MS. NIGRELLI: Okay, great.  I just wanted to make sure that I --

THE COURT: That's why I wrote it down, we're all writing it down so that's good.  Okay, is there anything else that we need to address?

MR. READY: No, Your Honor, not at this time.

THE COURT: Okay, everything's fine as far as the service of subpoenas?  Is that another --

MR. READY: I guess -- I don't know if you want --

MS. NIGRELLI: So, Your Honor, I believe you're

Ruling by the Court                    197

going to look to see if you can tailor your subpoena so I don't have to file any documents and then we'll work together to try and come to some agreement this week.  If we can't, perhaps we could reach out to Your Honor?

THE COURT:  That's fine.  I -- what I'm going to tell you with regard to the motion to quash that's on the schedule now, obviously I'm going to deny it as moot because --

MR. READY:  Mm-hmm.

THE COURT:  -- here we are and we have jurisdiction, so to the extent that there's going to be an issue, you'll -- something else will need to be filed.

MR. READY:  Okay.

MS. NIGRELLI:  Okay.

THE COURT:  Okay.

MS. NIGRELLI:  So right now, Your Honor, with him looking at the trial subpoenas as they relate to Mr. Redmond --

THE COURT:  Mm-hmm.

MS. NIGRELLI:  -- he's going to get back to me.  I think he's also going to do that with the other --

MR. READY:  I'm going to do it by Monday, if that works?  Okay.

MS. NIGRELLI:  Absolutely.

MR. READY:  Okay, yup.

Ruling by the Court                    198

MS. NIGRELLI:  And then we can discuss and hopefully work out any issues we have with our discovery and depositions.  I note that discovery is to be completed by 9/30 so --

THE COURT:  Yes, because I just don't think there's any other way to do it at this point --

MS. NIGRELLI:  Yes.

THE COURT:  -- we're -- we're --

MS. NIGRELLI:  Yes.

THE COURT:  -- I -- the reason that I do that is because it's an involuntary and I'm very aware of the fact that I don't want it to drag on --

MS. NIGRELLI:  I understand, Your Honor.

THE COURT:  -- I want it to be decided and an order for relief either entered or not entered quickly --

MR. READY:  I understand.

THE COURT:  -- so I don't mean to push you on discovery --

MS. NIGRELLI:  No, that's fine, Your Honor.

THE COURT:  -- but that's where we are.

MR. READY:  Yeah, appreciate it.

THE COURT:  Okay.

MR. READY:  Thank you, Your Honor.

THE COURT:  All right, I think that's it.

MS. NIGRELLI:  Thank you, Your Honor.

Ruling by the Court                    199

MR. READY:  Thank you, Your Honor.

THE DEBTOR:  Thank you, Your Honor.

THE COURT:  All right, thank you.  Safe travels home.

MS. NIGRELLI:  Yes, you too.

(Matter concluded, 4:15 p.m.)

* * *

**C E R T I F I C A T I O N**

We, Jacqueline Mullica and Diane Gallagher, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter on September 18, 2024, from 10:02 a.m. to 4:39 p.m.

/s/Jacqueline Mullica              September 22, 2024
JACQUELINE MULLICA                 DATE
DIANA DOMAN TRANSCRIBING, LLC

/s/Diane Gallagher                 September 22, 2024
DIANE GALLAGHER                    DATE
DIANA DOMAN TRANSCRIBING, LLC

# Exhibit B

# Exhibit B

## William Mulgrew

| | |
|---|---|
| **From:** | Albert A. Ciardi III <Aciardi@ciardilaw.com> |
| **Sent:** | Monday, September 23, 2024 1:06 PM |
| **To:** | Joel A. Ready, Esq.; Nicole Nigrelli |
| **Cc:** | Dorene Torres; Daniel Siedman; David Heim; William Mulgrew; Benjamin J. Lewis, Esq. |
| **Subject:** | RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss |

I have already clarified twice who we represent. We will also not turn over the original to your possession. We can make it available at my office or at Court.

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 1:04 PM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; William Mulgrew <william@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ciardi,

I can confirm we will supplement, if necessary, what we've already provided by close of business tomorrow. We'll also issue revised discovery today per my agreement with Ms. Nigrelli. However, please prioritize providing the original (or first generation copy if no original is found) of the document Mr. Shalter is alleged to have signed at his "exit interview" at your earliest convenience. It can be brought to my office and we'll sign for it being in our possession. I also need a thumb drive with the photo/scan taken by Ms. Hatmaker. If you can provide those by close of business tomorrow as well, that would be appreciated.

Again, we're willing to accommodate your deposition requests by either zoom or in person here in Blandon.

Finally, as previously requested, kindly clarify whether you or your office currently represent any of the following persons: Shannon Kroemmelbein, Stephanie Miller, ARC Realty, LLC, Seguro Medico, LLC, Benefits Now, LLC, Bene Market, LLC, National Brokers of America, Inc., Alan Redmond Charitable Foundation, The Redmond Group, LLC, The Leads House, Redmond Marketing, LLC, Redmond Group Investments, LLC, QuickHealth Care, Jesus Barrios, Arthur W. Walsh, Jr., Tonya Hatmaker, Norman M. Valz, and any legal person associated with any of the foregoing persons.

Joel Ready

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Monday, September 23, 2024 9:21 AM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ready

1

That's not how depositions work. Before we address that issue with the Court, please confirm that we are receiving all responsive documents to all our document requests by tomorrow. Given the breadth of the allegations in the TRO and Involuntary Petition, I am sure there are a substantial amount of documents and we will want ample time to review.

Mr. Stalter's transportation issues are not mine. He needs to appear where the notice indicates.

Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103
215-599 2018 (o)

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 8:31 AM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ciardi,

If you wish to do in person, you're welcome at my Blandon office on Thursday. I can't make it into Philadelphia and back on the schedule I have, but I could do it here. In addition, Mr. Stalter is without transportation, so it will have to be local for him.

Joel Ready

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Saturday, September 21, 2024 2:44 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ready

We would prefer in person so let us know if Friday would work for that. Please confirm we will have all of the responsive documents y Tuesday.

Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103

215-599 2018 (o)

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Friday, September 20, 2024 4:21 PM
**To:** Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>
**Subject:** Re: Alan Christopher Redmond - deposition notices/ Motion to Dismiss


Nicole,

I'll be back in on Monday. I can't do travel to and from Philadelphia on Thursday with my schedule, but I could do these all by zoom. Please advise on whether you would agree to that.

Joel Ready

Get Outlook for iOS

**From:** Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Sent:** Friday, September 20, 2024 2:00:33 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>
**Subject:** Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Hi Joel-
Please see attached notices of deposition regarding our Motion to Dismiss scheduled for hearing on October 1, 2024.  Please note that I have agreed to take Mr. Jordan's testimony via zoom; all other deponents are required to come to my office, 1905 Spruce Street, Philadelphia PA on Thursday September 26th.   Please confirm that you will provide the documents requested by Tuesday **September 24, 2024 at noon**.

Thanks,
Nicole

# Exhibit C

# Exhibit C

7550 Woodbury Pike
Roaring Spring, PA 16673

**OFFICE:** 814.793.2377
**WEB:** www.lesnevich.com
**EMAIL:** info@lesnevich.com

# LESNEVICH & DETWILER
## FORENSIC DOCUMENT EXAMINERS

September 25, 2024

Joel A. Ready, Esquire
Cornerstone Law Firm, LLC
8500 Allentown Pike, Suite 3
Blandon, PA 19510

> Re:   *Forensic Document Analysis*
> *Eastern District Bankruptcy Court of PA//Case No. 24-13093*
> *My File No. 2024-096*

### PRELIMINARY REPORT OF EXAMINATION

Dear Mr. Ready,

I have completed my preliminary examination of the three questioned[1] documents submitted for analysis.  These documents are identified as follows:

**(Q-1)**   Photocopy reproduction[2] of a *Seguro Medico Final Pay Agreement and Release Letter addressed to Ethan Shalter*, dated August 6, 2024, bearing one (1) questioned signature in the name "Ethan Shalter".

**(Q-2)**   Photocopy reproduction of a *Seguro Medico, LLC Exit Interview Letter addressed to Ethan Shalter*, dated August 6, 2024, bearing one (1) questioned signature in the name "Ethan Shalter".

---

[1]   "Questioned - associated with the matter under investigation about which there is some question, including, but not limited to, whether the questioned and known items have a common origin." - SWGDOC, *Standard for Examination of Handwritten Items.*

[2]   As used in this preliminary report, the term "photocopy" can include copies or reproductions created through a variety of different processes using common "office copier" type machines, as well as telefacsimiles, microfilm blowbacks, digital files (PDF's), etc.

*Joel A. Ready, Esquire*                                                   *September 25, 2024*
*Page 2 of 4*

**(Q-3)**   Photocopy reproduction of a ***Seguro Medico, LLC Exit Mutual Release***, dated August 6, 2024, bearing one (1) questioned signature in the name "Ethan Shalter".

For reference, copies of these documents have been attached hereto for easy identification.

Following a comprehensive analysis, which included visual comparisons and low magnification microscopic examinations, it was determined that the questioned "Ethan Shalter" signatures on the submitted Exhibit Q-1 through Q-3 documents display a notable degree of pictorial consistency and similarity in writing style when compared to each other.   However, upon closer examination, the handwriting characteristics and individual writing movement formations comprising the questioned "Ethan Shalter" signatures were found to be identical, to the extent that the signatures can be perfectly superimposed.[3]

Considering that handwriting *variation*[4] is a key element found in every individual's unique handwriting habits and characteristics (*i.e., range of variation*[5]), combined with the physical impossibility of an individual producing two identical signatures with machine-like precision, it has been determined that the Exhibit Q-1 through Q-3 documents do not collectively contain three independently executed genuine signatures of Ethan Shalter, as purported, but rather reproductions of the same exact signature that have been reproduced from a common source, or *model signature*.[6]   Due to the identical nature of the questioned "Ethan Shalter" signatures, it can be inferred that at least two of the signatures are direct copies of the third, or all three were replicated from an unknown source.   In other words, it has been determined that at least two, if not all three, of the questioned signatures attributed to "Ethan Shalter" on the Exhibit Q-1 through Q-3 documents were produced using a

---

[3]      "Since variation is an integral part of natural writing, no two writings of the same material by the same writer are identical in every detail. Within a writer's range of variation, there are handwriting habits and patterns that are repetitive and similar in nature.  These repetitive features give handwriting a distinctive individuality for examination purposes."  - SWGDOC, *Standard for Examination of Handwritten Items.*

[4]      "Variation – those deviations among repetitions of the same handwriting characteristic(s) that are normally demonstrated in the habits of each writer." – SWGDOC, *Standard for Examination of Handwritten Items.*

[5]      "Range of variation – the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual." – SWGDOC, *Standard for Examination of Handwritten Items.*

[6]      "Model signature – A signature that is used as a prototype for simulation or copy, by manual, electronic, or other means." – SWGDOC, *Standard Terminology Relating to the Examination of Questioned Documents.*

*Joel A. Ready, Esquire*                                                    *September 25, 2024*
*Page 3 of 4*

method known as transposition fabrication, commonly referred to as a "cut-and-paste" simulation.[7]  This process typically involves copying a signature from one document and directly pasting it onto a new document to create the false appearance of authenticity.  The simulation process can be carried out manually, using devices like photocopiers or other mechanical means, or digitally through the utilization of photo editing software such as Adobe Photoshop®.

As noted throughout the following treatises, the conclusion rendered in this matter is further supported by authoritative literature of the field of Forensic Document Examination:

> *"Copies can be used to create fabrications of non-existent original documents. Signatures can be placed on contracts and agreements, dates or amounts altered, or paragraphs added.  Usually these cut-and-paste efforts are quite detectable with careful scrutiny.  The first red flag is that a copy, rather than an original document is proffered.  Since no original in fact exists, the proponent must explain why only a copy of a valuable or otherwise important document can be found.*
>
> *The most decisive way to demonstrate a fabrication is to locate the source item[s] from which it was made.  <u>No single signature can exist on more than one document.  If a particular signature is found on one document, a replication of that signature cannot validate a different document</u> [emphasis added].*
>
> *Often physical evidence on the fabrication will establish its nature and indications of its method of creation even when the source document cannot be located.  There may be shadow lines, slight cutoff ascenders or descenders of letters, or other signs of the cutout.  Printed/typed text may not be in proper alignment or may even be in a different type style and font size.  If there is typed signature block that can be measures accurately, it may be possible to prove that the typing underneath the signature is a different copy generation than other text on the document."*
> *(Scientific Examination of Questioned Documents, Second Edition, Kelly J. and Lindblom, B., 2006, pg. 223)*

---

[7]    "A "cut and paste" simulation can be achieved in one of two ways: **i.** A mechanical method where a model signature is physically cut from a document (original or copy) and pasted with adhesive to another document.  The latter document is then copied.  Alternatively, a transparency copy is made of the model signature.  The transparency is then placed over the document needed, and a new copy is made.  **ii.** An electronic method where a document bearing a model signature is scanned and this signature is then electronically "cut and pasted" onto another document, which is then printed, and the file may or may not have been saved.  Alternatively, a signature on a portable document format (PDF) document can be selected, copied, and pasted onto another document that is then printed." - Mohammed, L., <u>Forensic Examination of Signatures</u>, (2019) Pgs. 52-53.

*Joel A. Ready, Esquire*                                                      *September 25, 2024*
*Page 4 of 4*

> *"It is a matter of common knowledge that genuine signatures written by the same writer differ from each other within certain well-defined limits, and, surprising as it may first appear, with a group of signatures certain normal divergences in size, lateral spacing and proportions actually indicate genuineness.  This fact is shown in an examination of traced forgeries which in exact size and proportions may be too nearly like each other or too nearly like a common model to be genuine.  The same damaging similarity may also appear in several simulated forgeries all carefully made from one genuine signature. [emphasis added]"*
> *(Questioned Documents, Second Edition, Osborn, 1929, p. 207)*

The analyses and conclusion expressed in this preliminary report are based upon a collective evaluation of the evidence made available at this time and are stated to a reasonable degree of professional certainty within the FDE profession. In the event circumstances may warrant, I reserve the right to supplement this preliminary report upon the receipt of any additional evidence, as well as any other pertinent information specific to my analysis in connection with this matter.  To the extent any additional information or evidence becomes relevant to the opinion expressed in this preliminary report, the submitting party will be promptly notified and the preliminary report will be revised accordingly.

I am in the process of finalizing my formal report of examination, along with the corresponding court demonstratives, and will submit the same upon completion.

Additionally, enclosed as **Exhibits 1** and **2**, respectively, are copies of my testimony list and current curriculum vitae.

_____

KHODY R. DETWILER
FORENSIC DOCUMENT EXAMINER

# EXHIBIT 1

TESTIMONY LIST OF
*KHODY R. DETWILER*



# The Testimony List of
# KHODY R. DETWILER
### Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST FROM 2012 TO PRESENT

(1)      JANUARY 20, 2012

People vs. Cory Byrd
(Ind. #2011-749)
County Court (County of Orange) - Goshen, New York
Retained by the Orange County District Attorney's Office
Jury Trial - Honorable Jeffery G. Berry
Our File No. 2011-056

(2)      APRIL 9, 2013

MERS vs. Ruth A. Carvalho, et al
Court of Common Pleas - Philadelphia, Pennsylvania
Retained by Philadelphia VIP (Pro Bono)
Bench Trial - Honorable Eugene Edward J. Maier
Our File No. 2012-020

(3)      MAY 15, 2013

In Re: Declaration of Trust Dated October 19, 1977of Chester C. Lockwood
and Helene J. Lockwood, Settlors. (No. 1509-1375)
In Re: Irrevocable Deed of Trust of Edna P. Lockwood, Settlor,
Dated December 15, 1983. (No. 1509-1376)
Court of Common Pleas of Chester County - West Chester Pennsylvania
Retained by Astor Weiss Kaplan & Mandel, LLP
Bench Trial - Honorable Katherine B. L. Platt
Our File No. 2012-070

(4)      JANUARY 9, 2014

Commonwealth of Pennsylvania vs. Michelle M. Cohen
Court of Common Pleas of Chester County - West Chester Pennsylvania
Retained by the Pennsylvania Office of Attorney General (POAG)
Jury Trial - Honorable Jacqueline Carroll Cody
Our File No. 2012-008

*Khody R. Detwiler Testimony List - Page 1 of 18*



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(5)      APRIL 11, 2014

People vs. David Stevenson
(Ind. #2013-067)
County Court (County of Orange) - Goshen, New York
Retained by the Orange County District Attorney's Office
Jury Trial - Honorable Jeffery G. Berry
Our File No. 2014-005

(6)      APRIL 25, 2014

Estate of Mary Jennelle Travis a/k/a Mary Jennelle Butler Travis, Deceased
Court of Common Pleas of Lancaster County, Pennsylvania
(No. 36-2012-2130)
-Orphans Court Division
Retained by Nikolaus & Hohenadel, LLP
Bench Trial - Honorable Jay J. Hoberg
Our File No. 2013-033

(7)      JUNE 30, 2014

Langenkamp vs. New York University
New York Southern District Court (No. 1:2010cv08883)
Retained by New York University
Presiding Judge: Honorable Alvin K. Hellerstein
**Deposition**
Our File No. 2012-049

(8)      AUGUST 28, 2014

Commonwealth of Pennsylvania vs. Frank Charles Scott
(CP-17-CR-0000717-2013)
Court of Common Pleas, County of Clearfield, Pennsylvania
Retained by Sobel & Collins
Jury Trial - Honorable Paul E. Cherry
Our File No. 2014-022



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(9)    MAY 4, 2015

In Re: Walter J. Konjolka, Deceased
(No.: 936 of 2014)
Court of Common Pleas of Allegheny County, Pennsylvania
-Orphans' Court Division
Retained by Sikov & Love, P.A.
Bench Trial - Honorable Lawrence J. O'Toole
Our File No. 2014-107

(10)    MAY 22, 2015

Statewide Investigating Grand Jury
(POAG Western Regional Office located in Pittsburgh, Pennsylvania)
Retained by the Pennsylvania Office of Attorney General (PAOG)
Honorable Norman A. Krumenacker, III
**Grand Jury Testimony**
Our File No. 2015-005

(11)    JUNE 25, 2015 - (INTERNATIONAL)

2014-1479 Ashot Yegiazaryan vs. Vitaly Ivanovich Smagin
High Court of Justice (Queen's Bench Division)
-Commercial & Admirability Court (London, England)
Retained by Gibson Dunn & Crutcher LLP (UK Office)
Bench Trial - The Honorable Justice Nigel Teare
Our File No. 2015-013

(12)    SEPTEMBER 1, 2015

M&M Insurance Group, INC., vs. Ronald Ferraro
Court of Common Pleas of Lawrence County, Pennsylvania
Retained by Verterano & Manolis
Bench Trial - Honorable Eugene Fike II
Our File No. 2015-030

*Khody R. Detwiler Testimony List - Page 3 of 18*



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(13)     JANUARY 28, 2016

United States of America vs. Raza, et al.
United States District Court
-Eastern District of Virginia (Alexandria, Virginia)
Retained by Winston & Strawn LLP
Jury Trial - Honorable Claude M. Hilton
Our File No. 2015-075

(14)     MARCH 17, 2016

In re: Nomination Petition of Erin R. McClelland for the
Office of Representative in Congress (Petition Hearing)
Commonwealth Court of Pennsylvania (Pittsburgh, Pennsylvania)
Retained by the Law Offices of Charles A. Pascal, Jr.
Petition Hearing - Honorable Patricia A. Mccullough
Our File No. 2016-015

(15)     APRIL 28, 2016

Dantzler vs. Young
(Case No.: 150202116)
Court of Common Pleas (City Hall) - Philadelphia, Pennsylvania
Retained Philadelphia Legal Assistance (Pro Bono)
Bench Trial - Honorable Shelley Robins-New
Our File No. 2015-084

(16)     JUNE 7, 2016

Estate of Robert P. Bieber, Deceased, Dennis R. Newhard and
Sandra Newhard, Executors vs. Leslie M. DiMenichi
(Case No. C48-CV-2013-3399)
Court of Common Pleas - Northampton County, Pennsylvania
Retained by Fitzpatrick Lentz & Bubba, P.C.
Bench Trial - Honorable Emiddio Giordano
Our File No. 2015-045

*Khody R. Detwiler Testimony List - Page 4 of 18*



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(17)     AUGUST 25, 2016

In Re: Estate of John Edward Brumbaugh, Deceased
(Docket No.: 26-2016)
Court of Common Pleas - Bedford County, Pennsylvania
Retained by Haberstroh Sullivan Keating & George, LLP
Bench Trial - Honorable Travis W. Livengood
Our File No. 2016-026

(18)     OCTOBER 7, 2016

In Re: Estate of John Edward Brumbaugh, Deceased
(Docket No.: 26-2016)
Court of Common Pleas - Bedford County, Pennsylvania
Retained by Haberstroh Sullivan Keating & George, LLP
Hearing - Honorable Travis W. Livengood
Our File No. 2016-026

(19)     OCTOBER 21, 2016

John C. Maley, et al. vs. Shell Western Exploration and Production, LP, et al.
(Docket No.: 352-CV-2012)
Court of Common Pleas - Tioga County, Pennsylvania
Retained by Norton Rose Fulbright US LLP
Jury Trial - Honorable George W. Wheeler
Our File No. 2015-040

(20)     MARCH 17 & 20, 2017

High Value Trading, LLC and Alskom Realty, LLC vs.
Jack Shaoul and Universe Antiques, Inc.
New York State Supreme Court - New York County, New York
Retained by Budd Larner, P.C.
Jury Trial - Honorable Margaret A. Chan
Our File No. 2013-032

*Khody R. Detwiler Testimony List - Page 5 of 18*



# KHODY R. DETWILER

### Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(21)     MAY 22, 2017

In the Matter of the Will of E. Warren Bradway, Deceased
Superior Court of New Jersey, Chancery Division-Probate Part
Camden County, Docket No. CP 0116-2016
Retained by Cozen O'Connor
Bench Trial - Honorable Nan S. Famular
Our File No. 2016-070

(22)     JULY 18, 2017

Quazzo vs. ADA Chester Corporation et al
(#37-1-12 Wrcv/Civil/Jury Trial)
Vermont Superior Court - Woodstock, Vermont
Retained by Langrock Sperry & Wool, LLP
Jury Trial - Honorable Robert P. Gerety Jr.
Our File No. 2012-004

(23)     NOVEMBER 21, 2017

Patel vs. Parmar (Monto Co. Case No. 2016-13282)
Court of Common Pleas - Montgomery County, Pennsylvania
Retained by Sidkoff, Pincus & Green, P.C.
Bench Trial - Honorable Richard P. Haaz
Our File No. 2017-028

(24)     JULY 5, 2018

Commonwealth of Pennsylvania vs. Mitchell
Court of Common Pleas - Tioga County, Pennsylvania
Retained by Attorneys Will Korey and Samuel C. Stretton
Hearing - Honorable George W. Wheeler
-Motion to set aside verdict; New Trial
-Motion to Modify Sentence
Our File No. 2018-033



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(25)    JULY 30, 2018

Rodney L. Dively Estate vs Bobbi Delozier
(Case No. 2017-00660)
Court of Common Pleas - Bedford County, Pennsylvania
Retained by Forr, Stokan, Huff, Kormanski and Naugle
Hearing - Honorable Travis W. Livengood
Our File No. 2018-079

(26)    OCTOBER 8, 2018

Commonwealth of Pennsylvania vs. Robinson
Court of Common Pleas - Dauphin County, Pennsylvania
Retained by Attorney Roy L. Galloway
PCRA Hearing - Honorable Scott Arthur Evans
Our File No. 2018-071

(27)    DECEMBER 10, 2018

IN RE: Estate of Naomi R. Cherup, Deceased
(Docket No. 02-15-04102)
Court of Common Pleas of Allegheny County, Pennsylvania
-Orphans' Court Division
Retained by Jones Gregg Creehan & Gerace, LLP
Hearing - Timothy E. Finnerty, Hearing Officer
Our File No. 2016-051

(28)    DECEMBER 19, 2018

IN RE: Estate of Sean M. Schellenger
Philadelphia County, Register of Wills
(Docket No. 4157-2018)
Retained by Crocker & Crocker, P.C.
Hearing - John F. Raimondi, Deputy Register of Wills
Our File No. 2018-096



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com ✉

linkedin.com/in/
khody-r-detwiler 🔗

7550 Woodbury Pike
Roaring Spring, PA 16673 🏠

Roaring Spring, PA
814.793.2377 📍

Pittsburgh, PA
412.430.3887 📍

Philadelphia, PA
215.800.0120 📍

Chicago, IL
312.236.5186 📍

St. Louis, MO
636.530.7722 📍

www.lesnevich.com 🖥

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(29)     JANUARY 30, 2019

Commonwealth of Pennsylvania vs. Kashif Ellis
Court of Common Pleas - Blair County, Pennsylvania
Retained by the Blair County District Attorney's Office
Jury Trial - Honorable Elizabeth A. Doyle
Our File No. 2018-073

(30)     MAY 28, 2019

IN RE: Estate of Edward R. Zimmerman, Deceased
(Docket No. O.C. 82 of 2018)
Court of Common Pleas of Warren County, Pennsylvania
-Orphans Court Division
Retained by Stapleford & Byham, LLC
Bench Trial - Honorable Gregory J. Hammond
Our File No. 2018-136

(31)     JUNE 10, 2019

Jonathan P. Ruff, et al. v. Danial Kiser
(C-12-CV-18-000918)
Circuit Court for Hartford County, Maryland
Retained by Neuberger, Quinn, Gielen, Rubin & Gibber P.A.
**Deposition**
Our File No. 2019-026

(32)     JUNE 24, 2019

BSPLLC Substitute Trustee v. Rene Mitchell
(CAEF15-20853)
Circuit Court for Prince George's County, Maryland
Retained by Duane Morris LLP
Bench Trial - Honorable Crystal D. Mittelstaedt
Our File No. 2018-083

*Khody R. Detwiler Testimony List - Page 8 of 18*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(33)     AUGUST 8, 2019

Office of Disciplinary Counsel The Disciplinary Board of the Supreme
Court of Pennsylvania vs. Anthony S. Rachuba, IV, Esquire
Office of Disciplinary Counsel, District II Office - Trooper, Pennsylvania
Retained by the Disciplinary Board of the Supreme Court of
Pennsylvania Office of Disciplinary Counsel
Disciplinary Hearing - Three Panel Hearing Committee
Our File No. 2019-019

(34)     OCTOBER 8, 2019

Jacquelyn Soffer v. Jeffrey Soffer - JAMS Arbitration (Ref. No.: 1425028944)
Retained by Kellogg Hansen Todd Figel & Frederick PLLC
Before the Honorable Garrett E. Brown, Jr., David H. Coar, and Thomas I. Vanaskie
New York, New York
**Testimony Submitted in Written Form**
Our File No. 2019-078

(35)     OCTOBER 28, 2019

Office of Disciplinary Counsel The Disciplinary Board of the Supreme
Court of Pennsylvania vs. Ephraim Tahir R. Mella, Esquire
Office of Disciplinary Counsel, District I Office - Philadelphia, Pennsylvania
Retained by Lamb McErlane, PC
Disciplinary Hearing before Special Master, Carl D. Buchholz, III, Esquire
Our File No. 2019-090

(36)     MARCH 16, 2020

Joseph Dugan and Water Transfer Solutions, LLC vs. Donald M. Gallo
Court of Common Pleas of Allegheny County, Pennsylvania
-Civil Division
Retained by Colkitt Law Firm, P.C.
Bench Trial - Honorable Christine A. Ward
Our File No. 2019-112



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(37)     AUGUST 28, 2020

Jai Shekhawat v. Anil Kumar, Udai Kumar, Jeffrey Sratton, John Aiello
and Quinnox, Inc., a Delaware corporation (C.A. No. 2019-0079-AGB)
Delaware Court of Chancery - Honorable Andre G. Bouchard
Retained by Abrams & Bayliss LLP
**Deposition**
Our File No. 2020-033

(38)     OCTOBER 12, 2020

Susan Elaine Montler vs. Robert Wilfred Montler
(Case No.: 2017-GN-1183)
Court of Common Pleas - Blair County, Pennsylvania
Retained by Gentile, Horoho & Avalli, P.C.
Bench Trial - Honorable Hiram A. Carpenter, III
Our File No. 2019-074

(39)     DECEMBER 14 & 15, 2020

Beverley B. Schottenstein, et al. v.  J.P. Morgan Securities, LLC; Evan A. Schottenstein
and Avi E. Schottenstein, et al. (FINRA Arb. No. 19-02053 - Boca Raton, Florida)
FINRA Arbitration - Arbitration Panel: Donna Greenspan Solomon (Chairperson),
David Rich, and James M. Scutti
Retained by Maynard, Cooper & Gale, PC
Our File No. 2020-054

(40)     FEBRUARY 12, 2021

RR Trans Systems, Inc., an Illinois corporation, ROS & ROZ Logistics, Inc., an Illinois
corporation, and Vladislav Tsvetkov, Derivatively as a shareholders of RR Trans Systems,
Inc., and ROS & ROZ Logistics, Inc., and Individually vs. Rosen Zdravkov, an individual,
and Viktoryia Kurkezh, an individual (Case No. 17-CH-14267)
Circuit Court of Cook County, Illinois - Chancery Division - Honorable Neil Cohen
Retained by the Law Office of David L. LaPorte, P.C.
**Deposition**
Our File No. 2020-099

*Khody R. Detwiler Testimony List - Page 10 of 18*



# The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/ khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(41)    FEBRUARY 17, 2021

In Re: Estate of John P. Zitcovich a/k/a John P. Zitcovich, Sr., Deceased
(Docket No. 02-19-01099)
Court of Common Pleas of Allegheny County, Pennsylvania
-Orphans' Court Division
Retained by Jones Gregg Creehan & Gerace, LLP
Bench Trial - Honorable Lawrence J. O'Toole
Our File No. 2020-090

(42)    MARCH 1, 2021

In Re: Estate of Bernard R. Unterkoefler (Docket No. 2019-43-OC)
Court of Common Pleas of Susquehanna County, Pennsylvania
-Orphans' Court Division
Retained by Beardsley Law, PLLC
Bench Trial - Honorable Jason J. Legg
Our File No. 2020-075

(43)    MARCH 19, 2021

Kirk Saleme, Richard Latker v. Sean M. Burke
Court of Common Pleas of Blair County, Pennsylvania 24th Judicial District
(No. 2021 GN 659)
Retained by Grabill & Seelye, P.L.L.C.
Bench Trial - Honorable Paul E. Cherry (County of Clearfield, Pennsylvania)
Our File No. 2021-024

(44)    JULY 26, 2021

Marjam Supply CO., INC., vs. American Contractors of New Jersey, LLC, Joseph
Pallonetti, Port IMP. South II Urban Renewal, LLC, XYZ Corporation 1-10 and/or John
Does 1-10 (Mortgage and Lien Holders)
Superior Court of New Jersey Law Division: Hudson County (No.: HUD-L-1359-19)
Retained by Pribish-Reiss LLP
Bench Trial - Honorable Christine M. Vanek
Our File No. 2020-083

*Khody R. Detwiler Testimony List - Page 11 of 18*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(45)      AUGUST 16, 2021

Commonwealth of Pennsylvania v. Myrle Evelyn Miller
(MJ-17302-CR-0000106-2021)
Court of Common Pleas of Union County, Pennsylvania
Retained by the Pennsylvania Office of Attorney General (POAG)
Preliminary Hearing - Honorable Jeffrey L. Mensch
Our File No. 2021-022

(46)      AUGUST 24, 2021

Bolger v. Meridian Nursing & Rehab, et al.
Superior Court of New Jersey - Monmouth County
(Docket No.: MON-L-2975-17) - Honorable Kathleen A. Sheddy
Retained by the Law Firm of Brian P. Murphy, P.C.
**Deposition**
Our File No. 2019-069

(47)      SEPTEMBER 20, 2021

Brad D. Bayles, an individual, for Himself, and on behalf of Jefferson of Monticello,
Inc., a Pennsylvania corporation vs. Robert G. Hamrock, an individual and Jefferson
of Monticello, Inc., a Pennsylvania corporation (Case No.: GD-18-2757)
Court of Common Pleas of Allegheny County, Pennsylvania
-Civil Division
Retained by The Montgomery Law Firm LLC
Jury Trial - Honorable Alan D. Hertzberg
Our File No. 2020-005

(48)      OCTOBER 20, 2021

Commonwealth of Pennsylvania vs. Peter Robert Harvey
(MJ-40201-CR-0000098-2021)
Commonwealth of Pennsylvania, County of Indiana
Retained by the Indiana County District Attorney's Office
Preliminary Hearing - Honorable Guy B. Haberl
Our File No. 2021-043



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(49)    OCTOBER 26, 2021

Carl E. Merrell; Lyle Ranson; Jeanette Ranson; Craig S. Miller; Wanda Edwards Miller;
and Robert Nastase; Plaintiffs, v. James M. Smith; Jennifer Smith; and Carolina
Beverage Group LLC F/K/A Carolina Beer & Beverage, LLC, Defendants.
Superior Court of North Carolina - Mecklenburg County
(Docket No.: 19-CVS-21650 [Master File] Related Cases: 19 CVS 22027
and 19 CVS 23665) - Honorable Michael L. Robinson
Retained by Parker Poe Adams & Bernstein LLP
**Deposition**
Our File No. 2020-107

(50)    JANUARY 6, 2022 - (INTERNATIONAL)

Santa Monica Equity Inc. v. Christelle Fila Nzololo
In the High Court of the Hong Kong Special Administrative Region
-Court of First Instance Miscellaneous Proceedings No. 214 of 2021 (Hong Kong)
Retained by Kobre & Kim  (Central Hong Kong Office)
Bench Trial - The Honorable Anthony Chan J
Our File No. 2020-008

(51)    FEBRUARY 16, 2022

Beulah Allen v. Ali Ghasemzadeh, M.D., et al. (Case No.: 118-CI-00292)
Mason County Circuit Court - Mason County, Kentucky
Retained by Calderhead Lockemeyer & Peschke Law Office
Jury Trial - Honorable Stockton B. Wood
Our File No. 2020-084

(52)    MARCH 16, 2022

State of Delaware v. James Cooke (I.D. No. 0506005981)
Delaware Superior Court, New Castle County
Retained by the Office of the Federal Public Defender - Middle District of Pennsylvania
Evidentiary Hearing - Honorable T. Henley Graves
Our File No. 2018-103



The Testimony List of

# KHODY R. DETWILER

### Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(53)      JUNE 30, 2022

IN RE: The Estate of Robert A. Dobson, a/k/a Robert Allen Dobson, Deceased
(Docket No. 1422-0162)
Court of Common Pleas of Centre County, Pennsylvania
-Orphans' Court Division
Retained by Babst, Calland, Clements & Zomnir, P.C.
Bench Trial - Honorable Brian K. Marshall
Our File No. 2022-033

(54)      AUGUST 31, 2022

Commonwealth of Pennsylvania vs. Brian Bradley Giles
(Docket No.: R2899956)
Court of Common Pleas of Cambria County, Pennsylvania
Retained by the Cambria County Office of the District Attorney
Preliminary Hearing - Honorable Michael Muslin
Our File No. 2022-075

(55)      OCTOBER 5, 2022

IMO Estate of Delores Maloney, Deceased
Superior Court of New Jersey, Chancery Division-Probate Part
Burlington County, Docket No. 2019-2212
Retained by McNeely McGuigan & Esmi LLC
Bench Trial - Honorable Paula T. Dow
Our File No. 2022-036

(56)      DECEMBER 21, 2022

SALEM CONSUMER SQUARE OH LLC, v. BELFOR USA GROUP, INC.
United States Bankruptcy Court for the Western District of Pennsylvania
(Bankruptcy No. 21-20020-CMB) - Honorable Carlota  M. Böhm
Retained by Bernstein-Burkley, P.C.
**Deposition**
Our File No. 2022-022

*Khody R. Detwiler Testimony List - Page 14 of 18*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT



khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

**(57)    JANUARY 25, 2023**

David Paul Washinsky, as Executor of the Estate of Paul Washinsky, Plaintiff,
vs. Thomas Nicholas Washinsky, Defendant, (No.: 11-22-159)
Court of Common Pleas of Cambria County, Pennsylvania
Orphans' Court Division
Retained by Evey Black Attorneys LLC
Bench Trial - Honorable Patrick T. Kiniry
Our File No. 2022-044

**(58)    MARCH 21 & 24, 2023**

IN RE: Nomination Petition of Gary Masino As Candidate for City
Council In the 10th Council District (Petition Hearing)
Commonwealth Court of Pennsylvania - City Hall (Philadelphia, Pennsylvania)
Retained by the Law Offices of J. Matthew Wolfe
Petition Hearing - Honorable Joshua Roberts
Our File No. 2023-025

**(59)    APRIL 6, 2023**

IN RE: Estate of Edward Bernard Rasor, Deceased
In the Circuit Court of the Seventh Judicial Circuit
in and for Broward County, Florida (No. PRC 170004900)
Retained by Saavedra-Goodwin Attorneys and Counselors at Law
Bench Trial (Probate Division) - Honorable Nicholas Lopane
Our File No. 2023-018

**(60)    APRIL 14, 2023**

Ralph Elsell, Plaintiff, vs. Encore Wire Corporation, Defendant
Cause No. 471-04957-2021 (471st Judicial District)
Collin County, Texas - Honorable Andrea Bouressa
Retained by Littler Mendelson, P.C.
**Deposition**
Our File No. 2022-105



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(61)  APRIL 20, 2023

Commonwealth of Pennsylvania v. Myrle Evelyn Miller
(CP-60-CR-0000229-2021)
Court of Common Pleas of Union County, Pennsylvania
Retained by the Pennsylvania Office of Attorney General (POAG)
Jury Trial - Honorable Edward D. Reibman
(Specially assigned Lehigh County Senior Judge)
Our File No. 2021-022

(62)  MAY 3, 2023

IN RE: The Estate of Dorothy Grigg, Deceased (No. 11-22-686)
Court of Common Pleas of Cambria County, Pennsylvania
Orphans' Court Division
Retained by Smorto, Persio, Webb & McGill
Bench Trial - Honorable Patrick T. Kiniry
Our File No. 2022-073

(63)  AUGUST 22, 2023

In the Matter of the Estate of Rebecca A. Lewis, Deceased (File No. 2022-38876)
State of New York Surrogate Court: County of Cattaraugus
Retained by Cole, Sorrentino, Hurley, Hewner & Gambino, P.C.
Bench Trial - Honorable Ronald D. Ploetz
Our File No. 2022-087

(64)  AUGUST 29, 2023

Kimberlee Duran-Woomer and Aaron Duran, Plaintiffs, vs.
Elaine Frances Zajicek, Defendant (No. GD-22-000611)
Court of Common Pleas of Allegheny County, Pennsylvania - Civil Division
Retained by John Linkosky & Associates
Bench Trial - Honorable Michael E. McCarthy
Our File No. 2022-078



The Testimony List of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TESTIMONY LIST continued

(65)    OCTOBER 23, 2023

JB&B Capital, LLC, Plaintiff, v. Medrite LLC and Laura Kasper, Defendants
(Case No. 3:21-cv-00117)
United States District Court
-Eastern District of Tennessee (Greenville, Tennessee)
Retained by Woolf, McClane, Bright, Allen & Carpenter, PLLC
Bench Trial - Honorable Clifton L. Corker
Our File No. 2022-019

(66)    DECEMBER 6, 2023

Commonwealth of Pennsylvania v. Dushawn Onell Ellis
(CP-06-CR-2598-2022)
Court of Common Pleas of Berks County, Pennsylvania
Retained by the Pennsylvania Office of Attorney General (POAG)
Jury Trial - Honorable Thomas G. Parisi
Our File No. 2022-079

(67)    MAY 14, 2024

Felicia Bey v. Karen Renee Leake, individually, and as Executrix of the
Estate of Joseph Holder Bey, deceased.
(C.A. No. 2023-0233-SEM)
Delaware Court of Chancery, New Castle County
Retained by Ferry Jospeh, P.A.
Bench Trial - Honorable Selena E. Molina
Our File No. 2022-093

(68)    JUNE 10, 2024

TD Bank, N.A. vs. Supnick, et al.
Superior Court of New Jersey Chancery Division - Burlington County
(Docket No.: F-5075-14) - Honorable Paula T. Dow., PJ Ch.
Retained by Duane Morris LLP
**Deposition**
Our File No. 2024-041

*Khody R. Detwiler Testimony List - Page 17 of 18*



# The Testimony List of

# KHODY R. DETWILER

## Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/ khody-r-detwiler

7550 Woodbury Pike Roaring Spring, PA 16673

Roaring Spring, PA 814.793.2377

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

Chicago, IL 312.236.5186

St. Louis, MO 636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and signature analysis

forensic consulting

electronic signature analysis and verification

forensic document examination and authentication

non-destructive ink, paper, and electrostatic indentation analysis

## TESTIMONY LIST continued

(69)     JULY 23, 2024

Commonwealth of Pennsylvania v. Jean Ann Shaffer
(MJ-24303-CR-0000222-2024)
Commonwealth of Pennsylvania, County of Blair
Retained by the Blair County District Attorney's Office
Preliminary Hearing - Honorable Paula M. Aigner
Our File No. 2024-048

(70)     SEPTEMBER 13, 2024

Paragon Data Systems, Inc. v. Cintas Corporation, et al.
In the Court of Common Pleas - Cuyahoga County, Ohio
(Case No.: 22-CV-969925) - Honorable Maureen Clancy
Retained by Squire Patton Boggs (US) LLP, Jones Day, and
Keating Muething & Klekamp PLL
**Deposition**
Our File No. 2024-060

# EXHIBIT 2

CURRICULUM VITAE OF
*KHODY R. DETWILER*



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## PROFESSIONAL PROFILE

In my capacity as a Forensic Document Examiner ("FDE")[1], specializing in handwriting and signature analysis, I provide comprehensive, confidential reports and high-quality demonstrative exhibits tailored for a diverse client base.  This includes legal professionals, state and federal law enforcement agencies, medium-to-large sized businesses, insurance companies, Fortune 500 corporations, and a host of private clientele.  My primary objective in every case is to provide my clients with the expert insights required to make informed decisions concerning the nature or authenticity of written or digital documents, thereby enabling them to approach legal proceedings with confidence whenever required.

## HIGHLIGHTS/MAJOR CASES

PAUL D. CEGLIA vs. MARK ELLIOT ZUCKERBERG AND FACEBOOK INC.
- *Retained by counsel representing Mark Zuckerberg and Facebook in a breach of contract action brought in Federal Court in Buffalo, New York; alleging a  multi-billion-dollar ownership interest in Facebook.*

CHEVRON vs. DONZINGER, ET. AL., (SDNY); AGUINDA v. CHEVRON (LAGO AGRIO, ECUADOR); CHEVRON v. REPUBLIC OF ECUADOR  (THE HAGUE, NETHERLANDS)
- *Retained by counsel representing Chevron Corporation in several different international legal proceedings stemming from a multi-billion-dollar environmental lawsuit originating from Lago Agrio, Ecuador.*

ALGOSAIBI (AHAB) vs. MAAN AL SANEA (SAAD GROUP)
(AL KHOBAR, SAUDI ARABIA)
- *Retained by counsel representing Saudi businessman, Maan Al Sanea, in a matter involving multi-billion-dollar fraud claims in multiple jurisdictions with connections to over 100 international banking institutions originating from Saudi Arabia.*

UNITED STATES OF AMERICA v. MICHAEL T. FLYNN
- *Retained by counsel representing retired Lieutenant General and former National Security Advisor of the United States, Michael T. Flynn, in a criminal matter stemming from the Special Counsel investigation conducted by special prosecutor, Robert S. Mueller, III.*

UNITED STATES OF AMERICA v. ROBERT HUNTER BIDEN
- *Retained by counsel representing Hunter Biden, son of President Joseph R. Biden, in a criminal matter involving gun possession charges filed by Special Counsel David C. Weiss in the United States District Court for the District of Delaware.*

LÓPEZ REGUEIRO v. AMERICAN AIRLINES INC., 1:19-CV-23965, (S.D. FLA.)
- *Retained by counsel representing American Airlines Inc., in a matter involving substantial economic claims under the Helms-Burton Act related to the contested ownership rights of the Havana International Airport and numerous hotels located in Varadero, Cuba.*

*Khody R. Detwiler CV (7/24) - Page 1 of 22*

[1] *See:  ANSI/ASB Standard 011, First Edition 2022, Scope of Expertise in Forensic Document Examination -* https://www.swgdoc.org/



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## HIGHLIGHTS/MAJOR CASES continued

FLETCHER ET AL. vs. DOIG  ET AL. (CHICAGO, ILLINOIS)
- *Retained by counsel representing famed European artist, Peter Doig, in a civil action brought in Federal Court in Chicago, Illinois; pertaining to the authentication of a purported original "Peter Doig" painting; with an estimated value in excess of 10 million dollars.*

REPUBLIC OF GUINEA - SIMANDOU MINING RIGHTS
- *Retained by counsel representing the interests of a large international mining firm in a matter stemming from allegations that the multi-billion-dollar mining rights to Simandou (a large untapped deposit of high grade iron ore located in the Republic of Guinea) were secured through bribery, corruption, and fraud.*

ESTATE OF BADRI "ARKADY" PATARKATSISHVILI (TBILISI, REPUBLIC OF GEORGIA)
- *Assisted on a matter in which our firm was retained by counsel representing the multi-billion-dollar business estate of former Georgian presidential candidate, Badri "Arkady" Patarkatsishvili, originating from Tbilisi, Georgia.*

SANUM INVESTMENTS LTD vs. GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC
- *Retained by counsel representing Macau-based Sanum Investments, and Netherlands-based Lao Holdings, NV in bilateral investment treaty arbitration claims against the Government of Laos.*

KASEM NARONGDEJ vs. GOLDEN MUSIC LIMITED (ET AL.)
(HONG KONG, SAR PEOPLE'S REPUBLIC OF CHINA AND BANGKOK, THAILAND)
- *Retained by counsel representing Dr. Kasem Narongdej in a matter involving the fraudulent misappropriation of corporate shares that resulted in a  multi-billion-dollar family dispute with implications in multiple international jurisdictions.*

PEOPLE v. CORY BYRD (IND. #2011-749) & PEOPLE v. DAVID STEVENSON
(IND. #2013-067)
- *Retained by the Orange County District Attorney's Office in Goshen, New York to examine evidence, and provide expert witness testimony, in two separate highly publicized homicide trials involving the murder of a 4-year-old child, and the murder of a 35-year-old mother of four.  Both jury trials resulted in guilty verdicts.*

EXONERATION OF SHAURN THOMAS (PHILADELPHIA, PENNSYLVANIA)
- *Retained by the Pennsylvania Innocence Project and Dechert LLP in the successful exoneration of Shaurn Thomas.   Mr. Thomas spent 24 years in a Pennsylvania prison for a murder that he did not commit.*

PEOPLE vs. ANTHONY D. MARSHALL AND FRANCIS X. MORRISSEY, JR.
(BROOKE RUSSELL ASTOR ESTATE)
- *Assisted on a matter in which our firm was retained by the New York County District Attorney's Office in a highly publicized criminal case involving the Estate of philanthropist, Brooke Russell Astor.*



*The Curriculum Vitae of*

# KHODY R. DETWILER

*Forensic Document Examiner*

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## HIGHLIGHTS/MAJOR CASES continued

PEOPLE v. PAMELA BUCHBINDER (IND. NO. 3160/17)
- *Retained by the New York County District Attorney's Office in a highly publicized criminal case relating to the attempted murder of Buchbinder's former partner, Dr. Michael Weiss. On September 7, 2022, Buchbinder entered into a plea agreement and was later sentenced to 11 years in New York State Prison.*

JORGE YARUR BASCUÑAN, TARASCONA CORP. v. DANIEL YARUR ELSACA, CRISTIÁN JARA TAITO, OSCAR BRETÓN DIEGUEZ, GM & E ASSET MGMT. S.A., FINTAIR FIN. CORP., 338 F. SUPP. 3D 301 (2018)
- *Retained by counsel representing Mr. Daniel Yarur Elsa, former superintendent of the Chilean equivalent of the Securities and Exchange Commission, in active litigation in the Southern District of New York involving RICO and quantum merit claims, as well as litigation in Chile and the British Virgin Islands.*

FUENTES TELLEZ v. VERGARA MADRIGAL
- *Retained by counsel representing the late Mexican businessman, Jorge Carlos Vergara Madrigal, in litigation concerning the ownership and control of one of the largest business conglomerates in Mexico.*

ESTATE OF LUCIA REGINA MOREIRA SALLES (RIO DE JANEIRO, BRAZIL)
- *Retained by counsel representing the executor of the Estate interests of philanthropist, Lucia Regina Moreira Salles in a contested Will matter originating in Rio de Janeiro, Brazil.*

THE CHURCH OF CHRIST, SCIENTIST - THE MARY BAKER EDDY LIBRARY (BOSTON, MASSACHUSETTS)
- *Retained by The Church of Christ, Scientist in Boston, Massachusetts to conduct a series of forensic document examinations and handwriting examinations on a volume of highly contentious historical records dating back to the  early 1900's pertaining to the Church's founder, Mary Baker Eddy.*

SANTA MONICA EQUITY INC. v. CHRISTELLE FILA NZOLOLO (HONG KONG, SAR PEOPLE'S REPUBLIC OF CHINA)
- *Retained by counsel representing the business interests of Santa Monica, Inc., a Marshall Islands company beneficially owned by the late Mr. George Catsiapis, in a matter involving the alleged misappropriation of substantial business funds by Christelle Fila Nzololo.  On January 6, 2022, I presented evidence before the High Court of the Hong Kong Special Administrative Region in a contempt proceeding related to this matter.*

COMMONWEALTH v. MYRLE EVELYN MILLER (CP-60-CR-0000229-2021)
- *Retained by the Pennsylvania Office of Attorney General to examine evidence, and provide expert witness testimony, in a highly publicized homicide trial involving the murder of 77-year-old John W. Nichols by his former spouse, Myrle [Nichols] Miller. The jury returned a unanimous guilty verdict on all charges.*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/ khody-r-detwiler

7550 Woodbury Pike Roaring Spring, PA 16673

Roaring Spring, PA 814.793.2377

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

Chicago, IL 312.236.5186

St. Louis, MO 636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and signature analysis

forensic consulting

electronic signature analysis and verification

forensic document examination and authentication

non-destructive ink, paper, and electrostatic indentation analysis

## HIGHLIGHTS/MAJOR CASES continued

ESTATE OF DR. GHAITH RASHAD PHARAON (SAUDI ARABIA)
- *Retained by counsel representing the contested Estate interests of Saudi billionaire businessman, Dr. Ghaith Rashad Pharaon.*

THE ISLAMIC BANK OF ASIA LTD., vs. AHMAD HAMAD ALGOSAIBI & BROTHERS CO. (SINGAPORE)
- *Retained by counsel representing the Islamic Bank of Asia Ltd. in a matter involving multiple fraud claims in connection with a series of multi-million-dollar banking transactions originating from Singapore and Saudi Arabia.*

ESTATE TRUSTEES OF BARRY SHERMAN AND HONEY SHERMAN (ONTARIO, CANADA)
- *Retained by counsel representing the Estate Trustees of the multi-billion-dollar Estates of Canadian businessman and philanthropist, Dr. Barry Sherman and his wife, Honey Sherman, in legal proceedings against one of Canada's largest news outlets.*

GRUPO SALINAS TELECOM, S.A. DE C.V. AND GRUPO SALINAS TELECOM II, S.A. DE C.V., v AT&T MOBILITY HOLDINGS B.V., AND NEW CINGULAR WIRELESS SERVICES, INC.
(MEXICO CITY, MEXICO)
- *Retained by counsel representing the defendants in a high-value litigation brought in New York State Supreme Court originating from Mexico City, Mexico. This matter required travel to Mexico City to examine original evidence.*

LONG HAI HONG v CHAN YU LYDIA AND OTHERS
(HONG KONG, SAR PEOPLE'S REPUBLIC OF CHINA)
- *Retained by counsel representing the Respondents in a matter concerning the validity of signatures on critical share transfer documents.  This case required travel to Hong Kong to examine the original evidence.*

## TRAINING EXPERIENCE/EMPLOYMENT

LESNEVICH & DETWILER - FORENSIC DOCUMENT LABORATORY
Forensic Document Examiner:  December 2008 - Present | Partner 2011

Following the mandatory senior internship sponsored by Penn State University, I continued with the formal training program in the field of Forensic Document Examination.  Under the direct supervision and instruction of Gus R. Lesnevich, the training program was comprised of a full-time period of 24 months (2 years) of in-person training.  This comprehensive training program covered all facets of the Forensic Document Examination field.

*Khody R. Detwiler CV (7/24) - Page 4 of 22*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TRAINING EXPERIENCE/EMPLOYMENT continued

I received my initial training in accordance with the standard guidelines set forth by the Scientific Working Group for Forensic Document Examination (SWGDOC), *Standard for Minimum Training Requirements for Forensic Document Examiners* (formerly, ASTM International Standard Designation-2388-11 [05]).  My training covered various specific areas of instruction related to forensic document examination, which include:

- *Evidence Handling Procedures*
- *Handwriting/Printing Examination*
- *Photography and Digital Imaging*
- *Alterations, Obliterations, and Erasures*
- *Specialized Lighting Techniques*
- *Expert Witness and Legal Proceedings*
- *Electronic Signature Analysis (e-Sig/DCS)*
- *Demonstrative Court Chart Production*
- *Expert Testimony (Courtroom and Deposition)*

- *Examination Procedures*
- *Print Processes Identification*
- *Photocopiers/Facsimiles Analysis*
- *Mechanical Impression Analysis*
- *Paper and Font Analysis*
- *Spectral Ink Analysis (i.e., VSC®)*
- *Indentation Analysis (i.e., EDD/ESDA®)*
- *Forensic Research and Review*
- *Report Preparation*

Throughout the course of my training, I was also assigned the responsibility of conducting case-specific research and literature reviews for each of the individual cases submitted to our laboratory for analysis.  This entailed thorough examination and study of the leading authoritative texts and peer-reviewed journals published in the field of Forensic Document Examination.

## EDUCATION

BACHELOR OF SCIENCE DEGREE - CRIMINAL JUSTICE (BS)
THE PENNSYLVANIA STATE UNIVERSITY
UNIVERSITY PARK, PENNSYLVANIA
2005 - 2009
- Deans List Honors
- From August through December of 2008, I completed a mandatory semester long internship with Gus R. Lesnevich for partial fulfillment of my bachelor's degree in the Criminal Justice program at Penn State University.



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

 khody@lesnevich.com

 linkedin.com/in/ khody-r-detwiler

 7550 Woodbury Pike Roaring Spring, PA 16673

 Roaring Spring, PA 814.793.2377

 Pittsburgh, PA 412.430.3887

 Philadelphia, PA 215.800.0120

 Chicago, IL 312.236.5186

 St. Louis, MO 636.530.7722

 www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and signature analysis

forensic consulting

electronic signature analysis and verification

forensic document examination and authentication

non-destructive ink, paper, and electrostatic indentation analysis

## TECHNICAL TRAINING

TECHNICAL TRAINING BY FOSTER + FREEMAN® USA INC.
(Sterling, Virginia - September 2, 2009)
- Non-Destructive Spectral Ink Analysis-Video Spectral Comparator (VSC®)
    - Models: VSC®6000/HS, VSC®2000/HR, and VSC®400
- Non-Destructive IndentationAnalysis - Electrostatic Detection Apparatus (ESDA®)
    - Models: ESDA®2 and ESDA®Lite

TECHNICAL TRAINING IN PHOTOGRAPHY AND DIGITAL IMAGING SOFTWARE
(Martinsburg, Pennsylvania)
- Instruction in Adobe Products by professional photographer Gerald T. Leidy
- Following  graduation from the Brooks Institute of Photography in Santa Barbara, California,  Mr. Leidy enlisted with the United States Navy - Atlantic Fleet Combat Camera Group stationed in Norfolk, Virginia.  In 1974, after serving four years with the United States Navy, Mr. Leidy established, and currently maintains, a professional photography studio located in Martinsburg, Pennsylvania.

APPLETON PAPERS SECURITY PAPER SCHOOL
(Roaring Spring, Pennsylvania - December 1, 2011)
- Overview of the various paper making and dandy roll processes
- Detailed review of the different watermarking methods and their specific applications to securities technology and anti-counterfeiting efforts

FUNDAMENTALS OF FORENSIC QUESTIONED DOCUMENTS
Continuing & Professional Education Certificate Program through West Virginia University (November 2012)
- Instructed by Anthony Iten of West Virginia University

ADVANCED VIDEO SPECTRAL COMPARATOR (VSC®) WORKSHOP
(Indianapolis, Indiana - August 29, 2013)
- Instructed by Foster + Freeman® Application Engineers Michael Zontini & Owen Lang

ROCHESTER INSTITUTE OF TECHNOLOGY - PRINTING PROCESS IDENTIFICATION AND IMAGE ANALYSIS FOR FORENSIC DOCUMENT EXAMINERS SEMINAR
(Rochester, New York - November 12-15, 2013)
- Some of the topics of instruction included the following:
    - Traditional and Digital Printing Process Identification and Discrimination
    - Image Analysis and Digital Image Processing
    - Security Inks and Security Papers

*Khody R. Detwiler CV (7/24) - Page 6 of 22*



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TECHNICAL TRAINING continued

ADVANCED VIDEO SPECTRAL COMPARATOR (VSC®) WORKSHOP
(Honolulu, Hawaii - August 15, 2014)
• Instructed by Foster + Freeman® Application Engineers Michael Zontini & F.L. Jim Lee

VIDEO SPECTRAL COMPARATOR (VSC®) & ELECTROSTATIC DETECTION
APPARATUS (ESDA®) TECHNOLOGY: EXPLAINING TO THE LAYPERSON
(San Diego, California - September 1, 2017)
• Instructed by Foster + Freeman Application Engineer Michael Zontini

PIKASO WRITE-ON 3.0 DOCUMENT COMPARISON SOFTWARE WORKSHOP
(Park City, Utah - August 18, 2018)
• Instructed by Pierre Goudreault and Brian Lindblom

CENTER FOR STATISTICS AND APPLICATIONS IN FORENSIC SCIENCE (CSAFE)
FORENSIC TRAINING COURSES
(Handwriting Analysis - March 11, 2021)
(Statistical Thinking for Forensic Practitioners, Session 1 - March 26, 2021)
(Statistical Thinking for Forensic Practitioners, Session 2 - April 9, 2021)
(Statistical Thinking for Forensic Practitioners, Session 3 - April 23, 2021)
• These courses were designed to introduce fundamental concepts of probability and
  statistics related to forensic issues and explore how they can be applied to assess the
  probative value of forensic evidence.
• Instructed by Hal Stern of the University of California, Irvine and Alicia Carriquiry of
  Iowa State University

FORENSIC DOCUMENT EXAMINATION PAPER MANUFACTURING AND PRINT
PROCESS TWO -DAY TRAINING SEMINAR
(DAY 1: American Eagle Paper Mills - Tyrone, Pennsylvania - May 12, 2022)
• Overview and hands-on access to the various paper making and dandy roll processes
  (including sheeting of paper for cut size and folio, quality assurance procedures, paper
  staining and chemical considerations, paper recycling techniques, and paper finishing).
• Detailed review of the different watermarking and security fiber methods and their
  specific applications to securities technology and anti-counterfeiting measures.
(DAY 2: NPC, Inc., - Claysburg, Pennsylvania - May 13, 2022)
• Overview and hands-on access to the various commercial printing processes — analog
  and digital (*i.e.*, offset, high speed inkjet, and laser).
• Comprehensive review and live demonstration of the entire offset plate setting
  process.



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION

DOCUMENT SECURITY ALLIANCE MEETING (DSA)
(Washington, DC, United States Secret Service Headquarters - October 20, 2011)
• Symposium on document security before and after September 11TH 2001

NORTHEASTERN ASSOCIATION OF FORENSIC SCIENTISTS (NEAFS) 40TH
ANNUAL MEETING
(Hershey, Pennsylvania - November 3-6, 2014)
• Workshop: Ethics in the Practice of Forensic Science
  - (Instructed by Robin Bowen of West Virginia University)

NORTHEASTERN ASSOCIATION OF FORENSIC SCIENTISTS (NEAFS) 46TH
ANNUAL MEETING
(Virtual - October 14-17, 2020)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
64TH ANNUAL SCIENTIFIC MEETING
(Atlanta, Georgia - February 20-25, 2012)
• Workshop/Panel Discussion: Flawed Forensics: Recognizing and Challenging
  Misleading Forensic Evidence and Disingenuous Expert Testimony

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
65TH ANNUAL SCIENTIFIC MEETING
(Washington, DC - February 18-23, 2013)
• Workshop: Signature Examination of Healthy and Impaired Writers
    - (Instructed by Michael Caligiuri & Linton Mohammed)
• Workshop: Hyper-spectral Imaging - United States Library of Congress
    - (Instructed by Fanella G. France & Joseph C. Stevens)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
67TH ANNUAL SCIENTIFIC MEETING
(Orlando, Florida - February 16-21, 2015)
• Workshop: Classification of Typewritten Documents
    - (Instructed by Karen J. Nobles & Peter V. Tytell)
• Workshop: Automating Image Production for Forensic Document Examiners
    - (Instructed by Mark Goff)



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
71ST ANNUAL SCIENTIFIC MEETING
(Baltimore, Maryland - February 18-23, 2019)
• Workshop: Deciphering Complex Electrostatic Detection Device (EDD) Impressions
    -(Instructed by Mark Goff)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
73RD ANNUAL SCIENTIFIC MEETING
(Virtual Meeting - February 15-19, 2021)
• Workshop: A Complete Introduction to Digitally Captured Signatures ("DCS") and
   a Tutorial for Namirial's Firma Certa Forensic Analysis Tool
        - (Instructed by Nikolaos Kalantzis)
• Workshop: Technology and Design of Security Documents for Counterfeiting and
   Alteration Resistance
        - (Instructed by Joel A. Zlotnick)

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
74TH ANNUAL SCIENTIFIC MEETING
(Seattle, Washington - February 21-25, 2022)
• Workshop: The Application of Evaluative Reporting for Forensic Handwriting
   Examinations
        - (Instructed by Tobin Tanaka & Miriam Angel)
• Workshop: Forensic Examination and Evaluation of the Fine and Subtle Elements of
   Signatures and Handwriting
        - (Instructed by Linton Mohammed & Karen J. Nobles)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
69TH ANNUAL MEETING
(Philadelphia, Pennsylvania - August 20-25, 2011)
• Workshop: Printing Process Identification for Forensic Document Examiners
        - (Instructed by Scott Walters & Jeffrey Payne)
• Workshop: Signature Examination Workshop - Complex Issues and Common
   Problems
        - (Instructed by Dennis Ryan & Dave Oleksow)
• Workshop: Using Adobe Photoshop in a Forensic Document Workflow
        - (Instructed by George Reis)

*Khody R. Detwiler CV (7/24) - Page 9 of 22*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
70TH ANNUAL MEETING
(Charleston, South Carolina - August 18-23, 2012)
• Workshop: The Individuality of Inkjet Printing (Instructed by Rolf Fauser)
• Workshop: Managing Human Factors in the Forensic Sciences
    - (Instructed by Scott Shappell)
• Workshop: Kinematic Features of Signature Writing in Persons with
Alzheimer's Disease
    - (Instructed by Linton Mohammed & Michael Caligiuri)
• Workshop: Electrostatic Detection Devices (EDD) - Theoretical and Operational
Considerations
    - (Instructed by Dan C. Purdy, Grant Sperry, & Robert Muehlberger)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
71ST ANNUAL MEETING
(Indianapolis, Indiana - August 24-29, 2013)
• Workshop: Conclusion Scales and Logical Inference
    - (Instructed by R. Brent Ostrum)
• Workshop: Forensic Examination of Digital Signatures
    - (Instructed by William J. Flynn & Kathleen Annunziata Nicolaides)
• Workshop: Challenging Signatures
    - (Instructed by A. Frank Hicks)

JOINT ANNUAL MEETING OF THE AMERICAN SOCIETY OF QUESTIONED
DOCUMENT EXAMINERS (ASQDE - 72ND) AND THE AUSTRALASIAN SOCIETY OF
FORENSIC DOCUMENT EXAMINERS, INC. (ASFDE, INC — 33RD)
(Honolulu, Hawaii - August 11-15, 2014)
• Workshop: Skillful Freehand Signature Simulation
    - (Instructed by Lloyd Cunningham & Linton Mohammed)
• Workshop: Adobe, Digital Media and Evidence
    - (Instructed by John Penn, II of Adobe)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
73RD ANNUAL MEETING
(Toronto, Canada - August 9-13, 2015)
• Workshop: Characteristics of Fountain Pen Writing and Aqueous Ink Analysis
    - (Instructed by Lloyd Cunningham, Valery Aginsky, Linton Mohammed,
     & William J. Flynn)
• Workshop: Principles of Forensic Examination of Arabic Signatures
    - (Instructed by Mohammed Aloyoni & Dr. Abdulaziz Alkahtani)



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
75TH ANNUAL MEETING
(San Diego, California - August 28 through September 1, 2017)
- Workshop: Forensic Science Research: Your Mission to Propose, Innovate
  and Collaborate
    - (Instructed by Heather Waltke, Gerald LaPorte, Lisa Hanson, & Melissa Taylor)
- Workshop: Preparing a Digital Signature File for Forensic Analysis
    - (Instructed by Kathleen Annunziata Nicolaides & William Flynn)
- Workshop: Chinese Handwriting and Signatures Workshop: Hanzi through the Eyes
  of the Forensic Document Examiner
    - (Instructed by Chiew Yung Yang & Chin Chin Lim)
- Workshop: Write or Wrong? Bias, Decision-Making and the use of Contextual
  Information in Forensic Document Examination
    - (Instructed by Niki Osborne, Lloyd Cunningham, & Jane Lewis )

JOINT ANNUAL MEETING OF THE AMERICAN SOCIETY OF QUESTIONED
DOCUMENT EXAMINERS (ASQDE - 76TH ANNUAL MEETING) AND THE
SOUTHWEST ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS (SWAFDE)
(Park City, Utah - August 19-23, 2018)
- Workshop: Mark Hofmann – Master Forger and Murderer (The Mormon Murders &
  White Salamander Letter)
    - (Instructed by George Throckmorton, William J. Flynn, & Lloyd Cunningham)
  - Workshop: Latin American Writing
    - (Instructed by Manuel Gonzales, Eric Cedeno, & Leydis Gonzalez)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
78TH ANNUAL MEETING
(Virtual Meeting - August 10 - 13, 2020)
- Workshop: Overview of Digital Examination Techniques and Remote Case Review
    - (Instructed by Mark Goff)
- Workshop: Opinion Measurement Workshop
    - (Instructed by Veronica Dahir, Charles Edwards, Samiah Ibrahim,
      & Jonathan Jackson-Morris)



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

AUSTRALASIAN SOCIETY OF FORENSIC DOCUMENT EXAMINERS, INC. (ASFDE, INC.) 40TH ANNUAL MEETING
(Virtual Meeting - May 24 - 28, 2021 )
• Workshop: Digital Examination Techniques
    - (Instructed by  Mark Goff)
• Workshop: Digitally Captured Signatures
    - (Instructed by Jan Zimmer & Nikolaos Kalantzis)
• Workshop: Writing Reports Workshop
    - (Instructed by Kristy Martire, Stephanie Summersby, Carolyn Bird, Gary Edmonds, & Loene Howes)
• Workshop/Discussion: Document Dating (Non-Destructive Techniques, Handwriting and Signatures, and Destructive Techniques
    - (Instructed by Samiah Ibrahim)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE) 79TH ANNUAL MEETING
(Virtual Meeting - August 10 - 12, 2021 )
• Workshop: Demonstrative Evidence in the Courtroom, An Evaluation and Discussion of Probative and Prejudicial Characteristics of Demonstrative Visual Aids
    - (Instructed by Mara Merlino, Tobin Tanaka, & Samiah Ibrahim)
• Workshop: Pressure Training Calibration Workshop for Digitally Captured Signatures
    - (Instructed by Nikolaos Kalantzis)
• Workshop: Examination Basics for Adobe PDF files
    - (Instructed by Brent Ostrum)

AUSTRALASIAN SOCIETY OF FORENSIC DOCUMENT EXAMINERS, INC. (ASFDE, INC.) 41ST ANNUAL MEETING
(Virtual Meeting - May 10-13, 2022)
• Workshop: Technology and Design of Security Documents
    - (Instructed by Joel A. Zlotnick)
• Workshop: Signatures: Disguised or Simulated?
    - (Instructed by Carolyne Bird & Nicole Crown)

*Khody R. Detwiler CV (7/24) - Page 12 of 22*



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

JOINT ANNUAL MEETING OF THE AMERICAN SOCIETY OF QUESTIONED
DOCUMENT EXAMINERS (ASQDE - 80TH ANNUAL MEETING) AND THE
SOUTHWEST ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS (SWAFDE)
(San Antonio, Texas - August 8-10, 2022)
• Workshop: Some Basics on FDE Examination of PDF Documents
    - (Instructed by Joe Parker & Charlotte Ware)
• Workshop: Special Topics in QD for the 21ST Century
    - (Instructed by Lloyd Cunningham & Linton Mohammed)
• Workshop: The Robert Durst Case: Revisiting Myths of Handprinting Examinations
    - (Instructed by Lloyd Cunningham & Linton Mohammed)
• Workshop: What Lies Beneath: Peeling Back the Layers on Forensic Document
  Evidence
    - (Instructed by Roberto King, Richard Wilson & Beth McMurchie)
• Workshop: Forensic Document Examination in the Courtroom: Expectations of,
  and for, the FDE
    - (Instructed by myself & Karen J. Nobles)

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
81ST ANNUAL MEETING [JOHN JAY COLLEGE OF CRIMINAL JUSTICE]
(New York, New York - August 7-9, 2023 )
• Workshop: Taking Advantage of Digitally Captured Signature (DCS) technology &
  applying it to pen & paper casework
    - (Instructed by Nikolaos Kalantzis)
• Workshop: Digitally Captured Signature (DCS) visualizations: ...from numbers to
  images...to numbers again!
    - (Instructed by Nikolaos Kalantzis)
• Workshop: The Seven Habits for Highly Effective Standards Development
    - (Instructed by Teresa Ambrosius)

THE INAUGURAL FORENSIC DOCUMENT EXAMINERS LIVE INTERNATIONAL
KNOWLEDGE EXCHANGE ON DOCUMENTS "FDE LINKED" CONFERENCE
(Virtual - March 31 through April 1, 2023)
    - (Organized by Carolyn Bird, Nikolaos Kalantzis & Samiah Ibrahim)



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS



Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(State College, Pennsylvania - May 19-23, 2014)
- Attended various presentations sponsored by the Questioned Documents Section,
  some of the topics of discussion included the following:
  - Thermal Ribbon Analysis and the Thermal Ribbon Analysis Platform (TRAP)
  - The Use of Photoshop Macros to Simplify the Creation of Working Charts
  - Spectral Analysis of Documents Subjected to Latent Print Examinations
    utilizing the Video Spectral Comparator (VSC)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) QUESTIONED
DOCUMENTS SECTION FALL WORKSHOP: "VALUABLE SIGNATURES AND
MEMORABILIA" NATIONAL BASEBALL HALL OF FAME
(Cooperstown, New York - November 12, 2015)
- Instructed by the following individuals:
  - Michael Posner - Manager of Major League Baseball's Authentication Program
  - Special Agent, Brian Brusokas - Art Crime Team (FBI)
  - Special Agent, John Iannuzzi - Interstate Robbery Apprehension Team (FBI)
  - Gregg Mokrzycki - Forensic Document Examiner (FBI)
  - Peter J. Belcastro, Jr. - Forensic Document Examiner (FBI)
  - Erik Strohl - VP of Exhibitions and Collections - National Baseball Hall of Fame
  - Jim Gates - Library Director - National Baseball Hall of Fame
  - Sue MacKay - Director of Collections - National Baseball Hall of Fame

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Cambridge, Maryland - May 18-22, 2015)
- Workshop: Forensic Examination of Biometrically Captured e-Signatures
  - (Instructed by William Flynn & Kathleen Annunziata Nicolaides)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) ANNUAL
MEETING
(Richmond, Virginia - May 17-20, 2016)
- Workshop: The Application of QD Examinations of the Analysis of Fine Art
  and Other Antiques
  - (Instructed by Gregg Mokrzycki)
- Workshop: Identification Science
  - (Instructed by Stephen McKasson)



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Pittsburgh, Pennsylvania - May 23-26, 2017)
• Workshop: The Examination of Questioned Documents with Complicated
  Specimens Requiring Multiple Examination Types
        - (Instructed by Nadeem-Ul-Hassan Khan)
• Workshop: Covert Communications and Concealment Techniques
        - (Instructed by Gregg Mokrzycki)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) QUESTIONED
DOCUMENTS SECTION FALL WORKSHOP: "QUESTIONED DOCUMENTS EXPERT
TESTIMONY WORKSHOP" - VIRGINIA DEPARTMENT OF FORENSIC SCIENCES
(Manassas, Virginia - December 5, 2017)
• In addition to myself, this workshop was instructed by the following individuals:
        - (Joseph Stevens, Michael Wallace, Kenneth E. Melson, Ted Burkes,
          Kathleen Storer, & Kelly Pearson)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Hunt Valley, Maryland - May 15-18, 2018)
• Workshop: VSC® & ESDA® Technology: Explaining to the Layperson
        - (Instructed by Allyce McWhorter & Rebecca Walls of Foster + Freeman®)
• Workshop: Handwriting Examination of Signatures
        - (Instructed by Ronald N. Morris)
• Workshop: Charred and Water Soaked Documents
        - (Instructed by Gregg Mokrzycki & Peter J. Belcastro, Jr.)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
ANNUAL MEETING
(Morgantown, West Virginia - May 7-10, 2019)
• Workshop: Examining Writing on Unusual Surfaces
        - (Instructed by Gregg Mokrzycki & Peter J. Belcastro, Jr.)
• Workshop: Examination of Torn/Cut Edges
        - (Instructed by Lorie Cousin & Peter J. Belcastro, Jr.)
• Workshop: How Chemical Examinations of Inks and Paper Can Corroborate
  and Supplement Forensic Document Examinations
        - (Instructed by Gerald M. LaPorte)

*Khody R. Detwiler CV (7/24) - Page 15 of 22*



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/ khody-r-detwiler

7550 Woodbury Pike Roaring Spring, PA 16673

Roaring Spring, PA 814.793.2377

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

Chicago, IL 312.236.5186

St. Louis, MO 636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) ANNUAL MEETING
(Pocono Manor, Pennsylvania - September 21-24, 2021)
• Workshop: Digitally Captured Signatures; Introduction, Visualization, and Analysis
  - (Instructed by Nikolaos Kalantzis)
• Workshop: Technology and Design of Security Documents for Counterfeiting and Alteration Resistance
  - (Instructed by Joel A. Zlotnick)
• Workshop: PDF Forensics
  - (Instructed by Leonard Rosenthol of Adobe)

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS) ANNUAL MEETING
(Pittsburgh, Pennsylvania - May 6-10, 2024)
• Workshop: Exploration in Variation and its Impact on Forensic Handwriting Examination
  - (Instructed by Nancy Cox & Jeffrey Payne)
• Workshop: Security Printing Processes Workshop
  - (Instructed by Nancy Cox, Jeffrey Payne, & Scott Walters)

3RD INTERNATIONAL WORKSHOP ON AUTOMATED FORENSIC HANDWRITING ANALYSIS (AFHA)
(Honolulu, Hawaii - August 9-10, 2014)
• This workshop explored a variety of automated systems which may be used to assist in the examination of both "online" and "offline" signatures and writings. Some of the specific topics of discussion included the following:
  - *Overview of handwriting pattern recognition systems*
    • Kinematic approaches to signature analysis
    • Mathematical approaches to signature complexity and stability
  - *Endorsed by the following organizations:*
    • German Research Centre for Artificial Intelligence (DFKI)
    • Netherlands Forensic Institute - Ministry of Security and Justice (NFI)
    • American Society of Questioned Document Examiners (ASQDE)

*Khody R. Detwiler CV (7/24) - Page 16 of 22*



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS



Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES



handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

NIST MEASUREMENT SCIENCE & STANDARDS IN FORENSIC HANDWRITING
ANALYSIS CONFERENCE
(Gaithersburg, Maryland - June 4-5, 2013)
- National Institute of Standards and Technology Campus (NIST)
- In collaboration with the following organizations:
  - American Academy of Forensic Sciences - QD Section (AAFS)
  - American Board of Forensic Document Examiners (ABFDE)
  - American Society of Questioned Document Examiners (ASQDE)
  - Federal Bureau of Investigation Laboratory (FBI)
  - National Institute of Justice (NIJ)
  - Scientific Working Group for Forensic Document Examination (SWGDOC)

FOSTER + FREEMAN® - FORENSIC WEBINAR SERIES
- Questioned Document Examination (QDE) Symposium: Multi-Faceted Examinations
- Video Spectral Comparator (VSC): Detecting Counterfeits and Frauds
- Document Examination: Authentication and Grading of Stamps, Cards and
  Collectibles
- Detect More Evidence: Top Tips to get the most out of your Forensic Light Source
- Digitally Captured Signatures (DCS) in Everyday (pen + paper) Casework
- Identity and Drivers Licenses - Addressing the Cost and Impact of Counterfeiting
  - From What We Need to What We Have - An Examiner's View

MIDWESTERN ASSOCIATION OF FORENSIC SCIENTISTS (MAFS)
44TH ANNUAL MEETING
(Mackinac Island, Michigan - September 20-25, 2015)
- Workshop: Forensic Examination of Electronic Signatures
  - (Instructed by William J. Flynn & Kathleen Annunziata Nicolaides)
- Workshop: Getting the Most Out of Your Visual Spectral Comparator
  - (Instructed by David Tobin & Michael Zontini of Foster + Freeman USA)
- Workshop: The Examination of Documents Requiring a Multi-Faceted Approach
  - (Instructed by Brian Lindblom)
- Workshop: Evaluating Signatures: What Matters?
  - (Instructed by A. Frank Hicks)
- Workshop: The Application of Questioned Document Examinations to the Analysis
  of Valuable Signatures & Other Antiques
  - (Instructed by Gregg Mokrzycki & Peter J. BelcastroJr.)



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation
Expert Witness Testimony
Courtroom Demonstratives
Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## CONTINUING EDUCATION (cont.)

THE SOUTHWESTERN ASSOCIATION OF FORENSIC DOCUMENT EXAMINERS (SWAFDE) ANNUAL MEETING
(Denver, Colorado - October 11-13, 2019)
• Workshop: A Behind the Scenes (and under the covers) Tour of PDF's from Adobe's
  PDF Architect
       - (Instructed by Leonard Rosenthol of Adobe)
• Workshop: Dispelling the Myths about the Forensic Examination of Hand-printing
       - (Instructed by Lloyd Cunningham & Linton Mohammed)
• Workshop: How Chemical Examinations of Inks and Paper Can Corroborate and
  Supplement Forensic Document Examinations
       - (Instructed by Gerald M. LaPorte)

## TRAININGS / PRESENTATIONS / SEMINARS TAUGHT

PRESENTATION - A Picture is Worth a Thousand Words: Effective Testimony Demonstratives
(Honolulu, Hawaii - 2014 ASQDE Annual Meeting)

PRESENTATION - Overview of the field of Forensic Document Examination
(Altoona, Pennsylvania - May 30, 2017 - AMBUCS)

PRESENTATION - Double-Sided Photocopies: The Next Best Thing
(San Diego, California - 2017 ASQDE Annual Meeting)

SEMINAR - Workshop: Questioned Documents Expert Testimony Workshop
(Manassas, Virginia - December 5, 2017 - MAAFS QD Fall Workshop)

PRESENTATION - Contested Estates: A Bloody Mess
(Hunt Valley, Maryland - 2018 MAAFS Annual Meeting)

PRESENTATION - Contested Estates: A Bloody Mess
(Baltimore, Maryland - 2019 AAFS Annual Meeting)

PRESENTATION - Introduction to Forensic Document Examination
(Virtual - July 16, 2020 - CLE for Kellogg Hansen Todd Figel & Frederick PLLC)



# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/ khody-r-detwiler

7550 Woodbury Pike Roaring Spring, PA 16673

Roaring Spring, PA 814.793.2377

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

Chicago, IL 312.236.5186

St. Louis, MO 636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and signature analysis

forensic consulting

electronic signature analysis and verification

forensic document examination and authentication

non-destructive ink, paper, and electrostatic indentation analysis

## TRAININGS / PRESENTATIONS / SEMINARS TAUGHT (cont.)

TRAINING - 2020 PENNSYLVANIA OFFICE OF ATTORNEY GENERAL MEDICAID FRAUD WEBEX TRAINING - INTRODUCTION TO FORENSIC DOCUMENT EXAMINATION (August 19, 2020)
- Sponsored by the Pennsylvania Office of Attorney General (POAG)
- Provided special agents and prosecutors across the commonwealth with a comprehensive understanding of the diverse capabilities within the field of forensic document examination tailored to meet their specific case requirements and demands.

PRESENTATION - Obtaining Request Handwriting Exemplars in a Socially Distant World
(Virtual - 2020 ASQDE Annual Meeting & 2020 NEAFS Annual Meeting)

PRESENTATION - Examining the Evidence - Forensic Handwriting Analysis at The Mary Baker Eddy Library (Boston, Massachusetts)
(Podcast - October 1, 2021 - Seekers and Scholars - The Mary Baker Eddy Library)

SEMINAR - Workshop: Forensic Document Examination in the Courtroom: Expectations of, and for, the FDE
(San Antonio, Texas - August 9, 2022 - ASQDE/SWAFDE Joint Meeting)

PRESENTATION - Forensic Document Examination… *All You Need to Know and More*
(Pittsburgh, Pennsylvania - December 13, 2022 - CLE for Babst, Calland, Clements and Zomnir, P.C.)

TRAINING - Unveiling the Art and Science of Forensic Document Examination: An Introduction (Prosecutor Perspective)
(Lancaster, Pennsylvania - March 5, 2024 - 2024 Pennsylvania Office of Attorney General (POAG) - Attorney Conference)

TRAINING - Unveiling the Art and Science of Forensic Document Examination: An Introduction (Agent Perspective)
(Pocono Manor, Pennsylvania - March 20, 2024 - 2024 Pennsylvania Office of Attorney General (POAG) - All Agents Conference)

PRESENTATION - ESDA® Sequencing for Forensic Document Examination: A Case Study
(Pittsburgh, Pennsylvania - May 9, 2024 - 2024 MAAFS Annual Meeting)



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## TRAININGS / PRESENTATIONS / SEMINARS TAUGHT (cont.)

TRAINING - Deciphering Truth: The Role of Questioned Document Analysis in Intelligence Operations
(Williamsport, Pennsylvania - May 21, 2024 - Pennsylvania State Police (PSP) and Pennsylvania Criminal Intelligence Center (PaCIC) Intelligence Liaison Officer Certification Conference)

PRESENTATION - CLE Ethical Issues in Document Forgery and Alterations
(York, Pennsylvania - July 16, 2024 - Registers of Wills & Clerks of Orphans' Court Association of Pennsylvania 96th Annual Conference)

## PUBLICATION

I am a contributing author to the published textbook, _Forensic Document Examination in the 21st Century_, edited by Jan Seaman Kelly and Miriam Angel, and published by CRC Press Taylor and Francis Group [2021] (ISBN: 978-0-367-25155-0). My specific contribution was chapter 14, entitled "Forensic Analysis of Handwritten Electronic Signatures." The official book description is as follows:

> _"Forensic Document Examination in the 21st Century covers the latest technology and techniques providing a complete resource on contemporary issues and methods in forensic document examination. Forensic document examiners provide their findings as expert testimony in court. Due to rapid changes in technology, including digital documents, printing and photocopying capabilities, and more, there is a great need for this up-to-date reference._
>
> _The examination of documents can include comparison of handwriting or hand-printing; detection of alterations or photocopier and computer manipulation; restoration or decipherment of erased and obliterated writing; visualization of latent impressions; the identification of printing processes; and differentiation of inks. Computer-generated documents are prevalent, and electronically-captured signatures are becoming more widespread, meaning the knowledge of advances in technology and adoption of new validated techniques and methods of document examination are crucial to the reliability of forensic opinions._
>
> _Forensic Document Examination in the 21st Century includes the latest research on the subject and with contributions from leading experts on their various areas of expertise. The book will be a welcome addition to the literature and support the foundational basis for methods and procedures for use it expert testimony in court, serving as a resource for forensic document examiners, trainees, and those in the criminal and legal communities who use the services of expert document examiners and witnesses."_



The Curriculum Vitae of

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/
khody-r-detwiler

7550 Woodbury Pike
Roaring Spring, PA 16673

Roaring Spring, PA
814.793.2377

Pittsburgh, PA
412.430.3887

Philadelphia, PA
215.800.0120

Chicago, IL
312.236.5186

St. Louis, MO
636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and
signature analysis

forensic consulting

electronic signature
analysis and verification

forensic document
examination and authentication

non-destructive ink, paper, and
electrostatic indentation analysis

## PROFESSIONAL AFFILIATIONS

AMERICAN ACADEMY OF FORENSIC SCIENCES (AAFS)
Regular Member | **Questioned Documents Section**

AAFS - ACADEMY STANDARDS BOARD (ASB)
Forensic Document Examination Consensus Body

- Served as Vice Chair from 2015-2020

- Served on the working group for the *ANSI/ASB Standard 44: Standard for Examination of Documents for Indentations*

- Presently fulfilling the role of the chair of the working group for the *ANSI/ASB Standard 155: Standard for Minimum Training Requirements for Forensic Document Examiners*

AMERICAN SOCIETY OF QUESTIONED DOCUMENT EXAMINERS (ASQDE)
Regular Member  |  **Currently Serving as Director of the Executive Committee**

- In addition to meeting the standard ASQDE membership criteria, achieving 'Regular' Membership status requires an examiner to undergo a rigorous testing process.  This evaluation procedure involves successfully passing a series of written and practical examinations.  Following this, the examiner must also successfully complete an oral board assessment conducted by a three-member panel chosen from the Evaluation and Examination Committee of the ASQDE.

- In addition to my role as Director of the Executive Committee, I am also currently a member of both the ASQDE Evaluation and Examination Committee and the ASQDE Resource Center Committee.

MID-ATLANTIC ASSOCIATION OF FORENSIC SCIENTISTS (MAAFS)
Regular Member | **Physical Evidence Section [Questioned Documents]**

- Served as Questioned Document Section Chair from 2020-2021

MIDWESTERN ASSOCIATION OF FORENSIC SCIENTISTS, INC. (MAFS)
Regular Member | **Questioned Documents Section**

NORTHEASTERN ASSOCIATION OF FORENSIC SCIENTISTS (NEAFS)
Associate Member

INTERNATIONAL ASSOCIATION FOR IDENTIFICATION (IAI)
Regular Member

THE CHARTERED SOCIETY OF FORENSIC SCIENCES (CSFS) - United Kingdom
Affiliate Member

THE CANADIAN SOCIETY OF FORENSIC SCIENCES (CSFS) - Ottawa, Canada
Regular Member

ASTM INTERNATIONAL - COMMITTEE E30 - FORENSIC SCIENCE (ASTM)
Voting Member

*Khody R. Detwiler CV (7/24) - Page 21 of 22*



*The Curriculum Vitae of*

# KHODY R. DETWILER

Forensic Document Examiner

## CONTACT

khody@lesnevich.com

linkedin.com/in/ khody-r-detwiler

7550 Woodbury Pike Roaring Spring, PA 16673

Roaring Spring, PA 814.793.2377

Pittsburgh, PA 412.430.3887

Philadelphia, PA 215.800.0120

Chicago, IL 312.236.5186

St. Louis, MO 636.530.7722

www.lesnevich.com

## SKILLS

Civil & Criminal Litigation

Expert Witness Testimony

Courtroom Demonstratives

Civil & Criminal Investigations

## SERVICES

handwriting and signature analysis

forensic consulting

electronic signature analysis and verification

forensic document examination and authentication

non-destructive ink, paper, and electrostatic indentation analysis

## TESTIMONY EXPERIENCE

I've earned recognition as an expert in the field of Forensic Document Examination and have provided expert testimony on numerous occasions in both state and federal courts across the United States, as well as in various international jurisdictions. *A comprehensive testimony list is available upon request.*

## INTERNATIONAL EXPERIENCE

Since beginning my career in the field of Forensic Document Examination, I have conducted a wide variety of forensic examinations on countless individual documents and signatures involved in various litigations throughout the United States and abroad. My international casework has required extensive travel throughout Asia, North America, Central America, South America, Europe, and the Middle East. Furthermore, I have been retained on numerous international matters that have not required international travel.

# EXHIBIT Q-1



**Seguro Medico**

Date: August 6, 2024

Ethan Shalter

1369 Claire Dr.

Birsboro, PA 19508

Dear Ethan,

This is to inform you that your employment with Seguro Medico, LLC is separated effective July 25, 2024.


**Final pay:** As agreed, final pay has been personally handed to you in the amount of of $728.15 and provided to the employee on this day. This represents your final payment.

**Group Health Coverage:** Group health coverage will be terminated on the last day of the month following termination of employment.

**COBRA:** In accordance with federal regulations, under COBRA (Consolidated Omnibus Budget Reconciliation Act) all employees who have health insurance coverage shall receive proper notification from Optimed within fourteen (14) days from the end of the month following date of termination. As of the date of your termination you must return any company property that you may still have in your possession. Should you have further questions, please contact us at 484-332-3179.

Sincerely,

Arthur Walsh CEO

Acknowledged and accepted by:

_____                    _Tone Hat_  8/6/2024

Signature                                   Date

Current Mailing Address:

1369 Claire Dr

Birdsboro Pa 19508

# EXHIBIT Q-2

  

08/06/2024
Ethan Shalter
1369 Claire Dr
Birdsboro, Pa 19508
610-944-4750
Ethan.shalter@gmail.com
Re: Separation and Release from Employment


Dear Ethan,

This letter is to inform you that your employment as Fronter Manager with Seguro Medico Powered by Benefits Now, LLC in affiliation with Seguro Medico ("Company") has been terminated effective 07/25/2024 due to a mutual decision.

Your final paycheck has been provided to you on 08/06/2024 and will include payment up to and including any hours worked until 07/25/2024 minus applicable taxes. Additionally, the Company reserves the right to recoup all costs associated with the Licensed Training Program to include course cost, exam fees, fingerprinting, etc. per the Pre-Licensed Reimbursement Non-Compete Agreement that you signed.


Signed agreements.

During the time that you have worked at the Company you were exposed to information that is proprietary and/or confidential, including, but not limited to, customer, vendor, employee, and other information as covered under all of the Company's Non-Compete, Non-Disclosure, and Confidentiality Agreements that you signed on 04/15/2024.

We also ask that you not contact employees, customers, or vendors of the Company regarding matters relating to its business, or termination of your employment, although certainly, you are free to maintain such personal contacts and relationships as may have developed while employed here. We expect that you have not and will not make any disparaging remarks about the Company to anyone, including but not limited to any customer, or employee of the Company. This includes the use of social media to do so. We likewise agree that we will not make any disparaging remarks about you.

Return of Company Property:

The Company also expects that you will return all documents and any other information or materials that you have that are the property of the Company. These include but are not limited to: Office keys, Laptop, Monitors, Printer, Cell Phone, Headsets, Keyboards, etc. Please note that any unreturned or damaged company property will be deducted from your final pay. Should a deduction occur, you will be provided

an itemized list of the items unreturned/ missing/damaged, and their associated costs to fix or replace them.

We wish you the best of luck in your future endeavors.

Thank you,

8/6/2024

8/6/2024

Tonya Hatmaker                                    Date

# EXHIBIT Q-3

Exit Mutual Release, Waiver of Rights, Hold Harmless and Covenant Not to Bring Legal or Administrative Actions Against Other Party Related to Specific Matters

## SEGURO MEDICO, LLC/ ETHAN SHALTER

Seguro Medico, LLC. (hereinafter referred to in the alternative as "Seguro") an insurance brokerage with the primary business and address of 8 Morgan Drive, Sinking Spring, PA 19608 and its departing, Ethan Shalter hereby agree to the following releases, waivers and covenants.

Whereas, the parties are entering into this Agreement to enable a cleaner break in the employer/employee relationship, avoid future entanglements and the cost associated therewith, and prevent Ethan Shalter from suffering from unnecessary financial obligations and losing potential future employment opportunities.

1. Seguro specifically waives any obligations placed on Ethan Shalter to refrain from seeking employment in the insurance industry or with any company competing directly or indirectly with Seguro.
   NOTE: This waiver does NOT cover Ethan Shalter's surviving obligation to maintain the confidentiality of Seguro's business practices, trade secrets, vendors and customers. These obligations survive this agreement and remain surviving obligations under any and all employment contracts entered into between the parties to the Agreement.

2. Both parties mutually release the other for any acts or omissions that occurred during Ethan Shalter's employment with Seguro. This includes Seguro's business practices and Ethan Shalter's acts and omissions as a Fronter Manager.

3. For and in consideration of the above-given waivers and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, Ethan Shalter hereby agrees that I, my heirs, legal representatives and assigns will not make a claim against, sue, bring an administrative action against or prosecute Seguro or its employees, owners, officers, or agents, for any claims known or unknown resulting from the intentional or unintentional acts or omission, howsoever caused, by Seguro or its employees or agents.  In addition, I hereby release and discharge Seguro and/or its owners, officers, employees and agents from all actions, claims and demands, I, my heirs, legal representatives or assigns now have or may hereafter have for injury or damage resulting from my past employment and insurance sales activities with Seguro.

4. ENTIRE AGREEMENT: Either party's initial breach of any terms of this Agreement nullifies the waivers granted by the other party.

5. **Acknowledgement by Ethan Shalter:** I have carefully read this agreement and fully understand its contents. I am aware that this is a release of liability and a contract between myself and Seguro, and I have signed it of my own free will.

Witness my signature this 6th day of August, 2024

Seguro Medico, LLC

Tonya Hatmaker

Departing Employee

# Exhibit D

# INTENTIONALLY LEFT BLANK

# INTENTIONALLY LEFT BLANK

# Exhibit D

# Exhibit E


# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE SU, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | : : : | |
| Plaintiff, | : : : | CIVIL ACTION<br><br>No. 20-4265 |
| v. | : : | |
| BENE MARKET, LLC, et al, | : : | |
| Defendants. | : | |

**ORDER**

**AND NOW**, this  19th    day of March, 2024, upon review of Plaintiff's Motion for

Partial Summary Judgment, Defendants' Motion for Summary Judgment, and all briefs,

responses and replies, and after oral argument being held, it is hereby **ORDERED** as follows:

1.     Plaintiff's Motion for Partial Summary Judgment (ECF 79) is **GRANTED**;

2.     Defendants' Motion for Summary Judgment (ECF 80) is **DENIED**;

3.     Defendants' employees are entitled to the protections of the overtime provisions

of the FLSA;

4.     Defendants' employees are also individually covered by the FLSA because they

engaged in interstate commerce;

5.     Defendant Alan Redmond is jointly and severally liable as an "employer" under

Section 3(d) of the FLSA;

6.     Defendant Stephanie Miller is jointly and severally liable as an "employer" under

Section 3(d) of the FLSA;

7.     Defendants violated the Section 7 overtime provisions of the FLSA;

8.      Defendants violated the Section 6 minimum wage provisions of the FLSA;

9.      Defendants violated the Section 11(c) recordkeeping provisions of the FLSA;

10.     Defendants' overtime violations of the FLSA were willful;

11.     Defendants are liable for an amount of liquidated damages equal to the amount of back wages owed in this case under Section 16(b) of the FLSA;

12.     Defendants are hereby **PERMANENTLY ENJOINED** from further violations of the FLSA as follows:

a. Defendants are enjoined from failing to pay their employees minimum wage in violation of Sections 6 and 15(a)(2) of the FLSA and withholding such compensation owed to employees;.

b. Defendants are enjoined from failing to pay their employees overtime compensation at one and one half of their regular rates of pay for all overtime hours worked in excess of 40 hours in a week, in violation of Sections 7 and 15(a)(2) of the FLSA and withholding such overtime compensation owed to employees; and

c. Defendants are enjoined from failing to make, keep, and preserve complete and accurate records of their employees and of the wages, hours, and other conditions of employment which they maintain as prescribed by Section 11(c) of the FLSA and the Regulations issued and found at 29 C.F.R. Part 516.

**BY THE COURT:**

/s/ Jeffrey L. Schmehl
Jeffrey L. Schmehl, J.

# Exhibit F

Exhibit F

## William Mulgrew

| | |
|---|---|
| **From:** | Albert A. Ciardi III <Aciardi@ciardilaw.com> |
| **Sent:** | Monday, September 16, 2024 7:32 PM |
| **To:** | Joel A. Ready, Esq.; Nicole Nigrelli; Daniel Siedman |
| **Cc:** | David Heim; William Mulgrew |
| **Subject:** | RE: In re Alan Christopher Redmond - Case No. 24-13093 (pmm) |

Mr. Ready

You filed a bad faith involuntary with a non-existent creditor who submitted a false affidavit. The Involuntary Petition was the only premature act. You are a witness. Be guided accordingly.

Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103
215-599 2018 (o)

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 16, 2024 10:06 AM
**To:** Nicole Nigrelli <nnigrelli@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; William Mulgrew <william@cornerstonelaw.us>
**Subject:** Re: In re Alan Christopher Redmond - Case No. 24-13093 (pmm)

Good morning,

Depositions are premature at this stage, and I am not available on Tuesday at any rate. We will see you at the hearing on Wednesday at 10:00am.

Joel Ready

**From:** Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Sent:** Monday, September 16, 2024 9:43 AM
**To:** Daniel Siedman <dSiedman@ciardilaw.com>; Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: In re Alan Christopher Redmond - Case No. 24-13093 (pmm)

Mr. Ready,
We have not heard from you regarding our depositions and the trial scheduled for Wednesday September 18. As a result, I am reaching out to the Court today to request a status conference.
Nicole

1

**From:** Daniel Siedman <dSiedman@ciardilaw.com>
**Sent:** Friday, September 13, 2024 4:18 PM
**To:** joel@cornerstonelaw.us
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Subject:** In re Alan Christopher Redmond - Case No. 24-13093 (pmm)

Dear Mr. Ready,

Please be advised that Ciardi Ciardi & Astin have been retained by Mr. Redmond with regards to the improper and bad faith involuntary petition that you filed on behalf of the Petitioning Creditors. Attached hereto are as-filed copies of the Debtor's Application to Employ Ciardi Ciardi & Astin, Answer to the Involuntary Petition, Emergency Motion to Dismiss the Involuntary Petition and Motion for Expedited Hearing. Also, attached hereto is the Order granting our Expedited Relief. Please be advised that we intend to seek punitive damages from each of the Petitioning Creditors jointly and severally for the interference this deficient filing has caused.

Additionally, Mr. Redmond attaches Notices of Deposition for the three (3) petitioning creditors – Jason Scott Jordan, Cornerstone Law Firm, LLC and Ethan Shalter. The Depositions are scheduled for Tuesday, September 17, 2024 at 1905 Spruce Street, Philadelphia, PA 19103. Please confirm this afternoon that each Petitioning creditor along with the documents requested will be in our office for the depositions as scheduled. We expect each to run 2-3 hours. If you do not so confirm, we will ask the Court to move the hearing to the following week and enter a discovery order. In the event that your clients fail to appear at the depositions, we will ask the Court to postpone the hearings scheduled for Wednesday, September 18, 2024 and dissolve the temporary restraining order that was obtained in bad faith.

Lastly, we attach hereto three (3) trial subpoenas for the hearing on September 18, 2024.

If you have any questions or concerns, please contact us immediately as we are preparing for the depositions and evidentiary hearing next week.


Daniel S. Siedman, Esquire
Ciardi Ciardi & Astin
1905 Spruce Street,
Philadelphia, PA 19103
215-557-3550
215-557-3551- Fax
*Admitted in New Jersey and Pennsylvania*

The information contained in this e-mail message, together with any attachments thereto, is intended only for the personal and confidential use of the addressee[s] named above. The message and the attachments are or may be an attorney-client or other privileged or protected communication. If you are not the intended recipient of this message, or authorized to receive it for the intended recipient, you have received this message in error. You are not to review, use, disseminate, distribute or copy this message, any attachments thereto, or their contents. If you have received this message in error, please immediately notify us by return e-mail message, and delete the original message. This notice is included in all e-mail messages leaving our firm. Thank you for your cooperation.
IRS Circular 230 DISCLOSURE:
Notice regarding federal tax matters: Internal Revenue Service Circular 230 requires us to state herein that any federal tax advice set forth in this communication (1) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties that may be imposed by federal tax laws, and (2) cannot be used in promoting, marketing, or recommending to another person any transaction or matter addressed herein.

2

Get Outlook for iOS

# Exhibit G

# Exhibit G

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Monday, September 23, 2024 3:28 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim
<dheim@bochettoandlentz.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Readay

I can be perfectly clear that we will not stipulate to anything.  We expect to see all petitioning creditors, including yourself, in court on 10/1 where you each will be cross examined.  As Mr. Stalter has said his materially false and perjurious Affidavit was procured under the advice of counsel, the privilege is now waived, and we will most certainly address that with both you and him on the stand and at your deposition.

Your general statement that you will use every public document in existence throughout the world is probably a little vague under the Court's procedures and we will respond accordingly.

I assume you have advised Mr. Stalter of his right to not incriminate himself which I will do at the inception of the deposition.  Please be guided accordingly.


Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103
215-599 2018 (o)




**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 3:08 PM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim
<dheim@bochettoandlentz.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss


Dear Counsel,

1

Pursuant to my agreement with Ms. Nigrelli in Court, attached are Jason Scott Jordan's First Request for Admissions, First Set of Interrogatories, and First Set of Requests for Production of Documents. Additionally, please see enclosed two letters from myself to you.

Sincerely,

Joel A. Ready, Esq.
*Licensed in Pennsylvania, New Jersey and Maryland*

# CORNERSTONE LAW FIRM

8500 Allentown Pike
Suite 3
Blandon, PA  19510
610-926-7875
CornerstoneLaw.us

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Monday, September 23, 2024 1:50 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; William Mulgrew <william@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ready

To the best of my knowledge you have not served discovery. You have served trial subpoenas with document requests and the trial was moved to October 1. If I have missed a discovery request, please serve it appropriately. As I have now indicated four times, my firm represents Mr. Redmond.

Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103
215-599 2018 (o)

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 1:38 PM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; William Mulgrew <william@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

You're being intentionally evasive. Do you represent the entities or individuals named below? You have not answered that question.

If you are unwilling to turn over the original to us, I ask that you immediately turn over the digital scan/photo from Ms. Hatmaker's phone. That should be in your possession already since you attached it to your petition. I want that scan/photo original with all metadata.

Joel Ready

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Monday, September 23, 2024 1:06 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; William Mulgrew <william@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

I have already clarified twice who we represent.  We will also not turn over the original to your possession.  We can make it available at my office or at Court.

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 1:04 PM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; William Mulgrew <william@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ciardi,

I can confirm we will supplement, if necessary, what we've already provided by close of business tomorrow. We'll also issue revised discovery today per my agreement with Ms. Nigrelli. However, please prioritize providing the original (or first generation copy if no original is found) of the document Mr. Shalter is alleged to have signed at his "exit interview" at your earliest convenience. It can be brought to my office and we'll sign for it being in our possession. I also need a thumb drive with the photo/scan taken by Ms. Hatmaker. If you can provide those by close of business tomorrow as well, that would be appreciated.

Again, we're willing to accommodate your deposition requests by either zoom or in person here in Blandon.

Finally, as previously requested, kindly clarify whether you or your office currently represent any of the following persons: Shannon Kroemmelbein, Stephanie Miller, ARC Realty, LLC, Seguro Medico, LLC, Benefits Now, LLC, Bene Market, LLC, National Brokers of America, Inc., Alan Redmond Charitable Foundation, The Redmond Group, LLC, The Leads House, Redmond Marketing, LLC, Redmond Group Investments, LLC, QuickHealth Care, Jesus Barrios, Arthur W. Walsh, Jr., Tonya Hatmaker, Norman M. Valz, and any legal person associated with any of the foregoing persons.

Joel Ready

3

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Monday, September 23, 2024 9:21 AM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr.  Ready

That's not how depositions work.  Before we address that issue with the Court, please confirm that we are receiving all responsive documents to all our document requests by tomorrow.  Given the breadth of the allegations in the TRO and Involuntary Petition, I am sure there are a substantial amount of documents and we will want ample time to review.

Mr. Stalter's transportation issues are not mine.  He needs to appear where the notice indicates.


Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103
215-599 2018 (o)



**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 8:31 AM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss


Mr. Ciardi,

If you wish to do in person, you're welcome at my Blandon office on Thursday. I can't make it into Philadelphia and back on the schedule I have, but I could do it here. In addition, Mr. Shalter is without transportation, so it will have to be local for him.

Joel Ready

**From:** Albert A. Ciardi III <Aciardi@ciardilaw.com>
**Sent:** Saturday, September 21, 2024 2:44 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Mr. Ready

We would prefer in person so let us know if Friday would work for that.  Please confirm we will have all of the responsive documents y Tuesday.

Albert A Ciardi III
1905 Spruce Street
Philadelphia PA 19103
215-599 2018 (o)

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Friday, September 20, 2024 4:21 PM
**To:** Nicole Nigrelli <nnigrelli@ciardilaw.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>
**Subject:** Re: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Nicole,

I'll be back in on Monday. I can't do travel to and from Philadelphia on Thursday with my schedule, but I could do these all by zoom. Please advise on whether you would agree to that.

Joel Ready

Get Outlook for iOS

**From:** Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Sent:** Friday, September 20, 2024 2:00:33 PM
**To:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Cc:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>
**Subject:** Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Hi Joel-
Please see attached notices of deposition regarding our Motion to Dismiss scheduled for hearing on October 1, 2024.  Please note that I have agreed to take Mr. Jordan's testimony via zoom; all other deponents are required to come to my office, 1905 Spruce Street, Philadelphia PA on Thursday September 26th.   Please confirm that you will provide the documents requested by Tuesday **September 24, 2024 at noon**.

Thanks,
Nicole

# Exhibit H

# Exhibit H

## Joel A. Ready, Esq.

| | |
|---|---|
| **From:** | Nicole Nigrelli <nnigrelli@ciardilaw.com> |
| **Sent:** | Tuesday, September 24, 2024 3:48 PM |
| **To:** | Joel A. Ready, Esq.; Albert A. Ciardi III |
| **Cc:** | Dorene Torres; Daniel Siedman; David Heim; Benjamin J. Lewis, Esq. |
| **Subject:** | RE: Alan Christopher Redmond - Inappropriate Discovery |

Joel-

Most, if not almost all, of these requests are not appropriate.  First, the Putative Debtor will be filing his schedules in accordance with the Court's order.  Second, to the extent you are asking for information relating to companies, not the Putative Debtor, it is not relevant to the dismissal motion before the Court.  Third, you have asked the Putative Debtor for pay documents relating to Ethan Shalter.  Ethan testified he was **Not** employed by Alan Redmond.  Thus, I am unsure why Mr. Redmond would have any pay records relating to Mr. Shalter.

Moreover, you voluntarily withdrew your Emergency Motion and the TRO was vacated.  Your request for admissions are inappropriate and not relevant.

The Court was clear that the discovery was to be limited to the hearing on 10-1.  You are attempting to get expedited discovery on matters which are not relevant to the hearing scheduled on 10-1.  Please withdraw these requests by the end of business today.

**From:** Joel A. Ready, Esq. <joel@cornerstonelaw.us>
**Sent:** Monday, September 23, 2024 3:08 PM
**To:** Albert A. Ciardi III <Aciardi@ciardilaw.com>; Nicole Nigrelli <nnigrelli@ciardilaw.com>
**Cc:** Dorene Torres <dtorres@ciardilaw.com>; Daniel Siedman <dSiedman@ciardilaw.com>; David Heim <dheim@bochettoandlentz.com>; Benjamin J. Lewis, Esq. <Benjamin@cornerstonelaw.us>
**Subject:** RE: Alan Christopher Redmond - deposition notices/ Motion to Dismiss

Dear Counsel,

Pursuant to my agreement with Ms. Nigrelli in Court, attached are Jason Scott Jordan's First Request for Admissions, First Set of Interrogatories, and First Set of Requests for Production of Documents. Additionally, please see enclosed two letters from myself to you.

Sincerely,

Joel A. Ready, Esq.
*Licensed in Pennsylvania, New Jersey and Maryland*



CORNERSTONE
LAW FIRM

8500 Allentown Pike
Suite 3
Blandon, PA  19510
610-926-7875

1

# Exhibit I

# Exhibit I

# CORNERSTONE
# LAW █ FIRM
LLC

8500 Allentown Pike, Suite 3
Blandon, PA 19510

September 23, 2024

**Albert A. Ciardi, III, Esquire**
**Nicole M. Nigrelli, Esquire**
**Daniel S. Siedman, Esquire**
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103

> **Re:** **Designation of Exhibits and Service of Discovery Requests**
> **In re Alan Christopher Redmond, Case No. 24-13093**

Dear Counsel,

Enclosed for service on you is Jason Scott Jordan's First Request for Production of Documents, First Set of Interrogatories, and First Request for Admissions, all directed to Alan Christopher Redmond. Please provide all responses by the close of business on Friday, September 27, 2024 by electronic submission to joel@cornerstonelaw.us. Please do not hesitate to contact me if you have any questions regarding the same.

For the hearing scheduled on October 1, 2024, I designate all documents filed with the Court at ECF No. 10-1, as well as all documents provided to you by Benjamin Lewis by e-mail on September 18, 2024, as exhibits which Petitioners may offer into evidence.

For the same purpose, Petitioners may also offer into evidence the following: all liens of public record and docket sheets and court papers in all proceedings where Alan Christopher Redmond is a party, including the following:

(1)    Order at ECF No. 114, at <u>Julie Su, Secretary of Labor v. Bene Market, LLC et al.</u>, C.A. No. 5:20-CV-04265-JLS (E.D. Pa. Mar. 19, 2024).

(2)    All publicly-available filings with any secretary of state or similar authority in any State jurisdiction, for any entity associated with Redmond, including Benefits Now, LLC, Seguro Medico, LLC, Bene Market, LLC, ARC Realty, LLC, Alan Redmond Charitable Foundation, The Redmond Group, LLC, Redmond Marketing, LLC, Redmond Group Investments, LLC, QuickHealth Care, and any person with a reasonable variation of any of the foregoing names.

You are informed that I will request judicial notice of all of the foregoing documents identified in this letter at the October 1, 2024 hearing, if Redmond will not admit authenticity.

I am willing to limit or retract some of my discovery requests if Redmond will stipulate that he is generally not paying his debts as the same become due under 11 U.S.C. § 303(h)(1).

Additionally, if you don't wish to answer questions about his assets and transfers of assets, then you may retract your motion to dismiss on the basis of "bad faith." As a matter of law, by raising the contention of bad faith, I am entitled to discovery within the non-exhaustive factors test set forth as follows:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; **there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets**; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*In re* Forever Green Athletic Fields, Inc., 804 F.3d 328, 336 (3d Cir. 2015) (emphasis added).

Sincerely,

CORNERSTONE LAW FIRM, LLC

By: _Joel A. Ready_
Joel A. Ready

Enclosures

# Exhibit J

# Exhibit J

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:

NATIONAL BROKERS OF AMERICA,
INC.

      Debtor.

_____

Chapter 7

Bankruptcy No. 19-15488-pmm

_____

## DEBTOR'S MOTION FOR ENFORCEMENT OF THE AUTOMATIC STAY, VACATING OF JUDGMENTS AS VOID, AND ENJOINING JASON SCOTT JORDAN FROM PURSUING CLAIMS IN BERKS COUNTY CIVIL DOCKET 14-17117

Debtor, National Brokers of America, through undersigned counsel, request that the Court enter an order enforcing the automatic stay, voiding the judgments entered in Berks County Pennsylvania against Debtor, Alan C. Redmond, and Bene Market, LLC, enjoining Jason Scott Jordan from pursuing claims against the same in Berks County, Pennsylvania, Court of Common Pleas Civil Docket 14-17117, and issuing sanctions against Joel Ready, Esq. and Cornerstone Law Firm.

**Introduction**

This Motion asserts that Jason Jordan, by and through his counsel, Joel Reedy, Esq. and Cornerstone Law Firm, David Crossett, Esq. and Joel Reedy, Esq. and the Berks County Court of Common Pleas violated the Automatic Stay in this matter by obtaining, entering, and subsequently enforcing a judgment in excess of $13,000,000 pursuant to a verdict in a civil matter after trial in the Berks County Court of Common Pleas ("The Berks Matter") against Debtor, Alan C. Redmond and Bene Markets, LLC. It further asserts that Jason Jordan through counsel continues to violate the automatic stay in this matter as they are seeking assets of Debtor through a separate law suit

brought in the Berks County Court of Common Pleas in which Alan C. Redmond, Bene Markets, LLC and Stephanie Miller are Defendants ("The Pending Matter")

**Relevant Proceedings and Events**

Below is an abbreviated list of proceedings in Pennsylvania and before this Court which are relevant to the content and context of the present Motion

**Relevant Procedural and Factual History – Pennsylvania Proceedings**

1. On October 28, 2014, Debtor filed a Complaint against Jason Scott Jordan ("Jordan") in the Berks County, Pennsylvania, Court of Common Pleas seeking recovery on claims of Breach of Contract and Defamation, Berks County Civil docket 14-17117 ("the Berks Matter").

2. The gist of the Debtor's claims was that:

a. Alan C. Redmond, then sole owner of Debtor, offered employment and ownership interest to Jordan upon assurances that Jordan had a clean criminal history and was licensed to sell insurance; despite said assurance, after entering into an employment and ownership sharing contract with Jordan, it was learned Jordan had a substantial criminal history and was not licensed to sell insurance;

b. Jordan was charged, subsequent to the employment and ownership sharing contract, with two separate Driving Under the Influence charges and was beginning to miss work, perform poorly at work, and become threatening to employees at work;

c. Based upon Jordan's behavior and lack of credentials, Debtor refused Jordan access to the work premise and business decision making procedures to protect Debtor from liability;

d. And that Jordan subsequently began making false, defamatory statements against Debtor on social media which damaged Debtor.

3. On December 11, 2014, Jordan filed an Answer with New Matter and Counterclaim, seeking relief on claims of Breach of Contract, Breach of Fiduciary Duty, and requesting that an appraiser be appointed. Alan C. Redmond ("Redmond") was also added as a Plaintiff to the Berks Matter.

4. A summary of the claims of Jordan against Debtor and Redmond is that:

a. Jordan was illegally terminated under the employment and ownership sharing contract;

b. Jordan's rights as a shareholder of Debtor were breached;

c. The Debtor had failed to pay Jordan's legal fees as required;

d. And that the action of Debtor and Redmond amounted to an illegal freeze out of Jordan.

5. After extensive pre-trial litigation, including an appeal to the Superior Court of Pennsylvania, a bench trial was held on the Counterclaim in the Berks Matter in September 2021.

6. In a Decision and Verdict issued by the Honorable Timothy J. Rowley on December 20, 2021 (see "Exhibit A" attached hereto), the Trial Court found, *inter alia*:

a. Debtor was organized in February 2013 to serve as an insurance call center;

b. In July of 2013, at a time when Debtor was indisputably not profitable, Debtor hired Jordan as an *employee* via an employment contract. The contract was offered due, in part, to his experience in the insurance sales industry;

c. On November 1, 2013, a "Shareholders' Agreement" (attached as "Exhibit B" hereto) was executed by Jordan and Redmond whereby Redmond and Jordan became equal ("50/50") owners of Debtor. Further set forth in the agreement, Jordan and Redmond would hold

equal voting rights in consideration of Debtor failing to pay Jordan all monies allegedly owed

Jordan under the employment contract;

    d.    From November 1, 2013 through August 4, 2014, Redmond and Jordan were equal

in every way as owners of Debtor, a period in which Debtor became "very" profitable (See

"Exhibit A" supra);

    e.    On August 4, 2014, Redmond effectuated a "freeze-out" of Jordan, refusing him

access to Debtor's property, management of Debtor, and profits from Debtor, and the freeze out

continued through trial;

    f.    That post-freeze out, Redmond failed to keep corporate procedure of Debtor and

treated profits of Debtor as profits of Redmond and filed false or fraudulent tax documents through

C. Malcolm Smith & Co. regarding Debtor;

    g.    Redmond transferred over $360,000.00 from Debtor to Bene Market, LLC

("Bene"), a business 96% owned by Redmond, along with Debtor's book of business, essentially

and legally making Bene a successor of a now practically-defunct Debtor;

    h.    That between the above and the time of trial, Redmond "misappropriated"

$3,698,627.10 directly from Debtor and an additional $11,797,865 from Bene for a combined total

of $15,496,492 in profit that was not shared with Jordan; and

    i.    The actions of Redmond in "freezing out" Jordan and subsequent management of

Debtor was in violation of the Shareholders' Agreement and Bylaws of Debtor.

7. The Court entered a verdict in favor of Jordan and against Redmond as follows:

    a.    $8,105,197.20 in compensatory damages;

    b.    $5,000,000 in punitive exemplary damages;

    c.    Total damages awarded in the amount of $13,105,197.20

4

8. On December 30, 2021, Redmond filed a Motion for Post-Trial Relief.

9. On January 11, 2022, due to the retirement of Judge Rowley, the Honorable Jeffrey K. Sprecher was appointed the Judge presiding over the Berks matter.

10. On March 31, 2022, Judge Sprecher issued an Amended Verdict, entering judgment in the amount of $13,105,197.20 against "**the Plaintiffs**", including NBOA, the debtor for whom a stay was and remains in place through this Honorable Court. A copy of the Amended Verdict entered by Judge Sprecher is attached as Exhibit "C."

11. Judgments in that amount have been entered in Berks County, Pennsylvania against both Redmond *and* Debtor (see judgment index attached as "Exhibit D" hereto).

12. On April 19, 2022, Redmond and the Debtor appealed to the Superior Court of Pennsylvania.

13. On October 21, 2022, an Order was issued staying the execution of the judgment.

14. On January 25, 2024, the stay of execution was lifted by the Superior Court of Pennsylvania.

15. On July 28, 2022, Jordan, by and through Joel Reedy, Esq. and Cornerstone Law Firm, filed a civil suit in the Berks County, Pennsylvania Court of Common Pleas against Bene, Redmond, and Stephania Miller ("Miller") asserting a claim of Unjust Enrichment, seeking to pierce Bene's corporate veil, and demanding damages and a receivership, Berks County Civil Docket 22-11757 ("the Pending Matter").

16. The gist of the Pending Matter is:

      a. That following the freeze out of Jordan referenced in the Berks Matter, and as determined in the Berks matter, Redmond misappropriated nearly $4 million of

Debtor funds through payments of personal debts, legal fees, and distributions and salaries not shared with Jordan, a 50/50 owner;

b.  That Redmond misappropriated Debtor's book of business by transferring it to Bene at a discounted rate;

c.  That Bene essentially operated as the Debtor with simply a different name, having the same business model, location, employees, equipment, etc.

d.  That Miller, the former Chief Financial Officer of Debtor, is a four percent (4%) owner of Bene;

e.  That Redmond has misappropriated over $11 million from Bene without sharing with Jordan;

f.  **That Bene is simply a continuation of Debtor, and that the assets of Bene are actually the assets of Debtor.**

g.  **That Bene eschews all corporate formalities and is simply a façade for Redmond's personal dealings.**

**Relevant Procedural and Factual History – Present Bankruptcy Proceedings**

17. On September 3, 2019, Debtor filed its petition under Chapter 7 ("Petition").

18. On January 30, 2020, Jordan removed the Berks matter to this Court, docketed as Adversary Proceeding 20-000016.

19. On January 4, 2021, the Honorable Patricia M. Mayer signed a "Consent Order to Remand State Court Claims Against Alan Christopher Redmond to State Court and to Lift Stay for State Court Claims by Jason Scott Jordan Against Alan Christopher Redmond" entered into between Jordan and Chapter 7 Trustee, Robert H. Holber.  A copy of the January 4, 2021 Consent Order is attached as Exhibit "E."

20. Pursuant to this Consent Order, Jordan was allowed to pursue claims **against Redmond only** as they were not core proceedings involving property of the Debtor's estate:

> Notwithstanding the Initial Stay Relief Order, the automatic stay (including a stay under 11 U.S.C. § 362) is hereby lifted as it applies to claims by Jason Scott Jordan against Alan Christopher Redmond in the State Court Action *provided however that such State Court Action shall not include any claims against the Debtor* or the Trustee nor shall the Trustee be required to participate in any discovery in the State Court action.

Exhibit "E" Consent Order at ¶ 5 (emphasis added).

21. At no point, at any time, for any duration, was the stay lifted as to Debtor or as to property of the Debtor's estate.

**Violation of the Automatic Stay – Argument**

The Debtor submits that the automatic stay was violated by the entry of the judgment against the Debtor in Berks matter. The Debtor further avers that as the finances of Redmond and Bene are so intertwined with that of Debtor- in fact, Jordan's judgment against Redmond and Bene is based on a theory that they inappropriately came into possessions of Debtor- this case presents an unusual circumstance under which the automatic stay should be applied not only to Debtor, but also third-parties Redmond and Bene. The Debtor further asserts that through the Pending Matter, Jordan and his counsel, Joel Reedy, Esq., and Cornerstone Law Firm, are knowingly continuing to violate the automatic stay as they seek damages from Redmond, Bene, and Miller from assets they not only acknowledge, but affirmatively argue, belong to Debtor's estate.

> Pursuant to 11 U.S.C. §362:
>
> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
> **(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this

7

title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

**(2)** the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

**(3)** any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

**(4)** any act to create, perfect, or enforce any lien against property of the estate;

**(5)** any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

**(6)** any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

**(7)** the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

**(8)** the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable

Regarding the "estate";

Such estate is comprised of all the following property, wherever located and by whomever held:

**(1)** Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

…

**(6)** Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

**(7)** Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. §541.

Further, the automatic stay can also be applied to property of the estate of a debtor which is in the possession of a third party. The Third Circuit has recognized that the automatic stay can be extended to third parties in "unusual circumstances." McCartney v. Inegra National Bank North, 106 F.3d 506 (3rd Cir. 1997). In McCartney, the Third Circuit recognized one such unusual circumstance "where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against

8

the third-party defendant will in effect be a judgment or finding against the debtor." Id. at 510. (*quoting* A.H. Robbins Co. v. Piccinin, 488 F.2d 994, 999 (4th Cir. 1986).   "Unusual circumstances exist warranting extension of the stay to nondebtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization" LTL Mgmt. v. Does, 21-30589 (MBK) (Bankr. D.N.J. Feb. 25, 2022) (quoting In re Philadelphia Newspapers, LLC,  407 B.R. 606, 616 (E.D. Pa. 2009)).

In McCartney, the automatic stay was extended beyond the debtor and to an action on a loan against a third party to which the debtor was a guarantor.  McCartney, 106 F.3d at 510-11. In A.H. Robbins, the automatic stay was applied to the debtor's co-defendants in product liability lawsuits as judgments against the co-defendants could potentially reduce the insurance pool available to the debtor, thus lessening the estate.  A.H. Robbins, 488 F.2d 1008.  In Philadelphia Newspapers, the automatic stay was applied to non-debtor co-defendants in civil suits as the debtor was contractually obligated to indemnify these co-defendants.  Philadelphia Newspapers 407 B.R. at 613-14.

Further, along these lines, the Third Circuit has held that claims against a successor organization of the Debtor on a legal theory that the successor organization of the Debtor concern assets of the Debtor's estate and alleged injured parties do not have standing to bring suit seeking these assets.  *See* In re Emoral, Inc., 740 F.3d 875 (3rd Cir. 2014).  In Emoral, Aaroma was a successor corporation to Emoral, who at the time of the transfer of assets was knowingly open to liability for personal injury and product liability claims.  Id. at 877.  Emoral filed bankruptcy, and alleged injured parties brought suit against Aaroma in the New Jersey State Trial Court on claims of personal injury and product liability originating against Emoral, arguing

9

Aaroma was a "mere continuation" of Emoral. Id. The Third Circuit held that seeking to hold a successor entity liable as a mere continuation of another entity is a general claim, as any creditor of the original entity would be entitled to relief under the same theory. Id. at 880. A general claim is part of the original organization's bankruptcy estate and thus should be subject to prosecution by the bankruptcy trustee. Id. at 880. The same can be said about actions against a party under a veil-piercing theory. Id.

Here, the automatic stay has been violated. The automatic stay was imposed under §362 of the Code at the time of Debtors' filing of their Petition on September 3, 2019. At that point in time, pursuant to §362, all judicial proceedings against Debtor were stayed. This much was obvious and reflected in this Court's Consent Order of January 4, 2021, allowing the Berks Matter to proceed against Redmond alone. The Consent Order specifically states that the automatic stay was lifted as to claims only against Redmond "***provided however that such State Court Action shall not include any claims against the Debtor.***" Ex. "E," Consent Order at ¶ 5 (emphasis added). Further, the enforcement of any claim or judgment against the Debtor was stayed and *remains* stayed. Nonetheless, Judge Sprecher issued a verdict against Debtor on March 31, 2022 despite the stay, and a judgment was entered in Berks County in violation of the stay.

Further, Debtor submits to this Court that the judgments against Redmond and Bene are also in violation of the automatic stay under law and application. While this Court allowed the Berks Matter to continue against Redmond *individually*, the Decision and Verdict from Judge Rowley, and the evidence produced at trial on which the Opinion and Verdict were based, made clear that Redmond and Bene Market were liable to the extent they are in possession of the Debtor's assets. Judge Rowley found that after the supposed freeze-out of Jordan (which the Trial

10

Court itself ordered on Petition of Debtor in August of 2014), Redmond eschewed all corporate procedures required in the operation of Debtor.

Judge Rowley found that Redmond improperly distributed to himself profits rightfully belonging to Debtor. Judge Rowley found that Redmond improperly transferred Debtor's book of business to Bene, a company almost wholly owned by Redmond, and that the profits of Bene were actually attributable to Debtor. Judge Rowley further found that Redmond improperly transferred profits of Bene (actually belonging to Debtor) to himself. It is clear from the Decision and Verdict that any verdict and subsequent judgment against Redmond and Bene is due to their supposed finances being inseparably intertwined with Debtor and/or their being in possession of property actually, impliedly or legally belonging to Debtor.

According to Judge Rowley's holdings, Jordan was a 50/50 owner of Debtor from November 1, 2013. As such, Judge Rowley ruled Jordan was entitled to half of all profits distributed. This, according to Judge Rowley's ruling, would include profits which were produced by Bene, which Judge Rowley ruled was a clear successor business to Debtor.

Debtor submits that these facts inarguably demonstrate that these are "unusual circumstances" pursuant to the A.H., McCartney, and Philadelphia Newspapers line of cases in which the automatic stay should be extended to third-parties Redmond and Bene. The damages to which Jordan received a verdict and judgment to recover is property which belonged to Debtor, but Judge Rowley found was misappropriated by Bene and Redmond. Based on Judge Rowley's rulings, the finances of Redmond, Bene, and Debtor are so intertwined, Jordan's judgment against Redmond is a judgment against Debtor. Indeed, this is not a legal fiction since the judgment index is clear that a $13 million judgment was, in fact, entered against the Debtor. As such, the

11

judicial proceedings against Redmond violated the automatic stay and the entry and enforcement of the Berks County judgments against Redmond and Bene violate the automatic stay.

Further, Debtor submits that pursuant to Emoral and its predecessor and successor cases, Jordan, Joel Reedy, Esq. and Cornerstone Law Firm are actively violating the automatic stay by pursuing the Pending Matter. In the Pending Matter, Jordan and counsel do not tacitly admit that Bene is a "mere continuation" of Debtor in possession of Debtor assets, they *expressly argue that point*. Moreover, by seeking to pierce Bene's corporate veil as a personal façade for Redmond, they are *expressly attributing the assets of Debtor to Redmond*. The holding in Emoral is crystal clear- seeking damages from a third-party non-debtor as a mere continuation of the Debtor or through piercing the veil is seeking assets of the Debtor's Estate. Assets of the Debtor's estate are subject to the automatic stay.

For the foregoing reasons, the Debtor requests that this Court find that the Berks Matter's verdicts against it and Redmond violate the automatic stay, as do the entry and enforcement of judgments against it, Redmond, and Bene. The Debtor further requests that this Court find that the prosecution of the Pending Matter is a knowing violation of the automatic stay by Jordan, Joel Reedy, Esq. and Cornerstone Law Firm.

### Request for Remedies- Injunction, Void of Judgments, and Sanctions

Bankruptcy Courts are courts of equity with the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. 105(a).

### Equitable Relief- Injunction and Void of Judgment.

The Debtor submits that to effectuate the purpose of the Code in this particular case, it would be equitable to issue an injunction prohibiting Jordan from attempting to enforce the

12

judgments entered against the Debtor, Redmond, and Bene.  Further, the Debtor submits that the liability, damages, and ability to meet those damages by Redmond and Bene in connection with the Berks matter are so intertwined with the Debtor's bankruptcy estate that the verdict against Debtor, Redmond, and Bene should be voided and litigation against these parties in the Berks matter must be returned to the status quo, as it existed *prior* to the Consent Order. This is because prosecuting the Berks matter against Redmond was in violation of the automatic stay in all aspects.

**Sanctions**

Section 362(k)(1) of the Bankruptcy Code provides redress for violations of the automatic stay. It mandates that, subject to exceptions not applicable in this case, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, **in appropriate circumstances, may recover punitive damages**."4 11 U.S.C. § 362(k)(1). "A debtor alleging a violation of the automatic stay has the burden to demonstrate, by a preponderance of the evidence, that a violation was willfully committed by the respondent, and that the debtor suffered damage as a result of the violation." In re Panek, 402 B.R. 71, 76 (D. Mass. 2009).  To be a "willful" violation of the stay, it is not necessary that the party has the specific intent to violate the stay, just that the act was clearly a violation of the stay. *See* In Re Aleckna, No. 20-1309 (3d Cir. Sep. 9, 2021).

Here, the Pending Matter is a clear willful violation of the automatic stay.  Based on the crystal clear holding in Emoral, there can be no doubt in the mind of Jordan, Joel Reedy, Esq., and Cornerstone Law Firm that the Pending Matter- which seeks estate assets through theories of mere continuation and piercing veil liability- is a stay violation.  As such, Redmond and Bene are entitled to costs and legal fees associated with the Pending Matter.  They further requests punitive damages as the Pending Matter is a duplicative theory of liability from the Berks Matter- which itself turned

13

out to be a violation of the stay- and amounts to the harassment of Redmond and Bene over the

verdict and judgment in the Berks Matter while clearly violating the stay.

Accordingly, Debtor requests that this Court enter:

1. The dismissal of the entire verdict and judgment in favor of Jordan in the Berks Matter (Berks County Civil Docket 14-17117);

2. Enjoin Jordan from prosecuting the Berks Matter and

3. Strike the judgments against the Debtor, Redmond, and Bene and/or prohibit their enforcement;

4. Dismissal of the Pending Matter (Berks County Civil Docket 22-11757);

5. Sanctions against Jason Jordan, Joel Reedy, Esq., and Cornerstone Law Firm in the amount of costs in defending the Pending Matter, including legal fees, and punitive damages.

Philadelphia, PA
May 24, 2024

RESPECTFULLY SUBMITTED,

___/s/ Norman M. Valz_____
Norman M. Valz, Esquire (Pa. No. 61338)
Attorney for Defendants
Norman M. Valz & Associates, P.C.
490 Norristown Road
Suite 150
Blue Bell, PA 19422
(215) 756-2424
nvalz@msn.com

14

**CERTIFICATE OF SERVICE**

I CERTIFY that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF) on this 24th day of May 2024, upon all registered users who have entered their appearance in any way for this case in compliance with the Federal Rules of Bankruptcy Procedure and the Rules of the Eastern District of Pennsylvania.

Philadelphia, PA
May 24, 2024

RESPECTFULLY SUBMITTED,

___/s/ Norman M. Valz_____
Norman M. Valz, Esquire (Pa. No. 61338)
Attorney for Defendants
Norman M. Valz & Associates, P.C.
490 Norristown Road
Suite 150
Blue Bell, PA 19422
(215) 756-2424
nvalz@msn.com

# Exhibit K

# Exhibit K

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA**

In re:

NATIONAL BROKERS OF AMERICA,
INC.

Chapter 7

    Debtor.

Bankruptcy No. 19-15488-pmm

## <u>ORDER</u>

    **AND NOW**, this <u>2nd</u> day of <u>July</u>, 2024, upon consideration of the

Motion to Intervene for Purposes of Debtor's Motion for Enforcement of the Automatic Stay,

Vacating of Judgments as Void, and Enjoining Jason Scott Jordan From Pursuing Claims in

Berks County Civil <u>Docket 14-17117</u>, filed by Proposed Intervenor, Alan C. Redmond, it is

hereby **ORDERED** that the Motion is **GRANTED.**

    Alan C. Redmond is hereby granted Interested Party status with respect to the Debtor's

Motion [<u>ECF No. 179</u>] and he and/or his counsel of record are permitted to be heard at the

Court's July 2, 2024, 11 A.M. hearing for said Motion.

BY THE COURT:

_Patricia M. Mayer_

Hon. Patricia M. Mayer, U.S.B.J.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:

NATIONAL BROKERS OF AMERICA,
INC.                                             Chapter 7

    Debtor.                                      Bankruptcy No. 19-15488-pmm

_____          _____

**NON-PARTY ALAN C. REDMOND'S MOTION TO INTERVENE IN SUPPORT OF
DEBTOR'S MOTION FOR ENFORCEMENT OF THE AUTOMATIC STAY,
VACATING OF JUDGMENTS AS VOID, AND ENJOINING JASON SCOTT JORDAN
FROM PURSUING CLAIMS IN BERKS COUNTY CIVIL DOCKET 14-17117**

Non-party Alan C. Redmond ("Redmond"), through undersigned counsel, requests that

the Court enter an order allowing him to intervene in the motion of Debtor, National Brokers of

America, Inc.,  ("Debtor") to enforce the automatic stay, void the judgments entered in Berks

County Pennsylvania against Debtor, Alan C. Redmond, and Bene Market, LLC, enjoining Jason

Scott Jordan from pursuing claims against the same in Berks County, Pennsylvania, Court of

Common Pleas Civil Docket 14-17117, and issuing sanctions against Joel Ready, Esq. and

Cornerstone Law Firm.

**INTRODUCTION**

Redmond is one of the parties subject to judgments entered in a Berks County case, in

which (as set forth in the motion of Debtor) a judgment of more than $13 million was entered in

favor of Jason Jordan, despite the automatic stay in this Court.  Additionally, the automatic stay

is being violated in another case in Berks County, in which Jason Jordan seeks the Debtor's

assets in a suit against Alan C. Redmond, Bene Markets, LLC and Stephanie Miller.

As Redmond is an "interested party" under Bankr. R. 2018(a), he is entitled to permissive intervention: the judgment and the second action affect his property interests, along with the interests of the Debtor.

## FACTUAL SUMMARY

Below is an abbreviated list of proceedings in Pennsylvania and before this Court which are relevant to the content and context of the present Motion

### A.     Pennsylvania Proceedings

On October 28, 2014, Debtor filed a Complaint against Jason Scott Jordan ("Jordan") in the Berks County, Pennsylvania, Court of Common Pleas seeking recovery on claims of Breach of Contract and Defamation, Berks County Civil docket 14-17117 ("the Berks Matter").  In the Berks Matter, Debtor claimed that Redmond, then sole owner of Debtor, offered employment and ownership interest to Jordan upon assurances that Jordan had a clean criminal history and was licensed to sell insurance; despite said assurance, after entering into an employment and ownership sharing contract with Jordan, it was learned Jordan had a substantial criminal history and was not licensed to sell insurance.  Jordan was also alleged to have 2 DUI charges and work performance issues, resulting in Jordan's lack of access to work premises, after which Jordan began making false, defamatory statements against Debtor on social media which damaged Debtor.

Jordan counterclaimed on breach of contract and breach of fiduciary duty, sought an appraiser, and added Redmond as a party.  Jordan's claims were for illegal termination and loss of rights as a shareholder of Debtor.  After a bench trial was held in September 2021, a Decision and Order of December 20, 2021, that Redmond was liable to Jordan for $8,105,197.20 in

compensatory damages, $8,105,197.20 in compensatory damages, for a total amount of $13,105,197.20.

After post-trial motions, on March 31, 2022, Judge Sprecher issued an Amended Verdict, entering judgment in the amount of $13,105,197.20 against **"the Plaintiffs"**, including the Debtor, the debtor for whom a stay was and remains in place through this Honorable Court.

On July 28, 2022, Jordan, by and through Joel Reedy, Esq. and Cornerstone Law Firm, filed a civil suit in the Berks County, Pennsylvania Court of Common Pleas against Bene Markets LLC ("Bene"), Redmond, and Stephania Miller ("Miller") asserting a claim of Unjust Enrichment, seeking to pierce Bene's corporate veil, and demanding damages and a receivership, Berks County Civil Docket 22-11757 ("the Pending Matter"). The Pending Matter alleges misappropriation of nearly $4 million of Debtor funds, misappropriation of Debtor's book of business by transferring it to Bene at a discounted rate, and that Bene is simply a continuation of Debtor under another name. In the Pending Matter, Jordan is thus seeking the Debtor's assets in direct violation of the automatic stay.

**B.    Present Bankruptcy Proceedings**

1. The instant Bankruptcy proceeding was initiated by the Debtor's Chapter 7 petition on September 3, 2019. On January 30, 2020, Jordan removed the Berks matter to this Court, docketed as Adversary Proceeding 20-000016. On January 4, 2021, the Honorable Patricia M. Mayer signed a "Consent Order to Remand State Court Claims Against Alan Christopher Redmond to State Court and to Lift Stay for State Court Claims by Jason Scott Jordan Against Alan Christopher Redmond" entered into between Jordan and Chapter 7 Trustee, Robert H. Holber.

2.  Pursuant to this Consent Order, Jordan was allowed to pursue claims **against Redmond only** as they were not core proceedings involving property of the Debtor's estate:

> Notwithstanding the Initial Stay Relief Order, the automatic stay (including a stay under 11 U.S.C. § 362) is hereby lifted as it applies to claims by Jason Scott Jordan against Alan Christopher Redmond in the State Court Action *provided however that such State Court Action shall not include any claims against the Debtor* or the Trustee nor shall the Trustee be required to participate in any discovery in the State Court action.

Exhibit "E" to Debtor Motion, Consent Order at ¶ 5 (emphasis added). At no point, at any time, for any duration, was the stay lifted as to Debtor or as to property of the Debtor's estate.

### LEGAL ARGUMENT

Intervention is permitted under Bankruptcy Rule 2018(a), under which "the court may permit any interested entity to intervene generally or with respect to any specified matter." Fed. R. Bankr. P. 2018(a). On a motion for intervention, the court may consider whether the proposed intervenor's interest is one being adequately represented by another party already in the case, and whether intervention would cause undue delay or prejudice. *In re Beulah Rd. Land Co.*, No. 13-23148-CMB, 2013 WL 6384344, at *1 (Bankr. W.D. Pa. Dec. 5, 2013). Good cause for intervention can be established by demonstrating an "economic or similar interest related to the case." *Id.*

Here, it is apparent that Redmond has an "economic or similar interest" to the issue at hand, namely whether the automatic stay was violated by Jordan and his counsel. While the claims as to Redmond were ruled to not be core proceedings at an earlier phase in these proceedings, the March 31, 2022, Amended Verdict in the Berks County case elevated Redmond's economic interests to those of the Debtor. And the entire gist of the Pending Matter is an attempt to claim that assets of Bene are actually assets of the Debtor—allegations that place the Pending Matter squarely within the jurisdiction of this Court as a "core proceeding." 28

4

U.S.C.A. § 157(b)(2)(o) ("other proceedings affecting the liquidation of the assets of the estate").[1] Redmond has a right to be heard, and to be represented, with respect to any hearing on the motion filed by the Debtor with respect to the violations of the automatic stay and conduct of Jordan and his counsel with respect to this Court, as his interests—economic and as a member or owner of Bene—are implicated by the motion, the Amended Verdict, and the Pending Matter.

Redmond, therefore, seeks leave to intervene, and file his joinder to the Debtor's motion (attached hereto as Exhibit "A").

### CONCLUSION

Redmond respectfully requests that his motion to intervene be granted so that he may take part in consideration of the motion of the Debtor concerning violation of the automatic stay.

**BOCHETTO & LENTZ, P.C.**

Dated: June 27, 2024      By:    */s/ George Bochetto*
George Bochetto, Esquire (27783)
David P. Heim, Esquire (84323)
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com

*Attorneys for Alan C. Redmond*

---

[1] Even should the Court decide that Redmond's interests are not "core," they are certainly related claims that could affect the Debtor's estate, and this Court may make preliminary rulings. *In re Jamuna Real Est., LLC*, 357 B.R. 324, 331 (Bankr. E.D. Pa. 2006) (veil-piercing claims are related to the bankruptcy estate).

## <u>CERTIFICATE OF SERVICE</u>

I, *George Bochetto, Esquire*, hereby certify that a true and correct copy of the forgoing was

filed electronically through this Court's ECF System and is available for viewing and downloading

from this Court's ECF System. I further certify that an electronic copy of the foregoing was served

upon all parties of record through this Court's ECF System.


**BOCHETTO & LENTZ, P.C.**

Dated: <u>June 27, 2024</u>       By:   */s/ George Bochetto, Esquire*
                            GEORGE BOCHETTO, ESQUIRE

# Exhibit "A"

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:

NATIONAL BROKERS OF AMERICA, INC.

Chapter 7

    Debtor.

Bankruptcy No. 19-15488-pmm

## INTERVENOR ALAN C. REDMOND'S MOTION JOIN DEBTOR'S MOTION FOR ENFORCEMENT OF THE AUTOMATIC STAY, VACATING OF JUDGMENTS AS VOID, AND ENJOINING JASON SCOTT JORDAN FROM PURSUING CLAIMS IN BERKS COUNTY CIVIL DOCKET 14-17117

Non-party Alan C. Redmond ("Redmond"), through undersigned counsel, joins in the motion of National Brokers of America, Inc., ("Debtor") to enforce the automatic stay, void the judgments entered in Berks County Pennsylvania against Debtor, Alan C. Redmond, and Bene Market, LLC, enjoining Jason Scott Jordan from pursuing claims against the same in Berks County, Pennsylvania, Court of Common Pleas Civil Docket 14-17117, and issuing sanctions against Joel Ready, Esq. and Cornerstone Law Firm.

**BOCHETTO & LENTZ, P.C.**

Dated: June 27, 2024

By: */s/ George Bochetto*
George Bochetto, Esquire (27783)
David P. Heim, Esquire (84323)
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com

*Attorneys for Alan C. Redmond*

# Exhibit L

# Exhibit L

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ALAN CHRISTOPHER REDMOND | Bankruptcy No. 24-13093-PMM |
| | Involuntary Chapter 11 |

**JASON SCOTT JORDAN'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO ALAN CHRISTOPHER REDMOND**

TO:    **Alan Christopher Redmond**
c/o Nicole M. Nigrelli, Enquire
Albert A. Ciardi, III, Esquire
Daniel S. Siedman, Esquire
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103

Via U.S. mail and e-mail: dSiedman@ciardilaw.com; nnigrelli@ciardilaw.com; Aciardi@ciardilaw.com

Pursuant to Federal Rule of Civil Procedure 34, please furnish to Joel@cornerstonelaw.us or at my office at 8500 Allentown Pike, Suite 3, Blandon, Berks County, Pennsylvania, before close of business on September 27, 2024, in accordance with the Court's directive to complete discovery, a photostatic copy or like reproduction of the following materials concerning this action or its subject matter which are in your possession, custody or control and which are not protected by the attorney/client privilege.

This Request for Production of Documents is continuing and any responsive material obtained subsequent to your response to this request which would have been included in its initial response are demanded herein as if this request was reissued immediately thereafter and you are obligated to notify undersigned counsel of such developments and to supply undersigned counsel with a true and correct copy of the same without delay.

DEFINITIONS

1.    The terms "you" and "your" refer to the addressee(s) of this First Set of Requests for Production of Documents and all legal persons where you are hired as a consultant, or where you

have an ownership interest of any kind, or where you have managerial authority, or where you have control, or where you have formed a partnership with.

2.      The term "documents" is an all-inclusive term referring to any writing and/or recorded or graphic matter, however produced or reproduced. The term "documents" includes, without limitation, correspondence, memoranda, interoffice communications, minutes, reports, notes, schedules, computations, analyses, drawings, diagrams, specifications, tables, graphs, charts, maps, surveys, books of account, ledgers, invoices, receipts, quotations, bids, purchase orders, pleadings, questionnaires, contracts, agreements, bills, checks, drafts, diaries, logs, proposals, printouts, recordings, telegrams, photographs, films, tests, studies, and all other documents, tangible or retrievable of any kind, including all documents stored in a computer or on a computer disk or thumb drive.

"Documents" also includes any preliminary notes and drafts of all the forgoing, in whatever form, for example: printed, typed, long-hand, short-hand, on paper, paper tape, tabulating cards, computer disks or computer stored or other forms. In all cases where originals and/or non-identified copies are available, "document" also means copies thereof.

3.      The term "statements" is an all-inclusive term referring to any written utterance whether or not it is signed or otherwise adopted or approved by the person making it and any oral utterance which has been contemporaneously recorded by stenographic, mechanical, electrical, or any other means or had been transcribed from such a recording so as to be a substantially verbatim recital of the verbal expression of the person making it.

4.      The term "person" means and refers to a natural person, corporation, company, trust, sole proprietorship, estate, partnership, joint venture, or any other entity, including any officer, director, employee, owner, partner, executor, trustee, agent, representative, successor or assign thereof.

2

5.     Unless the context clearly requires otherwise, the term "communication" means and refers to any oral statement, discussion, conversation or conference (whether face-to-face or by telephone) and any document by, to, between or among one or more persons to the communication.

6.     The terms "relating to," "connected with" and "in connection with" mean constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, concerning or referring to, directly or indirectly.

7.     The conjunctions "and" and "or" shall be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any document otherwise within the scope of any Request.

8.     As used herein, all words used in their singular form shall be deemed to include the words in their plural form.

9.     As used herein, all words used in their masculine form shall be deemed to include the words in their feminine form.

10.    "ECF" means Electronic Case File, being the sequential number assigned to each document filed with the U.S. Bankruptcy Court for the Eastern District of Pennsylvania at Case No. 24-13093.

11.    "Instant case" means the Involuntary Bankruptcy Petition pending in U.S. Bankruptcy Court for the Eastern District of Pennsylvania at Case No. 24-13093.

## CLAIMS OF PRIVILEGE

If any document sought by the Request is withheld from production based on privilege, work product or any other reason, you shall identify each such document in your response to this Request by stating the date, author, and each recipient of the documents and shall indicate the precise reason why its production is being withheld.

3

NOTICE TO COUNSEL

Having sought dismissal of the Involuntary Petition on the grounds of bad faith, Alan Christopher Redmond has opened the door as to the following, non-exhaustive factors for the Court's consideration:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; **there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets**; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*In re* Forever Green Athletic Fields, Inc., 804 F.3d 328, 336 (3d Cir. 2015) (emphasis added).

Accordingly, Jason Scott Jordan is entitled to discover all information relative to the foregoing.

REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All documents evidencing payment, including the person who is the source of such payment, to Ethan Shalter.

2.    Any IRS Form W-2 issued to Ethan Shalter.

3.    Any other documents bearing Ethan Shalter's signature.

4.    Proof of the most recent payment issued to Ethan Shalter.

5.    Original copies, including metadata, of the submission to the Court at ECF No. 20-1, Exhibit A thereto.

6.    All unexpired contracts for employment, consultancy, or independent contractor work between you and any other person.

7.    All documents evidencing the disposition of assets of Bene Market, LLC, including its receivables, contracts, and book of business, as a result of you causing it to cease operations.

8.    All documents evidencing transfer of assets from you to yourself and Shannon Kroemmelbein as tenancies by the entireties.

9.    All documents evidencing transfer of assets from you to Shannon Kroemmelbein or to any legal person owned by or controlled by Shannon Kroemmelbein.

10.    All documents evidencing transfer of assets, between 2020 and the present, made by you to any relative of yours (including your mother) or to any legal person owned by or

4

controlled by any of your relatives.

11.     All documents evidencing transfer of assets from you to Alan Redmond Charitable Foundation since the latter's formation.

12.     Your personal federal income tax returns from 2020 through the present together with all schedules.

13.     Your last pay stub.

14.     All unexpired contracts between you and any person acting on your behalf.

15.     All documents evidencing your ownership interest (regardless of type of ownership interest) in another business entity and real estate.

16.     For each and every creditor you marked as "Undisputed" at ECF No. 48, all documents evidencing each and every payment to such creditor over the past two years and the source of such payment, whether it was you, Shannon Kroemmelbein, or another person, who paid the same.

17.     All contracts between you and each of the creditors identified at ECF No. 48, including all settlement agreements and contract modifications or amendments.

18.     All documents evidencing your tax liabilities shown on ECF No. 48 as applied to Internal Revenue Service, Pennsylvania UC Tax Services, Pennsylvania Department of Revenue, and Berks County Tax Claim Bureau.

19.     All internal governing documents (including articles of incorporation, certificates of formation, bylaws, shareholders' agreements, managers' agreements, and operating agreements) for Benefits Now, LLC, Seguro Medico, LLC, Bene Market, LLC, ARC Realty, LLC, Alan Redmond Charitable Foundation, The Redmond Group, LLC, The Leads House, Redmond Marketing, LLC, Redmond Group Investments, LLC, QuickHealth Care, and any person with a reasonable variation of any of the foregoing names.

20.     All receipts for each payment made by you to each attorney identified in the Certification of Fees Incurred by Intervenor Alan C. Redmond (July 10, 2024) at Case No. 19-15488-PMM, in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania.

21.     All evidence you obtained by subpoena in the instant case.

22.     All evidence you obtained from any other creditor in the instant case.

23.     All evidence you obtained by any private investigator retained for the instant case, including surveillance videos and audio-recordings.

5

Respectfully submitted,

**CORNERSTONE LAW FIRM, LLC**

Dated: September 23, 2024          By:     /s/ Joel A. Ready
                                           Joel A. Ready, Esquire
                                           PA Attorney I.D. # 321966
                                           Benjamin J. Lewis, Esquire
                                           PA Attorney I.D. # 313733
                                           8500 Allentown Pike, Suite 3
                                           Blandon, PA 19510
                                           (610) 926-7875

6

# Exhibit M

# Exhibit M

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ALAN CHRISTOPHER REDMOND | Bankruptcy No. 24-13093-PMM |
| | Involuntary Chapter 11 |

**JASON SCOTT JORDAN'S FIRST SET OF INTERROGATORIES DIRECTED TO
ALAN CHRISTOPHER REDMOND**

**TO:    Alan Christopher Redmond**
c/o Nicole M. Nigrelli, Enquire
Albert A. Ciardi, III, Esquire
Daniel S. Siedman, Esquire
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103

Via U.S. mail and e-mail: dSiedman@ciardilaw.com; nnigrelli@ciardilaw.com;
Aciardi@ciardilaw.com

Pursuant to Federal Rule of Civil Procedure 33, please furnish to Joel@cornerstonelaw.us or at my office at 8500 Allentown Pike, Suite 3, Blandon, Berks County, Pennsylvania, before close of business on September 27, 2024, in accordance with the Court's directive to complete discovery, a photostatic copy or like reproduction of the following materials concerning this action or its subject matter which are in your possession, custody or control and which are not protected by the attorney/client privilege.

This First Set of Interrogatories is continuing and any information obtained subsequent to your response to this request which would have been included in its initial response are demanded herein as if this request was reissued immediately thereafter and you are obligated to notify undersigned counsel of such developments and to supply undersigned counsel with a true and correct copy of the same without delay.

## DEFINITIONS

1.     The terms "you" and "your" refer to the addressee(s) of this First Set of Requests for Production of Documents and all legal persons where you are hired as a consultant, or where you

have an ownership interest of any kind, or where you have managerial authority, or where you have control, or where you have formed a partnership with.

2.      The term "documents" is an all-inclusive term referring to any writing and/or recorded or graphic matter, however produced or reproduced. The term "documents" includes, without limitation, correspondence, memoranda, interoffice communications, minutes, reports, notes, schedules, computations, analyses, drawings, diagrams, specifications, tables, graphs, charts, maps, surveys, books of account, ledgers, invoices, receipts, quotations, bids, purchase orders, pleadings, questionnaires, contracts, agreements, bills, checks, drafts, diaries, logs, proposals, printouts, recordings, telegrams, photographs, films, tests, studies, and all other documents, tangible or retrievable of any kind, including all documents stored in a computer or on a computer disk or thumb drive.

"Documents" also includes any preliminary notes and drafts of all the forgoing, in whatever form, for example: printed, typed, long-hand, short-hand, on paper, paper tape, tabulating cards, computer disks or computer stored or other forms. In all cases where originals and/or non-identified copies are available, "document" also means copies thereof.

3.      The term "statements" is an all-inclusive term referring to any written utterance whether or not it is signed or otherwise adopted or approved by the person making it and any oral utterance which has been contemporaneously recorded by stenographic, mechanical, electrical, or any other means or had been transcribed from such a recording so as to be a substantially verbatim recital of the verbal expression of the person making it.

4.      The term "person" means and refers to a natural person, corporation, company, trust, sole proprietorship, estate, partnership, joint venture, or any other entity, including any officer, director, employee, owner, partner, executor, trustee, agent, representative, successor or assign thereof.

2

5.  "Identify" means "Identify," when used in reference to a natural person, means to set forth the person's:

    (a)    Full name;
    (b)    Present or last known home address;
    (c)    Present or last known business address;
    (d)    Present employer; and
    (e)    Job title.

6.  "Identify," when used in reference to a person that is a corporation, partnership, proprietorship, association or group, means to state the person's:

    (f)    Full name;
    (g)    Address;
    (h)    Telephone number;
    (i)    Form of organization; and
    (j)    Business activities.

7.  "Identify," when used in reference to documents, means to state the following with respect to each document:

    (k)    Its date;
    (l)    The identity of the person(s) who authored it;
    (m)    The identity of the person(s) to whom it was addressed and who are known or believed to have received copies of it;
    (n)    The form of the document (that is, letter, memorandum, invoice, blueprint, etc.);
    (o)    Its title;
    (p)    Its length (in number of pages);
    (q)    The identity of the person(s) who you know or believe have custody of each copy or draft of the document having notations unique to such copy; and
    (r)    A detailed description of the subject matter of the document.
    (s)    Instead of identifying documents, you may produce them for inspection and copying at the offices of the Defendants' counsel.

8.  "Identify," when used in connection with spoken communication, means to:

    (t)    State the date of the communication;
    (u)    State the place where the communication occurred;
    (v)    Identify each person who took part in or heard the communication;
    (w)    Provide a detailed description of the subject matter of the communication; and
    (x)    Identify each document which refers to or relates to the communication.

3

9.     Unless the context clearly requires otherwise, the term "communication" means and refers to any oral statement, discussion, conversation or conference (whether face-to-face or by telephone) and any document by, to, between or among one or more persons to the communication.

10.    The terms "relating to," "connected with" and "in connection with" mean constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, concerning or referring to, directly or indirectly.

11.    The conjunctions "and" and "or" shall be individually interpreted in every instance as meaning "and/or" and shall not be interpreted disjunctively to exclude any document otherwise within the scope of any Request.

12.    As used herein, all words used in their singular form shall be deemed to include the words in their plural form.

13.    As used herein, all words used in their masculine form shall be deemed to include the words in their feminine form.

14.    "ECF" means Electronic Case File, being the sequential number assigned to each document filed with the U.S. Bankruptcy Court for the Eastern District of Pennsylvania at Case No. 24-13093.

15.    "Instant case" means the Involuntary Bankruptcy Petition pending in U.S. Bankruptcy Court for the Eastern District of Pennsylvania at Case No. 24-13093.

<u>CLAIMS OF PRIVILEGE</u>

If any document sought by the Request is withheld from production based on privilege, work product or any other reason, you shall identify each such document in your response to this Request by stating the date, author, and each recipient of the documents and shall indicate the precise reason why its production is being withheld.

4

<u>NOTICE TO COUNSEL</u>

Having sought dismissal of the Involuntary Petition on the grounds of bad faith, Alan Christopher Redmond has opened the door as to the following, non-exhaustive factors for the Court's consideration:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; **there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets**; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*In re* Forever Green Athletic Fields, Inc., 804 F.3d 328, 336 (3d Cir. 2015) (emphasis added). Accordingly, Jason Scott Jordan is entitled to discover all information relative to the foregoing.

<u>INTERROGATORIES</u>

1.    For each debt identified in ECF No. 48, describe in detail the date when such debt became due.

2.    Describe in detail the transfer of all assets held by Bene Market, LLC, including its receivables, as a result of you causing it to cease operations.

3.    As a result of marriage or contemplated marriage, describe in detail each and every transfer of assets you made to Shannon Kroemmelbein, or to any legal person owned by or controlled by Shannon Kroemmelbein, and indicate whether you retained any ownership or control of such asset and include the date of such transfer.

4.    Describe in detail your relationship with each of the following persons: Jesus Barrios, Arthur W. Walsh, Jr., Benefits Now, LLC, Seguro Medico, LLC, Bene Market, LLC, ARC Realty, LLC, Stephanie Miller, Tonya Hatmaker, Norman M. Valz, Alan Redmond Charitable Foundation, The Redmond Group, LLC, The Leads House, Redmond Marketing, LLC, Redmond Group Investments, LLC, QuickHealth Care, and any person with a reasonable variation of any of the foregoing names.

5.    Identify all legal persons, anywhere in the world, where you have an ownership interest of any kind, or which have hired you in any capacity, or where you have managerial authority, or control, or had formed a partnership with.

6.    Based on your answers to the foregoing interrogatory, identify the jurisdiction

5

where such legal person is formed or incorporated and provide an address for service of process for such legal person.

7.     Describe in detail the person, account number, and date you opened the account for all accounts held by you in any bank, financial institution, or brokerage.

8.     Describe in detail your current sources of income and all forms of compensation, whether directly or in-kind or made on your behalf to another person, including the person who is paying the same, its terms and conditions, and frequency and manner of payment.

9.     Identify all of your current financial assets within the meaning of 13 Pa.C.S. § 8102. For each of the foregoing, identify the person who serves as an intermediary.

10.     In respect of your answers to Petitioner Jason Scott Jordan's First Request for Admissions where you did not answer, "Admitted," describe in detail all facts supporting such answer.

11.     Identify all testifying expert witnesses you have retained for the instant case.

12.     Based on your answers in the foregoing interrogatory, state the substance of the expert testimony you expect that person to give, describe in detail that expert's principles and methods, and the qualifications of such expert. In lieu thereof, you may produce an expert report and curriculum vitae for such expert.

Respectfully submitted,

**CORNERSTONE LAW FIRM, LLC**

Dated: September 23, 2024        By:     /s/ Joel A. Ready
                                         Joel A. Ready, Esquire
                                         PA Attorney I.D. # 321966
                                         Benjamin J. Lewis, Esquire
                                         PA Attorney I.D. # 313733
                                         8500 Allentown Pike, Suite 3
                                         Blandon, PA 19510
                                         (610) 926-7875

6

# Exhibit N

# Exhibit N

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ALAN CHRISTOPHER REDMOND | Bankruptcy No. 24-13093-PMM |
| | Involuntary Chapter 11 |

**JASON SCOTT JORDAN'S FIRST REQUEST FOR ADMISSIONS DIRECTED TO
ALAN CHRISTOPHER REDMOND**

**TO:**   **Alan Christopher Redmond**
c/o Nicole M. Nigrelli, Enquire
Albert A. Ciardi, III, Esquire
Daniel S. Siedman, Esquire
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103

Via U.S. mail and e-mail: dSiedman@ciardilaw.com; nnigrelli@ciardilaw.com;
Aciardi@ciardilaw.com

Pursuant to Federal Rule of Civil Procedure 36, please furnish to Joel@cornerstonelaw.us or at my office at 8500 Allentown Pike, Suite 3, Blandon, Berks County, Pennsylvania, before close of business on September 27, 2024, in accordance with the Court's directive to complete discovery, a photostatic copy or like reproduction of the following materials concerning this action or its subject matter which are in your possession, custody or control and which are not protected by the attorney/client privilege.

This Request for Admission is continuing and any responsive material obtained subsequent to your response to this request which would have been included in its initial response are demanded herein as if this request was reissued immediately thereafter and you are obligated to notify undersigned counsel of such developments and to supply undersigned counsel with a true and correct copy of the same without delay.

REQUEST FOR ADMISSIONS

1.      Admit the authenticity of each exhibit at ECF No. 10-2 submitted with the Emergency Motion for Special Relief in the instant case.

2.      Admit the authenticity of the documents in Exhibit A hereto, including Exhibits

A-1 and A-2.

3. Admit the authenticity of the UCC Financing Statement filed on September 24, 2020 with the Pennsylvania Department of State and which is appended as Exhibit B.

4. Admit the authenticity of the UCC Financing Statement filed on February 1, 2021 with the Pennsylvania Department of State and which is appended as Exhibit C.

5. Admit the authenticity of the Order of the U.S. District Court for the Eastern District of Pennsylvania., at ECF No. 114, in Julie Su, Secretary of Labor v. Bene Market, LLC et al., C.A. No. 5:20-CV-04265-JLS (E.D. Pa. Mar. 19, 2024), which Order is attached as Exhibit D.

Respectfully submitted,

**CORNERSTONE LAW FIRM, LLC**

Dated: September 23, 2024          By:    /s/ Joel A. Ready
                                           Joel A. Ready, Esquire
                                           PA Attorney I.D. # 321966
                                           Benjamin J. Lewis, Esquire
                                           PA Attorney I.D. # 313733
                                           8500 Allentown Pike, Suite 3
                                           Blandon, PA 19510
                                           (610) 926-7875

2