1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: | ) | 24-13093-pmm |
|  | ) |  |
| ALAN CHRISTOPHER REDMOND, | ) | Reading, PA |
|  | ) | October 1, 2024 |
| Debtor. | ) | 10:02 AM |

TRANSCRIPT OF EXPEDITED MOTION TO DISMISS
BEFORE THE HONORABLE PATRICIA M. MAYER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Debtor:              ALBERT A. CIARDI III, ESQ.
                             NICOLE M. NIGRELLI, ESQ.
                             CIARDI CIARDI & ASTIN
                             1905 Spruce Street
                             Philadelphia, PA 19103

For the Petitioning          JOEL A. READY, ESQ.
Creditors:                   BENJMAIN J. LEWIS, ESQ.
                             CORNERSTONE LAW FIRM
                             519 Walnut Street
                             Reading, PA 19601

For C. Malcolm Smith III     BRANDON D. PACK, ESQ.
and C. Malcolm Smith &       BARLEY SNYDER
Company, P.C.                2755 Century Boulevard
                             Wyomissing, PA 19610

For the Internal Revenue     ANTHONY ST. JOSEPH, ESQ.
Service:                     Assistant United States Attorney
                             UNITED STATES ATTORNEY'S OFFICE
                             615 Chestnut Street, Suite 1250
                             Philadelphia, PA 19106

ECR OPERATOR:                KEITH R. BORZILLO

Proceedings recorded by electronic sound recording.

Michael Drake, CET**D-513
eScribers
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

**eScribers, LLC**

2

I N D E X

| WITNESSES: | VOIR DIRE DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Debtor:<br>Khody Detwiler | 20 | 47 | 52 | |
| For the Debtor:<br>Jason Scott Jordan | 220 | | | |
| For the Petitioning Creditors:<br>Alan Christopher Redmond | 60 | 175 | 204 | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Exhibit 19 | 157 | 162 |
| Exhibit 20 | 157 | 162 |
| Exhibit 21 | 157 | 162 |
| Exhibit 22 | 161 | 162 |
| Exhibit 51 | 157 | 162 |
| Exhibit 52 | 157 | 162 |
| Exhibit 53 | 157 | 162 |
| Exhibit 54 | 157 | 162 |
| Exhibit 77 | 160 | 162 |
| Exhibit 78 | 160 | 162 |
| Exhibit 79 | 160 | 162 |
| Exhibit 80 | 160 | 162 |
| Exhibit 81 | 161 | 162 |

3

THE CLERK:  Calling matter number 1 and 2, Alan of Christopher Redmond, Answer of Alan Christopher Redmond to the involuntary Chapter 11 petition and expedited motion to dismiss case.

THE COURT:  Okay.  So why don't we start with appearances?  And we'll move on from there.

MR. READY:  Good morning, Your Honor.  Joel Ready on behalf of the petitioning creditors.  And Benjamin Lewis also.

THE COURT:  Okay.

MR. CIARDI:  Good morning, Your Honor.  Albert Ciardi and Nicole Nigrelli.  We are counsel to Mr. Redmond.  And I know he's on his way.  I just don't know why he's not here.

THE COURT:  Oh, okay.

MR. CIARDI:  But --

THE COURT:  Do we need a minute?

MR. CIARDI:  I'm assuming he should be here any second.

THE COURT:  Okay.

MR. CIARDI:  So as we finish things up, we should be --

THE COURT:  Okay.

MR. CIARDI:  I'm --

THE COURT:  Okay.

MR. PACK:  Good morning, Your Honor.  Brandon Pack.

4

I'm here for the third party, C. Malcolm Smith, III and C. Malcom Smith & Company, P.C.

THE COURT: Okay. All right. So --

MR. ST. JOSEPH: Good morning, Your Honor.

THE COURT: Oh, yes. Good morning.

MR. ST. JOSEPH: This is Anthony St. Joseph. I'm here for the IRS. We received a subpoena yesterday.

THE COURT: Yes. Okay. Well, why don't we -- since you're here, why don't we take that first?

So I understand -- I'm sure it's Mr. Ready that sent the subpoena, right?

MR. READY: Correct, Your Honor.

THE COURT: Okay. So Mr. St. Joseph, tell me -- I guess give me your position.

MR. ST. JOSEPH: Okay. Simply, the subpoena was not properly served. That's the first thing.

The second thing is what we -- what happens when you serve a subpoena on a federal party -- or excuse me, on a federal entity that is not a party is we have two regulations that need to be followed. And so that was what we would normally do. Since it was yesterday afternoon, I haven't sent or gathered the 2E letter yet or talked to the people at IRS who would have that information.

So our position is simply that a subpoena was not -- first of all was not properly served. And secondly, there's no

way for the IRS to produce a litany of documents and a witness in less than twenty-four hours.

On top of that, most of the information falls under the Privacy Act.  So we would have to work through that as well as opposed to the subpoenaing party simply subpoenaing the actual taxing -- the entity whose tax information they're seeking.

THE COURT:  Okay.  Mr. Ready?

MR. READY:  Your Honor, obviously with an expedited case, there are a number of things that had to be gathered here.  So I understand the objections.  I regret that we weren't able to try to get ahold of them earlier to try to work some of those issues out.  I'm content for today to hold off on anything regarding their production and deal with it if we need to have subsequent hearings.

It may also depend -- really, a lot of what we're seeking from them would deal with some of the bad-faith elements, depending on what they bring up.  So --

THE COURT:  Okay.

MR. READY:  I'm content for that to be held off for, for today's purposes.

THE COURT:  Okay.

MR. CIARDI:  Your Honor --

THE COURT:  Mr. Ciardi?

MR. CIARDI:  -- I think it bears pointing out that

6

this is one of approximately, I think, thirteen subpoenas that went out that were not on notice to us as they are supposed to be.  So we're only receiving notice of subpoenas when proof of service, whenever they get service on these parties, is put on the docket.  So I don't know when these subpoenas were sent out.  But we had no ability to do what we might want to do in response to a subpoena being served on the IRS for tax records or other things because they didn't comply with the rules.  And that may be an issue that you're going to hear about from another party, that there's been no compliance at all with the rules relating to service of subpoenas.

So, I mean, that's one issue.  But we want to raise it that it's not simply related just to the IRS.  There's probably -- well, I shouldn't say.  We've seen a whole bunch of subpoenas hit the docket.  I don't know how many other ones got served because we weren't copied on them as we were supposed to be under the rules.

THE COURT:  Mr. Ready?

MR. READY:  Your Honor, I'd have to look.  I believe we've copied them, or I thought we had.  If we have not, then I apologize for the oversight.  Some of these are documents we've requested anyway from debtor's counsel in discovery.  So I don't think that there is a surprise element there.  But again, I'm happy to wait and work that out should this become relevant based on their bad-faith defense.

7

THE COURT:  Okay.

MR. CIARDI:  This isn't a surprise issue, Your Honor. This is just a compliance with the rules issue.  Like --

THE COURT:  Understood.  Got it.  All right.

Mr. St. Joseph, thank you.  I'm guessing that you don't need to stay on.  And we will -- to the extent, I guess, that we need the IRS in the future, we'll do what we need to do.  But for now, I think you're good.

MR. ST. JOSEPH:  Thank you, Your Honor.  And everybody knows how to find me.  So I'm --

THE COURT:  Okay.  All right.  Thank you.

Okay.  Moving forward, why don't we -- I think it probably makes sense to talk about the -- I guess the objection to the entry of an order for relief and then lead into the bad faith.  Does that make sense to everyone?

MR. CIARDI:  Either way is fine, Your Honor.  But I think counsel to one of the other subpoena parties may want to address the Court for a similar issue.

THE COURT:  Okay.

MR. CIARDI:  That's --

MR. PACK:  That's me, Your Honor.

THE COURT:  Okay.

MR. PACK:  I filed an emergency motion to quash the subpoena last night.

THE COURT:  I didn't get any emergency motion.  Was

8

there an expedited request on it?

MR. PACK:  I believe there was.  It was filed late last night, given that my client was only served the subpoena this weekend and we had to rush it out.  So I did file an -- I have a copy here if you would like it.

THE COURT:  You filed the actual motion, or you actually filed an expedited request as well and contacted --

MR. PACK:  I don't recall if an expedited request was filed.

THE COURT:  Okay.

MR. PACK:  But I did file --

THE COURT:  So it's probably sitting on the docket without me knowing about it.

MR. PACK:  I apologize.

THE COURT:  Which is a problem because I have not looked at it.

MR. PACK:  I do apologize for that, Your Honor.

THE COURT:  Okay.  So what is it that I'm supposed to do with it now?

MR. READY:  And, Your Honor, I'll represent -- we also had some discussions yesterday with counsel's office. Again, similar.  We are requesting documents that the putative debtor refused to produce in discovery that are in the possession of his accountant.  So we had asked for those.  We also agreed that we could give them more time to try to produce

9

those, again, to the degree they become relevant, based on what's presented on bad faith today and that we could work with them to deal with any objections or other issues. That's when the motion was filed.

So again, I don't necessarily need to force them to deal with this today. It's going to depend on what's brought out on the on the bad-faith defense. Based on the exhibits that were produced last night, I'm not actually sure if we're even going to get to the issues of dissipation of assets. But because the putative debtor did not produce in discovery documents showing transfers of assets or said that wasn't relevant even after our teleconference last week, we have to seek it from other sources. So that's why this was filed.

Again, I don't necessarily know that we have to deal with it today. I'm happy to continue trying to work with counsel on any concerns that they have. And I understand he felt he needed more time. I do understand it was a tight time line. And unfortunately, that's just the situation we're in.

THE COURT: Okay. So --

MR. CIARDI: And this is another one we weren't served.

THE COURT: There's a third one?

MR. CIARDI: No. This is -- we weren't served --

THE COURT: This is the second one.

MR. CIARDI: -- with this one either.

10

THE COURT:  Okay.

MR. HEIM:  Your Honor, I'm David Heim.  I represent Segura Medico.

There's a subpoena, similar subpoena issued to Segura Medico.  Do you want me to address that now, Judge?

THE COURT:  Was this also filed on the docket without any notice to the Court?

MR. HEIM:  The motion?

THE COURT:  Yeah.

MR. HEIM:  It was filed yesterday, Judge.  And I did not -- I was not aware -- I knew that we would be here today talking about it.  I was not aware about the requirement to do it on an expedited basis, Judge.

THE COURT:  Okay.

MR. HEIM:  In essence, the same --

THE COURT:  But --

MR. HEIM:  -- service issues exist.

THE COURT:  But we apparently want to talk about rules today and how nobody is complying with the rules.  I'm just going to make clear that, clearly, both sides have a problem with rules and procedures.

MR. HEIM:  I'm not on any side, Judge.  I'm just representing a third party.

THE COURT:  I'm just saying.  Go ahead.

MR. HEIM:  Judge, I learned about Seguro Medico's

11

subpoena sometime Friday afternoon.  It was filed on the docket with a certificate of service.  Was never -- I represented Seguro Medico on other subpoenas in this case.  I'm not sure why Mr. Ready wouldn't have just sent me the subpoena.  I would have accepted service of it.  Apparently, it was issued the week before, but Mr. Ready decided to have it served in Delaware at a corporate agent office which never provided notice to my client.

Given the exigencies of the situation, there's just no possible way we could comply with the subpoena which has a schedule of about ten or twelve different categories.  And my understanding of -- well, it's not my understanding.  Rule 45 does require advance notice to the parties.  That never happened.  So that's the essence of the motion, Judge.  It's just impossible to comply with that subpoena within really twenty-four hours' notice.

THE COURT:  Mr. Ready, you're going to tell me the same thing, aren't you?

MR. READY:  Largely.  I mean, I will add that Seguro Medico has essentially been involved.  Counsel has been here. A lot of the documents were asking for were asked for from prior hearings.  So I don't think any of this -- again, some of this should have already been produced, it's our position.  So again, I think it probably depends on what they bring out on bad faith.  I think that we want to preserve the right to get

these documents, if -- depending on what they're trying to put forward today on their part of the case.

THE COURT:  All right.  So with regard to -- I guess we're now at at least two -- well, I guess three with the IRS. To the extent that we get to a point today where it becomes apparent to you, Mr. Ready, that you are going to need the information that is in those subpoenas and requests for documents, we may need to do that on a different day because today obviously is too tight of schedule.

MR. READY:  I understand that, Your Honor.

THE COURT:  Okay.  So for now, I'm going to leave that -- suspend it until we decide whether or not we need to move forward with them.  So I'll note the motions.  And then we'll  deal with them as they come.

MR. PACK:  Thank you, Your Honor.

THE COURT:  All right. Okay.  Is there anything else before we start?  No.  Okay.

So why don't we do -- well, why don't we do this?  If we're going to start to talk about whether or not this involuntary was proper, why don't -- Mr. Ready, do you want to begin to talk to me about the insolvency of the debtor?  And then we'll move on to bad faith from there.

MR. READY:  Your Honor, We can.  I am prepared to move forward however the Court would like.  I mean, we can call our first witnesses to do testimony, but I also can point to

13

exhibits that we've already submitted in terms of what's demonstrated on insolvency.

THE COURT:  Okay.

MR. READY:  So I just would want to know how the Court would like us to proceed on that.

THE COURT:  I presume that everyone has seen the exhibits, or is there a problem --

MR. CIARDI:  We have, Your Honor.

THE COURT:  -- with exhibits?

MR. CIARDI:  I mean, we've seen what the exhibits are, but he can't simply offer them.

THE COURT:  No, no, no.  I understand.

MR. CIARDI:  He needs to present a foundational witness to authenticate.  And they need to be relevant.  So to the extent that --

THE COURT:  I was just asking with respect to even just --

MR. CIARDI:  We've seen them all.

THE COURT:  Okay.

MR. CIARDI:  Yeah.

MR. READY:  And, Your Honor, I can make an offer of proof as to what we present on insolvency that would help the Court.  Or if you just want me to begin calling witnesses, I'd be happy to.

THE COURT:  Why don't you start calling witnesses?

14

MR. READY: Okay. Your Honor, we're going to begin with, Khody Detwiler.

THE COURT: Okay.

MR. CIARDI: I'm going to ask for an offer of proof on what that witness has to do with A, insolvency, or B, the inability to pay debts as they come due.

MR. READY: So, Your Honor, we've brought in Mr. Detwiler, who is an expert witness on handwriting. This is what I'd ask the Court about last week. We have him prepared to testify that the documents submitted supposedly bearing Ethan Shalter's signatures are not genuine. And so he's going to testify to that. We believe this is directly relevant on our motion to dismiss the bad faith claim for the bad faith of the putative debtor.

And in addition, this is just a scheduling matter. We need to have the expert in so that we can get them out.

MR. CIARDI: Your Honor, we -- a couple of things there. Number 1, entirely irrelevant to A, whether there's insolvency, or B, whether there's an issue of -- whether there's been any investigation as to whether the debtor is paying his debts as they come due, which is where they have to go before we even get to that. So they got to put on evidence that they've investigated and that they can prove that the debtor is not paying his debts as they come due and the insolvency.

15

We don't need to get to that because, frankly, with regard to Mr. Shalter, whether he gave or didn't give a release and we believe he did is irrelevant.  He's not a creditor of Mr. Redmond.  Your Honor has already ruled on that.

THE COURT:  Well, I mean, I think he's a creditor. He may be a disputed creditor, but I think he's a creditor.

MR. CIARDI:  Well, he asserts a claim --

THE COURT:  Right.

MR. CIARDI:  -- against Mr. Redmond.

THE COURT:  Right.

MR. CIARDI:  A claim that he never -- well, he admitted in his deposition yesterday that he never even gave a notice of it to Mr. Redmond before the involuntary so therefore, as a matter of law, could never have been disputed or undisputed.  So it's disputed.  So what is his position? Where does it -- how is that advancing the ball on where we are on insolvency, failure to pay debts as they come due?

THE COURT:  Well, I'll tell you, I tend to agree that there is a large amount of the Shalter -- I'll call it the Shalter issue that is not relevant to today.  However, for a very limited reason, I think that Mr. Ready has the ability to at least show that there's an amount that's owed.  And the way to do that, I presume, with this witness, is to ask him about whether or not the release, which is what your client is relying on to say that there is no debt that's due, is genuine.

16

MR. CIARDI:  Well, our client is relying on a couple things, Your Honor, one which I think you've already determined is that it's disputed.

MR. READY:  But, Your Honor, if it's disputed on the basis of a -- basis of a fraudulent document that was created after the fact just to dispute the debt, that's not a good-faith dispute.

MR. CIARDI:  It's disputed.

MR. READY:  And, Your Honor, it is not correct that he testified that he had never put Mr. Redmond on notice of the debt.  It was his testimony yesterday and before this Court last time that he told Mr. Redmond that numerous times before he was terminated.  The law does not require that he continue updating him.  It does not require that there be demands served upon him before bringing him in as a -- bringing in your claim in an involuntary bankruptcy.

Your Honor, yes, we've opened -- we've asked to open the judgment on Shalter.  I guess I'm less concerned about that today than to show the Court that when they're trying to move forward on bad faith, it is the putative debtor who has acted in bad faith by submitting documents that an expert, a nationally renowned expert, is about to tell the Court cannot be genuine based on the testimony that was given by one of his agents.

So, Your Honor, this isn't going to be a major issue.

17

I'm not really necessarily looking to relitigate all of the Ethan Shalter issues.  But I think this is -- definitely bears on the question of bad faith.

MR. CIARDI:  Your Honor, if they want to reopen who's a disputed creditor or not, we're cool with that because Mr. Jordan testified yesterday that he's aware of an indemnity agreement.  And he's aware that he's been sued in Court of Common Pleas of Philadelphia County.  And the claim against him there is for more than the debt here.  So I'll put Mr. Jordan up on the stand and I'll dispute his claim, and we will be back to there being just one creditor maybe in this case.

THE COURT:  I'm not going to --

MR. CIARDI:  and I'm okay with that.

THE COURT:  -- reopen the numerosity argument, but I do think that what Mr. Ready is indicating is that I think he believes it's relevant to whether or not clean hands exist on the other side.

MR. CIARDI:  Then --

THE COURT:  Am I characterizing that correctly?

MR. READY:  Correct, Your Honor.

MR. CIARDI:  Then all we're going to ask, Your Honor, is we're going to be able to have time to get our own expert to recall this expert, to cross-examine them after we have our expert, and figure it out from there, which we're going to need to do.  We only have had three days to go get an expert.

18

MR. READY:  No.  Your Honor, so they've had the same amount of time I had.  They brought in a document that we've never seen before and had testimony about it on, what was it,, Wednesday, two weeks ago.  We went out and immediately found an expert who reviewed these documents.

And I did it, Your Honor -- I'll represent to the Court, I did it as an officer of the court because I was accused by counsel of having participated in a perjury.  So I had an obligation, I felt, to go and review that.  I hired a consulting expert.  He gave me a very strong opinion that this was clearly -- these are clearly not all original signatures, which he'll discuss.  I sent that to them Wednesday of last week, in addition to filing with the Court, because I wanted to be right up front on what we had.  And I told them this because I wanted them to have the opportunity to do due diligence.  Now they've had nearly a week.

Your Honor, I don't object if they if they want to try to come get an expert to rebut this later.  And maybe -- again, maybe, Your Honor, this isn't even going to be necessary by the time we're all done today.  But this is why I brought this up on the teleconference with the Court and with counsel last week before I brought him in and had him travel in at our expense.  I wanted to make sure that we'd be able to present him here today because what he has to say I think is directly relevant to unclean hands to the question of whether there has

been forfeiture by wrongdoing and also to the degree that what they're claiming is that we somehow participated in somebody lying about what documents they had signed.  Then this is going to be directly relevant to rebut that.

So for all those reasons, we want to call him as a witness.

MR. CIARDI:  Your Honor, they can call him as a witness.  He has nothing to do with what is before the Court today.  And we'll just have to recall them or deal with it at some point in time in the future when we get our own.

THE COURT:  All right.  I'll allow it.  You can call your witness.

MR. READY:  Thank you, Your Honor.  We call Khody Detwiler to the stand and move to sequester all nonparty witnesses.

THE COURT:  Do we want to -- I don't know who else is in the gallery that perhaps needs to leave.  Yes.

Is that everyone?  You would know better than I would.

MR. READY:  Yes.  Yes.

THE COURT:  Okay.  All right.

THE CLERK:  Please remain standing and raise your right hand.

DEBTOR'S WITNESS, KHODY DETWILER, SWORN

THE CLERK:  State your name, and spell your whole

20

name for the record.

THE WITNESS: My name is Khody Detwiler. Khody is K-H-O-D-Y. Detwiler is D-E-T-W-I-L-E-R.

THE COURT: Okay. You can have a seat.

THE WITNESS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. READY:

Q   Good morning.

A   Good morning.

Q   Would you tell the Court where your residence is?

A   Yes. I reside in Blair County, Pennsylvania.

Q   And what is your title?

A   I'm a forensic document examiner.

Q   And what is a forensic document examiner?

A   So a forensic document examiner is a forensic scientist who is typically called upon when there's an issue as to the authenticity of a document or some part of a document such as signature, handwriting, or security features, things of that nature.

Q   I'm going to name some people for you real quick: Jason Jordan, Alan Redmond, Ethan Shalter. Do you know any of those individuals personally?

A   I do not.

Q   Have you ever met or spoken with any of those individuals?

A   I have not.

21

Q    I'll give you one more:  Cornerstone Law Firm.  Do you know who that entity is?

A    I know it is as to this case because, obviously, I've been working with you and your firm for the past week or so.

Q    And have you ever -- had you any prior relationship with Cornerstone Law Firm before this case?

A    I have not.

Q    How long have you been working in the field of forensic document examination?

A    Since 2008.

Q    How did you first become involved in the field of forensic document examination?

A    So I completed a semester-long internship sponsored through Penn State University that was required for fulfillment of my Bachelor's of Science degree in criminal justice.

Q    Do you have a degree?

A    I do.

Q    And what is it?

A    So it's a Bachelor of Science degree in criminal justice.

Q    Okay.  So you did complete that bachelor's degree?

A    I did.

Q    Okay.  Are there any colleges or universities that offer degrees in forensic document examination?  If so, which ones?

A    There are not.  So some forensic programs do offer certain coursework that involves forensic document examination as well

22

as other forensic disciplines, but there's no pure degree in forensic document examination.

MR. READY: Your Honor, I apologize. It is okay if I remain seated for this examination? Thank you.

THE COURT: Yes.

BY MR. READY:

Q    Are you familiar with the Scientific Working Group for Forensic Document Examination?

A    I am. So that organization goes by the acronym doc, SWGDOC, S-W-G-D-O-C.

Q    And what is this organization?

A    SWGDOC is an organization that receives federal funding. And they maintain and publish The standards in the field of forensic document examination. They're referred to as SWGs or SWG, which is standard working groups. And a lot of the other forensic disciplines have them as well, such as ballistics, toxicology, fingerprints, things of that nature.

Q    Does SWGDOC maintain standards regarding minimum training requirements to be a forensic document examiner?

A    They do, yes.

Q    And is this the same training standard that's acknowledged and employed the majority of state and federal law enforcement agencies for document examiners?

A    It is. It's essentially the gold standard for training of forensic document examiners, both in the government and the

23

private sector.

Q    And what is the training that's involved?

A    So the training is two years full time under the direct supervision of a principal trainer.  In my case, the principal trainer was an individual by the name of Gus Lesnevich, L-E-S-N-E-V-I-C-H.  Gus Lesnevich had roughly fifty-five years in the field.  He was Army CID where he learned the trade itself, then went to the Secret Service and then entered private practice.

Q    So in addition to that training, have you had any additional training specific to forensic document examination?

A    I have.  So I've done a variety of different trainings. For example, the Rochester Institute of Technology used to offer a print process identification course, a forty-hour course at the college.  I took that course.  There was a variety of other courses.  West Virginia University used to offer a course as well.  And then I also maintained my proficiency by attending professional conferences every year, going to various workshops that involve anything from handwriting comparisons to standard development to conducting specialized examinations.

Q    In your work in this field, have you ever worked traveled on international matters?

A    I have, yes.

Q    And could you tell us some different countries in which

24

you performed your work?

A    Sure.  I've been to South America, specifically in Ecuador.  I've worked in Mexico.  I've worked in Saudi Arabia, Bahrain as well as Hong Kong and various locations throughout Europe.

Q    Do you have any contracts to perform forensic document examination with any government agencies?

A    I do, yes.

Q    And how much time do you devote to that type of work?

A    So it's forty-plus hours a week.  It's full time.

Q    Are you a member of any professional associations or organizations?

A    I am, yes.

Q    And what sort of organizations are you a part of?

A    So I think it's easiest to kind of break them down in three sections.  So we have international, national, and then regional.

So from an international standpoint, I'm a member of the International Association for Identification, as well as the Canadian Society of Forensic Sciences and the Chartered Society of Forensic Scientists.  So the Canadian Society is based in Ottawa.  Chartered Society is based in the UK.

And then from a national standpoint, I'm a member of the American Society of Questioned Document Examiners, the American Academy of Forensic Sciences, specifically the questioned

25

document section.

And then from a regional standpoint, which is essentially umbrellaed under the American Academy, I'm a member of the Mid-Atlantic Association of Forensic Scientists, the Midwest Association of Forensic Scientists, and the Northeastern Association of Forensic Scientists.

Q    And can you state which government agencies that you work for --

A    Sure.

Q    -- have contracts with?

A    So I contract with the Pennsylvania Office of Attorney General.  And we've had that contract for well over a decade.  And I also contract with the United States Secret Service.

Q    You said we have had a contract for over a decade.  Can you say who we is?

A    Sure.  So whenever Mr. Lesnevich was still involved in the business, we were both contracted by the AG's Office.  Since he's retired, I'm the sole examiner for that contract.

Q    Are there particular criteria or examination procedures that are necessary to achieve a specific membership status within any of the organizations that you just named a moment ago?

A    There are.  For the majority of the organizations to enter into the questioned documents section, you have to verify your training.  The training standard.  The two-year training

26

standard is used as essentially the litmus test for that type of verification.  Then you also have to submit letters of reference from other examiners who are familiar with your work.

And one organization in particular, which is the American Society of Questioned Document Examiners, involves an entire testing process.  It's a series -- essentially, it's a four-prong series.  So the first step is verifying your credentials.

And then after you verify your credentials, you enter into a provisional testing stage which involves a series of written and practical examinations.

So once you pass the written test and you go into five practical examinations.  The practical examinations are designed to mimic casework.  So they involve signatures, handwriting, nondestructive examinations, for example ink separation, indentation analysis.  So you work five practical examinations.

After successful completion of those, then you go into an oral board phase.  The oral board phase is given before a panel of three of your peers at the American Society.  And essentially you have to defend three of the five practical examinations.

Q    Do you participate in any type of annual proficiency testing?

A    I do.

Q    And what sort of testing do you do?

27

A     So every year I go through -- it's called collaborative testing services.  So they offer proficiency tests which are also used by, for example, the Pennsylvania State Police as well as FBI, Secret Service.  All the different federal laboratories that have questioned document section use CTS.

And then in addition to that, I also took a proficiency test this past year for the Secret Service, which was actually part of the requirement to do their contract work.

Q     Has any of your work in the field of forensic document examination ever been published?

A     It has, yes.

Q     And what sort of work has been published for you?

A     So I was a contributing author to a textbook that was published a few years ago.  The textbook is called Forensic Document Examination in the 21st Century.  My specific contribution was chapter 14, which deals with the forensic examination of digitally captured signatures.

Q     Have you ever testified in a court of law as an expert in this field?

A     I have, yes.

Q     And can you tell some of the courts that you've testified?

A     So different state and federal courts throughout the U.S. I've also testified internationally in London High Court as well as Hong Kong High Court.

Q     How many times have you provided sworn testimony as an

28

expert in this field?

A    Including today, seventy-one.

Q    Have you ever been excluded from giving expert testimony as an expert in forensic document examination?

A    I have not, no.

Q    And do you have a curriculum vitae?

A    I do.

MR. READY:  Okay.  I'm going to show the Court.

(Pause)

THE COURT:  Do you need --

MR. CIARDI:  Your Honor, I just want to be clear that under the federal rules, the report doesn't go into evidence. Only the opinion goes into evidence.  So it won't be offered into evidence?

THE COURT:  No.  I presume you were just --

MR. READY:  I'm just showing his --

THE COURT:  -- showing it to him?

MR. READY:  I'm showing him his CV or his -- which is attached to that.  I can I can separate it out.  That's fine.

THE COURT:  Okay.  Is it on the list of exhibits?

MR. READY:  It is.  It's attached to his report.

THE COURT:  Okay.  Got it.

MR. CIARDI:  Judge, if it makes it easier, we're not going to question his qualifications.

MR. READY:  Okay.

29

MR. CIARDI: I can stipulate to it. I don't care.

THE COURT: Okay.

MR. READY: Fair enough. Well, at this time then, we're going to offer him as an expert in the field of forensic document examination.

THE COURT: No objection?

MR. CIARDI: No objection, Your Honor.

THE COURT: Okay. The witness is qualified.

BY MR. READY:

Q    All right. Mr. Detwiler, could you explain to the Court how a person can be identified through forensic handwriting examination or handwriting analysis?

A    Sure. So forensic handwriting analysis is based primarily upon two main principles. The first principle is that no individual will ever write exactly the same or more than one occasion. So we're not machines, so we write within what we call range of variation. So if you write your signature ten times on a sheet of paper, they're going to look consistent, but they're all going to be different.

The second principle is that no two individuals taken at random, will ever share that same exact set of handwriting habits and characteristics, meaning no two individuals will have the identical range of variation. Everybody writes within range of variation that is unique and specific to themselves and differ from another person.

30

So when you take these principles and you apply them to casework, what you're going to do is you're going to be provided with a series of either known signatures, known handwritings, whatever the case may be, and you're going to start going through those handwritings to establish that range of variation and how far somebody deviates from execution to execution.

So essentially, as an examiner, we're creating an inventory of all the different variations, different letter forms, heights, relationships, baseline alignment, all these things to establish the normal natural characteristics of a given writer.

And then when we do -- once we have the range of variation established for the known writer, we then do the same thing with the questioned material.  So if you have more than one questioned signature, you're going to intercompare and establish what variations are there.  And you're also looking at this stage to determine whether or not you're dealing with one writer or multiple writers so that, again, then you can separate your groups out.

So once you've established range of variation for the questioned, range of variation for the known, then you do a cross-comparison.  So you're looking for either agreement or differences.  If you have differences, then you have to consider are they significant.  So what does that mean?  So

31

significant differences would be any differences that fall outside the range of variation that cannot be reasonably explained.

So what I mean by reasonably explained, if you have somebody who signs a will on their deathbed, obviously their handwriting habits and characteristics are going to be different because it's a deathbed signature versus something that was done, you know, twenty years prior. So again, you have to consider all the limiting factors that you have to determine whether or not something is significant or if it's just a difference that can be attributed to some factor.

So once you actually do the comparison, you determine the significance of any similarities or differences, and you draw your opinion based upon the evidence you have. So if you have no limitations, you have complete agreement, you can render a definitive ID. If you have, again, on the opposite side, no limitations, significant differences, opposite muscular movements, things of that nature, you can render an elimination.

And then we also -- we render our opinions on a nine point scale which account for limitations, quality and quantity of the evidence. So you have identification, highly probable, probable indications, no conclusion, and then the same four on the elimination side of the scale.

Q    Can you give us a definition for the term questioned

32

document?

A    I can.  So a questioned document is any document that would be submitted to a laboratory like my own and which there's question either as to the document as a whole, so for instance a passport, somebody says we don't think this is an authentic passport, or some part of the document.  So it could be signature, handwriting.  Whatever it is, if there's a question as to the authenticity of that document or some part of the document, it's coined a questioned document.

Q    Okay.  I'm going to show you a document, it's part of our same exhibits, that's been previously admitted in this Court.

(Pause)

THE CLERK:  Can we go off the record, Judge?

THE COURT:  Sure.  There it is.  It came up.  It came up.

THE CLERK:  I stayed on the record.

THE COURT:  That's fine.  That's fine.  It came up.

MR. READY:  Okay.

THE COURT:  I think we're good.

MR. READY:  All right.  Okay.  So --

THE COURT:  You can see it, correct?

THE WITNESS:  I can.

THE COURT:  Okay.

BY MR. READY:

Q    Mr. Detwiler, were these documents -- I'm going to show

33

you three documents. I'll scroll through them slowly here. Were these documents submitted to you as documents bearing questioned handwriting entries in this matter?

A Yes, they were.

Q Okay. Did you examine these three questioned documents?

A I did.

Q Did you tell us what the definition of the term known document is?

A Sure. So a known document, unlike a questioned document, would be any comparison document submitted for the purpose of an examination in which there is no contention as to the authenticity. So again, in a passport situation, it would be a known passport. For writing or signatures, it would be known writings or signatures of that individual.

Q And I'm going to now show you additional documents. Do you recognize these documents?

A I do, yes.

Q Okay. And were these documents given to you as part of your investigation?

A They were. I referred to those as K1 in my report, which just simply means known 1.

Q Okay. And what was the purpose of having these documents in your possession?

A So the purpose of this was to look at the -- or establish a range of variation for the known writer 1 to determine

34

whether or not the questioned signatures fell within the range of variation or fell outside the range of variation.

Q    From your examinations and comparisons of the evidence in the matter, have you formed any opinion as to whether the three questioned documents collectively contained three independently executed genuine signatures of Ethan Shalter?

A    I have, yes.

Q    And what is your opinion?

A    The three submitted question documents identified as Q1, Q2, and Q3 in my report do not collectively contain three independently executed genuine signatures of Ethan Shalter.

Q    And can you explain to the Court how you came to that conclusion?

A    Certainly.  So when I examined the three question signatures, the one thing that became pretty clear -- pretty clear pretty quickly, excuse me, was that the signatures themselves, you could actually superimpose each of those signatures one on top of the other.  There was a lack of variation.  So when you -- and kind of going back to my initial testimony, when you go through known signatures and established range of variation, how far somebody differs from execution to execution, that's what you would normally expect to find in signatures written by a common writer.  But in this instance, when you overlay those signatures and they're identical, that's not humanly possible.

35

Q    Now I can show you on the screen, but you've prepared some enlarged copies of these exhibits; is that correct?

A    I have, yes.

Q    Okay.

A    Thank you.

Q    So first, just for the record, is this a true and accurate enlarged reproduction of what's attached to your expert report?

A    Yes.  And specifically the Exhibit 4 attached to my report.

Q    Okay.  And could you explain to the Court let's go to the first page what we are looking at on this report?

A    Sure.  So on the first page, which is actually page 2 at the bottom right-hand corner, this is just for identification purposes, this is a reproduction of what I identify as Q1, your questioned document number 1.  You see the first two pages on the left hand side and then an enlarged reproduction of the signature on the right.

Q    And at the risk of asking a stupid question, what's the purpose of enlarging these signatures on these documents?

A    So again, this is just to get a clearer view of the signature itself and also isolating them out of the document focuses specifically on the signature.

Q    Okay.  I'm going to go to the next page.  And can you tell the Court what this is, page 3?

A    So page 3, this is actually a reproduction of the Exhibit

36

Q2 or the second questioned document.  So you have the pages 1 and 2 on the left and then, again, an enlarged reproduction of the Ethan Shalter's signature that's been placed to the right.

Q    And same question about page 4.

A    Page 4 is same as pages 2 and 3, only at this page we have the Q3 document and the document on the left, enlarged signature brought out on the right.

Q    And I'm going to now turn you to page 5.  What is this page meant to demonstrate?

A    So page 5, again, this is more just for illustration purposes so that you can see the signatures in an isolated view with no markings.  And again, one of the things that becomes pretty clear pretty quickly is that these signatures are pictorially similar when compared against one another so much so that they are identical.

Q    When you say identical, how can you be sure that these are identical signatures?

A    Because you can superimpose the signatures one over top of the other.

Q    And did you superimpose them to see that?

A    I did, yes.

Q    And what sort of programing or software do you use to do that?

A    So there were three different ways this was done.  So I used Photoshop.  So in Photoshop, you can put the signature on

37

a different level, delete the background, and basically overlay one over top of the other.  Then we also have a specialized piece of equipment.  It's called a video spectral comparator. The acronym is just VSC.  The VSC allows for false color overlays.  So you put the document -- or copy of the document into the VSC.  It changes it to green, Like, a light green color.  Pull the document out.  Then you can slide other documents in, adjust the size and the angle to see whether or not they overlay.  So it's -- and it'll turn that color pink. So in the overlay, it's going to turn black.

And then the third process was, again, producing these on transparency film and physically just doing overlays to make sure that they were in fact the same signatures.

Q    In looking at these signatures, what are the things that help you to identify them, even without overlaying them, that they're the same signature?

A    Well, I think a lot of this is just based upon my knowledge, experience, expertise of looking at signatures on a daily basis.  To me, this was pretty, pretty clear when I first saw the documents that these were the same exact signatures being reproduced.  Some of the things that more from a layman's perspective these are what I would consider to be complex signatures.  Complexity is usually measured in changes of direction.  And as you can see, as you go through the actual formation or the line construction of the signature, you have

38

at least eight changes of direction in the signature itself. So again, complex. It's not like we're dealing with a check mark where you could have a chance to match.

And then again, once you look at proportions, so you have the upper loop to the top left, again, with the pointed movement to the extreme right. And again, you compare that at the two examples below. Again, you can see that they're, again, exactly the same. And you can do that with each of the different portions of the signature itself to show that they're the same signature.

Q    Now I see -- let me turn to the next page, page 6. What is this chart meant to demonstrate?

A    So page 6, this essentially helps break it down a little bit further to -- to really kind of demonstrate that these signatures are identical. So this is a process that's referred to as grid mapping. It's used in a lot of different fields. But in particular with our field when you're dealing with identical signatures, it's a very effective way to essentially break the signatures down by portion so that you can look at each isolated portion by essentially block. What I mean by that is, for each of the images, I place a series of half-inch markings that form a grid.

So in the column side we have 1 through 5. And then on the row side, we have A through L. And again if you go, for example Q1 of the signature at the top and you look at cell 2B

39

and then you compare that against Q2 and Q3, you can see that the cell is populated with the same exact formation and all three of those areas.  So again, this confirms that you're dealing with an identical signature.  This is just an illustration to help break it down a little bit further to really isolate your -- your focus on specific pieces and not the whole signature.

Q    I want to draw your attention to what's listed there for Q2 and I guess roughly block H2.  There's a little spot where there's maybe just a little bit -- looks like it's almost a little bit darker than an H2 in the other two.  Can you explain whether that's inconsistent with your finding that these are three identical signatures?

A    So it's not.  So whenever you're dealing with especially photocopied evidence, the rate of reproduction, the type of machine that the document is reproduced on, whether or not the intensity was, you know, scaled up on a certain machine versus another can cause differences.  And again, the coloring or the -- the darkness of a particular point in -- in a signature -- so again, you brought up H2.  Again, when you look at Q2, it looks like it's a little bit of a darker area compared to the other two.  But again, it's the exact same movement.

And another area that I would point your attention to is if you look at I4 and Q3, which is basically looking at the

40

ending stroke, so the ending stroke itself would have a taper. But when you look at I4 and Q2, and Q1, you can see that it looks like it's slightly longer.  And again, this is an issue of the copy process.

The bottom line is when you take the signature collectively, you can overlay it or superimpose it on top of one another with precision.

Q    You have a note here at the bottom that says these images are adjusted to compensate for asymmetry in size and angle variations.  Can you explain what you mean by that?

A    Sure.  So again, this goes right back to the copy issue. So every time you make a photocopy of a document, it's going to reduce the size if you just make a normal copy, right?  If you enlarge it, it's obviously going to enlarge.  If you're making a reproduction, it's going to reduce it by a certain percentage.  And depending upon the make, model of the machine, this could be horizontal or vertical, or it could be consistent both horizontal and vertical.

So again, by putting this on here, when you go into Photoshop and you overlay the signature, sometimes you might have to tilt a signature, adjust the angle so that they superimpose perfectly.  But again, it's one of those things. You're basically adjusting orientation, not physical movement.

Q    You discussed earlier that there's a range of variation for signatures.  Would the fact that maybe one of the

41

signatures on one of these questioned documents was larger than the others count as part of the range of variation, or would that not be enough to distinguish it?

A   It would not in this case.  I mean, obviously size can be part of range variation.  In this particular instance, the fact that you can still superimpose the signatures is the real issue.  If it was a sizing issue and the signature differed in proportions, you know, the -- the actual movements themselves were slightly different than the other two, then I would say it was an independent signature, not a collective signature that's identical.  But again, in this case, the sizing really comes down to copy process, because, again, once you actually overlay the signatures, you can make them superimpose.

Q   I'm going to turn your attention now to page 7.  Can you explain to the Court what this image is meant to demonstrate?

A   Certainly.  So on page 7, what we have on the left hand side are the three questioned signatures that we've been looking at on the previous pages.  Again, we still have the half-inch overlaid dotted lines.  And then on the right hand side, I've placed reproductions of three of the known signatures that were submitted.  So this is K1-3, K1-4, and K1-5.

One thing that you'll notice is when you look at the known signatures on the right-hand side, none of those are identical, but they are consistent, right?  So this is what we would

42

expect to see in signatures written by a common writer.  You have that normal natural variation showing up in the known signatures.  But then when you compare it against the signatures to the left, the questioned signatures, again, they are all identical.  There's no variation at all.

Q    Could you just briefly point out a couple of examples of the known signatures that are variations that you would expect to find?

A    Certainly.  So if you look at the extreme top left-hand side, the top loop if you will, which is actually the beginning part of the signature, if you look at K1-3, you can see it's more of a narrow oblong formation.  And the writer actually starts inside the loop and then goes up to the left and then comes back down counterclockwise to form the top.  In K1-4, the writer actually starts to the extreme left, goes in an upward fashion counterclockwise loop, and then continues into the body.  And in K3, you have more of a pointed movement when the writer changes that first change of direction.  So again, you have differences between the three.  But again, there's differences of what we would call normal natural variation.

Q    The known documents that you reviewed as part of this case, were they documents that were produced for this litigation, or were they things that you understood to be from prior incidents?

A    So these were things that appeared on documents that would

43

have been produced as normal course of business.  They weren't request writings or request standards.

Q    I'm going to turn your attention to page 8.  And can you explain to the Court what we're looking at here?

A    So on page 8, this is just a reproduction of the five known signatures that were submitted.  And again, to -- to kind of hit on your previous question, we have a social security card, driver's license, vehicle registration card, an affidavit, and then also a rental agreement.  So we have a variety of different types of documents, different dates and again, show that normal natural variation.

Q    You have in the top right under K1-004 in bold letters original.  What's the significance of that notation?

A    So the significance is just denoting that the document that I received was an original ink signature.  It wasn't a copy or a reproduction of any kind.

Q    I will turn your attention to page 9.  Can you tell the Court what the significance of this page is?

A    So on page 9, these are actually the initials that appeared throughout the seven-page rental agreement, which was identified as K15 in my report.  The one thing that's pretty clear once you actually see these particular initials is that Mr. Shalter actually signs his initials very much the same way he would sign his signature.  So if you flip back to the previous page 8, you can see that their formations are

44

essentially the same.

And again, one of the -- one of the main observations with regard to the initials just to verify that, again, writing is variation, is these seven sets of initials shown on page 8 -- or page 9 rather demonstrate that normal natural variation. Even though they were all reportedly dated the same date, they again are not identical.

Q    I'm going to turn your attention to page 10. Can you tell the Court what we are seeing here on page 10?

A    Sure. So on page 10, the three questioned documents that were submitted for examination also contained a countersigned signature. That signature was Tonya Hatmaker (ph.). So the top three samples, Q1, Q2, and, Q3, are from the three questioned documents that we have. Instead of looking at Ethan Shalter's signature, we're looking at Tonya Hatmaker's signature now.

And then X1 was an affidavit that was also submitted that contained another signature for Tonya Hatmaker. This affidavit was dated September 13th, so a little over a month after the date of the questioned documents.

Q    So in pointing out -- you've got a thing here saying same day and a different one saying about a month gap. What's the significance of comparing it in that way?

A    So again, the significance is just to demonstrate that even on the same day, signatures are not identical. Even when

45

you look at her signatures on these documents, they show normal natural variations.  They're not identical like we have for Ethan's signatures on the same documents.

Q    Do you have an opinion about whether Tonya Hatmaker's signatures on these documents were authentic?

A    I do not, no.  Again, I have no known signatures.  There's no way I could do a comparison until I would have that evidence.  These are just signatures in that name.  So again, I'm not saying they're questioned.  I'm not saying they're known.  I'm just comparing them side-by-side.

Q    And I'm going to turn your attention now to page 11.  And what does this demonstrate?

A    So on page 11, this is actually an enlarged reproduction of the signature block from the Q2 document.  The one thing that is pretty obvious when you look at this is the signature for Ethan Shalter and the accompanying signature line are very faint whenever you look at the document where all the other printed texts, including the signature for Tonya, the handwritten dates, the signature lines, and also the printed text, thank you, and the names is very bold.

So again, whenever you see something like this in the case, especially when you're dealing with identical signatures being reproduced on documents, this is very characteristic of a transposition fabrication.  It's, again, the technical term, but it's commonly referred to as a cut-and-paste, where, again,

46

the sample was taken from some other source, which was probably reproduced more times than the document being created, which gives you the difference faint versus dark.  So again, when you incorporate something into it and then print it, it's going to have a different resolution.  And that's what you're seeing here.

Q    Can you speak to what degree of confidence you offer these opinions today?

A    So it's the highest degree of confidence.  Again, when you have identical signatures in our field, that is not physically possible to naturally execute signatures that are identical.

Q    I may have covered this.  Did you speak to Ethan Shalter about these signatures at any time?

A    I have not, no.

Q    And when you were retained for this, what was the call, the question given to you to review?

A    I was, again, to look at the signatures to determine if they were naturally written, genuine signatures in the name of Ethan Shalter.

Q    Have you reviewed any of the documents filed in this case or the contentions of the parties?

A    Just what was attached to my report.

Q    Okay.  And has everything you've offered today in terms of your opinions been offered within a reasonable degree of scientific certainty within the standards in your field and

47

profession?

A    So we use the term professional certainty.  Again, I think it's, from my standpoint, the same thing.  But yes, it is.

MR. READY:  Okay.  Your Honor.  That's all I have for direct.

THE COURT:  Mr. Ciardi?

MR. CIARDI:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. CIARDI:

Q    Mr. Detwiler, I think you testified that you put these signatures in Photoshop?

A    That's correct.  That was one of the three processes, yes.

Q    Okay.  And when you put them in Photoshop, do you take a picture of them?  Do you scan them in?  What do you do?

A    So in this case, I would have used the digital evidence that was submitted to me in the PDF files.

Q    So you received a PDF from somebody, and you then scanned that in and then used Photoshop to do what?

A    So I didn't scan it in.  I would have just used the PDF and opened the PDF with Photoshop.

Q    Okay.  So you open the PDF with Photoshop then what do you do?

A    So in Photoshop, the first thing you're going to do is make a working copy of the PDF file.  So once you actually open it in Photoshop, you would crop the signatures out and then you

48

would delete the background.  So again, it's as simple as selecting the background color, which is in this case white, you delete it to make it transparent, save it as a PNG file which maintains that transparency, and then you open up all three images in separate layers.  And you can select the layer. You can, you know, transform the image.  You can tilt the image to see whether or not they actually line up.

Q    Do you do anything to enhance the image?

A    I do not, no.

Q    Okay.  So you do not touch the image at all when you transpose it onto the white paper?  It's not bolded.  It's not faded.  It's not enhanced.  You don't fill in any gaps, nothing?

A    No.  The only thing that I do, whenever you're using the levels, I use a -- it's a tool.  It's called the darken tool. So basically, whenever things overlay perfectly, that transparency is going to turn completely black.

Q    And do you darken it all the signature?

A    I don't, no.

MR. CIARDI:  Okay.  Could I present an exhibit?

Q    Sir, do you see up on the screen a piece of your expert report?

A    I do, yes.

Q    Okay.  And just looking at -- these are the three signatures that you say are identical, right?

49

A    Correct.

Q    And if there were differences -- or let's say if they weren't identical, then your opinion would not be what you provided to the Court today, correct?

A    Correct.

Q    Now, if you could take a look at -- let's go to Q2.  Do you see that?

A    Yes, I do.

Q    Do you see that in the top right corner, the signature goes all the way into what is K4?

A    You mean K1?

Q    I'm sorry.  K1, yes.  You see that?

A    I see the ending, yes.

Q    Okay.  And if we go to number 1, Q1, do you see that the top right corner doesn't get to the edge of J1?

A    In the image, yes.

Q    Okay.  And if we go to the bottom, do you see that it barely gets into J1?  Do you see that?

A    I do, yes.

Q    Okay.  And sticking with that one, you noticed that in between what would be C2 and D2, that loop is almost blank.  Do you see that?

A    That's correct, yes.

Q    Okay.  But if we go to Q2, the top loop continues through C2 and D2.  Do you see that?

50

A     Yes, I do.

Q     Okay.  And when we go up to Q1, the top loop has a little tail that comes down from C1 into C2.  Do you see that?

A     I do, yes.  There's a -- a faint line.

Q     And that tail does not exist on either Q2 or Q3, correct?

A     In C2 and D2?

Q     Yes.  The tail in Q1 at the top -- that's in C1 and C2 does not exist in Q2 and Q3, correct?

A     It definitely exists in Q2.  Q3, again, this goes right back to reproduction quality, which is what I explained in my direct testimony, is sometimes you have different copy processes that produce copies that might be a little bit fainter, a little bit darker.  And again, these were all submitted as non-original documents, which would certainly account for what you're seeing here.

Q     Okay.  So that impacts your ability to make an accurate determination because of the quality of the signatures?

A     It does not because proportionally, when you look at the entire signature collectively, they -- you can superimpose all the different movements, the proportions of the movements, the loops of the movements.  Again, these are the exact same signature.  What you're pointing out are just differences in reproduction quality.

Q     Okay.  And if I look again at Q2 now at where it's -- I believe it would be J4, do you see that bottom loop goes all

51

the way into that box and there's actually a gap there?  Do you see that?

A    Do you mean a gap between --

Q    The line of the grid that you created --

A    Okay.

Q    -- and the end of the signature.  There's a little gap.

A    Okay.

Q    Do you see that?

A    I believe I see what you're referring to.  Yes.

Q    Okay.  But if we go up to Q1, there is no such gap there.

A    And again, this is certainly explained through reproduction quality because, again, you have the gap in Q3.

Q    Sir, you're the one who put these on the grid, correct?

A    That is correct, yes.

Q    Okay.  And the fact that there is a -- and you said they lined up perfectly, correct?

A    You can superimpose the three signatures, one on top of the other.

Q    But one, if they are perfect, sticks out more into J4 than the other two and leaves a gap between that line, correct?

A    Again, it's reproduction quality.  It's not an issue of the size of the signature itself.

Q    Would you agree with, sir, that not being able to look at the original does impact your analysis?

A    In a situation like this it doesn't, because when you have

52

a cut and paste, you don't have an original document.

MR. CIARDI: I  have no further questions, Your Honor.

THE COURT:  Any redirect, Mr. Ready?

MR. READY:  Very briefly.

REDIRECT EXAMINATION

BY MR. READY:

Q    Is there any question in your mind about any of the opinions that you've rendered here today?

A    Absolutely not.

Q    And is this a difficult case of analysis for you?

MR. CIARDI:  Objection, Your Honor.  He gave an opinion.  Difficult case, not difficult case, it's argument.

MR. READY:  Your Honor, I can ask him how it compares to other cases if that would be better, but I'm asking him whether he thinks --

THE COURT:  I think he's already given his opinion. So I think we're -- we don't need to put any gloss on that.

MR. READY:  Okay.  Thank you, Your Honor.  Nothing further.

THE COURT:  Okay.  You can step down.  Thank you.

THE WITNESS:  Thank you, Your Honor.  Would you like me to leave this here?

THE COURT:  No.  You can give it back to your counsel.  That's fine.

THE WITNESS:  Thank you.

53

THE COURT:  I don't think anybody else is using it.

THE CLERK:  Keith is going to need it eventually.

MR. READY:  Your Honor --

THE COURT:  I'm sorry?

MR. READY:  Oh.

THE CLERK:  Keith is going to need it eventually.

THE COURT:  Yeah.  He can have mine.

MR. READY:  And can this witness be excused?

THE COURT:  Yes.  You don't have any --

MR. CIARDI:  Excused, but we will recall the witness at some point in time --

THE COURT:  Right.

MR. CIARDI:  -- in the future, Your Honor.

THE COURT:  Right.  Understood.

MR. CIARDI:  Yes.

MR. READY:  So, Your Honor, I'm going to offer -- I'd like to ask the Court to take judicial notice of several of our exhibits.  And that will help us to determine which witness we need to call next, if there's going to be any opposition, or I'll seek a stipulation.  That would be PC-51 to begin with, the Berks County Tax Claim Bureau with the records custodian affidavit.  PC-52, certified copy of the lien from the Pennsylvania Department of Revenue filed in the Berks County Court of Common Pleas.  And PC-53, notice of the federal tax lien filed in the Berks County Court of Common Pleas.  I will

54

note we did file RFAs on each of these, which were denied.  So I'm just asking either for a stipulation or for judicial notice as that will speed things along.

THE COURT:  Is there an objection to the authenticity of any of those three documents, Mr. Ciardi?  It's under page 8.

MR. CIARDI:  No.  I'm just looking at them just to confirm that they are actually certified.

Your Honor, the 52 and 53 I have are the exact same document.  And they are the estate tax lien.  I do not have a 53 as a federal tax lien nor a copy that's certified.

MR. READY:  One moment, Your Honor.

Your Honor, I'm sorry.  53 is the Pennsylvania Department of -- I misspoke -- the Pennsylvania Department of Revenue tax lien, but it is certified.  It's a certified copy of lien there.

MR. CIARDI:  Your Honor, 52 and 53 are the exact same piece of paper, at least on the exhibits that I was given last night.

MR. READY:  Ah, they are indeed.

THE COURT:  I have the same.

MR. READY:  Your Honor -- I see.  53, if you scroll to the end, has the notice of federal tax lien.  That's fine. 52 is just the state tax lien.  For some reason, it was also included on 53.  It's the last page of 53.

55

THE COURT: Ah, I see it.

MR. CIARDI: Your Honor, I'm not going to stipulate to 53 because 53 -- the name of the taxpayer is Bennie Marcus, LLC, which is not the debtor, so it's irrelevant.

MR. READY: Well, Your Honor, they've testified though already in a prior hearing -- I mean, if I need to call Mr. Redman to establish this again, I can. But he testified that this was the subject -- that this lien is why he was personally liable on this debt. So, I mean, I can call him to reestablish that if I need to, Your Honor.

THE COURT: No, that's not necessary. I'll accept it.

MR. READY: And, Your Honor, I would also suggest seek a stipulation that they have not made any payments toward the debts of Cornerstone Law Firm or Jason Jordan in this matter. And again, if not, I can call the debtor to establish that.

THE COURT: Is there an objection?

MR. CIARDI: Well, Your Honor, the position with regard to Mr. Jordan is you're going to hear when he takes the stand is that we don't owe him any money. But I would stipulate that we haven't paid cornerstone law Firm. I will not stipulate to with regard to Mr. Jordan.

THE COURT: Okay. All right. So --

MR. READY: Well --

56

THE COURT:  You're halfway there.

MR. READY:  Just to be clear though, so they would stipulate though that they have not paid anything to Jason Jordan, correct?  I mean, I just want to be clear.  If I -- again, if I need to call -- I understand they're going to try to contest the debt somehow later, which I don't know that they can do as a matter of law.  But they are admitting then that they haven't paid him anything.  This goes to the question of whether he's regularly paying his debts.

MR. CIARDI:  Your Honor, we're only supposed to be regularly paying debts that are undisputed.  He's a disputed creditor.

MR. READY:  Well, that's news, Your Honor.

THE COURT:  I think that was --

MR. CIARDI:  No, it's not.

THE COURT:  Okay.  Well, in terms of the numerosity argument, it was accepted as an undisputed --

MR. CIARDI:  Your Honor, the deposition we took of Mr. Jordan yesterday where he admitted that he signed an indemnification agreement and is aware of the claim of CBSG for which he would be half responsible for more than outweighs his claim.  So his claim is -- frankly, as far as we're concerned, he owes us money.

MR. READY:  Okay.  Well, Your Honor, they already stipulated at the last hearing that he was an undisputed

57

creditor.  So they appear to be taking that back.  Your Honor ruled on that basis.  They cannot collaterally attack the judgment in this Court.  That's not what we're here for.

MR. CIARDI:  We're not collaterally attacking it, Judge.  We had a claim against him that exceeds the amount of his claim.  Different issue.

THE COURT:  To the extent though that I've already ruled that he is owed a debt and that it is an undisputed debt, whether or not there's an offset is a different matter.  But to the extent that it -- he is a petitioning creditor and he's a qualified petitioning creditor, for that reason, I'm going to allow -- the stipulation or the lack thereof, I'm going to allow the entry of Mr. Jordan's debt as essentially a qualified creditor and that no payments have been made.  You can make that argument when he's on the stand in terms of the offset, but I don't feel the need to put him on the stand now to establish the debt.

MR. READY:  And to say that he hasn't been paid.

THE COURT:  Correct.

MR. READY:  Right.  Okay.  Thank you, Your Honor.  And I would ask also for stipulations as to Bill Rush, that his debt has not been paid.  That was testified to by Mr. Redmond last time, again could recall to have the same testimony, but it's in the transcript.  Okay.

THE COURT:  Okay.  Mr. Ciardi?

58

MR. CIARDI: We're not stipulating to that, Your Honor. It's not that he's not paid it. It's that it's not paid when due. And if he wants to establish that Mr. Rush has a problem with that, he needs to call Mr. Rush and say that Mr. Rush has a problem with that. So that's not -- that stipulation doesn't get him where he needs to go here.

MR. READY: Well, no, Your Honor.

MR. CIARDI: So we're not stipulating. Let's be clear.

MR. READY: So --

THE COURT: Okay.

MR. READY: Again, I'll call whatever witnesses I need to, but just to conserve the Court's time and conserve everybody's time, Mr. Redmond testified last time, and I'm paraphrasing it slightly, but Bill Rush is a real nice guy, I've been working to pay that down, he's been giving me time. But, Your Honor, case law is clear that that still doesn't mean he's paying the debt on time. That was established that he was not -- he's not paying it on time. He may be a real nice guy, but unless they have a novation in place, that means that that debt is not being paid on time.

MR. CIARDI: On time is a relationship between the debtor and the creditor. And if the debtor and the creditor are happy with the relationship, it being paid as and when due, due being set by the creditor. So that's completely incorrect

59

statement of the law.

THE COURT:  Mr. Ready?

MR. READY:  Your Honor, if we need to --

THE COURT:  I think you probably need to call him.

MR. READY:  Okay.  Very good.  And finally, same as to Bochetto & Lentz, same based on the testimony last time.  I take it, they will stipulate that their debt will not -- is not being paid on time.

MR. CIARDI:  Your Honor --

THE COURT:  I'm going to guess no.

MR. CIARDI:  -- to make it clear, we're not stipulating to anything.

THE COURT:  Understood.

MR. CIARDI:  We have a real serious issue with all of their evidence.

THE COURT:  Okay.

MR. READY:  Okay.  Your Honor, I'll call Alan Redmond to the stand.

THE COURT:  Okay.

THE CLERK:  Please remain standing and raise your right hand.

PETITIONING CREDITORS'S WITNESS, ALAN CHRISTOPHER REDMOND, SWORN

THE CLERK:  State your name and spell your full name for the record.

60

THE WITNESS: Alan Christopher Redmond. It's A-L-A-N R-E-D-M-O-N-D.

DIRECT EXAMINATION

BY MR. READY:

Q    Good morning, Mr. Redmond.

A    Good morning.

Q    You don't currently have any contract with Mr. Rush or his law firm that allows you to have a payment plan for your debt; is that correct?

A    Myself and Bill discussed this over the phone and in person in regards to his debts. And hopefully once this is over, we will start resuming the payments.

Q    Okay. So let me ask my question again. You don't have any written contract with Mr. Rush or his law firm that allows you to have a payment plan on his debt; is that correct?

A    I'm -- I'm not sure, Joel. I don't know if there's a -- if there's an agreement or something signed.

Q    Okay.

A    Maybe ask him that.

Q    Okay. So you don't know whether you have signed a contract with him regarding a payment plan?

A    We've had a relationship for approximately ten years, so I don't recall. But again, you can ask him that. I'm sure he'll know.

Q    Okay. Same question regarding Bochetto & Lentz. Do you

**eScribers, LLC**

61

have any written contract with them allowing you to make payments on your debt over time?

A    I've talked to the principals, I believe it's George Bochetto, David Heim and George Bochetto and Mr. Lentz.

MR. CIARDI:  Your Honor, I just want to be clear. We're not breaching any privilege.  We're only talking about payments here.

THE COURT:  We are.

MR. READY:  Yeah.

MR. CIARDI:  And so his comments about his discussions with his lawyer are only --

THE COURT:  Only regarding --

MR. READY:  I'm only --

MR. CIARDI:   -- on that issue.

MR. READY:  I'm only --

THE COURT:  Correct?

MR. READY:  Correct.  I'm only --

THE COURT:  Okay.

MR. READY:  -- asking to the -- about payment of debt.  Yes, Your Honor.

THE WITNESS:  Can you repeat the question, please?

BY MR. READY:

Q    Sure, sure.  And I want to be 100 percent clear.  I'm only asking you about discussions you've had with them on a business nature.

62

A     Sure.  I understand, yeah.

Q     So do you have any signed contract with Bochetto & Lentz that allows you to have a payment plan on your debt to them?

A     I do not.

Q     Okay.  And the debt that you owe to them, when did this -- when did this debt arise that you have to Bochetto & Lentz?

A     I retained Bochetto & Lentz and David for the funding case, Attorney Ready.  So I would say approximately two years ago.  So that's when I started to use Bochetto & Lentz.

Q     Okay.  And when did that -- when did your first bills come due in that case?

A     I would imagine within the first month or so.

Q     Okay.  The debt that you owe today precedes the last sixty or ninety days, correct?

A     Yes, it does.  Yeah.  Correct.

Q     I'm going to show you a document.  It's marked PC-77.  Do you recognize this document?

A     Yes.  It has my signature.

Q     And I'm going to scroll back to the top.

A     Um-hum.

Q     It says response of putative debtor Alan Christopher Redmond to petitioning creditor Jason Scott Jordan's first set of interrogatories.  Do you remember working on this document with your counsel?

A     I really don't.  There's been so many documents the last

63

number of months from your -- your law firm.  It's been hard to keep track of to be honest, sir.

Q    Okay.  But you do acknowledge that this is your signature verifying that these answers are yours, correct?

A    Yes, sir.

Q    Okay.  So it's from September 27th.  So was there a point at which you were asked questions about documents you might have or debts that were information in your possession?

A    I really don't recall the documents, Joel, but I can I can certainly look at it.

Q    Okay.  So I'm going to take you to number 1 up here.  For each debt identified in ECF number 48, I will represent to you that's a schedule that you and your counsel filed with the Court.  Describe in detail the date when such debt became due. Did you have any part in answering this objection, putative debtor objects that this request is outside the scope of this matter?

A    Could you -- could you clarify your question again? There's a lot of words there, buddy.

Q    Sure.  Were you involved in objecting to this interrogatory, number 1?

A    Can I see the title of the interrogatory?

Q    Sure.

A    You're going a little bit quick, Joel.

Q    I'll go back to the top.

64

A    My apologies.  Okay.  Could I see the date, please, just so I can --

Q    Sorry.

A    Can I see the date?

Q    Can you see the what?

A    Date.

Q    The date?  Sure.  It's 9/27 --

A    Okay.

Q    -- of this year.

A    Okay.

Q    I'll scroll down.  You see that?

A    Yep, um-hum.

Q    And I'll scroll back to the question I asked you about now.

A    Um-hum.

Q    See if that refreshes your recollection.  It's interrogatory number 1.  For each debt identified in ECF number 48 -- and I'll, again, represent to you that schedules that you filed with your counsel.

A    Sure.

Q    Can you tell me this objection, did you craft this objection or did your counsel?

A    I worked on this with my counsel.  And they would advise me this question.  And I would have answered as honestly as possible.

65

Q    Okay.  I'm going to show you a second document here, which is PC-78.  So I'll start at the top for you, and I'll move slow, okay?  Responsive putative debtor to petitioning creditor Jason Scott Jordan's first set of requests for production of documents.

A    Sure.

Q    Do you recognize this document?

A    Yes.  It looks -- it looks familiar.

Q    Okay.  I'm going to scroll you all the way to the bottom. I'm going to show you a signature page.

A    Um-hum.

Q    I just want to make sure we're all on the same page here.

A    Sure.

Q    Is that your signature?

A    It is.

Q    And I'm looking at number 1, requests for production of document, all documents evidencing payments, including the person who is in the -- is the -- sorry.  Number 16.  I have the wrong number here.  All right.  I'm sorry.  We're looking at number 16.

A    Okay.

Q    It says for each and every creditor you mark as undisputed on ECF number 48 -- and again, I'll represent to you that's the document showing your list of creditors.  All documents evidencing each and every payment to such creditor over the

66

past two years, and the source of such payment, whether it was you, Shannon Kroemmelbein, or another person who paid the same. Do you remember answering this question with your counsel?

A    Yes.  I remember working on this document with my counsel.

Q    Your answer was putative debtor has no responsive documents?

A    Um-hum.

Q    You have no documents showing each and every payment that you made to any of your undisputed creditors in the last two years; is that correct?

A    Well, I think the problem was that we had, Joel, is -- excuse me, Attorney Ready, we received this, I think, the day before your -- your interrogatories the day before you actually requested them.  So I remember rushing with Nicole to work on this documents.  I'm providing as much -- much information as I could give as possible.

Q    Okay.  So is this a true answer that you have no documents demonstrating any payments to any of your undisputed creditors; is that correct?

A    And you're talking about the creditors on the -- the list that we've went through?

A    Correct.

Q    I would say there are some documents to be honest, Joel. Yeah.  I would say if we really went digging and didn't have twenty-four hours to find these documents, I'm sure there's

67

documents from 2015, 2016, 2018.

Q    Okay.  So this does say over the past two years.  So let's talk about since September of 2022.  Do you have any documents that would show you've made payments to any of your undisputed creditors?

A    Well, the biggest thing is I would -- I would have to go to my wife to get these documents.  You know, my wife makes most of the payments to -- to the debtors in -- in the quickest time she can.  So I would literally need to go and ask my wife to help me get these documents.

Q    Okay.  So let me just make sure I'm understanding.  You're saying that you personally don't have possession of any documents evidencing any payments from 2022 to 2024 to any of your undisputed creditors?

A    Well, again, I would need to go through all my documents.  I would need a week or so to do that to pull it together, Joel.  But most of these documents would -- would reside with Shannon.  That's where they would be.

Q    So this discovery was served last Monday.  You've had a little over a week.  What efforts have you made to search your records or speak with your wife about her records on this question?

A    Well, to be honest, I thought this was an involuntary bankruptcy for myself.  What has this got to do with my wife and her businesses?

68

Q    So let me ask my question again.  See if I can make it a little more clear.

A    Okay.

Q    I asked you --

A    Sure.

Q    -- what efforts have you made in the last week to find responsive documents to this question?

A    I made a valiant effort to find documents.  I've looked through my emails over the last year and a half, and I worked with my counsel to prepare these interrogatories.

Q    Okay.  So you said you looked through your email.  Where else did you look for documents showing payments you've made over the last two years to any undisputed creditors?

A    Mainly email.

Q    Okay.  All right.  Anything else that was part of -- part of that effort you described?

A    No, email in particular.

Q    Okay.  So your email has no records.  And is there anywhere else that you believe that you might have documents evidencing payments that you've made to any undisputed creditor in the last two years?

A    That would be with Shannon.

Q    Okay.  Did you speak with your wife about any such documents?

A    Yeah, we discussed documents.  She consulted with her

69

attorney, Mr. -- Attorney Heim.  And that's between them, you know?

Q    Okay.

A    You could ask her.  David could ask her.  But Shannon is going to talk to her -- her attorney.

Q    So, in other words, you made her aware that you needed documents evidencing payments that you and she made for your undisputed creditors?, correct?

A    Ask the question again, Joel, please.

Q    You and you and Ms. Kroemmelbein discussed the fact that you needed all documents showing payments to the undisputed creditors, right?

A    Myself and Shannon have discussed this case vigorously in the last couple of weeks.

Q    Okay.  And so the answer to that question is yes, you discussed that she needed to get you any documents showing evidence of payments, correct?

A    Well, you see, I think you're putting words in my mouth a little bit here.  So --

Q    Okay.  Well, then let me ask you again.

A    Sure.

Q    And don't let me put any words in your mouth.  I want to hear from you.

A    Sure.

Q    Did you discuss with Ms. Kroemmelbein the fact that you

70

needed documents evidencing all payments made over the last two years?

A    We discussed that, correct --

Q    Okay.

A    -- when these interrogatories came through.

Q    And did she ever give you an answer on whether she would provide those documents?

A    She said to me she's going to discuss it with her counsel, David Heim.

Q    And did you follow up with her at any point about needing those documents?

A    Yeah.  I've asked her about documents and various other documents.  And she's talked to her attorney.

Q    Okay.  Where would those documents be?  Would they be on her computer, in a --

A    I can't speculate, Joel.  She's a very organized person. So --

Q    Okay.  So you don't have access to her documents wherever they are?

A    No.  I wouldn't go near her documents.

Q    All right.  I'm going to show you a couple other documents just to make --

A    Sure.

        MR. READY:  I can -- let me see if I can speed any of this along.  I'm going to ask for stipulations to PC-79, PC-80,

71

and PC-81.  I'll represent those are responsive debtor to creditor's first RFA, the actual FRAs that were sent, and then time stamps debtor schedules of September 27.

MR. CIARDI:  They are what they are, Your Honor.  I mean, if he wants me to stipulate to their authenticity, we can do that.  I don't know what else he would want a stipulation as.

MR. READY:  Yeah, just stipulated to the admissibility.  That's all I'm seeking.

MR. CIARDI:  Authenticity is what I'm stipulating to. As to whether they're admissible or not, they have to be admissible for a purpose and be relevant for something.  And no one has yet offered them to do anything.

MR. READY:  Okay.

THE COURT:  Mr. Ready?

MR. READY:  I'll walk through them.  No problem.

THE COURT:  Okay.

BY MR. READY:

Q   I'd like to look at number 79, PC-79.  Do you recognize this document?

A   Yeah.  Again, Joel, there's been a thousand documents from you, so I recognize this document vaguely.

Q   Okay.  I'm going to scroll down.  I'm going to ask you, is this your signature?

A   It is, yeah.

72

Q    Okay.  And I'm going to bring it back to the top here.
I'm sorry.  So I'm just going to kind of run these through with
you.  We asked you to admit the authenticity Of exhibits in ECF
number 10-2.  Those were documents attached to the emergency
Motion for special relief.  You said denied, that you did not
admit the authenticity of these documents.  Did you review
those documents that were attached to the emergency motion for
special relief?

A    Which document are you talking about?

Q    The documents that were attached --

A    You didn't say that in the question.  Which documents?
Sorry, Joel.

Q    The documents attached to the emergency motion for special
relief.  Did you review --

A    I'm sure myself and my counsel looked at some of these
documents together, yes.

Q    Okay.  Do you recall which documents you believed were not
authentic?

A    No.

          MR. CIARDI:  Your Honor, I'm going to object.
There's actually a complete answer beyond the word "denied" to
that.

          THE WITNESS:  Um-hum.

          MR. CIARDI:  And if Mr. Ready wants to simply read it
in or look at it. I think we save a lot of time here.

73

MR. READY:  I'd love to save some time.  But of course, if we're not going to stipulate to anything, we're going to have to do this painfully.  And I don't want to do it that way.  He says denied.  I'm asking him if he remembers which ones he thought were authentic.  I'm happy to walk through it one-by-one.

MR. CIARDI:  Mr. Ready said -- I mean, Mr. Redmond said denied and then explained the answer denied.  So you can't just read the word denied and say that's all he did.

MR. READY:  Okay.  Your Honor, that's fine.  Let's scroll down.  I don't think that was a tricky question, but let me scroll down.

BY MR. READY:

Q    You said Exhibit E is an alleged marriage certification of which Mr. Redmond has no information on its source.  Mr. Redmond admits he's been married but cannot authenticate the attached documents.  Do you not -- you couldn't authenticate your marriage certificate; is that correct?

MR. CIARDI:  I'm going to object, Your Honor.  Whatever the document is, it's not up on the stand.  And we're not looking at it.  It's not a marriage certificate.

BY MR. READY:

Q    Let's skip here with you to PC-44.

A    Um-hum.

Q    Do you recognize this document?

74

A    I really don't.

Q    Okay.  Do you have any reason to dispute that this is a certification of your marriage to Shannon Kroemmelbein?

MR. CIARDI:  Your Honor, marriage certificate would be something issued the day of the marriage.  This is issued three years later.

MR. READY:  So, I mean, I guess I've got counsel's answer on that.  I'd like to hear his on whether he recognizes it.

MR. CIARDI:  I'm objecting to the term marriage certificate.

MR. READY:  I think I said -- I just said marriage certification.  I read it right off of the document.

THE COURT:  Ask your question.

BY MR. READY:

Q    Mr. Redmond, do you recognize this marriage certification?

A    No.  I've never seen it before.  It's not my part -- part of the household, Joel.

Q    Okay.  Do you have any reason to dispute the validity or authenticity of this document?

A    Well, you know, Joel, I know you're trying to catch me on lies here, et cetera and, you know --

THE COURT:  I'm going to --

THE WITNESS:  -- my credibility about --

THE COURT:  -- stop you for a moment.  And I'm going

75

to ask you --

THE WITNESS:  -- that -- but we're looking at marriage certificates.

THE COURT:  Hold on.

THE WITNESS:  Yeah.  Yeah.

THE COURT:  I'm going to ask you to address counsel --

THE WITNESS:  Sure.

THE COURT:  -- by his proper name and not by Joel throughout these proceedings.

THE WITNESS:  Okay.

THE COURT:  I'm going to ask you to call him Mr. Ready.

THE WITNESS:  Okay.

THE COURT:  Please.

THE WITNESS:  Yeah.

THE COURT:  Thank you.

THE WITNESS:  Sorry.

THE COURT:  I'm sorry.  You can ask the question again --

THE WITNESS:  Um-hum.

THE COURT:  -- because I interrupted.

MR. READY:  No, no problem.

BY MR. READY:

Q    Do you have any reason to dispute the authenticity of this

76

document?

A    Mr. Ready, that's a layered question.  You know, I've never seen this document before, so I'm not going to validate its authenticity.  Are myself and Shannon married?  We're happily married with three kids.  You know, we live together.  We go on vacation together.  We're -- we're in love.  I don't know what this certificate is.  It could be authentic.  It has a seal.  It looks authentic.  But, you know, I'm not a handwriting expert or a certificate expert.  And I've never seen it before.

Q    What investigation did you do before answering the request for admission to determine whether this was a valid copy of your marriage certificate?

A    I talked to the attorneys over here, Attorney Ready, and I said -- they said, have you seen the marriage certificates?  And I'm like, no, I've never seen this before.

Q    Okay.  Did you do any other review to see if this was an authentic document?

A    Can you give me examples of what you mean by review?

Q    Did you do anything else?  Did you undertake any other efforts to see if this was an authentic document, or did you just say --

A    No.

Q    -- no, I haven't seen it before?

A    I looked at the certificate.  I talked to my counsel.  I

77

haven't seen this certificate before.  And that's it.

Q    Okay.  It says that you were duly married here on December 4th, 2021.  Do you agree to that fact?

A    Correct.

Q    Okay.  I'm going to go back to PC-79.  Exhibits I and J you said appear to be copies of Mr. Redmond's answers to state court discovery.  And while they appear authentic, Mr. Redmond does not admit that they are complete.  Do you remember giving that answer?

A    I can remember working on that answer with my attorneys.

Q    Okay.  I've shown you your answers in state court discovery.  I can do so again.

        MR. CIARDI:  Objection, Your Honor.  I don't believe they've been shown to the witness.  We just discussed answers in federal court discovery.

        MR. READY:  Your Honor, I'm referring to the last hearing where he was shown, and we went through this fairly extensively.

        THE COURT:  Okay.  I'll allow it.

BY MR. READY:

Q    I've shown you those.  And you know what?  I'll show them again.  Let me just take a moment.  I'm going to show you this document.  I'll give you just a moment.  It says Alan Redmond's objections and answers to first interrogatories in aid of execution.  Do you remember seeing this document?

78

A     Again, I'm sure I've seen the document, Mr. Reay.

Q     So we actually went through this, I think, I guess it's been about two weeks now.  We went through it in this in this courtroom.  Do you remember that?

A     Yes, I do.

Q     Okay.  I'm going to scroll to the bottom.  I just want to make sure we're all on the same page.

A     Um-hum.

MR. READY:  Your Honor, is the record from the prior hearing incorporated into this, or do I need to reestablish anything here?

THE COURT:  No, you don't need to reestablish anything here.

MR. READY:  Okay.  Then I won't spend the time on it.

BY MR. READY:

Q     So do you have any reason to contest the authenticity of this document?

A     No.  It looks very authentic, Mr. Ready.

Q     Okay.  When you said in your response -- I'm going to go back to PC-79.  You said, while they appear authentic, Mr. Redmond does not admit that they are complete.  What did you mean by that?

A     Well, you know, when you're sitting in court and you're seeing hundreds of documents, Mr. Ready, you know, I didn't want to lie or mislead you or anybody else.  So there's just a

lot of -- a lot of documents. So that's where, you know, they appear authentic, but I'm not sure if it's fully complete.

Q Okay. So let me just ask you to --

A I'm just trying to answer it honestly, Mr. Ready.

Q All right I appreciate that. So when you say --

A Um-hum.

Q -- they're not complete, are you suggesting you believe there are additional pages that were not included?

A To the documents?

Q Yes.

A Could I see the document again, please, sir?

Q Sure. But before I do that, you reviewed these exhibits with your attorney, correct?

A Correct.

Q And you had the opportunity to look through every page, correct?

A Correct.

Q So when you said you don't admit that they are complete, did you believe there were missing pages at the time that you said this answer?

A No, that was not my -- my points.

Q I mean, what did you mean by you don't admit they're not complete, that they are complete?

A Well, you know what? If I can see the document, again, that would be helpful if possible.

80

Q    Okay, sure.

A    Great.

Q    I'll go to one of them again.  This is --

A    Um-hum

Q    -- now marked as PC-19.

A    Um-hum.

Q    I'll scroll for you.  You tell me what you need to look at.

A    I just need to see the bottom page.

Q    The bottom page?  Sure.  L

A    Yeah, to see my signature, et cetera, Mr. Ready.  So this looks complete.  There's a verification at the bottom.  I reviewed the documents with -- with my attorneys.  So this looks like a complete document.

Q    Okay.

A    The point is saying I'm not -- I was referring to the contents in case I missed the line or missed the sentence, because I'm obviously trying to -- to remember to the best of my recollection.  So that's where I was referring to.

Q    Okay.  So when you said you do not admit that Exhibits I and J are complete, what you meant is you didn't admit that your answers to those -- your answers were not complete answer you're saying?

MR. CIARDI:  Objection, Your Honor.  That's not what he said.

81

MR. READY:  Is that not exactly what he just said?

THE COURT:  It sounded pretty close.  But why don't you ask him again?

MR. READY:  Sure.

THE COURT:  And perhaps he can clarify.

MR. READY:  Sure.

BY MR. READY:

Q    Mr. Redmond, what did you mean when you said that PC-19 and 20, which were Exhibits I and J to these documents, were not complete?

A    This document that I'm looking at is obviously complete.  There's a verification signature at the bottom, et cetera.  But I wanted to make sure that I said that I'm not sure if all the answers are fully completed.  That's -=- that's what I meant.

Q    Okay.

A    You know --

Q    So the answers that --

A    There is --

Q    -- you gave to those documents were not complete is what you're saying here?

A    No.

MS. NIGRELLI:  Objection.

A    They were completed to the best of my ability.  They were completed to the best of my ability.  But honestly, when you're under a time crunch to get everything together, you're doing

82

the best that you can to provide as much information as possible.  And when Albert and Nicole asked me are these -- is this complete, this is the best that I have, this is what I -- what I've got for -- for these exhibits or this document.  So that's what that means.

Q    Okay.  So to be clear, on September 27th of this year, upon the cool light of reflection and after reviewing your discovery from state court, you agreed that your answers in state court were not complete?

MS. NIGRELLI:  Objection.

MR. CIARDI:  Objection.  That is not --

MS. NIGRELLI:  Not what he said.

MR. CIARDI:  -- not what he said, Your Honor.

MR. READY:  Well, then I don't have a clue what he's saying, Your Honor, because that's what I just heard twice.

THE COURT:  And I've heard the answers, and I think we can move on.

MR. READY:  Yes, Your Honor.

THE COURT:  And I'll give them the weight that they deserve.

THE WITNESS:  Um-hum.

MR. READY:  I'll seek a stipulation to PC-6, which is the deposition transcript from state courts.  This was also denied as to authenticity -- or denies RFA.

MR. CIARDI:  Your Honor, this is from 2019.  I'm not

83

stipulating to it. It's not relevant.

THE COURT: You're not stipulating to its admissibility? You're saying it's authentic?

MR. CIARDI: I'm not stipulating to its admissibility. Okay. It's an exhibit and it's authentic.

THE COURT: Okay.

MR. CIARDI: But I'm not stipulating to its admission, its relevance, or its use. Unless he's going to impeach the witness with some question about it, it's irrelevant.

THE COURT: Mr. Ready?

MR. READY: So, Your Honor, I mean, we have a right to ask in discovery questions about what's authentic and what's not if they're denying documents.

THE COURT: Well, but I think that you can certainly use it to impeach. I don't have any issue with that. I'm just not sure that it the document itself needs to be admitted in order to do that.

MR. READY: Okay.

THE COURT: So if this is about credibility, you're well within your realm to ask him questions about it.

MR. READY: Okay. That's fine. I understand, Your Honor.

And, Your Honor, just to do the exercise, I'll ask for a stipulation as to PC-80, which was the original request

84

for admission.

MR. CIARDI:  What's the request, to stipulate to what?

MR. READY:  To its admissibility, Your Honor.

MR. CIARDI:  Your Honor, it's not evidence.

MR. READY:  Well --

MR. CIARDI:  The answers which are in 79 are evidence.  I mean, does he want us to stipulate that he sent them and that we then answered them?  Because that's the only evidentiary aspect of that document.  I'm not trying to be hyper-technical.  I just don't know what its relevance is. It's a document that was sent that was answered.  The answers are, in fact, evidence.  The document itself is not evidence.

MR. READY:  Your Honor, we're going to be seeking an adverse inference for the fact that he has not answered in discovery.  And when they're bringing a bad faith claim and he won't acknowledge these documents, that's part of their bad faith.

MR. CIARDI:  Your Honor, I don't have to acknowledge the authenticity of a discovery document that he put together. I have to answer it.  We answered it.  The answers are actually detailed.  And the answers -- and the questions are in the document that is actually evidence which is the response.  I don't know -- if Your Honor wants to admit it -- I don't think it's relevant, but it certainly doesn't add anything.  It

85

certainly hasn't proved any of the things that I'm waiting to hear about today, which are what debts we aren't paying when due.

MR. READY:  Well, actually --

MR. CIARDI:  I've been waiting an hour for that.

MR. READY:  Well, actually, I think what they've said is they don't have any proof at all that he's paying any debts.

MR. CIARDI:  Not our burden, Your Honor.  His burden.

THE COURT:  Understood.

MR. READY:  So, Your Honor, this is directly relevant as to whether he's participating in discovery and whether if they're going to try to claim we're not meeting our burden because of this proceeding, that the discovery answers, or lack thereof or inadequacy thereof, are certainly relevant to what we're doing here today.

MR. CIARDI:  Actually, Your Honor, that's incorrect. Prior to filing the involuntary petition under both Forever Green and many other cases, it is their burden to do the due diligence to determine the answers to these questions.  And they didn't do that because, as you're going to see when we put our evidence on, not one of their petitioning creditors knows the answer to that question what bills aren't being paid.  Not one.  So they did absolutely no due diligence.  That burden lies on them before the filing and during the filing.  And if this is all we're going to hear about today, I don't know why

86

we're still having this witness on the stand.

MR. READY: So, Your Honor, first of all, as this Court is already aware and has already been demonstrated from the discovery, discovery that was sent in the state court case asked for a full list of creditors. And we were told about zero undisputed creditors. As we've already established, we have found publicly available tax liens that show three undisputed creditors in addition to the two that are still relevant in this matter. And we had zero information about any other undisputed creditor.

So to the degree they want to try to claim that we didn't do due diligence, his answers under oath saying that he didn't have any undisputed creditors are conclusive on that issue. They cannot have him lie under oath and then turn around and say that we didn't do our due diligence because we relied on those answers.

Your Honor, the reason I'm showing this discovery now is I'm trying to establish that he's admitting that those answers were incomplete. He's admitting in this litigation. And I'm also showing that though we sent detailed things seeking what kind of information he could give us, that he didn't answer most of these.

So I'm offering it now. And obviously some of that's going to come down to legal argument. But the fact that they're not willing to agree to the authenticity of these

87

documents is just indefensible in a proceeding like this.

MR. CIARDI:  Your Honor, we --

THE COURT:  Well, I'm not sure that he's objecting to the authenticity.  I think what he's saying is --

MR. CIARDI:  Admissibility.

THE COURT:  -- that you don't need to admit them because you have him on the stand.

MR. READY:  Okay.  All right, Your Honor.

MR. CIARDI:  And more importantly, Your Honor, that admitting them -- even if you admit them, you still got to ask the witness the questions.  Just admitting discovery doesn't do anything.  So, I mean, there's a process.  And he's got to do the process.

MR. READY:  All right, Your Honor.  I'll continue.

BY MR. READY:

Q    Mr. Redmond, are you insolvent?

A    What do you mean insolvent, Joel?  Or excuse me, Mr. Ready.

Q    Are you able to pay your debts?

A    Am I personally able to pay my debts?

Q    Correct.

A    I have been able to work with various -- various creditors payment plans and options.  And my wife has been able to help me pay these debts.

Q    Okay.  Tell me each of the undisputed creditors that you

88

have a payment plan with.

A    We have -- well, I would love to see the document, because there's a lot of them.

A    Well, tell me from your memory which creditors do you have a payment plan with.

Q    Okay.  Yeah.  Well, an undisputed debt is with CardFlex. I was able to work out a payment plan with them, Mr. Ready.

Q    Okay.  And is that a signed contract?

A    It is a signed contract.

Q    Okay.  And Tell me the rest of them, which other ones.

A    Producer Advance.  I was able to reach a settlement agreement with them also.

Q    And is that in writing?

A    I believe it is.  It was a quite a while back, Mr. Ready, but I believe it is.

Q    Okay.  And tell me, other undisputed creditors you have a payment plan with.

A    We also have All Web Leads, which was a lead generation firm.  That's also, as I say, in settlement.

Q    Okay.  And who else?

A    We've worked -- I've been able to work out some payment plans or payment arrangements hopefully once this Bochetto & Lentz, as I mentioned, with Mr. Rush, with Duane Morris.

Q    And I've already asked you about two of those, but is the one with Duane Morris in writing?

89

A    The one with Duane Morris is not in writing.

Q    Okay.

A    I talked to the attorney at the firm.  He was willing to work with -- with myself.

MR. READY:  One moment.

Q    I'm going to take you back to PC-78.  We asked you to provide all contracts between you and each of the creditors identified at ECF 48 -- again, that's the list of creditors -- including all settlement agreements and contract modifications or amendments.

A    Um-hum.

Q    You answered putative debtor has no responsive documents. I reserve the right to amend and/or supplement this response as our investigation continues.

A    Um-hum.

Q    Do you remember giving that answer?

A    I can remember working on that with my attorneys. Correct.

Q    Okay.  You were telling me today that you do have three responsive documents; is that correct?

A    Well, again, as I said previously, Mr. Ready, I would need to get with Shannon, who's the custodian of all documents, who's the one paying these debts from our household.  And I would need to -- to go through the documents.  We're talking about documents, sir, from 2018, 2019.  But if that's what the

90

Court would want me to do, that's what I would do.

Q    Okay.  So you believe you have written agreements with Card Flex, All Web Leads, and I think you said Producer?

A    Yes, sir.

Q    Okay.

A    Producer Events.  Yes, sir.

Q    And you had those on September the 27th of this year, correct?

A    I would need to go through my records, but I believe we have some settlement agreements.  Yes.

Q    Well, let me rephrase it.  You haven't signed them since last, what was that, Thursday, have you?  So you didn't you didn't sign any of those contracts last week, did you?

A    We did not enter into any settlement agreements in the last week, sir.  No.

Q    Okay.  So you did have those three documents last week when this was asked of you, correct?

A    Again, we -- I answered this question the way I seen fit with the help of my attorneys.  And Shannon has a lot of the records.  And it doesn't point -- that Shannon -- you know, Shannon has a lot of the records.  That -- she's basically she's paying them.  She's paying them, not basically.  She's paying them.

Q    Okay.  So it's your testimony that you did not have those contracts in your possession last week when you were asked for

91

them?

A    I don't believe I had them in my -- my possession.  I did look for documents.  You didn't find documents.  But --

Q    What did you do to -- what did you do to look for the contracts between you and each of the creditors?

A    I went through my emails.

Q    Did you say emails?

A    Yes.

Q    Okay.  Did you look anywhere else?

A    Through my emails, desktop, some old computers, you know, maybe three or four-hour expedition.

Q    Okay.  And did you ask Ms. Kroemmelbein for copies of the documents?

A    I did.  I asked her that she had the All Web Leads agreement or Producer Advance agreements.

Q    Okay.  And what did she say?

A    I'm talking to my attorney.

Q    Okay.  Did you follow up with her about providing them to you?

A    I've asked her quite a few times, sir, about the documents.  But she's defaulting to -- to David.  She's a savvy businesswoman, so she's going to talk to her attorney.

Q    To David Hein, who was also your attorney at state court, Correct?

A    Yes.  David was my attorney.  But she was talking to

92

David who represents Segura, which is Shannon's company.

Q    And Mr. Heim represents both of you, correct?

A    I think that's not uncommon, you know, to have a husband and wife --

Q    It's just a yes or no question.  He represents both of you?

A    He's represented me in a par funding case, correct.

Q    So did she ever represent to you whether she had those contracts or not?

A    She said she was going to talk to her attorney, Mr. Ready.

Q    Okay.  So let me ask you a different question.

A    Um-hum.

Q    How do you know that contracts exist between CardFlex and you, Producer and you, and All Web Leads and you?  How do you know those contracts exist?

A    We've discussed these contracts, you know --

Q    Who is we?  Who is we?

A    Sorry.  Sorry, Attorney Ready.  Myself and Shannon have discussed these contracts before.

Q    So you don't know whether they exist from personal knowledge?

A    It depends on which contracts we're talking about.

Q    Let's start with CardFlex.

A    Sure.

Q    How do you know that that contract exists?  You said there

93

was a contract for how you're going to pay that debt.

A    I have seen that contract.

Q    And how did you see it?

A    Myself and Shannon reviewed it together.  She actually helped me -- she actually asked me to help her review the contract.

Q    Okay.  And you had to sign on that contract, correct?

A    Correct.

Q    Okay.  Same for the other two?

A    Producer Advance was a while back, but I would -- I don't want to assume, but I would imagine it's my signature on the contract, Attorney Ready.

Q    Okay.  And how about All Web Leads?

A    That would be the same.  It would be my -- my signature on the contract because that was a Bene Market debt.

Q    Did you sign it in person?  Did you sign it digitally?

A    It could have been either/or.  If you mean, like, an e-sign or --

Q    Sure.

A    I would say it's probably a combination of both.  It would have either been e-signed or are signed in person with my pen.

Q    Okay.  And did you keep it -- did you keep a copy of any of these?

A    As I said, when we got married, Shannon took over a lot of our records.

94

Q    Okay.  I'm going to take you down to -- yeah, I'm going to take you, yes, to 18, all documents evidencing your tax liabilities shown on ECF number 48 applied to IRS, unemployment compensation tax services, Department of Revenue, Berks County Tax Claim Bureau.

A    Um-hum.

Q    You said we were in possession of all tax liens; is that correct?

A    Can you -- can you say that question again?  You --

Q    You said that we were in possession of all tax liens; is that correct?

A    You guys as in Cornerstone Law?

Q    Okay.  So the question was about tax liabilities that you had listed on your schedule.

A    Um-hum.

Q    We asked you for all documents evidencing your tax liabilities to those entities, the IRS, Pennsylvania UC Tax Services, Department of Revenue, Berks County Tax claim Bureau. Your answer was petitioning creditors are in possession of all tax liens.  Do you recognize that answer?

A    Yes, I do.  I talked to my attorneys about that answer.

Q    Okay.  And you admit you've not paid each of those taxing authorities; is that correct?

A    I have not paid?

Q    Yes.

95

A      There have been multiple payments on each of these.

Q      Okay.

A      Um-hum.

Q      So we asked you all documents evidencing your tax liabilities and earlier asked you for payments.  So have any of those payments happened in the last two years?

A      There have been payments on the IRS and the UC tax services and the Department of Revenue in the last two -- and the claims, yes.

Q      Okay.  Is there a reason you did not provide those in response to the document asking for evidence of all payments?

A      Well, obviously, if the attorneys had advised me that you guys were in possession of these tax liens.

Q      Okay.  How about the payments that we asked for?  Is there any reason you didn't provide any of the payment history on those debts?

A      No.  If I'm talking to my attorneys and they believe this is the best way to answer the question, this is -- this is how I'm going to answer, Attorney Ready.

Q      Okay.  Fair to say your attorneys know more about your legal affairs than you do; is that right?

A      Yeah.

Q      Okay.

A      I would say yes, sir.

Q      You delegate things to your attorneys.  You trust them to

96

take care of it.  Is that right?

A    Yeah.  We -- we communicate with our attorneys, myself and Shannon, as much as we can and try to understand the process. But yes, this -- this is what Shannon pays the attorneys to do.

Q    Okay.  And you -- so Shannon pays for your attorneys.  Is that what you just said?

A    Yes.  Shannon has paid for the attorneys multiple times.

Q    Okay.  So let me go back to my question for a moment ago.

A    Um-hum.

Q    You're insolvent; is that correct?

        MR. CIARDI:  Objection, Your Honor; asked and answered.  He answered it.  That was the first question he asked.

        MR. READY:  I don't believe he answered it.  I think he said he --

        THE COURT:  I think he asked you to define what you believed insolvent was.  I think that's --

        MR. READY:  All right.

        THE COURT:  I think that was the answer.

        MR. READY:  Okay.  Yeah.

BY MR. READY:

Q    So let me ask, Mr. Redmond, are you able to pay all of your debts as they become due currently?

A    We -- I have worked out and Shannon has worked out our debts with various -- various creditors.  I believe if we

97

continue to work hard and I can continue to provide support to her and her businesses as a consultant, I believe that all these debts will be paid off in the next year or so, correct.

Q    Okay.  But as of today, you are unable to pay all of those debts, correct?

MR. CIARDI:  Objection, Your Honor.  It's not what his testimony is.

MR. READY:  Well, that's why I'm asking.

THE COURT:  It's a new question.

MR. READY:  Yeah.

BY MR. READY:

Q    As of today, you're not able to pay all of those debts, correct?

A    To pay all the debts today, right now?

Q    Yes.

A    No.  I cannot write a check for fifty million dollars, Attorney Ready.

Q    And let's just focus on the undisputed debts for a minute because the fifty million I think you're pulling from a disputed creditor.  So let me ask you this.  Are you able to pay Jason Scott Jordan's judgment today?

A    No.

Q    Okay.  Are you able to pay Cornerstone Law firm's judgment today?

A    Me personally?

98

Q    Yes.

A    No, I am not.

Q    Are you able to pay the Berks County Tax Claim Bureau today?

A    I am not.

Q    Are you able to pay the unemployment compensation tax bill today?

A    Again, I'm on a consultation agreements based on company's performance.

Q    But it's just a yes or no question, Mr. Redmond.

A    Right now today, no.

Q    Okay.  How about the Pennsylvania Department of Revenue? Are you able to pay them today?

A    No.

Q    Are you able to pay All Web Leads today in full?

A    Not in full.  No, sir.

Q    Are you able to pay American Workers today in full?

A    No, sir.  That's a disputed debt.  So -- but no.

Q    But no?  Okay.

A    Um-hum.

Q    Are you able to pay today Bochetto & Lentz today in full?

A    No.

Q    Bull Rush today in full?

A    No.

Q    CardFlex today in full?

99

A    No.

Q    Are you able to pay Duane Morris today in full?

A    No, I am not.

Q    What is -- and will Shannon Kroemmelbein pay those judgments if payment comes due?

A    In full?

Q    Yes.

A    I don't think she could pay everything in full, Attorney Ready, not today.

Q    Okay.  I'm going to take you to a document which is PC-51. This document shows that you have taxes due in Berks County for property taxes from 2021, 2022, 2023.  Does that sound correct to you?

A    It does.

Q    Okay.  You agree that those debts became due in each of those tax years?

A    Yes.

Q    I'm going to scroll you down here.  It says there was a payor through online credit of Shannon Kroemmelbein.

A    Um-hum.

Q    Ms. Kroemmelbein paid the last payments on these debts; is that correct?

A    Correct.

Q    And you have not been able to make payment on these debts in the last two years; is that right?

100

A    I've contributed a little bit, but Shannon has been bearing the brunt of this.

MR. READY:  Your Honor, I'm aware that there was an amended schedule filed this morning for debtor's schedules. I'm not sure if it's been identified as an exhibit yet.  I'd just ask for counsel's clarification on if they if they've numbered it.

MS. NIGRELLI:  I believe it has, Your Honor.  I think it's number 22.

MR. READY:  Number 22.  Okay.  And that's -- I apologize.  The term we're using, it's not PC.

MS. NIGRELLI:  PD.

MR. READY:  PD.  Thank you.  All right.

BY MR. READY:

Q    I'm going to show you PD-22.  So this is a schedule that you just signed and filed this morning or that you just -- excuse me, that your attorneys filed this morning; is that correct?

A    That is correct.

Q    It looks to me like you signed it yesterday, September 30th; is that right?

A    Um-hum.  Yes, sir.

Q    Okay.  I'm going to just ask you -- I guess if you just signed it yesterday, I might not need to show it all to you. Is this schedule true and correct to the best of your

101

knowledge?

A    There was one area that I talked to my attorney about this morning before court because I wanted to make sure it was accurate. I believe it was Producer Advance or All Web. But apart from that, yes, I believe it's true and accurate.

Q    And which one? All Web or Producer that you think you're not sure about?

A    It's -- I texted her this morning because it was up last night making sure it was -- thinking about it. Can I -- can I -- I think it was -- if I can see them, Attorney Ready.

Q    Sure. Which one did you see?

A    There was just one that was marked disputed, and it was undisputed. So we can see All Web, this is correct. This is undisputed, sir. If I could see Producer Advance. The two boxes were ticked, I believe, by accident. Producer Advance. Yes, that's the one that I -- I talked to my attorneys about around 9 a.m. That is an undisputed debt, sir. It's not disputed, as I testified previously.

Q    Okay. So it says here disputed. Are you saying the schedule you filed this morning is not accurate?

A    No. I'm saying that I told my attorneys that I feel like they made a mistake on the schedule.

Q    Well, all right.

Q    But that is an undisputed debt.

Q    What's your what is your basis for changing the thinking

102

that this is undisputed?

A   What is the basis?  I'm not disputing the amount of money owed to Producer Advance, although there is money owed.

Q   Is there currently litigation in this matter?

A   With Producer Advance?

Q   Yes.

A   I don't believe so.  No.

Q   Okay.

A   I entered into a settlement agreement with the owner.

Q   Okay.  Is that a written settlement agreement?

A   I believe it is, yes.

Q   Okay.  And when did you enter into that settlement agreement?

A   I think it was in 2020, 2021, approximately.

Q   Three or four years ago; is that right?

A   Yes, sir.

Q   So it's been undisputed this entire time; is that right?

A   We entered into a settlement agreement.  Then I began to make payments.  And then Shannon started to help me make payments.  So I don't believe that is -- that is a disputed debt, sir.

Q   Okay.  So when we asked you for contracts regarding creditors, you had that contract in your possession last week; is that right?

A   I didn't have that contract in my possession.

103

Q    Why not?

A    Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together.  And when I ask her for contracts, she starts to talk to her attorney. That's -- that's the way it goes, as I've said a number of times.

Q    Got it.  All right.  So you don't have access to any of the documents relating to your debts; is that right?

A    As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents.  But Shannon is the custodian of many of these documents, sir.

Q    But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A    I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q    Okay.  And you did not find any of the contracts that we've asked for; is that right?

A    I could not find Producer Advance.  But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q    Okay.  What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A    There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety.  And that's what we did.

Q    Okay.  And what was the reason for putting it in tenants by the entirety?

MR. CIARDI:  Objection, Your Honor.  Privilege.

Q    Okay.  I'm not asking you for what your attorney's told you.  I'm just asking you why did you do it?

A    This is what we recommended to do.  You know, there was a debtor -- excuse me, creditor.

MR. CIARDI:  Objection, Your Honor.

THE COURT:  There wasn't a -- I don't think there was a --

MR. CIARDI:  Calls for privilege.

THE COURT:  -- question pending.  I think there was an answer pending.  So why don't you finish your answer?

THE WITNESS:  Yes, ma'am.

We put it in tenants in the entirety.  We had talked to one of our attorneys.  We were in a dispute with Par Funding.  And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q    So it was a --

A    Sorry.  Your turn.

Q    No.  It's okay.  Go ahead.

105

A    There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q    Is Shannon receiving income from Seguro Medico?

A    Yes, she is.

Q    And why is she -- how much is she receiving annually?

A    I would know that.  You would need to talk to Shannon.

Q    Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A    She's the owner.

Q    Okay.  Why are you guaranteeing the debts of Seguro Medico?

A    Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q    So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A    I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

106

whatever I can to help her grow the business because I've been in the insurance business ten, eleven, twelve years or was in the insurance business ten, eleven, twelve years.  A lot of these people know who I am.  You know, I have previous relationships, Attorney Ready.  So it makes sense to try and help her get her start-up off the ground as quickly as possible.  And if I can help in any way, I absolutely will.

Q   Okay.  Your wife currently works for Pottstown School District; is that right?

A   Yes.  She actually went back to her position the last couple of months.  And Arthur Walsh -- she had Arthur Walsh, the CEO, take over the operations.

Q   Okay.  So she's full time at Pottstown School District, right?

A   Yes.  I believe she's working forty to forty-five hours a week.

Q   Okay.  She's, I believe, earning 109,000 a year from the school district; is that right?

A   I don't know what her income is, Attorney Ready, but it sounds accurate.

Q   Okay.  And that's roughly what she was earning before she was married to you, correct?

A   No, that's -- that's incorrect.  I know she was making more money than that.

Q   What was she making before she married you?

107

A    You would have to ask her, but I believe it was more.

Q    Okay.  Where was she working before she married you?

A    She was working -- she was doing a number of things, but her main career was as a special education principal, building a school district down in Berks County.

Q    Okay.  And how long did she work there?

A    I believe she was there maybe a decade.  She was also -- she's also finishing up her doctorate as well.  So she was doing both.

Q    Okay.  And when she left the Pottstown School District, what did she do after that?

A    Well, Covid hit, unfortunately.  And she wanted to start -- she -- she always found the insurance business intriguing.  And she seen that I had marginal success, not a lot of success, obviously.  And she wanted to get involved in the business.  So she had spoken with the Arthur Walsh.  I was starting to wind down Fannie Market, LLC.  And Arthur and Shannon are a lot smarter than me, a lot more educated than me, you know, MBAs and all the fancy stuff, wanted to open their own business.  And I really needed a break to be honest with you, Attorney Ready, from working so hard in this business.  It's being very difficult.  And I took a step back, let them do all their fancy MBA stuff.  And I was able to provide value, particularly in software developments and recommendations on some stuff that I've learned over the last ten years.

108

Q    And --

A    Excuse me, twelve to thirteen years.

Q    Okay.  At the same time that you wound down Bene Market, you jumped on board with Seguro Medico; is that correct?

A    Could you -- sir, could you clarify what you mean jumped on board?

Q    Sure.  At the same time that you wound down Bene Market was the same month that you signed a consultant agreement with Seguro; is that right?

A    I signed the consultant consultation agreement in January 2020.  That's when I -- when I signed that with Seguro.

Q    Okay.  And that's at the same time that you wound down Bene Market; is that right?

A    Well, I have plans of winding down Bene Market back in 2018, sir.  We were racking up debts.  The business was getting harder and harder, to be honest.  So I have plans of winding up.  But to answer your question directly, I was starting to wind down Bene Market September, October.  That's when things were starting to wind down.  The block of business had dwindled to almost nothing, a block of business being that the clients that we were serving was almost nothing.  There was issues with compliance and licensing that just  --it just wasn't appealing to me anymore, to be perfectly frank.

Q    Okay.  So back to the question though.  You wound down Bene Market the same month that you signed on as a consultant,

109

correct?

A    No.  I've been winding down.  You know, winding down as a business owner, Attorney Ready, isn't just a decision overnight.  It takes a year and a half, two years to -- to really make that decision because it's a hard decision to make when you -- you employ people.

Q    Okay.  When did you stop -- when did Bene Market cease operations?

A    I believe that was December 2019, beginning of 2020.

Q    So I'm sorry.  You did say then that that's the same month that you signed the consultancy agreement with Seguro Medico?

A    I signed the consultation agreement January 2020 with Seguro.  Correct.

Q    And did I just understand that you said that that's when you stopped operating Bene Market?

A    I think my answer was that it took more than, you know, an overnight decision to -- to wind down Bene Market.  It was in the process in my head --

Q    But again, my question --

A    -- at that time.

Q    My question is about the last month that Bene Market had operations.  That was January of 2020; is that correct?

A    I believe that -- if I may answer the question this way, I believe the last payroll for Bene Market was the -- the last week in December 2019.

110

Q    Okay.  And the following month is when you -- is when you signed the consultant agreement with Seguro?

A    I believe I signed that around the 22nd of January.  I stepped away.  And -- and they wanted me to start consulting for them.  So that's what I did.

Q    So the book of business that Bene Market had at the time that you stopped its operations, where did it go?

A    Zero, over-collateralized, similar to MBOA.  Bene Market's block of business was attached to advanced contracts.  I don't know if you want me to elaborate.  Similar to Producer Advance. So when a policy is sold, you receive an advance commission. And unfortunately, the strength of the product was causing the client to cancel before the advance was realized.  So betting market was in a significant amount of debts.  And with them -- with them clients, they are collateralized.  They were collateralized similar to -- to MBOA.  That block of business is supposed to maintain so that every month it pays down these debts.  And obviously, it hasn't paid down these debts.

Q    Okay.  So you had customers who'd signed up and those premiums continue, correct, at Bene Market?

        MR. CIARDI:  Objection, Your Honor, I think we need a time frame.  And are we talking about 2019 now?  He said just contracted.  When?

        MR. READY:  Sure.

        THE COURT:  You can define that.

111

MR. READY:  I'll ask.  Yeah.

BY MR. READY:

Q    In the year 2019, you still had ongoing contracts that Bene Market was signing people up to pay premiums and you were getting paid on, correct?

A    At the end of 2019, Bene Market was actually losing contracts.  So respectfully -- are you talking about the whole year, Attorney Ready, or at the end of the year, sir?

Q    So again, there were contracts with Bene Market that people were paying in that was -- that money was coming --

A    Oh, excuse me.

Q    -- to Bene Market, correct?

A    When I hear contract, I think a contract with the insurance carrier.  Policies, that the client had a policy, yes.  But the misconception is that Bene Market owns these clients or NBA owned these clients.  These are not our clients. We are paid from an insurance carrier to enroll these clients for them.  And they pay us the commission.  It's a commission, almost like a referral or finder's fee, for want of a better phrase or to make it make it easy.

So Bene Market doesn't have any assets apart from computers, you know, small, fixed, depreciating assets.

Q    So Bene Market has contracts with insurance providers -- or had in 2019 --

A    Yes.

112

Q     -- insurance contracts, right?

A     Yes, sir.

Q     And they were being paid by the insurance provider for those contracts, correct?

A     Incorrect.  The insurance carrier -- there's a difference between an insurance provider and an insurance carrier.

Q     Okay.

A     Like --

Q     They're being paid by the insurance --

MR. CIARDI:  Your Honor, can he finish his answer?

THE WITNESS:  If you'd like, I can -- sorry, Your Honor.

THE COURT:  If you want to explain, that would be great.

THE WITNESS:  Yes, ma'am.

So an insurance agency, a sales agency, will go and get products from an insurance carrier, Attorney Ready.  So maybe it's Blue Cross Blue Shield or UnitedHealthcare or, you know, one of these products.  And you will enter into what's called an MGA agreement, a managing general agency agreement, with -- with these carriers.  So you'll start selling their products on their platform, and they will pay you a commission. That's it.

BY MR. READY:

Q     Okay.  And you had those contracts active though in 2019

113

with Bene Market; is that right?

A    Contracts come and they go.  So I'm not trying to be deliberately facetious, but sometimes you start off with a contract at the start of 2019, and sometimes you end with a different contract.  It's a very, very volatile space. Sometimes carriers don't want to work with you anymore. Sometimes carriers go bankrupt, which happened in 2019 with Corvantis.  There's a lot of moving parts, sir.

Q    Okay.  Which contracts did you still have active in the summer of 2019 with Bene Market?

A    I believe we were selling with Bene Market -- I think it was a Corvantis, which is short-term medical product.  It bridges the gap between a client being out of Obamacare and getting into open enrollment.  They also had access to dental policies.  I believe we were still selling Blue Cross Blue Shield.  I'm not sure.  I don't want to say the wrong thing, but we were selling two or three products at the time, short-term medical products, health insurance products, dental, accidents to provide the client with -- with full protection.

Q    So in 2019, what did you do to end those contracts with the Producers with Bene Market?

A    They usually just fade out, Attorney Ready.  You know, you stop producing.  The carrier has their block of business. That's -- that's what it is.  And you stop producing.  But that's -- that's really what -- unless they want to terminate

114

you for not producing, but you no longer sell that product. You usually can't afford to sell that product.

Q So how many contracts were still active at the end of 2019?

A I'm not sure honestly, Attorney Rudy, not to be, you know, deceptive, but I would -- I would literally need to go and check. I believe it was two or three contracts potentially.

Q And they were still paying out to Bene Market, correct?

A They were paying Bene Market advances. One of the big things that -- let me clarify. One of the big issues the Bene Market had in 2019 is it lost a lot of its advance contracts. I thought Bene Market was operating okay. It was operating pretty well.

It was hard to find talent in Reading, Pennsylvania, to be honest. And nothing against Reading, but it was just difficult. The job market was difficult at the time. And there was a lot of insurance carriers and insurance providers as well going through really hard times with paying advances on time, paying your commissions on time, too high of a claims ratio, meaning the carrier was paying more out in claims than it was paying to the client or ourselves and commissions. So there was a lot of difficulties in 2019.

I can't remember your question. I apologize. I got excited talking about insurance. My apologies.

Q So there were still carriers that were paying Bene Market

115

at the end of 2019, correct?

A    Yeah, I think it was -- there would have been because there would have been payroll in December.

Q    Okay.

A    Correct.

Q    And they continue paying into 2020, correct?

A    There was a small residual that was being paid to Bene Market at some point, but I'm not exactly sure what it was.  I just want to keep --

Q    And that would --

A    Sorry.

Q    And that would have continued all through 2020, correct?

A    No, that that's incorrect.

Q    When did it end?  When did the payments to Bene Market end?

A    I would need to look at the books.  But, you know, I feel like you think there's millions of dollars sitting here and there's --

Q    Mr. Redmond, I'm asking a simple --

A    -- millions -- millions of dollars of debt.

         MR. CIARDI:  Your Honor --

A    For instance, Producer Advance --

         MR. READY:  I'm going to object as nonresponsive.

A    Well, I'm just trying to educate you about the insurance business.  Producer Advance -- sorry, Attorney Ready.  But

116

producer events is a personal guarantee insurance contracts. It's a -- that's what the carrier paid us that I had to personally guarantee.  So obviously, there was not a lot, if any, revenue for Bene Market in 2019 or 2020 or 2021.  Producer Advance would have been obviously paid back in full.  But there was a big change in the insurance marketplace between 2018 and 2019.  Obamacare rates came down.  Networks changed. Obamacare -- excuse me, ACA, Affordability Act, there was some rule changes in that as well.  So, you know, it became redundant in a way for an agency to sell non-Obamacare ACA plans.  And that's why I wound down Bene Market.  I was basically exhausted with that and MBOA.

Q    Okay.  So my question was, when in 2020 did the payments from carriers cease?

A    It would have been -- if you want me to guess because I said I don't know exactly --

Q    I'm not asking you to guess.  But if you have an estimate that would be appropriate.

A    It would be very quickly, if immediately.  Bene Market stopped making money very quickly.  That's how it works, Attorney Ready.  If you don't sell policies, you don't get paid.

Q    And I want to make sure we're clear.  I'm not -- I'm not necessarily asking about profit.  You're saying that Bene Market --

117

A     Sure, I --

Q     -- stopped receiving any income in 2020 very soon?

A     But again, I feel like I'm -- I'm answering the question. I'm not exactly sure when that happened, but I know it was very quickly.

Q     Okay.  You said you needed a break when you stopped operating Bene Market?

A     Sure.

Q     You started immediately with Seguro Medico?

A     Well, who started immediately?

Q     You did.

A     No, I didn't.  I didn't start immediately with Seguro. Arthur and Shannon were in American House down in Reading, Pennsylvania eighty hours a week building that company.  I was able to sit at home and work on their systems when they required me to work on them.  And we have documentation about that as well.  I was actually able to relax for the first time in thirteen -- thirteen years I'm assuming, fourteen years maybe.  I actually get to do what I believe I'm pretty good at, which was helping them build their systems while they were recruited.

Q     When you say --

A     While --

Q     I'm a little confused by your answer.  When you say you have documentation about that, what --

118

A     Sure.

Q     -- what do you mean?

A     Sure.  When I would come into the office, they would track my time when I was in the office.  You know, I was literally told to go home on a number of occasions.

Again, I know you say that he's a hapless old man and a housewife, these are highly intelligent people.  I believe Arthur has two MBAs.  He was the national sales director for American General for thirty years, one of the largest companies in the world.  He's around thousands of agents like I did previously in my past when it was 2009, 2010.

And then Shannon was no longer working during Covid.  It made perfect sense for her.  She's seen that the business was enjoyable.  She'd been around a lot of the Bene Market stuff, Attorney Ready.  And they went in and built that business.  They created SOPs.  They hired.  They fired.  They put in software development systems.  They gave me assignments.  This is what they did.  And that's why Seguro has been relatively successful, a lot more successful than I could make it, to be perfectly frank, which pains me to say.  Shannon tells me that every day.  But that's just what -- what it is.

Q     You said Ms. Kroemmelbein was not working during Covid; is that correct?

A     Again, I'm not good at this, but I know that she was working in Seguro for a good year and a half, two years setting

119

up that company.  In fact, she was in Seguro, still her company Friday, Saturday, and Sunday of last week working hard.  I was in there helping her at Seguro's office.  And my role has had to go to two to three times a week.  To be perfectly honest, Attorney Ready, Mr. Walsh's wife is literally in stage 4 cancer, so I've been trying to assist him, which was obviously unexpected.

Q    So I'm sorry to hear that about her.

A    Thank you.

Q    I want to go back to your earlier statement, because I heard you -- I think twice I heard you say Ms. Kroemmelbein was not working during Covid.  I think you said that's kind of what -- she took some time off.  Many people did.  I'm just asking, is that correct?  Did I understand you?

A    Attorney Ready, I don't know exactly what the dates are. Obviously, I'm not good at that.  But she was working in Seguro for a year and a half to two years on the functions and setup of Seguro.

Q    So again maybe --

A    You can hold me to --

Q    I'm not asking you --

A    Sorry, Your Honor.

Q    -- for dates right now.  I'm just saying, you said she was not working during Covid, that's what I heard you say, during just the pandemic?

120

A     For the third time, what I've said to you is I'm not exactly sure on what the dates were, but from my recollection, five years ago she was working, forming an insurance agency with Arthur Walsh.  I can't give you the exact dates, the exact times, but she spent two -- a year and a half to two years setting up this business because that's what she does.

Q     Seguro Medico does the same kind of work that Bene Market did, correct?

A     Slightly different.

Q     What's different about it?

A     The whole infrastructure.  You know, before with MBOA or Bene Market, it felt like a call center, to be perfectly frank. That was the talent that I had to build a call center.

Seguro Medico, from what I can see -- and I've been involved in some of the procedures and operations.  There's a compliance department.  There's an HR department.  There's an actual CEO in Arthur Walsh who knows what he's doing instead of me haphazardly guessing, you know, what to do.  There's ongoing performance management.  There's training.  You know, they did a phenomenal job of, you know, building -- building the agency to be honest.  So --

Q     But Bene Market and Seguro Medico sold the same types of products, correct?

A     No.  They -- they have not sold the same type of products.

Q     What products does Seguro Medico sell that Bene Market

121

does not sell -- or they don't sell?

A    One of the big shifts that Seguro Medico has been able to do with -- with Shannon and Arthur's acumen is to get better products.  There's different SKUs within the insurance business, Attorney reading.  There's ACA plans.  There's short-term medical plans.  There's hospital indemnity plans.  These are all lower-level plans.

What Arthur and Shannon have been able to do is bring in ERISA plans, similar to maybe what you attorneys, respectfully, sir, would have in group insurance.  So they're selling a different type of caliber of plan.  And I think that's why they don't have advanced debts.  They weren't forced into borrowing money, excuse me.

You know, the other products that MBOA and Bene Market were selling, sir, were causing a significant amount of debts because they just weren't staying on the books long enough.  You know, people were getting them in January and canceling them in June.  And that's why, you know, we -- I have this debt.  The biggest thing borrowing money from Par Funding, which is obviously a high-interest loan, is we couldn't meet payroll.  You know, we couldn't meet payroll, so we had to go and borrow money.  And we couldn't make payroll because the insurance carriers didn't like the quality of the product that we were selling -- or that they give us.

So I know that was a long way to say Segura Medico is a

122

proper insurance agency instead of the -- excuse me, instead of the stuff that I was attempting to do.

Q   Ms. Kroemmelbein had no experience in insurance before starting with Seguro Medico, correct?

A   Understands.  She's been around me long enough to understand what insurance is.  You're talking about a very high-level, sophisticated organizational leadership female who has an MBA, I believe, from Lehigh, who's finishing --

Q   Mr. Redmond --

A   -- her doctorate's --

Q   Mr. Redmond --

A   -- who's raising three kids.  You know, she -- she has experience in business.  We can say that.

Q   Okay.  But to answer my question, she had zero experience personally in insurance before Seguro Medico, correct?

A   Could you define insurance for me, sir?  Insurance?

Q   You need me to define insurance for you?

A   No.  I need you to -- there's insurance sales.  There's claims.  There's third-party administrators.  I need you to be very specific.

Q   Actually, I'll stay broad.  She had zero experience in any of what you just said?

A   Okay.

Q   Correct?

A   In insurance?  Well, I'll tell you.  You know, when she

123

was running schools for special needs kids, she had a lot of experience in insurance.  She -- she put the group plans together.  She negotiated with the carriers.  She had some experience.  I wouldn't stay zero.

Q    Okay.  Other than what you've just said, you'd agree she didn't have any other experience in the business side of insurance, correct, before Seguro Medico?

A    Are you -- if you're going to define it, I would need you to define it, Attorney Ready.  In sales?

Q    All right.  Sure.  We'll go through them one at a time. Did she have any experience in insurance sales?

A    She did not have experience in insurance sales.

Q    Did she have any experience in insurance regulations?

A    No, she did not.

Q    Did you have any experience in insurance brokering?

A    No.

Q    Did you have any experience in insurance underwriting?

A    No.

Q    Is there any other thing that I've missed that she would have had experience in regarding insurance?

A    No, just a highly sophisticated, talented, kind person who knows how to build businesses better than myself.  And to be honest, Arthur as well, although he's very talented as well.

         MR. READY:  Your Honor, I've got a good bit more. I'm happy to keep going.  Would the Court -- I just want to

124

check on scheduling, how the Court wants to proceed.

THE COURT:  Okay  Well, we can go as long as 1 o'clock, and then I am going to take a break, which gives you basically another half hour or so.

MR. READY:  Okay.

THE COURT:  If you think that you can't complete it by then, then we will need to bring him back after lunch.

MR. READY:  I'll do my best to keep it moving.

THE COURT:  Okay.

MR. READY:  Thank you, Your Honor.

BY MR. READY:

Q    So I'm going to go back to an earlier question.  I don't think it quite got nailed down.  I asked you -- you said you needed a break, and that's why you started consulting with Seguro Medico.

A    Sure.

Q    And that was immediately after you ended your work at Bene Market, correct?

A    Yeah.  There was a bit of synergy.  You know, Shannon had said that I should continue to operate agencies.  And I was pretty burnt out.  You know, it'd been a rough ride getting to -- to this country from 2007, graduating in 2007 in this country and then, you know, getting the 2019 and realizing that you're in a ton of debts.  You know, it wasn't -- it wasn't very satisfying.

125

Q     Okay.  So you said you needed a break, but you did immediately continue working in the same industry?

A     I answered that question before.  I did not.  I -- I took a break.  I signed the consultation agreement, I believe, on the 20th or the 22nd of January.  And then I started to assist them sometime towards the end of January, I believe, February, on a very part-time basis.

Q     Okay.  So your consulting agreement was signed in January, but you really didn't begin working full time until when?

A     Again, I would -- what do you mean full -- excuse me, Attorney Ready.  Full time?  I haven't worked full time.  I haven't worked full time since 2020, 2020, when I signed the consultation agreement.  For instance, last week, I was at home four days of the week because Arthur was actually able to go in and Shannon was able to go in.  They didn't need my help.  I brought the kids to school.  I fed the kids.  I did some work on a software development project that they had me working on, which is a new module for a lead generation system.  That's what I did.  And I've been doing things like that for, you know, the last number of -- last number of years for them.

Q     Okay.  So your testimony, if I understand it correctly, is that you have not worked full time since Bene market shut down; is that correct?

A     I have not worked -- I have not worked full time.  I've been able to work when they needed me.

126

Now, as I said, Arthur has needed me a little bit more. I've been in there pretty heavily because that's what he asked me to do. And Shannon didn't -- didn't have the foresight, obviously, to see that Arthur's wife was -- you know, had stage 4 cancer. So I've been in there more than I would like to, but it's Shannon's company. You know, it's -- it's Arthur's company. I'm going to do what I can to help both of them while they're both dealing with other things.

Q    Your payments from Seguro Medico come in cash, check?

A    I received wires from Seguro Medico before, wires or transfers.

Q    Okay.

A    Yeah.

Q    To where?

A    To my previous bank account.

Q    Okay. I'm going to point your attention to PC-77, which is in front of you, number 7.

A    Um-hum.

Q    Describe in detail the person, account number, and date you opened the account for all accounts held by you and any bank, financial institution, or brokerage. Your answer was none.

A    Um-hum.

Q    So what bank account did you not disclose to us in discovery that you're referring to now?

127

A    I don't have a bank account.  I haven't had a bank account for about a year and two months.  The reason why I haven't had a bank account is because my bank account was shut down because some of this debt was being picked up and seeped into Santander Bank at the time.  And they shut my bank account down.  I had an overdrawn bank account.  So that's what I told my attorneys, and that's how they answered.  I do not have a bank account.

Q    All right.  So maybe I misunderstood your prior answer.

A    Um-hum.

Q    You're paid by check, wire?

A    I have -- I have received wires.  And I have received transfers from Seguro Medico before.

Q    To where?

A    To my previous bank account as I said.

Q    Okay.

A    Um-hum.

Q    So in the last -- when did that bank account shut down?

A    As I said, I believe it was approximately a year ago, around a year ago.

Q    Okay.  In the last year, you've been paid by Seguro Medico in what form, cash, check?

A    I have -- I have not been paid by Seguro Medico in the last year.

Q    So your consulting work in the last year has been pro bono; is that correct?

128

A    I wouldn't say that.  You know, the nice thing about working for your wife and her partner is that the business grows in value or revenue grows -- grows or gets bigger, Attorney Ready, then Shannon can take a bigger distribution.  That's -- that's the way it works.

Q    I understand.  So you're working for the company as to -- is to benefit Mr. Kroemmelbein?

A    No.  It's to benefit the company.  That's the whole point.  That's -- that's why you're a consultant, so you can consult for a company and help them.  But obviously, there's a residual value to me.  You know, if my wife makes more money, maybe we can go on a vacation this year.  That's the way marriage works.

Q    And so your work for Seguro Medico though is pro bono.  You're not being paid for it; is that correct?

A    I haven't been paid from Seguro for -- for -- I would imagine for a long time, for the last year maybe.  But again, Attorney Ready, I would need to go and look.  I would need to go and see if they've given me 200 bucks.  I just don't want to be dishonest.

Q    Okay.  If they've given you 200 bucks, it would have been in cash, correct?

A    Yeah, I -- it would have been.

Q    When was the last time you were paid in cash by Seguro Medico?

A    Years ago.

129

Q    How many years ago?

A    I would -- I would say between two and three years ago, sir.

Q    Okay.  So in the last year --

A    Two and a half to three years ago.

Q    In the last year when you haven't had a bank account, you have not been paid in cash; is that correct?

A    Correct.

Q    Okay.  So in last year when you haven't had a bank account, obviously you haven't been paid by check or wire, correct?

A    Um-hum.  Correct, yes.

Q    Okay.  Seguro Medico uses the property 8 Morgan Drive at Sinking Spring; is that right?

A    That's correct.

Q    And that's owned by ARC Realty, correct?

A    Yes, sir.

Q    And that was owned by ARC Realty before your marriage; is that right?

A    I don't know.  I think that was 2022.  I would need to check the -- the deeds.  I believe it was.  It may have been 2021.  If I can think about it for a second.  I believe Seguro moved into -- Shannon bought the property I believe in -- I believe it was 2022, I believe so, April 2022, April or May 2022 I think.  It may be 2021.  I apologize.

130

Q    How much was it paid -- how much does Seguro pay Arc Realty for the rental on that property?

A    I don't know what the rental agreement is for -- for Seguro and Arc Realty.

Q    Okay.  So who manages Arc Realty?  Is that Ms. Kroemmelbein?

A    Shannon was managing Arc Realty.  Yeah.

Q    Okay.  Who is now?

A    She's managing it on a part-time basis while I'm trying to figure out the debts.  That's what she asked me to do.  And that's what I'm attempting to do.

Q    Okay.  You said you were likely going to have to file bankruptcy earlier this year?

A    When did I say that?

Q    Do you not recall --

A    I don't.

Q    -- ever saying that?

A    I really don't.

MR. READY:  Okay.  Well, give me one second.  Give me one moment.

I'm sorry.  That's the wrong one.  Give me just one moment.

(Pause)

MR. READY:  Well.  Thank you.  All right.  I'm sorry. That took me a little too long.  I apologize.

131

BY MR. READY:

Q I'm looking at PC-20. I want to show you your answer in number 21.

A Um-hum.

Q We asked you to identify something in the bottom here. You said in your answer, I have a number of personal judgments and personal guarantees that will likely result in personal bankruptcy in the next one to two months. Do you remember saying that?

A What -- sorry, Attorney Ready. What was this document, sir? Can I -- can I see that --

Q Sure.

A -- just so I can put it together?

Q Yeah. That was in May of this year.

A Okay. Yeah. We -- I was personally having hard times getting these debts under control back then in May. But what I feel like I've been able to do is get these debt structured, and I believe that these debts will be able to be paid off in the next one or two years, as they previously stated.

Q Has your financial situation improved since May?

A Has mine personally?

Q Yes.

A No.

Q And you are still not getting any income from your work at Seguro Medico?

132

A     Correct.  But I will say Seguro Médico is growing rapidly. And I expect to start getting income from Seguro Medico very shortly.

Q     Oh, okay.  And in what --

A     Yeah.

Q     -- form will that come in?

A     I would imagine it'll be a check or it'll be a check that I write back to my wife until I get a bank account approved.

Q     You intend to continue giving your income to your wife during the time until you get a bank account?

A     If I make income, I would most -- right now, if I was -- if I had income, I would be giving it to my wife.

Q     All right.  You said you're hoping to get the debts paid in the next one to two years.

A     Um-hum.

Q     What is going to change in the next six months, one year, two years that will allow you to pay these debts?

A     Seguro Medico is growing at a rapid rate.  It's doing a very good job.  And I feel like I'm bringing a lot of value as a consultant.  And thankfully in an indirect way, that affects me because Shannon is bringing in more money to the household as Arthur is bringing in more money for his household.  But from what I've heard and what I've seen from Arthur and Shannon, actually last Saturday, numbers are spiking coming up to open enrollment.  And I expect it to be a big open

133

enrollment for them.

Q    This may sound like a dumb question, but Ms. Kroemmelbein is not under any obligation to pay your debts, correct?

A    She has undersigned some of these settlement agreements.

Q    Okay.

A    Yeah.

Q    Fair response.  Let me ask you a different way.

A    Um-hum.

Q    You and Ms. Kroemmelbein don't have some contract where she has to pay your debts, correct?

A    No.

Q    Okay.  There's no power you have to compel her to pay any of these debts, correct?

A    No, sir.  No.

Q    Okay.

A    No.

Q    You're entitled to a share of the profits of Seguro Medico under your consultant consulting agreement?

A    That's what the initial consultation agreement was supposed to be.  But, you know, when you're working for your wife and her partner, things move.  Sometimes if it's a good month, you would get paid.  Sometimes if it's a bad month, you get paid less.  You know, it's -- I'm not going to hold my wife to, you know, certain stipulations in a consultative agreement, sir.

134

Q     Okay.  Fair enough.  It's not a normal business relationship?

A     I would say it is a normal business relationship.  I think that I show up and consult when I need to, when they need my help.  And when they don't, I don't.  It's that simple.

Q     But you'll agree the thing that's not normal is you're not getting paid, correct?

A     I don't think that's a regular either, to be perfectly frank.  You know, there's a lot of consultants in the world, Attorney Ready, they go and work for startups and consult for them in the hope that the business becomes very successful.  That's what a lot of consultants think.

Q     And when it becomes successful, how will that benefit you personally?

A     Well, as you can see from the consultative agreements, there's going to be a percentage of profits that would be paid to me.

Q     But they can terminate that at any time, correct?

A     They can, yeah.

Q     Okay.  You said Segura has been doing well?  It's been growing?

A     It's been up and down.  But I believe that from what Arthur and what Shannon, more so than Arthur recently, because Arthur's wife has been sick, but what Shannon is telling me through her PNLs is that it's looking like it's in an upswing,

135

especially coming up to -- to November and December with the health insurance marketplace opening.  So I expect them to make more money.

Q    So you've been declining your share of the profits over this last year voluntarily, correct?

A    I don't think it's been there to -- to -- to -- to pay me.

Q    So Seguro Medico is not profitable?

A    I wouldn't know.  You would honestly need to ask Arthur and Shannon.

Q    I think you just told me that you've been looking at profit and loss statements with her?

A    Yeah, vaguely.  Again, you know.

Q    Is it profitable?

A    Profit and loss statements are based on projections many times.  So you know, I'll be honest with you.  When Shannon and Arthur say -- profit -- profit and loss statements can also be projectional.  So when they're showing me what November and December and January and February are going to do, you know, I believe them.  And I try and find a way to bring value to -- to their operation.

Q    So you haven't looked at any profit and loss statements.  You've looked at projections; is that correct?

A    Yeah, I -- they -- they -- they build it on a profit and loss pro schema where they can see it.  But you're correct, you know.  I'm looking at projections.

136

Q    So Seguro Medico is not profitable, correct?

A    I have no idea.

Q    Okay.  Okay.  So you haven't declined to share the profits.  You don't know whether it's making money or not?

A    Correct.  I don't know if it's profitable.

Q    Do you -- you don't review any -- any numbers related to the business in your work?

A    It depends if Arthur and Shannon want me to look at numbers.  Then I'll look at numbers with them.

Q    When you go in and sit in your office on a daily basis, you look through all sorts of records related to business, right?

A    But I don't go and sit in my office on a daily basis.  As I said, I've been at the office more --

Q    Okay.

A    -- because I'm trying to help Arthur.

Q    Days that you --

A    You know.

Q    Days that you are at the office, you look at the numbers related to the business, right?  You look at sales numbers, you look at contracts --

A    I will look at whatever Arthur and Shannon want me to look at.  For instance, if you would like an example, sir.

Q    Well, let me just ask this.  You're -- when you're in the office on any given day, okay?

137

A     Uh-huh.

Q     Do you access the numbers?

A     Which day in particular are you talking about?

Q     Do you --

A     A Monday or Tuesday or what?

Q     Oh, any of the above.

A     Okay.

Q     Do you ever access any of the numbers related to the business when you are physically there?

A     No.

Q     Any numbers?

A     Unless Arthur and Shannon want me to look at numbers, I will look at numbers.

Q     Okay.  It's your testimony that you don't look at how many sales have been made, who's making the most sales in the business?

A     I have -- I have looked at sales numbers.

        MR. CIARDI:  Your Honor, I'm going to object.  He said numbers generally and was referring to profitability earlier.  Now he's changing the question and assuming facts that aren't in evidence.  So I think we need to be clear in the questioning if we're moving on to something other than profitability, which is where he's been in the past.

        THE COURT:  Why don't you just clarify what you're asking?

138

MR. READY:  Sure, sure.

BY MR. READY:

Q    When you sit at your desk at the office --

A    Uh-huh.

Q    -- do you have access --

A    Now which -- sorry, Your Honor.  I apologize.  I keep -- I apologize to interrupt.  Sorry, Attorney Ready.  Go on ahead.

Q    Okay.  Yeah.  When you -- when you sit at your desk in the office --

A    Uh-huh.

Q    -- do you have access to the -- the profits and loss statements of the business?

A    As I've said, first of all, which desk?  It depends what desk is available.  So for instance, last week I had to sit upstairs, because the downstairs desks were full.  They went on a recruiting spree where Arthur hired six or seven people.  The last time I looked at numbers, I believe you were saying sales numbers.  I had to look at sales numbers three to four or five days ago, because Arthur was not in the office.  So many of the time, Jesus Barrera, who's the vice president of operations, or Ms. Hatmaker will bring the numbers to me to review.  I have thirteen years of experience in sales.

Q    Okay.  So you do regularly see the sales numbers in the business, right?

A    I look at the sales numbers if that is my objective.  If

139

they want me to help with sales, I will help them with sales. If they want me to build a SQL server, I will build the SQL server.

Q   I understand your testimony is that you don't do anything without being asked to do it, essentially, okay.  But my question is a little different.

A   Sure.

Q   I'm asking you, do you have access --

A   Uh-huh.

Q   -- to that information when you're at Seguro Medico?

A   Access to which information?  The sales information?

Q   Sure.  Sales information.

A   I have a sub admin user login into a CRM where I can go in and start looking at reports and work, but it's not super admin access, it's not full access.  That's with Arthur and Shannon.

Q   Okay.  What do you not have access to?

A   I -- there's many things that I don't have -- have access to.

Q   Okay.  Do you have access to the top sales performers to know who's selling the most in a given day, week, or month?

A   Well, from what I understand, Arthur has that delegated to Jesus Barrera, who's the sales director/VP.  So of course, I'll talk to Jesus about who's leading sales, et cetera.  I will say that there's a slight shift here in the -- I built the leaderboard that has the sales numbers.  That's what I did at

140

home for three or four weeks.  So I built the -- the gamification leaderboard for the guys.  So yeah, technically, I could walk by the leaderboard and see who the top salesperson is.

Q    Okay.  Do you have access of your own power, your own access, to information about how much money is made in a given week?

A    Yeah, that would -- they would share that with me.

Q    Okay.

A    Uh-huh.

Q    Do you have access of your own power and ability to -- what debts are being paid by the company?

A    That would be more of a Shannon thing, but we would try and have an open conversation about that.  Yes.

Q    Okay.

A    So she would say, I'm going to pay card flex this week, or --

Q    You have --

A    Or Arthur would as well.  Arthur's got heavily involved in the last number of -- number of months, before his wife got sick, with, you know, with debt repayment schedules.

Q    Okay.  And you have -- you have access -- you listen to phone calls that sales agents are on, correct?

A    Very, very rarely.

Q    Okay.

141

A    Maybe once a year, Attorney Ready.  Maybe once or twice a year.

Q    Has that --

A    Yeah, I --

Q    -- been consistent since the beginning of Seguro Medico, that you've only listened to sales calls maybe once or twice a year?

A    I've -- part -- here's the thing.  I try not to get involved in that aspect, because that's the aspect that drove me crazy with the previous businesses, listening to thousands of calls.  So I -- I try and stay away from that, to be perfectly frank.  I'll leave that to Jesus Barrera and Arthur Walsh, the --

Q    Okay.

A    -- the employees of Seguro.

Q    So -- so you, since 2020, you've listened to, you think, calls roughly eight times?

A    No, I --

Q    Two times a year?

A    Maybe once or twice I've listened to some sales calls or customer service calls --

Q    Since 2020?

A    But I have not specifically been given that task, because they know I don't want to do that, you know, it's --

Q    Okay.  Just wanted to make --

142

A    -- it's not really part of my consultation agreement, to be honest.

Q    I just want to make sure.  So since 2020, though.  And make sure I understand this completely.

A    Uh-huh.

Q    Since 2020, you're saying you've only listened to one or two sales calls at Seguro Medico?

A    But again, Attorney Ready, it's such a general question, respectfully.  Like, you're asking me to remember what happened four years ago.  Maybe I've listened to six, maybe I listened to eight.  My premise was that I usually, 99 percent of the time, don't listen to sales calls.  That's -- that's the best that I can do, sir.

Q    Do you attend meetings where sales calls are played for the sales force?

A    No, I haven't attended a sales meeting at Seguro for -- for years.

Q    Arthur has probably asked me to stop in and see how his meeting is going.  He has had me critique him on his meetings, but that is not my shtick.  That's what the ownership does.  I want nothing to do with it.

A    Do you attend meetings where someone else is speaking to the whole team about a sales call and playing it?

Q    I have been asked to -- to stand at the back of the room.  And I've been asked to help someone prepare a sales meeting or

143

a compliance meeting. I've been asked to do that. I've helped them with their PowerPoint, but I am not leading meetings. That is not my job.

Q    Do you --

A    I do not want to do that again.

Q    Do you attend meetings in your office or anybody's office where sales calls are played for the sales team?

A    Well, number one, as I said, I don't have an office. But if you -- I'm in the office and someone like Arthur or Jesus wants me to listen to a call, because they're my employer, Arthur is my employer, of course I'm going to listen. But I'm not going to sit down and listen to thousands of sales calls. I used to do that with Bene Markets, and it's not part of my consultated (sic) -- consultation agreement.

Q    I want to show you your consultation agreement --

A    Uh-huh.

Q    -- since we're discussing it. First of all, this is a true and accurate reflection of your consultation agreement?

A    Yes. Correct.

Q    Okay. And it says here that you're going to work in HIPAA compliance, lead generation --

A    Uh-huh.

Q    -- marketing development --

A    Uh-huh.

Q    -- on this technology and information systems management,

144

SOP, standard operating procedures, right?

A    Yes, sir.

Q    And procedure formation?

A    Uh-huh.

Q    Human resources management, production recommendations, introduction to various lead and insurance carrier vendors; is that correct?

A    Yes, sir.

Q    What lead in insurance carrier vendors have you introduced them to?

A    So we've seen on the -- the creditor list, all web leads. You know, thankfully, I had a great relationship with -- or I still have a good relationship with Bill Daniel, the owner.  So all web leads would have been one.  Precise leads would have been another.  I have used dozens, maybe close to a hundred lead vendors.  And the time with NBOA and Bene Market.  And that can really help a company grow.  You know, if you have connections, you can use these connections to, you know, to further enhance Seguro's ability to grow.

Q    Seguro Medico operates a call center at 8 Morgan Drive, correct?  That's the main process there?

A    No, we clarified that.  It's an agency.  I ran call -- sorry to be facetious.  I'll try that again.  I ran call centers.  Seguro Medico is an actual insurance agency.  It's a big difference.

145

Q     What's the difference?

A     Okay.  So when we're talking about HIPAA compliance, lead generation, marketing development, standardized operation procedures, having a bunch of really smart people like MBAs operating and owning and running the business -- I don't want to generalize, but we don't really see that done in Florida in the call center world.  I don't know if you've ever been to a call center, Attorney Ready, but it is not an insurance agency. It's a sales machine of trying to get advanced commissions. That's what it is.

Seguro Medico has verification, compliance, customer service, fulfillment, a CRM that is proprietary, lead generation.  It has a lot of its own internal lead generation, HIPAA compliance, third-party audits.  It has attorneys like Attorney Heim.  You know, it's a -- it's a real organization. It's just not another call center.

Q     So what's operated at 8 Morgan Drive, though, is the location where insurance is bought and sold, right?  It's there.  That's what's happening there, correct?

A     Seguro Medico operates at 8 Morgan Drive, correct.

Q     Okay.

A     I've been to the office.

Q     And that's where they bind insurance for people, correct?

A     I don't -- I am not sure what "bind" means.

Q     Okay.  People who call in to Seguro Medico, they're all,

146

first of all, calling in to 8 Morgan Drive, right?  That's where the phones are directed?

A     Well, the lead is going -- is generated online from a lead vendor, and it comes into Seguro Medico.  It's an inbound leads that goes into the dialer system.  The dialer system will then pick up that call.  The screen will pop.  It was one of the things that I built, believe it or not.  But the screen will pop on the -- the agents or whoever answers the phone, we'll fill out the information and begin to shop for the -- for the the customer, the potential customer, the lead.

Q     Okay.  And then that -- all those -- the people who are answering those calls, who are processing those inquiries, who are dealing with those leads, who are dealing with customer service calls, they're all sitting at 8 Morgan Drive, right?

A     Correct.

Q     Okay.  There's not another office somewhere, right?

A     No.

Q     Okay.  And that's where they solicit future policyholders, right?

A     I don't like the word solicit, but yes, they attempt to sell clients an insurance policy or a policy similar to insurance.

Q     And Seguro Medico has lost its insurance license in several jurisdictions, correct?

A     Yeah.  That's --

147

Q    Which states has it lost its license?

A    I'm not sure, you know.  That would be a more pointed question for Attorney Heim or for Arthur Walsh.  I try to stay away from compliance completely.

Q    Okay.  If I represented to you that it's lost its license in Washington State, would you agree that that's correct?

A    I believe their -- leads are not being purchased in Washington State right now.

Q    Okay.  What other states are they not being purchased in?

A    I have no idea.  I'm not the one who sets up the lead form and the lead order form or paid for the leads.

Q    So how do you know they're not being purchased in Washington State?

A    Again, you're in an agency and you walk by, and you say to the sales guy, hey, buddy, how's it going, and he says, hey, it's really slow.  We lost Washington State.  You know, these are conversations that happen in any office.  So you pick this up, and that's what it is, you know.

Q    Okay.  Got you.

A    There's information, and I'm -- I'm in an office.  I'm picking out information and trying to help the company succeed.

Q    Okay.  So you don't know from your work that it's lost its license in Washington State.  You think you just heard that from a coworker?

A    Not a coworker.  I would have heard that from Arthur Walsh

148

or Jesus Barrera. They may have mentioned that.

Q Which one?

A I have -- I can't remember, Joel.

Q Okay. I'm going to bring you down here. You agree that part of your job is hiring and firing, right?

A No. Absolutely not.

Q Okay. Let's see here. So assisting in human resource management and providing recommendations for improving production employee workflows. You don't believe that encompasses hiring and firing?

A I've said -- no. And that's not what I do anyway. You know, it's not my job to hire and fire. Now to be honest, Arthur has asked me to sit in on some interviews before, to gauge the temperature of the client. But that is not what I do. Again, I wanted to make sure I didn't do that because I did that all the time in NBOA and Bene Market, and I did not want to do that anymore.

Q So I'm going to keep you going. Down here it says --

MR. CIARDI: Your Honor, I'm going to ask for proof. I have no idea what this has to do with his creditors and his ability to pay his creditors. We're talking about the internal management of a company he doesn't own. That's what we've been talking about for -- and I understand that there's issues that came up at the last hearing, and there might be things we're going to discuss about it. So it's gone on. But unless

149

they're tying this back to his creditors and his inability to pay his debts, I don't know how it has any relevance.

THE COURT:  Mr. Ready?

MR. READY:  Sure.  Well, Your Honor, a few answers. First of all, what we've learned today so far is that Mr. Redmond works in a business but does not get paid for it.  So that directly bears on whether he'll be able to pay his creditors.

A second thing is that despite what he's saying about his role at the business, it is contradicted by the agreement that's in front of the Court.  This goes to the question of whether he's dissipating assets, whether he's disguising income.  So all of this bears on his credibility and on whether there's dissipated assets.

MR. CIARDI:  Your Honor, whether he's getting paid a dollar a million dollars, that question's been asked and answered.  What his duties are, if he goes there and doesn't get paid, how is that at all relevant?  Whether he picks up one phone call or a thousand phone calls?

MR. READY:  Right --

MR. CIARDI:  The question was asked and answered. Are you getting paid now?  And his answer was no.

MR. READY:  So --

MR. CIARDI:  What else do we need?

MR. READY:  The Court may consider, under the

150

totality of the circumstances, whether the debtor has paid only creditors he wants to pay rather than all the debts outstanding.  Your Honor, I'll represent I'm pretty close to the end of this line.  I do want to ask him about the hold harmless and indemnification agreement, which I think is important because he says he's personally guaranteeing debts, but his agreement is the opposite.  So I --

THE COURT:  Okay.

MR. READY:  -- I would like to know more about that.

THE COURT:  I'll allow that.

BY MR. READY:

Q    Mr. Redmond.

A    Uh-huh.

Q    Down here at the bottom, you see paragraph 6, it says hold harmless and indemnification?

A    Sure.

Q    First of all, you understand those terms, correct?

A    Yes.

Q    Okay.  So this says that you shall not be liable for any claims, damages, or liabilities arising from the services provided under this agreement?

A    Uh-huh.

Q    And it says that you're -- down here, client also acknowledges that consultant's recommendations and advice are provided in a consultative capacity?

151

A    Uh-huh.

Q    So it says that client, Seguro Medico, agrees to hold you harmless for any outcomes that result from decisions made by the client.  Did I read that correctly?

A    You did.

Q    Okay.  And so you're not responsible for any of the debts of Seguro Medico, correct?

A    Well, you know --

MR. CIARDI:  Your Honor, that's not what this says. This says actions taken as a result of his consultative services.  It's nothing to do with debts or not debts.

MR. READY:  Your Honor, that would certainly cover if there were debts --

MR. CIARDI:  That's --

MR. READY:  -- that were incurred by the business.

MR. CIARDI:  Then that's going to call for a legal conclusion, Your Honor.  And then my objection will be something different.

MR. READY:  Okay.

MR. CIARDI:  But that's not what this document says.

MR. READY:  Your Honor, I'll accept that they believe that's the legal conclusion.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Your Honor, not to interrupt, but can we just take a five-minute bathroom break --

152

THE COURT: Well --

UNIDENTIFIED SPEAKER: -- if we're going to.

THE COURT: Yeah, we're -- we're close to done. We're at, like, 12:58. So you have basically two minutes.

MR. READY: Okay. Understood, Your Honor.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

BY MR. READY:

Q   Who else has taken shares of the profits of Seguro Medico?

A   Who else gets paid? Who else gets shares?

Q   Yes.

A   Well, what does that mean, Joel? Distributions?

Q   Yes. Who gets the distributions from Seguro Medico?

A   I would imagine it's Arthur and -- well, I know Shannon, obviously, gets distributions and I believe Arthur gets distributions, too. You would need to ask him.

Q   Okay. When did Shanonn -- Ms. Kroemmelbein resign employment with the Bucks County Intermediate Unit?

A   I'm not exactly sure.

Q   Okay. Just so that we have a complete -- one moment.

A   Uh-huh.

MR. READY: That's all the questions I have for this witness.

THE COURT: Okay. Since we are at roughly 1:00, I presume that you're going to want to have your client on the stand when we come back?

153

MR. CIARDI:  Well, Your Honor, I want to discuss that with Ms. Nigrelli.  We may choose to put him on in our case-in-chief and be done with him for now.

THE COURT:  Okay.

MR. CIARDI:  I haven't made that decision yet, so I -- maybe in a -- when we take the break, we'll make that decision, but.

THE COURT:  Okay.  But I presume there won't be discussion regarding his testimony?

MR. CIARDI:  No, we won't be discussing it with him, Your Honor.  I don't know whether I'm going to call him or not call him --

THE COURT:  Understood.

MR. CIARDI:  -- after the -- that -- I just haven't made that decision.

THE COURT:  Okay.  That's fine.

You can step down.  Thank you, Mr. Redmond.

THE WITNESS:  Thank you.

THE COURT:  Okay.  So my plan is to come back at 2:00, unless you need more time than that, which is fine, too.

MR. CIARDI:  No.

THE COURT:  I might need more time than that, but I don't have anything in between.  So I can come back at 2:00, if that's okay with everyone.

MR. CIARDI:  2:00 is fine, Your Honor.

154

MR. READY:  That's fine.

MR. CIARDI:  I'd just like to know what other witnesses that they intend to present for the --

THE COURT:  Sure.

MR. CIARDI:  -- rest of the day, so that we can plan --

THE COURT:  Sure.

MR. CIARDI:  -- what we intend to call.

THE COURT:  Mr. Ready?  What's your plan?

MR. READY:  Yes, Your Honor.  I want to review my notes.  I'm not sure that I have any more witnesses that I need to present, so.

THE COURT:  Okay.  Okay.

MR. READY:  I need to just double-check a few things.

THE COURT:  Okay.

MR. PACK:  Your Honor, I'm sorry.

THE COURT:  Yes?

MR. PACK:  I just want to make sure -- I want to confirm with Mr. Ready and Your Honor.  I represent a third party who was issued a subpoena.  I just want to make sure I don't have to come back today.

THE COURT:  I don't believe --

MR. READY:  I'm really sorry.  I didn't realize.

MR. PACK:  I know you said --

MR. READY:  I actually didn't realize he was still

155

here.

MR. PACK:  -- we have to table it.  I just wanted to confirm.

THE COURT:  I don't -- I understand because I think you were going to make that decision after --

MR. READY:  After --

THE COURT:  -- some --

MR. READY:  -- after they present --

THE COURT:  -- testimony.

MR. READY:  -- on bad faith, yes.

THE COURT:  Okay.

MR. READY:  Yes.

THE COURT:  Well, then that will probably not be today.

MR. READY:  Yeah.  I'm truly sorry.  I already thought that was taken care of.  I apologize.

THE COURT:  Okay.

MR. READY:  I didn't realize you're still here.

THE COURT:  Understood.

MR. PACK:  Thank you, Your Honor.

THE COURT:  Yes.  All right.  So the plan when we come back is you'll let me know whether you have anyone else.

MR. READY:  Yes, Your Honor.

THE COURT:  And then I'll let Mr. Ciardi proceed from there.

156

MR. READY:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Thank you, everyone.

MR. CIARDI:  Thank you, Your Honor.

MR. PACK:  Thank you.

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  Sorry to make you wait so long for a break.

(Recess)

THE CLERK:  All rise.  Court is now in session.  You may be seated.

THE COURT:  Okay.  We're back, I think.  Are we on the record?

ECR:  Yep.

THE COURT:  Yeah?  Okay.  All right.  So where do we stand?

MR. READY:  Upon review, Your Honor --

MS. NIGRELLI:  Your Honor, one second.  I think Mr. Ciardi just --

THE COURT:  Sure.

MR. READY:  I'm sorry.

MS. NIGRELLI:  -- ran to the restroom.

THE COURT:  No problem.  We can.  Okay.  We're back on?

ECR:  Yep.

THE COURT:  Okay.  Mr. Ready?

157

MR. READY: Thank you, Your Honor. We're prepared to rest. I do have some exhibits to admit, but I can wait. I wasn't clear from Your Honor's policies if you prefer to wait to the end of trial or just our case-in-chief?

THE COURT: I'm happy to do them now --

MR. READY: Okay. Sure.

THE COURT: -- if that'll.

MR. READY: So I think we are -- I believe PC-19, 20, and 21 were already admitted at the prior hearing. But I'm asking for those to be admitted again or considered as part of this record.

THE COURT: Okay.

MR. READY: Okay. Asking for judicial notice of PC-51, 52, and 53, which I believe Your Honor had granted earlier, but I would move to admit those, as well.

THE COURT: Okay.

MR. READY: Asking for judicial notice of PC-54, which relates to the Uniform Commercial Code financing statement. It's publicly recorded, showing the Redmonds personally guaranteeing the debts of Seguro Medico.

MR. CIARDI: Objection, Your Honor. A, there's been no witness that laid a foundation for it, and B, a UCC financing statement does not show guarantees. It simply shows that a UCC-1 statement was filed. So to the extent they're offering it for that, A, that's not an appropriate use, but B,

158

it's not authenticated.

MR. READY:  So generally, Your Honor, public records are something that the Court can judicially notice.  I mean, I'm happy to argue about the significance of it later, but we would ask for the Court to notice it and admit it.

MR. CIARDI:  I don't know who pulled the search.  I don't know who did the search.  There's nothing.  And again, there's no foundation laid for what this is or why it's being offered.

MR. READY:  I'm happy to explain why it's very important.

MR. CIARDI:  He's not the witness.

THE COURT:  Well, let's start at the beginning.  So you have a problem with authenticity, first and foremost?  Because --

MR. CIARDI: Yes, Your Honor.  We did not stipulate to the authenticity of this document.

THE COURT:  To the extent that the public records exception applies?

MR. CIARDI:  Well, it's not certified, number one.  It's a piece of paper.  That's all I got, okay.  And it attaches documents that are filed publicly, yes, but there's no certification on those, either.  So again, there are public records here.  There's a search report, okay.  What or how that search report is created -- I mean, maybe if we remove the

159

search report, okay, the UCC-1s can come in, because they are truly a public record.

THE COURT:  Right.

MR. CIARDI:  But the search report would not be a public record.

THE COURT:  Mr. Ready?

MR. READY:  So Your Honor, first of all, generally, public records can be judicially noticed.  This has been ruled, including on 12(b)(6) motions.  I can cite some case law to the degree the Court wants to hear it, but documents filed with the Secretary of State are generally able to be judicially noticed.

THE COURT:  Right.  And I don't think that Mr. Ciardi has a problem with the actual UCCs themselves.  I think he has a problem with the report that's attached to it?

MR. CIARDI:  Correct.

THE COURT:  Correct?

MR. CIARDI:  And I actually think we made that distinction in answering the admissions, Your Honor.  That there's UCCs that are attached, and then there's a report.

MR. READY:  Your Honor, I'm happy --

MR. CIARDI:  The report seems to be generated by a person at the law firm.

THE COURT:  Right.

MR. READY:  I'm happy to agree that the report would not be admitted as part of the exhibit.

160

THE COURT:  Okay.  So it would be pages 2, 3, and 4 of the exhibit, which I think are just the UCCs, correct?

MR. READY:  Yes, Your Honor, I believe that's correct.

THE COURT:  Well, maybe it's -- yeah.  Yeah.  The report's the first page.  So is there any issue with the UCC themselves coming out?

MR. CIARDI:  There's no issue with the UCC themselves.  I'll have an issue in argument if we're going to say they're anything other than what a UCC-1 is, but --

THE COURT:  Understood.

MR. CIARDI:  -- that's a different issue, Your Honor.

THE COURT:  Okay.  So is that all of them?  There's more?

MR. READY:  Sorry, there are a few more.

THE COURT:  That's -- go ahead.

MR. READY:  Sorry.  There are a few more.  PC 77, 78, 79, and 80 are discovery responses of Alan Redmond.

MR. CIARDI:  I think we've already dealt with, Your Honor, that 80 is not necessary.  It's irrelevant.  If you want to let it in, I honestly don't care.

THE COURT:  You have no problem with 77, 78, and 79, but just 80?  Is that --

MR. CIARDI:  I think 80 is duplicative of 79.  But if there's some special need to have 80 as well as 79, then that's

161

fine.

THE COURT:  Mr. Ready, you're looking for all of them?

MR. READY:  I guess, yes.  I don't --

THE COURT:  All right.  They'll be admitted.

MR. READY:  Oh, I'm sorry.  And Your Honor, it's PC-81 is the debtor schedules which were referenced.  I would also ask for those to be admitted as well.

THE COURT:  These are the amended ones?

MR. READY:  No, you're not -- Your Honor, they're not.

THE COURT:  No.

MR. READY:  It was PD-22 that we ended up using.

THE COURT:  Right.

MR. READY:  I believe.

THE COURT:  Okay.  Because this is the former one?

MR. READY:  I --

THE COURT:  81 is the former?

MR. READY:  I would be fine with admitting both, to the degree that there's any issue, PC-81 and PD-22.

UNIDENTIFIED SPEAKER:  (Indiscernible) before the Court.

THE COURT:  Any issue, Mr. Ciardi?

MR. CIARDI:  I have no issue with either one of them, Your Honor.

162

MR. READY:  All right.

THE COURT:  Okay.

MR. READY:  And that is all from me, Your Honor.

THE COURT:  All right.  Well, so I just want to make sure I have the list correct.  So I have PC-19 through 21; PC-51 through 53; PC-54, just as to the UCCs, which are the second, third, and fourth pages; PC-77 through 80; ad PC-81, as well as PD-22.  Is that everything?

MR. READY:  Yes, Your Honor.

THE COURT:  All right.  They will be admitted.

(Exhibits 19, 20, 21, 51, 52, 53, 54, 77, 78, 79, 80, 81 Received)

(Exhibit 22 Received)

MR. READY:  Thank you.

THE COURT:  All right.

MR. CIARDI:  And do I understand that's their entire case-in-chief on the involuntary?

THE COURT:  I think you are resting at this point, correct?

MR. READY:  Yes, Your Honor.  I mean, we reserve the right to respond to specific --

THE COURT:  Obviously.

MR. READY:  -- bad-faith allegations, but yeah.  Yes.

THE COURT:  Okay.

MR. CIARDI:  No, no, I just want to be clear, Your

163

Honor, because our -- while not normally done at the -- it's done at the close of evidence of the plaintiff's case.  I want to preserve the record in the future and say that they have not met their burden and move under Rule 50, or the bankruptcy equivalent of it, for what would be the essentially a directed verdict, that there has not been sufficient evidence presented with regard to both the numerosity with regard to disputes as to creditors, and also with regard to debts not being paid when they come due.  I believe they failed to meet their burden on each of those elements with regard to their case-in-chief.

THE COURT:  Mr. Ready?

MR. READY:  Your Honor, the Court has already ruled on numerosity.

THE COURT:  Uh-huh.

MR. READY:  So as to whether the debts are being paid when they come due, we have just had Mr. Redmond's, the putative debtor, admit that he is insolvent.  He did --

MR. CIARDI:  We did not have that, Your Honor.  He did not admit that.

MR. READY:  He refused to use the word insolvent.  He instead preferred to say that he cannot pay a single one of his undisputed debts.  And I walked him through every single one of them.  That would be my definition of insolvent.  So he admitted that.  He admitted that he has no payment plans with all but three of them, which he claimed he had payment plans

164

for.  We've admitted evidence that he did not produce those in discovery.  I submit to the Court that his explanations for not submitting them are not persuasive.  We have a right to an adverse inference that they do not exist.  We also presented evidence that he does not wish to pay certain creditors.  And as a result, we presented more than enough evidence to support our burden on that issue.

THE COURT:  Mr. Ciardi?

MR. CIARDI:  So Your Honor, I believe the witness testified, and then when we call him in our case-in-chief, we'll again go through this, that both for Bochetto & Lentz, and Mr. Rush, he had agreements with those creditors, and they were comfortable with his -- whatever he was or was not paying.  And the same with Duane Morris.  No contradictory evidence presented.

With regard to produce or advance card flex and all web leads, he indicated he had agreements with them.  While the agreements weren't produced, none of those creditors, having gotten notice and having the opportunity to appear and participate for the last two weeks -- god knows if they got subpoenaed.  We don't know that, because we weren't provided any of those.  But as to that, none of them have showed up to contradict or say anything different than what Mr. Redmond is saying.

So the only creditors that we are not paying are Mr.

165

Jordan, who we have a counterclaim against, or a claim against that more than exceeds the amount of his debt.  We have the Cornerstone debt, which we agree we have not paid, Mr. Shalter's nonexistent debt, because he does not have a claim against Mr. Redmond, and Complete Business Solutions, who we are disputing and has been disputed, as well as the claim of -- I believe we've made it very clear that American Workers Insurance, we're disputing.

So as to the undisputed debts, the testimony is we're paying those creditors.  As to the disputed debts, we are not paying those creditors.

MR. READY:  Your Honor, as to the undisputed debts, the undisputed testimony is that he's not paying anyone.  The testimony is that he doesn't have any records proving he's paying anyone.  The testimony is that he's not paying Cornerstone Law Firm, Jason Scott Jordan, and cannot pay either one of them.  The testimony is that he has got some sort of agreement with CardFlex, but he hasn't produced it.  The testimony is that he is not paying Duane Morris, LLP, and can't pay them.

Rush Law Group, can't pay it off right now.  And the fact that -- that the case law is very clear; the fact that a debtor or creditor is voluntarily forbearing, that they are being friendly, that they are being nice, which is exactly how he described it in the first hearing, that is not sufficient to

166

mean that they are being paid on time.  The Pennsylvania Department of Revenue, the Berks County Tax Claim Bureau, the Pennsylvania Unemployment Compensation Tax Bureau, Your Honor, they are not paid.  I mean, by definition, these are tax liens. They are late.  They certainly are not going to be able to say that they're all fine with not being paid on time.  That's not how taxes work.

As far as Bochetto & Lentz, again, obviously that's a friendly creditor.  But he owes them $41,000.  And he said today he cannot pay them.  And on top of that, he's acknowledged that he's cut off his only revenue stream voluntarily -- voluntarily, for his own personal familial reasons, to enrich his wife.  He's chosen to cut off his own revenue stream.  This is more than enough evidence for us to meet our burden.

THE COURT:  Mr. Ciardi?

MR. CIARDI:  Your Honor, it is not our burden.  It is their burden.

THE COURT:  Understood.

MR. CIARDI:  It is always their burden.  What you will hear, I guess, in our case-in-chief, is that no one ever investigated this prefile.  And you will see today -- and what we've seen today is they don't have any evidence from any of these creditors.  They have known of the existence of these creditors for a while.  They've sued Bene Markets.  They've

167

sued our client.  They've taken discovery deposition, or discovery in aid of execution in state court.  They've done nothing.

And then when they get sued in state court, which they did get sued in state court in the Complete Business Solutions group, then there's this rush to get the involuntary in, and get a stay out of this court.  Not this Court, not for what is happening against the debtor, to protect the debtor, but to protect them.  That was the purpose of this file.  And they didn't do any discovery to find out whether we were or were not paying debts on time.  Our creditors have the right to say, we're okay with you doing what you're doing.  They have that right.  Nothing says they don't have that right. Otherwise, any three creditors could put anybody into bankruptcy at any point in time, even if you're paying another fifty people or they're comfortable waiting for something to happen.

So I don't believe they've met their burden, Your Honor.  And we want to make our record so that as for Rule 50 purposes, that we are prepared to move forward, if we need to.

MR. READY:  Your Honor, the case --

THE COURT:  Go ahead.

MR. READY:  -- the case law is exceedingly clear that they cannot selectively choose to pay creditors.  They cannot be paying the lesser creditors.  The biggest undisputed

168

creditor they have is Jason Scott Jordan.  They're not paying him.  That's enough.

MR. CIARDI:  They absolutely can.

MR. READY:  Well --

MR. CIARDI:  There's absolutely --

MR. READY:  -- well, they can't --

MR. CIARDI:  --  no law that says I can't pick and choose, outside of bankruptcy, who I want to pay.

MR. READY:  No, that's --

MR. CIARDI:  There's absolutely no law that says that.

MR. READY:  Your Honor, I'm happy to cite case law, or we can brief this issue.  But Your Honor --

MR. CIARDI:  Cite the case law.

MR. READY:  -- it's enough to show -- sure.  The failure to pay just one significant creditor can support a finding that the debtor is generally not paying debts.  That's In Re: Euro-American Lodging Corp., 357 BR 700 at 713. Allowing a single creditor to initiate an involuntary bankruptcy proceeding -- different case -- provided there are fewer than twelve creditors is acceptable, that's 202 BR 341.

When we can show that they are completely ignoring an obligation, such as a judgment that makes up the vast majority of the debt one owes, so long as he is current on all of his other recurring obligations, that's good enough.  504 BR 815.

169

Additionally, the Court may consider, under the totality of the circumstances, whether the debt debtor has paid those creditors whose claims she wants to pay, rather than all outstanding debts.  That's 249 BR 411.  I can go on.

Your Honor, we pass all of the national tests that are being used.  We are the major creditor.  He is insolvent, which he not only admitted on the stand, but which he also admitted in his discovery when he produced a personal financial statement at PC-21 that shows that he is $6.7 million in the red.  Those are his words under oath, not mine.  He has acknowledged that he is insolvent and cannot pay his debts, here today in written discovery.

This whole argument that we didn't investigate it, Your Honor, we have relied on what Mr. Redmond told us under oath.  And now they're coming in and saying it is bad faith to rely on what their client swears to us under oath.  He said that he didn't have any other undisputed creditors in his discovery.  We found tax liens.  We became aware of that.  But even if we look at the three tax liens, which are undisputed and are too, then the only five undisputed creditors we could possibly have known about before filing were all not getting paid on time.  That can't possibly be bad faith.

And Your Honor, I'll go further that the elements of the bad faith test -- which is their burden.  The elements of the bad faith test, which is their burden, which go to the

170

issues of whether we looked before we leapt, whether we did our discovery, whether we knew that he was insolvent before filing. Those really are only opened up if they can show that we didn't meet the test.  If we have a meritorious contention, if we've met the statutory remedies, then the investigation is not important, because we've proven our case.

What they're left with is trying to show ill will. They didn't ask a single one of my witnesses yesterday about ill will.  What they're left with is trying to show suspicious timing.  And this whole thing about the lawsuit, happy to get into that at the appropriate time.  That's definitely their burden to try to prove.  Those issues are on them.  But they're down to those factors.

And to the degree that dissipation of assets is also one of those factors, they forfeited the chance to argue on that because they wouldn't produce discovery on those issues. So Your Honor, this is a really straightforward issue.  Mr. Redmond can't pay any of his debts.  He's voluntarily turning off income.  We're entitled to an involuntary bankruptcy.

MR. CIARDI:  Your Honor, first of all, the legal proposition that Mr. Ready was trying to find cases for was that proposition a debtor can pick and choose who he wants to pay.  None of the cases he cited stand for that proposition, based upon what he alone read.  None of them cite for that proposition.  I think that we're moving into the bad faith

171

case.  I'm not at bad faith yet.  I'm at, did they prove that I am not paying undisputed debts as they come due?  That is their burden.  It is not to prove insolvency or admit insolvency.  That's not the test.  He can say insolvency all he wants.  It is not the test.

The test is, did he come forward with evidence to show that there are creditors that we are not paying that are undisputed?  Yes, the three tax liens are unpaid.  No doubt about it.  But we have five creditors that are being paid, and we have disputes with other creditors that aren't being paid.  That's not what an involuntary is meant to do.  What you're hearing, Judge, is a two-party dispute; us and them.  It has been a two-party dispute for four years, and none of the other creditors seem to care.  And that's what the involuntary is meant to take care of.  What do the other creditors want to do as well?  How are they going to be impacted?

Well, all the other creditors that we have deals with, they don't get to get paid any more if we file -- if there's an involuntary, because we then convert to an 11 and we go through a voluntary Chapter 11 process.  That's how that works.  So they get affected.  They're not here.  They're not participating.  The only two people participating are Mr. Ready's client and my client.  It is a two-party dispute, Judge.

MR. READY:  That's just not correct.

172

THE COURT:  I understood.

MR. READY:  And Your Honor, of course, if they say that these creditors have a problem with this, where are they? Where are these creditors they say are objecting to this process?  Again, the idea that we can't rely on what Mr. Redmond said under oath today, what he said previously.  And then this claim that while he's paying his creditors, he sat on the stand and said he has zero records showing that he's made payments in the last two years.  That's what he said.  And that's also what he told us in discovery, that he has no record showing he's made any payments in the last two years.  Your Honor, what more evidence could we possibly want?

THE COURT:  Okay.  So a couple of things.  One is I think I've already ruled on the numerosity prong, and I think that that's been met.  With respect to today, I think there is credible evidence that Mr. Redmond, at least for the last year and a half perhaps, has not had any income, has not made any payments.  To the extent that he's testified that his wife makes payments and his wife has the payment arrangements and that's her job, I suppose, does not get him out of the problem of not being able to tell me that he's paying his debts on time.  He has no proof that he's paying his debts on time.

Obviously, there's the three taxing authorities, but beyond that, I haven't seen anything.  There's nothing that's part of the record that says that these payment agreements that

173

are supposedly out there actually exist, or that payments are being made under them.  I find it difficult to say that the petitioning creditors have not met their burden when there is no evidence from Mr. Redmond, there is no testimony from Mr. Redmond, with respect to affirmatively paying his debts.  I think that's what is required under the statute.

So to the extent that you want my decision now, I'm happy to give it.  I do believe that they've met their burden. With respect to this case, I'll still allow us to go forward on the motion to dismiss.  But I will tell you that I see no reason not to allow them to move forward with regard to this involuntary, based on what has been presented today.

MR. CIARDI:  Well, then, Your Honor, we need to just -- we'll then move forward to presenting our evidence, which will go in opposition to all the elements, which --

THE COURT:  Understood.

MR. CIARDI:  -- again, will be going as to all of the elements.

THE COURT:  Okay.  Well, not to numerosity, I assume?

MR. CIARDI:  Well, Your Honor -- and I understand you've ruled on numerosity.  We still have an issue with it. Depending on how Your Honor rules at the end of this --

THE COURT:  Okay.

MR. CIARDI:  -- whole proceeding, that may or may not be an issue for us.

174

THE COURT: Okay.

MR. READY: And Your Honor?

THE COURT: Yes?

MR. READY: I just want to reraise, and we had filed this previously, but -- and I understand the Court may just take this under advisement. But we had raised the issue that, again, having not complied with discovery to give us documents specifically to the issues of dissipation of assets. And that was after -- even after, Your Honor, on a teleconference last week told them. I asked you at the end to clarify that is part of what they need to produce in discovery. They said it's outside the scope.

And then the second issue is having submitted, and I want to be one-hundred-percent clear. I'm not accusing counsel of knowingly bringing in fraudulent documents, but Mr. Redmond, having submitted fraudulent documents with fake signatures on them, that he has acted in bad faith and has forfeited the opportunity to fight this case on bad faith. The bad -- the good faith requirement extends to debtor and -- debtor and creditor. And he cannot come in, again, with unclean hands and say that now we get into an expedition over who knew what and when they knew it, and how they decided to file and all of that, when he's willing to submit fraudulent documents. So for that reason, we would ask the Court to consider dismissing their bad faith claim at the outset.

175

MR. CIARDI:  Maybe he could cite a case that would say that she could do that, Your Honor.

THE COURT:  I'm not going to do that.

MR. CIARDI:  I didn't think so.

THE COURT:  I'm going to hear it.  You're welcome to make argument in opposition, and I welcome that.  I'm just not going to do it at this point in time.  I'm going to give you your opportunity to present your case.

MR. CIARDI:  Understood, Your Honor.  Then we would call Mr. Redmond back to the stand.

THE COURT:  You understand that you're still under oath, correct?

THE WITNESS:  Yeah.

THE COURT:  Okay.  You can have a seat.

CROSS-EXAMINATION

BY MR. CIARDI:

Q    Mr. Redmond, you testified in your examination by Mr. Ready about a company called Producer Advance?

A    Yes, sir.

Q    Okay.  What is that company?

A    That is a company that advances you commissions when you sell an insurance product.

Q    Okay.  So if I'm understanding, you've got an agent that gets commissions?

A    Uh-huh.

176

Q    You've got an insurance company that pays commissions?

A    Sure.

Q    And Producer Advance is a lender?

A    Third-party lender.

Q    Okay.

A    Yes, sir.

Q    And do they have a lien on anything?  Do they have rights to anything?

A    I believe they have a UCC-1 filing.

Q    Okay.  And would they have had a UCC-1 filing on Bene Market?

A    Yes, sir.

Q    And that would have entitled them to what, if you know?

A    The UCC-1 would be if we violated the settlement agreement that we entered into, they would have a right to seize our assets and receivables.

Q    Okay.  At Bene Market?

A    Yes, sir.

Q    Okay.  Now these Producer Advances, these advanced contracts.

A    Uh-huh.

Q    Did you also use them at NBOA?

A    Yes, we had advanced agreements at NBOA.

Q    Okay.  Was NBOA or Bene Market an insurance agency?

A    Yes, they were a call center and they were starting to

177

morph into an insurance agency.

Q Okay. Do you know whether Seguro uses Producer Advance for its commissions?

A No, sir.

Q Okay. Does it use any other company like Producer Advance?

A No, they don't. Arthur and Shannon don't use advances. I recommended against it.

Q Okay. Do you have a claim against Mr. Jordan?

A Yes, I do.

Q How much?

A Approximately $17.5 million.

Q What is it based upon?

A It is based on the Par Funding case.

Q Okay. And when you say based on the Par Funding case, why?

A Mr. Jordan is claiming that he's a fifty-percent shareholder of NBOA. And Par Funding was an advance company -- excuse me -- that was helping NBOA continue to pay its bills. They were advancing us money. They were actually purchasing future receivables, slightly different than Producer Advance, which was an advance on product sales. So the half of the money owed to Par Funding is 17.5 million. And if Mr. Jordan, in my opinion, is to be enriched by a bankrupt company, he also needs to understand that there's debts that are significant

178

debt that generated on NBOA's income.

MR. READY:  Sorry, I'm going to object.  I'm going to object and I'm going to move to strike this testimony because this is res judicata.  Judge Rowley, in his decision in 2021, explicitly considered Mr. Redmond's claims that there were debts that had to offset Mr. Jordan's rights in the claim that was brought, and he rejected that claim.  So we're now trying to reopen that issue at this stage, and that's not appropriate.

MR. CIARDI:  Your Honor, I guess he could raise them back in the Complete Business funding --  Complete Business Solutions Group case pending in the Court of Common Pleas, where Mr. Jordan has been added as a defendant.  And they probably could be presenting that there, had this involuntary not been filed and they ran in to seek a stay of any resolution of those preliminary objections or whatever they had filed while this case was pending.  So they may have gotten that resolution, but that can't happen, because that claim is now subject to the bankruptcy stay.  So as of right now, Mr. Redmond can testify as to the existence of his claim, which he believes is out there.  And there has been no adverse ruling on it.

THE COURT:  Well, but if there has been an adverse ruling in the state court, I'm supposed to ignore that?

MR. CIARDI:  I don't see an adverse ruling being presented anywhere that says that this claim that we've raised

179

with regard to the Par Funding guarantees has been dismissed.

MR. READY:  So Your Honor, it's well established under American law that a court will not offset an unliquidated claim against a final judgment.

MR. CIARDI:  Well, wait.

MR. READY:  So there --

MR. CIARDI:  Is there a ruling on this or not?

MR. READY:  So two things.  First, it is res judicata, as we've already said, from the judgment that was entered by Judge Rowley in 2021.  Second, even if it's not, they cannot demand an offset here of an unliquidated claim versus a judgment.  They can't do that.  They can do an adversarial proceeding in the future if they think they've got some grounds to do it, but they cannot do an offset.  That's not relevant at the threshold stage of deciding whether we're qualified as an involuntary creditor.

MR. CIARDI:  Your Honor, I'm entitled to put my case on as to whether he believes he has a claim, because that will be an asset of any bankruptcy.  If Your Honor grants the involuntary, we're going to convert, become an 11, bring that case here and sue Mr. Jordan here as part of that.  So it's going to get addressed at some point in time.  But I haven't asked the Court to rule on it.  I've asked them if he believes he has a claim.  That's an entirely different issue.

MR. HEIM:  Your Honor, I handled the Par Funding case

180

and I actually filed a joinder complaint against Mr. Jordan. The idea that it's res judicata -- the claims in the joinder complaint in Philadelphia are for unjust enrichment; that claim was never raised or adjudicated in front of Judge Rowley.  For res judicata to apply, the claim, the same issue has to have been raised and adjudicated.  That didn't happen.  There was no unjust enrichment claim in front of Judge Rowley against Mr. Jordan.  So res judicata can never apply to that.

The other position in that case is that there's indemnity that is owed.  There is an indemnity agreement that these two gentlemen signed.  And the third issue is, is that Mr. Jordan is a shareholder of NBOA, and we are trying to pierce the veil of the corporation so the shareholder can be liable for this debt.  Mr. Redmond, under the bylaws, is owed indemnity by NBOA.

THE COURT:  Isn't NBOA in a bankruptcy itself?

MR. HEIM:  It is.

THE COURT:  So why are we --

MR. HEIM:  We're not --

THE COURT:  -- why are we doing anything to NBOA at this point?

MR. HEIM:  We are -- we have -- NBOA is not a party to the lawsuit, Judge.  I can tell you that.  It's in the evidence, Judge.  We are not bringing NBOA into that lawsuit, but we are attempting to hold one of its owners responsible

181

with its other owner.

MR. READY:  Your Honor, what he just testified was that because Jason Jordan was a co-owner with him, he thinks he's liable.  What the evidence will show, that what they're going to be trying to pursue is documents that he signed personal guarantees for, years after he froze Jason Jordan out.  They tried to litigate that as part of the underlying lawsuit.  It was rejected by the judge.  It is absolutely issue preclusion.

In addition, though, Your Honor, it's just illogical.  They're trying to say that after Jason Jordan was frozen out of a company that he owned, and a value of seven million dollars was taken from him by Mr. Redmond, that they can now come back and say all the decisions that Mr. Redmond made later, without his input and with him being on the outside of locked doors, he's now personally responsible for it.  That doesn't make any kind of sense at all.

MR. CIARDI:  This isn't an evidentiary objection, Your Honor.

MR. READY:  Well --

MR. CIARDI:  This is a closing.  I'm allowed to ask him if he thinks he has a claim.

MR. READY:  But Your Honor, the unliquidated to liquidated, the res judicata, are my evidentiary objection.  I just want to be clear.  I understand the Court may choose to

182

take evidence.  We could spend the next three hours, and we could come back and spend more time fighting over what was going on with some indemnity agreement.  But Your Honor, it's just not right.  It doesn't go to the issue of whether Mr. Jordan, right now, as the judgment creditor, is qualified.

MR. CIARDI:  Your Honor --

THE COURT:  I don't think that that's --

MR. CIARDI:  -- that's not my point.

THE COURT:  -- the underlying point.

MR. CIARDI:  Yeah.

THE COURT:  I do think I know where this is leading. I will give it the appropriate weight.  I understand your objection.

I'll let you ask the question.

MR. CIARDI:  Thank you, Your Honor.

MR. READY:  And I would just ask for a standing objection to that issue --

THE COURT:  Understood.

MR. READY:  -- so I don't have to bother the Court again.  Thank you.

THE COURT:  Understood.

BY MR. CIARDI:

Q    Mr. Redmond --

MR. CIARDI:  Can I put the exhibit up?

THE COURT:  Yes.

183

BY MR. CIARDI:

Q    Mr. Redmond, I'm going to show you what has been marked as Debtor's Exhibit 13.

A    Uh-huh.

Q    Have you seen this before?

A    Yes.

Q    What is it?

A    This is David Heim's filing.  This is Complete Business Solutions v. Alan Redmond and Jason Jordan.  Attorney Heim was handling this case for me.

Q    And this was filed in June of 2024?

A    Yes, sir.  Hold on.  Say it -- excuse me.  Can you say that again, please?

Q    Was it filed in June of 2024?

A    June of 2024?

Q    I'm sorry.  Yes.

A    Yeah.

Q    Wrong document.  This one.  I keep getting the wrong --

A    Yep, 13th of June, 2024.  Thank you.

Q    Thank you.  Okay.  Now I'm going to ask you to take a look at Exhibit 14.  Have you seen this document before?

A    I have.

Q    Was this document filed in the Court of Common Pleas of Philadelphia County?

184

A     Yes, sir.

Q     Okay.  Do you know when?

A     It would have been around June of '24.

Q     Okay.  Can you take a look at the date on the bottom of this last page of the document?

A     Um-hum.  That is July 8th, 2024.

Q     Okay.  And has this complaint been filed in the Court of Common Pleas of Philadelphia County?

A     Yes, sir.

Q     And now could you take a look at Exhibit 15?

A     Um-hum.

Q     Sir, did you file a notice of involuntary bankruptcy in the Complete Business Solutions Group case with regard to this involuntary petition?

A     Did I file this?

Q     Did you -- no?

A     No.

Q     Okay.  Do you see who did file it?

MR. READY:  Your Honor, we'll stipulate that we did.

THE COURT:  Okay.

A     Yes, Cornerstone Law Firm.

BY MR. CIARDI:

Q     Okay.  Are you aware of a motion for special relief that was filed in this case?

A     I am.

185

Q    And did you read it when it was filed?

A    I believe myself and David went over that when it -- before it was filed.

Q    Okay.  And does this appear to be -- looking at Exhibit 18 -- the emergency motion for special relief that was filed by the petitioning creditors?

A    Yes.

Q    Okay.  And do you understand that this was originally filed under seal, so you could not see it?

A    Correct, yeah.

Q    And that's because, I believe, there's an allegation that you are a flight risk?

A    Um-hum, yes.

Q    Okay.  And you've been fighting with Mr. Jordan since when?

A    Goodness, 2014.  Too long.

Q    Okay.  Could you take a look -- let's go to page 2.  It's page 2 of the document.  Do you see this section of the motion for special relief?

A    Yes.

Q    Okay.  So do you see the sentence there, "Redmond entered into a sham agreement with an older man, having no experience or licensure in the insurance industry, named Arthur W. Walsh, Jr."?

A    I see that.

186

Q    Okay.  Is that a true statement, sir?

A    As I said earlier, no, it is not.

Q    Okay.  Now let's start with the first part.  Did you enter into a sham agreement with Mr. Walsh?

A    No, sir.

Q    Have you ever seen any evidence of some agreement that you entered into with Mr. Walsh?

A    The only agreement I have is the consultation agreement.

Q    Okay.  And did this indicate this is upon -- this statement is upon information and belief?

A    This is a made-up statement, sir.

Q    Okay.  Now, does Mr. Walsh have experience and licensure in the insurance industry?

A    Yes, he does.

Q    Okay.  So let's start with experience.  How long has he been, to the best of your knowledge, in the insurance industry?

MR. READY:  I'm going to object, Your Honor, at this time.  This agreement is all going to be founded on hearsay.

THE COURT:  Mr. Ciardi?

MR. CIARDI:  His knowledge of what somebody is licensed or not licensed would not be hearsay, Your Honor. I'll lay a foundation for it.

MR. READY:  Your Honor, it would have to be hearsay.

187

There's literally no way that he would be the person who would know that.

And Your Honor, furthermore, again, this really isn't relevant. This is a sentence that was filed by myself, by counsel, in a TRO, that was withdrawn upon agreement of the parties.

MR. CIARDI: No.

MR. READY: So we are now fighting over something that's a side issue, that's not really even the basis of the involuntary petition. I mean, this is a side issue.

MR. CIARDI: Now, that's rich. This is a side issue? False statements in a TRO meant to stop him from operating and to prejudice a whole bunch of other companies, they're a side issue? For a motion that was withdrawn when they had to put up money to backstop their allegations, and they walked away from it. That's not a sham; that's bad faith. We're going to through a lot of these allegations that are absolutely false, that were made to try to convince Your Honor -- and Your Honor did enter a TRO, albeit less broad than they wanted.

But the fact that they submitted statements that were false, had no basis, goes to bad faith because it goes to the sole purpose of this involuntary -- was a bad faith effort to try to collect on their judgments and not to do something for the benefit of all the creditors. So I think we're allowed some leeway to go through what basis there is.

188

THE COURT:  For the same reason that I allowed you your expert this morning, I'm going to allow this.

BY MR. CIARDI:

Q   Mr. Redmond, have you ever been presented with any evidence, any document that says that Mr. Walsh has no licenses in any state?

A   No.

Q   Okay.  Do you know whether Mr. Walsh has any experience in the insurance industry?

A   I do.  Excuse me.

Q   And how do you know that?

A   Shannon showed me -- excuse me.  Shannon showed me his resume --

MR. READY:  I object.

A   -- when she was thinking of hiring him for a -- as a CEO.

MR. READY:  I object on hearsay.  This is not within his personal knowledge.

MR. CIARDI:  Your Honor, I just asked how he knew.  I didn't ask him what he knew yet.

MR. READY:  Well, but they backloaded it -- or frontloaded it, rather.  They said, what's the conclusion, and then said, and how do you know the conclusion you don't know from personal knowledge.  That's still hearsay.  And I suppose I should move to strike the last response as well.

But Your Honor, again, we are very close to ending up

189

in a side trial, where we're going to have to call Arthur Walsh and pull his records.  There are some affidavits already in that will show the Court showing that he's not licensed, at least here in Pennsylvania.  This is going to turn into a side trial on Mr. Walsh.  They're going to have to bring in Ms. Kroemmelbein to testify to what she knows or why she knows it.

MR. CIARDI:  Your Honor, we're going to get into all of those people because we're going to prove that every single statement they made was false and meant to influence this Court to enter a TRO, to have a dramatic impact on my client, because he had then sued Mr. Jordan.

MR. READY:  Your Honor --

MR. CIARDI:  And we're going to get into Mr. Jordan's background and his licenses today, as well.

MR. READY:  We certainly are not because it's not even remotely relevant, Your Honor.

MR. CIARDI:  It goes to credibility.

MR. READY:  So we would object, but I want to also emphasize, even just a statement we heard a minute ago, it was designed to keep him from operating.  There's nothing to keep him from operating Seguro Medico, which they're trying to claim isn't him.  So they can't have that both ways, Your Honor.

THE COURT:  I'm going to strike the last response. I'm going to ask you to ask a different question --

MR. CIARDI:  Okay.

190

THE COURT: -- because I don't want him to have to answer by saying that he spoke to his wife or concluded something from something that was provided to him by his wife.

BY MR. CIARDI:

Q    So to be clear, you've never entered into a sham agreement with Mr. Walsh?

A    No, sir.

Q    Okay. And the only agreement you've entered into with Mr. Walsh is the consultation agreement that was in evidence today?

A    Correct.

Q    Okay. And do you see a sentence there that says, "As well as the name Jesus Barrios (sic) whose identity has not yet been confirmed, is an actual person"?

A    I do.

Q    Okay. And do you know a Mr. Barrios (sic)?

A    Yes, I – yeah, I think he --

Q    You're not Mr. Barrios (sic), are you?

A    No.

Q    Is Mr. Walsh Mr. Barrios (sic)?

A    No, sir.

Q    Okay. And Mr. Shalter, who is one of the petitioning creditors, he worked at Seguro Medico, correct?

A    Yes, he does.

Q    Okay. And does Mr. Barrios (sic) work there?

A    It's actually Jesus Barrera.

191

Q    Okay.

A    He was the vice-president of operations.  Very talented guy.  He works at Seguro for Sean.

Q    Was he Mr. Shalter's boss?

A    I believe that Mr. Shalter reports to him because Mr. Shalter was part of the sales floor, and Jesus does a lot of things, including the sales floor.

Q    Okay.  So would it be fair to say that Mr. Barrera is somebody known to Mr. Shalter?

A    Absolutely.

Q    And Mr. Shalter would know that he is an actual human being and a person?

A    Yes, sir.

Q    Okay.  And not yet been confirmed as an actual person?

A    Correct.

Q    Okay.  So is that a true or false statement?

A    That was a false statement.

Q    Okay.  Further up the page, do you see a section, "Redmond then transferred all of the assets of Bene Market"?

A    Yes.

Q    Okay.  I think you were asked some questions about that today?

A    Yes, sir.

Q    Okay.  Did you transfer any assets of Bene Market to Seguro Medico?

192

A    No, sir.

Q    Okay.  I believe you testified -- well, why don't you tell us again.  Did Bene Market have any assets at the end of 2019?

A    It had some computers, but it didn't have any real assets.

Q    Did it have accounts receivable?

A    No, sir.

Q    Did it have a book of business?

A    Bene Market had a -- did have a book of business, but it was offsetting the advance -- the -- the millions of dollars of debt.

Q    Okay.  In the Bene Market business, did you buy leads?

A    Yes, sir.

Q    Okay.  And people call on those leads?

A    They're actually ingoing leads, but the -- the -- the people actually call in to Bene Market.

Q    And so you're generating new business every day?

A    Yes, sir.

Q    Okay.  And to the extent an insurance policy is sold --

A    Correct.

Q    -- how do you get paid in Bene Market?

A    The -- I guess we can call it the piece of business or the policy is submitted directly to the carrier.  The policy is then underwritten by the carrier.  The carrier will make the policy active.  Once the policy goes active, then that generates commissions.  And then the third-party advance

193

company will come in and give you a four-, six-month advance, for instance, which is a debt for the company and for myself. And we'll pay that to Bene Market.

Q    Okay.  And when the company stopped operating, what happened to those advance commissions and/or commissions that were earned on policies that were running out?

A    There's no -- no new revenue.  Bene Market just ceases having income.  What is left is the -- the block of business, which is really owned by the carrier.  And that offsets the advances that -- that -- that -- as you can see, such as Producer Advance.

Q    Okay.  So did you transfer any of the assets of Bene Market to Benefits Now, LLC or Seguro Medico, LLC?

A    No, sir.

Q    Was Bene Market sued by Mr. Jordan?

A    Yes, sir.

Q    Okay.  And that was in 2022?

A    I believe so, yes.

Q    Okay.  Do you know if discovery was taken in that case?

A    I believe it was.

Q    So Mr. Jordan had the opportunity to take discovery on all of these issues, with regard to Bene Market, for the last two years?

A    I believe so, yes.

Q    Now, you were asked, I believe, about your interrogatories

194

in aid of execution that you gave in the spring?

A    Yes.

Q    Okay.  And I think one of them was PC-19.  Do you remember this?

A    Vaguely.

Q    Okay.  And then, would it be fair to say, sir, that you also gave a supplement to that, correct?

A    I believe so.

Q    And that would be PC-20?

A    I'm assuming so, yes.

Q    Okay.

A    I can't really remember.

Q    Okay.  And in the answers to interrogatories and the supplement, wouldn't it be fair to say that you referenced a financial statement that you provided as well?

A    Correct.

Q    Okay.  So that in order to say that the answers and the supplemental answers are complete, does one need to look at the financial statement?

A    Correct.

Q    And that's PC-21?

A    Yes, that's it.

Q    Okay.  Now let's go back to PC-19.

A    Uh-huh.

Q    And I'm going to go to the first one --

195

A     Uh-huh.

Q     -- identify your legal name, home address.  Is your answer to that correct?

A     Yes, sir.

Q     Is your answer to number 2 correct?

A     Yes.

Q     Okay.  And you objected in that answer, correct?

A     Yes.

Q     And is your answer to 3 correct?

A     It is, yes.

Q     All right.  And 4, you objected?

A     Correct.

Q     All right.  Then you were asked in number 5 whether you owned any real property.

A     Um-hum.

Q     And you answered, 2005 Regency Drive; is that correct?

A     It is, yes.

Q     Okay.  Can you tell me why you did not include Arc Realty (ph.)?

A     Yeah.  I asked the -- the attorneys, is this for Alan Redmond's or is this for Arc Realty.  They said it was for Alan Redmond's, and this is what I -- what I put down.

Q     Okay.  Number 6, identify any on all fixtures, goods, farm products, timber.  Did you answer that?

A     I did.

196

Q    Okay.   Identify, in number 7, all your properties, since 2014, that you have conveyed.  So did you convey any properties since 2014?

A    No.

Q    Okay.  Question 8 asks you to identify all your oil, gas timber, and mineral rights.  Do you have any of those?

A    No, sir.

Q    Was your answer correct?

A    It was objected to, but, yes, I --

Q    Okay.

A    -- I believe it is.

Q    Did you identify, in the next question, all your leases and leasehold interests?

A    Yes, sir.

Q    Okay.  Question 10, do you have any currency or coins.  Did you answer that?

A    I did.

Q    Do you have any?

A    I do not.

Q    Is that answer correct?

A    Yes, sir.

Q    Do you have any safe deposit boxes?

A    I do not.

Q    Okay.  Since 2014, you were asked about your transfer of money, coins, and historical collections.  A, did you have any

197

of those?

A    No, I did not.  I do not.

Q    Did you transfer any of those?

A    No, sir.

Q    Okay.  Before we move on, there was a statement in this motion for TRO -- or motion for special relief that you have a pattern of -- "a documented history of transferring assets outside the United States".  Did you remember reading that?

A    I did.

Q    A documented history?

A    Yes.

Q    Okay.  When was the last time you transferred money outside of this country to somebody in the United Kingdom?

A    When did I send money?

Q    Yes.

A    I sent money to my mother, who needed money.  I believe it was maybe six or seven months ago.  I don't even know if I sent it.  Shannon would have sent it.  So I -- I believe sent my mother some money.

Q    Okay.

A    Yeah.

Q    And before that -- and by the way, how much was that money?

A    I think it was, like, 20 -- 2,500 dollars.

Q    2,500 dollars?

198

A    Um-hum.

Q    Okay.  And before that, can you remember a time when you, you --

A    Um-hum.

Q    -- not Shannon --

A    Sure.

Q    -- you transferred money to anybody outside the United States?

A    No.

Q    Okay.  Did you ever transfer the sum of 56,000 dollars to your mother?

A    No, never.

Q    Okay.  Did you ever transfer 5,000 dollars to your mother?

A    Maybe, when business was good with NBOA, maybe.  But from my recollection, it was always around 2,500 to 4,000 dollars.

Q    Okay.  And if you transferred it when you were in business with NBOA, what years would that have been?

A    That would have been 2013 to 2017, I believe.

Q    Okay.  So when you read the words, "a documented history of transferring assets outside of the United States and to members of his family in the British Isles", did you go and look in the motion for special relief to see if there was proof of such a transfer?

A    Did I go and look for proof?

Q    No.  Did you look at the document?  Did you look in the

199

document that we were served, this 300 pages --

A    Well --

Q    -- to see if anybody attached this documented history?

A    Well, it's absurd, so honestly, probably not.  I wouldn't -- I didn't do that.

Q    Are you aware of having a -- first of all, did you ever see anybody document a history of you transferring assets?

A    No.

Q    Okay.  Do you have any idea where this statement comes from?

A    No.  I -- it sounds like crazy talk, I guess.

Q    Okay.  And that was submitted by all three of the petitioning creditors --

A    Um-hum.

Q    -- to convince this Court to enter a temporary restraining order, which ultimately got entered?

A    Correct.

Q    And sitting here in the courtroom today, or in the courtroom before, did you hear any evidence of a documented history of transferring assets?

A    No, sir.

Q    Okay.  So back to the answers to interrogatories, you identified, in question 14, that you received consulting income and rental income?

A    Yes, sir.

200

Q     Were those your only two sources of income?

A     Correct.

Q     Is this answer correct?

A     It is.

Q     Okay.  You were asked to identify cash registers.  Do you understand what that means?

A     Yes.

Q     What do you believe it means?

A     Like, a -- a register that sits at the front of American supermarkets.  You know, money being drawn and --

Q     Do you have a cash register?

A     No, sir.

Q     Okay.  And in the answer to 15, do you state that you don't own a bank account?

A     That was correct at the time of this, yes.

Q     Okay.  And this was, to be clear, March of 2024?

A     Yes.

Q     Okay.  Fair to say, that you were not noticed for an asset deposition between March of 2024 and today?

A     That's correct.

Q     Are you aware of any statement in Petitioning Creditor 19 that was incorrect?

A     No.

Q     Okay.  And with regard to Petitioning Creditor 20, which is the supplemental document, are you aware of any answer that

201

you made that was incorrect?

A    I can look at the document, if that's okay, real quick.

Q    Sure.  I don't know if you need me to make it bigger for you and scroll through it.

A    Yeah.  Okay.  No.

Q    Okay.

A    Everything is -- is correctly answered.

Q    Okay.  And then, do you agree that you reference PC-21 in both PC-19 and 20, correct?

A    Yes.

Q    Okay.  Now, sir, let's go back to the emergency motion for special relief, and go to page 3.  So do you see a statement in that document, "When Jordan propounded interrogatories in aid of execution, Attorney Valz (ph.) assisted Redmond in giving false answers and material omissions"?  Oh, I'm sorry.  There we go.  Do you see that?

A    One second, sir.  I do see that, yes.

Q    Okay.  Is that a true statement?

A    Absolutely not, sir.

Q    Have you seen any testimony or any evidence, presented at any point in time, that your answers to those interrogatories were false?

A    No.

Q    Are you aware of whether there was a motion to compel filed in the state court regarding your interrogatories in aid

202

of execution?

A      I -- I'm not sure.  I believe there was.

Q      But all that came to an end when the involuntary was filed?

A      Yes, sir.

Q      I'm going to ask you to take a look at another part of that.  Do you see a statement, "after stripping Bene Market, LLC of its assets"?

A      I do.

Q      All right.  In this pleading, this motion for special relief, did you see any document that showed you stripped Bene Market of its assets?

A      No.

Q      Have you ever been presented with any evidence that you stripped Bene Market of its assets?

A      No, sir.

Q      Okay.  And Mr. Jordan had a court case against Bene Market where he could have presented such evidence?

A      Correct.

Q      Okay.  And was any evidence presented in that case?

A      I do not believe so.

Q      Okay.  It says here that Bene Market was the recipient of 35 million dollars of loans from Complete Business Solutions Group; is that correct?

A      That's completely false.

203

Q    Okay.  Why do you say it's completely false?

A    The loans for -- excuse me.  The loans for CBSG originated with NBOA to keep NBOA afloat.  And the way CBSG ended up is there was a -- a -- a personal guarantee for myself.  Bene Market was also responsible for the debt.  Bene Market was also responsible for the debts.  Maybe it's misworded, but it -- it's -- it's an incomplete observation.

Q    Okay.  So Bene Market guaranteed the Complete Business Solutions Group debt?

A    Yes, along with myself and NBOA.

Q    Okay.  But the 35 million dollars, where did that go?

A    That went right into the companies.

Q    Into NBOA or Bene Market?

A    That would have been in both.

Q    It would have been in both?

A    Yes, sir.

Q    Okay.  And where did that money go once it went in there?

A    It was used for operations, generating leads, hiring staff.  There was some money used during COVID to -- to pay the staff.  So --

Q    Okay.

A    -- yeah, various operations.

        MR. CIARDI:  Nothing further of the witness, Your Honor.

        THE COURT:  Mr. Ready?

204

MR. READY:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. READY:

Q    Mr. Redmond, you do, in fact, have an agreement with Arthur Walsh of Seguro Medico, correct?

A    Yes.  I have a consultation agreement.

Q    Okay.  And that agreement allows you to accept profits required -- excuse me.  That agreement entitles you to accept profits from Seguro Medico in exchange for your services, correct?

A    The way I understand the agreement is if Seguro is doing well, I can potentially partake in profits.

Q    And it's money that you're choosing not to take at this time, correct?

A    We're waiting for Seguro to -- to -- to get into a better financial position.  Then I plan to resume.

Q    I want to ask you about -- I'm going to show you a document that's been marked -- give me one second.

A    Um-hum.

Q    I'm going to show you what's been marked PC-03.  This is the decision and verdict of Judge Rowley.  I want to direct your attention to paragraph 57.

A    Yes.

Q    "Following the freeze-out, Redmond wired the sum of 56,000 dollars, paid by wire" --

205

A     Um-hum.

Q     -- "to Redmond's mother, Maria (ph.) Redmond."  Do you see that?

A     I do.

Q     Okay.  I also want to ask you about -- you said you'd given 2,500 to your mother several times?  Is that what you testified?

A     Multiple times, yes.

Q     Okay.  And you sent money to your mother, you said, a couple of months ago, if I understood correctly?

A     I believe it was -- I think I said five or six months ago, maybe -- maybe sooner.  So maybe three, four months ago.

Q     I want to ask you about the Alan Redmond Charitable Foundation --

A     Sure.

Q     -- that you set up.

A     Yes.

Q     I saw a newspaper article.  You told the reporter that the foundation you set up to direct the Redmond charitable giving; is that correct?

A     It was actually a foundation that was supposed to be called the Redmond Foundation.  There was a mistake made with by an attorney.  But the Redmond Foundation's goal was to distribute money from our family to -- to people, really, in the education realm, such as Wyndcroft, in regards to school

206

security, Mercyhurst University, and -- and other things that are close to Shannon's heart, and also mine.

Q   And the Wyndcroft School is where your kids attend; is that correct?

A   That's correct.  Myself and -- and Shannon's kids attend there.

Q   And then you also gave money to St. Malachy's School in Northern Ireland, correct?

A   Correct, another worthy cause.

Q   Okay.

A   Um-hum.

Q   How much did you give St. Malachy's School, by the way?

A   I believe St. Malachy's was 30,000 dollars, I believe.

Q   Okay.  Just give me one second.  We've covered some of this.  I'm not trying to repeat anything.

THE COURT:  Um-hum.

Q   I'm going to show you what's been marked as PC-73.

A   Um-hum.

Q   It does not appear to be on my list.  Give me a second.

MR. CIARDI:  Neither is PC-03 on the list.

MR. READY:  Your Honor, I do apologize.  We provided a Dropbox, which I understand the Court can't do.  So I think we emailed some of these in batches.  I'm just looking --

THE COURT:  Okay.

MR. READY:  -- to see real quick.

207

BY MR. READY:

Q    All right.  I'll try again.  I'm going to show you a document that's marked as PC-73.  Do you recognize this document?

A    I have seen this document.

Q    Okay.  You're aware that Arthur Walsh does not have a license in Pennsylvania to do insurance; is that correct?

A    No, it's not.

Q    Okay.  What is your understanding of Mr. Walsh's status?

A    Arthur Walsh approached me for some help with compliance. I said I'd be happy to help, a couple years ago, I believe, Mr. Ready.  Arthur Walsh was a resident producer in Delaware with forty-seven licenses, and he had a license in Pennsylvania back then.  Pennsylvania being very adversarial to myself over the last number of years, and also to Arthur Walsh, based on the premise that we don't handle Obamacare.  And we believe that there's a better product available to the consumer. Pennsylvania had their -- this consent order against Mr. Walsh, in regards to his nonresident license.

But just to reiterate, Arthur is licensed residently in Delaware.  And I believe right now, he has between forty-three and forty-seven nonresident licensed -- nonresident license -- licensed states.  Excuse me.

Q    Okay.  So let me make sure I understand.  You're saying Pennsylvania has been adversarial against you?  Is that what

208

you said?

A    Pennsylvania has been adversarial to a lot of insurance agencies in Pennsylvania over the last ten years.

Q    So how has Pennsylvania been adversarial?  Let me just clarify, do you mean Pennsylvania's Insurance Department?

A    The Department of -- sorry, yes.

Q    Okay.

A    The Department of Insurance in -- in Pennsylvania.

Q    And you said they've been adversarial against you personally; is that correct?

A    They were adversarial, actually, to myself and Jason when we worked together.  They have -- they -- they were also adversarial against Bene Market and myself, as well.

Q    And can you give me any examples?  What do you mean?  What has Pennsylvania's Department of Insurance done to you?

A    The -- the way that -- that the -- or the Department of Insurance works is they -- they send you complaints and they accuse you of, in this instance, a number of false allegations against Arthur.

Q    But you would agree that he consented to the discipline as a result of this, correct?

A    He consented, with his attorney's advice, to get rid of Pennsylvania, as he was not selling in Pennsylvania.  And Shannon was not selling in Pennsylvania.  And to be perfectly frank, he shouldn't have had a nonresident license in PA in the

209

first place, because he's never sold in Pennsylvania.

Q    And you would agree that he had done false scripts, that he had --

A    Absolutely --

Q    -- persuaded people they had insurance that they didn't have, correct?

A    Absolutely not.

Q    Okay.  So for example, in Finding J here, Respondent's employees, using false scripts, made sales from July 2020 to April 2021, where they purchased policies with full medical coverage that covered pre-existing conditions, you say this is just not true?

A    It's not true.

Q    Okay.  But you do understand he consented to this, correct?

A    I understand that he would have understand this.

Q    Okay.  And you would agree that their adversarial proceedings against you have been on similar grounds; is that correct?

A    I would say pretty similar, yes.  You -- you would be correct in that statement --

Q    Okay.

A    -- Mr. Ready.

Q    It's going to be a lot of the same allegations, that you claimed insurance was bound for customers, and it wasn't,

210

right?

A    I -- I -- I don't understand.  Bound as in?  It's not an insurance word so you have to --

Q    Okay.

A    -- you know --

Q    You've been accused by the Department of Insurance of deceiving customers about whether their insurance was bound?

A    Yes, I --

Q    Okay.

A    -- we have.

Q    Well, not just "we", you individually, right?

A    Oh, sure.  Yes.

Q    Yeah.  And your license is now inactive in Pennsylvania for insurance, correct?

A    That is correct.

Q    Okay.  You've also been suspended in several other states; isn't that right?

A    Correct.

Q    You've been suspended in Massachusetts?

A    Yes.

Q    Washington?

A    A number of years ago, yes.

Q    South Dakota?

A    Correct.

Q    Nebraska?

211

A     I believe so, yes.

Q     Some other states as well, correct?

A     I -- I believe there's a handful of states, yes, sir.

Q     Okay.  You testified earlier -- I just want to make sure I got this right -- that Bene Market, as of 2020, had zero money coming in, regardless of whether it was making profit, but zero money just coming in; is that correct?

A     Correct.  When you stop selling product, the advances stop coming.  The -- I don't know the exact dates, but I know it was end of 2019, beginning of 2020.

Q     Okay.

        MR. READY:  I'd take just a moment here to open a different exhibit.

Q     I am going to show you -- we're back to PC-19.

A     Um-hum.

Q     And this is your answers to interrogatories from state court.  I just want to run through a few of your answers here.

A     Um-hum.

Q     I know we've seen some of these before.  Number 5, identify all of your current real properties, directly or indirectly owned by you or under your control, or by any entity of which you possess an ownership or membership interest.

A     Um-hum.

Q     Did I read that correctly?

A     I believe you did.  Yes, sir.

212

Q    Okay.  You object, and you say, without waiver of the same, and you identify a single real property; is that correct?

A    Yes, 2005 Regency Drive.

Q    But as you just said, Arc Realty, at the time, did own real property, correct?

A    It did.

Q    Okay.  And you do understand Arc Realty was an entity directly or indirectly owned by you and under your control, in which you possess an ownership interest, correct?

A    Arc Realty is, yes.

Q    Okay.  So that was a false statement, correct?

A    No, it's not.  This is in regards to Alan Redmond.  This is what the questions are, and I answered them as -- if it was Arc Realty discovery or interrogatory, I would have listed them as assets.

Q    Okay.

A    But it was directed toward Alan Redmond.  And that's what I was advised to do.  I was very particular with that with the -- the attorneys.

Q    Who advised you to do that?

A    I don't know which attorney it was, to be perfectly frank, but it was one of the attorneys that we were working with at the time.

Q    If I told you that Norman Valz was representing you in this litigation at the time, would that sound correct?

213

A    That -- that's -- that's who it was.  Yes, sir.  Thank you.

Q    Norman Valz helped you organize the Redmond Charitable Foundation, correct?

A    He did.

Q    And he helped you organize Arc Realty, correct?

A    He started to organize -- he started to organize Arc Realty or help us get reorganized, after he -- he started working with me directly, yes.

Q    And he's the one that told you to put it as a tenancy by the entirety, correct?

A    Correct.

Q    Okay.  Number 7 says, identify all of your real properties you have conveyed, including the grantee.  You object, and then you answer, none.  Did I read that correctly?

A    You did.

Q    And you had, at this point, conveyed your interest in Arc Realty from yourself to yourself and Shannon Kroemmelbein, correct?

A    Not to play dumb, but I -- can you explain "conveyed" and "including the grantee"?  And then I can tell you if I've answered the question incorrectly.

Q    Sure, sure.  This was March of this year.

A    Um-hum.

A    When did you change the ownership structure of Arc realty

214

to be a tenancy by the entirety?

A    I believe -- I believe that was at the beginning of 2021.

Q    Okay.  And Mr. Valz is the one who assisted you with that, correct?

A    Correct.

Q    Same attorney who helped you answer this question saying, none, correct?

A    Correct.

Q    Okay.  Number 14, identify all your sources of income, including self-employment and rental income.  What's your understanding of the term "sources of income"?

A    Any income that goes -- flows into -- to Alan Redmond or -- or his bank account.

Q    Okay.  So we asked for sources of income, and you responded, "Consulting income, rental income".  Did you believe that was a full and complete answer to this question?

A    Yeah.  It's a -- you're -- you're asking to identify where it's coming from.  And I'm receiving -- I was receiving consulting income and rental income.

Q    From where, Mr. Redmond?

A    The consulting income was coming from Seguro, and the rental income was coming from 2005 Regency Drive.

Q    And it would be fair to say that those would be the sources of that income, correct?

A    Yeah.

215

Q   Okay.  Number 15, you were asked, identify all cash registers where you have authority to withdraw money and coins. You object, and say, this interrogatory is vague and confusing as to what is meant by "cash registers".  What about the term "cash registers" did you find vague and confusing?

A   It was a little bit vague and confusing, to be honest, since I thought I was educated, as I just answered to Al, I don't have a cash register that I can access.

Q   Who first explained to you what a cash register was?

A   Maybe Norm, maybe Al, maybe they did.  I'm --

Q   Mr. Redmond, is it your testimony here today --

A   Uh-huh.

Q   -- that in March of this year, you didn't know what a cash register was?

A   No.  My testimony is I don't own cash registers, Mr. Ready.

Q   I understand.

A   Uh-huh.

Q   But this says you didn't know what it meant.  Did you not know, in March of this year, what a cash register was?

A   I had an idea what a cash register is.  We -- in Ireland, we call it a till, believe it or not.  So --

Q   Ah.  So if we had asked for a till --

A   Yeah.

Q   -- you might have known what we were asking for?

216

A    You got it, yes.

Q    Okay.  I understand.  Can you go to number 16?  Identify all of your current financial assets, within the meaning of Section 8102.  You say here you do not know what terms like a "securities intermediary" mean; is that correct?

A    Correct.

Q    And I'll save you the trouble, and we can go through a bunch of these.  There's also things in here when you say you don't know what chattel paper is --

A    Uh-huh.

Q    -- that you don't know what letters of credit are?

A    Um-hum.

Q    You didn't know what a letter of credit was when you answered this discovery, Mr. Redmond?

A    No, we did not.

Q    Okay.

A    I didn't know what chattel paper was, either.

Q    Did you ask your attorney what any of that was?

A    We probably communicated on it, but he recommended to object to the question because it was vague and confusing.

Q    Okay.  Vague and confusing.

A    Um-hum.

Q    There's a statute here that has some definitions that we provided you; Section 8102 --

A    Um-hum.

217

Q    -- Title 13.  Did you look up that statute and read it?

A    I would not have.  My attorney would have.

Q    Okay.  So you didn't do any -- did you google what a security was?

A    I have a vague idea of what a security is.

Q    What's your understanding of what a security is?

A    It has something to do with the stock markets, Mr. Ready.

Q    Okay.  So did you attempt to give an answer related to the stock market and whether you had any stocks in this answer?

A    No.  I was recommended to object, and it was vague and confusing.

Q    And that was by Mr. Valz, correct?

A    Norman would have helped me prepare -- prepare this.  Yes, sir.

Q    Okay.  In your personal financial statement, which is number 21 --

MR. READY:  Just one moment.

Q    -- it says here, "assets" -- second line -- "cash in bank" --

A    Um-hum.

Q    -- "$2,432.17."  Did I read that correctly?

A    You did.

Q    And then go down to Section 3, it says you have a Santander bank account, correct?

A    It does, yes.

218

Q    Okay.  And that was sworn to in both March and May of this year?

A    Um-hum.

Q    You told us earlier in this proceeding that you haven't had a bank account in over a year.

A    Well, I said 9 to 12 months, but I remembered the Santander bank accounts.  That Santander bank account no longer exists.  Unfortunately, a lot of my bank accounts were shut down, based on the fact that I was -- I had negative balances --

Q    When --

A    -- based on the debt that I was trying to serve.

Q    When did you close this bank account with Santander?

A    I'm not sure, but I could get you the answer on that. Actually, the bank closed the bank account.  Let me be clear.

Q    Okay.  And you don't know when?

A    I don't.  As I said, it would be in the last nine to twelve months, if not sooner.

Q    How much funds does the Alan Redmond Charitable Foundation currently have?

A    Zero.

Q    Who has donated to the foundation, other than you and Ms. Kroemmelbein?

A    Shannon has donated.  That's it.

Q    Okay.  You haven't donated any money to the foundation; is

219

that correct?

A     No, I have not.

Q     The one that bears your name?

A     Again, it should be the Redmond Foundation, but that is correct.

Q     And that income has come from Arc Realty, correct?

A     No.  That income has come from Shannon.

Q     Okay.  When Arc Realty makes a distribution of money --

A     Um-hum.

Q     -- where does it go?

A     Arc Realty hasn't made a distribution in -- in years to anybody.  Arc Realty --

Q     What does it do with the income that it collects?

A     The 4,500 dollars is collected by myself.  It's handed to Shannon (indiscernible).  And the rental, the 4,500 goes right into her bank account to help with bills.

Q     Do you have any joint bank accounts with Ms. Kroemmelbein?

A     We do not.

Q     Okay.  What do you do to get your half of the Arc Realty that's paid out?

A     It -- it -- our marriage doesn't work like that.

Q     You give it all to her?

A     A hundred percent.

          MR. READY:  Okay.  I have nothing further, Your Honor.

220

THE COURT:  Anything on redirect?

MR. CIARDI:  No, nothing on redirect, Your Honor.

THE COURT:  Okay.  You can step down.  Thank you.

THE WITNESS:  Thank you.

MR. CIARDI:  Your Honor, our next witness will be Mr. Jordan.

THE CLERK:  Please remain standing and raise your right hand.

PETITIONING CREDITORS' WITNESS, JASON JORDAN, SWORN

THE CLERK:  State your name and spell your whole name for the record.

THE WITNESS:  Jason Scott Jordan, J-A-S-O-N S-C-O-T-T J-O-R-D-A-N.

THE COURT:  Oh, I'm sorry.  You can sit down.

THE WITNESS:  Sorry.  I always get nervous when I sit here.

THE COURT:  Sorry about that.

DIRECT EXAMINATION

BY MR. CIARDI:

Q    Mr. Jordan, you're one of the petitioning creditors, correct?

A    Yes, I believe so.

Q    Okay.  Can you tell me what investigation you did prior to signing on to the involuntary petition regarding the creditors of Mr. Redmond?

221

MR. READY:  So Your Honor, I am going to object again because once again, having already met our burden to the petitioning creditors, that doesn't entitle them, then, to go into the question of what we investigated.  The investigation has spoken for itself.  We demonstrated that we were entitled to relief.

MR. CIARDI:  Goes to bad faith.  Forever Green says they can meet their elements, and it can still be dismissed on bad faith.

MR. READY:  It does.  But it says it can be dismissed on bad faith on one of the elements, such as ill will, malice, something else.  If we've met our responsibilities, if we've met our burden, then by definition, our investigation was sufficient.

THE COURT:  I think I've already ruled with regard to the statutory requirements being that.  So to the extent that you --

MR. CIARDI:  I'm entitled to probe as to what due diligence they did, Your Honor, and how that ties into the other things that they were presented with, and as well as the patently false motion for special relief they filed with the Court because all of that goes into the bad faith.  That false document, that document that, literally, no one could prove an element to, and no one wants to back up, goes to bad faith.  And then I'm going to go into his credibility with about

222

thirty-two questions about the thirty-two states he submitted insurance applications to.

MR. READY:  So Your Honor, first of all, when it comes to the question of what research he did, again, we've already shown that it was sufficient to meet our burden.  They can still show -- if they have something else related to actual malice, they can still show that.  But they don't have a right to then say, well -- even this thing with the TRO, they're saying there's materially false statements.

Your Honor, unless, essentially, the Court is going to require us to go ahead and put on our full TRO hearing, that we didn't have, as part of a negotiated resolution, we're going to have to go --

MR. CIARDI:  It wasn't a negotiated resolution, Judge.  They had to put up a bond, and they ran.

MR. READY:  And --

MR. CIARDI:  That's what happened.

MR. READY:  Your Honor, we had trouble scheduling for another date to come back.  We went out in the hall.  We discussed different options.

MS. NIGRELLI:  Your Honor, that is not what happened.

MR. READY:  But --

MS. NIGRELLI:  And you know that.  What happened was we discussed it.  And I said I would wait, Your Honor, and we would keep the TRO in place.  And you said, Ms. Nigrelli, it's

223

going to be -- it's coming on to the same day.

And then you pulled me aside and you asked if I would agree for you to withdraw it so you didn't have to put up the bond. And I said, yes. That is not a negotiated settlement at all. I agreed to you allowing yourself to withdraw it so that that TRO didn't happen on today.

MR. READY: No, Your Honor.

MS. NIGRELLI: But that was going to stay in place.

MR. READY: And I don't need to argue all those points. The point is, Your Honor, this is not -- unless we're going to come back and put on the full TRO hearing now, so we can demonstrate all the evidence that we had that's not now necessary, then this whole line of questioning is just getting into side issues.

THE COURT: I'll say this. With respect to credibility and bad faith, I do think that they have, at least, a limited scope to ask questions about, with the understanding, though, that I have already made the determination that the statutory elements have been met.

To the extent that you want to present evidence that speaks to underlying statements as a means to attack credibility, I'm happy to let you do that. I think that's essentially what you were doing --

MR. CIARDI: Yes.

THE COURT: -- and that you will continue to do. So

224

I'll allow you to do that, with the understanding, though, that the testimony that's being given with respect to that is a small part of the totality of circumstances determination that I need to make.  So we are not relitigating the TRO.  We're not litigating the TRO, period.  Okay?

MR. READY:  Yes, Your Honor.

MR. CIARDI:  Your Honor, I'm just asking what the support is for the statements made and what investigation they did.

THE COURT:  Okay.

BY MR. CIARDI:

Q    So Mr. Jordan, can you tell me what investigation you did as part of preparing for the involuntary bankruptcy file?

A    I leave most of that up to my legal counsel.  I was approached with, you know, the basis of why it was taking place.  You know, from the stay that was lifted in January, to the original discovery in March, which led to some, you know, misleading answers, I guess, which led to some supplemental discovery, which then eventually led us to the road of involuntary bankruptcy.  And a -- a lot of the legal jargon is confusing for me to articulate, but that's the basis of what I understood.

Q    Sir, do you have any facts that would tend to show that Redmond transferred all of the assets of Bene Market?

225

Do you have any personal knowledge of those facts?

A    Again, a lot of that is left to my legal counsel.

Q    Well, that's a yes or a no.  Do you have those facts or not?

A    Facts that he's transferring money from Bene Market to another organization?

Q    Yes.

A    Well, the money went somewhere.  You know, we had a three- or four-million-dollar book of business with NBOA, which, in my settlement or whatever you want to call it -- my judgment with Rowley, he laid out clearly that the money went from NBOA to Bene, and now it's from Bene, where it just disappeared again within a month's time.  And that's just not how the business works.  So --

Q    So let me ask it differently.  Do you have any facts that you can point to that shows that Mr. Redmond transferred a dollar from Bene Market to anybody else?

A    Again, that's stuff that I leave up to my legal counsel.  I -- I don't have the --

Q    Sir, I need you to answer the question.  Do you have those facts or not?

MR. READY:  Your Honor, I think that's been asked and answered.

MR. CIARDI:  It hasn't.

226

MR. READY:  I think he just testified to what Judge Rowley found.  He just testified to the fact that there was a book of business that it had, that he gave a circumstantial answer, and he also said that he leaves the rest of that up to legal counsel.  That's the answer he just gave.

MR. CIARDI:  That's not the question I asked, which was, does he have any facts on his personal knowledge that would support this statement?

THE COURT:  I think he has answered that.

BY MR. CIARDI:

Q  So the answer is no, you have none of those facts on your own?

MR. READY:  I'm just going to object, Your Honor.

A  I stand by my answer.

Q  Okay.  Would it be fair to say you have no facts that Redmond entered into a sham agreement with an older man?

A  Again, those are statements that I leave up to my legal counsel.

Q  So did you read the motion for special relief before it was filed?

A  Absolutely.  My attorneys and I get together a couple times a month, and we review.  And I can concur with what Alan said.  There's a lot of legal documents that go over, but yeah, we review stuff.  Absolutely.

Q  Okay.  So you reviewed the document before it

227

was filed?

A    Which document are you referring to?

Q    The motion for special relief.

A    Is that the TRO?

Q    Yes.

A    Okay.  I -- yes, I've -- I've -- I've seen that.

Q    Okay.  And did you satisfy yourself that there were sufficient facts to support every statement made in the motion?

A    I trust what my legal counsel will put forward.

Q    So you relied wholly on counsel and what counsel put forward in this?

MR. READY:  Objection as to mischaracterization.

Q    Well, do you have any independent facts, sir -- independent of counsel?

A    Independent facts regarding the TRO?

Q    Yes.

A    It's all -- I -- I've based my legal facts solely on my legal representation.  I'm not a lawyer by any means.

Q    Sir, I'm asking you, do you know, independent of your lawyers, any fact that is in the motion for special relief?

A    I -- I couldn't articulate what you're looking for.  I don't -- I don't know.  I know what my lawyers -- what

228

I give to my lawyers to represent me on.

Q     Okay.  Are you telling me that you gave them the facts for the motion for special relief?

A     No.  I'm saying I leave a lot of that in the hands of my legal representatives.

Q     Okay.  But my question is very simple, sir -- very simple.  Other than what your lawyers told you --

A     Um-hum.

Q     -- do you, independently, know any fact that was asserted in the motion for special relief that you read?

A     I -- I know about a TRO.  I know it's a temporary -- temporary restraining order.  To the extent of anything more than that, that's what I know.  The rest of it, I leave to my legal counsel.

Q     When was the first time, if at all, you had a conversation with Mr. Shalter?

A     In the elevator, I think, at the last hearing.

Q     Okay.  And you had never spoken to him before that?

A     No, sir.

Q     And when you read the line, "documented history of transferring assets outside of the United States", what were you relying upon?  Simply the one sentence from Judge Rowley?

MR. READY:  So Your Honor, I'm going to again object.  Mr. Redmond just testified to his own history of transferring

229

money outside of the United States.  He's been doing it for months.  He transferred money --

MR. CIARDI:  That's not what he testified to, Your Honor.  He said, one time in the last six months.  Mr. Ready should listen to the answers.

MR. READY:  I listened pretty carefully to the answers.  He testified that several times he transferred thousands of dollars.  He testified that money has gone out through the Redmond Charitable Foundation out to schools over there.  So as far as -- we've presented evidence to support this already.

MR. CIARDI:  No.

MR. READY:  This is just an attempt to try to confuse a witness about what is or isn't already proven.

MR. CIARDI:  No.  Your Honor --

THE COURT:  I think that he can respond as to what he provided to you with regard to the facts.  If he did not provide those facts to you, you just need to answer that, and then we can move on.  Because I understand that there's evidence from other sources, but I think Mr. Ciardi is asking specifically Mr. Jordan, since he is a petitioning creditor, what he knew or what he provided, and I think that's proper.

So Mr. Ciardi?

BY MR. CIARDI:

Q    Let me ask a different question.  Have you

230

spoken to any other creditor of Mr. Redmond?

MR. READY:  Objection, Your Honor, as to common interest privilege.

MR. CIARDI:  There's no common interest privilege, Your Honor.  That's Datacom Systems, Incorporated.  People that are not petitioning creditors do not get a common interest.

MR. READY:  No, Your Honor.

MR. CIARDI:  And that is 2014 Westlaw 1077651.

MR. READY:  I'll have to look at the case specifically.  I would cite to Teleglobe Communications v. BCE, Inc., that's 493 F.3d 345.  Your Honor, the privilege is protected, even in transactional contexts.  It protects communications with creditors who are in and out of bankruptcy. It protects in all those situations.  That's the whole idea of --

MR. CIARDI:  No, Your Honor.  It is --

MR. READY:  -- the common interest.

THE COURT:  The common interest is a special exception to the waiver of attorney-client privilege.  That's what the common interest is.  So I've asked him what his conversations were with other creditors, or if he's aware of conversations with other creditors, not whether they had any -- they clearly haven't signed up to join the involuntary, so there is no common legal interest because they're not petitioning creditors.

231

MR. READY:  That's not accurate, Your Honor.  They still have the same common legal interest because --

MR. CIARDI:  No, they don't.

MR. READY:  -- they have same adverse partner.

And Your Honor, here's an additional ground; relevance.  What does it matter?  What does it matter whether he's talked to other creditors?

MR. CIARDI:  It's relevant, Your Honor, because it goes to whether he's spoken to any of the creditors that are in this case, and whether there is an attempt to get additional information that would be improper from any of those creditors.  Did he reach out to CardFlex?  Did he reach out to Producer Advance?  Did they say anything to him?  Did they tell him, no, this guy is fine; we don't have any issues with Mr. Redmond?  I'm entitled to ask what he's done.

THE COURT:  I'll allow it, very limitedly.

MR. CIARDI:  And it will go to damages at some point.

THE COURT:  Okay.  I'll allow it.

BY MR. CIARDI:

Q    Are you aware of any conversations with other creditors, outside of the petitioning creditors?

A    I, again, leave that to my legal counsel.  I haven't specifically personally had direct conversations with creditors, if that's what you're asking.

Q    My question is different.  Are you aware of any

232

conversations with creditors, other than the petitioning creditors?

MR. READY:  Well, hold on.  He just testified that he hasn't had conversations.  I mean, if they're trying to find out now whether his attorneys had conversations, that would certainly be privilege.

MR. CIARDI:  The attorneys are petitioning creditors, Your Honor.

MR. READY:  No.  The law firm is a petitioning creditor.

MR. CIARDI:  Then fine.  I'll ask Mr. Crossit (ph.).  And somewhere I'll get to the bottom of who they've talked to.

THE COURT:  Okay.  We'll leave it there and we'll move on to the next question.

BY MR. CIARDI:

Q    Sir, what investigation are you aware of that was done, pre-filing, into Mr. Redmond, his paying of his creditors under any sort of frequency.  What investigation are you aware of?

A    Again, that's solely on the shoulders of my legal counsel.

Q    Okay.  Are you aware of any investigation that was done?

A    Yeah.  Yeah.  In depth investigation by my legal counsel, yeah.

Q    Okay.

A    For sure.

Q    So are you aware of any investigation that was done into

233

CardFlex?

A    I believe it would have been the listing of creditors that we reviewed in this courtroom last time.

Q    Okay.  I'm talking about before the filing of the involuntary settlement.

A    I don't know the timelines.  Again, that's --

Q    Was it --

A    I know that they looked into the creditors.  I don't know the specifics as to when or why or -- you know.

Q    You signed an involuntary petition --

A    Um-hum.

Q    -- that said that Mr. Redmond was not paying his undisputed debts as they came due.

A    Um-hum.

Q    What facts did you have that enabled you to make that allegation?

A    Based on my legal counsel.

Q    So just what your legal counsel told you?

A    Yeah.  So the involuntary bankruptcy came about, again, from the March discovery which lead to the supplemental discoveries where he was being misleading.  He wasn't giving us bank accounts or information which lead to us going down the road of involuntary bankruptcy.

Q    So --

A    As far as what transpired there with the specific

234

creditors, I don't -- you know.  That's --

Q    Wouldn't it be fair to say, sir --

A    -- what I have the legal counsel for.

Q    -- that you testified in your deposition yesterday --

A    I'm sorry.  I didn't catch the first part of that.

Q    Wouldn't it be fair to say, sir, that you testified in your deposition yesterday that the discussion of an involuntary bankruptcy started in July of this year?

A    No, that's not fair.

Q    That's not what you testified to?

A    No.  The discussion of the involuntary bankruptcy stemmed, I believe, from, again, the March and May discovery.  And I think that's where it stemmed from.  When -- and the discovery, I believe, stemmed from the lifting of the stay in January from the superior court.

Q    Okay.  So you're saying that there was no testimony that you have in your deposition where you discuss July as being when you started?

A    I mean, it's possible.  The depositions can be, you know, tricky and long.

Q    They can be tricky and long?

A    Yeah.  You're more than welcome to reread what I've --

Q    Okay.

A    -- discussed with you.

Q    So are you licensed in any states for insurance purposes?

235

MR. READY:  I'm just going to object, Your Honor, as to relevance.

MR. CIARDI:  Goes to his credibility, Your Honor.

MR. READY:  Why would that go to his credibility, whether he's licensed --

MR. CIARDI:  If he submitted 32 false licensing applications, and probably another 32 false renewal applications, and lied about felony convictions?  Sixty-four times that he's committed perjury?

MR. READY:  So, Your Honor --

MR. CIARDI:  That goes to credibility, Your Honor.

MR. READY:  So, Your Honor, a couple things.  I've looked at the documents they provided as exhibits first day.  It's very clear that they are completely misreading the requirements of insurance licensure.  The issue that they're trying to get into, and that they'd have to lay a foundation for, is that he had juvenile convictions in the State of Florida.  Those are not counted for insurance filings, and they are not relevant.  They are inadmissible under Rule 609 of the Rules of Evidence.  And, Your Honor, furthermore, to be quite blunt, I don't think it matters whether Mr. Jordan committed a major crime on his way here today.  It doesn't matter.  He's a petitioning creditor.  Whether he's a bad guy or not does not affect whether he acted in bad faith.  This is essentially the idea of using a character trait to try to prove some sort of

236

bad action in this matter.  They have to prove bad faith in regards to the involuntary petition.

THE COURT:  Mr. Ciardi?

MR. CIARDI:  First of all, Your Honor, Mr. Jordan was over 18 at the time of both convictions, so he's not a juvenile.  Okay?

Second of all, I don't know what Mr. Ready read, but the renewal application very clearly says that if you are convicted or plead guilty, you need to disclose your felony convictions.  And Mr. Jordan testified, in his deposition, that he did not disclose any of his felony convictions, guilty pleas, whatever you want to call them, in any of the thirty-two states he's been licensed in, and any of the renewal applications that he's had.  We have the renewals, and the regulars that -- and so I can point them to him, and I have his convictions.  Why that's important?  Because you just heard a whole host of testimony that Mr. Ready presented to Mr. Redmond about Mr. Walsh's banned -- or being dismissed from the insurance, or not getting licensure.  And Mr. Redmond not being licensed.

So all of that becomes important and relevant, and it goes to credibility.  If he's committed, basically, 64 different -- perjury 64 times, I think that goes to the weight of whether he is testifying truthfully regarding what he did with this motion for special release.

237

MR. READY:  So, Your Honor, what they have submitted as exhibits for today -- first -- first time we've learned about this issue, by the way, was yesterday.  And what they submitted for exhibits yesterday, not -- that we saw before the Court is a docket report from Florida showing that he was charged when he was 17 years old.  Under Florida law, Florida Statute Section 626.207, anyone who was a minor at the time of the offense, it is a juvenile matter, no matter when they plead or are convicted.  The form they submitted, a blank form, not signed by him, by the way, Your Honor.  So we're not even at the point where they've laid a perfect foundation.  A blank form they've submitted for the NAIC says that you disregard any juvenile convictions when you're filling it out, and you disregard any traffic convictions when you're filling it out.  That's everything that they have that they've submitted.  So this is irrelevant as a matter of law.  They're wrong about the insurance; he's perfectly fine.

The second issue is that this is a violation of Rule 609 which flips the burden of Rule 403.  They have to show that the probative value substantially outweighs any prejudicial effect.  And they can't show that.

THE COURT:  I'm going to sustain the objection.

MR. CIARDI:  Your Honor, I -- just give me one moment, Your Honor.

THE COURT:  Um-hum.

238

MR. CIARDI:  Your Honor, let me be clear.  None of these dockets that we have are sealed.  So they are not juvenile records.  Okay?

THE COURT:  Whether or not they're sealed, I don't think that that necessarily proves that they're juvenile versus not juvenile records.  It -- I take at face value what Mr. Ready has argued, which is that they were charges that were instated when Mr. Jordan was a minor.  And given that, I'm not sure that the probative value --

MR. CIARDI:  That's not correct.

THE COURT:  -- is high here.

MR. CIARDI:  Your Honor, the -- it's not that he was convicted of a crime when he was 18.

THE COURT:  No, I didn't say convicted; that he was charged.

MR. CIARDI:  No, he was convicted.  He plead guilty.

THE COURT:  What I'm saying is if he was charged when he was under 18, I think that's the relevant fact that we're leaving out.

MR. CIARDI:  No, but there is one where he was charged after he was 18 beyond any doubt.  And, more importantly, it is -- these are felonies that are available on his record, and there are 32 states that he submitted applications to, and he testified yesterday in his deposition that he has never reported the existence of these felonies in

239

any of those 32 applications.

Now, he then had renewals.  So that's 64 times, at a minimum, that he has committed perjury, each of these being under oath.  And that is relevant to the examination of what he's saying with regard to this motion for special relief.

THE COURT:  Mr. Ready?

MR. CIARDI:  It will come out at some point in time. I will be taking his deposition again.  I will put all this in front of him because it -- we are going to make this a central issue in this case.

THE COURT:  His credibility to be a petitioning creditor or his credibility beyond the stand right now?

MR. CIARDI:  His credibility generally.  On everything, Your Honor.

THE COURT:  Because --

MR. CIARDI:  His credibility on the stand.

THE COURT:  Because he is a petitioning creditor. That ship has sailed.  However --

MR. READY:  What --

THE COURT:  -- I understand attacking his credibility for purposes of today's testimony.  I'm just not sure I'm willing to do that with regard to juvenile convictions.

So to the extent that there is one that is not --

MR. READY:  And there's not.  I want to be a hundred percent clear.  So I'm looking at what they produced right now,

240

and the -- first of all, one of these, the offense date, his first one, is from 7-31-1999.  Mr. Jordan can establish his birthdate is 1982.  He was not 18 years old at the time of that offense date.  That makes it juvenile.

There are others they show.  There is drug charges they submitted.  All of them are withdrawn and dismissed.  The only thing that they have here is there's a driving while suspended license, which is explicitly exempted in the document they have submitted -- and, again, I want to highlight.  They don't even have a copy of the document that he's supposed to have signed under perjury.  They have a copy of a form allocation that some groups use, which he testified he has never used.

MS. NIGRELLI:  No, he didn't.

MR. READY:  He testified he uses an online database that he goes through and fills these things out.  So they're trying to use a blank form that he didn't sign, or that they don't have a signature on, to say that he committed perjury.  This is like multiple layers.  It's like a Russian nesting doll of things to try to get to -- and he was -- and he had crimes when he was a kid a quarter of a Century ago.

MR. CIARDI:  Let me make it easy then, Your Honor.  I won't ask the witness these questions.  We're just going to go each of the 32 licensing jurisdictions and deal with them there.  And they'll do whatever they need to do to Mr. Jordan.

241

And if that's how they want to proceed with this, one way or the other, we're getting to the bottom of this.  If it's not in this Court, I understand it will be through the State licensing boards.  And then they'll do with Mr. Jordan whatever they need to do.

THE COURT:  And you can feel free to do that.  But for today, I'm not willing to allow juvenile convictions to be addressed.

MR. CIARDI:  I disagree that these are --

THE COURT:  They are highly --

MR. CIARDI:  -- juvenile convictions, Your Honor.

THE COURT:  -- prejudicial.

MR. CIARDI:  I disagree that these are juvenile convictions.

THE COURT:  Okay.  We can disagree, but I don't think you would disagree -- well, you probably would.  But that it would be highly prejudicial to allow it versus its probative value, which is, okay, you're telling me that he's lying.  I got it.  I got it.  I don't need it 32 times.  I got it.

MR. CIARDI:  Okay.

THE COURT:  I just don't think that we need to go there.

MR. CIARDI:  Under -- Your Honor, I respect the decision.

THE COURT:  Okay.

242

MR. CIARDI:  And I'm not --

THE COURT:  Okay.

MR. CIARDI:  -- pushing back on that.  I just -- what I want to be clear is is that we're not raising this because we don't think it's probative.  We think his honesty in state licensing applications is highly relevant and highly probative, especially given what has been said in this case regarding my client.

So I think it's something that will be probed at some point in time.  If not today, it'll be down the road; it'll be with his state boards, whatever it is.

THE COURT:  For today's purposes, we're talking about a bad faith filing of an involuntary.  We have a petitioning creditor on the stand.  And I guess, I'm mindful of not going too far afield of what we really need to get to today, which is was there some bad intent here in filing this involuntary.  And I get that credibility is always an issue for a witness.  I totally get that, and I will give it the weight that it deserves.  But I don't want to go too far down that road and miss the point of where we need to be.

MR. CIARDI:  Understood, Your --

THE COURT:  That's the only reason I give that admonition.

MR. CIARDI:  Understood, Your Honor.

Okay.  Can I then have a minute just to speak with --

243

THE COURT:  Yes.

MR. CIARDI:  Okay.

THE COURT:  Yes, you may.

(Counsel Confer)

MR. CIARDI:  Your Honor, could I have a moment to discuss things with my client before we decide who to put on next?  I will not be --

THE COURT:  Are you --

MR. CIARDI:  -- asking any more questions of Mr. Jordan.

THE COURT:  Okay.  That's what I was going to ask.

MR. CIARDI:  Yeah.

THE COURT:  Okay.

I'm going to allow him to get off the stand unless you feel the need to --

MR. READY:  No, Your Honor.  That's fine.  Thank you.

THE COURT:  Okay.

You can --

THE WITNESS:  Thank you.

THE COURT:  -- sit, please.

MR. READY:  Can we take a brief --

THE COURT:  We can take a break.

MR. READY:  Okay.

THE COURT:  We'll go off the record.

MR. READY:  Just a five-minute break.  Thank you,

244

Your Honor.

THE COURT:  No problem.

(Recess)

THE CLERK:  Okay.  We're back.

THE COURT:  Okay.

MR. CIARDI:  We don't have any more witnesses.

THE COURT:  Okay.

MR. CIARDI:  I think as we've stated no Rule 15 motion, we think Your Honor should dismiss the case.  But if Your Honor is not inclined to do that, we're prepared to move forward as a Chapter 11 debtor.  So we want --

THE COURT:  Okay.

MR. CIARDI:  -- the authority to do that if your ruling is that the involuntary is not dismissed.

THE COURT:  Okay.

MR. CIARDI:  So.

THE COURT:  All right.  Well, I mean, given what I've heard today and the testimony that has been offered, I think it's -- well, two things.  One is obviously they've met statutory requirements.  With respect to bad faith, I don't think that I've heard enough to sway me into believing that this was done out of some malicious intent or that there wasn't a reasonable basis for the filing.  Having said that, it is a totality of circumstances analysis.  And I think when I add together what I've heard with respect to the amount of the

245

debt, the lack of income, the failure to provide me with evidence that payment arrangements were made and that payments were actually being made, I think that that burden of showing that debts have not been being paid when they were due has been met.

With respect to a credibility determination, I don't think that what I've heard today challenges my ruling despite the fact that I do understand that there are parts of testimony from probably all witnesses, with the exception of the expert, that are incredible versus being credible. I don't think it was enough for me to rule that there has been bad faith here.

So given that, I am going to enter the order for relief, and deny the motion to dismiss. And we'll move forward with the involuntary petition.

MR. CIARDI: Your Honor, do we need to file a new application of the employee?

THE COURT: No.

MR. CIARDI: Okay. So I'm just --

THE COURT: You do not.

MR. CIARDI: Okay. And I just want to make sure that --

THE COURT: You do not. There is the application, there's the objection. I typically will set those up for hearing. I'm not sure that I need to do that.

MR. CIARDI: I only ask because we filed it as on

246

behalf of the punitive debtor.

THE COURT:  I know you did.

MR. CIARDI:  And now it's the debtor, so --

THE COURT:  Right.

MR. CIARDI:  -- we just need to know, moving forward, if that -- if we needed to update that or anything further, but other than that --

THE COURT:  No, I don't think that you need to.

MR. CIARDI:  Okay.

THE COURT:  I think I can --

MR. CIARDI:  I assume the US Trustees Office then will start sending us all their --

THE COURT:  Correct.

MR. CIARDI:  -- things.  Okay.

THE COURT:  Correct.

Mr. Ready?

MR. READY:  Yes, Your Honor.  Just two things.  First of all, we had asked for disclosure of any conflicts of interest in joint representation of adverse parties to the estate.  We've not received any answer on that.  Given the number of attorneys who have represented multiple pieces of this, including Seguro, Mr. Redmond, Ms. Kroemmelbein, we wanted clarity that their firm does not represent any of the individuals that we've named as the control adverse parties.

THE COURT:  I thought that they had put it out -- had

247

answered that.

MR. CIARDI:  This would be the sixth time I'd have to answer that question.

THE COURT:  I believe --

MR. READY:  No --

THE COURT:  -- that they -- at least for Mr. Ciardi's firm, my understanding is that they have no representation with regard to any other parties.

MR. CIARDI:  We've said that.

THE COURT:  And that the only party that they are representing is the debtor, Mr. Redmond.

MR. READY:  Okay.  If that's Your Honor's understanding, I'm content with that.

THE COURT:  Okay.

MR. READY:  It was not -- okay.

THE COURT:  Okay.

MR. READY:  The second thing is we had filed our motion for sanctions -- we can update it -- but regarding seeking the expert fees to demonstrate the fraudulent documents that were submitted to the Court, we are still seeking the Court to award those on the basis of fraud on the Court.

MR. CIARDI:  We're getting our own expert, Your Honor, and we're going to deal with that when we deal with the fraudulent motion for TRO that was filed.  We'll file our own motion for sanctions on that, and you can have hearings on both

248

at the same time.

THE COURT:  Okay.  Then I will hold off and suspend my thoughts on that until I see more papers.

MR. READY:  Okay.

THE COURT:  Is there anything further?

MR. READY:  No, Your Honor.

THE COURT:  Okay.  Thank you all.

MS. NIGRELLI:  Thank you, Your Honor.

THE COURT:  All right.

MR. CIARDI:  Thank you, Your Honor.

(Proceedings Concluded)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: October 31, 2024

_____
eScribers, LLC
7227 N. 16th Street
Suite #207
Phoenix, AZ 85020

**_**

**—- (4)**
192:8,9,14,14

**$**

**$17.5 (1)**
177:12
**$2,432.17 (1)**
217:21
**$41,000 (1)**
166:9
**$6.7 (1)**
169:9

**=**

**=- (1)**
81:14

**A**

**ability (9)**
6:6;15:21;50:16;
81:23,24;103:15;
140:11;144:19;
148:21
**able (37)**
5:12;17:22;18:23;
51:23;87:19,20,22,23;
88:7,11,21;96:22;
97:12,20,23;98:3,6,
13,15,17,21;99:2,24;
107:23;117:15,17;
121:2,8;125:14,15,25;
131:17,18;149:7;
159:11;166:5;172:21
**above (1)**
137:6
**Absolutely (15)**
52:9;85:23;106:7;
148:6;168:3,5,10;
181:8;187:17;191:10;
201:19;209:4,7;
226:21,24
**absurd (1)**
199:4
**ACA (3)**
116:8,10;121:5
**Academy (2)**
24:25;25:3
**accept (4)**
55:11;151:21;
204:7,8
**acceptable (1)**
168:21
**accepted (2)**
11:5;56:17
**access (19)**
70:18;103:7;
113:14;137:2,8;

138:5,11;139:8,11,15,
15,16,17,19;140:5,6,
11,22;215:8
**accident (1)**
101:15
**accidents (1)**
113:19
**accompanying (1)**
45:16
**account (27)**
31:21;50:15;
126:15,19,20,24;
127:1,1,3,3,5,6,7,14,
17;129:6,10;132:8,
10;200:14;214:13;
217:24;218:5,7,13,15;
219:16
**accountant (1)**
8:24
**accountants (1)**
105:6
**accounts (6)**
126:20;192:5;
218:7,8;219:17;
233:22
**accurate (8)**
35:6;50:16;101:4,5,
20;106:20;143:18;
231:1
**accuse (1)**
208:18
**accused (2)**
18:8;210:6
**accusing (1)**
174:14
**achieve (1)**
25:20
**acknowledge (3)**
63:3;84:17,19
**acknowledged (3)**
22:21;166:11;
169:11
**acknowledges (1)**
150:24
**acronym (2)**
22:9;37:4
**Act (2)**
5:4;116:8
**acted (3)**
16:20;174:17;
235:24
**action (2)**
104:20;236:1
**actions (1)**
151:10
**active (5)**
112:25;113:9;
114:3;192:24,24
**actual (12)**
5:6;8:6;37:24;41:8;
71:2;120:17;144:24;
159:13;190:13;
191:11,14;222:6

**actually (48)**
8:7;9:8;27:7;31:12;
34:17;35:12,25;
41:12;42:10,12,15;
43:19,22,23;45:13;
47:24;48:7;51:1;54:8;
66:13;72:21;78:2;
84:21,23;85:4,6,16;
93:4,5;106:10;111:6;
117:17,19;122:21;
125:14;132:24;
154:25;159:17;173:1;
177:20;180:1;190:25;
192:14,15;205:21;
208:11;218:15;245:3
**acumen (1)**
121:3
**ad (1)**
162:7
**add (3)**
11:19;84:25;244:24
**added (1)**
178:12
**addition (6)**
14:15;18:13;23:10;
27:6;86:8;181:10
**additional (5)**
23:11;33:15;79:8;
231:5,10
**Additionally (1)**
169:1
**address (4)**
7:18;10:5;75:6;
195:2
**addressed (2)**
179:22;241:8
**adjudicated (2)**
180:4,6
**adjust (2)**
37:8;40:21
**adjusted (1)**
40:9
**adjusting (1)**
40:23
**admin (2)**
139:13,14
**administrators (1)**
122:19
**admissibility (5)**
71:9;83:3,5;84:4;
87:5
**admissible (2)**
71:11,12
**admission (3)**
76:12;83:8;84:1
**admissions (1)**
159:18
**admit (18)**
72:3,6;77:8;78:21;
79:18,22;80:20,21;
84:24;87:6,10;94:22;
157:2,15;158:5;
163:17,19;171:3

**admits (1)**
73:16
**admitted (15)**
15:12;32:11;56:19;
83:17;157:9,10;
159:25;161:5,8;
162:10;163:24,24;
164:1;169:7,8
**admitting (6)**
56:7;86:18,19;
87:10,11;161:19
**admonition (1)**
242:23
**advance (31)**
11:13;88:11;91:15;
93:10;101:4,14,15;
102:3,5;103:19;
110:10,11,13;114:11;
115:22,25;116:5;
164:16;175:18;176:3;
177:2,6,18,21,22;
192:9,25;193:1,5,11;
231:13
**advanced (5)**
110:9;121:12;
145:9;176:19,23
**advances (7)**
114:9,18;175:21;
176:19;177:7;193:10;
211:8
**advancing (2)**
15:16;177:20
**adversarial (9)**
179:13;207:14,25;
208:2,4,9,11,13;
209:17
**adverse (8)**
84:15;164:4;
178:20,22,24;231:4;
246:19,24
**advice (3)**
104:1;150:24;
208:22
**advise (1)**
64:23
**advised (3)**
95:12;212:18,20
**advisement (1)**
174:6
**affairs (1)**
95:21
**affect (1)**
235:24
**affected (1)**
171:21
**affects (1)**
132:20
**affidavit (4)**
43:9;44:17,18;
53:22
**affidavits (1)**
189:2
**affirmatively (1)**

173:5
**afford (1)**
114:2
**Affordability (1)**
116:8
**afield (1)**
242:15
**afloat (1)**
203:3
**afternoon (2)**
4:21;11:1
**again (137)**
6:23;8:22;9:1,5,14;
11:22,24;18:19;
30:19;31:8,16;33:12;
35:20;36:2,10,12;
37:11;38:2,4,5,6,7,8,
24;39:3,18,20,20,22;
40:3,11,19,22;41:11,
12,18;42:4,18,19;
43:6,11;44:2,3,7,24;
45:6,8,21,24,25;46:3,
9,17;47:2;48:1;50:9,
13,21,24;51:11,12,21;
55:7,16;56:5;57:23;
58:12;60:13,23;
63:18;64:18;65:23;
67:15;68:1;69:9,20;
71:21;75:20;77:12,
22;78:1;79:11,24;
80:3;81:3;89:8,21;
90:18;94:9;98:8;
103:9,20;109:19;
111:9;117:3;118:6,
24;119:19;125:10;
128:16;135:12;142:8;
143:5;144:23;147:14;
148:15;157:10;158:7,
23;164:11;166:8;
172:5;173:17;174:7,
20;182:20;183:13;
187:3;188:25;192:3;
207:2;219:4;221:1,2;
222:4;225:2,14,19;
226:17;228:24;
231:22;232:19;233:6,
19;234:12;239:8;
240:9
**against (23)**
15:9;17:8;36:14;
39:1;42:3;57:5;
114:15;165:1,1,5;
167:8;177:8,9;179:4;
180:1,7;202:17;
207:18,25;208:9,13,
19;209:18
**agencies (5)**
22:23;24:7;25:7;
124:20;208:3
**agency (13)**
112:16,16,20;
116:10;120:3,20;
122:1;144:22,24;

145:8;147:14;176:24;
177:1
**agent (2)**
11:7;175:23
**agents (4)**
16:24;118:10;
140:23;146:8
**ago (23)**
18:4;25:22;27:14;
62:9;96:8;102:15;
120:3;127:18,19;
128:25;129:1,2,5;
138:19;142:10;
189:19;197:17;
205:10,11,12;207:11;
210:22;240:21
**agree (16)**
15:18;51:23;77:3;
86:25;99:15;123:5;
134:6;147:6;148:4;
159:24;165:3;201:8;
208:20;209:2,17;
223:3
**agreed (3)**
8:25;82:8;223:5
**agreement (55)**
17:7;30:23;31:15;
43:9,20;56:20;60:17;
88:12;91:15;102:9,
10,13,18;108:8,10;
109:11,12;110:2;
112:20,20;125:4,8,13;
130:3;133:18,19,24;
142:1;143:14,15,18;
149:10;150:5,7,21;
165:18;176:14;
180:10;182:3;185:22;
186:4,7,8,9,20;187:5;
190:5,8,9;204:4,6,7,8,
11;226:16
**agreements (14)**
89:9;90:2,10,14;
91:15;98:8;105:4;
133:4;134:15;164:12,
17,18;172:25;176:23
**agrees (1)**
151:2
**AG's (1)**
25:17
**Ah (3)**
54:20;55:1;215:23
**ahead (6)**
10:24;104:25;
138:7;160:16;167:22;
222:11
**ahold (1)**
5:12
**aid (5)**
77:24;167:2;194:1;
201:13,25
**Al (2)**
215:7,10
**Alan (16)**

20:21;59:17,22;
60:1;62:21;77:23;
160:18;183:9;195:20,
21;205:13;212:12,17;
214:12;218:19;
226:23
**A-L-A-N (1)**
60:1
**albeit (1)**
187:19
**Albert (1)**
82:2
**alignment (1)**
30:10
**allegation (2)**
185:12;233:16
**allegations (5)**
162:23;187:15,17;
208:18;209:24
**alleged (1)**
73:14
**allocation (1)**
240:12
**allow (15)**
19:11;57:12,13;
77:19;132:17;150:10;
173:9,11;188:2;
224:1;231:16,18;
241:7,17;243:14
**allowed (3)**
181:21;187:24;
188:1
**allowing (3)**
61:1;168:19;223:5
**allows (5)**
37:4;60:8,14;62:3;
204:7
**almost (5)**
39:10;49:21;
108:20,21;111:19
**alone (1)**
170:24
**along (3)**
54:3;70:25;203:10
**although (2)**
102:3;123:23
**always (5)**
107:13;166:20;
198:15;220:15;
242:17
**amend (1)**
89:13
**amended (2)**
100:4;161:9
**amendments (1)**
89:10
**America (1)**
24:2
**American (11)**
24:24,24;25:3;26:4,
19;98:17;117:13;
118:9;165:7;179:3;
200:9

**amount (9)**
15:19,22;18:2;57:5;
102:2;110:14;121:15;
165:2;244:25
**analysis (6)**
26:15;29:12,13;
51:24;52:10;244:24
**and/or (2)**
89:13;193:5
**angle (3)**
37:8;40:9,21
**annual (1)**
26:22
**annually (1)**
105:11
**answered (23)**
64:24;84:9,12,15,
21;89:12;90:18;
96:12,12,14;125:3;
127:7;149:17,21;
195:16;201:7;212:13;
213:22;215:7;216:14;
225:24;226:9;247:1
**Anthony (1)**
4:6
**anymore (3)**
108:23;113:6;
148:17
**apart (2)**
101:5;111:21
**apologies (2)**
64:1;114:24
**apologize (12)**
6:21;8:14,17;22:3;
100:11;114:23;
129:25;130:25;138:6,
7;155:16;206:21
**apparent (1)**
12:6
**apparently (2)**
10:18;11:5
**appealing (1)**
108:22
**appear (8)**
57:1;77:6,7;78:20;
79:2;164:19;185:4;
206:19
**appeared (2)**
42:25;43:20
**application (3)**
236:8;245:16,22
**applications (7)**
222:2;235:7,8;
236:14;238:24;239:1;
242:6
**applied (1)**
94:3
**applies (1)**
158:19
**apply (3)**
30:1;180:5,8
**appreciate (1)**
79:5

**approached (2)**
207:10;224:16
**appropriate (5)**
116:18;157:25;
170:11;178:8;182:12
**approved (1)**
132:8
**approximately (6)**
6:1;60:22;62:8;
102:14;127:18;
177:12
**April (3)**
129:24,24;209:10
**Arabia (1)**
24:3
**ARC (24)**
103:25;105:2,2;
129:16,18;130:1,4,5,
7;195:18,21;212:4,7,
10,14;213:6,7,17,25;
219:6,8,11,12,19
**area (3)**
39:21,24;101:2
**areas (1)**
39:3
**argue (3)**
158:4;170:15;223:9
**argued (1)**
238:7
**argument (8)**
17:14;52:12;56:17;
57:15;86:24;160:9;
169:13;175:6
**arise (1)**
62:6
**arising (1)**
150:20
**Army (1)**
23:7
**around (9)**
86:15;101:17;
110:3;118:10,14;
122:5;127:19;184:3;
198:15
**arrangements (3)**
88:22;172:19;245:2
**Arthur (46)**
106:11,11;107:16,
17;117:13;118:8;
120:4,17;121:8;
123:23;125:14;126:1;
132:22,23;134:23,23;
135:8,16;136:8,16,22;
137:12;138:16,19;
139:15,21;140:19;
141:12;142:18;143:9,
11;147:3,25;148:13;
152:13,14;177:7;
185:24;189:1;204:5;
207:6,10,12,15,20;
208:19
**Arthur's (5)**
121:3;126:4,6;

134:24;140:19
**article (1)**
205:18
**articulate (2)**
224:22;227:24
**aside (1)**
223:2
**aspect (3)**
84:10;141:9,9
**asserted (1)**
228:10
**asserts (1)**
15:7
**asset (2)**
179:19;200:18
**assets (27)**
9:9,11;103:23;
111:21,22;149:12,14;
170:14;174:8;176:16;
191:19,24;192:3,4;
193:12;197:7;198:20;
199:7,20;202:8,12,15;
212:15;216:3;217:18;
224:25;228:22
**assignments (1)**
118:17
**assist (2)**
119:6;125:5
**assisted (2)**
201:14;214:3
**assisting (1)**
148:7
**Association (4)**
24:19;25:4,5,6
**associations (1)**
24:11
**assume (3)**
93:11;173:19;
246:11
**assuming (3)**
117:18;137:20;
194:10
**asymmetry (1)**
40:9
**Atlantic (1)**
25:4
**attached (14)**
28:19,21;35:7,8;
46:22;72:4,7,10,13;
73:17;110:9;159:14,
19;199:3
**attaches (1)**
158:22
**attack (2)**
57:2;223:21
**attacking (2)**
57:4;239:20
**attempt (4)**
146:20;217:8;
229:13;231:10
**attempting (3)**
122:2;130:11;
180:25

**attend (5)**
142:14,22;143:6;
206:3,5
**attended (1)**
142:16
**attending (1)**
23:18
**attention (9)**
39:8,24;41:14;43:3,
17;44:8;45:11;
126:16;204:22
**Attorney (58)**
25:11;62:8;66:12;
69:1,1,5;70:13;76:14;
79:13;89:3;91:17,22,
23,25;92:10,18;
93:12;95:19;97:17;
99:8;101:2,10;103:4,
10,21;106:5,19;
107:21;109:3;111:8;
112:17;113:22;114:5;
115:25;116:21;
118:15;119:5,15;
121:5;123:9;125:11;
128:4,17;131:10;
134:10;138:7;141:1;
142:8;145:8,15;
147:3;183:9;201:14;
205:23;212:21;214:6;
216:18;217:2
**attorney-client (1)**
230:19
**attorneys (29)**
76:14;77:10;80:13;
89:17;90:19;94:21;
95:12,17,20,25;96:2,
4,5,7;100:17;101:16,
21;104:1,19;121:9;
127:6;145:14;195:20;
212:19,22;226:21;
232:5,7;246:21
**attorney's (2)**
104:7;208:22
**attributed (1)**
31:11
**audits (1)**
145:14
**authentic (15)**
32:6;45:5;72:18;
73:5;76:7,8,18,21;
77:7;78:18,20;79:2;
83:3,5,13
**authenticate (3)**
13:14;73:16,17
**authenticated (1)**
158:1
**authenticity (18)**
20:17;32:8;33:12;
54:4;71:5,10;72:3,6;
74:20;75:25;76:4;
78:16;82:24;84:20;
86:25;87:4;158:14,17
**author (1)**

27:13
**authorities (2)**
94:23;172:23
**authority (2)**
215:2;244:13
**available (4)**
86:7;138:14;
207:17;238:22
**award (1)**
247:21
**aware (22)**
10:11,12;17:6,7;
56:20;69:6;86:3;
100:3;169:18;184:23;
199:6;200:21,25;
201:24;207:6;230:21;
231:20,25;232:16,18,
20,25
**away (4)**
110:4;141:11;
147:4;187:15

## B

**Bachelor (1)**
21:19
**Bachelor's (2)**
21:15,20
**back (51)**
17:10;34:19;40:11;
42:14;43:24;50:10;
52:23;57:1;62:19;
63:25;64:13;72:1;
77:5;78:20;88:14;
89:6;93:10;96:8;
106:10;107:22;
108:14,24;116:5;
119:10;124:7,12;
131:16;132:8;142:24;
149:1;152:25;153:19,
23;154:21;155:22;
156:11,22;175:10;
178:10;181:13;182:2;
194:23;199:22;
201:11;207:13;
211:14;221:24;
222:19;223:11;242:3;
244:4
**background (4)**
37:1;48:1,2;189:14
**backloaded (1)**
188:20
**backstop (1)**
187:15
**bad (40)**
7:14;9:2;11:25;
12:22;14:13,13;
16:20,21;17:3;84:16,
17;133:22;155:10;
169:15,22,24,25;
170:25;171:1;174:17,
18,18,25;187:16,21,
22;221:7,9,11,22,24;

223:16;235:23,24;
236:1,1;242:13,16;
244:20;245:11
**bad-faith (4)**
5:17;6:25;9:7;
162:23
**Bahrain (1)**
24:4
**balances (1)**
218:10
**ball (1)**
15:16
**ballistics (1)**
22:16
**bank (31)**
126:15,21,24;
127:1,1,3,3,5,5,6,7,14,
17;129:6,9;132:8,10;
200:14;214:13;
217:19,24;218:5,7,7,
8,13,15,15;219:16,17;
233:22
**bankrupt (2)**
113:7;177:24
**bankruptcy (20)**
16:16;67:24;
130:13;131:8;163:4;
167:15;168:8,20;
170:19;178:18;
179:19;180:16;
184:13;224:14,21;
230:13;233:19,23;
234:8,11
**banned (1)**
236:18
**barely (1)**
49:18
**Barrera (6)**
138:20;139:22;
141:12;148:1;190:25;
191:8
**Barrios (5)**
190:12,15,17,19,24
**based (22)**
6:25;9:1,7;16:23;
24:21,22;29:13;
31:14;37:17;59:6;
98:8;135:14;170:24;
173:12;177:13,14,15;
207:15;218:9,12;
227:18;233:17
**baseline (1)**
30:10
**basically (11)**
37:1;39:25;40:23;
48:16;90:21,22;
105:5;116:12;124:4;
152:4;236:22
**basis (18)**
10:13;16:5,5;37:19;
57:2;101:25;102:2;
125:7;130:9;136:10,
13;187:9,21,25;

224:16,22;244:23;
247:21
**batches (1)**
206:23
**bathroom (1)**
151:25
**BCE (1)**
230:10
**bearing (3)**
14:10;33:2;100:2
**bears (5)**
5:25;17:2;149:7,13;
219:3
**became (5)**
34:15;63:14;99:15;
116:9;169:18
**become (5)**
6:24;9:1;21:11;
96:23;179:20
**becomes (5)**
12:5;36:12;134:11,
13;236:21
**began (1)**
102:18
**begin (6)**
12:21;13:23;14:1;
53:20;125:9;146:9
**beginning (6)**
42:10;109:9;141:5;
158:13;211:10;214:2
**behalf (1)**
246:1
**belief (1)**
186:11
**believes (4)**
17:16;178:20;
179:18,23
**believing (1)**
244:21
**below (1)**
38:7
**Bene (81)**
93:15;108:3,7,13,
14,18,25;109:7,15,17,
21,24;110:6,8,20;
111:4,6,9,12,15,21,
23;113:1,10,11,21;
114:8,9,10,12,25;
115:7,14;116:4,11,19,
24;117:7;118:14;
120:7,12,22,25;
121:14;124:17;
125:22;143:13;
144:16;148:16;
166:25;176:10,17,24;
191:19,24;192:3,8,11,
15,20;193:3,7,12,15,
22;202:7,11,15,17,22;
203:4,5,8,13;208:13;
211:5;224:25;225:6,
13,13,18
**benefit (4)**
128:7,8;134:13;

187:24
**Benefits (1)**
193:13
**Bennie (1)**
55:3
**Berks (9)**
53:21,23,25;94:4,
18;98:3;99:11;107:5;
166:2
**best (12)**
80:18;81:23,24;
82:1,3;95:18;100:25;
103:15;104:20;124:8;
142:12;186:17
**better (7)**
19:18;52:14;
111:19;121:3;123:22;
204:15;207:17
**betting (1)**
110:13
**beyond (4)**
72:21;172:24;
238:21;239:12
**big (6)**
114:9,10;116:6;
121:2;132:25;144:25
**bigger (3)**
128:3,4;201:3
**biggest (3)**
67:6;121:19;167:25
**Bill (5)**
57:21;58:15;60:10;
98:6;144:13
**bills (4)**
62:10;85:22;
177:19;219:16
**bind (2)**
145:23,24
**birthdate (1)**
240:3
**bit (14)**
38:14;39:5,10,11,
21;50:12,13;63:24;
69:19;100:1;123:24;
124:19;126:1;215:6
**black (2)**
37:10;48:17
**Blair (1)**
20:11
**blank (4)**
49:21;237:9,11;
240:17
**block (9)**
38:20;39:9;45:14;
108:19,20;110:9,16;
113:23;193:8
**Blue (4)**
112:18,18;113:15,
15
**blunt (1)**
235:21
**board (4)**
26:18,18;108:4,6

**boards (2)**
241:4;242:11
**Bochetto (12)**
59:6;60:25;61:4,4;
62:2,6,7,9;88:22;
98:21;164:11;166:8
**body (1)**
42:17
**bold (2)**
43:12;45:20
**bolded (1)**
48:11
**bond (2)**
222:15;223:4
**bono (2)**
127:25;128:13
**book (5)**
110:6;192:7,8;
225:10;226:3
**books (2)**
115:16;121:16
**borrow (1)**
121:22
**borrowing (2)**
121:12,19
**boss (1)**
191:4
**both (21)**
10:20;22:25;25:17;
40:18;85:17;92:2,5;
93:20;107:9;126:7,8;
161:19;163:7;164:11;
189:22;201:9;203:14,
15;218:1;236:5;
247:25
**bother (1)**
182:19
**bottom (16)**
35:13;40:5,8;49:17;
50:25;65:9;78:6;80:9,
10,12;81:12;131:5;
150:14;184:5;232:12;
241:2
**bought (2)**
129:23;145:18
**bound (3)**
209:25;210:2,7
**box (1)**
51:1
**boxes (2)**
101:15;196:22
**BR (4)**
168:18,21,25;169:4
**breaching (1)**
61:6
**break (15)**
24:15;38:13,19;
39:5;107:20;117:6;
124:3,14;125:1,4;
151:25;153:6;156:7;
243:22,25
**bridges (1)**
113:13

**brief (2)**
168:13;243:21
**briefly (2)**
42:6;52:4
**bring (10)**
5:18;11:24;72:1;
121:8;124:7;135:19;
138:21;148:4;179:20;
189:5
**bringing (8)**
16:15,15;84:16;
132:19,21,22;174:15;
180:24
**British (1)**
198:21
**broad (2)**
122:21;187:19
**brokerage (1)**
126:21
**brokering (1)**
123:15
**brought (9)**
9:6;14:7;18:2,20,
22;36:7;39:20;
125:16;178:7
**brunt (1)**
100:2
**bucks (3)**
128:18,20;152:17
**buddy (2)**
63:19;147:15
**build (6)**
117:20;120:13;
123:22;135:23;139:2,
2
**building (4)**
107:4;117:14;
120:20,20
**built (4)**
118:15;139:24;
140:1;146:7
**Bull (1)**
98:23
**bunch (4)**
6:14;145:4;187:13;
216:8
**burden (24)**
85:8,8,12,18,23;
163:4,9;164:7;
166:15,17,18,20;
167:18;169:24,25;
170:12;171:3;173:3,
8;221:2,13;222:5;
237:19;245:3
**Bureau (6)**
53:21;94:5,18;98:3;
166:2,3
**burnt (1)**
124:21
**business (61)**
25:17;43:1;61:24;
105:18,25;106:1,2,3;
107:13,16,20,21;

108:15,19,20;109:3;
110:6,9,16;113:23;
115:25;118:13,15;
120:6;121:5;122:13;
123:6;128:2;134:1,3,
11;136:7,11,20;137:9,
16;138:12,24;145:5;
149:6,10;151:15;
165:5;167:5;178:10,
10;183:9;184:13;
192:7,8,11,16,21;
193:8;198:14,16;
202:23;203:8;225:10,
15;226:3
**businesses (4)**
67:25;97:2;123:22;
141:10
**businesswoman (1)**
91:22
**buy (1)**
192:11
**bylaws (1)**
180:14

**C**

**C1 (2)**
50:3,7
**C2 (5)**
49:21,25;50:3,6,7
**caliber (1)**
121:11
**call (46)**
12:24;15:19;19:5,7,
11,13;29:17;42:20;
46:15;53:19;55:6,9,
16;56:5;58:4,12;59:4,
17;75:12;120:12,13;
142:23;143:10;
144:20,22,23;145:7,8,
16,25;146:6;149:19;
151:16;153:11,12;
154:8;164:10;175:10;
176:25;189:1;192:13,
15,21;215:22;225:11;
236:12
**called (8)**
20:16;27:1,14;37:3;
48:15;112:20;175:18;
205:22
**calling (3)**
13:23,25;146:1
**Calls (15)**
104:14;140:23;
141:6,11,17,20,21;
142:7,12,14;143:7,12;
146:12,14;149:19
**came (10)**
32:14,14,17;34:12;
70:5;116:7;148:24;
202:3;233:13,19
**can (196)**
12:23,24,25;13:21;

14:16,23;19:7,11;
20:4;25:7,14;27:21;
28:19,19;29:1,11;
30:19;31:11,15,18,25;
32:2,13,21,22;34:12;
35:1,23;36:11,16,18,
25;37:7,24;38:7,8,19;
39:1,11,18;40:2,6,10;
41:4,6,13,14;42:11;
43:3,17,25;44:8;46:7;
48:5,6,6;50:19;51:17;
52:13,20,23;53:7,8;
55:7,9,16;56:7;57:14;
60:23;61:21;63:9,9,
22;64:2,4,5,21;67:9;
68:1;70:24,24;71:5;
75:19;76:19;77:10,
12;79:24;81:5;82:1,
17;83:15;89:17;94:9,
9;96:3;97:1;101:9,9,
10,13;103:9,19,20;
106:1,7;110:25;
112:10,11;119:20;
120:14;122:13;124:2;
126:7;128:4,9,12;
129:22;131:11,11,13;
134:15,18,19;135:16,
24;139:13;142:13;
144:17,18;151:25;
153:17,23;154:5;
156:22;157:2;158:3;
159:1,8,9;168:3,13,
16,22;169:4;170:3,
22;171:4;175:14;
178:19;179:12;180:8,
13,23;181:13;182:24;
183:12;184:4;192:21;
193:10;195:18;198:2;
201:2;204:12;208:14;
213:20,21;215:8;
216:2,7;220:3,14,23;
221:8,8,10;222:6,7;
223:12;224:12;
225:17;226:22;
229:16,19;234:19,21;
236:15;240:2;241:6,
15;242:25;243:18,21,
22;246:10;247:18,25
**Canadian (2)**
24:20,21
**cancel (1)**
110:13
**canceling (1)**
121:17
**cancer (2)**
119:6;126:5
**capacity (1)**
150:25
**captured (1)**
27:17
**card (5)**
43:8,8;90:3;140:16;
164:16

**CardFlex (7)**
88:6;92:13,23;
98:25;165:18;231:12;
233:1
**care (6)**
29:1;96:1;155:16;
160:21;171:14,15
**career (1)**
107:4
**carefully (1)**
229:6
**carrier (14)**
111:14,17;112:5,6,
17;113:23;114:20;
116:2;144:6,9;
192:22,23,23;193:9
**carriers (8)**
112:21;113:6,7;
114:17,25;116:14;
121:23;123:3
**case (58)**
5:10;11:3;12:2;
17:11;21:3,6;23:4;
30:4;41:4,11;42:22;
45:22;46:20;47:15;
48:2;52:10,12,12;
58:17;62:8,11;69:13;
80:17;86:4;92:7;
159:9;163:2;165:22;
167:21,23;168:12,14,
20;170:6;171:1;
173:9;174:18;175:1,
8;177:14,15;178:11,
16;179:17,21,25;
180:9;183:10;184:13,
24;193:19;202:17,20;
230:9;231:10;239:10;
242:7;244:9
**case-in- (1)**
153:2
**case-in-chief (5)**
157:4;162:17;
163:10;164:10;
166:21
**cases (4)**
52:14;85:18;
170:21,23
**casework (2)**
26:13;30:2
**cash (17)**
126:9;127:21;
128:21,23;129:7;
200:5,11;215:1,4,5,8,
9,13,15,20,21;217:18
**catch (2)**
74:21;234:5
**categories (1)**
11:11
**cause (2)**
39:18;206:9
**causing (2)**
110:12;121:15
**CBSG (3)**

Case 24-13093-pmm Doc 105 Filed 11/05/24 Entered 11/05/24 13:48:50 Desc Main
In Re: Alan Christopher Redmond Document Page 253 of 280

October 1, 2024

56:20;203:2,3
**cease (2)**
  109:7;116:14
**ceases (1)**
  193:7
**cell (2)**
  38:25;39:2
**center (7)**
  120:12,13;144:20;
  145:7,8,16;176:25
**centers (1)**
  144:24
**central (1)**
  239:9
**Century (2)**
  27:15;240:21
**CEO (3)**
  106:12;120:17;
  188:15
**certain (5)**
  21:24;39:17;40:15;
  133:24;164:5
**Certainly (15)**
  34:14;41:16;42:9;
  50:14;51:11;63:10;
  83:15;84:25;85:1,14;
  103:20;151:12;166:5;
  189:15;232:6
**certainty (2)**
  46:25;47:2
**certificate (10)**
  11:2;73:18,21;74:4,
  11;76:7,9,13,25;77:1
**certificates (2)**
  75:3;76:15
**certification (5)**
  73:14;74:3,13,16;
  158:23
**certified (6)**
  53:22;54:8,11,15,
  15;158:20
**cetera (4)**
  74:22;80:11;81:12;
  139:23
**challenges (1)**
  245:7
**chance (2)**
  38:3;170:15
**change (4)**
  42:18;116:6;
  132:16;213:25
**changed (1)**
  116:7
**changes (5)**
  37:6,23;38:1;42:18;
  116:9
**changing (2)**
  101:25;137:20
**chapter (3)**
  27:16;171:20;
  244:11
**character (1)**
  235:25

**characteristic (1)**
  45:23
**characteristics (3)**
  29:22;30:11;31:6
**characterizing (1)**
  17:19
**charged (4)**
  237:6;238:15,17,21
**charges (2)**
  238:7;240:5
**Charitable (5)**
  205:13,19;213:3;
  218:19;229:9
**chart (1)**
  38:12
**Chartered (2)**
  24:20,22
**chattel (2)**
  216:9,17
**check (11)**
  38:2;97:16;114:7;
  124:1;126:9;127:10,
  21;129:10,21;132:7,7
**chief (1)**
  153:3
**choose (5)**
  153:2;167:24;
  168:8;170:22;181:25
**choosing (1)**
  204:13
**chosen (1)**
  166:13
**CHRISTOPHER (3)**
  59:22;60:1;62:21
**CIARDI (251)**
  5:23,24,25;7:2,16,
  20;9:20,23,25;13:8,
  10,13,18,20;14:4,17;
  15:7,9,11;16:1,8;17:4,
  13,18,21;19:7;28:11,
  23;29:1,7;47:6,7,9;
  48:20;52:2,11;53:10,
  13,15;54:5,7,17;55:2,
  19;56:10,15,18;57:4,
  25;58:1,8,22;59:9,11,
  14;61:5,10,14;71:4,
  10;72:20,24;73:7,19;
  74:4,10;77:13;80:24;
  82:11,13,25;83:4,7;
  84:2,5,7,19;85:5,8,16;
  87:2,5,9;96:11;97:6;
  104:6,11,14;110:21;
  112:10;115:21;
  137:18;148:19;
  149:15,21,24;151:9,
  14,16,20;153:1,5,10,
  14,21,25;154:2,5,8;
  155:24;156:3,18;
  157:21;158:6,12,16,
  20;159:4,12,15,17,21;
  160:8,12,19,24;
  161:23,24;162:16,25;
  163:18;164:8,9;

166:16,17,20;168:3,5,
  7,10,14;170:20;
  173:13,17,20,24;
  175:1,4,9,16;178:9,
  24;179:5,7,17;181:18,
  21;182:6,8,10,15,22,
  24;183:1;184:22;
  186:21,22;187:7,11;
  188:3,18;189:7,13,17,
  25;190:4;203:23;
  206:20;220:2,5,19;
  221:7,18;222:14,17;
  223:24;224:7,11;
  225:25;226:6,10;
  229:3,12,15,20,23,24;
  230:4,8,16;231:3,8,
  17,19;232:7,11,15;
  235:3,6,11;236:3,4;
  237:23;238:1,10,12,
  16,20;239:7,13,16;
  240:22;241:9,11,13,
  20,23;242:1,3,21,24;
  243:2,5,9,12;244:6,8,
  13,16;245:15,18,20,
  25;246:3,5,9,11,14;
  247:2,9,22
**Ciardi's (1)**
  247:6
**CID (1)**
  23:7
**circumstances (4)**
  150:1;169:2;224:3;
  244:24
**circumstantial (1)**
  226:3
**cite (6)**
  159:9;168:12,14;
  170:24;175:1;230:10
**cited (1)**
  170:23
**claim (39)**
  14:13;15:7,11;
  16:15;17:8,10;53:21;
  56:20,22,22;57:5,6;
  84:16;85:12;86:11;
  94:5,18;98:3;165:1,4,
  6;166:2;172:7;
  174:25;177:9;178:6,
  7,17,19,25;179:4,11,
  18,24;180:3,5,7;
  181:22;189:21
**claimed (2)**
  163:25;209:25
**claiming (2)**
  19:2;177:17
**claims (8)**
  95:9;114:19,20;
  122:19;150:20;169:3;
  178:5;180:2
**clarification (1)**
  100:6
**clarified (1)**
  144:22

**clarify (7)**
  63:18;81:5;108:5;
  114:10;137:24;
  174:10;208:5
**clarity (1)**
  246:23
**clean (1)**
  17:16
**clear (33)**
  10:20;28:11;34:15,
  16;36:13;37:19;
  43:22;56:2,4;58:9,17;
  59:11;61:5,23;68:2;
  82:6;103:12;116:23;
  137:21;157:3;162:25;
  165:7,22;167:23;
  174:14;181:25;190:5;
  200:16;218:15;
  235:14;238:1;239:25;
  242:4
**clearer (1)**
  35:20
**clearly (6)**
  10:20;18:11,11;
  225:12;230:23;236:8
**CLERK (12)**
  19:22,25;32:13,16;
  53:2,6;59:20,24;
  156:9;220:7,10;244:4
**client (21)**
  8:3;11:8;15:24;
  16:1;110:13;111:14;
  113:13,19;114:21;
  148:14;150:23;151:2,
  4;152:24;167:1;
  169:16;171:23,23;
  189:10;242:8;243:6
**clients (7)**
  108:20;110:15;
  111:16,16,16,17;
  146:21
**close (8)**
  81:2;144:15;150:3;
  152:3;163:2;188:25;
  206:2;218:13
**closed (1)**
  218:15
**closing (1)**
  181:21
**clue (1)**
  82:14
**Code (1)**
  157:18
**coined (1)**
  32:9
**coins (3)**
  196:15,25;215:2
**collaborative (1)**
  27:1
**collateralized (2)**
  110:15,16
**collaterally (2)**
  57:2,4

**collect (1)**
  187:23
**collected (1)**
  219:14
**collections (1)**
  196:25
**collective (1)**
  41:10
**collectively (4)**
  34:5,10;40:6;50:19
**collects (1)**
  219:13
**college (1)**
  23:15
**colleges (1)**
  21:22
**color (4)**
  37:4,7,9;48:2
**coloring (1)**
  39:18
**column (1)**
  38:23
**combination (1)**
  93:20
**comfortable (2)**
  164:13;167:16
**coming (13)**
  103:16;111:10;
  132:24;135:1;160:7;
  169:15;211:6,7,9;
  214:18,21,22;223:1
**comments (1)**
  61:10
**Commercial (1)**
  157:18
**commission (4)**
  110:11;111:18,18;
  112:22
**commissions (10)**
  114:19,21;145:9;
  175:21,24;176:1;
  177:3;192:25;193:5,5
**committed (5)**
  235:9,21;236:22;
  239:3;240:18
**Common (16)**
  17:8;34:23;42:1;
  53:24,25;178:11;
  183:24;184:8;230:2,
  4,6,17,18,20,24;231:2
**commonly (1)**
  45:25
**communicate (1)**
  96:2
**communicated (1)**
  216:19
**Communications (2)**
  230:10,13
**companies (3)**
  118:9;187:13;
  203:12
**Company (32)**
  4:2;92:1;103:25;

104:2;105:5,8,8,23,
24;117:14;119:1,1;
126:6,7;128:6,8,10;
140:12;144:17;
147:21;148:22;
175:18,20,21;176:1;
177:5,18,24;181:12;
193:1,2,4
**company's (1)**
98:8
**comparator (1)**
37:3
**compare (3)**
38:6;39:1;42:3
**compared (2)**
36:14;39:22
**compares (1)**
52:13
**comparing (2)**
44:23;45:10
**comparison (3)**
31:12;33:10;45:7
**comparisons (2)**
23:20;34:3
**compel (2)**
133:12;201:24
**compensate (1)**
40:9
**compensation (3)**
94:4;98:6;166:3
**complaint (3)**
180:1,3;184:7
**complaints (1)**
208:17
**complete (31)**
21:20;31:15;72:21;
77:8;78:21;79:2,7,18,
23,23;80:12,14,21,22;
81:10,11,19;82:3,9;
124:6;152:19;165:5;
167:5;178:10,10;
183:8;184:13;194:18;
202:23;203:8;214:16
**completed (4)**
21:13;81:14,23,24
**completely (8)**
48:17;58:25;142:4;
147:4;168:22;202:25;
203:1;235:14
**completion (1)**
26:17
**complex (2)**
37:22;38:2
**Complexity (1)**
37:23
**compliance (11)**
6:10;7:3;108:22;
120:16;143:1,21;
145:2,11,14;147:4;
207:10
**complied (1)**
174:7
**comply (3)**

6:8;11:10,15
**complying (1)**
10:19
**computer (1)**
70:15
**computers (3)**
91:10;111:22;192:4
**concerned (2)**
16:18;56:22
**concerns (1)**
9:16
**concluded (1)**
190:2
**conclusion (6)**
31:23;34:13;
151:17,22;188:21,22
**conclusive (1)**
86:13
**concur (1)**
226:22
**conditions (1)**
209:11
**conducting (1)**
23:20
**Confer (1)**
243:4
**conferences (1)**
23:18
**confidence (2)**
46:7,9
**confirm (3)**
54:8;154:19;155:3
**confirmed (2)**
190:13;191:14
**confirms (1)**
39:3
**conflicts (1)**
246:18
**confuse (1)**
229:13
**confused (1)**
117:24
**confusing (7)**
215:3,5,6;216:20,
21;217:11;224:22
**connections (2)**
144:18,18
**consent (1)**
207:18
**consented (3)**
208:20,22;209:14
**conserve (2)**
58:13,13
**consider (6)**
30:25;31:9;37:22;
149:25;169:1;174:24
**considered (2)**
157:10;178:5
**consistent (4)**
29:18;40:17;41:25;
141:5
**construction (1)**
37:25

**consult (3)**
128:9;134:4,10
**consultancy (1)**
109:11
**consultant (9)**
97:2;105:24;108:8,
10,25;110:2;128:9;
132:20;133:18
**consultants (2)**
134:9,12
**consultant's (1)**
150:24
**consultated (1)**
143:14
**consultation (13)**
98:8;108:10;
109:12;125:4,13;
133:19;142:1;143:14,
15,18;186:8;190:9;
204:6
**consultative (4)**
133:24;134:15;
150:25;151:10
**consulted (1)**
68:25
**consulting (10)**
18:10;110:4;
124:14;125:8;127:24;
133:18;199:23;
214:15,19,21
**consumer (1)**
207:17
**contacted (1)**
8:7
**contain (1)**
34:10
**contained (3)**
34:5;44:11,18
**content (3)**
5:13,20;247:13
**contention (2)**
33:11;170:4
**contentions (1)**
46:21
**contents (1)**
80:17
**contest (2)**
56:6;78:16
**contexts (1)**
230:12
**continue (12)**
9:15;16:13;87:14;
97:1,1;110:20;115:6;
124:20;125:2;132:9;
177:19;223:25
**continued (1)**
115:12
**continues (3)**
42:16;49:24;89:14
**contract (28)**
25:11,12,13,14,18;
27:8;60:7,14,21;61:1;
62:2;88:8,9;89:9;

92:25;93:1,2,6,7,12,
15;102:23,25;111:13,
13;113:4,5;133:9
**contracted (2)**
25:17;110:23
**contracts (33)**
24:6;25:10;89:7;
90:13,25;91:5;92:9,
13,15,16,19,22;
102:22;103:3,4,17;
110:9;111:3,7,9,23;
112:1,4,25;113:2,9,
20;114:3,7,11;116:1;
136:21;176:20
**contradict (1)**
164:23
**contradicted (1)**
149:10
**contradictory (1)**
164:14
**contributed (1)**
100:1
**contributing (1)**
27:13
**contribution (1)**
27:16
**control (4)**
131:16;211:21;
212:8;246:24
**conversation (2)**
140:14;228:16
**conversations (8)**
147:17;230:21,22;
231:20,23;232:1,4,5
**convert (2)**
171:19;179:20
**convey (1)**
196:2
**conveyed (4)**
196:2;213:14,17,20
**convicted (5)**
236:9;237:9;
238:13,14,16
**convictions (12)**
235:8,17;236:5,10,
11,16;237:13,14;
239:22;241:7,11,14
**convince (2)**
187:18;199:15
**cool (2)**
17:5;82:7
**co-owner (1)**
181:3
**copied (2)**
6:16,20
**copies (4)**
35:2;50:12;77:6;
91:12
**copy (16)**
8:5;37:5;40:4,11,
13;41:12;43:16;
47:24;50:11;53:22;
54:11,15;76:12;

93:22;240:10,11
**corner (3)**
35:13;49:9,15
**Cornerstone (9)**
21:1,6;55:15,22;
94:12;97:23;165:3,
16;184:21
**Corp (1)**
168:18
**corporate (1)**
11:7
**corporation (1)**
180:13
**correctly (8)**
17:19;125:21;
151:4;201:7;205:10;
211:24;213:15;
217:21
**Corvantis (2)**
113:8,12
**counsel (38)**
6:22;7:17;9:16;
11:20;18:8,21;52:24;
62:24;63:13;64:19,
22,23;66:3,4;68:10;
70:8;72:15;75:7;
76:25;174:14;187:5;
224:15;225:3,20;
226:5,18;227:10,11,
11,15;228:14;231:22;
232:19,21;233:17,18;
234:3;243:4
**counsel's (3)**
8:21;74:7;100:6
**count (1)**
41:2
**counted (1)**
235:18
**counterclaim (1)**
165:1
**counterclockwise (2)**
42:14,16
**countersigned (1)**
44:11
**countries (1)**
23:25
**country (3)**
124:22,23;197:13
**County (14)**
17:8;20:11;53:21,
23,25;94:4,18;98:3;
99:11;107:5;152:17;
166:2;183:25;184:8
**couple (11)**
14:17;16:1;42:6;
69:14;70:21;106:11;
172:13;205:10;
207:11;226:22;
235:12
**course (10)**
23:14,15,15,17;
43:1;73:2;104:20;
139:22;143:11;172:2

**courses (1)**
23:16
**coursework (1)**
21:25
**COURT (395)**
4:3,5,8,13;5:8,19,
22,24;6:18;7:1,4,11,
18,19,22,25;8:6,10,
12,15,18;9:19,22,24;
10:1,6,7,9,14,16,18,
24;11:17;12:3,11,16,
24;13:3,5,6,9,12,16,
19,23,25;14:3,9;15:5,
8,10,18;16:11,19,22;
17:7,12,14,19;18:7,7,
13,21;19:8,11,16,21;
20:4,10;22:5;27:18,
23,24;28:8,10,15,17,
20,22;29:2,6,8,10;
32:11,14,17,19,21,23;
34:12;35:10,24;
41:15;43:4,18;44:9;
47:6;49:4;52:3,16,20,
23;53:1,4,7,9,12,14,
17,24,25;54:4,21;
55:1,11,18,24;56:1,
14,16;57:3,7,19,25;
58:11;59:2,4,10,13,
16,19;61:8,12,16,18;
63:14;71:15,17;
74:14,23,25;75:4,6,9,
12,15,17,19,22;77:7,
11,15,19;78:12,23;
81:2,5;82:8,9,16,19;
83:2,6,11,15,20;85:9;
86:3,4;87:3,6;90:1;
91:23;96:16,19;97:9;
101:3;104:12,15;
110:25;112:13;
123:25;124:1,2,6,9;
137:24;149:3,11,25;
150:8,10;151:23;
152:1,3,23;153:4,8,
13,16,19,22;154:4,7,
9,13,15,17,22;155:4,
7,9,11,13,17,19,21,24;
156:2,6,9,11,14,19,22,
25;157:5,7,12,16;
158:3,5,13,18;159:3,
6,10,12,16,23;160:1,
5,11,13,16,22;161:2,
5,9,12,14,16,18,22,23;
162:2,4,10,15,18,22,
24;163:11,12,14;
164:2,8;166:16,19;
167:2,4,5,7,7,22;
169:1;172:1,13;
173:16,19,23;174:1,3,
5,24;175:3,5,11,14;
178:11,22,23;179:3,
23;180:16,18,20;
181:25;182:7,9,11,18,
19,21,25;183:24;

184:8,20;186:21;
188:1;189:3,9,23;
190:1;199:15;201:25;
202:17;203:25;
206:16,22,24;211:17;
220:1,3,14,17;221:15,
22;222:10;223:15,25;
224:10;226:9;229:16;
230:18;231:16,18;
232:13;234:15;236:3;
237:5,22,25;238:4,11,
14,17;239:6,11,15,17,
20;241:3,6,10,12,15,
21,25;242:2,12,22;
243:1,3,8,11,13,17,20,
22,24;244:2,5,7,12,
15,17;245:17,19,22;
246:2,4,8,10,13,15,
25;247:4,6,10,14,16,
20,21,21
**courtroom (4)**
78:4;199:18,19;
233:3
**courts (3)**
27:21,22;82:23
**Court's (1)**
58:13
**cover (1)**
151:12
**coverage (1)**
209:11
**covered (3)**
46:12;206:14;
209:11
**Covid (6)**
107:12;118:12,22;
119:12,24;203:19
**coworker (2)**
147:24,25
**craft (1)**
64:21
**crazy (2)**
141:10;199:11
**created (5)**
16:5;46:2;51:4;
118:16;158:25
**creating (1)**
30:8
**credentials (2)**
26:7,8
**credibility (18)**
74:24;83:20;
149:13;189:17;
221:25;223:16,22;
235:3,4,11;236:22;
239:11,12,13,16,20;
242:17;245:6
**credible (2)**
172:16;245:10
**credit (3)**
99:19;216:11,13
**creditor (41)**
15:3,5,6,6;17:5,11;

56:12;57:1,10,11,14;
58:23,23,25;62:22;
65:3,22,25;68:20;
86:10;97:20;104:10;
144:11;165:23;166:9;
168:1,16,19;169:6;
174:20;179:16;182:5;
200:21,24;229:21;
230:1;232:10;235:23;
239:12,17;242:14
**creditors (81)**
65:24;66:9,18,20;
67:5,14;68:13;69:8,
12;85:21;86:5,6,8,13;
87:22,25;88:4,16;
89:7,8;91:5;94:19;
96:25;102:23;148:20,
21;149:1,8;150:2;
163:8;164:5,12,18,25;
165:10,11;166:24,25;
167:11,14,24,25;
168:21;169:2,17,20;
171:7,9,10,14,15,17;
172:3,4,7;173:3;
185:6;187:24;190:22;
199:13;220:20,24;
221:3;230:6,13,21,22,
25;231:7,9,11,21,21,
24;232:1,2,7,17;
233:2,8;234:1
**CREDITORS' (1)**
220:9
**creditor's (1)**
71:2
**CREDITORS'S (1)**
59:22
**crime (2)**
235:22;238:13
**crimes (1)**
240:20
**criminal (2)**
21:15,19
**criteria (1)**
25:19
**critique (1)**
142:19
**CRM (2)**
139:13;145:12
**crop (1)**
47:25
**Cross (2)**
112:18;113:15
**cross-comparison (1)**
30:23
**CROSS-EXAMINATION (2)**
47:8;175:15
**cross-examine (1)**
17:23
**Crossit (1)**
232:11
**crunch (1)**
81:25
**CTS (1)**

27:5
**currency (1)**
196:15
**current (3)**
168:24;211:20;
216:3
**currently (5)**
60:7;96:23;102:4;
106:8;218:20
**curriculum (1)**
28:6
**custodian (3)**
53:21;89:22;103:11
**customer (5)**
141:21;145:11;
146:10,10,13
**customers (3)**
110:19;209:25;
210:7
**cut (3)**
52:1;166:11,13
**cut-and-paste (1)**
45:25
**CV (1)**
28:18

**D**

**D2 (3)**
49:21,25;50:6
**daily (3)**
37:19;136:10,13
**Dakota (1)**
210:23
**damages (2)**
150:20;231:17
**Daniel (1)**
144:13
**dark (1)**
46:3
**darken (2)**
48:15,18
**darker (3)**
39:11,21;50:13
**darkness (1)**
39:19
**database (1)**
240:15
**Datacom (1)**
230:5
**date (12)**
44:6,20;63:14;64:1,
4,6,7;126:19;184:4;
222:19;240:1,4
**dated (2)**
44:6,19
**dates (7)**
43:10;45:19;
119:15,23;120:2,4;
211:9
**David (12)**
10:2;61:4;62:7;
69:4;70:9;91:21,23,

25;92:1;103:21;
183:8;185:2
**day (14)**
12:8;44:22,25;
66:12,13;74:5;
118:21;136:25;137:3;
139:20;154:5;192:16;
223:1;235:13
**days (6)**
17:25;62:14;
125:14;136:17,19;
138:19
**deal (10)**
5:14,17;9:3,6,14;
12:14;19:9;240:24;
247:23,23
**dealing (9)**
30:18;38:2,17;39:4,
14;45:22;126:8;
146:13,13
**deals (2)**
27:16;171:17
**dealt (1)**
160:19
**deathbed (2)**
31:5,7
**debt (51)**
15:25;16:6,11;17:9;
55:9;56:6;57:8,8,13,
17,22;58:18,21;59:7;
60:8,15;61:2,20;62:3,
5,6,13;63:12,14;
64:17;88:6;93:1,15;
98:18;101:17,24;
102:21;105:20;
115:20;121:19;127:4;
131:17;140:21;165:2,
3,4;168:24;169:2;
178:1;180:14;192:10;
193:2;203:5,9;
218:12;245:1
**debtor (34)**
8:23;9:10;12:21;
14:14,20,24;16:20;
55:4,16;58:23,23;
62:21;63:16;65:3;
66:5;71:1,3;89:12;
104:10;150:1;161:7;
163:17;165:23;167:8,
8;168:17;169:2;
170:22;174:19,19;
244:11;246:1,3;
247:11
**debtors (1)**
67:8
**debtor's (4)**
6:22;19:24;100:4;
183:3
**debts (75)**
14:6,21,24;15:17;
55:15;56:9,11;60:11;
63:8;85:2,7;87:19,20,
24;89:23;95:16;

96:23,25;97:3,5,12,
14,18;99:15,21,24;
103:3,8;105:13,16,23;
108:15;110:14,18,18;
121:12,15;124:24;
130:10;131:16,18;
132:13,17;133:3,10,
13;140:12;149:2;
150:2,6;151:6,11,11,
13;157:20;163:8,15,
22;165:9,10,12;
167:11;168:17;169:4,
11;170:18;171:2;
172:21,22;173:5;
177:25;178:6;203:6;
233:13;245:4
**decade (3)**
25:12,14;107:7
**deceiving (1)**
210:7
**December (6)**
77:2;109:9,25;
115:3;135:1,18
**deceptive (1)**
114:6
**decide (2)**
12:12;243:6
**decided (2)**
11:6;174:22
**deciding (1)**
179:15
**decision (12)**
109:3,5,5,17;153:5,
7,15;155:5;173:7;
178:4;204:21;241:24
**decisions (2)**
151:3;181:14
**declined (1)**
136:3
**declining (1)**
135:4
**deeds (1)**
129:21
**defaulting (1)**
91:21
**defend (1)**
26:20
**defendant (1)**
178:12
**defense (2)**
6:25;9:7
**define (6)**
96:16;110:25;
122:16,17;123:8,9
**definitely (3)**
17:2;50:9;170:11
**definition (5)**
31:25;33:7;163:23;
166:4;221:13
**definitions (1)**
216:23
**definitive (1)**
31:16

**degree (14)**
9:1;19:1;21:15,16,
19,20;22:1;46:7,9,24;
86:11;159:10;161:20;
170:14
**degrees (1)**
21:23
**Delaware (3)**
11:7;207:12,21
**delegate (1)**
95:25
**delegated (1)**
139:21
**delete (3)**
37:1;48:1,3
**deliberately (1)**
113:3
**demand (1)**
179:11
**demands (1)**
16:14
**demonstrate (9)**
36:9;38:12,14;
41:15;44:5,24;45:12;
223:12;247:19
**demonstrated (3)**
13:2;86:3;221:5
**demonstrating (1)**
66:18
**denied (8)**
54:1;72:5,21;73:4,
8,8,9;82:24
**denies (1)**
82:24
**denoting (1)**
43:14
**dental (2)**
113:14,18
**deny (1)**
245:13
**denying (1)**
83:14
**Department (16)**
53:23;54:14,14;
94:4,18;95:8;98:12;
120:16,16;166:2;
208:5,6,8,15,16;210:6
**depend (2)**
5:16;9:6
**depending (4)**
5:18;12:1;40:16;
173:22
**depends (4)**
11:24;92:22;136:8;
138:13
**deposit (1)**
196:22
**deposition (11)**
15:12;56:18;82:23;
167:1;200:19;234:4,
7,17;236:10;238:24;
239:8
**depositions (1)**

234:19
**depreciating (1)**
111:22
**depth (1)**
232:21
**Describe (2)**
63:14;126:19
**described (2)**
68:16;165:25
**deserve (1)**
82:20
**deserves (1)**
242:19
**designed (2)**
26:13;189:20
**desk (4)**
138:3,8,13,14
**desks (1)**
138:15
**desktop (1)**
91:10
**despite (2)**
149:9;245:7
**detail (2)**
63:14;126:19
**detailed (2)**
84:22;86:20
**determination (4)**
50:17;223:18;
224:3;245:6
**determine (8)**
30:18;31:10,12;
33:25;46:17;53:18;
76:12;85:19
**determined (1)**
16:2
**Detwiler (9)**
14:2,8;19:14,24;
20:2,3;29:10;32:25;
47:10
**D-E-T-W-I-L-E-R (1)**
20:3
**development (5)**
23:20;118:17;
125:17;143:23;145:3
**developments (1)**
107:24
**deviates (1)**
30:6
**devote (1)**
24:9
**dialer (2)**
146:5,5
**differ (1)**
29:25
**differed (1)**
41:7
**difference (5)**
31:11;46:3;112:5;
144:25;145:1
**differences (11)**
30:24,24;31:1,1,13,
17;39:18;42:19,20;

49:2;50:22
**different (43)**
11:11;12:8;23:12,
25;27:4,22;29:19;
30:9,9;31:7;36:24;
37:1;38:9,16;41:9;
43:10,10;44:22;46:5;
50:11,20;57:6,9;
92:11;113:5;120:9,
10;121:4,11;133:7;
139:6;151:18;160:12;
164:23;168:20;
177:21;179:24;
189:24;211:13;
222:20;229:25;
231:25;236:23
**differently (1)**
225:16
**differs (1)**
34:21
**difficult (7)**
52:10,12,12;
107:22;114:16,16;
173:2
**difficulties (1)**
114:22
**digging (1)**
66:24
**digital (1)**
47:15
**digitally (2)**
27:17;93:16
**diligence (6)**
18:15;85:19,23;
86:12,15;221:19
**DIRECT (9)**
20:6;23:3;47:5;
50:11;60:3;204:21;
205:19;220:18;
231:23
**directed (3)**
146:2;163:5;212:17
**direction (3)**
37:24;38:1;42:18
**directly (10)**
14:12;18:24;19:4;
85:10;108:17;149:7;
192:22;211:20;212:8;
213:9
**director (1)**
118:8
**director/VP (1)**
139:22
**disagree (4)**
241:9,13,15,16
**disappeared (1)**
225:14
**discipline (1)**
208:20
**disciplines (2)**
22:1,16
**disclose (3)**
126:24;236:9,11

**disclosure (1)**
246:18
**discoveries (1)**
233:21
**discovery (40)**
6:22;8:23;9:10;
67:19;77:7,12,15;
82:8;83:13;84:16,20;
85:11,13;86:4,4,17;
87:11;126:25;160:18;
164:2;167:1,2,10;
169:8,12,18;170:2,16;
172:10;174:7,11;
193:19,21;212:14;
216:14;224:18,20;
233:20;234:12,13
**discuss (7)**
18:12;69:25;70:8;
148:25;153:1;234:17;
243:6
**discussed (13)**
40:24;60:10;68:25;
69:10,13,16;70:3;
77:14;92:16,19;
222:20,24;234:24
**discussing (2)**
143:17;153:10
**discussion (3)**
153:9;234:7,11
**discussions (3)**
8:21;61:11,24
**disguising (1)**
149:12
**dishonest (1)**
128:19
**dismiss (4)**
14:13;173:10;
244:9;245:13
**dismissed (6)**
179:1;221:8,10;
236:18;240:6;244:14
**dismissing (1)**
174:24
**dispute (10)**
16:6,7;17:10;74:2,
19;75:25;104:19;
171:12,13,23
**disputed (16)**
15:6,14,15;16:3,4,
8;17:5;56:11;97:20;
98:18;101:12,18,19;
102:20;165:6,10
**disputes (2)**
163:7;171:10
**disputing (3)**
102:2;165:6,8
**disregard (2)**
237:12,14
**dissipated (1)**
149:14
**dissipating (1)**
149:12
**dissipation (3)**

9:9;170:14;174:8

**distinction (1)**
159:18

**distinguish (1)**
41:3

**distribute (1)**
205:24

**distribution (3)**
128:4;219:8,11

**Distributions (4)**
152:11,12,14,15

**District (5)**
106:9,13,18;107:5,
10

**doc (1)**
22:9

**docket (6)**
6:5,15;8:12;10:6;
11:1;237:5

**dockets (1)**
238:2

**doctorate (1)**
107:8

**doctorate's (1)**
122:10

**document (120)**
16:5;18:2;20:13,14,
15,17,17;21:9,12,23,
25;22:2,8,14,19,23,
25;23:11;24:6,24;
25:1;26:5;27:5,9,15;
28:4;29:5;32:1,2,2,4,
6,8,9,9,10;33:8,9,9,
10;35:15,21;36:1,6,6;
37:5,5,7;39:16;40:12;
43:14;45:14,17;46:2;
52:1;54:10;62:16,17,
23;65:1,7,17,24;66:4;
71:20,22;72:9;73:20,
25;74:13,20;76:1,3,
18,21;77:23,25;78:1,
17;79:11,24;80:14;
81:11;82:4;83:17;
84:10,12,13,20,23;
88:2;95:11;99:10,11;
131:10;151:20;
158:17;183:18,22,24;
184:5;185:18;188:5;
198:25;199:1,7;
200:25;201:2,13;
202:11;204:18;207:3,
4,5;221:23,23;
226:25;227:2;240:8,
10

**documentation (2)**
117:16,25

**documented (6)**
197:7,10;198:19;
199:3,19;228:21

**documents (123)**
5:1;6:21;8:22;9:11;
11:21;12:1,8;14:10;
16:21;18:5;19:3;

25:24;32:25;33:1,2,2,
5,15,16,18,22;34:5,9;
35:19;37:8,20;41:1;
42:21,22,25;43:10;
44:10,14,20;45:1,3,5,
23;46:20;50:14;54:5;
62:25;63:7,9;65:5,17,
24;66:6,8,15,17,23,
25;67:1,3,7,10,13,15,
17;68:7,8,12,19,24,
25;69:7,11,16;70:1,7,
11,12,13,14,18,20,21;
71:21;72:4,6,7,10,11,
13,16,17;73:17;
78:24;79:1,9;80:13;
81:9,19;83:14;84:17;
87:1;89:12,20,22,24,
25;90:16;91:3,3,13,
21;94:2,16;95:4;
103:8,10,11;158:22;
159:10;174:7,15,16,
23;181:5;226:23;
235:13;247:19

**doll (1)**
240:19

**dollar (2)**
149:16;225:18

**dollars (17)**
97:16;115:17,20;
149:16;181:12;192:9;
197:24,25;198:10,13,
15;202:23;203:11;
204:25;206:13;
219:14;229:8

**donated (3)**
218:22,24,25

**done (17)**
18:20;23:12;31:8;
36:24;145:6;152:3;
153:3;163:1,2;167:2;
208:15;209:2;231:15;
232:16,20,25;244:22

**doors (1)**
181:15

**dotted (1)**
41:19

**double-check (1)**
154:14

**doubt (2)**
171:8;238:21

**down (54)**
24:15;38:13,19;
39:5;41:12;42:14;
50:3;52:20;58:16;
64:11;71:23;73:11,
12;86:24;94:1;99:18;
107:5,17;108:3,7,12,
14,18,19,24;109:2,2,
17;110:17,18;116:7,
11;117:13;124:13;
125:22;127:3,5,17;
134:22;143:12;148:4,
18;150:14,23;153:17;

170:13;195:22;
217:23;218:9;220:3,
14;233:22;242:10,19

**downstairs (1)**
138:15

**dozens (1)**
144:15

**dramatic (1)**
189:10

**draw (2)**
31:13;39:8

**drawn (1)**
200:10

**Drive (9)**
129:13;144:20;
145:17,20;146:1,14;
195:16;212:3;214:22

**driver's (1)**
43:8

**driving (1)**
240:7

**Dropbox (1)**
206:22

**drove (1)**
141:9

**drug (1)**
240:5

**Duane (6)**
88:23,25;89:1;99:2;
164:14;165:19

**due (26)**
14:6,21,24;15:17,
25;18:15;58:3,24,25;
62:11;63:14;85:3,18,
23;86:12,15;96:23;
99:5,11,15;163:9,16;
171:2;221:18;233:13;
245:4

**duly (1)**
77:2

**dumb (2)**
133:2;213:20

**duplicative (1)**
160:24

**during (8)**
85:24;118:12,22;
119:12,24,24;132:10;
203:19

**duties (1)**
149:17

**dwindled (1)**
108:19

---

**E**

**e- (1)**
93:17

**earlier (11)**
5:12;40:24;95:5;
119:10;124:12;
130:13;137:20;
157:14;186:2;211:4;
218:4

**earned (1)**
193:6

**earning (2)**
106:17,21

**easier (1)**
28:23

**easiest (1)**
24:15

**easy (2)**
111:20;240:22

**ECF (6)**
63:12;64:17;65:23;
72:3;89:8;94:3

**ECR (2)**
156:13,24

**Ecuador (1)**
24:3

**edge (1)**
49:15

**educate (1)**
115:24

**educated (2)**
107:18;215:7

**education (2)**
107:4;205:25

**effect (1)**
237:21

**effective (1)**
38:18

**effort (3)**
68:8,16;187:22

**efforts (3)**
67:20;68:6;76:21

**eight (3)**
38:1;141:17;142:11

**eighty (1)**
117:14

**Either (13)**
7:16;9:25;30:3,23;
32:4;50:5;54:2;93:21;
134:8;158:23;161:24;
165:16;216:17

**either/or (1)**
93:17

**elaborate (1)**
110:10

**element (2)**
6:23;221:24

**elements (9)**
5:18;163:10;
169:23,24;173:15,18;
221:8,11;223:19

**elevator (1)**
228:17

**eleven (2)**
106:2,3

**elimination (2)**
31:19,24

**else (21)**
12:16;19:16;53:1;
68:12,15,19;71:6;
76:20;78:25;88:20;
91:9;103:16;142:22;

**earned (1)**
193:6

149:24;152:8,9,9;
155:22;221:12;222:6;
225:18

**email (4)**
68:11,14,17,18

**emailed (1)**
206:23

**emails (6)**
68:9;91:6,7,10;
103:9,13

**emergency (7)**
7:23,25;72:4,7,13;
185:5;201:11

**emphasize (1)**
189:19

**employ (1)**
109:6

**employed (1)**
22:22

**employee (2)**
148:9;245:16

**employees (2)**
141:15;209:9

**employer (2)**
143:10,11

**employment (1)**
152:17

**enabled (1)**
233:15

**encompasses (1)**
148:10

**end (18)**
51:6;54:23;111:6,8;
113:4,20;114:3;
115:1,14,15;125:6;
150:4;157:4;173:22;
174:10;192:3;202:3;
211:10

**ended (3)**
124:17;161:13;
203:3

**ending (4)**
40:1,1;49:13;
188:25

**enforcement (1)**
22:22

**enhance (2)**
48:8;144:19

**enhanced (1)**
48:12

**enjoyable (1)**
118:14

**enlarge (2)**
40:14,14

**enlarged (6)**
35:2,7,16;36:2,6;
45:13

**enlarging (1)**
35:19

**enough (12)**
29:3;41:3;121:16;
122:5;134:1;164:6;
166:14;168:2,15,25;

244:21;245:11
**enrich (1)**
166:13
**enriched (1)**
177:24
**enrichment (2)**
180:3,7
**enroll (1)**
111:17
**enrollment (3)**
113:14;132:25;
133:1
**enter (10)**
25:23;26:8;90:14;
102:12;112:19;186:4;
187:19;189:10;
199:15;245:12
**entered (11)**
23:8;102:9,18;
176:15;179:10;
185:22;186:7;190:5,
8;199:16;226:16
**entire (4)**
26:5;50:19;102:17;
162:16
**entirely (2)**
14:18;179:24
**entirety (5)**
104:2,5,18;213:11;
214:1
**entities (1)**
94:17
**entitle (1)**
221:3
**entitled (7)**
133:17;170:19;
176:13;179:17;221:5,
18;231:15
**entitles (1)**
204:8
**entity (5)**
4:19;5:6;21:2;
211:21;212:7
**entrepreneurship (1)**
105:19
**entries (1)**
33:3
**entry (2)**
7:14;57:13
**equipment (1)**
37:3
**equivalent (1)**
163:5
**ERISA (1)**
121:9
**e-signed (1)**
93:21
**especially (4)**
39:14;45:22;135:1;
242:7
**essence (2)**
10:15;11:14
**essentially (17)**

11:20;22:24;25:2;
26:1,6,20;30:8;38:13,
18,20;44:1;57:13;
139:5;163:5;222:10;
223:23;235:24
**establish (10)**
30:5,11,17;33:24;
55:7,16;57:17;58:3;
86:18;240:2
**established (6)**
30:14,21;34:20;
58:18;86:6;179:2
**estate (3)**
54:10;103:25;
246:20
**estimate (1)**
116:17
**et (4)**
74:22;80:11;81:12;
139:23
**Ethan (10)**
14:11;17:2;20:21;
34:6,11;36:3;44:14;
45:16;46:12,19
**Ethan's (1)**
45:3
**Euro-American (1)**
168:18
**Europe (1)**
24:5
**even (23)**
9:9,12;13:16;14:22;
15:12;18:19;37:15;
44:6,25,25;87:10;
167:15;169:19;174:9;
179:10;187:9;189:16,
19;197:17;222:8;
230:12;237:10;
240:10
**Events (2)**
90:6;116:1
**eventually (3)**
53:2,6;224:20
**everybody (2)**
7:10;29:23
**everybody's (1)**
58:14
**everyone (5)**
7:15;13:6;19:18;
153:24;156:2
**evidence (50)**
14:22;28:12,13,14;
31:14,22;34:3;39:15;
45:8;47:15;59:15;
69:17;84:5,8,13,13,
23;85:21;95:11;
137:21;163:2,6;
164:1,5,6,14;166:14,
23;171:6;172:12,16;
173:4,14;180:24;
181:4;182:1;186:6;
188:5;190:9;199:19;
201:20;202:14,18,20;

223:12,20;229:10,20;
235:20;245:2
**evidencing (9)**
65:17,25;67:13;
68:20;69:7;70:1;94:2,
16;95:4
**evidentiary (3)**
84:10;181:18,24
**exact (10)**
29:21;37:20;39:2,
22;50:21;54:9,17;
120:4,4;211:9
**exactly (10)**
29:15;38:8;81:1;
115:8;116:16;117:4;
119:15;120:2;152:18;
165:24
**EXAMINATION (26)**
20:6;21:9,12,23,25;
22:2,4,8,14;23:11;
24:7;25:19;27:10,15,
17;28:4;29:5,12;
33:11;44:11;52:5;
60:3;175:17;204:2;
220:18;239:4
**examinations (8)**
23:21;26:10,12,12,
14,16,21;34:3
**examine (1)**
33:5
**examined (1)**
34:14
**examiner (6)**
20:13,14,15;22:19;
25:18;30:8
**examiners (5)**
22:23,25;24:24;
26:3,5
**example (6)**
23:13;26:14;27:3;
38:25;136:23;209:8
**examples (4)**
38:7;42:6;76:19;
208:14
**exceedingly (1)**
167:23
**exceeds (2)**
57:5;165:2
**exception (3)**
158:19;230:19;
245:9
**exchange (1)**
204:9
**excited (1)**
114:24
**excluded (1)**
28:3
**excuse (19)**
4:18;34:16;66:12;
87:17;100:17;104:10;
108:2;111:11;116:8;
121:13;122:1;125:10;
177:19;183:12;

188:10,12;203:2;
204:8;207:23
**excused (2)**
53:8,10
**execute (1)**
46:11
**executed (2)**
34:6,11
**execution (9)**
30:6,7;34:21,22;
77:25;167:2;194:1;
201:14;202:1
**exempted (1)**
240:8
**exercise (1)**
83:24
**exhausted (1)**
116:12
**Exhibit (15)**
35:8,25;48:20;
73:14;83:5;100:5;
159:25;160:2;162:13;
182:24;183:3,22;
184:10;185:5;211:13
**exhibits (21)**
9:7;13:1,7,9,10;
28:20;32:11;35:2;
53:18;54:18;72:3;
77:5;79:12;80:20;
81:9;82:4;157:2;
162:11;235:13;237:2,
4
**exigencies (1)**
11:9
**exist (9)**
10:17;17:16;50:5,8;
92:13,15,20;164:4;
173:1
**existence (3)**
166:24;178:19;
238:25
**exists (3)**
50:9;92:25;218:8
**expect (6)**
34:22;42:1,7;132:2,
25;135:2
**expedited (5)**
5:9;8:1,7,8;10:13
**expedition (2)**
91:11;174:21
**expense (1)**
18:23
**experience (19)**
37:18;122:3,13,14,
21;123:2,4,6,11,12,
13,15,17,20;138:22;
185:23;186:13,16;
188:8
**expert (24)**
14:8,16;16:21,22;
17:22,23,24,25;18:5,
10,18;27:18;28:1,3,4;
29:4;35:7;48:21;76:9,

9;188:2;245:9;
247:19,22
**expertise (1)**
37:18
**explain (10)**
29:10;34:12;35:10;
39:11;40:10;41:15;
43:4;112:13;158:10;
213:20
**explained (6)**
31:3,4;50:10;51:11;
73:8;215:9
**explanations (1)**
164:2
**explicitly (2)**
178:5;240:8
**extends (1)**
174:19
**extensively (1)**
77:18
**extent (14)**
7:6;12:5;13:15;
57:7,10;157:24;
158:18;172:18;173:7;
192:18;221:16;
223:20;228:12;
239:23
**extreme (3)**
38:6;42:9,15

**F**

**F3d (1)**
230:11
**fabrication (1)**
45:24
**face (1)**
238:6
**facetious (2)**
113:3;144:23
**fact (22)**
16:6;37:13;40:25;
41:5;51:15;69:10,25;
77:3;84:13,15;86:24;
119:1;165:22,22;
187:20;204:4;218:9;
226:2;227:22;228:9;
238:18;245:8
**factor (1)**
31:11
**factors (3)**
31:9;170:13,15
**facts (18)**
137:20;224:24;
225:1,5,6,17,22;
226:7,12,15;227:8,14,
16,18;228:3;229:17,
18;233:15
**fade (1)**
113:22
**faded (1)**
48:12
**failed (1)**

In Re: Alan Christopher Redmond

October 1, 2024

163:9

**failure (3)**
15:17;168:16;245:1

**faint (3)**
45:17;46:3;50:4

**fainter (1)**
50:13

**Fair (13)**
29:3;95:20;133:7;
134:1;191:8;194:6,
14;200:18;214:23;
226:15;234:2,6,9

**fairly (1)**
77:17

**faith (37)**
7:15;9:2;11:25;
12:22;14:13,13;16:7,
20,21;17:3;84:16,18;
155:10;169:15,22,24,
25;170:25;171:1;
174:17,18,19,25;
187:16,21,22;221:7,9,
11,22,24;223:16;
235:24;236:1;242:13;
244:20;245:11

**fake (1)**
174:16

**fall (1)**
31:1

**falls (1)**
5:3

**false (20)**
37:4;187:12,17,21;
189:9;191:16,17;
201:15,22;202:25;
203:1;208:18;209:2,
9;212:11;221:21,22;
222:9;235:6,7

**familial (1)**
166:12

**familiar (3)**
22:7;26:3;65:8

**family (2)**
198:21;205:24

**fancy (2)**
107:19,23

**Fannie (1)**
107:17

**far (9)**
30:6;34:21;56:22;
149:5;166:8;229:10;
233:25;242:15,19

**farm (1)**
195:23

**fashion (1)**
42:16

**FBI (1)**
27:4

**features (1)**
20:18

**February (2)**
125:6;135:18

**fed (1)**

125:16

**federal (11)**
4:18,19;22:12,22;
27:4,22;28:12;53:24;
54:11,23;77:15

**fee (1)**
111:19

**feel (8)**
57:16;101:21;
115:16;117:3;131:17;
132:19;241:6;243:15

**fees (1)**
247:19

**fell (2)**
34:1,2

**felonies (2)**
238:22,25

**felony (3)**
235:8;236:9,11

**felt (3)**
9:17;18:9;120:12

**female (1)**
122:7

**few (7)**
27:14;91:20;149:4;
154:14;160:15,17;
211:17

**fewer (1)**
168:21

**field (12)**
21:8,11;22:13;23:7,
22;27:9,19;28:1;29:4;
38:17;46:10,25

**fields (1)**
38:16

**fifty (3)**
97:16,19;167:16

**fifty-five (1)**
23:6

**fifty-percent (1)**
177:17

**fight (1)**
174:18

**fighting (3)**
182:2;185:14;187:8

**figure (2)**
17:24;130:10

**file (15)**
8:4,11;47:24;48:3;
54:1;130:12;167:9;
171:18;174:22;
184:12,15,18;224:14;
245:15;247:24

**filed (44)**
7:23;8:2,6,7,9;9:4,
13;10:6,10;11:1;
46:20;53:23,25;
63:13;64:19;100:4,
16,17;101:20;157:24;
158:22;159:10;174:4;
178:14,15;180:1;
183:11,14,24;184:7,
24;185:1,3,6,9;187:4;

201:25;202:4;221:21;
226:20;227:1;245:25;
247:17,24

**files (1)**
47:16

**filing (13)**
18:13;85:17,24,24;
169:21;170:2;176:9,
10;183:8;233:4;
242:13,16;244:23

**filings (1)**
235:18

**fill (2)**
48:12;146:9

**filling (2)**
237:13,14

**fills (1)**
240:16

**film (1)**
37:12

**final (1)**
179:4

**finally (1)**
59:5

**financial (8)**
126:21;131:20;
169:8;194:15,19;
204:16;216:3;217:15

**financing (2)**
157:18,23

**find (16)**
7:10;34:22;42:8;
66:25;68:6,8;91:3;
103:17,19;114:14;
135:19;167:10;
170:21;173:2;215:5;
232:4

**finder's (1)**
111:19

**finding (3)**
39:12;168:17;209:8

**fine (19)**
7:16;28:19;32:17,
17;52:24;54:23;
73:10;83:22;153:16,
20,25;154:1;161:1,
19;166:6;231:14;
232:11;237:17;
243:16

**fingerprints (1)**
22:17

**finish (2)**
104:16;112:10

**finishing (2)**
107:8;122:8

**fire (1)**
148:12

**fired (1)**
118:16

**firing (2)**
148:5,10

**Firm (16)**
21:1,4,6;55:15,22;

60:8,14;63:1;88:19;
89:3;159:22;165:16;
184:21;232:9;246:23;
247:7

**firm's (1)**
97:23

**first (49)**
4:9,16,25;12:25;
21:11;26:7;29:14;
35:6,11,12,15;37:19;
42:18;47:23;62:10,
12,22;65:4;71:2;
77:24;86:2;96:12;
117:17;138:13;
143:17;146:1;149:5;
150:17;158:14;159:7;
160:6;165:25;170:20;
179:8;186:3;194:25;
199:6;209:1;215:9;
222:3;228:15;234:5;
235:13;236:4;237:2,
2;240:1,2;246:17

**fiscally (1)**
105:7

**fit (1)**
90:18

**five (9)**
26:11,15,20;43:5;
120:3;138:18;169:20;
171:9;205:11

**five-minute (2)**
151:25;243:25

**fixed (1)**
111:22

**fixtures (1)**
195:23

**Flex (3)**
90:3;140:16;164:16

**flight (1)**
185:12

**flip (1)**
43:24

**flips (1)**
237:19

**floor (2)**
191:6,7

**Florida (5)**
145:6;235:18;
237:5,6,6

**flows (1)**
214:12

**focus (2)**
39:6;97:18

**focuses (1)**
35:22

**follow (2)**
70:10;91:18

**followed (1)**
4:20

**following (2)**
110:1;204:24

**forbearing (1)**
165:23

**force (2)**
9:5;142:15

**forced (1)**
121:12

**foremost (1)**
158:14

**forensic (31)**
20:13,14,15,15;
21:8,11,23,24,25;
22:1,2,8,14,16,19,25;
23:11;24:6,20,21,25;
25:4,5,6;27:9,14,16;
28:4;29:4,11,13

**foresight (1)**
126:3

**Forever (2)**
85:17;221:7

**forfeited (2)**
170:15;174:17

**forfeiture (1)**
19:1

**form (11)**
38:22;42:14;
127:21;132:6;147:10,
11;237:9,9,12;240:11,
17

**formation (4)**
37:25;39:2;42:12;
144:3

**formations (1)**
43:25

**formed (1)**
34:4

**former (2)**
161:16,18

**forming (1)**
120:3

**forms (1)**
30:10

**forty (1)**
106:15

**forty-five (1)**
106:15

**forty-hour (1)**
23:14

**forty-plus (1)**
24:10

**forty-seven (2)**
207:13,22

**forty-three (1)**
207:22

**forward (15)**
7:12;12:2,13,24;
16:20;167:20;171:6;
173:9,11,14;227:10,
12;244:11;245:13;
246:5

**found (5)**
18:4;86:7;107:13;
169:18;226:2

**foundation (15)**
157:22;158:8;
186:24;205:14,19,21,

22;213:4;218:19,22,
25;219:4;229:9;
235:16;237:11
**foundational (1)**
13:13
**Foundation's (1)**
205:23
**founded (1)**
186:20
**four (9)**
31:23;102:15;
103:15;125:14;
138:18;140:1;142:10;
171:13;205:12
**four- (2)**
26:6;193:1
**four-hour (1)**
91:11
**four-million-dollar (1)**
225:10
**fourteen (1)**
117:18
**fourth (1)**
162:7
**frame (1)**
110:22
**frank (7)**
108:23;118:20;
120:12;134:9;141:12;
208:25;212:21
**frankly (2)**
15:1;56:22
**FRAs (1)**
71:2
**fraud (1)**
247:21
**fraudulent (6)**
16:5;174:15,16,23;
247:19,24
**free (1)**
241:6
**freeze-out (1)**
204:24
**frequency (1)**
232:18
**Friday (2)**
11:1;119:2
**friendly (2)**
165:24;166:9
**front (7)**
18:14;126:17;
149:11;180:4,7;
200:9;239:9
**frontloaded (1)**
188:21
**froze (1)**
181:6
**frozen (1)**
181:11
**fulfillment (2)**
21:14;145:12
**full (29)**
23:3;24:10;59:24;

86:5;98:15,16,17,21,
23,25;99:2,6,8;
106:13;113:19;116:5;
125:9,10,11,11,12,22,
24;138:15;139:15;
209:10;214:16;
222:11;223:11
**fully (2)**
79:2;81:14
**functions (1)**
119:17
**funding (12)**
22:12;62:7;92:7;
104:20;121:19;
177:14,15,18,23;
178:10;179:1,25
**funds (1)**
218:19
**further (10)**
38:14;39:5;52:2,19;
144:19;169:23;
191:18;203:23;
219:24;246:6
**furthermore (2)**
187:3;235:20
**future (7)**
7:7;19:10;53:13;
146:18;163:3;177:21;
179:13

### G

**gallery (1)**
19:17
**gamification (1)**
140:2
**gap (8)**
44:22;51:1,3,6,10,
12,20;113:13
**gaps (1)**
48:12
**gardening (1)**
105:4
**gas (1)**
196:5
**gathered (2)**
4:22;5:10
**gauge (1)**
148:14
**gave (12)**
15:2,12;18:10;
52:11;81:19;118:17;
194:1,7;206:7;226:3,
5;228:2
**General (4)**
25:12;112:20;
118:9;142:8
**generalize (1)**
145:6
**generally (6)**
137:19;158:2;
159:7,11;168:17;
239:13

**generated (3)**
146:3;159:21;178:1
**generates (1)**
192:25
**generating (2)**
192:16;203:18
**generation (6)**
88:18;125:18;
143:21;145:3,13,13
**gentlemen (1)**
180:11
**genuine (6)**
14:11;15:25;16:23;
34:6,11;46:18
**George (2)**
61:3,4
**gets (8)**
49:18;128:3;152:9,
9,12,14,14;175:24
**given (22)**
8:3;11:9;16:23;
26:18;30:12;33:18;
46:16;52:16;54:18;
128:18,20;136:25;
139:20;140:6;141:23;
205:6;224:2;238:8;
242:7;244:17;245:12;
246:20
**gives (2)**
46:3;124:3
**giving (9)**
28:3;58:16;77:8;
89:16;132:9,12;
201:14;205:19;
233:21
**gloss (1)**
52:17
**goal (1)**
205:23
**god (1)**
164:20
**goes (28)**
22:9;28:13;40:11;
42:13,15;49:10;50:9,
25;56:8;103:5;146:5;
149:11,17;187:21,21;
189:17;192:24;
214:12;219:15;221:7,
22,24;231:9;235:3,
11;236:22,23;240:16
**gold (1)**
22:24
**Good (20)**
4:4,5;7:8;20:8,9;
32:19;59:5;60:5,6;
117:19;118:24,25;
119:16;123:24;
132:19;133:21;
144:13;168:25;
174:19;198:14
**good- (1)**
16:6
**Goodness (1)**

185:16
**goods (1)**
195:23
**google (1)**
217:3
**government (3)**
22:25;24:7;25:7
**graduating (1)**
124:22
**granted (1)**
157:14
**grantee (2)**
213:14,21
**grants (1)**
179:19
**Great (3)**
80:2;112:14;144:12
**green (4)**
37:6,6;85:18;221:7
**grid (4)**
38:16,22;51:4,13
**ground (2)**
106:6;231:5
**grounds (2)**
179:14;209:18
**Group (9)**
22:7;121:10;123:2;
165:21;167:6;178:11;
184:13;202:24;203:9
**groups (3)**
22:15;30:20;240:12
**grow (3)**
106:1;144:17,19
**growing (4)**
105:25;132:1,18;
134:21
**grows (3)**
128:3,3,3
**guarantee (3)**
116:1,3;203:4
**guaranteed (1)**
203:8
**guaranteeing (5)**
105:13,16,23;
150:6;157:20
**guarantees (4)**
131:7;157:23;
179:1;181:6
**guess (21)**
4:14;7:6,13;12:3,4;
16:18;39:9;59:10;
74:7;78:2;100:23;
105:22;116:15,17;
161:4;166:21;178:9;
192:21;199:11;
224:19;242:14
**guessing (2)**
7:5;120:18
**guilty (3)**
236:9,11;238:16
**Gus (2)**
23:5,6
**guy (6)**

58:15,19;147:15;
191:3;231:14;235:23
**guys (3)**
94:12;95:13;140:2

### H

**H2 (3)**
39:9,11,20
**habits (2)**
29:22;31:6
**half (11)**
56:21;68:9;109:4;
118:25;119:17;120:5;
124:4;129:5;172:17;
177:22;219:19
**half-inch (2)**
38:21;41:19
**halfway (1)**
56:1
**hall (1)**
222:19
**hand (6)**
19:23;35:16;41:16,
19;59:21;220:8
**handed (1)**
219:14
**handful (1)**
211:3
**handle (1)**
207:16
**handled (1)**
179:25
**handling (1)**
183:10
**hands (4)**
17:16;18:25;
174:20;228:5
**handwriting (12)**
14:8;20:18;23:20;
26:14;29:11,12,13,21;
31:6;32:7;33:3;76:9
**handwritings (2)**
30:4,5
**handwritten (1)**
45:19
**haphazardly (1)**
120:18
**hapless (1)**
118:6
**happen (5)**
147:17;167:17;
178:17;180:6;223:6
**happened (9)**
11:14;95:6;113:7;
117:4;142:9;193:5;
222:17,21,23
**happening (2)**
145:19;167:8
**happens (2)**
4:17;105:18
**happily (1)**
76:5

**happy (16)**
6:24;9:15;13:24;
58:24;73:5;123:25;
157:5;158:4,10;
159:20,24;168:12;
170:10;173:8;207:11;
223:22
**hard (8)**
63:1;97:1;107:21;
109:5;114:14,18;
119:2;131:15
**harder (2)**
108:16,16
**harmless (3)**
150:5,15;151:3
**Hatmaker (3)**
44:12,18;138:21
**Hatmaker's (2)**
44:15;45:4
**head (1)**
109:18
**health (2)**
113:18;135:2
**hear (12)**
6:9;55:20;69:23;
74:8;85:2,25;111:13;
119:8;159:10;166:21;
175:5;199:19
**heard (14)**
82:15,16;119:11,
11,24;132:23;147:23,
25;189:19;236:16;
244:18,21,25;245:7
**hearing (12)**
55:6;56:25;77:17;
78:10;148:24;157:9;
165:25;171:12;
222:11;223:11;
228:17;245:24
**hearings (3)**
5:15;11:22;247:25
**hearsay (5)**
186:20,23,25;
188:16,23
**heart (1)**
206:2
**heavily (2)**
126:2;140:19
**heights (1)**
30:10
**Heim (20)**
10:2,2,8,10,15,17,
22,25;61:4;69:1;70:9;
92:2;103:21;145:15;
147:3;179:25;180:17,
19,22;183:10
**Heim's (1)**
183:8
**Hein (1)**
91:23
**held (2)**
5:20;126:20
**help (28)**

13:22;37:15;39:5;
53:18;67:10;87:23;
90:19;93:5;102:19;
105:20,25;106:1,6,7;
125:15;126:7;128:10;
134:5;136:16;139:1,
1;142:25;144:17;
147:21;207:10,11;
213:8;219:16
**helped (6)**
93:5;143:1;213:3,6;
214:6;217:13
**helpful (1)**
79:25
**helping (3)**
117:20;119:3;
177:19
**helps (1)**
38:13
**here's (2)**
141:8;231:5
**hey (3)**
105:20;147:15,15
**High (4)**
27:23,24;114:19;
238:11
**highest (1)**
46:9
**high-interest (1)**
121:20
**high-level (1)**
122:7
**highlight (1)**
240:9
**highly (7)**
31:22;118:7;
123:21;241:10,17;
242:6,6
**HIPAA (3)**
143:20;145:2,14
**hire (1)**
148:12
**hired (3)**
18:9;118:16;138:16
**hiring (4)**
148:5,10;188:15;
203:18
**historical (1)**
196:25
**history (9)**
95:15;197:7,10;
198:19;199:3,7,20;
228:21,25
**hit (3)**
6:15;43:7;107:12
**hold (10)**
5:13;75:4;119:20;
133:23;150:4,14;
151:2;180:25;183:12;
232:3
**home (5)**
117:15;118:5;
125:13;140:1;195:2

**honest (13)**
63:2;66:23;67:23;
107:20;108:16;
114:15;119:4;120:21;
123:23;135:15;142:2;
148:12;215:6
**honestly (7)**
64:24;79:4;81:24;
114:5;135:8;160:21;
199:4
**honesty (1)**
242:5
**Hong (2)**
24:4;27:24
**Honor (265)**
4:4,12;5:9,23;6:19;
7:2,9,16,21;8:17,20;
10:2;12:10,15,23;
13:8,21;14:1,7,17;
15:4;16:2,4,9,17,25;
17:4,20,21;18:1,6,17,
19;19:7,13;20:5;22:3;
28:11;29:7;47:4,7;
52:2,11,13,18,21;
53:3,13,16;54:9,12,
13,17,22;55:2,5,10,
13,19;56:10,13,18,24;
57:1,20;58:2,7,17;
59:3,9,17;61:5,20;
71:4;72:20;73:10,19;
74:4;77:13,16;78:9;
80:24;82:13,15,18,25;
83:12,23,24;84:4,5,
14,19,24;85:8,10,16;
86:2,17;87:2,8,9,14;
96:11;97:6;100:3,8;
104:6,11;110:21;
112:10,12;115:21;
119:22;123:24;
124:10;137:18;138:6;
148:19;149:4,15;
150:3;151:9,12,17,21,
24;152:5,6;153:1,11,
25;154:10,16,19;
155:20,23;156:1,3,16,
17;157:1,14,21;158:2,
16;159:7,18,20;160:3,
12,20;161:6,10,25;
162:3,9,20;163:1,12,
18;164:9;165:12;
166:3,17;167:19,21;
168:12,13;169:5,14,
23;170:17,20;172:2,
12;173:13,20,22;
174:2,9;175:2,9;
178:9;179:2,17,19,25;
181:2,10,19,23;182:3,
6,15;184:19;186:19,
23,25;187:3,18,18;
188:18,25;189:7,12,
16,22;203:24;204:1;
206:21;219:25;220:2,
5;221:1,19;222:3,10,

18,21,24;223:7,10;
224:6,7;225:23;
226:13;228:24;229:4,
15;230:2,5,7,11,16;
231:1,5,8;232:8;
235:1,3,10,11,12,20;
236:4;237:1,10,23,24;
238:1,12;239:14;
240:22;241:11,23;
242:24;243:5,16;
244:1,9,10;245:15;
246:17;247:23
**Honor's (2)**
157:3;247:12
**hope (1)**
134:11
**hopefully (2)**
60:11;88:22
**hoping (1)**
132:13
**horizontal (2)**
40:17,18
**hospital (1)**
121:6
**host (1)**
236:17
**hour (2)**
85:5;124:4
**hours (7)**
5:2;24:10;66:25;
103:15;106:15;
117:14;182:1
**hours' (1)**
11:16
**house (2)**
104:21;117:13
**household (4)**
74:18;89:23;
132:21,22
**households (1)**
104:21
**housewife (1)**
118:7
**how's (1)**
147:15
**HR (1)**
120:16
**Human (3)**
144:5;148:7;191:11
**humanly (1)**
34:25
**hundred (3)**
144:15;219:23;
239:24
**hundreds (1)**
78:24
**husband (1)**
92:3
**hyper-technical (1)**
84:11

**I**

18,21,24;223:7,10;
**I4 (2)**
39:25;40:2
**ID (1)**
31:16
**idea (10)**
136:2;147:10;
148:20;172:5;180:2;
199:9;215:21;217:5;
230:14;235:25
**identical (20)**
29:23;34:24;36:15,
16,17;38:15,18;39:4,
13;41:11,24;42:5;
44:7,25;45:2,22;
46:10,11;48:25;49:3
**identification (4)**
23:14;24:19;31:22;
35:13
**identified (8)**
29:11;34:9;43:21;
63:12;64:17;89:8;
100:5;199:23
**identify (16)**
35:14;37:15;131:5;
195:2,23;196:1,5,12;
200:5;211:20;212:2;
213:13;214:9,17;
215:1;216:2
**identity (1)**
190:12
**ignore (1)**
178:23
**ignoring (1)**
168:22
**III (1)**
4:1
**ill (3)**
170:7,9;221:11
**illogical (1)**
181:10
**illustration (2)**
36:10;39:5
**image (6)**
41:15;48:6,6,8,10;
49:16
**images (3)**
38:21;40:8;48:5
**imagine (5)**
62:12;93:11;
128:16;132:7;152:13
**immediately (7)**
18:4;116:19;117:9,
10,12;124:17;125:2
**impact (2)**
51:24;189:10
**impacted (1)**
171:16
**impacts (1)**
50:16
**impeach (2)**
83:9,16
**important (5)**
150:6;158:11;

Case 24-13093-pmm   Doc 105   Filed 11/05/24   Entered 11/05/24 13:48:50   Desc Main
In Re: Alan Christopher Redmond   Document   Page 262 of 280

October 1, 2024

170:6;236:16,21
**importantly (2)**
87:9;238:22
**impossible (1)**
11:15
**improper (1)**
231:11
**improved (1)**
131:20
**improving (1)**
148:8
**inability (2)**
14:6;149:1
**inactive (1)**
210:13
**inadequacy (1)**
85:14
**inadmissible (1)**
235:19
**inbound (1)**
146:4
**Inc (1)**
230:11
**incidents (1)**
42:24
**inclined (1)**
244:10
**include (1)**
195:18
**included (2)**
54:25;79:8
**Including (10)**
28:2;45:18;65:17;
89:9;159:9;191:7;
213:14,21;214:10;
246:22
**income (32)**
105:9;106:19;
117:2;131:24;132:2,
9,11,12;149:13;
170:19;172:17;178:1;
193:8;199:23,24;
200:1;214:9,10,11,12,
14,15,15,19,19,21,22,
24;219:6,7,13;245:1
**incomplete (2)**
86:19;203:7
**inconsistent (1)**
39:12
**incorporate (1)**
46:4
**incorporated (2)**
78:10;230:5
**incorrect (7)**
58:25;85:16;
106:23;112:5;115:13;
200:22;201:1
**incorrectly (1)**
213:22
**incredible (1)**
245:10
**incurred (1)**
151:15

**indeed (1)**
54:20
**indefensible (1)**
87:1
**indemnification (3)**
56:20;150:5,15
**indemnity (6)**
17:6;121:6;180:10,
10,15;182:3
**indentation (1)**
26:15
**independent (5)**
41:10;227:14,15,
16,21
**independently (3)**
34:5,11;228:9
**indicate (1)**
186:10
**indicated (1)**
164:17
**indicating (1)**
17:15
**indications (1)**
31:23
**indirect (1)**
132:20
**indirectly (2)**
211:21;212:8
**Indiscernible (2)**
161:21;219:15
**individual (3)**
23:5;29:15;33:14
**individually (1)**
210:11
**individuals (5)**
20:22,24;29:20,22;
246:24
**industry (5)**
125:2;185:23;
186:14,18;188:9
**inference (2)**
84:15;164:4
**influence (1)**
189:9
**information (22)**
4:23;5:3,6;12:7;
63:8;66:15;73:15;
82:1;86:9,21;139:10,
11,11,12;140:6;
143:25;146:9;147:20,
21;186:11;231:11;
233:22
**infrastructure (1)**
120:11
**ingoing (1)**
192:14
**initial (2)**
34:19;133:19
**initials (5)**
43:19,22,23;44:3,4
**initiate (1)**
168:19
**ink (2)**

26:14;43:15
**input (1)**
181:15
**inquiries (1)**
146:12
**inside (1)**
42:13
**insolvency (10)**
12:21;13:2,22;14:5,
19,25;15:17;171:3,3,4
**insolvent (10)**
87:16,17;96:10,17;
163:17,20,23;169:6,
11;170:2
**instance (9)**
32:5;34:23;41:5;
115:22;125:13;
136:23;138:14;193:2;
208:18
**instated (1)**
238:8
**Instead (5)**
44:14;120:17;
122:1,1;163:21
**Institute (1)**
23:13
**institution (1)**
126:21
**insurance (80)**
106:2,3;107:13;
111:14,17,23;112:1,3,
5,6,6,9,16,17;113:18;
114:17,17,24;115:24;
116:1,6;120:3;121:4,
10,23;122:1,3,6,15,
16,16,17,18,25;123:2,
7,11,12,13,15,17,20;
135:2;144:6,9,24;
145:8,18,23;146:21,
22,23;165:8;175:22;
176:1,24;177:1;
185:23;186:14,17;
188:9;192:18;207:7;
208:2,5,8,15,17;
209:5,25;210:3,6,7,
14;222:2;234:25;
235:15,18;236:19;
237:17
**intelligent (1)**
118:7
**intend (3)**
132:9;154:3,8
**intensity (1)**
39:17
**intent (2)**
242:16;244:22
**intercompare (1)**
30:16
**interest (12)**
211:22;212:9;
213:17;230:3,4,6,17,
18,20,24;231:2;
246:19

**interests (1)**
196:13
**intermediary (1)**
216:5
**Intermediate (1)**
152:17
**internal (2)**
145:13;148:21
**international (4)**
23:23;24:16,18,19
**internationally (1)**
27:23
**internship (1)**
21:13
**interrogatories (12)**
62:23;66:13;68:10;
70:5;77:24;193:25;
194:13;199:22;
201:13,21,25;211:16
**interrogatory (5)**
63:21,22;64:17;
212:14;215:3
**interrupt (2)**
138:7;151:24
**interrupted (1)**
75:22
**interviews (1)**
148:13
**into (63)**
7:14;25:24;26:8,11,
17;28:12,13,14;37:6;
40:19;42:16;46:4;
49:10,18;50:3;51:1,
19;78:10;90:14;
102:9,12,18;112:19;
113:14;115:6;118:3;
121:12;127:4;129:23;
139:13;146:4,5;
167:14;170:11,25;
174:21;176:15;177:1;
180:24;185:22;186:4,
7;189:4,7,13;190:5,8;
203:12,13;204:15;
214:12;219:16;221:4,
19,22,25;223:14;
226:16;232:17,25;
233:8;235:16;244:21
**intriguing (1)**
107:14
**introduced (1)**
144:9
**introduction (1)**
144:6
**inventory (1)**
30:9
**investigate (1)**
169:13
**investigated (3)**
14:23;166:22;221:4
**investigation (15)**
14:20;33:19;76:11;
89:14;170:5;220:23;
221:4,13;224:8,13;

232:16,18,20,21,25
**involuntary (36)**
12:20;15:13;16:16;
67:23;85:17;162:17;
167:6;168:19;170:19;
171:11,14,19;173:12;
178:13;179:16,20;
184:12,14;187:10,22;
202:3;220:24;224:13,
21;230:23;233:5,10,
19,23;234:7,11;
236:2;242:13,16;
244:14;245:14
**involve (2)**
23:19;26:13
**involved (9)**
11:20;21:11;23:2;
25:16;63:20;107:15;
120:15;140:19;141:9
**involves (3)**
21:25;26:5,9
**Ireland (2)**
206:8;215:21
**irrelevant (6)**
14:18;15:3;55:4;
83:10;160:20;237:16
**IRS (10)**
4:7,22;5:1;6:7,13;
7:7;12:4;94:3,17;95:7
**Isles (1)**
198:21
**isolate (1)**
39:6
**isolated (2)**
36:11;38:20
**isolating (1)**
35:21
**issue (49)**
6:9,12;7:2,3,18;
14:19;15:20;16:25;
20:16;40:3,11;41:7,7;
51:21;57:6;59:14;
61:14;83:16;86:14;
160:6,8,9,12;161:20,
23,24;164:7;168:13;
170:17;173:21,25;
174:6,13;178:8;
179:24;180:5,11;
181:8;182:4,17;
187:9,10,11,14;
235:15;237:3,18;
239:10;242:17
**issued (5)**
10:4;11:5;74:5,5;
154:20
**issues (15)**
5:13;9:3,9;10:17;
17:2;108:21;114:10;
148:23;170:1,12,16;
174:8;193:22;223:14;
231:14

## J

**J1 (2)**
49:15,18
**J4 (2)**
50:25;51:19
**January (11)**
108:10;109:12,22;
110:3;121:17;125:5,
6,8;135:18;224:17;
234:14
**jargon (1)**
224:21
**Jason (15)**
20:20;55:15;56:3;
62:22;65:4;97:21;
165:16;168:1;181:3,
6,11;183:9;208:11;
220:9,12
**J-A-S-O-N (1)**
220:12
**Jesus (9)**
138:20;139:22,23;
141:12;143:9;148:1;
190:12,25;191:6
**job (7)**
114:16;120:20;
132:19;143:3;148:5,
12;172:20
**Joel (16)**
60:16;63:9,24;
66:11,23;67:16;69:9;
70:16;71:21;72:12;
74:18,21;75:9;87:17;
148:3;152:11
**join (1)**
230:23
**joinder (2)**
180:1,2
**joint (2)**
219:17;246:19
**Jordan (44)**
17:6,9;20:21;55:15,
20,23;56:4,19;165:1,
16;168:1;177:9,17,
23;178:12;179:21;
180:1,8,12;181:3,6,
11;182:5;183:9;
185:14;189:11;
193:15,21;201:13;
202:17;220:6,9,12,20;
224:12;229:21;
235:21;236:4,10;
238:8;240:2,25;
241:4;243:10
**J-O-R-D-A-N (1)**
220:13
**Jordan's (6)**
57:13;62:22;65:4;
97:21;178:6;189:13
**JOSEPH (7)**
4:4,6,6,13,15;7:5,9

**Jr (1)**
185:24
**Judge (22)**
10:5,10,13,22,25;
11:14;28:23;32:13;
57:5;171:12,24;
178:4;179:10;180:4,
7,23,24;181:8;
204:21;222:15;226:1;
228:23
**judgment (10)**
16:18;57:3;97:21,
23;168:23;179:4,9,
12;182:5;225:12
**judgments (3)**
99:5;131:6;187:23
**judicata (6)**
178:4;179:9;180:2,
5,8;181:24
**judicial (4)**
53:17;54:2;157:13,
17
**judicially (3)**
158:3;159:8,11
**July (4)**
184:6;209:9;234:8,
17
**jumped (2)**
108:4,5
**June (6)**
121:18;183:11,14,
15,20;184:3
**jurisdictions (2)**
146:24;240:24
**justice (2)**
21:15,19
**juvenile (12)**
235:17;236:6;
237:8,13;238:3,5,6;
239:22;240:4;241:7,
11,13

## K

**K1 (3)**
33:20;49:11,12
**K1- (1)**
41:21
**K1-004 (1)**
43:12
**K1-3 (2)**
41:21;42:11
**K1-4 (2)**
41:21;42:14
**K15 (1)**
43:21
**K3 (1)**
42:17
**K4 (1)**
49:10
**keep (13)**
63:2;93:22,22;
115:9;123:25;124:8;

138:6;148:18;183:18;
189:20,20;203:3;
222:25
**keeps (1)**
103:3
**Keith (2)**
53:2,6
**Khody (5)**
14:2;19:13,24;20:2,
2
**K-H-O-D-Y (1)**
20:3
**kid (1)**
240:21
**kids (7)**
76:5;122:12;123:1;
125:16,16;206:3,5
**kind (11)**
24:15;34:19;38:14;
43:6,16;72:2;86:21;
119:12;120:7;123:21;
181:17
**Kingdom (1)**
197:13
**knew (7)**
10:11;170:2;
174:21,22;188:18,19;
229:22
**knowing (1)**
8:13
**knowingly (1)**
174:15
**knowledge (9)**
37:18;92:21;101:1;
186:17,22;188:17,23;
225:1;226:7
**known (23)**
30:3,3,14,22;33:7,9,
13,13,21,25;34:20;
41:20,23;42:2,7,21;
43:6;45:6,10;166:24;
169:21;191:9;215:25
**knows (7)**
7:10;85:21;120:17;
123:22;164:20;189:6,
6
**Kong (2)**
24:4;27:24
**Kroemmelbein (22)**
66:2;69:10,25;74:3;
91:12;99:4,19,21;
103:24;118:22;
119:11;122:3;128:7;
130:6;133:2,9;
152:16;189:6;213:18;
218:23;219:17;
246:22

## L

**laboratories (1)**
27:5
**laboratory (1)**

32:3
**lack (4)**
34:18;57:12;85:13;
245:1
**laid (4)**
157:22;158:8;
225:12;237:11
**large (1)**
15:19
**Largely (1)**
11:19
**larger (1)**
41:1
**largest (1)**
118:9
**last (76)**
7:24;8:3;9:8,12;
14:9;16:12;18:12,22;
54:18,25;56:25;
57:23;58:14;59:6;
62:13,25;66:9;67:19;
68:6,9,13,21;69:14;
70:1;77:16;90:12,13,
15,16,25;95:6,8;
99:21,25;101:8;
102:23;106:10;
107:25;109:21,24,24;
119:2;125:13,20,20;
127:17,20,23,24;
128:16,23;129:4,6,9;
132:24;135:5;138:14,
17;140:20;148:24;
164:20;172:9,11,16;
174:9;184:5;188:24;
189:23;193:22;
197:12;207:15;208:3;
218:17;228:17;229:4;
233:3
**late (2)**
8:2;166:5
**later (5)**
18:18;56:6;74:6;
158:4;181:14
**law (31)**
15:14;16:13;21:1,6;
22:22;27:18;55:15,
22;56:7;58:17;59:1;
60:8,14;63:1;94:12;
97:23;159:9,22;
165:16,21,22;167:23;
168:7,10,12,14;179:3;
184:21;232:9;237:6,
16
**lawsuit (4)**
170:10;180:23,24;
181:7
**lawyer (2)**
61:11;227:19
**lawyers (4)**
227:22,25;228:1,7
**lay (2)**
186:24;235:16
**layer (1)**

48:5
**layered (1)**
76:2
**layers (2)**
48:5;240:19
**layman's (1)**
37:21
**lead (17)**
7:14;88:18;125:18;
143:21;144:6,9,16;
145:2,12,13;146:3,3,
10;147:10,11;233:20,
22
**leaderboard (3)**
139:25;140:2,3
**leadership (1)**
122:7
**leading (3)**
139:23;143:2;
182:11
**Leads (18)**
88:18;90:3;91:14;
92:14;93:13;98:15;
144:11,14,14;146:4,
13;147:7,11;164:17;
192:11,13,14;203:18
**leapt (1)**
170:1
**learned (5)**
10:25;23:7;107:25;
149:5;237:2
**lease (1)**
105:4
**leasehold (1)**
196:13
**leases (1)**
196:12
**least (8)**
12:4;15:22;38:1;
54:18;172:16;189:4;
223:16;247:6
**leave (11)**
12:11;19:17;52:22;
141:12;224:15;
225:19;226:17;228:4,
14;231:22;232:13
**leaves (2)**
51:20;226:4
**leaving (1)**
238:19
**led (3)**
224:18,19,20
**leeway (1)**
187:25
**left (13)**
35:16;36:2,6;38:5;
41:16;42:4,13,15;
107:10;170:7,9;
193:8;225:2
**left-hand (1)**
42:9
**legal (26)**
86:24;95:21;

151:16,22;170:20;
195:2;224:15,21;
225:2,19;226:5,18,23;
227:10,18,19;228:5,
14;230:24;231:2,22;
232:19,21;233:17,18;
234:3
**Lehigh (1)**
122:8
**lender (2)**
176:3,4
**Lentz (11)**
59:6;60:25;61:4;
62:2,6,7,9;88:23;
98:21;164:11;166:8
**Lesnevich (3)**
23:5,6;25:16
**L-E-S-N-E-V-I-C-H (1)**
23:6
**less (4)**
5:2;16:18;133:23;
187:19
**lesser (1)**
167:25
**letter (3)**
4:22;30:9;216:13
**letters (3)**
26:2;43:12;216:11
**level (1)**
37:1
**levels (1)**
48:15
**liabilities (5)**
94:3,13,17;95:5;
150:20
**liable (4)**
55:9;150:19;
180:14;181:4
**license (12)**
43:8;146:23;147:1,
5,23;207:7,13,19,23;
208:25;210:13;240:8
**licensed (10)**
186:23,23;189:3;
207:20,22,23;234:25;
235:5;236:13,20
**licenses (3)**
188:5;189:14;
207:13
**licensing (5)**
108:22;235:6;
240:24;241:3;242:6
**licensure (4)**
185:23;186:14;
235:15;236:19
**lie (2)**
78:25;86:14
**lied (1)**
235:8
**lien (10)**
53:22,25;54:10,11,
15,16,23,24;55:8;
176:7

**liens (9)**
86:7;94:7,10,20;
95:13;166:4;169:18,
19;171:8
**lies (2)**
74:22;85:24
**lifted (1)**
224:17
**lifting (1)**
234:14
**light (2)**
37:6;82:7
**likely (2)**
130:12;131:7
**limitations (3)**
31:15,17,21
**limited (2)**
15:21;223:17
**limitedly (1)**
231:16
**limiting (1)**
31:9
**line (13)**
9:18;37:25;40:5;
45:16;48:7;50:4;51:4,
20;80:17;150:4;
217:18;223:13;
228:21
**lined (1)**
51:16
**lines (2)**
41:19;45:19
**liquidated (1)**
181:24
**list (9)**
28:20;65:24;66:20;
86:5;89:8;144:11;
162:5;206:19,20
**listed (3)**
39:8;94:14;212:14
**listen (6)**
140:22;142:12;
143:10,11,12;229:5
**listened (7)**
141:6,16,20;142:6,
10,10;229:6
**listening (1)**
141:10
**listing (1)**
233:2
**litany (1)**
5:1
**literally (6)**
67:9;114:6;118:4;
119:5;187:1;221:23
**litigate (1)**
181:7
**litigating (1)**
224:5
**litigation (4)**
42:23;86:19;102:4;
212:25
**litmus (1)**

26:1
**little (21)**
38:13;39:5,9,10,11,
21;44:19;50:2,12,13;
51:6;63:24;67:20;
68:2;69:19;100:1;
117:24;126:1;130:25;
139:6;215:6
**live (1)**
76:5
**living (1)**
104:22
**LLC (5)**
55:4;107:17;
193:13,13;202:8
**LLP (1)**
165:19
**loan (1)**
121:20
**loans (3)**
202:23;203:2,2
**location (1)**
145:18
**locations (1)**
24:4
**locked (1)**
181:15
**Lodging (1)**
168:18
**login (1)**
139:13
**London (1)**
27:23
**long (14)**
21:8;107:6;121:16,
25;122:5;124:2;
128:16;130:25;156:6;
168:24;185:16;
186:16;234:20,21
**longer (4)**
40:3;114:1;118:12;
218:7
**look (59)**
6:19;29:18;33:24;
38:4,19,25;39:20,25;
40:2;41:23;42:9,11;
45:1,15,17;46:17;
49:6;50:18,24;51:23;
63:10;68:12;71:19;
72:25;79:15;80:7;
91:3,4,9;103:20;
115:16;128:17;136:8,
9,11,19,20,21,22,22;
137:12,13,14;138:18,
25;169:19;183:22;
184:4,10;185:17;
194:18;198:22,24,25,
25;201:2;202:6;
217:1;230:9
**looked (12)**
8:16;68:8,11;72:15;
76:25;135:21,22;
137:17;138:17;170:1;

233:8;235:13
**looking (28)**
17:1;30:17,23;
35:11;37:14,18;
39:25;41:18;43:4;
44:14,15;48:24;54:7;
65:16,19;73:21;75:2;
81:11;131:2;134:25;
135:10,25;139:14;
161:2;185:4;206:23;
227:24;239:25
**looks (10)**
39:10,21;40:3;65:8,
8;76:8;78:18;80:12,
14;100:20
**loop (8)**
38:5;42:10,13,16;
49:21,24;50:2,25
**loops (1)**
50:21
**losing (1)**
111:6
**loss (6)**
135:11,14,16,21,24;
138:11
**lost (6)**
114:11;146:23;
147:1,5,16,22
**lot (38)**
5:16;11:21;22:15;
37:17;38:16;63:19;
72:25;79:1,1;88:3;
90:19,21;93:24;
106:3;107:15,18,18;
113:8;114:11,17,22;
116:3;118:14,19;
123:1;132:19;134:9,
12;145:13;187:17;
191:6;208:2;209:24;
218:8;224:21;225:2;
226:23;228:4
**love (3)**
73:1;76:6;88:2
**lower-level (1)**
121:7
**lunch (1)**
124:7
**lying (2)**
19:3;241:18

**M**

**ma'am (2)**
104:17;112:15
**machine (4)**
39:16,17;40:16;
145:9
**machines (1)**
29:16
**made-up (1)**
186:12
**main (4)**
29:14;44:2;107:4;

144:21
**Mainly (1)**
68:14
**maintain (3)**
22:13,18;110:17
**maintained (1)**
23:17
**maintains (1)**
48:4
**major (3)**
16:25;169:6;235:22
**majority (3)**
22:22;25:23;168:23
**makes (9)**
7:13;28:23;67:7;
106:5;128:11;168:23;
172:19;219:8;240:4
**making (8)**
40:14;101:9;
106:23,25;116:20;
136:4;137:15;211:6
**Malachy's (3)**
206:7,12,13
**Malcolm (1)**
4:1
**Malcom (1)**
4:2
**malice (2)**
221:11;222:7
**malicious (1)**
244:22
**man (3)**
118:6;185:22;
226:16
**management (5)**
120:19;143:25;
144:5;148:8,22
**manages (1)**
130:5
**managing (3)**
112:20;130:7,9
**many (12)**
6:15;27:25;62:25;
85:18;103:11;114:3;
119:13;129:1;135:14;
137:14;138:19;
139:17
**mapping (1)**
38:16
**March (9)**
200:16,19;213:23;
215:13,20;218:1;
224:18;233:20;
234:12
**Marcus (1)**
55:3
**marginal (1)**
107:14
**Maria (1)**
205:2
**mark (2)**
38:3;65:22
**marked (8)**

62:16;80:5;101:12;
183:3;204:18,20;
206:17;207:3
**Market (80)**
93:15;107:17;
108:3,7,13,14,18,25;
109:7,15,17,21,24;
110:6,14,20;111:4,6,
9,12,15,21,23;113:1,
10,11,21;114:8,9,11,
12,16,25;115:8,14;
116:4,11,19,25;117:7;
118:14;120:7,12,22,
25;121:14;124:18;
125:22;144:16;
148:16;176:11,17,24;
191:19,24;192:3,8,11,
15,20;193:3,7,13,15,
22;202:7,12,15,17,22;
203:5,5,8,13;208:13;
211:5;217:9;224:25;
225:7,18
**marketing (2)**
143:23;145:3
**marketplace (2)**
116:6;135:2
**Markets (3)**
143:13;166:25;
217:7
**Market's (1)**
110:8
**markings (2)**
36:12;38:22
**marriage (16)**
73:14,18,21;74:3,4,
5,10,12,16;75:3;
76:13,15;103:24;
128:12;129:18;
219:21
**married (9)**
73:16;76:4,5;77:2;
93:24;105:2;106:22,
25;107:2
**Massachusetts (1)**
210:19
**match (1)**
38:3
**material (2)**
30:15;201:15
**materially (1)**
222:9
**matter (17)**
14:15;15:14;33:3;
34:4;55:16;56:7;57:9;
63:17;86:9;102:4;
231:6,6;235:22;
236:1;237:8,8,16
**matters (2)**
23:23;235:21
**may (29)**
5:16;6:9;7:17;12:8;
15:6;30:4;46:12;
58:19;109:23;129:21,

24,25;131:14,16,20;
133:2;148:1;149:25;
153:2;156:10;169:1;
173:24,24;174:5;
178:16;181:25;218:1;
234:12;243:3
**maybe (36)**
17:11;18:18,19;
39:10;40:25;60:19;
91:11;107:7;112:18;
117:19;119:19;121:9;
127:8;128:11,16;
141:1,1,6,20;142:10,
10;144:15;153:6;
158:25;160:5;175:1;
197:17;198:14,14;
203:6;205:12,12,12;
215:10,10,10
**MBA (2)**
107:23;122:8
**MBAs (3)**
107:19;118:8;145:4
**MBOA (5)**
110:8,16;116:12;
120:11;121:14
**mean (45)**
6:12;11:19;12:24;
13:10;15:5;30:25;
31:4;38:20;40:10;
41:4;49:11;51:3;55:6,
9;56:4;58:17;71:5;
73:7;74:7;76:19;
78:22;79:22,22;81:8;
83:12;84:8;87:12,17;
93:17;108:5;118:2;
125:10;152:11;158:3,
25;162:20;166:1,4;
187:10;208:5,14;
216:5;232:4;234:19;
244:17
**meaning (3)**
29:22;114:20;216:3
**means (8)**
33:21;58:20;82:5;
145:24;200:6,8;
223:21;227:20
**meant (11)**
36:9;38:12;41:15;
80:21;81:14;171:11,
15;187:12;189:9;
215:4,19
**measured (1)**
37:23
**medical (4)**
113:12,18;121:6;
209:10
**Medico (55)**
10:3,5;11:3,20;
105:9,14,17;108:4;
109:11;117:9;120:7,
14,22,25;121:2,25;
122:4,15;123:7;
124:15;126:9,10;

127:12,20,22;128:13,
24;129:13;131:25;
132:2,18;133:17;
135:7;136:1;139:10;
141:5;142:7;144:20,
24;145:11,20,25;
146:4,23;151:2,7;
152:8,12;157:20;
189:21;190:22;
191:25;193:13;204:5,
9
**Médico (1)**
132:1
**Medico's (1)**
10:25
**meet (7)**
121:20,21;163:9;
166:15;170:4;221:8;
222:5
**meeting (5)**
85:12;142:16,19,
25;143:1
**meetings (5)**
142:14,19,22;
143:2,6
**member (4)**
24:11,18,23;25:3
**members (1)**
198:21
**membership (2)**
25:20;211:22
**memory (1)**
88:4
**mentioned (2)**
88:23;148:1
**Mercyhurst (1)**
206:1
**meritorious (1)**
170:4
**met (13)**
20:24;163:4;
167:18;170:5;172:15;
173:3,8;221:2,12,13;
223:19;244:19;245:5
**Mexico (1)**
24:3
**MGA (1)**
112:20
**Mid- (1)**
25:3
**Midwest (1)**
25:4
**might (9)**
6:6;40:20;50:12;
63:7;68:19;100:24;
148:24;153:22;
215:25
**million (9)**
97:16,19;149:16;
169:9;177:12,23;
181:12;202:23;
203:11
**millions (4)**

115:17,20,20;192:9
**mimic (1)**
26:13
**mind (1)**
52:7
**mindful (1)**
242:14
**mine (4)**
53:7;131:21;
169:10;206:2
**mineral (1)**
196:6
**minimum (2)**
22:18;239:3
**minor (2)**
237:7;238:8
**minute (3)**
97:18;189:19;
242:25
**minutes (1)**
152:4
**mischaracterization (1)**
227:13
**misconception (1)**
111:15
**mislead (1)**
78:25
**misleading (2)**
224:19;233:21
**misreading (1)**
235:14
**miss (1)**
242:20
**missed (3)**
80:17,17;123:19
**missing (1)**
79:19
**misspoke (1)**
54:14
**mistake (2)**
101:22;205:22
**misunderstood (1)**
127:8
**misworded (1)**
203:6
**model (1)**
40:16
**modifications (1)**
89:9
**module (1)**
125:18
**moment (14)**
25:21;54:12;74:25;
77:22,23;89:5;96:8;
130:20,22;152:19;
211:12;217:17;
237:24;243:5
**Monday (2)**
67:19;137:5
**money (45)**
55:21;56:23;102:2,
3;106:24;111:10;
116:20;121:13,19,22;

128:11;132:21,22;
135:3;136:4;140:6;
177:20,23;187:15;
196:25;197:12,14,16,
16,19,23;198:7;
200:10;203:17,19;
204:13;205:9,24;
206:7;211:5,7;215:2;
218:25;219:8;225:6,
9,12;229:1,2,8
**month (13)**
44:19,22;62:12;
108:8,25;109:10,21;
110:1,17;133:22,22;
139:20;226:22
**months (14)**
63:1;106:11;127:2;
131:8;132:16;140:20;
197:17;205:10,11,12;
218:6,18;229:2,4
**month's (1)**
225:14
**more (51)**
8:25;9:17;17:9;
21:1;29:15;30:15;
36:10;37:21;42:12,
17;46:2;51:19;56:21;
68:2;87:9;95:20;
106:24;107:1,18;
109:16;114:20;
118:19;123:24;126:1,
5;128:11;132:21,22;
134:23;135:3;136:14;
140:13;147:2;150:9;
153:20,22;154:11;
160:14,15,17;164:6;
165:2;166:14;171:18;
172:12;182:2;228:13;
234:22;238:21;243:9;
244:6
**Morgan (6)**
129:13;144:20;
145:17,20;146:1,14
**morning (13)**
4:4,5;20:8,9;60:5,6;
100:4,16,17;101:3,8,
20;188:2
**morph (1)**
177:1
**Morris (6)**
88:23,25;89:1;99:2;
164:14;165:19
**most (8)**
5:3;67:8,17;86:22;
132:11;137:15;
139:20;224:15
**mother (7)**
197:16,19;198:11,
13;205:2,6,9
**motion (35)**
7:23,25;8:6;9:4;
10:8;11:14;14:13;
72:5,7,13;173:10;

**motions (2)**
12:13;159:9
**mouth (2)**
69:18,22
**move (20)**
12:13,22,24;16:19;
19:14;65:2;82:17;
133:21;157:15;163:4;
167:20;173:11,14;
178:3;188:24;197:5;
229:19;232:14;
244:10;245:13
**moved (1)**
129:23
**movement (4)**
38:6;39:23;40:23;
42:17
**movements (5)**
31:18;41:8;50:20,
20,21
**Moving (6)**
7:12;113:8;124:8;
137:22;170:25;246:5
**much (15)**
24:9;36:14;43:23;
66:15,15;82:1;96:3;
105:11;130:1,1;
140:6;177:11;197:22;
206:12;218:19
**multiple (6)**
30:19;95:1;96:7;
205:8;240:19;246:21
**muscular (1)**
31:17
**Myself (20)**
60:10;67:24;69:13;
72:15;76:4;89:4;
92:18;93:4;96:2;
123:22;185:2;187:4;
193:2;203:4,10;
206:5;207:14;208:11,
13;219:14

**N**

**NAIC (1)**
237:12
**nailed (1)**
124:13
**name (16)**
19:25;20:1,2,20;
23:5;45:8;46:18;55:3;
59:24,24;75:9;
190:12;195:2;219:3;
220:10,10

**named (3)**
25:21;185:24;
246:24
**names (1)**
45:20
**narrow (1)**
42:12
**national (4)**
24:16,23;118:8;
169:5
**nationally (1)**
16:22
**natural (6)**
30:11;42:2,20;
43:11;44:5;45:2
**naturally (2)**
46:11,18
**nature (4)**
20:19;22:17;31:18;
61:25
**NBA (1)**
111:16
**NBOA (21)**
144:16;148:16;
176:22,23,24;177:18,
19;180:12,15,16,20,
22,24;198:14,17;
203:3,3,10,13;225:10,
13
**NBOA's (1)**
178:1
**near (1)**
70:20
**nearly (1)**
18:16
**Nebraska (1)**
210:25
**necessarily (5)**
9:5,14;17:1;116:24;
238:5
**necessary (5)**
18:19;25:20;55:11;
160:20;223:13
**need (83)**
4:20;5:14;7:6,7,7;
9:5;12:6,8,12;13:14;
14:16;15:1;17:24;
28:10;52:17;53:2,6,
19;55:6,10;56:5;
57:16;58:13;59:3,4;
67:9,15,16;78:10,12;
80:7,9;87:6;89:21,24;
90:9;100:24;105:12,
20;110:21;114:6;
115:16;122:17,18,19;
123:8;124:7;125:15;
128:17,17;129:20;
134:4,4;135:8;
137:21;149:24;
152:15;153:20,22;
154:11,14;160:25;
167:20;173:13;
174:11;194:18;201:3;

223:9;224:4;225:21;
229:18;236:9;240:25;
241:4,19,21;242:15,
20;243:15;245:15,24;
246:5,8
**needed (13)**
9:17;69:6,11,16;
70:1;107:20;117:6;
124:14;125:1,25;
126:1;197:16;246:6
**needing (1)**
70:10
**needs (8)**
13:13;19:17;58:4,6;
83:17;105:25;123:1;
177:25
**negative (1)**
218:9
**negotiated (4)**
123:3;222:12,14;
223:4
**Neither (1)**
206:20
**nervous (1)**
220:15
**nesting (1)**
240:19
**Networks (1)**
116:7
**new (5)**
97:9;125:18;
192:16;193:7;245:15
**news (1)**
56:13
**newspaper (1)**
205:18
**next (13)**
35:23;38:11;53:19;
97:3;131:8,19;
132:14,16;182:1;
196:12;220:5;232:14;
243:7
**nice (4)**
58:15,19;128:1;
165:24
**Nicole (2)**
66:14;82:2
**night (5)**
7:24;8:3;9:8;54:19;
101:9
**NIGRELLI (13)**
81:22;82:10,12;
100:8,12;153:2;
156:17,21;222:21,23,
25;223:8;240:14
**nine (2)**
31:20;218:17
**ninety (1)**
62:14
**nobody (1)**
10:19
**nondestructive (1)**
26:14

**none (11)**
41:24;126:22;
164:18,22;170:23,24;
171:13;213:15;214:7;
226:11;238:1
**nonexistent (1)**
165:4
**non-Obamacare (1)**
116:10
**non-original (1)**
50:14
**nonparty (1)**
19:14
**nonresident (4)**
207:19,22,23;
208:25
**nonresponsive (1)**
115:23
**nor (1)**
54:11
**Norm (1)**
215:10
**normal (11)**
30:11;40:13;42:2,
20;43:1,11;44:5;45:1;
134:1,3,6
**normally (3)**
4:21;34:22;163:1
**Norman (3)**
212:24;213:3;
217:13
**Northeastern (1)**
25:5
**Northern (1)**
206:8
**notation (1)**
43:13
**note (3)**
12:13;40:8;54:1
**notes (1)**
154:11
**notice (19)**
6:2,3;10:7;11:8,13,
16;15:13;16:10;
41:23;53:17,24;54:2,
23;157:13,17;158:3,
5;164:19;184:12
**noticed (4)**
49:20;159:8,11;
200:18
**novation (1)**
58:20
**November (2)**
135:1,17
**number (47)**
5:10;14:18;35:15;
49:14;63:1,11,12,21;
64:17,17;65:16,18,19,
20,23;71:19;72:4;
94:3;100:9,10;103:5;
107:3;118:5;125:20,
20;126:17,19;131:3,
6;140:20,20;143:8;

158:20;195:5,13,23;
196:1;207:15;208:18;
210:22;211:19;
213:13;214:9;215:1;
216:2;217:16;246:21
**numbered (1)**
100:7
**numbers (20)**
132:24;136:6,9,9,
19,20;137:2,8,11,12,
13,17,19;138:17,18,
18,21,23,25;139:25
**numerosity (7)**
17:14;56:16;163:7,
13;172:14;173:19,21
**numerous (1)**
16:12

**O**

**oath (8)**
86:12,14;169:10,
15,16;172:6;175:12;
239:4
**Obamacare (4)**
113:13;116:7,8;
207:16
**object (20)**
18:17;72:20;73:19;
115:23;137:18;178:2,
3;186:19;188:14,16;
189:18;212:1;213:14;
215:3;216:20;217:10;
221:1;226:13;228:24;
235:1
**objected (3)**
195:7,11;196:9
**objecting (4)**
63:20;74:10;87:3;
172:4
**objection (29)**
7:13;29:6,7;52:11;
54:4;55:18;63:15;
64:21,22;77:13;
80:24;81:22;82:10,
11;96:11;97:6;104:6,
11;110:21;151:17;
157:21;181:18,24;
182:13,17;227:13;
230:2;237:22;245:23
**objections (4)**
5:11;9:3;77:24;
178:15
**objective (1)**
138:25
**objects (1)**
63:16
**obligation (3)**
18:9;133:3;168:23
**obligations (1)**
168:25
**oblong (1)**
42:12

Case 24-13093-pmm   Doc 105   Filed 11/05/24   Entered 11/05/24 13:48:50   Desc Main
In Re: Alan Christopher Redmond   Document      Page 267 of 280

October 1, 2024

**observation (1)**
203:7
**observations (1)**
44:2
**obvious (1)**
45:15
**obviously (25)**
5:9;12:9;21:3;31:5;
40:14;41:4;80:18;
81:11;86:23;95:12;
107:15;110:18;116:3,
5;119:6,16;121:20;
126:4;128:10;129:10;
152:14;162:22;166:8;
172:23;244:19
**occasion (1)**
29:16
**occasions (1)**
118:5
**o'clock (1)**
124:3
**October (1)**
108:18
**off (15)**
5:13,20;32:13;
74:13;97:3;106:6;
113:3;119:13;131:18;
165:21;166:11,13;
170:19;243:14,24
**offense (3)**
237:8;240:1,4
**offer (11)**
13:11,21;14:4;
21:22,24;23:14,17;
27:2;29:4;46:7;53:16
**offered (6)**
28:13;46:23,24;
71:13;158:9;244:18
**offering (2)**
86:23;157:25
**office (24)**
8:21;11:7;25:11,17;
118:3,4;119:3;
136:10,13,14,19,25;
138:3,9,19;143:6,6,8,
9;145:22;146:16;
147:17,20;246:11
**officer (1)**
18:7
**offset (6)**
57:9,15;178:6;
179:3,11,14
**offsets (1)**
193:9
**offsetting (1)**
192:9
**oil (1)**
196:5
**old (4)**
91:10;118:6;237:6;
240:3
**older (2)**
185:22;226:16

**omissions (1)**
201:15
**once (17)**
26:11;30:13,21;
31:12;38:4;41:12;
43:22;47:24;60:11;
88:22;141:1,1,6,20;
192:24;203:17;221:2
**one (113)**
6:1,12;7:17;9:20,
22,24,25;16:2,23;
17:11;21:1;26:4;
29:15;30:15,19;
34:15,18;36:12,14,18;
37:2;40:7,22,25;41:1,
23;43:21;44:2,2,22;
45:14;47:12;49:20;
51:13,17,19;54:12;
71:13;80:3;85:21,23;
88:25;89:1,5,23;
101:2,6,11,12,16;
104:19;112:19;114:9,
10;118:9;121:2;
123:10;130:19,20,21,
21;131:8,19;132:14,
16;142:6;143:8;
144:14;146:6;147:10;
148:2;149:18;152:19;
156:17;158:20;
161:16,24;163:21,22;
165:17;166:21;
168:16,24;170:8,15;
172:13;180:25;
183:18;190:21;194:3,
18,25;201:17;204:18;
206:14;212:22;
213:10;214:3;217:17;
219:3;220:20;221:11,
23,24;228:23;229:4;
237:23;238:20;
239:23;240:1,2;
241:1;244:19
**one-by-one (1)**
73:6
**one-hundred-percent (1)**
174:14
**ones (5)**
6:15;21:23;73:5;
88:10;161:9
**ongoing (2)**
111:3;120:18
**online (3)**
99:19;146:3;240:15
**only (31)**
6:3;8:3;17:25;
28:13;36:5;48:14;
56:10;61:6,11,12,13,
15,17,23;84:9;141:6;
142:6;150:1;164:25;
166:11;169:7,20;
170:3;171:22;186:8;
190:8;200:1;240:7;
242:22;245:25;

247:10
**onto (1)**
48:11
**open (10)**
16:17;47:21,24;
48:4;107:19;113:14;
132:25,25;140:14;
211:12
**opened (4)**
16:17;47:20;
126:20;170:3
**opening (1)**
135:2
**operate (1)**
124:20
**operated (1)**
145:17
**operates (2)**
144:20;145:20
**operating (10)**
109:15;114:12,12;
117:7;144:1;145:5;
187:12;189:20,21;
193:4
**operation (2)**
135:20;145:3
**operations (9)**
106:12;109:8,22;
110:7;120:15;138:20;
191:2;203:18,22
**opinion (10)**
18:10;28:13;31:14;
34:4,8;45:4;49:3;
52:12,16;177:24
**opinions (4)**
31:20;46:8,24;52:8
**opportunity (6)**
18:15;79:15;
164:19;174:18;175:8;
193:21
**opposed (1)**
5:5
**opposite (3)**
31:16,17;150:7
**opposition (3)**
53:19;173:15;175:6
**options (2)**
87:23;222:20
**oral (2)**
26:18,18
**order (8)**
7:14;83:18;147:11;
194:17;199:16;
207:18;228:12;
245:12
**organization (6)**
22:9,11,12;26:4;
145:15;225:7
**organizational (1)**
122:7
**organizations (4)**
24:12,14;25:21,23
**organize (4)**

213:3,6,7,7
**organized (1)**
70:16
**orientation (1)**
40:23
**original (7)**
18:11;43:13,15;
51:24;52:1;83:25;
224:18
**originally (1)**
185:9
**originated (1)**
203:2
**others (2)**
41:2;240:5
**Otherwise (1)**
167:14
**Ottawa (1)**
24:22
**ourselves (1)**
114:21
**out (58)**
5:13,25;6:2,6,24;
8:4;9:7;11:24;14:16;
17:24;18:4;28:19;
30:20;35:21;36:7;
37:7;42:6;44:21;
47:25;50:22;51:19;
88:7,21;96:24,24;
113:13,22;114:8,20;
124:21;130:10;146:9;
147:21;160:7;167:7,
10;172:20;173:1;
178:20;181:6,11;
193:6;219:20;222:19;
225:12;229:8,9;
230:13;231:12,12;
232:5;237:13,14;
238:19;239:7;240:16;
244:22;246:25
**outcomes (1)**
151:3
**outset (1)**
174:25
**outside (13)**
31:2;34:2;63:16;
168:8;174:12;181:15;
197:8,13;198:7,20;
228:22;229:1;231:21
**outstanding (2)**
150:3;169:3
**outweighs (2)**
56:21;237:20
**over (30)**
25:12,14;36:18;
37:2;44:19;60:10,12;
61:2;65:25;67:2,20;
68:9,13;70:1;76:14;
93:24;105:2;106:12;
107:25;135:4;174:21;
182:2;185:2;187:8;
207:14;208:3;218:5;
226:23;229:9;236:5

**over-collateralized (1)**
110:8
**overdrawn (1)**
127:6
**overlaid (1)**
41:19
**overlay (8)**
34:24;37:1,9,10;
40:6,20;41:12;48:16
**overlaying (1)**
37:15
**overlays (2)**
37:5,12
**overnight (2)**
109:4,17
**oversight (1)**
6:21
**owe (3)**
55:21;62:5,13
**owed (7)**
15:22;57:8;102:3,3;
177:23;180:10,14
**owes (3)**
56:23;166:9;168:24
**own (20)**
17:22;19:10;32:3;
105:8,23;107:20;
140:5,5,11;145:13;
148:22;166:12,13;
200:14;212:4;215:15;
226:12;228:25;
247:22,24
**owned (9)**
103:25;111:16;
129:16,18;181:12;
193:9;195:14;211:21;
212:8
**owner (5)**
102:9;105:15;
109:3;144:13;181:1
**owners (1)**
180:25
**ownership (4)**
142:20;211:22;
212:9;213:25
**owning (1)**
145:5
**owns (1)**
111:15

---

**P**

**P&Ls (1)**
105:6
**PA (1)**
208:25
**PACK (14)**
7:21,23;8:2,8,11,14,
17;12:15;154:16,18,
24;155:2,20;156:4
**page (44)**
35:11,12,12,23,24,
25;36:4,5,5,8,9,10;

38:11,11,13;41:14,16;
43:3,5,17,18,19,25;
44:4,5,8,9,10;45:11,
13;54:5,25;65:10,12;
78:7;79:15;80:9,10;
160:6;184:5;185:17,
18;191:18;201:12
**pages (9)**
35:15;36:1,5;41:18;
79:8,19;160:1;162:7;
199:1
**paid (64)**
55:22;56:3,8;57:18,
22;58:2,3,21,24;59:8;
66:2;85:22;94:22,24;
96:7;97:3;99:21;
110:18;111:5,17;
112:3,9;115:7;116:2,
5,22;127:10,20,22;
128:14,15,23;129:7,
10;130:1;131:18;
132:13;133:22,23;
134:7,16;140:12;
147:11;149:6,15,18,
22;150:1;152:9;
163:8,15;165:3;
166:1,4,6;169:2,22;
171:9,10,18;192:20;
204:25;219:20;245:4
**painfully (1)**
73:3
**pains (1)**
118:20
**pandemic (1)**
119:25
**panel (1)**
26:18
**paper (6)**
29:18;48:11;54:18;
158:21;216:9,17
**par (9)**
92:7;104:19;
121:19;177:14,15,18,
23;179:1,25
**paragraph (2)**
150:14;204:22
**paraphrasing (1)**
58:15
**part (35)**
12:2;20:17;24:14;
27:8;32:6,8,10;33:18;
41:2,5;42:11,21;
63:15;68:15,15;
74:17,17;84:17;
141:8;142:1;143:13;
148:5;157:10;159:25;
172:25;174:10;
179:21;181:7;186:3;
191:6;202:6;222:12;
224:3,13;234:5
**partake (1)**
204:12
**participate (2)**

26:22;164:20
**participated (2)**
18:8;19:2
**participating (3)**
85:11;171:22,22
**particular (9)**
25:19;26:4;38:17;
39:19;41:5;43:22;
68:17;137:3;212:18
**particularly (1)**
107:24
**parties (8)**
6:4;7:17;11:13;
46:21;187:6;246:19,
24;247:8
**partner (3)**
128:2;133:21;231:4
**partnership (1)**
105:21
**parts (2)**
113:8;245:8
**part-time (2)**
125:7;130:9
**party (9)**
4:1,18,19;5:5;6:10;
10:23;154:20;180:22;
247:10
**pass (2)**
26:11;169:5
**passport (4)**
32:5,6;33:12,13
**past (6)**
21:4;27:7;66:1;
67:2;118:11;137:23
**paste (1)**
52:1
**patently (1)**
221:21
**pattern (1)**
197:7
**Pause (3)**
28:9;32:12;130:23
**pay (53)**
14:6;15:17;58:16;
87:19,20,24;93:1;
96:22;97:4,12,14,21,
23;98:3,6,13,15,17,
21;99:2,4,8;103:2;
111:4,18;112:22;
130:1;132:17;133:3,
10,12;135:6;140:16;
148:21;149:2,7;
150:2;163:21;164:5;
165:16,20,21;166:10;
167:24;168:8,16;
169:3,11;170:18,23;
177:19;193:3;203:19
**paying (42)**
14:21,24;56:9,11;
58:18,19;85:2,7;
89:23;90:22,22,23;
111:10;114:8,9,18,19,
20,21,25;115:6;

164:13,25;165:10,11,
13,15,15,19;167:11,
15,25;168:1,17;171:2,
7;172:7,21,22;173:5;
232:17;233:12
**payment (23)**
60:8,15,21;61:19;
62:3;65:25;66:1,8;
87:23;88:1,5,7,17,21,
22;95:15;99:5,24;
163:24,25;172:19,25;
245:2
**payments (34)**
55:14;57:14;60:12;
61:2,7;65:17;66:18;
67:4,8,13;68:12,20;
69:7,11,17;70:1;95:1,
5,6,7,11,14;99:21;
102:19,20;115:14;
116:13;126:9;172:9,
11,18,19;173:1;245:2
**payor (1)**
99:19
**payroll (5)**
109:24;115:3;
121:21,21,22
**pays (4)**
96:4,5;110:17;
176:1
**PC (3)**
4:2;100:11;160:17
**PC- (3)**
157:13;161:6;162:5
**PC-03 (2)**
204:20;206:20
**PC-19 (8)**
80:5;81:8;157:8;
162:5;194:3,23;
201:9;211:14
**PC-20 (2)**
131:2;194:9
**PC-21 (3)**
169:9;194:21;201:8
**PC-44 (1)**
73:23
**PC-51 (2)**
53:20;99:10
**PC-52 (1)**
53:22
**PC-53 (1)**
53:24
**PC-54 (2)**
157:17;162:6
**PC-6 (1)**
82:22
**PC-73 (2)**
206:17;207:3
**PC-77 (3)**
62:16;126:16;162:7
**PC-78 (2)**
65:2;89:6
**PC-79 (4)**
70:25;71:19;77:5;

78:20
**PC-80 (2)**
70:25;83:25
**PC-81 (3)**
71:1;161:20;162:7
**PD (2)**
100:12,13
**PD-22 (4)**
100:15;161:13,20;
162:8
**PDF (6)**
47:16,17,19,20,21,
24
**peers (1)**
26:19
**pen (1)**
93:21
**pending (4)**
104:15,16;178:11,
16
**Penn (1)**
21:14
**Pennsylvania (27)**
20:11;25:11;27:3;
53:23;54:13,14;
94:17;98:12;114:14;
117:14;166:1,3;
189:4;207:7,13,14,18,
25;208:2,3,4,8,23,23,
24;209:1;210:13
**Pennsylvania's (2)**
208:5,15
**people (22)**
4:22;20:20;106:4;
109:6;111:4,10;
118:7;119:13;121:17;
138:16;145:4,23,25;
146:11;167:16;
171:22;189:8;192:13,
15;205:24;209:5;
230:5
**percent (4)**
61:23;142:11;
219:23;239:25
**percentage (2)**
40:16;134:16
**perfect (3)**
51:19;118:13;
237:11
**perfectly (12)**
40:22;48:16;51:16;
108:23;118:20;119:4;
120:12;134:8;141:12;
208:24;212:21;
237:17
**perform (1)**
24:6
**performance (2)**
98:9;120:19
**performed (1)**
24:1
**performers (1)**
139:19

**perhaps (3)**
19:17;81:5;172:17
**period (1)**
224:5
**perjury (6)**
18:8;235:9;236:23;
239:3;240:11,18
**person (15)**
29:11,25;60:11;
65:18;66:2;70:16;
93:16,21;123:21;
126:19;159:22;187:1;
190:13;191:12,14
**personal (14)**
92:20;116:1;131:6,
7,7;166:12;169:8;
181:6;188:17,23;
203:4;217:15;225:1;
226:7
**personally (17)**
20:22;55:9;67:12;
87:20;97:25;105:13,
22;116:3;122:15;
131:15,21;134:14;
150:6;157:20;181:16;
208:10;231:23
**perspective (1)**
37:22
**persuaded (1)**
209:5
**persuasive (1)**
164:3
**petition (7)**
85:17;184:14;
187:10;220:24;
233:10;236:2;245:14
**petitioning (27)**
57:10,11;59:22;
62:22;65:3;85:21;
94:19;173:3;185:6;
190:21;199:13;
200:21,24;220:9,20;
221:3;229:21;230:6,
25;231:21;232:1,7,9;
235:23;239:11,17;
242:13
**ph (5)**
44:12;195:19;
201:14;205:2;232:11
**phase (2)**
26:18,18
**phenomenal (1)**
120:20
**Philadelphia (4)**
17:8;180:3;183:25;
184:8
**phone (5)**
60:10;140:23;
146:8;149:19,19
**phones (1)**
146:2
**photocopied (1)**
39:15

**photocopy (1)**
40:12
**Photoshop (10)**
36:25,25;40:20;
47:11,13,18,20,21,23,
25
**phrase (1)**
111:20
**physical (1)**
40:23
**physically (3)**
37:12;46:10;137:9
**pick (4)**
146:6;147:17;
168:7;170:22
**picked (1)**
127:4
**picking (1)**
147:21
**picks (1)**
149:18
**pictorially (1)**
36:14
**picture (1)**
47:14
**piece (5)**
37:3;48:21;54:18;
158:21;192:21
**pieces (2)**
39:6;246:21
**pierce (1)**
180:13
**pink (1)**
37:9
**place (6)**
38:21;58:20;209:1;
222:25;223:8;224:17
**placed (2)**
36:3;41:20
**plaintiff's (1)**
163:2
**plan (14)**
60:8,15,21;62:3;
88:1,5,7,17;121:11;
153:19;154:6,9;
155:21;204:16
**plans (13)**
87:23;88:22;
108:14,16;116:11;
121:5,6,6,7,9;123:2;
163:24,25
**platform (1)**
112:22
**play (1)**
213:20
**played (2)**
142:14;143:7
**playing (1)**
142:23
**plead (3)**
236:9;237:8;238:16
**pleading (1)**
202:10

**Pleas (7)**
17:8;53:24,25;
178:11;183:25;184:8;
236:12
**Please (10)**
19:22;59:20;61:21;
64:1;69:9;75:15;
79:11;183:13;220:7;
243:20
**PNG (1)**
48:3
**PNLs (1)**
134:25
**point (32)**
12:5,25;19:10;
31:20;39:19,24;42:6;
53:11;63:6;70:10;
80:16;90:20;115:8;
126:16;128:8;162:18;
167:15;175:7;179:22;
180:21;182:8,9;
201:21;213:17;
223:10;225:17;
231:17;236:15;
237:11;239:7;242:10,
20
**pointed (3)**
38:5;42:17;147:2
**pointing (3)**
5:25;44:21;50:22
**points (2)**
79:21;223:10
**Police (1)**
27:3
**Policies (6)**
111:14;113:15;
116:21;157:3;193:6;
209:10
**policy (9)**
110:11;111:14;
146:21,21;192:18,22,
22,24,24
**policyholders (1)**
146:18
**pop (2)**
146:6,8
**populated (1)**
39:2
**portion (2)**
38:19,20
**portions (1)**
38:9
**position (8)**
4:14,24;11:23;
15:15;55:19;106:10;
180:9;204:16
**possess (2)**
211:22;212:9
**possession (12)**
8:24;33:23;63:8;
67:12;90:25;91:2;
94:7,10,19;95:13;
102:23,25

**possible (9)**
11:10;34:25;46:11;
64:25;66:16;79:25;
82:2;106:7;234:19
**possibly (3)**
169:21,22;172:12
**potential (1)**
146:10
**potentially (2)**
114:7;204:12
**Pottstown (3)**
106:8,13;107:10
**power (3)**
133:12;140:5,11
**PowerPoint (1)**
143:2
**practical (5)**
26:10,12,12,15,20
**practice (1)**
23:9
**precedes (1)**
62:13
**Precise (1)**
144:14
**precision (1)**
40:7
**preclusion (1)**
181:9
**pre-existing (1)**
209:11
**prefer (1)**
157:3
**preferred (1)**
163:21
**prefile (1)**
166:22
**pre-filing (1)**
232:17
**prejudice (1)**
187:13
**prejudicial (3)**
237:20;241:12,17
**preliminary (1)**
178:15
**premise (2)**
142:11;207:16
**premiums (2)**
110:20;111:4
**prepare (4)**
68:10;142:25;
217:13,13
**prepared (6)**
12:23;14:9;35:1;
157:1;167:20;244:10
**preparing (1)**
224:13
**present (9)**
13:13,22;18:23;
48:20;154:3,12;
155:8;175:8;223:20
**presented (15)**
9:2;163:6;164:4,6,
15;173:12;178:25;

188:4;201:20;202:14,
18,20;221:20;229:10;
236:17
**presenting (2)**
173:14;178:13
**preserve (2)**
11:25;163:3
**president (1)**
138:20
**presume (5)**
13:6;15:23;28:15;
152:24;153:8
**pretty (17)**
34:15,15,16;36:13,
13;37:19,19;43:21;
45:15;81:2;114:13;
117:19;124:21;126:2;
150:3;209:20;229:6
**previous (7)**
41:18;43:7,25;
106:4;126:15;127:14;
141:10
**previously (7)**
32:11;89:21;
101:18;118:11;
131:19;172:6;174:5
**primarily (1)**
29:13
**principal (3)**
23:4,4;107:4
**principals (1)**
61:3
**principle (2)**
29:14,20
**principles (2)**
29:14;30:1
**print (2)**
23:14;46:4
**printed (2)**
45:18,19
**prior (10)**
11:22;21:5;31:8;
42:24;55:6;78:9;
85:17;127:8;157:9;
220:23
**Privacy (1)**
5:4
**private (2)**
23:1,9
**privilege (8)**
61:6;104:6,14;
230:3,4,11,19;232:6
**pro (3)**
127:24;128:13;
135:24
**probable (2)**
31:22,23
**probably (15)**
6:14;7:13;8:12;
11:24;46:1;59:4;
93:20;142:18;155:13;
178:13;199:4;216:19;
235:7;241:16;245:9

**probative (5)**
237:20;238:9;
241:17;242:5,6
**probe (1)**
221:18
**probed (1)**
242:9
**problem (16)**
8:15;10:21;13:7;
58:4,5;66:11;71:16;
75:23;156:22;158:14;
159:13,14;160:22;
172:3,20;244:2
**procedure (1)**
144:3
**procedures (5)**
10:21;25:19;
120:15;144:1;145:4
**proceed (4)**
13:5;124:1;155:24;
241:1
**proceeding (6)**
85:13;87:1;168:20;
173:24;179:13;218:4
**proceedings (2)**
75:10;209:18
**process (13)**
23:14;26:6;37:11;
38:15;40:4;41:12;
87:12,13;96:3;
109:18;144:21;
171:20;172:5
**processes (2)**
47:12;50:12
**processing (1)**
146:12
**produce (9)**
5:1;8:23,25;9:10;
50:12;164:1,16;
170:16;174:11
**produced (9)**
9:8;11:23;42:22;
43:1;103:22;164:18;
165:18;169:8;239:25
**Producer (27)**
88:11;90:3,6;91:15;
92:14;93:10;101:4,6,
14,15;102:3,5;
103:19;110:10;
115:22,25;116:1,4;
175:18;176:3,19;
177:2,5,21;193:11;
207:12;231:12
**Producers (1)**
113:21
**producing (4)**
37:11;113:23,24;
114:1
**product (9)**
110:12;113:12;
114:1,2;121:23;
175:22;177:22;
207:17;211:8

**production (5)**
5:14;65:4,16;144:5;
148:9
**products (12)**
112:17,19,22;
113:17,18,18;120:23,
24,25;121:4,14;
195:24
**profession (1)**
47:1
**professional (3)**
23:18;24:11;47:2
**proficiency (4)**
23:18;26:22;27:2,6
**profit (8)**
116:24;135:11,14,
16,16,21,23;211:6
**profitability (2)**
137:19,23
**profitable (4)**
135:7,13;136:1,5
**profits (9)**
133:17;134:16;
135:4;136:4;138:11;
152:8;204:7,9,12
**programing (1)**
36:22
**programs (1)**
21:24
**project (1)**
125:17
**projectional (1)**
135:17
**projections (3)**
135:14,22,25
**prong (2)**
26:7;172:14
**proof (8)**
6:3;13:22;14:4;
85:7;148:19;172:22;
198:22,24
**proper (4)**
12:20;75:9;122:1;
229:22
**properly (2)**
4:16,25
**properties (4)**
196:1,2;211:20;
213:13
**property (7)**
99:12;129:13,23;
130:2;195:14;212:2,5
**proportionally (1)**
50:18
**proportions (3)**
38:4;41:8;50:20
**proposition (4)**
170:21,22,23,25
**propounded (1)**
201:13
**proprietary (1)**
145:12
**protect (4)**

104:21,21;167:8,9
**protected (1)**
230:12
**protection (1)**
113:19
**protects (2)**
230:12,14
**prove (8)**
14:23;170:12;
171:1,3;189:8;
221:23;235:25;236:1
**proved (1)**
85:1
**proven (2)**
170:6;229:14
**proves (1)**
238:5
**provide (10)**
70:7;82:1;89:7;
95:10,15;97:1;
107:23;113:19;
229:18;245:1
**provided (15)**
11:7;27:25;30:3;
49:4;150:21,25;
164:21;168:20;190:3;
194:15;206:21;
216:24;229:17,22;
235:13
**provider (2)**
112:3,6
**providers (2)**
111:23;114:17
**providing (3)**
66:15;91:18;148:8
**proving (1)**
165:14
**provisional (1)**
26:9
**public (6)**
158:2,18,23;159:2,
5,8
**publicly (3)**
86:7;157:19;158:22
**publish (1)**
22:13
**published (3)**
27:10,12,14
**Pull (3)**
37:7;67:16;189:2
**pulled (2)**
158:6;223:2
**pulling (1)**
97:19
**punitive (1)**
246:1
**purchased (4)**
147:7,9,12;209:10
**purchasing (1)**
177:20
**pure (1)**
22:1
**purpose (7)**

33:10,22,24;35:19;
71:12;167:9;187:22
**purposes (7)**
5:21;35:14;36:11;
167:20;234:25;
239:21;242:12
**pursue (1)**
181:5
**pushing (1)**
242:3
**put (36)**
6:4;12:1;14:22;
16:10;17:9;36:25;
37:5;47:10,13;51:13;
52:17;57:16;69:22;
84:20;85:20;104:1,
18;118:16;123:2;
131:13;153:2;167:14;
179:17;182:24;
187:14;195:22;
213:10;222:11,15;
223:3,11;227:10,12;
239:8;243:6;246:25
**putative (10)**
8:22;9:10;14:14;
16:20;62:21;63:15;
65:3;66:5;89:12;
163:17
**putting (3)**
40:19;69:18;104:4

**Q**

**Q1 (9)**
34:9;35:14;38:25;
40:2;44:13;49:14;
50:2,7;51:10
**Q2 (14)**
34:10;36:1;39:1,9,
21;40:2;44:13;45:14;
49:6,24;50:5,8,9,24
**Q3 (9)**
34:10;36:6;39:1,25;
44:13;50:5,8,9;51:12
**qualifications (1)**
28:24
**qualified (5)**
29:8;57:11,13;
179:16;182:5
**quality (7)**
31:21;50:10,17,23;
51:12,21;121:23
**quantity (1)**
31:21
**quarter (1)**
240:21
**quash (1)**
7:23
**question's (1)**
149:16
**quick (4)**
20:20;63:24;201:2;
206:25

**quickest (1)**
67:8
**quickly (6)**
34:16;36:13;106:6;
116:19,20;117:5
**quite (4)**
88:14;91:20;
124:13;235:20

**R**

**racking (1)**
108:15
**raise (5)**
6:12;19:22;59:20;
178:9;220:7
**raised (4)**
174:6;178:25;
180:4,6
**raising (2)**
122:12;242:4
**ran (5)**
144:22,23;156:21;
178:14;222:15
**random (1)**
29:21
**range (15)**
29:17,23,24;30:5,
13,21,22;31:2;33:25;
34:1,2,21;40:24;41:2,
5
**rapid (1)**
132:18
**rapidly (1)**
132:1
**rarely (1)**
140:24
**rate (2)**
39:15;132:18
**rates (1)**
116:7
**rather (4)**
44:5;150:2;169:3;
188:21
**ratio (1)**
114:20
**Re (1)**
168:18
**reach (3)**
88:11;231:12,12
**read (15)**
72:24;73:9;74:13;
151:4;170:24;185:1;
198:19;211:24;
213:15;217:1,21;
226:19;228:10,21;
236:7
**Reading (5)**
114:14,15;117:13;
121:5;197:8
**Ready (346)**
4:10,12;5:8,9,20;
6:18,19;8:20;11:4,6,

17,19;12:6,10,20,23;
13:4,21;14:1,7;15:21;
16:4,9;17:15,20;18:1;
19:13,20;20:7;22:3,6;
28:8,16,18,21,25;
29:3,9;32:18,20,24;
47:4;52:3,4,6,13,18;
53:3,5,8,16;54:12,20,
22;55:5,13,25;56:2,
13,24;57:18,20;58:7,
10,12;59:2,3,5,17;
60:4;61:9,13,15,17,
19,22;62:8;66:12;
70:24;71:8,14,15,16,
18;72:24;73:1,7,10,
13,22;74:7,12,15;
75:13,23,24;76:2,14;
77:16,20;78:9,14,15,
18,24;79:4;80:11;
81:1,4,6,7;82:14,18,
22;83:11,12,19,22;
84:4,6,14;85:4,6,10;
86:2;87:8,14,15,18;
88:7,14;89:5,21;
92:10,18;93:12;
95:19;96:14,18,20,21;
97:8,10,11,17;99:9;
100:3,10,13,14;
101:10;103:10;106:5,
19;107:21;109:3;
110:24;111:1,2,8;
112:17,24;113:22;
115:23,25;116:21;
118:15;119:5,15;
123:9,24;124:5,8,10,
11;125:11;128:4,17;
130:19,24;131:1,10;
134:10;138:1,2,7;
141:1;142:8;145:8;
149:3,4,20,23,25;
150:9,11;151:12,15,
19,21;152:5,7,21;
154:1,9,10,14,19,23,
25;155:6,8,10,12,15,
18,23;156:1,16,20,25;
157:1,6,8,13,17;
158:2,10;159:6,7,20,
24;160:3,15,17;161:2,
4,6,10,13,15,17,19;
162:1,3,9,14,20,23;
163:11,12,15,20;
165:12;167:21,23;
168:4,6,9,12,15;
170:21;171:25;172:2;
174:2,4;175:18;
178:2;179:2,6,8;
181:2,20,23;182:16,
19;184:19;186:19,25;
187:8;188:14,16,20;
189:12,15,18;203:25;
204:1,3;206:21,25;
207:1,12;209:23;
211:12;215:16;217:7,

17;219:24;221:1,10;
222:3,16,18,22;223:7,
9;224:6;225:23;
226:1,13;227:13;
228:24;229:4,6,13;
230:2,7,9,17;231:1,4;
232:3,9;235:1,4,10,
12;236:7,17;237:1;
238:7;239:6,19,24;
240:15;243:16,21,23,
25;246:16,17;247:5,
12,15,17
**Ready's (1)**
171:23
**real (15)**
20:20;41:6;58:15,
19;59:14;103:25;
145:15;192:4;195:14;
201:2;206:25;211:20;
212:2,5;213:13
**realize (3)**
154:23,25;155:18
**realized (1)**
110:13
**realizing (1)**
124:23
**really (30)**
5:16;11:15;17:1;
38:14;39:6;41:11;
62:25;63:9;66:24;
74:1;107:20;109:5;
113:25;114:18;125:9;
130:18;142:1;144:17;
145:4,6;147:16;
154:23;170:3,17;
187:3,9;193:9;
194:12;205:24;
242:15
**realm (2)**
83:21;205:25
**Realty (24)**
103:25;105:2,3;
129:16,18;130:2,4,5,
7;195:18,21;212:4,7,
10,14;213:6,8,18,25;
219:6,8,11,12,19
**reason (16)**
15:21;54:24;57:11;
74:2,19;75:25;78:16;
86:17;95:10,15;
104:4;127:2;173:11;
174:24;188:1;242:22
**reasonable (2)**
46:24;244:23
**reasonably (2)**
31:2,4
**reasons (3)**
19:5;105:1;166:13
**Reay (1)**
78:1
**rebut (2)**
18:18;19:4
**recall (9)**

8:8;17:23;19:9;
53:10;57:23;60:23;
63:9;72:17;130:15
**receivable (1)**
192:5
**receivables (2)**
176:16;177:21
**receive (1)**
110:11
**received (12)**
4:7;43:15;47:17;
66:12;104:1;126:10;
127:11,11;162:12,13;
199:23;246:20
**receives (1)**
22:12
**receiving (6)**
6:3;105:9,11;117:2;
214:18,18
**recently (1)**
134:23
**Recess (2)**
156:8;244:3
**recipient (1)**
202:22
**recognize (9)**
33:16;62:17;65:7;
71:19,22;73:25;
74:16;94:20;207:3
**recognizes (1)**
74:8
**recollection (4)**
64:16;80:19;120:2;
198:15
**recommendations (4)**
107:24;144:5;
148:8;150:24
**recommended (4)**
104:9;177:8;
216:19;217:10
**record (17)**
20:1;32:13,16;35:6;
59:25;78:9;156:12;
157:11;159:2,5;
163:3;167:19;172:10,
25;220:11;238:23;
243:24
**recorded (1)**
157:19
**records (19)**
6:7;53:21;67:21,21;
68:18;90:9,20,21;
93:25;136:11;158:2,
18,24;159:8;165:14;
172:8;189:2;238:3,6
**recruited (1)**
117:21
**recruiting (1)**
138:16
**recurring (1)**
168:25
**red (1)**
169:10

**redirect (5)**
52:3,5;204:2;220:1,
2
**Redman (1)**
55:7
**Redmond (82)**
15:4,9,13;16:10,12;
20:21;57:22;58:14;
59:17,23;60:1,5;
62:22;73:7,15,16;
74:16;77:7;78:21;
81:8;87:16;96:22;
98:10;115:19;122:9,
11;149:6;150:12;
153:17;160:18;
164:23;165:5;169:14;
170:18;172:6,16;
173:4,5;174:15;
175:10,17;178:19;
180:14;181:13,14;
182:23;183:2,9;
185:22;188:4;191:18;
201:14;204:4,24;
205:2,13,19,22,23;
212:12,17;213:3;
214:12,20;215:11;
216:14;218:19;219:4;
220:25;224:25;
225:17;226:16;
228:25;229:9;230:1;
231:14;232:17;
233:12;236:17,19;
246:22;247:11
**R-E-D-M-O-N-D (1)**
60:2
**Redmonds (1)**
157:19
**Redmond's (7)**
77:6,23;163:16;
178:5;195:21,22;
205:2
**reduce (2)**
40:13,15
**redundant (1)**
116:10
**reestablish (3)**
55:10;78:10,12
**reference (2)**
26:3;201:8
**referenced (2)**
161:7;194:14
**referral (1)**
111:19
**referred (4)**
22:14;33:20;38:15;
45:25
**referring (7)**
51:9;77:16;80:16,
19;126:25;137:19;
227:2
**reflection (2)**
82:7;143:18
**refreshes (1)**

64:16
**refused (2)**
8:23;163:20
**regard (20)**
12:3;15:2;44:3;
55:20,23;163:7,7,8,
10;164:16;173:11;
179:1;184:14;193:22;
200:24;221:15;
229:17;239:5,22;
247:8
**regarding (14)**
5:14;22:18;60:21,
25;61:12;102:22;
123:20;153:9;201:25;
220:24;227:16;
236:24;242:7;247:18
**regardless (1)**
211:6
**regards (5)**
60:11;205:25;
207:19;212:12;236:2
**Regency (3)**
195:16;212:3;
214:22
**regional (2)**
24:17;25:2
**register (7)**
200:9,11;215:8,9,
14,20,21
**registers (5)**
200:5;215:2,4,5,15
**registration (1)**
43:8
**regret (1)**
5:11
**regular (1)**
134:8
**regularly (3)**
56:9,11;138:23
**regulars (1)**
236:15
**regulations (2)**
4:19;123:13
**reiterate (1)**
207:20
**rejected (2)**
178:7;181:8
**related (7)**
6:13;136:6,11,20;
137:8;217:8;222:6
**relates (1)**
157:18
**relating (2)**
6:11;103:8
**relationship (8)**
21:5;58:22,24;
60:22;134:2,3;
144:12,13
**relationships (2)**
30:10;106:5
**relatively (1)**
118:18

**relax (1)**
117:17
**release (3)**
15:2,24;236:25
**relevance (5)**
83:8;84:11;149:2;
231:6;235:2
**relevant (25)**
6:24;9:1,12;13:14;
14:12;15:20;17:16;
18:25;19:4;71:12;
83:1;84:25;85:10,14;
86:9;149:18;179:15;
187:4;189:16;231:8;
235:19;236:21;
238:18;239:4;242:6
**relied (3)**
86:16;169:14;
227:11
**relief (20)**
7:14;72:5,8,14;
184:24;185:5,19;
197:6;198:22;201:12;
202:11;221:6,21;
226:19;227:3,23;
228:3,10;239:5;
245:13
**relitigate (1)**
17:1
**relitigating (1)**
224:4
**rely (2)**
169:16;172:5
**relying (3)**
15:25;16:1;228:23
**remain (4)**
19:22;22:4;59:20;
220:7
**remedies (1)**
170:5
**remember (19)**
62:23;66:3,4,14;
77:8,10,25;78:4;
80:18;89:16,17;
114:23;131:8;142:9;
148:3;194:3,12;
197:8;198:2
**remembered (1)**
218:6
**remembers (1)**
73:4
**remotely (1)**
189:16
**remove (1)**
158:25
**render (3)**
31:15,18,20
**rendered (1)**
52:8
**renewal (3)**
235:7;236:8,13
**renewals (2)**
236:14;239:2

**renowned (1)**
16:22
**rental (10)**
43:9,20;130:2,3;
199:24;214:10,15,19,
22;219:15
**reopen (3)**
17:4,14;178:8
**reorganized (1)**
213:8
**repayment (1)**
140:21
**repeat (2)**
61:21;206:15
**rephrase (1)**
90:11
**report (19)**
28:12,21;33:20;
34:10;35:7,9,11;
43:21;46:22;48:22;
158:24,25;159:1,4,14,
19,21,24;237:5
**reported (1)**
238:25
**reportedly (1)**
44:6
**reporter (1)**
205:18
**reports (2)**
139:14;191:5
**report's (1)**
160:6
**represent (12)**
8:20;10:2;18:6;
63:12;64:18;65:23;
71:1;92:8;150:3;
154:19;228:1;246:23
**representation (3)**
227:19;246:19;
247:7
**representatives (1)**
228:5
**represented (4)**
11:2;92:7;147:5;
246:21
**representing (3)**
10:23;212:24;
247:11
**represents (3)**
92:1,2,5
**reproduced (4)**
37:21;39:16;45:23;
46:2
**reproduction (14)**
35:7,14,16,25;36:2;
39:15;40:15;43:5,16;
45:13;50:10,23;
51:12,21
**reproductions (1)**
41:20
**request (9)**
8:1,7,8;43:2,2;
63:16;76:11;83:25;

84:2
**requested (2)**
6:22;66:14
**requesting (1)**
8:22
**requests (3)**
12:7;65:4,16
**require (4)**
11:13;16:13,14;
222:11
**required (4)**
21:14;117:16;
173:6;204:8
**requirement (3)**
10:12;27:8;174:19
**requirements (4)**
22:19;221:16;
235:15;244:20
**reraise (1)**
174:4
**reread (1)**
234:22
**res (6)**
178:4;179:8;180:2,
5,8;181:24
**research (1)**
222:4
**reserve (2)**
89:13;162:20
**reside (2)**
20:11;67:17
**residence (1)**
20:10
**resident (1)**
207:12
**residently (1)**
207:21
**residual (2)**
115:7;128:10
**resign (1)**
152:16
**resolution (5)**
46:5;178:14,17;
222:12,14
**resource (1)**
148:7
**resources (1)**
144:5
**respect (10)**
13:16;172:15;
173:5,9;223:15;
224:2;241:23;244:20,
25;245:6
**respectfully (3)**
111:7;121:9;142:9
**respond (2)**
162:21;229:16
**responded (1)**
214:15
**Respondent's (1)**
209:8
**response (9)**
6:7;62:21;78:19;

84:23;89:13;95:11;
133:7;188:24;189:23
**responses (1)**
160:18
**responsibilities (1)**
221:12
**responsible (6)**
56:21;151:6;
180:25;181:16;203:5,
6
**Responsive (6)**
65:3;66:5;68:7;
71:1;89:12,20
**rest (5)**
88:10;154:5;157:2;
226:4;228:13
**resting (1)**
162:18
**restraining (2)**
199:15;228:12
**restroom (1)**
156:21
**result (5)**
131:7;151:3,10;
164:6;208:21
**resume (2)**
188:13;204:16
**resuming (1)**
60:12
**retained (2)**
46:15;62:7
**retired (1)**
25:18
**Revenue (12)**
53:23;54:15;94:4,
18;95:8;98:12;116:4;
128:3;166:2,11,14;
193:7
**review (13)**
18:9;46:16;72:6,14;
76:17,19;93:5;136:6;
138:21;154:10;
156:16;226:22,24
**reviewed (8)**
18:5;42:21;46:20;
79:12;80:13;93:4;
226:25;233:3
**reviewing (1)**
82:7
**RFA (2)**
71:2;82:24
**RFAs (1)**
54:1
**rich (1)**
187:11
**rid (1)**
208:22
**ride (1)**
124:21
**right (124)**
4:3,11;7:4,11;
11:25;12:3,16;15:8,
10;18:14;19:11,21,

23;29:10;32:20;
35:17;36:3,7;38:6;
40:11,13;41:19,25;
43:12;48:25;49:9,15;
50:9;53:12,14;55:24;
57:20;59:21;65:19;
68:15;69:12;70:21;
74:13;79:5;83:12;
87:8,14;89:13;95:21;
96:1,18;97:14;98:11;
99:25;100:13,21;
101:23;102:15,17,24;
103:7,8,18;106:9,14,
18;108:9,13;112:1;
113:1;119:23;123:10;
127:8;129:14,19;
130:24;132:11,13;
136:12,20;138:24;
144:1;145:18;146:1,
14,16,19;147:8;
148:5;149:20;155:21;
156:2,14;159:3,12,23;
161:5,14;162:1,4,10,
15,21;164:3;165:21;
167:11,13,13;176:15;
178:18;182:4,5;
195:11,13;202:10;
203:12;207:2,21;
210:1,11,17;211:5;
219:15;220:8;222:7;
239:12,25;244:17;
246:4
**right-hand (2)**
35:13;41:24
**rights (3)**
176:7;178:6;196:6
**rise (1)**
156:9
**risk (2)**
35:18;185:12
**road (4)**
224:20;233:23;
242:10,19
**Rochester (1)**
23:13
**role (2)**
119:3;149:10
**room (1)**
142:24
**rough (1)**
124:21
**roughly (5)**
23:6;39:9;106:21;
141:17;152:23
**row (1)**
38:24
**Rowley (8)**
178:4;179:10;
180:4,7;204:21;
225:12;226:2;228:23
**Rudy (1)**
114:5
**Rule (10)**

11:12;116:9;163:4;
167:19;179:23;
235:19;237:18,19;
244:8;245:11
**ruled (8)**
15:4;57:2,8;159:8;
163:12;172:14;
173:21;221:15
**rules (10)**
6:8,11,17;7:3;
10:19,19,21;28:12;
173:22;235:20
**ruling (6)**
178:20,23,24;
179:7;244:14;245:7
**run (2)**
72:2;211:17
**running (6)**
105:2,5,7;123:1;
145:5;193:6
**rush (13)**
8:4;57:21;58:3,4,5,
15;60:7,14;88:23;
98:23;164:12;165:21;
167:6
**rushing (1)**
66:14
**Russian (1)**
240:19

---

## S

**safe (1)**
196:22
**sailed (1)**
239:18
**sales (42)**
112:16;118:8;
122:18;123:9,11,12;
136:20;137:15,15,17;
138:17,18,22,23,25;
139:1,1,11,12,19,22,
23,25;140:23;141:6,
20;142:7,12,14,15,16,
23,25;143:7,7,12;
145:9;147:15;177:22;
191:6,7;209:9
**salesperson (1)**
140:3
**same (57)**
10:15;11:18;18:1;
22:21;29:15,21;
30:14;31:23;32:11;
36:4,5;37:13,16,20;
38:8,10;39:2,22;
43:23;44:1,6,21,25;
45:3;47:3;50:21;54:9,
17,21;57:23;59:5,6;
60:25;65:12;66:2;
78:7;93:9,14;108:3,7,
8,12,25;109:10;120:7,
22,24;125:2;164:14;
180:5;188:1;209:24;

212:2;214:6;223:1;
231:2,4
**sample (1)**
46:1
**samples (1)**
44:13
**sanctions (2)**
247:18,25
**Santander (5)**
127:4;217:24;
218:7,7,13
**sat (1)**
172:7
**satisfy (1)**
227:7
**satisfying (1)**
124:25
**Saturday (2)**
119:2;132:24
**Saudi (1)**
24:3
**save (4)**
48:3;72:25;73:1;
216:7
**savvy (1)**
91:21
**saw (3)**
37:20;205:18;237:4
**saying (32)**
10:24;44:21,22;
45:9,9;67:12;80:16,
23;81:20;82:15;83:3;
86:12;87:4;101:19,
21;116:24;119:23;
130:17;131:9;138:17;
142:6;149:9;164:24;
169:15;190:2;207:24;
214:6;222:9;228:4;
234:16;238:17;239:5
**scale (2)**
31:21,24
**scaled (1)**
39:17
**scan (2)**
47:14,19
**scanned (1)**
47:17
**schedule (9)**
11:11;12:9;63:13;
94:14;100:4,15,25;
101:20,22
**schedules (5)**
64:18;71:3;100:4;
140:21;161:7
**scheduling (3)**
14:15;124:1;222:18
**schema (1)**
135:24
**School (10)**
106:8,13,18;107:5,
10;125:16;205:25;
206:3,7,12
**schools (2)**

123:1;229:9
**Science (2)**
21:15,19
**Sciences (2)**
24:20,25
**Scientific (2)**
22:7;46:25
**scientist (1)**
20:15
**Scientists (4)**
24:21;25:4,5,6
**scope (3)**
63:16;174:12;
223:17
**Scott (6)**
62:22;65:4;97:21;
165:16;168:1;220:12
**S-C-O-T-T (1)**
220:12
**screen (4)**
35:1;48:21;146:6,7
**scripts (2)**
209:2,9
**scroll (13)**
33:1;54:22;62:19;
64:11,13;65:9;71:23;
73:11,12;78:6;80:7;
99:18;201:4
**seal (2)**
76:8;185:9
**sealed (2)**
238:2,4
**Sean (1)**
191:3
**search (7)**
67:20;158:6,7,24,
25;159:1,4
**seat (2)**
20:4;175:14
**seated (2)**
22:4;156:10
**second (20)**
4:17;9:24;29:20;
36:1;65:1;129:22;
130:19;149:9;156:17;
162:7;174:13;179:10;
201:17;204:18;
206:14,19;217:18;
236:7;237:18;247:17
**secondly (1)**
4:25
**Secret (4)**
23:8;25:13;27:4,7
**Secretary (1)**
159:11
**section (9)**
25:1,24;27:5;
185:18;191:18;216:4,
24;217:23;237:7
**sections (1)**
24:16
**sector (1)**
23:1

**securities (1)**
216:5
**security (6)**
20:18;43:7;206:1;
217:4,5,6
**seeing (5)**
44:9;46:5;50:15;
77:25;78:24
**seek (5)**
9:13;53:20;55:14;
82:22;178:14
**seeking (7)**
5:7,17;71:9;84:14;
86:21;247:19,20
**seem (1)**
171:14
**seems (1)**
159:21
**seeped (1)**
127:4
**Segura (5)**
10:3,4;92:1;121:25;
134:20
**Seguro (76)**
10:25;11:3,19;
105:9,14,16;108:4,9,
11;109:11,13;110:2;
117:9,12;118:18,25;
119:1,16,18;120:7,14,
22,25;121:2;122:4,
15;123:7;124:15;
126:9,10;127:12,20,
22;128:13,15,23;
129:13,22;130:1,4;
131:25;132:1,2,18;
133:17;135:7;136:1;
139:10;141:5,15;
142:7,16;144:20,24;
145:11,20,25;146:4,
23;151:2,7;152:8,12;
157:20;177:2;189:21;
190:22;191:3,25;
193:13;204:5,9,11,15;
214:21;246:22
**Seguro's (2)**
119:3;144:19
**seize (1)**
176:15
**select (1)**
48:5
**selecting (1)**
48:2
**selectively (1)**
167:24
**self-employment (1)**
214:10
**sell (9)**
114:1,2;116:10,21;
120:25;121:1,1;
146:21;175:22
**selling (11)**
112:21;113:11,15,
17;121:10,15,24;

139:20;208:23,24;
211:8
**semester-long (1)**
21:13
**send (2)**
197:14;208:17
**sending (1)**
246:12
**sense (6)**
7:13,15;105:6;
106:5;118:13;181:17
**sent (15)**
4:10,21;6:5;11:4;
18:12;71:2;84:8,12;
86:4,20;197:16,17,18,
18;205:9
**sentence (5)**
80:17;185:21;
187:4;190:11;228:23
**separate (3)**
28:19;30:20;48:5
**separation (1)**
26:15
**September (8)**
44:19;63:6;67:3;
71:3;82:6;90:7;
100:20;108:18
**sequester (1)**
19:14
**series (5)**
26:6,7,9;30:3;38:21
**serious (1)**
59:14
**serve (2)**
4:18;218:12
**served (11)**
4:16,25;6:7,16;8:3;
9:21,23;11:6;16:14;
67:19;199:1
**server (2)**
139:2,3
**service (13)**
6:4,4,11;10:17;
11:2,5;23:8;25:13;
27:4,7;141:21;
145:12;146:14
**services (7)**
27:2;94:4,18;95:8;
150:20;151:11;204:9
**serving (1)**
108:21
**session (1)**
156:9
**set (7)**
29:21;58:25;62:22;
65:4;205:16,19;
245:23
**sets (2)**
44:4;147:10
**setting (2)**
118:25;120:6
**settlement (14)**
88:11,19;89:9;

90:10,14;102:9,10,12,
18;133:4;176:14;
223:4;225:11;233:5
**setup (1)**
119:17
**seven (4)**
44:4;138:16;
181:12;197:17
**seven-page (1)**
43:20
**seventy-one (1)**
28:2
**several (5)**
53:17;146:24;
205:6;210:16;229:7
**shall (1)**
150:19
**Shalter (18)**
15:2,19,20;16:18;
17:2;20:21;34:6,11;
43:23;45:16;46:12,
19;190:21;191:5,6,9,
11;228:16
**Shalter's (5)**
14:11;36:3;44:15;
165:4;191:4
**sham (5)**
185:22;186:4;
187:16;190:5;226:16
**Shannon (65)**
66:2;67:17;68:22;
69:4,13;74:3;76:4;
89:22;90:19,20,21;
92:18;93:4,24;96:3,4,
5,7,24;99:4,19;100:1;
102:19;103:2,11,21,
23;105:2,9,12,25;
107:18;117:13;
118:12,20;121:3,8;
124:19;125:15;126:3;
128:4;129:23;130:7;
132:21,24;134:23,24;
135:9,15;136:8,22;
137:12;139:15;
140:13;152:13;177:7;
188:12,12;197:18;
198:5;208:24;213:18;
218:24;219:7,15
**Shannon's (4)**
92:1;126:6;206:2,5
**Shanonn (1)**
152:16
**share (5)**
29:21;133:17;
135:4;136:3;140:8
**shareholder (3)**
177:18;180:12,13
**shares (2)**
152:8,9
**sheet (1)**
29:18
**Shield (2)**
112:18;113:16

Case 24-13093-pmm    Doc 105    Filed 11/05/24    Entered 11/05/24 13:48:50    Desc Main
In Re: Alan Christopher Redmond    Document      Page 274 of 280

October 1, 2024

**shift (1)**
139:24
**shifts (1)**
121:2
**ship (1)**
239:18
**shop (1)**
146:9
**short- (2)**
113:17;121:5
**shortly (1)**
132:3
**short-term (1)**
113:12
**shoulders (1)**
232:19
**show (44)**
15:22;16:19;28:8;
32:10,25;33:15;35:1;
38:9;43:11;45:1;
62:16;65:1,10;67:4;
70:21;77:21,22;86:7;
100:15,24;131:2;
134:4;143:15;157:23;
168:15,22;170:3,7,9;
171:7;181:4;183:2;
189:3;204:17,20;
206:17;207:2;211:14;
222:6,7;224:25;
237:19,21;240:5
**showed (4)**
164:22;188:12,12;
202:11
**showing (19)**
9:11;28:16,17,18;
42:2;65:24;66:8;
68:12;69:11,16;
86:17,20;135:17;
157:19;172:8,11;
189:3;237:5;245:3
**shown (7)**
44:4;77:11,14,17,
21;94:3;222:5
**shows (4)**
99:11;157:23;
169:9;225:17
**shtick (1)**
142:20
**shut (5)**
125:22;127:3,5,17;
218:8
**sic (6)**
143:14;190:12,15,
17,19,24
**sick (2)**
134:24;140:21
**side (19)**
10:22;17:17;31:16,
24;35:16;38:23,24;
41:17,20,24;42:10;
123:6;187:9,10,11,13;
189:1,4;223:14
**side-by-side (1)**

45:10
**sides (1)**
10:20
**sign (7)**
43:24;90:13;93:7,
16,16,18;240:17
**signature (55)**
20:18;29:17;30:16;
31:7;32:7;35:17,21,
22;36:3,7,25;37:16,
25;38:1,9,10,25;39:4,
7,20;40:5,20,21;41:7,
10,10;42:11;43:15,
24;44:12,12,15,16,18;
45:14,15,16,18,19;
48:18;49:9;50:19,22;
51:6,22;62:18;63:3;
65:10,14;71:24;
80:11;81:12;93:11,
14;240:18
**signatures (61)**
14:11;18:11;26:13;
27:17;30:3;33:13,14;
34:1,6,11,15,16,18,20,
23,24;35:19;36:11,13,
17,18;37:13,14,18,20,
23;38:15,18,19;
39:13;40:25;41:1,6,
13,17,21,24;42:1,3,4,
4,7;43:6;44:25;45:1,
3,5,6,8,22;46:10,11,
13,17,18;47:11,25;
48:25;50:17;51:17;
174:16
**signed (30)**
19:3;56:19;60:17,
20;62:2;88:8,9;90:11;
93:21;100:16,20,24;
108:8,10,11,25;
109:11,12;110:2,3,19;
125:4,8,12;180:11;
181:5;230:23;233:10;
237:10;240:11
**significance (7)**
31:13;43:13,14,18;
44:23,24;158:4
**significant (8)**
30:25;31:1,10,17;
110:14;121:15;
168:16;177:25
**signing (2)**
111:4;220:24
**signs (2)**
31:5;43:23
**similar (11)**
7:18;8:22;10:4;
36:14;110:8,10,16;
121:9;146:21;209:18,
20
**similarities (1)**
31:13
**simple (5)**
48:1;115:19;134:5;

228:6,7
**Simply (9)**
4:15,24;5:5;6:13;
13:11;33:21;72:24;
157:23;228:23
**single (6)**
163:21,22;168:19;
170:8;189:8;212:2
**Sinking (1)**
129:14
**sit (11)**
117:15;136:10,13;
138:3,8,14;143:12;
148:13;220:14,15;
243:20
**sits (1)**
200:9
**sitting (5)**
8:12;78:23;115:17;
146:14;199:18
**situation (5)**
9:18;11:9;33:12;
51:25;131:20
**situations (1)**
230:14
**six (6)**
132:16;138:16;
142:10;197:17;
205:11;229:4
**six-month (1)**
193:1
**sixth (1)**
247:2
**sixty (1)**
62:13
**Sixty-four (1)**
235:8
**size (5)**
37:8;40:9,13;41:4;
51:22
**sizing (2)**
41:7,11
**skip (1)**
73:23
**SKUs (1)**
121:4
**slide (1)**
37:7
**slight (1)**
139:24
**slightly (5)**
40:3;41:9;58:15;
120:9;177:21
**slow (2)**
65:3;147:16
**slowly (1)**
33:1
**small (3)**
111:22;115:7;224:3
**smart (1)**
145:4
**smarter (1)**
107:18

**Smith (2)**
4:1,2
**social (1)**
43:7
**Society (7)**
24:20,20,21,22,24;
26:5,19
**software (4)**
36:22;107:24;
118:17;125:17
**sold (6)**
110:11;120:22,24;
145:18;192:18;209:1
**sole (2)**
25:18;187:22
**solely (2)**
227:19;232:19
**solicit (2)**
146:18,20
**Solutions (7)**
165:5;167:6;
178:11;183:9;184:13;
202:23;203:9
**somebody (9)**
19:2;30:6;31:5;
32:5;34:21;47:17;
186:22;191:9;197:13
**somehow (2)**
19:2;56:6
**someone (3)**
142:22,25;143:9
**sometime (2)**
11:1;125:6
**sometimes (10)**
40:20;50:11;
105:18,19;113:3,4,6,
7;133:21,22
**somewhere (3)**
146:16;225:9;
232:12
**soon (1)**
117:2
**sooner (2)**
205:12;218:18
**SOP (1)**
144:1
**sophisticated (2)**
122:7;123:21
**SOPs (1)**
118:16
**sorry (41)**
49:12;53:4;54:13;
64:3;65:18,19;72:2,
12;75:18,19;92:18,
18;104:24;109:10;
112:11;115:11,25;
119:8,22;130:21,24;
131:10;138:6,7;
144:23;154:16,23;
155:15;156:6,20;
160:15,17;161:6;
178:2;183:16;201:15;
208:6;220:14,15,17;

234:5
**sort (7)**
24:14;26:25;27:12;
36:22;165:17;232:18;
235:25
**sorts (1)**
136:11
**sound (3)**
99:12;133:2;212:25
**sounded (1)**
81:2
**sounds (2)**
106:20;199:11
**source (3)**
46:1;66:1;73:15
**sources (7)**
9:13;200:1;214:9,
11,14,24;229:20
**South (2)**
24:2;210:23
**space (1)**
113:5
**speak (5)**
46:7,12;67:21;
68:23;242:25
**SPEAKER (5)**
151:24;152:2,6;
156:5;161:21
**speaking (1)**
142:22
**speaks (1)**
223:21
**special (22)**
72:5,8,13;107:4;
123:1;160:25;184:23;
185:5,19;197:6;
198:22;201:12;
202:10;221:21;
226:19;227:3,22;
228:3,10;230:18;
236:25;239:5
**specialized (2)**
23:21;37:2
**specific (8)**
23:11;25:20;27:15;
29:24;39:6;122:20;
162:21;233:25
**specifically (9)**
24:2,25;35:8,22;
141:23;174:8;229:21;
230:10;231:23
**specifics (1)**
233:9
**spectral (1)**
37:3
**speculate (1)**
70:16
**speed (2)**
54:3;70:24
**spell (3)**
19:25;59:24;220:10
**spend (3)**
78:14;182:1,2

**spent (1)**
120:5
**spiking (1)**
132:24
**spoke (1)**
190:2
**spoken (6)**
20:24;107:16;
221:5;228:18;230:1;
231:9
**sponsored (1)**
21:13
**spot (1)**
39:9
**spree (1)**
138:16
**Spring (2)**
129:14;194:1
**SQL (2)**
139:2,2
**ST (10)**
4:4,6,6,13,15;7:5,9;
206:7,12,13
**staff (2)**
203:19,20
**stage (6)**
26:9;30:18;119:5;
126:4;178:8;179:15
**stamps (1)**
71:3
**stand (21)**
17:10;19:14;55:21;
57:15,16;59:18;
73:20;86:1;87:7;
142:24;152:25;
156:15;169:7;170:23;
172:8;175:10;226:14;
239:12,16;242:14;
243:14
**standard (7)**
22:15,21,24;23:20;
25:25;26:1;144:1
**standardized (1)**
145:3
**standards (4)**
22:13,18;43:2;
46:25
**standing (4)**
19:22;59:20;
182:16;220:7
**standpoint (4)**
24:18,23;25:2;47:3
**start (19)**
12:17,19;13:25;
30:5;60:12;65:2;
92:23;107:13;110:4;
112:21;113:3,4;
117:12;132:2;139:14;
158:13;186:3,16;
246:12
**started (12)**
62:9;102:19;103:2;
117:9,10;124:14;

125:5;213:7,7,8;
234:8,18
**starting (5)**
107:17;108:17,19;
122:4;176:25
**starts (3)**
42:13,15;103:4
**start-up (1)**
106:6
**startups (1)**
134:10
**State (34)**
19:25;21:14;22:22;
25:7;27:3,22;54:24;
59:24;77:6,11;82:8,9,
23;86:4;91:23;147:6,
8,13,16,23;159:11;
167:2,4,5;178:23;
188:6;200:13;201:25;
211:16;220:10;
235:17;241:3;242:5,
11
**stated (2)**
131:19;244:8
**statement (26)**
59:1;119:10;
157:19,23,24;169:9;
186:1,11,12;189:9,19;
191:16,17;194:15,19;
197:5;199:9;200:21;
201:12,18;202:7;
209:21;212:11;
217:15;226:8;227:8
**statements (11)**
135:11,14,16,21;
138:12;187:12,20;
222:9;223:21;224:8;
226:17
**States (16)**
25:13;147:1,9;
197:8;198:8,20;
207:23;210:16;211:2,
3;222:1;228:22;
229:1;234:25;236:13;
238:23
**status (2)**
25:20;207:9
**statute (4)**
173:6;216:23;
217:1;237:7
**statutory (4)**
170:5;221:16;
223:19;244:20
**stay (11)**
7:6;122:21;123:4;
141:11;147:3;167:7;
178:14,18;223:8;
224:17;234:14
**stayed (1)**
32:16
**staying (1)**
121:16
**stemmed (3)**

234:11,13,14
**step (5)**
26:7;52:20;107:22;
153:17;220:3
**stepped (1)**
110:4
**sticking (1)**
49:20
**sticks (1)**
51:19
**still (27)**
25:16;41:6,18;
58:17;86:1,8;87:10;
111:3;113:9,15;
114:3,8,25;119:1;
131:24;144:13;
154:25;155:18;173:9,
21;175:11;188:23;
221:8;222:6,7;231:2;
247:20
**stipulate (12)**
29:1;55:2,22,23;
56:3;59:7;71:5;73:2;
84:2,8;158:16;184:19
**stipulated (2)**
56:25;71:8
**stipulating (8)**
58:1,8;59:12;71:10;
83:1,2,4,7
**stipulation (8)**
53:20;54:2;55:14;
57:12;58:6;71:6;
82:22;83:25
**stipulations (3)**
57:21;70:25;133:24
**stock (2)**
217:7,9
**stocks (1)**
217:9
**stop (8)**
74:25;109:7;
113:23,24;142:18;
187:12;211:8,8
**stopped (6)**
109:15;110:7;
116:20;117:2,6;193:4
**straightforward (1)**
170:17
**stream (2)**
166:11,14
**strength (1)**
110:12
**strike (3)**
178:3;188:24;
189:23
**stripped (2)**
202:11,15
**stripping (1)**
202:7
**stroke (2)**
40:1,1
**strong (1)**
18:10

**structure (1)**
213:25
**structured (1)**
131:17
**stuff (7)**
107:19,23,25;
118:14;122:2;225:19;
226:24
**stupid (1)**
35:18
**sub (1)**
139:13
**subject (2)**
55:8;178:18
**submit (3)**
26:2;164:2;174:23
**submitted (28)**
13:1;14:10;32:3;
33:2,10;34:9;41:21;
43:6;44:11,17;47:16;
50:14;174:13,16;
187:20;192:22;
199:12;222:1;235:6;
237:1,4,9,12,15;
238:23;240:6,9;
247:20
**submitting (2)**
16:21;164:3
**subpoena (16)**
4:7,11,15,18,24;
6:7;7:17,24;8:3;10:4,
4;11:1,4,10,15;154:20
**subpoenaed (1)**
164:21
**subpoenaing (2)**
5:5,5
**subpoenas (7)**
6:1,3,5,11,15;11:3;
12:7
**subsequent (1)**
5:15
**substantially (1)**
237:20
**succeed (1)**
147:21
**success (2)**
107:14,15
**successful (5)**
26:17;118:19,19;
134:11,13
**sue (1)**
179:21
**sued (7)**
17:7;166:25;167:1,
4,5;189:11;193:15
**sufficient (5)**
163:6;165:25;
221:14;222:5;227:8
**suggest (1)**
55:13
**suggesting (1)**
79:7
**sum (2)**

198:10;204:24
**summer (1)**
113:10
**Sunday (1)**
119:2
**super (1)**
139:14
**superimpose (9)**
34:17;36:18,20;
40:6,22;41:6,13;
50:19;51:17
**superior (1)**
234:15
**supermarkets (1)**
200:10
**supervision (1)**
23:4
**supplement (3)**
89:13;194:7,14
**supplemental (4)**
194:18;200:25;
224:19;233:20
**support (7)**
97:1;164:6;168:16;
224:8;226:8;227:8;
229:10
**suppose (2)**
172:20;188:23
**supposed (9)**
6:2,16;8:18;56:10;
110:17;133:20;
178:23;205:21;
240:10
**supposedly (2)**
14:10;173:1
**sure (106)**
4:10;9:8;11:3;
18:23;24:2;25:9,16;
29:13;32:14;33:9;
35:12;36:16;37:13;
40:11;44:10;60:16,
23;61:23,23;62:1;
63:20,23;64:7,20;
65:6,12,13;66:25;
67:11;68:5;69:21,24;
70:23;72:15;75:8;
78:1,7;79:2,12;80:1,
10;81:4,6,13,13;
83:17;87:3;92:24;
93:19;100:5;101:3,7,
9,11;108:7;110:24;
113:16;114:5;115:8;
116:23;117:1,4,8;
118:1,3;120:2;
123:10;124:16;
131:12;138:1,1;
139:7,12;142:3,4;
145:24;147:2;148:15;
149:4;150:16;152:18;
154:4,7,11,18,20;
156:19;157:6;162:5;
168:15;176:2;198:6;
201:3;202:2;205:15;

**eScribers, LLC**

207:24;210:12;211:4;
213:23,23;218:14;
232:24;238:9;239:21;
245:20,24
**surprise (2)**
6:23;7:2
**suspend (1)**
12:12
**suspended (3)**
210:16,19;240:8
**suspicious (1)**
170:9
**sustain (1)**
237:22
**sway (1)**
244:21
**swears (1)**
169:16
**SWG (1)**
22:15
**SWGDOC (3)**
22:10,12,18
**S-W-G-D-O-C (1)**
22:10
**SWGs (1)**
22:14
**SWORN (5)**
19:24;27:25;59:23;
218:1;220:9
**synergy (1)**
124:19
**system (3)**
125:18;146:5,5
**systems (5)**
117:15,20;118:17;
143:25;230:5

**T**

**table (1)**
155:2
**tail (3)**
50:3,5,7
**talent (2)**
114:14;120:13
**talented (3)**
123:21,23;191:2
**talk (13)**
7:13;10:18;12:19,
21;67:3;69:5;91:22;
92:10;103:4,21;
105:12;139:23;
199:11
**talked (12)**
4:22;61:3;70:13;
76:14,25;89:3;94:21;
101:2,16;104:18;
231:7;232:12
**talking (19)**
10:12;61:6;66:20;
72:9;89:24;91:17,25;
92:22;95:17;110:22;
111:7;114:24;122:6;

137:3;145:2;148:21,
23;233:4;242:12
**taper (1)**
40:1
**task (1)**
141:23
**tax (32)**
5:6;6:7;53:21,24;
54:10,11,15,23,24;
86:7;94:2,4,5,7,10,13,
16,17,18,20;95:4,7,
13;98:3,6;99:16;
166:2,3,4;169:18,19;
171:8
**taxes (3)**
99:11,12;166:7
**taxing (3)**
5:6;94:22;172:23
**taxpayer (1)**
55:3
**team (2)**
142:23;143:7
**technical (1)**
45:24
**technically (1)**
140:2
**Technology (2)**
23:13;143:25
**teleconference (3)**
9:12;18:21;174:9
**Teleglobe (1)**
230:10
**telling (4)**
89:19;134:24;
228:2;241:18
**tells (1)**
118:20
**temperature (1)**
148:14
**temporary (3)**
199:15;228:12,12
**ten (7)**
11:11;29:17;60:22;
106:2,3;107:25;208:3
**tenancy (2)**
213:10;214:1
**tenants (3)**
104:2,4,18
**tend (2)**
15:18;224:24
**term (10)**
31:25;33:7;45:24;
47:2;74:10;100:11;
113:18;121:6;214:11;
215:4
**terminate (2)**
113:25;134:18
**terminated (1)**
16:13
**terms (6)**
13:1;46:23;56:16;
57:15;150:17;216:4
**test (9)**

26:1,11;27:7;
169:24,25;170:4;
171:4,5,6
**testified (33)**
16:10;17:6;27:18,
21,23;47:10;55:5,7;
57:22;58:14;101:18;
103:12;164:10;
172:18;175:17;181:2;
192:2;205:7;211:4;
226:1,2;228:25;
229:3,7,8;232:3;
234:4,6,10;236:10;
238:24;240:12,15
**testify (4)**
14:10,12;178:19;
189:6
**testifying (1)**
236:24
**testimony (34)**
12:25;16:11,23;
18:3;27:25;28:3;
34:20;50:11;57:23;
59:6;90:24;97:7;
125:21;137:14;139:4;
153:9;155:9;165:9,
13,14,15,17,19;173:4;
178:3;201:20;215:11,
15;224:2;234:16;
236:17;239:21;
244:18;245:8
**testing (5)**
26:6,9,23,25;27:2
**tests (2)**
27:2;169:5
**textbook (2)**
27:13,14
**texted (1)**
101:8
**texts (1)**
45:18
**thankfully (2)**
132:20;144:12
**that'll (1)**
157:7
**therefore (1)**
15:14
**thereof (3)**
57:12;85:14,14
**thinking (3)**
101:9,25;188:15
**third (8)**
4:1;9:22;10:23;
37:11;120:1;154:19;
162:7;180:11
**third-party (4)**
122:19;145:14;
176:4;192:25
**thirteen (5)**
6:1;108:2;117:18,
18;138:22
**thirty (1)**
118:9

**thirty-two (3)**
222:1,1;236:12
**though (15)**
44:6;55:6;56:2,3;
57:7;86:20;105:22;
108:24;112:25;
128:13;142:3;145:17;
181:10;223:18;224:1
**thought (9)**
6:20;67:23;73:5;
104:20;105:6;114:12;
155:16;215:7;246:25
**thousand (2)**
71:21;149:19
**thousands (4)**
118:10;141:10;
143:12;229:8
**three (50)**
12:4;17:25;24:16;
26:19,20;33:1,5;34:4,
5,9,10,14;36:24;39:3,
13;41:17,20;42:19;
44:10,13,13;47:12;
48:5,24;51:17;54:5;
74:6;76:5;86:7;89:19;
90:16;91:11;102:15;
103:15;113:17;114:7;
119:4;122:12;129:2,
5;138:18;140:1;
163:25;167:14;
169:19;171:8;172:23;
182:1;199:12;205:12
**three- (1)**
225:10
**threshold (1)**
179:15
**throughout (4)**
24:4;27:22;43:20;
75:10
**Thursday (1)**
90:12
**ticked (1)**
101:15
**ties (1)**
221:19
**tight (2)**
9:17;12:9
**till (2)**
215:22,23
**tilt (2)**
40:21;48:6
**timber (2)**
195:24;196:6
**timelines (1)**
233:6
**times (22)**
16:12;27:25;29:18;
46:2;91:20;96:7;
103:6;114:18;119:4;
120:5;131:15;135:15;
141:17,19;205:6,8;
226:22;229:7;235:9;
236:23;239:2;241:19

**timing (1)**
170:10
**title (3)**
20:12;63:22;217:1
**today (65)**
5:13;9:2,6,15;
10:11,19;12:2,5,9;
15:20;16:19;18:20,
24;19:9;28:2;46:8,23;
49:4;52:8;62:13;85:2,
15,25;89:19;97:4,12,
14,21,24;98:4,7,11,
13,15,17,21,21,23,25;
99:2,9;149:5;154:21;
155:14;166:10,22,23;
169:12;172:6,15;
173:12;189:14;190:9;
191:22;199:18;
200:19;215:11;223:6;
235:22;237:2;241:7;
242:10,15;244:18;
245:7
**today's (3)**
5:21;239:21;242:12
**together (13)**
67:16;72:16;76:5,6;
81:25;84:20;93:4;
103:3;123:3;131:13;
208:12;226:21;
244:25
**told (17)**
16:12;18:14;86:5;
101:21;104:7;118:5;
127:6;135:10;169:14;
172:10;174:10;
205:18;212:24;
213:10;218:4;228:7;
233:18
**ton (1)**
124:24
**Tonya (5)**
44:12,15,18;45:4,
18
**took (9)**
23:15;27:6;56:18;
93:24;107:22;109:16;
119:13;125:3;130:25
**tool (2)**
48:15,15
**top (25)**
5:3;34:18;36:18;
37:2;38:5,25;40:6;
42:9,10,14;43:12;
44:13;49:9,15,24;
50:2,7;51:17;62:19;
63:25;65:2;72:1;
139:19;140:3;166:10
**totality (4)**
150:1;169:1;224:3;
244:24
**totally (1)**
242:18
**touch (1)**

**toward (2)**
48:10
55:14;212:17
**towards (1)**
125:6
**toxicology (1)**
22:17
**track (2)**
63:2;118:3
**trade (1)**
23:7
**traffic (1)**
237:14
**trainer (2)**
23:4,5
**training (11)**
22:18,21,24;23:2,3,
10,11;25:25,25,25;
120:19
**trainings (1)**
23:12
**trait (1)**
235:25
**transactional (1)**
230:12
**transcript (2)**
57:24;82:23
**transfer (8)**
103:23;191:24;
193:12;196:24;197:3;
198:10,13,23
**transferred (8)**
191:19;197:12;
198:7,16;224:25;
225:18;229:2,7
**transferring (7)**
197:7;198:20;
199:7,20;225:6;
228:22,25
**transfers (3)**
9:11;126:11;127:12
**transform (1)**
48:6
**transparency (3)**
37:12;48:4,17
**transparent (1)**
48:3
**transpired (1)**
233:25
**transpose (1)**
48:11
**transposition (1)**
45:24
**travel (1)**
18:22
**traveled (1)**
23:22
**trial (3)**
157:4;189:1,5
**tricky (3)**
73:11;234:20,21
**tried (1)**
181:7

**TRO (16)**
187:5,12,19;
189:10;197:6;222:8,
11,25;223:6,11;224:4,
5;227:4,16;228:11;
247:24
**trouble (2)**
216:7;222:18
**true (10)**
35:6;66:17;100:25;
101:5;143:18;186:1;
191:16;201:18;
209:12,13
**truly (2)**
155:15;159:2
**trust (2)**
95:25;227:10
**Trustees (1)**
246:11
**truthfully (1)**
236:24
**try (23)**
5:12,12;8:25;18:18;
56:5;85:12;86:11;
96:3;103:21;106:5;
135:19;140:13;141:8,
11;144:23;147:3;
170:12;187:18,23;
207:2;229:13;235:25;
240:20
**trying (28)**
9:15;12:1;16:19;
74:21;79:4;80:18;
84:10;86:18;113:2;
115:24;119:6;130:9;
136:16;145:9;147:21;
170:7,9,21;178:7;
180:12;181:5,11;
189:21;206:15;
218:12;232:4;235:16;
240:17
**Tuesday (1)**
137:5
**turn (13)**
36:8;37:9,10;38:11;
41:14;43:3,17;44:8;
45:11;48:17;86:14;
104:24;189:4
**turning (1)**
170:18
**twelve (6)**
11:11;106:2,3;
108:2;168:21;218:18
**twenty (1)**
31:8
**twenty-four (3)**
5:2;11:16;66:25
**twice (5)**
82:15;119:11;
141:1,6,20
**two (57)**
4:19;12:4;18:4;
23:3;29:14,20,22;

35:15;38:7;39:11,22;
41:9;51:20;62:8;66:1,
9;67:2;68:13,21;70:1;
78:3;86:8;88:24;93:9;
95:6,8;99:25;101:14;
109:4;113:17;114:7;
118:8,25;119:4,17;
120:5,5;127:2;129:2,
5;131:8,19;132:14,
17;141:19;142:7;
152:4;164:20;171:22;
172:9,11;179:8;
180:11;193:22;200:1;
244:19;246:17
**two-party (3)**
171:12,13,23
**two-year (1)**
25:25
**tying (1)**
149:1
**type (6)**
24:9;26:1,22;39:15;
120:24;121:11
**types (2)**
43:10;120:22
**typically (2)**
20:16;245:23

## U

**UC (2)**
94:17;95:7
**UCC (3)**
157:22;160:6,8
**UCC-1 (5)**
157:24;160:10;
176:9,10,14
**UCC-1s (1)**
159:1
**UCCs (4)**
159:13,19;160:2;
162:6
**UK (1)**
24:22
**ultimately (1)**
199:16
**umbrellaed (1)**
25:3
**Um-hum (57)**
62:20;64:12,15;
65:11;66:7;72:23;
73:24;75:21;78:8;
79:6;80:4,6;82:21;
89:11,15;92:12;94:6,
15;95:3;96:9;98:20;
99:20;100:22;126:18,
23;127:9,16;129:12;
131:4;132:15;133:8;
184:6,11;185:13;
195:15;198:1,4;
199:14;204:19;205:1;
206:11,16,18;211:15,
18,23;213:24;216:12,

22,25;217:20;218:3;
219:9;228:8;233:11,
14;237:25
**unable (1)**
97:4
**unclean (2)**
18:25;174:20
**uncommon (1)**
92:3
**under (38)**
5:3;6:17;23:3;25:3;
28:12;43:12;54:5;
81:25;85:17;86:12,
14;131:16;133:3,18;
149:25;150:21;163:4;
169:1,10,14,16;172:6;
173:2,6;174:6;
175:11;179:3;180:14;
185:9;211:21;212:8;
232:17;235:19;237:6;
238:18;239:4;240:11;
241:23
**underlying (3)**
181:7;182:9;223:21
**undersigned (1)**
133:4
**Understands (1)**
122:5
**Understood (19)**
7:4;42:23;53:14;
59:13;85:9;152:5;
153:13;155:19;
160:11;166:19;172:1;
173:16;175:9;182:18,
21;205:10;224:23;
242:21,24
**undertake (1)**
76:20
**underwriting (1)**
123:17
**underwritten (1)**
192:23
**undisputed (39)**
15:15;56:11,17,25;
57:8;65:22;66:9,18;
67:4,14;68:13,20;
69:8,11;86:6,8,10,13;
87:25;88:6,16;97:18;
101:13,14,17,24;
102:1,17;163:22;
165:9,12,13;167:25;
169:17,19,20;171:2,8;
233:13
**unemployment (3)**
94:3;98:6;166:3
**unexpected (1)**
119:7
**unfortunately (4)**
9:18;107:12;
110:12;218:8
**UNIDENTIFIED (5)**
151:24;152:2,6;
156:5;161:21

**Uniform (1)**
157:18
**unique (1)**
29:24
**Unit (1)**
152:17
**United (7)**
25:13;197:8,13;
198:7,20;228:22;
229:1
**UnitedHealthcare (1)**
112:18
**universities (1)**
21:22
**University (3)**
21:14;23:16;206:1
**unjust (2)**
180:3,7
**unless (9)**
58:20;83:8;113:25;
137:12;148:25;
153:20;222:10;
223:10;243:14
**unlike (1)**
33:9
**unliquidated (3)**
179:3,11;181:23
**unpaid (1)**
171:8
**up (60)**
5:18;17:10;18:14,
21;32:14,15,17;39:17,
20;42:2,13;48:4,7,21;
50:2;51:10,16;63:11;
70:10;73:20;91:18;
101:8;107:8;108:15,
17;110:19;111:4;
119:1;120:6;127:4;
132:24;134:4,22;
135:1;146:6;147:10,
18;148:24;149:18;
161:13;164:22;
168:23;170:3;182:24;
187:14;188:25;
191:18;203:3;205:16,
19;217:1;221:24;
222:15;223:3;224:15;
225:19;226:4,17;
230:23;245:23
**update (2)**
246:6;247:18
**updating (1)**
16:14
**upon (15)**
16:15;20:16;29:14;
31:14;37:17;40:16;
82:7;103:24;156:16;
170:24;177:13;
186:10,11;187:5;
228:23
**upper (1)**
38:5
**upstairs (1)**

138:15
**upswing (1)**
134:25
**upward (1)**
42:15
**use (15)**
27:5;36:22;47:2;
48:15;62:9;83:8,16;
144:18;157:25;
163:20;176:22;177:5,
7;240:12,17
**used (15)**
23:13,16;26:1;27:3;
36:25;38:16;47:15,
18,19;143:13;144:15;
169:6;203:18,19;
240:13
**user (1)**
139:13
**uses (3)**
129:13;177:2;
240:15
**using (6)**
48:14;53:1;100:11;
161:13;209:9;235:25
**usually (4)**
37:23;113:22;
114:2;142:11

## V

**vacation (2)**
76:6;128:12
**vague (7)**
215:3,5,6;216:20,
21;217:5,10
**vaguely (3)**
71:22;135:12;194:5
**valiant (1)**
68:8
**valid (1)**
76:12
**validate (1)**
76:3
**validity (1)**
74:19
**value (10)**
107:23;128:3,11;
132:19;135:19;
181:12;237:20;238:6,
9;241:18
**Valz (5)**
201:14;212:24;
213:3;214:3;217:12
**variation (22)**
29:17,23,24;30:6,
13,21,22;31:2;33:25;
34:2,2,19,21;40:24;
41:2,5;42:2,5,20;
43:11;44:4,5
**variations (5)**
30:9,17;40:10;42:7;
45:2

**variety (3)**
23:12,16;43:10
**various (9)**
23:19;24:4;70:12;
87:22,22;96:25,25;
144:6;203:22
**vast (1)**
168:23
**vehicle (1)**
43:8
**veil (1)**
180:13
**vendor (1)**
146:4
**vendors (3)**
144:6,9,16
**verdict (2)**
163:6;204:21
**verification (4)**
26:2;80:12;81:12;
145:11
**verify (3)**
25:24;26:8;44:3
**verifying (2)**
26:7;63:4
**versa (1)**
105:21
**versus (7)**
31:7;39:17;46:3;
179:12;238:5;241:17;
245:10
**vertical (2)**
40:17,18
**vice (2)**
105:21;138:20
**vice-president (1)**
191:2
**video (1)**
37:3
**view (2)**
35:20;36:11
**vigorously (1)**
69:13
**violated (1)**
176:14
**violation (1)**
237:18
**Virginia (1)**
23:16
**vitae (1)**
28:6
**volatile (1)**
113:5
**voluntarily (5)**
135:5;165:23;
166:12,12;170:18
**voluntary (1)**
171:20
**VSC (3)**
37:4,4,6

## W

**wait (6)**
6:24;156:6;157:2,3;
179:5;222:24
**waiting (4)**
85:1,5;167:16;
204:15
**waiver (2)**
212:1;230:19
**walk (4)**
71:16;73:5;140:3;
147:14
**walked (2)**
163:22;187:15
**Walsh (25)**
106:11,11;107:16;
120:4,17;141:13;
147:3,25;185:24;
186:4,7,13;188:5,8;
189:1,5;190:6,9,19;
204:5;207:6,10,12,15,
18
**Walsh's (3)**
119:5;207:9;236:18
**wants (12)**
58:3;71:5;72:24;
84:24;124:1;143:10;
150:2;159:10;169:3;
170:22;171:4;221:24
**Washington (6)**
147:6,8,13,16,23;
210:21
**way (34)**
5:1;7:16;11:10;
15:22;38:18;43:23;
44:23;45:7;49:10;
51:1;65:9;73:4;90:18;
95:18;103:5;106:7;
109:23;116:10;
121:25;128:5,12;
132:20;133:7;135:19;
187:1;197:22;203:3;
204:11;206:12;
208:16;235:22;237:3,
10;241:1
**ways (2)**
36:24;189:22
**Web (12)**
88:18;90:3;91:14;
92:14;93:13;98:15;
101:4,6,13;144:11,14;
164:17
**Wednesday (2)**
18:4,12
**week (28)**
9:12;11:6;14:9;
18:13,16,22;21:4;
24:10;67:16,20;68:6;
90:13,15,16,25;
102:23;106:16;
109:25;117:14;119:2,
4;125:13,14;138:14;
139:20;140:7,16;
174:10

**weekend (1)**
8:4
**weeks (5)**
18:4;69:14;78:3;
140:1;164:20
**weight (4)**
82:19;182:12;
236:23;242:18
**welcome (3)**
175:5,6;234:22
**weren't (10)**
5:12;6:16;9:20,23;
43:1;49:3;121:12,16;
164:18,21
**West (1)**
23:16
**Westlaw (1)**
230:8
**what's (23)**
9:2,6;13:1;35:7,18;
39:8;43:13;44:22;
83:13,13;84:2;
101:25;112:19;
120:10;145:1,17,19;
154:9;188:21;204:20;
206:17;214:10;217:6
**whenever (7)**
6:4;25:16;39:14;
45:17,21;48:14,16
**wherever (1)**
70:18
**white (2)**
48:2,11
**who'd (1)**
110:19
**whole (16)**
6:14;19:25;32:4;
39:7;111:7;120:11;
128:8;142:23;169:13;
170:10;173:24;
187:13;220:10;
223:13;230:14;
236:17
**wholly (1)**
227:11
**who's (10)**
17:4;89:22,23;
122:8,12;137:15;
138:20;139:20,22,23
**whose (3)**
5:6;169:3;190:12
**wife (26)**
67:7,7,9,21,24;
68:23;87:23;92:4;
105:19;106:8;119:5;
126:4;128:2,11;
132:8,9,12;133:21,23;
134:24;140:20;
166:13;172:18,19;
190:2,3
**willing (5)**
86:25;89:3;174:23;
239:22;241:7

**wind (4)**
107:17;108:18,19;
109:17
**winding (4)**
108:14,16;109:2,2
**wire (3)**
127:10;129:10;
204:25
**wired (1)**
204:24
**wires (3)**
126:10,10;127:11
**wish (1)**
164:5
**withdraw (3)**
215:2;223:3,5
**withdrawn (3)**
187:5,14;240:6
**within (13)**
11:15;25:21;29:16,
23;34:1;46:24,25;
62:12;83:21;121:4;
188:16;216:3;225:14
**without (6)**
8:13;10:6;37:15;
139:5;181:14;212:1
**witness (55)**
5:1;13:14;14:5,8;
15:23;19:6,8,12,24;
20:2,5;29:8;32:22;
52:21,25;53:8,10,18;
59:22;60:1;61:21;
72:23;74:24;75:2,5,8,
11,14,16,18,21;77:14;
82:21;83:9;86:1;
87:11;104:17;112:11,
15;152:22;153:18;
157:22;158:12;164:9;
175:13;203:23;220:4,
5,9,12,15;229:14;
240:23;242:17;
243:19
**witnesses (10)**
12:25;13:23,25;
19:15;58:12;154:3,
11;170:8;244:6;245:9
**word (5)**
72:21;73:9;146:20;
163:20;210:3
**words (6)**
63:19;69:6,18,22;
169:10;198:19
**work (39)**
5:4,12;6:24;9:2,15;
23:22;24:1,9;25:7;
26:3,15;27:8,9,12;
66:14;87:22;88:7,21;
89:4;97:1;107:6;
113:6;117:15,16;
120:7;124:17;125:16,
25;127:24;128:13;
131:24;134:10;136:7;
139:14;143:20;

In Re: Alan Christopher Redmond

October 1, 2024

147:22;166:7;190:24;
219:21
**worked (15)**
23:22;24:3,3;64:23;
68:9;88:21;96:24,24;
125:11,12,22,24,24;
190:22;208:12
**Workers (2)**
98:17;165:7
**workflows (1)**
148:9
**working (31)**
21:4,8;22:7,15;
47:24;58:16;62:23;
66:4;77:10;89:17;
105:5;106:15;107:2,
3,21;118:12,22,25;
119:2,12,16,24;120:3;
125:2,9,17;128:2,6;
133:20;212:22;213:9
**works (9)**
106:8;116:20;
128:5,12;149:6;
171:21;191:3;208:17;
225:15
**workshops (1)**
23:19
**world (3)**
118:10;134:9;145:7
**worthy (1)**
206:9
**wound (5)**
108:3,7,12,24;
116:11
**write (5)**
29:15,16,17;97:16;
132:8
**writer (9)**
30:12,14,19;33:25;
34:23;42:1,12,15,18
**writers (1)**
30:19
**writes (1)**
29:23
**writing (5)**
33:13;44:3;88:13,
25;89:1
**writings (2)**
33:14;43:2
**written (10)**
26:9,11;34:23;42:1;
46:18;60:14;61:1;
90:2;102:10;169:12
**wrong (6)**
65:19;113:16;
130:21;183:18,19;
237:16
**wrongdoing (1)**
19:1
**Wyndcroft (2)**
205:25;206:3

**X**

**X1 (1)**
44:17

**Y**

**year (42)**
23:18;27:1,7;64:9;
68:9;82:6;90:7;97:3;
106:17;109:4;111:3,
8,8;118:25;119:17;
120:5;127:2,18,19,20,
23,24;128:12,16;
129:4,6,9;130:13;
131:14;132:16;135:5;
141:1,2,7,19;172:16;
213:23;215:13,20;
218:2,5;234:8
**years (53)**
23:3,6;27:14;31:8;
60:22;62:8;66:1,10;
67:2;68:13,21;70:2;
74:6;95:6;99:16,25;
102:15;106:2,3;
107:25;108:2;109:4;
117:18,18;118:9,25;
119:17;120:3,5;
125:20;128:25;129:1,
2,5;131:19;132:14,
17;138:22;142:10,17;
171:13;172:9,11;
181:6;193:23;198:17;
207:11,15;208:3;
210:22;219:11;237:6;
240:3
**Yep (4)**
64:12;156:13,24;
183:20
**yesterday (16)**
4:7,21;8:21;10:10;
15:12;16:11;17:6;
56:19;100:20,24;
170:8;234:4,7;237:3,
4;238:24

**Z**

**zero (10)**
86:6,9;110:8;
122:14,21;123:4;
172:8;211:5,6;218:21

**1**

**1 (12)**
14:18;33:21,25;
35:15;36:1;38:23;
49:14;63:11,21;
64:17;65:16;124:2
**1:00 (1)**
152:23

**10 (4)**
44:8,9,10;196:15
**100 (1)**
61:23
**10-2 (1)**
72:4
**1077651 (1)**
230:8
**109,000 (1)**
106:17
**11 (6)**
45:11,13;171:19,
20;179:20;244:11
**12 (1)**
218:6
**12:58 (1)**
152:4
**12b6 (1)**
159:9
**13 (2)**
183:3;217:1
**13th (2)**
44:19;183:20
**14 (4)**
27:16;183:22;
199:23;214:9
**15 (4)**
184:10;200:13;
215:1;244:8
**16 (3)**
65:18,20;216:2
**17 (1)**
237:6
**17.5 (1)**
177:23
**18 (7)**
94:2;185:5;236:5;
238:13,18,21;240:3
**19 (2)**
162:11;200:21
**1982 (1)**
240:3

**2**

**2 (7)**
35:12;36:2,5;160:1;
185:18,18;195:5
**2,500 (4)**
197:24,25;198:15;
205:6
**2:00 (3)**
153:20,23,25
**20 (6)**
81:9;157:8;162:11;
197:24;200:24;201:9
**200 (2)**
128:18,20
**2005 (3)**
195:16;212:3;
214:22
**2007 (2)**
124:22,22

**2008 (1)**
21:10
**2009 (1)**
118:11
**2010 (1)**
118:11
**2013 (1)**
198:18
**2014 (5)**
185:16;196:2,3,24;
230:8
**2015 (1)**
67:1
**2016 (1)**
67:1
**2017 (1)**
198:18
**2018 (4)**
67:1;89:25;108:15;
116:6
**2019 (22)**
82:25;89:25;109:9,
25;110:22;111:3,6,
24;112:25;113:4,7,10,
20;114:4,11,22;
115:1;116:4,7;
124:23;192:3;211:10
**202 (1)**
168:21
**2020 (19)**
102:14;108:11;
109:9,12,22;115:6,12;
116:4,13;117:2;
125:12,12;141:16,22;
142:3,6;209:9;211:5,
10
**2021 (10)**
77:3;99:12;102:14;
116:4;129:22,25;
178:4;179:10;209:10;
214:2
**2022 (8)**
67:3,13;99:12;
129:20,24,24,25;
193:17
**2023 (1)**
99:12
**2024 (8)**
67:13;183:11,14,
15,20;184:6;200:16,
19
**20th (1)**
125:5
**21 (5)**
131:3;157:9;162:5,
11;217:16
**21st (1)**
27:15
**22 (3)**
100:9,10;162:13
**22nd (2)**
110:3;125:5
**24 (1)**

184:3
**249 (1)**
169:4
**27 (1)**
71:3
**27th (3)**
63:6;82:6;90:7
**2B (1)**
38:25
**2E (1)**
4:22

**3**

**3 (7)**
35:24,25;36:5;
160:1;195:9;201:12;
217:23
**30,000 (1)**
206:13
**300 (1)**
199:1
**30th (1)**
100:21
**32 (6)**
235:6,7;238:23;
239:1;240:24;241:19
**341 (1)**
168:21
**345 (1)**
230:11
**35 (2)**
202:23;203:11
**357 (1)**
168:18

**4**

**4 (7)**
35:8;36:4,5;119:5;
126:5;160:1;195:11
**4,000 (1)**
198:15
**4,500 (2)**
219:14,15
**403 (1)**
237:19
**411 (1)**
169:4
**45 (1)**
11:12
**48 (5)**
63:12;64:18;65:23;
89:8;94:3
**493 (1)**
230:11
**4th (1)**
77:3

**5**

**5 (6)**
36:8,10;38:23;

Case 24-13093-pmm    Doc 105    Filed 11/05/24    Entered 11/05/24 13:48:50    Desc Main
In Re: Alan Christopher Redmond    Document        Page 280 of 280

October 1, 2024

41:22;195:13;211:19
**5,000 (1)**
198:13
**50 (2)**
163:4;167:19
**504 (1)**
168:25
**51 (3)**
157:14;162:6,11
**52 (5)**
54:9,17,24;157:14;
162:11
**53 (12)**
54:9,11,13,17,22,
25,25;55:3,3;157:14;
162:6,11
**54 (1)**
162:11
**56,000 (2)**
198:10;204:24
**57 (1)**
204:22

**6**

**6 (4)**
38:11,13;150:14;
195:23
**609 (2)**
235:19;237:19
**626.207 (1)**
237:7
**64 (3)**
236:22,23;239:2

**7**

**7 (5)**
41:14,16;126:17;
196:1;213:13
**700 (1)**
168:18
**713 (1)**
168:18
**7-31-1999 (1)**
240:2
**77 (3)**
160:17,22;162:11
**78 (3)**
160:17,22;162:11
**79 (7)**
71:19;84:7;160:18,
22,24,25;162:11

**8**

**8 (12)**
43:3,5,25;44:4;
54:6;129:13;144:20;
145:17,20;146:1,14;
196:5
**80 (7)**
160:18,20,23,24,25;

162:7,11
**81 (3)**
161:7,18;162:11
**8102 (2)**
216:4,24
**815 (1)**
168:25
**8th (1)**
184:6

**9**

**9 (5)**
43:17,19;44:5;
101:17;218:6
**9/27 (1)**
64:7
**99 (1)**
142:11