# Exhibit A

# Exhibit A

1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

                                    )
 IN RE:                             )   24-13093-pmm
                                    )
 ALAN CHRISTOPHER REDMOND,          )   Reading, PA
                                    )   October 1, 2024
                 Debtor.            )   10:02 AM

         TRANSCRIPT OF EXPEDITED MOTION TO DISMISS
           BEFORE THE HONORABLE PATRICIA M. MAYER
             UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

 For the Debtor:            ALBERT A. CIARDI III, ESQ.
                            NICOLE M. NIGRELLI, ESQ.
                            CIARDI CIARDI & ASTIN
                            1905 Spruce Street
                            Philadelphia, PA 19103

 For the Petitioning        JOEL A. READY, ESQ.
 Creditors:                 BENJMAIN J. LEWIS, ESQ.
                            CORNERSTONE LAW FIRM
                            519 Walnut Street
                            Reading, PA 19601

 For C. Malcolm Smith III   BRANDON D. PACK, ESQ.
 and C. Malcolm Smith &     BARLEY SNYDER
 Company, P.C.              2755 Century Boulevard
                            Wyomissing, PA 19610

 For the Internal Revenue   ANTHONY ST. JOSEPH, ESQ.
 Service:                   Assistant United States Attorney
                            UNITED STATES ATTORNEY'S OFFICE
                            615 Chestnut Street, Suite 1250
                            Philadelphia, PA 19106

 ECR OPERATOR:              KEITH R. BORZILLO

Proceedings recorded by electronic sound recording.

Michael Drake, CET**D-513
eScribers
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

**eScribers, LLC**

2

I N D E X

| WITNESSES: | VOIR DIRE DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Debtor: Khody Detwiler | 20 | 47 | 52 | |
| For the Debtor: Jason Scott Jordan | 220 | | | |
| For the Petitioning Creditors: Alan Christopher Redmond | 60 | 175 | 204 | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Exhibit 19 | 157 | 162 |
| Exhibit 20 | 157 | 162 |
| Exhibit 21 | 157 | 162 |
| Exhibit 22 | 161 | 162 |
| Exhibit 51 | 157 | 162 |
| Exhibit 52 | 157 | 162 |
| Exhibit 53 | 157 | 162 |
| Exhibit 54 | 157 | 162 |
| Exhibit 77 | 160 | 162 |
| Exhibit 78 | 160 | 162 |
| Exhibit 79 | 160 | 162 |
| Exhibit 80 | 160 | 162 |
| Exhibit 81 | 161 | 162 |

102

that this is undisputed?

A   What is the basis?  I'm not disputing the amount of money owed to Producer Advance, although there is money owed.

Q   Is there currently litigation in this matter?

A   With Producer Advance?

Q   Yes.

A   I don't believe so.  No.

Q   Okay.

A   I entered into a settlement agreement with the owner.

Q   Okay.  Is that a written settlement agreement?

A   I believe it is, yes.

Q   Okay.  And when did you enter into that settlement agreement?

A   I think it was in 2020, 2021, approximately.

Q   Three or four years ago; is that right?

A   Yes, sir.

Q   So it's been undisputed this entire time; is that right?

A   We entered into a settlement agreement.  Then I began to make payments.  And then Shannon started to help me make payments.  So I don't believe that is -- that is a disputed debt, sir.

Q   Okay.  So when we asked you for contracts regarding creditors, you had that contract in your possession last week; is that right?

A   I didn't have that contract in my possession.

103

Q    Why not?

A    Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together.  And when I ask her for contracts, she starts to talk to her attorney. That's -- that's the way it goes, as I've said a number of times.

Q    Got it.  All right.  So you don't have access to any of the documents relating to your debts; is that right?

A    As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents.  But Shannon is the custodian of many of these documents, sir.

Q    But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A    I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q    Okay.  And you did not find any of the contracts that we've asked for; is that right?

A    I could not find Producer Advance.  But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q    Okay.  What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A    There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety.  And that's what we did.

Q    Okay.  And what was the reason for putting it in tenants by the entirety?

MR. CIARDI:  Objection, Your Honor.  Privilege.

Q    Okay.  I'm not asking you for what your attorney's told you.  I'm just asking you why did you do it?

A    This is what we recommended to do.  You know, there was a debtor -- excuse me, creditor.

MR. CIARDI:  Objection, Your Honor.

THE COURT:  There wasn't a -- I don't think there was a --

MR. CIARDI:  Calls for privilege.

THE COURT:  -- question pending.  I think there was an answer pending.  So why don't you finish your answer?

THE WITNESS:  Yes, ma'am.

We put it in tenants in the entirety.  We had talked to one of our attorneys.  We were in a dispute with Par Funding.  And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q    So it was a --

A    Sorry.  Your turn.

Q    No.  It's okay.  Go ahead.

105

A    There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q    Is Shannon receiving income from Seguro Medico?

A    Yes, she is.

Q    And why is she -- how much is she receiving annually?

A    I would know that.  You would need to talk to Shannon.

Q    Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A    She's the owner.

Q    Okay.  Why are you guaranteeing the debts of Seguro Medico?

A    Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q    So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A    I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

eScribers, LLC

103

Q     Why not?

A     Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together.  And when I ask her for contracts, she starts to talk to her attorney.  That's -- that's the way it goes, as I've said a number of times.

Q     Got it.  All right.  So you don't have access to any of the documents relating to your debts; is that right?

A     As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents.  But Shannon is the custodian of many of these documents, sir.

Q     But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A     I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q     Okay.  And you did not find any of the contracts that we've asked for; is that right?

A     I could not find Producer Advance.  But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q     Okay.  What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A     There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety.  And that's what we did.

Q    Okay.  And what was the reason for putting it in tenants by the entirety?

MR. CIARDI:  Objection, Your Honor.  Privilege.

Q    Okay.  I'm not asking you for what your attorney's told you.  I'm just asking you why did you do it?

A    This is what we recommended to do.  You know, there was a debtor -- excuse me, creditor.

MR. CIARDI:  Objection, Your Honor.

THE COURT:  There wasn't a -- I don't think there was a --

MR. CIARDI:  Calls for privilege.

THE COURT:  -- question pending.  I think there was an answer pending.  So why don't you finish your answer?

THE WITNESS:  Yes, ma'am.

We put it in tenants in the entirety.  We had talked to one of our attorneys.  We were in a dispute with Par Funding.  And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q    So it was a --

A    Sorry.  Your turn.

Q    No.  It's okay.  Go ahead.

105

A    There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q    Is Shannon receiving income from Seguro Medico?

A    Yes, she is.

Q    And why is she -- how much is she receiving annually?

A    I would know that.  You would need to talk to Shannon.

Q    Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A    She's the owner.

Q    Okay.  Why are you guaranteeing the debts of Seguro Medico?

A    Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q    So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A    I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

106

whatever I can to help her grow the business because I've been in the insurance business ten, eleven, twelve years or was in the insurance business ten, eleven, twelve years.  A lot of these people know who I am.  You know, I have previous relationships, Attorney Ready.  So it makes sense to try and help her get her start-up off the ground as quickly as possible.  And if I can help in any way, I absolutely will.

Q    Okay.  Your wife currently works for Pottstown School District; is that right?

A    Yes.  She actually went back to her position the last couple of months.  And Arthur Walsh -- she had Arthur Walsh, the CEO, take over the operations.

Q    Okay.  So she's full time at Pottstown School District, right?

A    Yes.  I believe she's working forty to forty-five hours a week.

Q    Okay.  She's, I believe, earning 109,000 a year from the school district; is that right?

A    I don't know what her income is, Attorney Ready, but it sounds accurate.

Q    Okay.  And that's roughly what she was earning before she was married to you, correct?

A    No, that's -- that's incorrect.  I know she was making more money than that.

Q    What was she making before she married you?

107

A    You would have to ask her, but I believe it was more.

Q    Okay.  Where was she working before she married you?

A    She was working -- she was doing a number of things, but her main career was as a special education principal, building a school district down in Berks County.

Q    Okay.  And how long did she work there?

A    I believe she was there maybe a decade.  She was also -- she's also finishing up her doctorate as well.  So she was doing both.

Q    Okay.  And when she left the Pottstown School District, what did she do after that?

A    Well, Covid hit, unfortunately.  And she wanted to start -- she -- she always found the insurance business intriguing.  And she seen that I had marginal success, not a lot of success, obviously.  And she wanted to get involved in the business.  So she had spoken with the Arthur Walsh.  I was starting to wind down Fannie Market, LLC.  And Arthur and Shannon are a lot smarter than me, a lot more educated than me, you know, MBAs and all the fancy stuff, wanted to open their own business.  And I really needed a break to be honest with you, Attorney Ready, from working so hard in this business.  It's being very difficult.  And I took a step back, let them do all their fancy MBA stuff.  And I was able to provide value, particularly in software developments and recommendations on some stuff that I've learned over the last ten years.

108

Q     And --

A     Excuse me, twelve to thirteen years.

Q     Okay.  At the same time that you wound down Bene Market, you jumped on board with Seguro Medico; is that correct?

A     Could you -- sir, could you clarify what you mean jumped on board?

Q     Sure.  At the same time that you wound down Bene Market was the same month that you signed a consultant agreement with Seguro; is that right?

A     I signed the consultant consultation agreement in January 2020.  That's when I -- when I signed that with Seguro.

Q     Okay.  And that's at the same time that you wound down Bene Market; is that right?

A     Well, I have plans of winding down Bene Market back in 2018, sir.  We were racking up debts.  The business was getting harder and harder, to be honest.  So I have plans of winding up.  But to answer your question directly, I was starting to wind down Bene Market September, October.  That's when things were starting to wind down.  The block of business had dwindled to almost nothing, a block of business being that the clients that we were serving was almost nothing.  There was issues with compliance and licensing that just  --it just wasn't appealing to me anymore, to be perfectly frank.

Q     Okay.  So back to the question though.  You wound down Bene Market the same month that you signed on as a consultant,

109

correct?

A No. I've been winding down. You know, winding down as a business owner, Attorney Ready, isn't just a decision overnight. It takes a year and a half, two years to -- to really make that decision because it's a hard decision to make when you -- you employ people.

Q Okay. When did you stop -- when did Bene Market cease operations?

A I believe that was December 2019, beginning of 2020.

Q So I'm sorry. You did say then that that's the same month that you signed the consultancy agreement with Seguro Medico?

A I signed the consultation agreement January 2020 with Seguro. Correct.

Q And did I just understand that you said that that's when you stopped operating Bene Market?

A I think my answer was that it took more than, you know, an overnight decision to -- to wind down Bene Market. It was in the process in my head --

Q But again, my question --

A -- at that time.

Q My question is about the last month that Bene Market had operations. That was January of 2020; is that correct?

A I believe that -- if I may answer the question this way, I believe the last payroll for Bene Market was the -- the last week in December 2019.

110

Q    Okay.  And the following month is when you -- is when you signed the consultant agreement with Seguro?

A    I believe I signed that around the 22nd of January.  I stepped away.  And -- and they wanted me to start consulting for them.  So that's what I did.

Q    So the book of business that Bene Market had at the time that you stopped its operations, where did it go?

A    Zero, over-collateralized, similar to MBOA.  Bene Market's block of business was attached to advanced contracts.  I don't know if you want me to elaborate.  Similar to Producer Advance.  So when a policy is sold, you receive an advance commission.  And unfortunately, the strength of the product was causing the client to cancel before the advance was realized.  So betting market was in a significant amount of debts.  And with them -- with them clients, they are collateralized.  They were collateralized similar to -- to MBOA.  That block of business is supposed to maintain so that every month it pays down these debts.  And obviously, it hasn't paid down these debts.

Q    Okay.  So you had customers who'd signed up and those premiums continue, correct, at Bene Market?

        MR. CIARDI:  Objection, Your Honor, I think we need a time frame.  And are we talking about 2019 now?  He said just contracted.  When?

        MR. READY:  Sure.

        THE COURT:  You can define that.

103

Q Why not?

A Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together. And when I ask her for contracts, she starts to talk to her attorney. That's -- that's the way it goes, as I've said a number of times.

Q Got it. All right. So you don't have access to any of the documents relating to your debts; is that right?

A As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents. But Shannon is the custodian of many of these documents, sir.

Q But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q Okay. And you did not find any of the contracts that we've asked for; is that right?

A I could not find Producer Advance. But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q Okay. What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety. And that's what we did.

Q Okay. And what was the reason for putting it in tenants by the entirety?

MR. CIARDI: Objection, Your Honor. Privilege.

Q Okay. I'm not asking you for what your attorney's told you. I'm just asking you why did you do it?

A This is what we recommended to do. You know, there was a debtor -- excuse me, creditor.

MR. CIARDI: Objection, Your Honor.

THE COURT: There wasn't a -- I don't think there was a --

MR. CIARDI: Calls for privilege.

THE COURT: -- question pending. I think there was an answer pending. So why don't you finish your answer?

THE WITNESS: Yes, ma'am.

We put it in tenants in the entirety. We had talked to one of our attorneys. We were in a dispute with Par Funding. And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q So it was a --

A Sorry. Your turn.

Q No. It's okay. Go ahead.

105

A     There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q     Is Shannon receiving income from Seguro Medico?

A     Yes, she is.

Q     And why is she -- how much is she receiving annually?

A     I would know that.  You would need to talk to Shannon.

Q     Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A     She's the owner.

Q     Okay.  Why are you guaranteeing the debts of Seguro Medico?

A     Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q     So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A     I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

106

whatever I can to help her grow the business because I've been in the insurance business ten, eleven, twelve years or was in the insurance business ten, eleven, twelve years.  A lot of these people know who I am.  You know, I have previous relationships, Attorney Ready.  So it makes sense to try and help her get her start-up off the ground as quickly as possible.  And if I can help in any way, I absolutely will.

Q    Okay.  Your wife currently works for Pottstown School District; is that right?

A    Yes.  She actually went back to her position the last couple of months.  And Arthur Walsh -- she had Arthur Walsh, the CEO, take over the operations.

Q    Okay.  So she's full time at Pottstown School District, right?

A    Yes.  I believe she's working forty to forty-five hours a week.

Q    Okay.  She's, I believe, earning 109,000 a year from the school district; is that right?

A    I don't know what her income is, Attorney Ready, but it sounds accurate.

Q    Okay.  And that's roughly what she was earning before she was married to you, correct?

A    No, that's -- that's incorrect.  I know she was making more money than that.

Q    What was she making before she married you?

107

A     You would have to ask her, but I believe it was more.

Q     Okay.  Where was she working before she married you?

A     She was working -- she was doing a number of things, but her main career was as a special education principal, building a school district down in Berks County.

Q     Okay.  And how long did she work there?

A     I believe she was there maybe a decade.  She was also -- she's also finishing up her doctorate as well.  So she was doing both.

Q     Okay.  And when she left the Pottstown School District, what did she do after that?

A     Well, Covid hit, unfortunately.  And she wanted to start -- she -- she always found the insurance business intriguing.  And she seen that I had marginal success, not a lot of success, obviously.  And she wanted to get involved in the business.  So she had spoken with the Arthur Walsh.  I was starting to wind down Fannie Market, LLC.  And Arthur and Shannon are a lot smarter than me, a lot more educated than me, you know, MBAs and all the fancy stuff, wanted to open their own business.  And I really needed a break to be honest with you, Attorney Ready, from working so hard in this business. It's being very difficult.  And I took a step back, let them do all their fancy MBA stuff.  And I was able to provide value, particularly in software developments and recommendations on some stuff that I've learned over the last ten years.

109

correct?

A     No.  I've been winding down.  You know, winding down as a business owner, Attorney Ready, isn't just a decision overnight.  It takes a year and a half, two years to -- to really make that decision because it's a hard decision to make when you -- you employ people.

Q     Okay.  When did you stop -- when did Bene Market cease operations?

A     I believe that was December 2019, beginning of 2020.

Q     So I'm sorry.  You did say then that that's the same month that you signed the consultancy agreement with Seguro Medico?

A     I signed the consultation agreement January 2020 with Seguro.  Correct.

Q     And did I just understand that you said that that's when you stopped operating Bene Market?

A     I think my answer was that it took more than, you know, an overnight decision to -- to wind down Bene Market.  It was in the process in my head --

Q     But again, my question --

A     -- at that time.

Q     My question is about the last month that Bene Market had operations.  That was January of 2020; is that correct?

A     I believe that -- if I may answer the question this way, I believe the last payroll for Bene Market was the -- the last week in December 2019.

110

Q    Okay.  And the following month is when you -- is when you signed the consultant agreement with Seguro?

A    I believe I signed that around the 22nd of January.  I stepped away.  And -- and they wanted me to start consulting for them.  So that's what I did.

Q    So the book of business that Bene Market had at the time that you stopped its operations, where did it go?

A    Zero, over-collateralized, similar to MBOA.  Bene Market's block of business was attached to advanced contracts.  I don't know if you want me to elaborate.  Similar to Producer Advance.  So when a policy is sold, you receive an advance commission.  And unfortunately, the strength of the product was causing the client to cancel before the advance was realized.  So betting market was in a significant amount of debts.  And with them -- with them clients, they are collateralized.  They were collateralized similar to -- to MBOA.  That block of business is supposed to maintain so that every month it pays down these debts.  And obviously, it hasn't paid down these debts.

Q    Okay.  So you had customers who'd signed up and those premiums continue, correct, at Bene Market?

MR. CIARDI:  Objection, Your Honor, I think we need a time frame.  And are we talking about 2019 now?  He said just contracted.  When?

MR. READY:  Sure.

THE COURT:  You can define that.

121

does not sell -- or they don't sell?

A One of the big shifts that Seguro Medico has been able to do with -- with Shannon and Arthur's acumen is to get better products. There's different SKUs within the insurance business, Attorney reading. There's ACA plans. There's short-term medical plans. There's hospital indemnity plans. These are all lower-level plans.

What Arthur and Shannon have been able to do is bring in ERISA plans, similar to maybe what you attorneys, respectfully, sir, would have in group insurance. So they're selling a different type of caliber of plan. And I think that's why they don't have advanced debts. They weren't forced into borrowing money, excuse me.

You know, the other products that MBOA and Bene Market were selling, sir, were causing a significant amount of debts because they just weren't staying on the books long enough. You know, people were getting them in January and canceling them in June. And that's why, you know, we -- I have this debt. The biggest thing borrowing money from Par Funding, which is obviously a high-interest loan, is we couldn't meet payroll. You know, we couldn't meet payroll, so we had to go and borrow money. And we couldn't make payroll because the insurance carriers didn't like the quality of the product that we were selling -- or that they give us.

So I know that was a long way to say Segura Medico is a

122

proper insurance agency instead of the -- excuse me, instead of the stuff that I was attempting to do.

Q Ms. Kroemmelbein had no experience in insurance before starting with Seguro Medico, correct?

A Understands. She's been around me long enough to understand what insurance is. You're talking about a very high-level, sophisticated organizational leadership female who has an MBA, I believe, from Lehigh, who's finishing --

Q Mr. Redmond --

A -- her doctorate's --

Q Mr. Redmond --

A -- who's raising three kids. You know, she -- she has experience in business. We can say that.

Q Okay. But to answer my question, she had zero experience personally in insurance before Seguro Medico, correct?

A Could you define insurance for me, sir? Insurance?

Q You need me to define insurance for you?

A No. I need you to -- there's insurance sales. There's claims. There's third-party administrators. I need you to be very specific.

Q Actually, I'll stay broad. She had zero experience in any of what you just said?

A Okay.

Q Correct?

A In insurance? Well, I'll tell you. You know, when she

123

was running schools for special needs kids, she had a lot of experience in insurance.  She -- she put the group plans together.  She negotiated with the carriers.  She had some experience.  I wouldn't stay zero.

Q    Okay.  Other than what you've just said, you'd agree she didn't have any other experience in the business side of insurance, correct, before Seguro Medico?

A    Are you -- if you're going to define it, I would need you to define it, Attorney Ready.  In sales?

Q    All right.  Sure.  We'll go through them one at a time. Did she have any experience in insurance sales?

A    She did not have experience in insurance sales.

Q    Did she have any experience in insurance regulations?

A    No, she did not.

Q    Did you have any experience in insurance brokering?

A    No.

Q    Did you have any experience in insurance underwriting?

A    No.

Q    Is there any other thing that I've missed that she would have had experience in regarding insurance?

A    No, just a highly sophisticated, talented, kind person who knows how to build businesses better than myself.  And to be honest, Arthur as well, although he's very talented as well.

        MR. READY:  Your Honor, I've got a good bit more. I'm happy to keep going.  Would the Court -- I just want to

124

check on scheduling, how the Court wants to proceed.

THE COURT:  Okay  Well, we can go as long as 1 o'clock, and then I am going to take a break, which gives you basically another half hour or so.

MR. READY:  Okay.

THE COURT:  If you think that you can't complete it by then, then we will need to bring him back after lunch.

MR. READY:  I'll do my best to keep it moving.

THE COURT:  Okay.

MR. READY:  Thank you, Your Honor.

BY MR. READY:

Q    So I'm going to go back to an earlier question.  I don't think it quite got nailed down.  I asked you -- you said you needed a break, and that's why you started consulting with Seguro Medico.

A    Sure.

Q    And that was immediately after you ended your work at Bene Market, correct?

A    Yeah.  There was a bit of synergy.  You know, Shannon had said that I should continue to operate agencies.  And I was pretty burnt out.  You know, it'd been a rough ride getting to -- to this country from 2007, graduating in 2007 in this country and then, you know, getting the 2019 and realizing that you're in a ton of debts.  You know, it wasn't -- it wasn't very satisfying.

151

A    Uh-huh.

Q    So it says that client, Seguro Medico, agrees to hold you harmless for any outcomes that result from decisions made by the client.  Did I read that correctly?

A    You did.

Q    Okay.  And so you're not responsible for any of the debts of Seguro Medico, correct?

A    Well, you know --

MR. CIARDI:  Your Honor, that's not what this says. This says actions taken as a result of his consultative services.  It's nothing to do with debts or not debts.

MR. READY:  Your Honor, that would certainly cover if there were debts --

MR. CIARDI:  That's --

MR. READY:  -- that were incurred by the business.

MR. CIARDI:  Then that's going to call for a legal conclusion, Your Honor.  And then my objection will be something different.

MR. READY:  Okay.

MR. CIARDI:  But that's not what this document says.

MR. READY:  Your Honor, I'll accept that they believe that's the legal conclusion.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Your Honor, not to interrupt, but can we just take a five-minute bathroom break --

152

THE COURT:  Well --

UNIDENTIFIED SPEAKER:  -- if we're going to.

THE COURT:  Yeah, we're -- we're close to done. We're at, like, 12:58.  So you have basically two minutes.

MR. READY:  Okay.  Understood, Your Honor.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

BY MR. READY:

Q    Who else has taken shares of the profits of Seguro Medico?

A    Who else gets paid?  Who else gets shares?

Q    Yes.

A    Well, what does that mean, Joel?  Distributions?

Q    Yes.  Who gets the distributions from Seguro Medico?

A    I would imagine it's Arthur and -- well, I know Shannon, obviously, gets distributions and I believe Arthur gets distributions, too.  You would need to ask him.

Q    Okay.  When did Shanonn -- Ms. Kroemmelbein resign employment with the Bucks County Intermediate Unit?

A    I'm not exactly sure.

Q    Okay.  Just so that we have a complete -- one moment.

A    Uh-huh.

MR. READY:  That's all the questions I have for this witness.

THE COURT:  Okay.  Since we are at roughly 1:00, I presume that you're going to want to have your client on the stand when we come back?

153

MR. CIARDI:  Well, Your Honor, I want to discuss that with Ms. Nigrelli.  We may choose to put him on in our case-in-chief and be done with him for now.

THE COURT:  Okay.

MR. CIARDI:  I haven't made that decision yet, so I -- maybe in a -- when we take the break, we'll make that decision, but.

THE COURT:  Okay.  But I presume there won't be discussion regarding his testimony?

MR. CIARDI:  No, we won't be discussing it with him, Your Honor.  I don't know whether I'm going to call him or not call him --

THE COURT:  Understood.

MR. CIARDI:  -- after the -- that -- I just haven't made that decision.

THE COURT:  Okay.  That's fine.

You can step down.  Thank you, Mr. Redmond.

THE WITNESS:  Thank you.

THE COURT:  Okay.  So my plan is to come back at 2:00, unless you need more time than that, which is fine, too.

MR. CIARDI:  No.

THE COURT:  I might need more time than that, but I don't have anything in between.  So I can come back at 2:00, if that's okay with everyone.

MR. CIARDI:  2:00 is fine, Your Honor.

# Exhibit B

Exhibit B



**Register of Wills and Clerk of Orphans' Court Division
of the Court of Common Pleas
of Berks County, Pennsylvania**

# MARRIAGE CERTIFICATION

I, Suzanne M. Myers, Clerk of Orphans' Court of Berks County, do hereby certify that:

### SHANNON   KROEMMELBEIN , 39

### and

### ALAN  CHRISTOPHER  REDMOND , 39,

were duly married on December 4th, 2021; and that a return of the solemnization of said marriage is

recorded in marriage Vol. 486   No. 307 and having been solemnized by  REV. BETH PALUBINSKY,

MINISTER OF THE GOSPEL on December 4th, 2021 at PHILADELPHIA, PHILADELPHIA County,

PA.

Witness my hand and seal this 31st day of May, 2024.

_____
Clerk of the Orphan's Court

_____
Asst Clerk of the Orphan's Court

# Exhibit C

# Exhibit C

# 2022 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L21000299741

**Entity Name:** ABN NETWORK LLC

**FILED**
**Mar 24, 2022**
**Secretary of State**
**0203028985CC**

**Current Principal  Place of Business:**

4960 NE 27TH AVENUE
LIGHTHOUSE POINT,  FL  33064

**Current Mailing Address:**

4960 NE 27TH AVENUE
LIGHTHOUSE POINT,  FL  33064

**FEI Number: 87-1447688**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

LOPEZ, PRISCILLA
4960 NE 27TH AVENUE
LIGHTHOUSE POINT, FL  33064  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                          Date

## Authorized Person(s) Detail :

| Title | MGR | | Title | AMBR |
| Name | DIGITAL BRIDGE NETWORK CORPORATION | | Name | LOPEZ, PRISCILLA |
| Address | 30 N. GOULD STREET - SUITE N | | Address | 4960 NE 27TH AVENUE |
| City-State-Zip: | SHERIDAN  WY  82801 | | City-State-Zip: | LIGHTHOUSE POINT  FL  33064 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: PRISCILLA LOPEZ                          MANAGER                    03/24/2022

Electronic Signature of Signing Authorized Person(s) Detail                                    Date

# Exhibit D

# Exhibit D



| Site Address | 4960 NE 27 AVENUE, LIGHTHOUSE POINT FL 33064-7803 | ID # | 4843 07 10 0180 |
|---|---|---|---|
| Property Owner | SOK, SENI 4960 NE 27TH LAND TR | Millage | 1411 |
| Mailing Address | 4960 NE 27 AVE LIGHTHOUSE POINT FL 33064 | Use | 01-01 |
| Abbr Legal Description | CORAL KEY VILLAS 3RD SEC 44-19 B LOT 21 BLK 13 | | |

The just values displayed below were set in compliance with Sec. 193.011, Fla. Stat., and include a reduction for costs of sale and other adjustments required by Sec. 193.011(8).

| * 2025 values are considered "working values" and are subject to change. |
|---|

### Property Assessment Values

| Year | Land | Building / Improvement | Just / Market Value | Assessed / SOH Value | Tax |
|---|---|---|---|---|---|
| 2025 | $400,000 | $4,450,740 | $4,850,740 | $2,407,060 | |
| 2024 | $400,000 | $4,450,740 | $4,850,740 | $2,407,060 | $45,351.95 |
| 2023 | $400,000 | $4,300,650 | $4,700,650 | $2,336,960 | $43,900.63 |

### 2025 Exemptions and Taxable Values by Taxing Authority

| | County | School Board | Municipal | Independent |
|---|---|---|---|---|
| Just Value | $4,850,740 | $4,850,740 | $4,850,740 | $4,850,740 |
| Portability | 0 | 0 | 0 | 0 |
| Assessed/SOH  18 | $2,407,060 | $2,407,060 | $2,407,060 | $2,407,060 |
| Homestead  100% | $25,000 | $25,000 | $25,000 | $25,000 |
| Add. Homestead | $25,000 | 0 | $25,000 | $25,000 |
| Wid/Vet/Dis | 0 | 0 | 0 | 0 |
| Senior | 0 | 0 | 0 | 0 |
| Exempt Type | 0 | 0 | 0 | 0 |
| Taxable | $2,357,060 | $2,382,060 | $2,357,060 | $2,357,060 |

### Sales History

| Date | Type | Price | Book/Page or CIN |
|---|---|---|---|
| 12/13/2023 | WD-T | $100 | 119492733 |
| 11/6/2019 | WD-T | $100 | 116216688 |
| 4/17/2017 | WD-Q | $2,316,000 | 114349750 |
| 8/22/2014 | WD-Q-DS | $500,000 | 112494622 |
| 11/12/2014 | VCT-T | | 112646768 |

### Land Calculations

| Price | Factor | Type |
|---|---|---|
| $50.00 | 8,000 | SF |
| | | |
| | | |
| | | |

| Adj. Bldg. S.F. (Card, Sketch) | 5003 |
|---|---|
| Units/Beds/Baths | 1/5/6 |
| Eff./Act. Year Built: 2017/2016 | |

### Special Assessments

| Fire | Garb | Light | Drain | Impr | Safe | Storm | Clean | Misc |
|---|---|---|---|---|---|---|---|---|
| 14 | P | | | | | LP | | |
| R | 1 | | | | | | | |
| 1 | | | | | | 1 | | |

# Exhibit E

# Exhibit E

**Berks County Civil Court Docket Summary**
**Docket Number: 23 13582**

**Judge:** Madelyn S. Fudeman, J.                    **Filed:** 09/05/2023
**SubType:** Complaint

**WBL SPO I LLC**

    *** VS ***

**ARC REALTY LLC**

**Attorney(s)**
Gulash, Jessica M

Rush, William R A

Valz, Norman M

| Date | Summary |
|---|---|
| 09/05/2023 | Real Property - Mortgage Foreclosure: Commercial - $1,367,605.27 plus... w/Certification Regarding Status of Foreclosed Premises |
| 09/05/2023 | Property Location: 1198 Reading Boulevard, Wyomissing, PA |
| 09/14/2023 | Sheriff's Service of Mortgage Foreclosure Complaint and Urgent Notice and Certification upon Deft Tenant/Occupant by handing to Arthur Walsh/APIC on 9/12/23; No Sheriff's Service of Mortgage Foreclosure Complain Urgent Notice and Certification upon Deft ARC Realty LLC |
| 09/27/2023 | Praecipe to Reinstate Complaint - Complaint Reinstated |
| 10/04/2023 | Appearance of Norman M Valz Esq. for Deft |
| 10/04/2023 | Certificate of Service |
| 10/04/2023 | Deft's Preliminary Objections to Complaint w/ Cert of Service |
| 10/04/2023 | Proposed Scheduling Order of |
| 10/04/2023 | Proposed Order |
| 10/04/2023 | Notice to Plead/Defend |
| 10/04/2023 | Deft's Brief in Support of Preliminary Objections |
| 10/04/2023 | Affidavit of Verification |
| 10/04/2023 | Certificate of Service |
| 10/06/2023 | Sheriff's Service of Reinstated Mortgage Foreclosure Complaint Urgent Notice and Certification upon Deft ARC Realty LLC by handing to Alyssa Hoffmaster/APIC on 10/4/23 |
| 10/13/2023 | Amended Complaint - $1,434,551.86 plus...  Certification regarding status of foreclosed premises. |
| 10/13/2023 | Certificate of Service of amended complaint in mortgage foreclosure upon William Rush, Esq and Norman Valz, Esq on 10/13/2023 via email and ECF |
| 10/29/2023 | Notice to Defend |
| 10/29/2023 | Deft's Answer with New Matter and Counterclaim to Pltf's Complaint in Mortagage Foreclosure |
| 10/29/2023 | Affidavit of Verification |
| 10/29/2023 | Certificate of Service of Deft's Answer with New Matter and Counterclaim to Pltf's Complaint in Mortagage Foreclosure |
| 11/20/2023 | Pltf's Preliminary Objections to Deft's Answer, New Matter, and Counterclaims w/ prop. Order |
| 11/20/2023 | Pltf's Brief in Support of its Preliminary Objections to Deft's Answer, New Matter and Counterclaims |
| 11/20/2023 | Praecipe for Argument of 12/18/23 RE: Pltf's Preliminary Objections to Deft's Answer, New Matter, and Counterclaims |
| 11/20/2023 | Affidavit of Service for Argument Court |
| 12/12/2023 | Order of 12/7/23 Scheduling PreTrial Conference and Settlement Conference on 2/27/24. Rule 2365 Notice and copies provided on 12/12/23 |
| 12/13/2023 | Appearance of Anton Kaminsky Esq. and Aubrie Linder Esq. for Deft |
| 12/13/2023 | Deft's Amended Answer with New Matter to Pltf's Amended Complaint in Mortgage Foreclosure w/Cert of Service |
| 12/13/2023 | Pltf's Answer to Deft's New Matter |
| 12/13/2023 | Certificate of Service of Pltf's Answer to Deft's New Matter |

| 12/15/2023 | Withdrawal of Appearance of William Rush Esq. for Deft w/Cert of Service |
|---|---|
| 12/28/2023 | Order of 12/07/23 Returned for Deft. ARC Realty LLC |
| 02/14/2024 | Deft's Unopposed Motion for Continuance w/ Proposed Order and Cert of Service |
| 03/19/2024 | Order of 3/18/24 Scheduling PreTrial and Settlement Conference on 5/9/24. Rule 236 Notice and copies provided on 3/19/24 |
| 05/31/2024 | Order of 5/30/24 scheduling Status Conference for 6/10/24. Rule 236 Notice and copies provided on 5/31/24 |
| 06/11/2024 | Order of 6/10/25 continuing status conference to 8/19/24. Rule 236 notice and copies provided on 6/11/24. |
| 08/06/2024 | Pltf's Motion to Strike Objections and Compel Discovery Responses from Deft |
| 08/06/2024 | Proposed Order |
| 08/06/2024 | Certificate of Service of Pltf's Motion to Strike Objections and Compel Discovery Responses from Deft |
| 08/20/2024 | Order of 8/20/24 continuing status conference to 9/4/24. Rule 236 Notice and copies provided on 8/20/24 |
| 08/21/2024 | Order of 8/20/24 continuing status conference to 9/4/24. Rule 236 Notice and copies provided on 8/21/24 |
| 09/03/2024 | Appearance of William Rush Esq for Deft w/ Cert of Service |
| 09/04/2024 | Withdrawal of Appearance of Anton Kaminsky Esq and Aubrie Linder Esq for Deft w/ Cert of Service |
| 09/06/2024 | Order of 9/5/24 RE: Pltf's Motion to Strike Objections and Compel Discovery. Rule 236 Notice and copies provided on 9/6/24 |
| 09/19/2024 | Order of 9/18/24 scheduling Argument for 9/24/24 re: Pltf's Letter Motion for Sanctions. Rule 236 Notice and copies provided on 9/19/24 |
| 09/23/2024 | Order of 9/18/24 scheduling Argument for 9/24/24 re: Pltf's Letter Motion for Sanctions. Rule 236 Notice and copies provided on 9/23/24 |
| 10/01/2024 | Order of 9/30/24 scheduling Argument for 10/9/24 re: Pltf's Letter Motion for Sanctions. Rule 236 Notice and copies provided on 10/1/24 |
| 10/09/2024 | Order of 10/9/24 Scheduling hearing on 10/21/24 RE: Pltf's Letter Motion for Sanctions against Deft. Rule 236 Notice and copies provided on 10/9/24 |
| 10/17/2024 | Pltf's Motion for Sanctions Against Deft |
| 10/17/2024 | Proposed Order |
| 10/17/2024 | Certificate of Service of Pltf's Motion for Sanctions |
| 10/24/2024 | Order of 10/23/24 RE: Pltf's Motion for Sanctions against Deft. Rule 236 Notice and copies provided on 10/24/24 |