# Exhibit A

Exhibit A

1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

)
IN RE:                            )   24-13093-pmm
                                  )
ALAN CHRISTOPHER REDMOND,         )   Reading, PA
                                  )   October 1, 2024
                    Debtor.       )   10:02 AM

TRANSCRIPT OF EXPEDITED MOTION TO DISMISS
BEFORE THE HONORABLE PATRICIA M. MAYER
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Debtor:            ALBERT A. CIARDI III, ESQ.
                           NICOLE M. NIGRELLI, ESQ.
                           CIARDI CIARDI & ASTIN
                           1905 Spruce Street
                           Philadelphia, PA 19103

For the Petitioning        JOEL A. READY, ESQ.
Creditors:                 BENJMAIN J. LEWIS, ESQ.
                           CORNERSTONE LAW FIRM
                           519 Walnut Street
                           Reading, PA 19601

For C. Malcolm Smith III   BRANDON D. PACK, ESQ.
and C. Malcolm Smith &     BARLEY SNYDER
Company, P.C.              2755 Century Boulevard
                           Wyomissing, PA 19610

For the Internal Revenue   ANTHONY ST. JOSEPH, ESQ.
Service:                   Assistant United States Attorney
                           UNITED STATES ATTORNEY'S OFFICE
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA 19106

ECR OPERATOR:              KEITH R. BORZILLO

Proceedings recorded by electronic sound recording.

Michael Drake, CET**D-513
eScribers
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

2

I N D E X

| WITNESSES: | VOIR DIRE DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Debtor:<br>Khody Detwiler | 20 | 47 | 52 | |
| For the Debtor:<br>Jason Scott Jordan | 220 | | | |
| For the Petitioning Creditors:<br>Alan Christopher Redmond | 60 | 175 | 204 | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Exhibit 19 | 157 | 162 |
| Exhibit 20 | 157 | 162 |
| Exhibit 21 | 157 | 162 |
| Exhibit 22 | 161 | 162 |
| Exhibit 51 | 157 | 162 |
| Exhibit 52 | 157 | 162 |
| Exhibit 53 | 157 | 162 |
| Exhibit 54 | 157 | 162 |
| Exhibit 77 | 160 | 162 |
| Exhibit 78 | 160 | 162 |
| Exhibit 79 | 160 | 162 |
| Exhibit 80 | 160 | 162 |
| Exhibit 81 | 161 | 162 |

102

that this is undisputed?

A    What is the basis?  I'm not disputing the amount of money owed to Producer Advance, although there is money owed.

Q    Is there currently litigation in this matter?

A    With Producer Advance?

Q    Yes.

A    I don't believe so.  No.

Q    Okay.

A    I entered into a settlement agreement with the owner.

Q    Okay.  Is that a written settlement agreement?

A    I believe it is, yes.

Q    Okay.  And when did you enter into that settlement agreement?

A    I think it was in 2020, 2021, approximately.

Q    Three or four years ago; is that right?

A    Yes, sir.

Q    So it's been undisputed this entire time; is that right?

A    We entered into a settlement agreement.  Then I began to make payments.  And then Shannon started to help me make payments.  So I don't believe that is -- that is a disputed debt, sir.

Q    Okay.  So when we asked you for contracts regarding creditors, you had that contract in your possession last week; is that right?

A    I didn't have that contract in my possession.

103

Q     Why not?

A     Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together.  And when I ask her for contracts, she starts to talk to her attorney.  That's -- that's the way it goes, as I've said a number of times.

Q     Got it.  All right.  So you don't have access to any of the documents relating to your debts; is that right?

A     As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents.  But Shannon is the custodian of many of these documents, sir.

Q     But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A     I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q     Okay.  And you did not find any of the contracts that we've asked for; is that right?

A     I could not find Producer Advance.  But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q     Okay.  What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A     There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety.  And that's what we did.

Q    Okay.  And what was the reason for putting it in tenants by the entirety?

MR. CIARDI:  Objection, Your Honor.  Privilege.

Q    Okay.  I'm not asking you for what your attorney's told you.  I'm just asking you why did you do it?

A    This is what we recommended to do.  You know, there was a debtor -- excuse me, creditor.

MR. CIARDI:  Objection, Your Honor.

THE COURT:  There wasn't a -- I don't think there was a --

MR. CIARDI:  Calls for privilege.

THE COURT:  -- question pending.  I think there was an answer pending.  So why don't you finish your answer?

THE WITNESS:  Yes, ma'am.

We put it in tenants in the entirety.  We had talked to one of our attorneys.  We were in a dispute with Par Funding.  And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q    So it was a --

A    Sorry.  Your turn.

Q    No.  It's okay.  Go ahead.

105

A    There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q    Is Shannon receiving income from Seguro Medico?

A    Yes, she is.

Q    And why is she -- how much is she receiving annually?

A    I would know that.  You would need to talk to Shannon.

Q    Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A    She's the owner.

Q    Okay.  Why are you guaranteeing the debts of Seguro Medico?

A    Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q    So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A    I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

103

Q    Why not?

A    Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together.  And when I ask her for contracts, she starts to talk to her attorney.  That's -- that's the way it goes, as I've said a number of times.

Q    Got it.  All right.  So you don't have access to any of the documents relating to your debts; is that right?

A    As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents.  But Shannon is the custodian of many of these documents, sir.

Q    But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A    I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q    Okay.  And you did not find any of the contracts that we've asked for; is that right?

A    I could not find Producer Advance.  But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q    Okay.  What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A    There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety.  And that's what we did.

Q    Okay.  And what was the reason for putting it in tenants by the entirety?

MR. CIARDI:  Objection, Your Honor.  Privilege.

Q    Okay.  I'm not asking you for what your attorney's told you.  I'm just asking you why did you do it?

A    This is what we recommended to do.  You know, there was a debtor -- excuse me, creditor.

MR. CIARDI:  Objection, Your Honor.

THE COURT:  There wasn't a -- I don't think there was a --

MR. CIARDI:  Calls for privilege.

THE COURT:  -- question pending.  I think there was an answer pending.  So why don't you finish your answer?

THE WITNESS:  Yes, ma'am.

We put it in tenants in the entirety.  We had talked to one of our attorneys.  We were in a dispute with Par Funding.  And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q    So it was a --

A    Sorry.  Your turn.

Q    No.  It's okay.  Go ahead.

105

A     There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q     Is Shannon receiving income from Seguro Medico?

A     Yes, she is.

Q     And why is she -- how much is she receiving annually?

A     I would know that.  You would need to talk to Shannon.

Q     Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A     She's the owner.

Q     Okay.  Why are you guaranteeing the debts of Seguro Medico?

A     Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q     So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A     I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

106

whatever I can to help her grow the business because I've been in the insurance business ten, eleven, twelve years or was in the insurance business ten, eleven, twelve years.  A lot of these people know who I am.  You know, I have previous relationships, Attorney Ready.  So it makes sense to try and help her get her start-up off the ground as quickly as possible.  And if I can help in any way, I absolutely will.

Q    Okay.  Your wife currently works for Pottstown School District; is that right?

A    Yes.  She actually went back to her position the last couple of months.  And Arthur Walsh -- she had Arthur Walsh, the CEO, take over the operations.

Q    Okay.  So she's full time at Pottstown School District, right?

A    Yes.  I believe she's working forty to forty-five hours a week.

Q    Okay.  She's, I believe, earning 109,000 a year from the school district; is that right?

A    I don't know what her income is, Attorney Ready, but it sounds accurate.

Q    Okay.  And that's roughly what she was earning before she was married to you, correct?

A    No, that's -- that's incorrect.  I know she was making more money than that.

Q    What was she making before she married you?

107

A    You would have to ask her, but I believe it was more.

Q    Okay.  Where was she working before she married you?

A    She was working -- she was doing a number of things, but her main career was as a special education principal, building a school district down in Berks County.

Q    Okay.  And how long did she work there?

A    I believe she was there maybe a decade.  She was also -- she's also finishing up her doctorate as well.  So she was doing both.

Q    Okay.  And when she left the Pottstown School District, what did she do after that?

A    Well, Covid hit, unfortunately.  And she wanted to start -- she -- she always found the insurance business intriguing.  And she seen that I had marginal success, not a lot of success, obviously.  And she wanted to get involved in the business.  So she had spoken with the Arthur Walsh.  I was starting to wind down Fannie Market, LLC.  And Arthur and Shannon are a lot smarter than me, a lot more educated than me, you know, MBAs and all the fancy stuff, wanted to open their own business.  And I really needed a break to be honest with you, Attorney Ready, from working so hard in this business. It's being very difficult.  And I took a step back, let them do all their fancy MBA stuff.  And I was able to provide value, particularly in software developments and recommendations on some stuff that I've learned over the last ten years.

108

Q    And --

A    Excuse me, twelve to thirteen years.

Q    Okay.  At the same time that you wound down Bene Market, you jumped on board with Seguro Medico; is that correct?

A    Could you -- sir, could you clarify what you mean jumped on board?

Q    Sure.  At the same time that you wound down Bene Market was the same month that you signed a consultant agreement with Seguro; is that right?

A    I signed the consultant consultation agreement in January 2020.  That's when I -- when I signed that with Seguro.

Q    Okay.  And that's at the same time that you wound down Bene Market; is that right?

A    Well, I have plans of winding down Bene Market back in 2018, sir.  We were racking up debts.  The business was getting harder and harder, to be honest.  So I have plans of winding up.  But to answer your question directly, I was starting to wind down Bene Market September, October.  That's when things were starting to wind down.  The block of business had dwindled to almost nothing, a block of business being that the clients that we were serving was almost nothing.  There was issues with compliance and licensing that just  --it just wasn't appealing to me anymore, to be perfectly frank.

Q    Okay.  So back to the question though.  You wound down Bene Market the same month that you signed on as a consultant,

109

correct?

A    No.  I've been winding down.  You know, winding down as a business owner, Attorney Ready, isn't just a decision overnight.  It takes a year and a half, two years to -- to really make that decision because it's a hard decision to make when you -- you employ people.

Q    Okay.  When did you stop -- when did Bene Market cease operations?

A    I believe that was December 2019, beginning of 2020.

Q    So I'm sorry.  You did say then that that's the same month that you signed the consultancy agreement with Seguro Medico?

A    I signed the consultation agreement January 2020 with Seguro.  Correct.

Q    And did I just understand that you said that that's when you stopped operating Bene Market?

A    I think my answer was that it took more than, you know, an overnight decision to -- to wind down Bene Market.  It was in the process in my head --

Q    But again, my question --

A    -- at that time.

Q    My question is about the last month that Bene Market had operations.  That was January of 2020; is that correct?

A    I believe that -- if I may answer the question this way, I believe the last payroll for Bene Market was the -- the last week in December 2019.

110

Q   Okay.  And the following month is when you -- is when you signed the consultant agreement with Seguro?

A   I believe I signed that around the 22nd of January.  I stepped away.  And -- and they wanted me to start consulting for them.  So that's what I did.

Q   So the book of business that Bene Market had at the time that you stopped its operations, where did it go?

A   Zero, over-collateralized, similar to MBOA.  Bene Market's block of business was attached to advanced contracts.  I don't know if you want me to elaborate.  Similar to Producer Advance.  So when a policy is sold, you receive an advance commission.  And unfortunately, the strength of the product was causing the client to cancel before the advance was realized.  So betting market was in a significant amount of debts.  And with them -- with them clients, they are collateralized.  They were collateralized similar to -- to MBOA.  That block of business is supposed to maintain so that every month it pays down these debts.  And obviously, it hasn't paid down these debts.

Q   Okay.  So you had customers who'd signed up and those premiums continue, correct, at Bene Market?

MR. CIARDI:  Objection, Your Honor, I think we need a time frame.  And are we talking about 2019 now?  He said just contracted.  When?

MR. READY:  Sure.

THE COURT:  You can define that.

103

Q    Why not?

A    Well, you know, when -- when Shannon started to pay the debts, she, she keeps all the contracts together.  And when I ask her for contracts, she starts to talk to her attorney. That's -- that's the way it goes, as I've said a number of times.

Q    Got it.  All right.  So you don't have access to any of the documents relating to your debts; is that right?

A    As I said before, I can go through all my emails again, Attorney Ready, and see if I have some of these documents.  But Shannon is the custodian of many of these documents, sir.

Q    But just to be clear, you testified you did go through all of your emails before answering these questions, correct?

A    I think -- I think what I said was I went through them in three to four hours to the best of my ability while everything else was coming at us.

Q    Okay.  And you did not find any of the contracts that we've asked for; is that right?

A    I could not find Producer Advance.  But as I said, I can certainly go and look again and see if I have it, or I can have Shannon talk to her attorney, David Heim, and try and get these produced.

Q    Okay.  What assets did you transfer to Shannon Kroemmelbein upon your marriage?

A    There was a real estate company, ARC Realty, that I owned.

104

And we received advice from our attorneys that we should put that company in tenants in the entirety.  And that's what we did.

Q    Okay.  And what was the reason for putting it in tenants by the entirety?

MR. CIARDI:  Objection, Your Honor.  Privilege.

Q    Okay.  I'm not asking you for what your attorney's told you.  I'm just asking you why did you do it?

A    This is what we recommended to do.  You know, there was a debtor -- excuse me, creditor.

MR. CIARDI:  Objection, Your Honor.

THE COURT:  There wasn't a -- I don't think there was a --

MR. CIARDI:  Calls for privilege.

THE COURT:  -- question pending.  I think there was an answer pending.  So why don't you finish your answer?

THE WITNESS:  Yes, ma'am.

We put it in tenants in the entirety.  We had talked to one of our attorneys.  We were in a dispute with Par Funding.  And we thought that was the best course of action to protect our households -- to protect our -- our house that we were living in at the time.

Q    So it was a --

A    Sorry.  Your turn.

Q    No.  It's okay.  Go ahead.

105

A    There's other reasons as well.  You know, we were getting married.  Shannon was running Arc Realty.  I had taken over Arc Realty at the time.  You know, she was doing everything from, you know, the lease agreements to, you know, gardening to, you know, running the company basically, working with our accountants on the P&Ls.  So we also thought it made sense fiscally as well.  And also because she was running the company, you know, she -- she wanted to own the company.

Q    Is Shannon receiving income from Seguro Medico?

A    Yes, she is.

Q    And why is she -- how much is she receiving annually?

A    I would know that.  You would need to talk to Shannon.

Q    Okay.  Why is she personally guaranteeing the debts of Seguro Medico?

A    She's the owner.

Q    Okay.  Why are you guaranteeing the debts of Seguro Medico?

A    Well, sometimes that happens in business and entrepreneurship.  So sometimes, you know, I'll say to my wife, hey, I have a debt here, I need help with it.  This is what a partnership is and vice versa.

Q    So I guess my question though is, why are you personally guaranteeing debts for a company that you don't own?

A    I'm a consultant for the company, as you know.  And if Shannon needs help growing her business, I'm going to do

106

whatever I can to help her grow the business because I've been in the insurance business ten, eleven, twelve years or was in the insurance business ten, eleven, twelve years.  A lot of these people know who I am.  You know, I have previous relationships, Attorney Ready.  So it makes sense to try and help her get her start-up off the ground as quickly as possible.  And if I can help in any way, I absolutely will.

Q    Okay.  Your wife currently works for Pottstown School District; is that right?

A    Yes.  She actually went back to her position the last couple of months.  And Arthur Walsh -- she had Arthur Walsh, the CEO, take over the operations.

Q    Okay.  So she's full time at Pottstown School District, right?

A    Yes.  I believe she's working forty to forty-five hours a week.

Q    Okay.  She's, I believe, earning 109,000 a year from the school district; is that right?

A    I don't know what her income is, Attorney Ready, but it sounds accurate.

Q    Okay.  And that's roughly what she was earning before she was married to you, correct?

A    No, that's -- that's incorrect.  I know she was making more money than that.

Q    What was she making before she married you?

107

A    You would have to ask her, but I believe it was more.

Q    Okay.  Where was she working before she married you?

A    She was working -- she was doing a number of things, but her main career was as a special education principal, building a school district down in Berks County.

Q    Okay.  And how long did she work there?

A    I believe she was there maybe a decade.  She was also -- she's also finishing up her doctorate as well.  So she was doing both.

Q    Okay.  And when she left the Pottstown School District, what did she do after that?

A    Well, Covid hit, unfortunately.  And she wanted to start -- she -- she always found the insurance business intriguing.  And she seen that I had marginal success, not a lot of success, obviously.  And she wanted to get involved in the business.  So she had spoken with the Arthur Walsh.  I was starting to wind down Fannie Market, LLC.  And Arthur and Shannon are a lot smarter than me, a lot more educated than me, you know, MBAs and all the fancy stuff, wanted to open their own business.  And I really needed a break to be honest with you, Attorney Ready, from working so hard in this business.  It's being very difficult.  And I took a step back, let them do all their fancy MBA stuff.  And I was able to provide value, particularly in software developments and recommendations on some stuff that I've learned over the last ten years.

109

correct?

A No. I've been winding down. You know, winding down as a business owner, Attorney Ready, isn't just a decision overnight. It takes a year and a half, two years to -- to really make that decision because it's a hard decision to make when you -- you employ people.

Q Okay. When did you stop -- when did Bene Market cease operations?

A I believe that was December 2019, beginning of 2020.

Q So I'm sorry. You did say then that that's the same month that you signed the consultancy agreement with Seguro Medico?

A I signed the consultation agreement January 2020 with Seguro. Correct.

Q And did I just understand that you said that that's when you stopped operating Bene Market?

A I think my answer was that it took more than, you know, an overnight decision to -- to wind down Bene Market. It was in the process in my head --

Q But again, my question --

A -- at that time.

Q My question is about the last month that Bene Market had operations. That was January of 2020; is that correct?

A I believe that -- if I may answer the question this way, I believe the last payroll for Bene Market was the -- the last week in December 2019.

110

Q    Okay.  And the following month is when you -- is when you signed the consultant agreement with Seguro?

A    I believe I signed that around the 22nd of January.  I stepped away.  And -- and they wanted me to start consulting for them.  So that's what I did.

Q    So the book of business that Bene Market had at the time that you stopped its operations, where did it go?

A    Zero, over-collateralized, similar to MBOA.  Bene Market's block of business was attached to advanced contracts.  I don't know if you want me to elaborate.  Similar to Producer Advance. So when a policy is sold, you receive an advance commission. And unfortunately, the strength of the product was causing the client to cancel before the advance was realized.  So betting market was in a significant amount of debts.  And with them -- with them clients, they are collateralized.  They were collateralized similar to -- to MBOA.  That block of business is supposed to maintain so that every month it pays down these debts.  And obviously, it hasn't paid down these debts.

Q    Okay.  So you had customers who'd signed up and those premiums continue, correct, at Bene Market?

MR. CIARDI:  Objection, Your Honor, I think we need a time frame.  And are we talking about 2019 now?  He said just contracted.  When?

MR. READY:  Sure.

THE COURT:  You can define that.

121

does not sell -- or they don't sell?

A     One of the big shifts that Seguro Medico has been able to do with -- with Shannon and Arthur's acumen is to get better products.  There's different SKUs within the insurance business, Attorney reading.  There's ACA plans.  There's short-term medical plans.  There's hospital indemnity plans.  These are all lower-level plans.

What Arthur and Shannon have been able to do is bring in ERISA plans, similar to maybe what you attorneys, respectfully, sir, would have in group insurance.  So they're selling a different type of caliber of plan.  And I think that's why they don't have advanced debts.  They weren't forced into borrowing money, excuse me.

You know, the other products that MBOA and Bene Market were selling, sir, were causing a significant amount of debts because they just weren't staying on the books long enough.  You know, people were getting them in January and canceling them in June.  And that's why, you know, we -- I have this debt.  The biggest thing borrowing money from Par Funding, which is obviously a high-interest loan, is we couldn't meet payroll.  You know, we couldn't meet payroll, so we had to go and borrow money.  And we couldn't make payroll because the insurance carriers didn't like the quality of the product that we were selling -- or that they give us.

So I know that was a long way to say Segura Medico is a

122

proper insurance agency instead of the -- excuse me, instead of the stuff that I was attempting to do.

Q   Ms. Kroemmelbein had no experience in insurance before starting with Seguro Medico, correct?

A   Understands.  She's been around me long enough to understand what insurance is.  You're talking about a very high-level, sophisticated organizational leadership female who has an MBA, I believe, from Lehigh, who's finishing --

Q   Mr. Redmond --

A   -- her doctorate's --

Q   Mr. Redmond --

A   -- who's raising three kids.  You know, she -- she has experience in business.  We can say that.

Q   Okay.  But to answer my question, she had zero experience personally in insurance before Seguro Medico, correct?

A   Could you define insurance for me, sir?  Insurance?

Q   You need me to define insurance for you?

A   No.  I need you to -- there's insurance sales.  There's claims.  There's third-party administrators.  I need you to be very specific.

Q   Actually, I'll stay broad.  She had zero experience in any of what you just said?

A   Okay.

Q   Correct?

A   In insurance?  Well, I'll tell you.  You know, when she

123

was running schools for special needs kids, she had a lot of experience in insurance.  She -- she put the group plans together.  She negotiated with the carriers.  She had some experience.  I wouldn't stay zero.

Q    Okay.  Other than what you've just said, you'd agree she didn't have any other experience in the business side of insurance, correct, before Seguro Medico?

A    Are you -- if you're going to define it, I would need you to define it, Attorney Ready.  In sales?

Q    All right.  Sure.  We'll go through them one at a time. Did she have any experience in insurance sales?

A    She did not have experience in insurance sales.

Q    Did she have any experience in insurance regulations?

A    No, she did not.

Q    Did you have any experience in insurance brokering?

A    No.

Q    Did you have any experience in insurance underwriting?

A    No.

Q    Is there any other thing that I've missed that she would have had experience in regarding insurance?

A    No, just a highly sophisticated, talented, kind person who knows how to build businesses better than myself.  And to be honest, Arthur as well, although he's very talented as well.

        MR. READY:  Your Honor, I've got a good bit more. I'm happy to keep going.  Would the Court -- I just want to

124

check on scheduling, how the Court wants to proceed.

THE COURT:  Okay  Well, we can go as long as 1 o'clock, and then I am going to take a break, which gives you basically another half hour or so.

MR. READY:  Okay.

THE COURT:  If you think that you can't complete it by then, then we will need to bring him back after lunch.

MR. READY:  I'll do my best to keep it moving.

THE COURT:  Okay.

MR. READY:  Thank you, Your Honor.

BY MR. READY:

Q   So I'm going to go back to an earlier question.  I don't think it quite got nailed down.  I asked you -- you said you needed a break, and that's why you started consulting with Seguro Medico.

A    Sure.

Q    And that was immediately after you ended your work at Bene Market, correct?

A    Yeah.  There was a bit of synergy.  You know, Shannon had said that I should continue to operate agencies.  And I was pretty burnt out.  You know, it'd been a rough ride getting to -- to this country from 2007, graduating in 2007 in this country and then, you know, getting the 2019 and realizing that you're in a ton of debts.  You know, it wasn't -- it wasn't very satisfying.

151

A    Uh-huh.

Q    So it says that client, Seguro Medico, agrees to hold you harmless for any outcomes that result from decisions made by the client.  Did I read that correctly?

A    You did.

Q    Okay.  And so you're not responsible for any of the debts of Seguro Medico, correct?

A    Well, you know --

MR. CIARDI:  Your Honor, that's not what this says. This says actions taken as a result of his consultative services.  It's nothing to do with debts or not debts.

MR. READY:  Your Honor, that would certainly cover if there were debts --

MR. CIARDI:  That's --

MR. READY:  -- that were incurred by the business.

MR. CIARDI:  Then that's going to call for a legal conclusion, Your Honor.  And then my objection will be something different.

MR. READY:  Okay.

MR. CIARDI:  But that's not what this document says.

MR. READY:  Your Honor, I'll accept that they believe that's the legal conclusion.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Your Honor, not to interrupt, but can we just take a five-minute bathroom break --

152

THE COURT:  Well --

UNIDENTIFIED SPEAKER:  -- if we're going to.

THE COURT:  Yeah, we're -- we're close to done. We're at, like, 12:58.  So you have basically two minutes.

MR. READY:  Okay.  Understood, Your Honor.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

BY MR. READY:

Q    Who else has taken shares of the profits of Seguro Medico?

A    Who else gets paid?  Who else gets shares?

Q    Yes.

A    Well, what does that mean, Joel?  Distributions?

Q    Yes.  Who gets the distributions from Seguro Medico?

A    I would imagine it's Arthur and -- well, I know Shannon, obviously, gets distributions and I believe Arthur gets distributions, too.  You would need to ask him.

Q    Okay.  When did Shanonn -- Ms. Kroemmelbein resign employment with the Bucks County Intermediate Unit?

A    I'm not exactly sure.

Q    Okay.  Just so that we have a complete -- one moment.

A    Uh-huh.

MR. READY:  That's all the questions I have for this witness.

THE COURT:  Okay.  Since we are at roughly 1:00, I presume that you're going to want to have your client on the stand when we come back?

153

MR. CIARDI:  Well, Your Honor, I want to discuss that with Ms. Nigrelli.  We may choose to put him on in our case-in-chief and be done with him for now.

THE COURT:  Okay.

MR. CIARDI:  I haven't made that decision yet, so I -- maybe in a -- when we take the break, we'll make that decision, but.

THE COURT:  Okay.  But I presume there won't be discussion regarding his testimony?

MR. CIARDI:  No, we won't be discussing it with him, Your Honor.  I don't know whether I'm going to call him or not call him --

THE COURT:  Understood.

MR. CIARDI:  -- after the -- that -- I just haven't made that decision.

THE COURT:  Okay.  That's fine.

You can step down.  Thank you, Mr. Redmond.

THE WITNESS:  Thank you.

THE COURT:  Okay.  So my plan is to come back at 2:00, unless you need more time than that, which is fine, too.

MR. CIARDI:  No.

THE COURT:  I might need more time than that, but I don't have anything in between.  So I can come back at 2:00, if that's okay with everyone.

MR. CIARDI:  2:00 is fine, Your Honor.

# Exhibit B

# Exhibit B

1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

          )
IN RE:              )   24-13093
          )
ALAN CHRISTOPHER REDMOND,   )   Conducted via telephone
          )   conference
        Debtor.     )   November 22, 2024

TRANSCRIPT OF SECTION 341 HEARING
BEFORE KEVIN CALLAHAN, U.S. TRUSTEE
HEARING OFFICER

APPEARANCES:

For the Debtor:            NICOLE M. NIGRELLI, ESQ.
                           CIARDI CIARDI & ASTIN
                           1905 Spruce Street
                           Philadelphia, PA 19103

For the Creditors,         JOEL A. READY, ESQ.
Jason Scott Jordan, Ethan  CORNERSTONE LAW FIRM, LLC
Shalter:                   8500 Allentown Pike, Suite 3
                           Blandon, PA 19510

For the Creditor,          JESSICA M. GULASH, ESQ.
WBL SPO I, LLC, WBL SPO    LUNDY, BELDECOS & MILBY, PC
II, LLC:                   450 N. Narberth Ave., Suite 200
                           Narberth, PA 19072

For the Creditor,          JOHN KETTERING, ESQ.
Complete Business          PIETRAGALLO GORDON ALFANO BOSICK &
Solutions Group, Inc.      RASPANTI, LLP
d/b/a Par Funding:         1818 Market Street, Suite 3402
                           Philadelphia, PA 19103

Also Present:              John Schanne
                           Trial Attorney, Office of the U.S.
                           Trustee

Proceedings recorded by electronic sound recording.

Joseph Burstein, CDLT-189
eScribers
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(800) 257-0885

2

HEARING OFFICER:  Good morning.  My name is Kevin Callahan.  I'm counsel to the United States Trustee.  This is the case of Alan Christopher Redmond, Bankruptcy No. 24-13093.  The case is assigned to the Honorable Patricia Mayer, bankruptcy judge for the Eastern District of Pennsylvania.

An involuntary petition was filed against the debtor on September 3rd, 2024.  On October 2nd, court entered an order for relief, and this is a pending Chapter 11 case.  Today's date is November 22nd.  We are conducting this meeting telephonically, and it is being electronically recorded.

I'm going to start with entries of appearance of the parties, beginning with counsel for the debtor.

MS. NICOLE NIGRELLI:  Good morning.  Nicole Negrelli, Ciardi Ciardi & Astin, counsel for Alan Christopher Redmond.

And with me also today is Alan Christopher Redmond.

HEARING OFFICER:  Mr. Redmond, good morning.

Where are you presently located, sir?

MR. ALAN REDMOND:  I am in Nicole's office, sir.

HEARING OFFICER:  Okay.

MR. REDMOND:  Spruce Street in Philadelphia, sir.

HEARING OFFICER:  Thank you.  And could you please raise your right hand?

DEBTOR, ALAN CHRISTOPHER REDMOND, SWORN

HEARING OFFICER:  Thank you.  Your counsel has submitted to me a copy of a government-issued photo ID card and

3

a Social Security card.

And Nicole, can you verify that the person in front of you is the person that you sent the identification cards?

MS. NIGRELLI:  I can.

HEARING OFFICER:  Thank you.  All right.

So let's get entries of appearance.  I have the names here.  Just confirm that you're here.

Joel [Red'-ee]?

MR. JOEL READY:  Yes, [Reed'-ee], but present, correct.

HEARING OFFICER:  Okay, and who do you represent, sir?

MR. READY:  I represent Jason Scott Jordan, Cornerstone Law Firm, and Ethan Shalter.

HEARING OFFICER:  Thank you.

Ms. Gulash?

MS. JESSICA GULASH:  I'm here, and I represent creditors WBL SPO I, LLC and WBL SPO II, LLC.

HEARING OFFICER:  And Mr. Kettering?

MR. JOHN KETTERING:  Yes, good morning.  John Kettering.  I represent Complete Business Solutions Group, Inc. doing business as Par Funding through its court-appointed receiver, Ryan K. Stumphauzer.

HEARING OFFICER:  Thank you.  And I also note for the record my colleague, John Schanne, an attorney in the Office of the U.S. Trustee, is also present.

4

So we're going to go forward here with an examination.

Mr. Redmond, I'm going to ask you a series of questions with respect to the debtor's filings that were made with the court, the debtor's intent to reorganize in Chapter 11. I'm not going to ask a lot of specific questions other than the ones I do ask. And then I'm going to allow creditors the opportunity to ask questions regarding your Chapter 11 case.

So going forward, Nicole, I assume you have the documents in front of you and in front of your client.

The first document I want to refer you to is the Official Form 106Dec. That's the declaration about your schedules, Mr. Redmond. And that document was filed on November 8th, 2024, Docket No. 108. And when you get to that document, let me know.

THE WITNESS: I am here, sir.

HEARING OFFICER: Do you have that document?

THE WITNESS: I do, sir.

HEARING OFFICER: And did you sign that document?

THE WITNESS: Yes, sir.

HEARING OFFICER: And that's declaring that the information in the schedules is true and accurate. So we're going to go through those that information.

But before we do that, could you just tell me how you are in this bankruptcy proceeding?

5

THE WITNESS:  Yes, sir.  I was -- an involuntary bankruptcy was filed against me.  That would have been sometime in September, I believe, and here we are.

HEARING OFFICER:  Okay.  So let's go through your schedules.  First of all, where do you reside?

THE WITNESS:  I reside in Wyomissing, Pennsylvania.

HEARING OFFICER:  Could you give us an address, please?

THE WITNESS:  Yes, sir.  2 High Road -- H-I-G-H Road -- Wyomissing, PA 19610.

HEARING OFFICER:  Thank you.  All right.

And how long have you resided there?

THE WITNESS:  It would have been from August to September 2022 until present, sir.

HEARING OFFICER:  Okay.  All right.  Let's go through the schedules here.  Schedule A/B indicates that you own 2005 Regency Drive in Reading, Pennsylvania; is that correct?

THE WITNESS:  It is, sir.

HEARING OFFICER:  And you valued that property at one million dollars.  Can you tell me how you reached that valuation?

THE WITNESS:  Initially, I valued it at 799, but I finally did a little bit of research.  It's been a busy few months, as you can imagine.  I simply used online tools like Zillow, Realtor.com.  I looked at some comps within the area,

6

sir.

HEARING OFFICER:  And is it correct that you are not residing there, first of all, right?

THE WITNESS:  Yes, sir, that's correct.

HEARING OFFICER:  Is somebody living -- is there somebody living there now?

THE WITNESS:  There is.  There's a rentee.  Actually, an Australian family are living there right now.

HEARING OFFICER:  Okay.  And can you just explain why you are not residing in the property that you own?

THE WITNESS:  I -- we rented it out, and I live in my -- my wife's house at 2 High Road, with my family, of course, sir.

HEARING OFFICER:  I'm not sure I got that.  Could you just repeat that?

THE WITNESS:  Yeah.  We're -- we're renting out 2005 Regency Drive, and I'm currently living at 2 High Road.

HEARING OFFICER:  Okay.  And your family is at 2 High Road?

THE WITNESS:  Yes, sir.

HEARING OFFICER:  All right.  Following that, there's a description of vehicles that you own.  And is that an accurate description of the vehicles that you own?

THE WITNESS:  Yes, sir.

HEARING OFFICER:  Do you own any other vehicles?

7

THE WITNESS:  I do not.

HEARING OFFICER:  And I note that the debtor lists household furniture.  Is that household furniture on Regency Drive or elsewhere?

THE WITNESS:  It is.  That is in Regency Drive, sir.

HEARING OFFICER:  Are you renting the property where you reside?

THE WITNESS:  No, we are not.  My wife owns 2 High Road.

HEARING OFFICER:  Okay.  And how long has she owned that property?

THE WITNESS:  September -- end of August, September 2022, sir.

HEARING OFFICER:  Okay.  And how much did she purchase that house for?

THE WITNESS:  That was a purchase -- I believe she purchased it for 2.8 million.

HEARING OFFICER:  Okay.  And do you know what source of funds she used to purchase that property?

THE WITNESS:  Yes, she used a combination of businesses that she owns, distributions from her businesses.

HEARING OFFICER:  And what is her name?

THE WITNESS:  Shannon, S-H-A-N-N-O-N --

HEARING OFFICER:  Okay.

THE WITNESS:  -- Redmond.

8

HEARING OFFICER:  Thank you.

MS. NIGRELLI:  And also, give him the maiden name.

THE WITNESS:  Oh, yes, Kroemmelbein.  This -- this is a tricky one, sir.  K-R-O --

HEARING OFFICER:  Well, your attorney interrupted me. I couldn't quite hear what she said and then you were saying.

Nicole, did you want to say something?

MS. NIGRELLI:  I said give -- yeah, I just said, why don't you give her maiden name.

HEARING OFFICER:  Are you asking me?

MS. NIGRELLI:  No, no, I said that to Alan, saying --

HEARING OFFICER:  Oh, okay.

MS. NIGRELLI:  -- to give the maiden name.

HEARING OFFICER:  Okay.  Thank you.

And if you could spell the maiden name, Mr. Redmond, that would be great.

THE WITNESS:  Yes, sir.  It's -- it's a long one. K-R-O-E-M-M-E-L-B-E-I-N.

HEARING OFFICER:  Thank you.

THE WITNESS:  Kroemmelbein.

HEARING OFFICER:  Kroemmelbein.  Okay.

THE WITNESS:  Yes, sir.

HEARING OFFICER:  And your testimony is that she owns several businesses.  Does she still own those businesses?

THE WITNESS:  She does.

9

HEARING OFFICER:  And is there a mortgage on that property?

THE WITNESS:  There is.

HEARING OFFICER:  And do you recall the amount that's owed on that mortgage?

THE WITNESS:  I spoke with her.  I believe it's between 1.55 million and 1.6 million dollars.

HEARING OFFICER:  Okay.  All right.  Let's go to collectibles of value.  Now, when you completed these schedules, were the assets that you listed assets that belong all to you alone?  Would that be correct?

THE WITNESS:  That is correct, sir.

HEARING OFFICER:  And would any of these -- do you have any assets that you jointly own with your spouse?

THE WITNESS:  Yes, we do.  We have the Mercedes Benz.

HEARING OFFICER:  Is that the one that's listed on Schedule A/B, the 2021, or is that another vehicle?

THE WITNESS:  Yeah, under -- that is listed on A/B under section 3.2.

HEARING OFFICER:  Okay.  And I do see that it says at least one of the debtors and another.  Thank you.

Any other property that's jointly owned that you're aware of?

THE WITNESS:  We have the Mercedes Benz.  I own Regency.  We have a real estate holding company, Arc

10

Realty (ph.) --

HEARING OFFICER:  I think that is --

THE WITNESS:  -- where we both own that together.

HEARING OFFICER:  Yes, we'll get to that in a second. Okay.

THE WITNESS:  Oh, sorry, sorry.  Go ahead, sir.

HEARING OFFICER:  No, no, you're good.  No, I appreciate that.

So how about the -- describe the music memorabilia and how you value that at 10,000 dollars?

THE WITNESS:  It's -- it's -- it's a collection of records, like, albums --

HEARING OFFICER:  Uh-huh.

THE WITNESS:  -- as people used to call music, sir.

HEARING OFFICER:  Yeah.

THE WITNESS:  So I have a Joni Mitchell -- I'm an old-time rock fan, without opining here.  But I have a Joni-Mitchell-signed record.  I have an Eddie-Van-Halen signed record.  In all, around 500, 600 dollars.  I'm a fan of Oasis, which is a British band.  I have a signed records -- excuse me, sorry, a picture of Noel Gallagher, who's a hero of mine. There's other small -- Alison Krauss.  I'm a country fan, as well.  My father was a musician.  So I guess they made it a little bit high, Mr. Callahan.  I would say it's worth between 5-and-10,000.

11

HEARING OFFICER:  All right.

THE WITNESS:  But I -- I wanted to put the -- the higher number, sir.

HEARING OFFICER:  Okay.  And with respect to further down on the list, there's an item identified generally as jewelry.  And you've identified a wedding ring and a Cartier watch, correct?

THE WITNESS:  Yes, sir.  And there's the pool table at Regency Drive.  That is in the basement.

HEARING OFFICER:  Yeah.

THE WITNESS:  And that actually came with the house. I talked to my attorneys, and I put down zero.  I think the pool table is probably worth maybe 1,000 dollars.  But if we were ever to sell the house, we couldn't get the -- the pool table out of -- out of the basement, sir, so I just wanted to point that small thing out.

HEARING OFFICER:  Okay.  Let's go back down to the jewelry.  And do you own any other jewelry that's worth more than 1,000 dollars that's not listed on the schedule?

THE WITNESS:  I have a Cartier watch that is -- was gifted to me from my wife that's approximately 10,000 dollars, sir.

HEARING OFFICER:  Okay.  All right.  Let's move down to items 16 and 17.  At the time of preparing these schedules that were filed on November 8th, was it your testimony that you

12

had no cash, as it's described in this --

THE WITNESS:  No cash, yes, sir.

HEARING OFFICER:  All right.  How much cash do you have on your hands today?

THE WITNESS:  Zero.

HEARING OFFICER:  You have no money with you?

THE WITNESS:  I have my wife's Discover card.  That is it, and my -- my ID, of course.

HEARING OFFICER:  Okay.  Deposits of money, checking, savings, or other financial accounts, you've listed none; is that correct?

THE WITNESS:  That's correct, yes, sir.

HEARING OFFICER:  And how long have you had no checking, savings, or other financial accounts?

THE WITNESS:  Initially, I thought it was December, but finally getting down to -- to do a little bit of research, that would have been -- excuse me, Mr. Callahan.  I'm just finding the exact sheet.  I apologize.

I think that was in January, Nicole.  (Indiscernible).

It would have been January 4th, sir.  And also, January 31st, I had two accounts with Mid Penn Bank, which is a local bank in Wyomissing.

HEARING OFFICER:  Uh-huh.

THE WITNESS:  January 4th was when the checking account was closed.  January 31st was when the savings account

13

was closed.

HEARING OFFICER:  So Mr. Redmond, you previously met with a representative of my office to discuss the financial requirements of a debtor-in-possession in Chapter 11.  And we requested certain financial information.  Do you recall that conversation you had over the phone with my colleague?

THE WITNESS:  Yes, I do, sir.

HEARING OFFICER:  And we had asked you to provide the three most recent -- copies of the three most recent monthly bank statements of all accounts.  And you supplied to us monthly account statements for two accounts at Mid Penn, Mid Penn Bank.  Do you recall doing that?

THE WITNESS:  Yes, I -- I do.  I worked with Nicole on that, sir.

HEARING OFFICER:  And is it your testimony today that those bank accounts, one account ending in number 101 and the other account ending in 283, were the only bank accounts you've had in your name since approximately January of 2024?

THE WITNESS:  Yes, I believe that -- that is correct. I rattled my brain to ensure I didn't miss anything, Mr. Callahan.  But Mid Penn was the bank account that I've been using -- or were using, excuse me -- for the last year and a half, two years, up until January.

HEARING OFFICER:  Okay.  Since January, have you received any income, January 2024?  Have you received any

14

income from any source?

THE WITNESS:  Yes, I have.

HEARING OFFICER:  And where was that income placed?

THE WITNESS:  That income would have been given to Shannon, my -- my wife, to help her pay household bills.

HEARING OFFICER:  Do you know if you directed anybody who -- well, let's talk about your sources of income.  What were your sources of income over the last year, since January of 2024?

THE WITNESS:  I have a consultation agreement, Mr. Callahan --

HEARING OFFICER:  Uh-huh, uh-huh.

THE WITNESS:  -- that I get paid a consultation fee on.  I also had the rental income from Regency Drive, which is 4,000 dollars per month.

HEARING OFFICER:  Okay.  And let's just talk about the rental income.  Where is that -- first, is the rental income current from the tenant?

THE WITNESS:  It is, yes, sir.

HEARING OFFICER:  And where is that money sent to?  Is it cash paid to you?  Is there a check written and deposited?  How is that paid?

THE WITNESS:  The tenant was initially providing myself with a check.  Then, they switched to wires, and that was being wired into Shannon's personal bank account, sir.

15

As -- as of recently, they have been providing a check, and that has been deposited into the DIP account.

HEARING OFFICER:  The debtor-in-possession account, you mean, right?

THE WITNESS:  Excuse me.  Yes, sir.

HEARING OFFICER:  Okay.  Let's move on, come back -- paragraph 19 talks about companies that you may have an interest, an ownership interest.  And I'm certain other parties may have more detailed questions, but just for the record, tell me what Arc Realty, LLC does?

THE WITNESS:  Arc Realty, LLC is simply a real estate holding company for a few properties.  It doesn't do much.  You know, previously, our attorneys, my attorneys, had recommended that I open an LLC to -- to hold property.

HEARING OFFICER:  Okay.  And you say, a few properties.  How many properties?

THE WITNESS:  Right now, there are two properties.

HEARING OFFICER:  Could you identify the location?

THE WITNESS:  Yes, sir.  The address on the first property is 1198 Reading Boulevard.

HEARING OFFICER:  Okay.

THE WITNESS:  Again, Mr. Callahan, that's in Wyomissing, Pennsylvania --

HEARING OFFICER:  Uh-huh.

THE WITNESS:  -- 19610.

16

HEARING OFFICER:  Okay.  And the second?

THE WITNESS:  Yes, sir.  It's 8 Morgan Drive, and that is in Sinking Spring, Pennsylvania 19608.

HEARING OFFICER:  Any other properties?

THE WITNESS:  No, sir.

HEARING OFFICER:  The property at 1198 Reading, do you have an idea as to the value of that property?

THE WITNESS:  That was initially purchased for 1.495 million.

HEARING OFFICER:  Okay.

THE WITNESS:  I would assume that it's probably went up a little bit in value.  I pulled that last night, sir.  The value is -- in my -- my estimation, is approximately 1.65 million dollars.

HEARING OFFICER:  Okay.  And is that a commercial or a residential property?

THE WITNESS:  That is a residential property with a mortgage from WBL.

HEARING OFFICER:  Okay.  And is the property occupied?

THE WITNESS:  It is not.

HEARING OFFICER:  Does it generate income of any sort?

THE WITNESS:  It does not.

HEARING OFFICER:  Are there tax obligations, unpaid tax obligations -- for example, real estate tax obligations -- on that property?

17

THE WITNESS:  I'm not sure, Mr. Callahan, but I can -- I can check that and -- and provide that to you, sir.

HEARING OFFICER:  All right.  8 Morgan Drive, can you describe that property, please?

THE WITNESS:  Yeah, it's a small commercial building. It's currently being leased by one of my wife's businesses, 7,800 square foot.  It's probably valued at 1.15-to-1.2 million dollars.

HEARING OFFICER:  Okay.

THE WITNESS:  And it does have a mortgage on it from a company, a lender, called NuBridge, N-U-Bridge, B-R-I-D-G-E.

HEARING OFFICER:  Yeah.  So one of the bank accounts you had at Mid Penn Bank that you say was closed in January of 2024 indicated that the account is identified as in the name of Alan C. Redmond and Gaia Gebbia of 8 Morgan Drive, Sinking Spring.  First, can you tell me why the account was addressed to that address, 8 Morgan Drive?

THE WITNESS:  That's where all the statements were going.  Shannon is -- Shannon keeps -- keeps us organized, to be honest with you, Mr. Callahan.  So all statements were going into her office address.

HEARING OFFICER:  Okay.  And is Gaia Gebbia related to you?

THE WITNESS:  She -- she is not.  She's actually -- she was, excuse me, Shannon's personal assistant who keeps

18

Shannon organized with her heavy workload.  So yeah, Gaia was -- was the -- the CC, I guess you could say, on -- on many bank statements, et cetera.

HEARING OFFICER:  But is she still working for or associated with your wife, Shannon?

THE WITNESS:  No, she is not.  She -- according to Shannon, she pursued another career.

HEARING OFFICER:  Okay.  But I'm just -- so she was on the account.  Do you know if -- at the time these accounts were open and being used, whether she used the account for deposits or disbursements?

THE WITNESS:  I'm not sure, Mr. Callahan, but I -- I can review that.  I want to give you the correct answer, of course.  I can review the statements again and provide that to you immediately.

HEARING OFFICER:  Okay.  And those bank account statements reflected deposits from other bank accounts -- well, accounts with different numbers.  Where were the -- back then, what was the source of that income that was placed into those accounts, if you recall?

THE WITNESS:  I'm -- I'm not exactly sure.  Again, I can get that information.  I would assume it would have been Shannon paying the consultation fees and making transfers into -- to that account.

HEARING OFFICER:  Okay.  All right.  Let's talk about

19

Bene Market, LLC.  What is that?

THE WITNESS:  Bene Market, LLC was a company that I owned ninety-six -- well, actually, I still own ninety-six percent.  It was an insurance agency, Mr. Callahan.

HEARING OFFICER:  Uh-huh.  And is it still operating?

THE WITNESS:  It is not.

HEARING OFFICER:  National Brokers of America?

THE WITNESS:  Unfortunately, National Brokers of America entered bankruptcy, I believe, the beginning of 2019, maybe the end of 2018.  But that is currently in -- in bankruptcy.

HEARING OFFICER:  How about the Redmond Group, LLC?

THE WITNESS:  That didn't do much of anything.  The idea was that it was going to be a marketing agency to provide leads to insurance companies.  It didn't really get off the ground.  It has not generated any income in the last four to six years, maybe -- maybe a little bit longer, Mr. Callahan.  It is defunct.

HEARING OFFICER:  How about Redmond Marketing, LLC?

THE WITNESS:  Same situation, sir, as to Redmond Group, now defunct.

HEARING OFFICER:  Okay.  And I see, in your responses to the other questions, with respect to assets, you list none until you reach question number 34, which discloses --

THE WITNESS:  Mr. Callahan, sorry to -- sorry to

20

interrupt you, sir.  I apologize.  As I was going through these again with -- with Nicole, there are some amendments that I will need to provide to number 19.  There are three other businesses now defunct.  But I was -- as -- as I was going through my -- my timelines, I do need to provide you an amendment on question 19, sir.

HEARING OFFICER:  Okay.  Do you want to just quickly name the entities and we can amend the documents later?

THE WITNESS:  Yes, sir.  And again, I apologize.

The first entity is U.S. Consolidation (ph.).  That is defunct, made very little money.  The next one is a company called Next -- excuse me, Mr. Callahan.  I owned that a hundred percent, U.S. Consolidation.  The next LLC is Next Gen Leads (ph.), as in G-E-N.  Again, that company is defunct, never really got off the ground much.  And the final company -- and I owned at a hundred percent also, sir.  And the final company was U.S. Trifecta (ph.).  U.S. Trifecta was a partnership with a former partner, and I owned that company fifty percent.  That has not been operational since, I believe, the end of 2022.

HEARING OFFICER:  Let's go to question 34.  And counsel for Mr. Jordan is here.  But is it your belief that the debtor has a possible claim against Mr. Jordan, Ethan Shalter, and/or Cornerstone Law?

THE WITNESS:  Yes, that is correct, sir.

HEARING OFFICER:  And with respect to the joinder

21

complaint, is that a -- has that been a complaint filed anywhere against Jason Scott Jordan?

THE WITNESS:  It has.

HEARING OFFICER:  Nicole, do you have the --

THE WITNESS:  Actually, I have the CCP -- sorry.

HEARING OFFICER:  Nicole, do you have it?

MS. NIGRELLI:  Yeah, that's pending in Philadelphia County, I believe the Court of Common Pleas.

THE WITNESS:  I believe so.

MS. NIGRELLI:  I can double check that.

HEARING OFFICER:  All right.

MS. NIGRELLI:  But it is related to the Par Funding.

THE WITNESS:  Complete Business Solutions.

MS. NIGRELLI:  Complete Business Solutions --

THE WITNESS:  Sorry, Nicole.

MS. NIGRELLI:  -- doing business as Par Funding.  And that liability is alleged to be fifty percent with Jason Scott Jordan.  And we list Complete Business Solutions Group as a little over thirty-five million.

HEARING OFFICER:  Okay.

MS. NIGRELLI:  So if we're held liable, we believe that he's responsible for seventeen million of that.

HEARING OFFICER:  Okay.  I'm going to move forward. And obviously, creditors will get the opportunity to ask some questions.

22

But let's go to Schedule G, executory contract and expired leases.  Mr. Redmond, I want to know about the consulting agreement with Seguro Medico, LLC.  First, what is Seguro Medico?

THE WITNESS:  That is -- it is an insurance agency that my wife and her partner own.

HEARING OFFICER:  And what is her partner's name?

THE WITNESS:  Arthur Walsh, Jr.

HEARING OFFICER:  Okay.  And what services do you perform for Seguro Medico?

THE WITNESS:  It's a lot of -- a lot of technology services.  I assisted them with building their CRM.

HEARING OFFICER:  What is a CRM?

THE WITNESS:  I help them with -- excuse me, a client relationship management tool --

HEARING OFFICER:  Okay.

THE WITNESS:  -- to store all their leads and contacts, leads being clients that they are attempting to enroll into an ACA policy or a dental insurance policy.  So it's very techy, which is actually something I'm good at, believe it or not.  So yeah, it's technology focused. Previously, being in the insurance business, I have some connections in the business from my stint there.  So you know, I've introduced them to lead vendors, helped them with integration, you know, with insurance carriers, a lot of tech

23

stuff.

HEARING OFFICER: Okay. And do you have a set fee that you receive, monthly basis, weekly basis?

THE WITNESS: I don't. I don't. I was supposed to be paid off of the performance of the company. But currently, I've talked to Artie and Shannon, and I will be receiving a set amount moving forward, sir. I -- I just thought that was easier for all intents and purposes, especially with this.

HEARING OFFICER: Let's go to Schedule I, which has information about your income and your spouse's income.

Are you there, sir?

THE WITNESS: Yes, sir. I'm here.

HEARING OFFICER: Okay. Schedule I, you identify yourself as a consultant, which we've learned already, and your spouse as an entrepreneur and principal. So let's break --

THE WITNESS: Correct.

HEARING OFFICER: -- that down. Is she the principal of a school in the Pottstown School District?

THE WITNESS: She is. She is. She decided, once she had -- and she's done this. But once she had Seguro set up and some of her other companies, she hires a pretty competent CEO. In Seguro's instance, Mr. Callahan, it was Arthur Walsh, MBA, sharp guy with thirty years of experience. And after she had our -- our -- our third child, Sophia, she decided to spend one to three days, one to two and a half days a week, in Seguro,

24

sir. And she wanted to pursue her passion of -- of building the special needs school up in -- up in Pottstown. So that -- her original background is -- is special needs, but she -- she's finishing her doctorate in organizational leadership. So she's -- she's a bit of a high flier and certainly out of my league.

HEARING OFFICER: Okay. So I'm just -- is it a particular school that she is a principal of, and is it in the public school district, or public school system?

THE WITNESS: I believe it is a school called Edgewood --

HEARING OFFICER: Could you spell that, please?

THE WITNESS: -- in Pottstown.

HEARING OFFICER: Edgewoods [sic]?

THE WITNESS: Yes, sir. Yes, yes.

HEARING OFFICER: E-D-G-E-W- -- D-S?

THE WITNESS: Yeah, E-D-G-E-W-zero -- W-O-O-D, Edgewood. And I mispronounced. She previously had special needs. This is an underprivileged school. I apologize.

HEARING OFFICER: Okay. So is this a list of -- again, it requests information regarding monthly income. And I see -- it appears that she receives 9,333 dollars monthly. Is that a salary paid by the Pottstown School District?

THE WITNESS: It is.

HEARING OFFICER: Okay. And then below, question 6A,

25

net income from rental property or operating a business, and she identifies 40,000 dollars per month income.  And is that from Seguro?

THE WITNESS:  That is from Seguro and another one of her businesses, correct.  It's a combination.

HEARING OFFICER:  Yeah.  Okay.  What other company?

THE WITNESS:  She has a company called ABN.

HEARING OFFICER:  Okay, and what does that company do?

THE WITNESS:  It -- it's -- it -- it helps insurance agencies like she owns, and other insurance agencies, scale. So to -- to expand, her background really is in formulation of organizational charts, you know, company infrastructure, expansion, et cetera.  So that's what ABN does.

HEARING OFFICER:  Okay.  So let's talk about Schedule J.  I'm sorry; you wanted to say something?

THE WITNESS:  Yeah.  She -- she also is starting a -- or -- or has started another company called Benefits Now, N-O-W.  And that company is, in all intents and purposes, focused on prescription coverage direct to consumer, as well as dental coverage.  That is based on, you know, her analysis that there's a viable market to be able to sell them products direct to -- to consumers, from what I understand.  It's more intricate than that, but that's what's -- what she's told me.

HEARING OFFICER:  Okay.  With respect to expenses, 15,699, is that for both homes, your home and her home?

26

THE WITNESS:  That is for her home, sir.

HEARING OFFICER:  For her home.

Is your home owned free and clear, no mortgages?

THE WITNESS:  It is not; it does have a mortgage.

HEARING OFFICER:  And Nicole, is that listed anywhere here?

MS. NIGRELLI:  That's WBL, and I believe Ms. Gulash is here.

HEARING OFFICER:  Well, I'm just asking if it shows up on Schedule J.

THE WITNESS:  (Indiscernible).  It might be under SPO, maybe, Nicole.

MS. NIGRELLI:  Let me look.  Well, I know that it's SPO, and it's in foreclosure -- I don't know if it's in foreclosure.  But I know there was a complaint filed, so if it's not included in here, I'll make sure that we amend that. I did list it on Schedule D, but we might have missed it.

THE WITNESS:  I'm not seeing that in there.

HEARING OFFICER:  Okay.  Mr. Redmond, we're going to move on.  Just --

MS. NIGRELLI:  I mean, we'll look at it, yeah.  Yeah.

THE WITNESS:  Sorry, yeah.

HEARING OFFICER:  Mr. Redmond, let's go to item 8, child care and children's education costs of 7,500 dollars a month; what is that?

27

THE WITNESS:  I pay my ex-wife.  I have two -- two children, Eva (ph.) and Noah (ph.), from a previous marriage, and there's 5,000 dollars of spousal support.  As part of that custody agreement, I also have to pay medical bills, tutoring, et cetera, and then Sophia's day care, which is myself and Shannon's firstborn, day care, clothing expenses.  This is what -- what I estimated.

HEARING OFFICER:  So you have a total of three children, correct?

THE WITNESS:  Yes, sir.

HEARING OFFICER:  Okay.  And you're allocating 7,500 dollars a month for child care and children's education costs?

THE WITNESS:  Correct.

HEARING OFFICER:  Are they going to private school?

THE WITNESS:  Yes.  Eva and Noah are going to Wyndcroft in Pottstown --

HEARING OFFICER:  So --

THE WITNESS:  -- right beside where -- where Shannon -- uh-huh.

HEARING OFFICER:  All right.  And then further down the list, you have, it looks like, four car payments.  It says car payment to vehicle 1, 2 --

THE WITNESS:  Yes.

HEARING OFFICER:  -- 3, 4.  Where does 3, 4 --

THE WITNESS:  Yes, I --

28

HEARING OFFICER:  -- appear on the schedules?

THE WITNESS:  Shannon has two other cars that she owns.

HEARING OFFICER:  And just identify the make and model, year?

THE WITNESS:  Yeah.  Yes, sir.  I'll -- I'll do my best.  Shannon owns a white Mercedes.  I believe it's a GL450.  And she also owns a Bentley Continental -- I believe it's a 2020, 2021 -- that she also owns, I guess you could say her sports car.

HEARING OFFICER:  So you each own two cars?  Or the two of you own four cars, right?

THE WITNESS:  No.  I own the Escalade.  We own the Mercedes S580 together.

HEARING OFFICER:  Uh-huh.

THE WITNESS:  And then the Bentley and the GL450, the white Mercedes, is owned by Shannon.

HEARING OFFICER:  So the totals here on Schedule I indicate you both have income of approximately 58,000 dollars per month and expenses of 43,000 dollars a month; is that accurate?

THE WITNESS:  Yes, that's -- that sounds -- yeah.

HEARING OFFICER:  In terms of what you believe it to be.  I understand much of these are estimates.  Okay.

Let's go to the statement of financial affairs.

29

And Mr. Ready, when you -- it's actually page 2 of 8 on the top.  It's the response to the question on the page before with respect to gross revenue.  It indicates that for this year --

Actually, these schedules, this statement of financial affairs, Nicole, I don't know why it doesn't list present revenue.  Oh, no.  Here, it does, January 1 of current year until the date you file for bankruptcy.

You marked zero, correct?

THE WITNESS:  (Indiscernible).  Okay, yes.

HEARING OFFICER:  It was marked zero, but don't you receive rent from Regency on a monthly basis?

THE WITNESS:  Yes, I do, I do.  Why did I mark that -- sorry.  Sorry, Mr. Callahan; I'm going to sidebar with Nicole.

HEARING OFFICER:  No, no, no, no, no, no.  No, you're not.

MS. NIGRELLI:  I'm not answering anything.

THE WITNESS:  Oh, I -- I --

MS. NIGRELLI:  Yeah.

THE WITNESS:  -- apologize.  Sorry, I apologize.

There is rental income on my consultation agreement. It -- it looks like this could potentially be a mistake, which I apologize for.

HEARING OFFICER:  No, you told us --

MS. NIGRELLI:  To be clear, he has not filed his tax

30

returns yet.

THE WITNESS: Uh-huh.

MS. NIGRELLI: So I think --

HEARING OFFICER: Well, that doesn't help.

He told us that he gets 4,000 dollars a month for the Regency property and whatever the amount was for consulting fees every month, or at least average. Why isn't that identified as gross income?

MS. NIGRELLI: Right. And to be clear, he did not receive any consulting fees --

THE WITNESS: Uh-huh.

MS. NIGRELLI: -- from January until, I don't know, September.

HEARING OFFICER: I didn't hear him say that.

MS. NIGRELLI: But this is --

HEARING OFFICER: Whoa, whoa, whoa, whoa, whoa. I didn't hear him say that.

Mr. Redmond, let's go back to this.

MS. NIGRELLI: Oh.

THE WITNESS: Yes, sir.

HEARING OFFICER: Is it your testimony that you received no consulting fees since January 1, 2024 from any source?

THE WITNESS: I'm reading the -- the question, and I think that --

31

HEARING OFFICER:  No, no, no, just --

MS. NIGRELLI:  I might have misspoke.

HEARING OFFICER:  No, no, no, no, no.  Let's put the paper down and tell me:  Did you receive any income for consulting since January 1, 2024 until the present date?

THE WITNESS:  Yes, I would have received money from consulting.

HEARING OFFICER:  Okay, and there's --

THE WITNESS:  And -- I -- I -- I also would have received rental income, sir.

HEARING OFFICER:  Yeah.  Okay.  Schedule I indicates -- that's exactly what you -- so why does this say zero?

THE WITNESS:  Mr. Callahan, I think I read -- read the question wrong.  I'm just reading the question again, sir.  If you could give me one second.  "Did you have any income from employment or from operating a business during this year?"  So I assumed, and I probably assumed wrong, that from owning a business or being employed, as in wages or business income, that's -- that's -- that's what I read that as, sir.

HEARING OFFICER:  Okay.  You can amend it, then.

THE WITNESS:  Okay.  My -- my apologies.

HEARING OFFICER:  All right.  Let's go to paragraph 17, "Within one year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any

32

property to anyone who promised to help you deal with your creditors or to make payments to your creditors?"  In paragraph 17, the response is no; is that correct?

THE WITNESS:  "Within one year before you filed for bankruptcy, did you or anyone acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors".  Again, reviewing this, Mr. -- I -- I think that's a yes.  Let me just read it again, sir, if you don't mind.  Sorry.  Oh, okay.  So Shannon has been helping me pay some of the -- the debts the last -- excuse me, some of the creditors over the last year or so, last number of years, Mr. Callahan.  So --

HEARING OFFICER:  Uh-huh.

THE WITNESS:  -- I just want to be clear on that, and obviously, I haven't.

HEARING OFFICER:  Okay.  Well, talk to your attorney after the meeting, and you can amend if necessary.

THE WITNESS:  Yes, sir.  Yes, sir.

HEARING OFFICER:  Are you familiar with the Rush Law Group?

THE WITNESS:  I am.

HEARING OFFICER:  And what does the Rush Law -- are they your attorney?  Do they serve as your counsel?

THE WITNESS:  Yes, I -- I have retained them for this -- this -- this matter, sir.

33

HEARING OFFICER:  Okay.  And do you recall reviewing and signing an application that was filed with the court to employ the Rush Law Group?

THE WITNESS:  I do; I believe that application is pending, Mr. Callahan.

HEARING OFFICER:  Okay.  And do you recall that the Rush Law Group was paid certain fees in connection with representing you in certain matters?

THE WITNESS:  I do.

HEARING OFFICER:  And could you tell me the source of those payments that were made to the Rush Law Group?

THE WITNESS:  I can; Shannon has been paying the legal fees to -- to Mr. -- excuse me, Attorney Rush.

HEARING OFFICER:  Would it surprise you that the declaration filed by Mr. Rush states that the Rush Law Group received the filing payments from you?

THE WITNESS:  Is this the filing?

HEARING OFFICER:  Well, I'll represent to you that's what it states in the declaration.  Was that an accurate statement?

THE WITNESS:  I have paid Bill Rush -- excuse me, Attorney Rush -- law fees --

HEARING OFFICER:  Okay.  And from what source of --

THE WITNESS:  -- as has Shannon recently.

HEARING OFFICER:  I'm sorry.  I cut you off; I

34

apologize.

THE WITNESS:  I'm sorry; I cut you off.  But Shannon has been paying these fees for the last number of months.

HEARING OFFICER:  Okay.  Okay.  But I --

MS. NIGRELLI:  Kevin, to be clear, there was a supplemental declaration filed by Bill Rush on 11/19 --

HEARING OFFICER:  Oh, okay.

MS. NIGRELLI:  -- that specifically dealt with where the payments came from and the incorrect assumptions of fact in the objection filed.

HEARING OFFICER:  Well, let's just talk about the incorrect statement, if it was; I don't know.  I'll take a look at the declaration.  Okay, I see it, filed 11/19.

And while looking at that, Mr. Redmond, did you pay Ms. Nigrelli's firm any fees in connection with representing you in this bankruptcy proceeding?

THE WITNESS:  No, I did not.

HEARING OFFICER:  Do you know if your spouse or any other party paid, on your behalf, fees?

THE WITNESS:  My spouse Shannon would have, yes, sir.

HEARING OFFICER:  Do you know what the amount of those fees was?

THE WITNESS:  I don't have that fully.  I believe it's been approximately 25,000 dollars, but I can certainly get that off Shannon, Mr. Callahan, and get that right to you.

35

HEARING OFFICER:  Nicole, you can help me out on this one.  Is that disclosed in the application?  I don't have yours in front of me.

MS. NIGRELLI:  I don't have it in front of me, but I can double check.

HEARING OFFICER:  Let's check now.

MS. NIGRELLI:  I'm sure it is.

HEARING OFFICER:  Okay.  Let's check now.  It does not appear in the statement of financial affairs, but I understand that may -- the language in that question --

MS. NIGRELLI:  I don't think -- yeah, I don't think it -- I don't think there's a question that was asked about --

HEARING OFFICER:  (Indiscernible).

MS. NIGRELLI:  -- Shannon paying our fees.  But like I said, I'll look into it and I'll get back to you.

HEARING OFFICER:  Well, I'm going to look at the application now, so.

MS. NIGRELLI:  Okay.  I don't have it in front of me. Do you want me to go get it?

HEARING OFFICER:  I'm pulling it up now on the screen. Paragraph 9 says, "CC&A was retained by the putative debtor for this case in other matters and received a retainer of 10,000 dollars on September 11th for the other matters unrelated to this involuntary case, prior to putative debtor being served with a restraining order and being provided notice".

36

Is that accurate, Mr. Redmond?

THE WITNESS:  That is accurate, yeah.  That's -- can I have a look at the -- the document, if possible?

MS. NIGRELLI:  I don't have the document in front of me.

HEARING OFFICER:  Okay.  Well, let's just go back to the statement of financial affairs.  This was filed on November 8th, 2024.

THE WITNESS:  Uh-huh.

HEARING OFFICER:  And the question 16 and 17 --

THE WITNESS:  Yeah.

HEARING OFFICER:  -- all deal with payments made to professionals, including attorneys, so that will need to be amended.

THE WITNESS:  Yes, sir, I see that.

HEARING OFFICER:  Okay.

THE WITNESS:  Absolutely.  Absolutely, yeah.

HEARING OFFICER:  All right.  Let's go to the last page --

THE WITNESS:  My apologies.

HEARING OFFICER:  -- of the statement of financial affairs.  I'm going to open it to creditors in a second, in a minute.

Mr. Redmond, is that your signature dated November 6th, 2024?

37

THE WITNESS: Yes, Mr. Callahan, it is.

HEARING OFFICER: And do you believe that the information on those schedules and the statement of financial affairs -- other than what we've discussed as perhaps needing to be amended, do you believe the other information is accurate and complete?

THE WITNESS: I believe the other information is accurate and complete. And there are some amendments that I need to do, obviously, as you stated, sir.

HEARING OFFICER: Yes, and please look at everything overall to make sure. And if there are inaccuracies, please be sure to tell your lawyer, and she can make the necessary amendments.

THE WITNESS: Absolutely.

HEARING OFFICER: Mr. Ready, do you have questions?

MR. READY: Yes, good morning.

Mr. Redmond, I want to turn your attention -- well, maybe I don't even need to point it out to you. There's a Matthew (ph.) Murrary -- I'll spell it, M-U-R-R-A-R-Y -- listed as a creditor at 2005 Regency Drive. Can you tell us who that is?

THE WITNESS: He is the rentee, Mr. Ready. He's the -- the person renting the -- the property, sir.

MR. READY: Okay. Do you know why he's listed as a creditor on this document?

38

THE WITNESS:  I -- Schedule G was for executory contracts, so I believed, because he has a leasing agreement, sir, that he needed to be in that section.

MR. READY:  Okay.  So you don't owe him any money; is that correct?

THE WITNESS:  No, sir, I do not.

MR. READY:  And do we have that name spelled right, M-U-R-R-A-R-Y?

THE WITNESS:  Mr. Ready, I think it's Murray (ph.).

MR. READY:  Okay.  I thought that might be a typo. It's probably M-U-R-R-A-Y?

THE WITNESS:  That is my fault, sir.  Yes, we will amend that, Mr. Ready.

MR. READY:  Okay.

THE WITNESS:  I believe -- Mr. Ready, I -- I believe it's M-U-R-R-A-Y, but I will -- I will confirm with the -- with the tenant, sir.  My apologies.

MR. READY:  Okay.  Understood.

Is he the only tenant at 2005 Regency Drive?

THE WITNESS:  He actually lives with his wife, and I believe they have three kids.

MR. READY:  Okay.  What is his wife's name?

THE WITNESS:  I'm not sure; I -- I call her Ms. Murray.

MR. READY:  Is he the only one that's on the lease?

39

THE WITNESS:  I -- I -- I believe it's either the Murray family or it's him on his own, but again, I -- I can provide that documentation.

MR. READY:  Okay.  How long have you been using your wife's Discover card?

THE WITNESS:  I've been using that, I would say, approximately a year and a half, potentially two years.

MR. READY:  What do you use that Discover card for?

THE WITNESS:  If I have to get gas, or you know, I have to pick up some supplies for the kids, you know, day-to-day types of things.

MR. READY:  Okay.  Do you use it for just general personal needs?

THE WITNESS:  I do, yes.

MR. READY:  Are there any other credit cards that you're using currently?

THE WITNESS:  There actually are.  Let me -- Mr. Ready, I'm going to my -- my wallet if you can give me one second.  If Shannon needs me to pick something up, I will use one of her business cards with Seguro Medico, which has a limit on it of 2,500 dollars.  So if she requests that I pick something up or -- or buy supplies.  Or if I need to purchase a piece of software, Mr. Ready, for the business, like a CRM add-on, I will -- I will request to --to use the card.  And she'll either allow it or deny it.

40

MR. READY:  What other credit cards do you have on you?

THE WITNESS:  I don't have any credit cards in my name, Mr. Ready.  I'm using my -- my wife's Discover.

MR. READY:  Sure.  So you mentioned the Discover, and you mentioned the Seguro Medico card.  Do you have any other credit cards that you use on a regular basis?

THE WITNESS:  I'm just checking.  I don't -- I'll need to provide you a full answer, Mr. Ready.  I -- I don't want to give you the wrong answer.  I -- I need to talk to Shannon about that.  I don't want to say that there isn't another card that I've used.  I -- I probably have, so I want to get you to full answer on that, sir.

MR. READY:  Okay.  So let's start with this.  Today, what other credit cards do you have on you, other than the two you've mentioned?

THE WITNESS:  I have a Seguro business card, and I also have Shannon's Discovery [sic] card.

MR. READY:  Okay.  Any others?

THE WITNESS:  No, I do not.

MR. READY:  Okay.  Do you have any debit cards on you today?

THE WITNESS:  I do not; Shannon is the -- the keeper of all -- all -- all credit cards and debit cards.

MR. READY:  Okay.  You're unsure, as you sit here

41

today, whether you've used any other credit cards, though, in the last year?  That's your answer?

THE WITNESS:  I would have used -- now that I think about it, I would have used a Bene Market card, debit card, that is with Shannon right now, or at the house.  But I would have used a Bene Market card, Mr. Ready.

MR. READY:  Okay.  And that one would have been -- you would have been the authorized user on that card, correct?

THE WITNESS:  That is correct.  I'm the owner of Bene.

MR. READY:  Okay.  You mentioned you're a ninety-six-percent owner of Bene Market.  Who owns the other four percent at this time?

THE WITNESS:  That is Ms. Stephanie Miller.

MR. READY:  What other watches do you own, other than the Cartier watch you've listed here?

THE WITNESS:  I have one Cartier watch; that's it.

MR. READY:  That's the only watch you own?

THE WITNESS:  Correct.  I'm not a big watch guy.

MR. READY:  Are there any bank accounts in your name anywhere in the world?

THE WITNESS:  There are not.

MR. READY:  Are there any credit cards in your name opened anywhere in the world?

THE WITNESS:  I did have a Capital One card a long time ago.  I believe that was closed, again, now that I think

42

about it.  It had a 500-dollar limit on it, Mr. Ready.  But now that you're asking me these questions, I can certainly provide you with that information.  I -- I -- I have not -- I don't have a Capital One card on me.  I have not accessed or used that for three to five years, sir.  But I just want to double check that -- that that is --

MR. READY:  Okay.  Give me one second here.

You said there's an Australian family living at 2005 Regency Drive.  I just want to connect that up.  Is that the Murray family?

THE WITNESS:  It is, sir, yes.

MR. READY:  Okay.  You said the name earlier, and just because of interference, I didn't catch it.  I think you may have even spelled it.  Can you spell Gaia Gebbia for me?

THE WITNESS:  I don't know how to spell her last name. I could attempt to.  Her first name, I believe, is G-A-I-A. I'm -- I'm not exactly sure.  Would you like me to guess, Mr. Ready?

HEARING OFFICER:  Mr. Ready, maybe I can help.  I have the bank account name on there.  So the spelling on the bank account name is G-E-B-B-I-A.

THE WITNESS:  Thank you, Mr. Callahan.

MR. READY:  All right.  You mentioned a couple of businesses that were unlisted.  I think you're going to amend. I just want to ask you a couple follow-up questions.  U.S.

43

Consolidation --

THE WITNESS: Yes, sir.

MR. READY: -- what type of entity is that? Is it an LLC, a corporation?

THE WITNESS: I believe it's an LLC. That was four, five, six years ago. I believe it's an LLC. Let me just --

MR. READY: And I'm sorry; I'm getting a lot of interference.

Where was that formed? Is that Delaware, Pennsylvania, somewhere else?

THE WITNESS: I believe it was in Pennsylvania.

MR. READY: Same question for Next Gen --

THE WITNESS: But I will check that.

MR. READY: Okay. Same question for Next Gen Leads, what type of entity and where was it formed?

THE WITNESS: Next Gen Leads, it would have been an LLC. I believe it was formed in Delaware or Pennsylvania. That's where I -- I formed LLCs, but I can provide you that, also, Mr. Ready.

MR. READY: All right. Same question for U.S. Trifecta?

THE WITNESS: My partner at the time, sir, was from Florida. I believe it was formed in Pennsylvania, but again, I can provide that to you, sir.

MR. READY: And do you know if it was an LLC or a

44

corporation?

THE WITNESS:  I believe it was an LLC.

MR. READY:  And who was your former partner?

THE WITNESS:  I'll spell -- spell this, Mr. Ready: Seni, S-E-N-I, last name Sok, S-O-K.

MR. READY:  Okay.  How much money did U.S. Trifecta make?

THE WITNESS:  I'm not exactly sure.  I would need to -- to provide that to you, sir.

MR. READY:  What would you look to to answer that question?

THE WITNESS:  I would contact Mr. Sok.  He was the keeper of finances.  I would ask him that question.

MR. READY:  What kind of business was U.S. Trifecta in?

THE WITNESS:  U.S. Trifecta was an MGA, what's known as a managing general agency.  Mr. Sok had various connections in the insurance business, the medical device business.  I did the tech side of things, Mr. Ready, the technology side.  Mr. Sok was more of the salesman recruiting agencies to sell the -- the various products that he had brought to the table.

MR. READY:  What was your wife's involvement, if any, in U.S. Trifecta?

THE WITNESS:  Shannon really showed an interest in the insurance business probably around 2019, 2018, end the 2018.

45

So she had some input in regards to, you know, her wheelhouse -- as I say, the fancy stuff, the MBA stuff, SOPs, operations, procedures, manuals, workflow integration.  So she did give us some input in that, Mr. Ready.

MR. READY:  You talked about your consulting agreement with Seguro Medico, and I understand you changed the amount now.  You're not being paid a percentage.  You're just getting a set amount moving forward.  So to begin with, what's the set amount you're being paid each month for your consulting work there?

THE WITNESS:  That is going to be fi -- excuse me, 4,000 dollars biweekly.

MR. READY:  How did you come to that agreement, or that number?

THE WITNESS:  Well, I finally got a meeting with -- with Mr. Walsh, and I sat down with him, the CEO.  And you know, he's aware of -- of what's going on with the involuntary bankruptcy, sir.  So the company isn't doing great at the moment, according to Mr. Walsh.  So you know, I -- I told him what my living expenses were and that I'd would like to make an income.  And he settled on 8,000 dollars per month, 4,000 biweekly.

MR. READY:  How much would you have been paid if you were still doing the percentage amount and actually taking that amount?

46

THE WITNESS: I'm not sure, but I know that I would have been paid a percentage of profit. From what I understand with my conversation with Mr. Walsh, the company is not profitable right now, for the last -- I think he said the last fifteen to eighteen months.

MR. READY: When did you make this -- when did you have this meeting with Mr. Walsh to make this change?

THE WITNESS: It's November 22nd. We met approximately three weeks ago. Just to be clear, Mr. Ready, he made this change, not myself.

MR. READY: So did he approach you to make the change?

THE WITNESS: Yes, correct.

MR. READY: Okay. And how much were you owed for the first, you know, ten months this year before you made that change?

THE WITNESS: As I said, not a lot of money, if anything at all. The company -- the way Mr. Walsh described it is the company was reflecting negative EBITDA, negative profitability. So technically, per the consultation agreements, it -- it was not a lot of money, if anything at all.

MR. READY: Okay. So is it your testimony, then, that you don't believe that they should have paid you anything for the first ten months this year? Is that correct?

THE WITNESS: That's not my testimony. My testimony

47

is what I said, sir, which is Mr. Walsh said the company -- company was not profitable.  And based on what he told me, if I backed that into the contract, then he would not owe me anything.

MR. READY:  All right.  I just want to make sure -- I'm not trying to put words in your mouth.  So you're saying that they didn't owe you anything for the first ten months of your work this year.  Is that what you just said?

THE WITNESS:  I'll repeat what I said, Mr. Ready.  Mr. Walsh told me that his company was not profitable and was struggling.  His wife, unfortunately, just passed of stage 4 cancer.  So he -- he was not profitable, from what he told me.  And backing that into the contract, sir, it would suggest that I was not to be paid anything if it was based on profit, which it was previously.

MR. READY:  Okay.  All right.  So nothing owed to the first ten months of this year.  All right.

You mentioned that Shannon is the owner of a business called -- I think you said ABM.  I take that to be Alpha Bravo Michael; is that accurate?

THE WITNESS:  It's not, Mr. Ready.  It's ABN, N for Norman.

MR. READY:  Okay.  And can you tell me what that stands for?

THE WITNESS:  I'm not exactly sure, to be honest.  I

48

can ask her, certainly.

MR. READY:  Do you know -- same questions as before, LLC, corporation, and where formed?

THE WITNESS:  I believe that is was formed in Florida. And it is an LLC, I believe, but I would need to confirm that with -- with Shannon.

MR. READY:  Okay.  Do you know how much income it brings in each year?

THE WITNESS:  I do not.

MR. READY:  Once again, just the phone connection, I may have misunderstood.  I think you said four cars total; is that correct?

THE WITNESS:  I own two cars.

MR. READY:  And then Shannon owns two.  Did I understand that accurately?

THE WITNESS:  I -- I'll clarify, Mr. Ready.  I own the Escalade, and Shannon and I own the Mercedes Benz.  I -- I believe it's an S580 model.  It is.  We own that together.

MR. READY:  Okay.  And then you mentioned a -- and again, I apologize.  It may just have been phone static.  You mentioned a sports car, I thought you said.  Which one is the sports car?

THE WITNESS:  That is the -- I'm classifying her Bentley as a sports car.

MR. READY:  That's the Bentley Continental; is that

49

right?

THE WITNESS:  That is correct, sir.  I think it's a sports car.

MR. READY:  Got it.  Okay.  Which did you drive today?

THE WITNESS:  Didn't drive today, sir.  I took an Uber down, (indiscernible).

MR. READY:  Okay.  Got it.  Which car do you drive into 8 Morgan Drive every day?

THE WITNESS:  It depends on which car she chooses.  So yesterday, I took her Bentley for the first time in a while.  I try and drive the S580.  It's a beautiful car.  I take the Escalade most days, also.  So it just depends on how the family is structured.  I picked up the kids from school yesterday.  I drove the Escalade.  She drove me out to dinner, as it's been a stressful time on Saturday, and she drove the Bentley.  So you know, it really depends on how the family is structured, sir, and also what car she wants to drive.

MR. READY:  Okay.  Why did you close the Mid Penn Bank accounts in Halifax?

THE WITNESS:  Unfortunately, I find myself -- great question -- I find myself in a lot of MCA debt with Complete Business -- Complete Business Group, i.e. Par Funding.  And you know, just due to bank accounts being closed over the last number of years, whether they're business bank accounts, personal bank accounts, it's always been very hard, since

50

ingesting that debt with Par Funding, to -- to keep a bank account open.  The MCAs are pretty vicious.  So you know, when we find out that -- when I find out, excuse me, that Complete Business Solutions was pursuing me personally, Mid Penn was already having issues with overdrawn bank accounts, sir.  So you know, it made sense to -- to -- to close down -- close down accounts before another bank account was seized.

MR. READY:  When did your Santander bank account close?

THE WITNESS:  I am not exactly sure, Mr. Ready.  I've tried to conta -- contact, excuse me, Santander about that a number of times, dozens of times, since we -- we met in court. But I believe it was -- I don't want to give you the wrong date.  I would need to do more research on that, sir.

MR. READY:  Do you believe it was before or after the Mid Penn Bank account?

THE WITNESS:  Again, Mr. Ready, not to -- to -- to be flippant here, I -- I would need to continue to -- to try and find that out for you, and I will.

MR. READY:  On your -- go ahead, sorry.

THE WITNESS:  Sorry, Mr. Ready.  That was just me sniffing; I apologize.

MR. READY:  Okay.  Gotcha.

On your most recent amended schedules -- November 8th, I think you filed them -- you asserted on Schedule I that

51

you're receiving 12,000 a month from interest and dividends.

Where does that money go, or how is it paid to you?

THE WITNESS:  That is a combination of the rental income, sir.  That's the 4,000 dollars in rental income and then the 8,000 dollars in consulting fees.

MR. READY:  When did the 8,000 dollars in consulting fees begin?

THE WITNESS:  It began -- I believe the new contract was the 1st of November.  Again, I can provide that new consultation agreement to you, sir.  I have not been paid that 8,000 dollars yet.  It should be paid out on the 1st of -- it will be paid out on the 1st of December, and I plan to deposit that into the DIP account.

MR. READY:  Okay.  And what account is that going into?

THE WITNESS:  That -- that'll be going into an M&T Bank account.

MR. READY:  Is that your debtor-in-possession account?

THE WITNESS:  Yes, sir.

MR. READY:  Okay.  What accountants have you used in the last ten years?

THE WITNESS:  My main accountant that I was using was Malcolm Smith -- excuse me, C. Malcolm Smith & Company.

MR. READY:  Okay.  You said main account.  Were there others that also assisted you?

52

THE WITNESS:  No.  Stephanie Miller was actually a CPA.  She was a four-percent owner of Bene -- Bene Market, as you know, or as I've stated, sir.  So you know, Stephanie Miller, for Bene Market, did a lot of accounting work.

MR. READY:  Over the past five years, which accountant has been doing your personal income tax return?  Is that Malcolm Smith or somebody else?

THE WITNESS:  That would have been Malcolm Smith, yes, sir.

MR. READY:  Okay.  I want to ask you about [Ser'-sha], LLC.  You had an ownership --

THE WITNESS:  [Shor'-sha], LLC?

MR. READY:  [Shor'-sha]?  My apologies.  Do you have an ownership interest in that entity, still?

THE WITNESS:  It sounds vaguely familiar.  It might need to be amended.  It's the first time I've heard that in a long time.  Again, at the risk of sounding flippant, Mr. Ready, or -- or abusive, I need to look into that, sir, and get back to you.  I know that it -- I know that it was not making -- I -- I know that it would be defunct and not making money.

MS. NIGRELLI:  Joel, can you spell that for me, please?

MR. READY:  I might have to defer to Mr. Redmond.  I know it's -- I guess it's an Irish word.  S-A-O-R-S-I --

THE WITNESS:  It -- it is.

53

MS. NIGRELLI: O-R --

THE WITNESS: It's S-O-I-R-S-E, and I believe that's a defunct company. It is -- it would be defunct, yeah.

MR. READY: And what did it do?

THE WITNESS: Mr. Ready, I -- I can't remember. I -- I'm assuming it was another marketing company that I was trying to get off the ground. But I honestly would -- would need to -- to -- to find that information out, sir. I know it didn't make any money, and I know that it is currently defunct.

MR. READY: Do you remember where it was formed, what state?

THE WITNESS: I don't, sir, but I can certainly provide that to you.

MR. READY: Do you remember the last time that you did any business with that LLC?

THE WITNESS: I do not.

MR. READY: You were the hundred-percent owner of that LLC?

THE WITNESS: I believe so, yes, but again, I'll have to confirm that.

MR. READY: You mentioned Arc Realty earlier. Is there also an Arc Realty II?

THE WITNESS: It's actually Arc Realty I, and I got clarification on that from my -- my attorney, Nicole. Arc Realty is the entity that holds the properties. But when I

54

went to file the taxes, there was already an Arc Realty in operation, I believe in Pennsylvania.  So -- so the taxes were filed correctly.  There's an Arc Realty I, but they are the -- the -- the same entity, Mr. Ready.  The -- they -- they're one and the same, I believe.

MR. READY:  And which jurisdiction are those entities or that entity formed in?

THE WITNESS:  I believe that Arc Realty, LLC is in Delaware.  And I believe that because Arc Realty LLC primary -- excuse me, primarily does business in PA, Arc Realty I is the PA entity so that we can take care of our business taxes, et cetera.  But they -- they are one and the same in general terms, sir.

MR. READY:  What subsidiaries exist under Arc Realty or Arc Realty I?

THE WITNESS:  Don't believe any subsidiaries do.

MR. READY:  Do they engage in any other business, other than the two rentals you've described?

THE WITNESS:  Arc Realty owns the 1198 Reading Boulevard property, and also the 8 Morgan Drive property, and that is -- that is it, sir.

MR. READY:  When do you expect to have your personal income tax return filed for 2023?

THE WITNESS:  I'm working on that as soon as I get paid my consultation fee.  I would like to get that filed by

55

the 15th, 16th of November.  You know, that is my plan.

MR. READY:  Are you on extension, or is it just overdue at this point?

THE WITNESS:  We're -- I'm on extension.

MS. NIGRELLI:  Joel, to be clear, we're going to be filing an application to retain an accountant, which is C. Malcolm Smith.  I believe that's in the process, FYI.

MR. READY:  Okay.  Thanks.

What assets, other than Arc Realty, did you transfer to Shannon when you married her?

THE WITNESS:  Could you clarify the question, Joel? Excuse me.  Mr. Ready, could you clarify that, sir?

MR. READY:  Sure.  Other than Arc Realty, what assets did you put in Shannon's name, transfer to her, or add her as a co-owner on?

THE WITNESS:  Arc Realty was the -- the only asset, the only company.

MR. READY:  The only company, you said?

THE WITNESS:  Yeah.

MR. READY:  Okay.  How about any other assets, property, cars?

THE WITNESS:  No, there -- there was no other transfers that I'm aware of.

MR. READY:  When did you begin placing all of your personal income in Shannon's bank account?

56

THE WITNESS: When I lost my bank account with Mid Penn, when that closed, it made sense to enter my income -- the rental income, also -- and to operate out of her -- operate the -- the household out of her -- her bank account.

MR. READY: Did you and Shannon enter into any contracts about that income transfer?

THE WITNESS: Contracts, what type of contracts, sir?

MR. READY: Did you and Shannon enter into any contracts at all, together, between the two of you?

THE WITNESS: Apart from our marriage -- apart from our marriage, but no, we have not.

MR. READY: Okay. What is the source of Shannon's 40,000 dollars a month in interest and dividends?

THE WITNESS: I believe she's taking distributions. I can find out, but I believe she's taking distributions from her -- her businesses.

MR. READY: Which businesses would those be? Are those are the ones you've already named?

THE WITNESS: I'm not sure, but I would -- I would have to find out from her, Mr. Ready.

MR. READY: How much of that comes in from Seguro Medico monthly?

THE WITNESS: Again, I would need to -- I would need to find that out from Shannon, sir.

MR. READY: Okay. Did you and Shannon have a

57

prenuptial agreement?

THE WITNESS:  No, absolutely not.

MR. READY:  All right.  In 2021, you disclosed that you'd had 1,143,904 dollars in income.  Where did that income go?

THE WITNESS:  Let me see here.  Is that on the schedule?

MS. NIGRELLI:  Can you repeat that, Joel?  I'm sorry.

MR. READY:  Sure.

And it's Official Form 107, page 2, if that'll help you.  You disclosed in the year 2021 that you had an income of just a little over 1.1 million.  What happened to that income?

THE WITNESS:  As in where was it -- are we -- let me --

MS. NIGRELLI:  He's on this Official Form (indiscernible).

THE WITNESS:  Ah, okay.  Yeah.

MR. READY:  107, page 2.  I think it's document 119 if you're looking on that top time stamp part.

THE WITNESS:  Yeah, that -- I believe that's Shannon's income, Mr. Ready.  Let me just have a look at this, sir. There's -- there's a lot of forms in front of me, so give me one second.

MR. READY:  Sure.  It's listed as your income there under debtor 1.

58

THE WITNESS:  Oh, it is.  Excuse me.  Sorry, Mr. Ready; I was looking at the wrong document.

MR. READY:  Okay.  It says it was from operating a business.

THE WITNESS:  (Indiscernible).  Yeah, it would have came from one of the businesses that I -- that I owned and operated.  But I will clarify which business that was or which businesses they were.

MR. READY:  Yeah, let's start there.  Which business would that have been in 2021?

THE WITNESS:  Again, I would need to clarify that, sir.  It would have been from one of the businesses listed, sir, but I -- I'll need to clarify that for you.

MR. READY:  You previously told me that Bene Market was no longer operating at that time, so this would have had to have been Seguro Medico, correct?

THE WITNESS:  I don't believe that is correct, no.  It would have came from Bene Market, U.S. Trifecta, one of the businesses that I was operating at the time.

MR. READY:  So you don't recall at this point where that 1.1 million dollars came from in 2021?

THE WITNESS:  As I've stated, it would have been from one of the businesses that I was operating, sir.  But again, I can clarify that, Mr. Ready.

MR. READY:  Sure.  What do you need to look at to

59

clarify that?

THE WITNESS:  I would have to look at my tax returns, and I can go through that this evening and provide that information to you and to Nicole.

MR. READY:  Okay.  Where did that money go?

THE WITNESS:  I would say to expenses.  A lot of money would have been reinvested back into the business that I -- I was running.  I have no idea.  I would need to look at that.

MR. READY:  So I guess some of this would have gone into a bank account -- let's start there -- correct?

THE WITNESS:  Potentially.  When I was operating my -- my businesses, there were a number of expenses paid, you know, from the business.  So I can confirm that, again.  I'm not sure, Joel.

MR. READY:  Okay.  So I mean, do you remember what bank account you were using in 2021?

THE WITNESS:  I don't.

MR. READY:  Okay.  And you don't remember how much of this money would have been money that came into a bank account versus reinvested into a business?  You don't have any idea; is that correct?

THE WITNESS:  Yeah, I would need to get them -- that information for you, sir.

MR. READY:  All right.  Same question with the 168,000 for 2022, what was that from?

60

THE WITNESS:  No idea.  I would -- I would have to check my tax returns and provide that information to you.

MR. READY:  Okay.  It says, operating a business.  In 2022, that would have been what business?

THE WITNESS:  I would need to get that information for you, Mr. Ready.  I can look at my tax returns and provide that -- all that information to you.

MR. READY:  Okay.  Okay.  Where did that money go?

THE WITNESS:  Again, as I said, I would need to look at my tax returns and my expenses, and again, I can provide all that information to you, sir.

MR. READY:  All right.  Give me one second.  I'm just trying not to go over anything already been asked you.  Give me a sec.

THE WITNESS:  Yeah, no problem, sir.

HEARING OFFICER:  Mr. Ready, do you want to allow some of the others to start and then we come back to you?

MR. READY:  Sure, sure.  That's fine.

HEARING OFFICER:  Ms. Gulash?

MS. GULASH:  I don't believe I have any questions at this time.  Thank you, though.

HEARING OFFICER:  Mr. Kettering?

MR. KETTERING:  This is going to be disappointing.  I don't think I have any questions, either.

HEARING OFFICER:  All right.  Back to you, Mr. Ready.

61

MR. READY:  I guess the pressure's back on me.  All right.

So Mr. Redmond, you and Ms. Kroemmelbein, I think you testified -- and I'm sorry.  Ms. Redmond.  I apologize.  You have one child in common; is that correct?

THE WITNESS:  In common, yes, we -- we have a child together.

MR. READY:  You have children -- she has children from a prior relationship, as well; is that right?

THE WITNESS:  No, that's incorrect.

MR. READY:  Oh, okay.  Okay.  So the 7,500 here that you've listed for child care expenses, that's all for your children; is that correct?

THE WITNESS:  I have 5,000 dollars of child support per month for Eva and Noah from my previous marriage.

MR. READY:  Got it.  Okay.  You've identified several businesses associated with your wife.  Are there any others that you know of that she's an owner of that you did not disclose?

THE WITNESS:  I don't.

MR. READY:  Okay.  What consideration did Shannon give in exchange for her ownership in Seguro Medico?

THE WITNESS:  I'm not sure what that question means, Mr. Ready.

MR. READY:  Yeah, did she buy into the --

62

THE WITNESS:  If -- if you could clarify.

MR. READY:  Did she buy into the company?  Did she give something of value in exchange for her ownership interest in Seguro?

THE WITNESS:  I have no idea what Arthur and her did. I'm not exactly sure.

MR. READY:  Okay.  And what is her percentage ownership in Seguro?

THE WITNESS:  I'm not sure; I believe she's the majority owner.

MR. READY:  Okay.  But you don't know what percentage?

THE WITNESS:  I can guess, but I would prefer not to.

MR. READY:  For National Brokers of America, there was a loan from Complete Business Solutions Group.  Where did that money go when it was received as part of a loan?

THE WITNESS:  If I can recollect, I think that was 2016.  There was multiple loans, Mr. Ready.  Do you have any idea of which loan you're referring to, what -- what date, sir?

MR. READY:  Just all of them, where did they go?

THE WITNESS:  I believe they went into National -- they would have went into the company, National Brokers of America, and some of the loans, once NBOA -- sorry, Mr. Ready -- NBOA closed down, it would have -- would -- would have went into Bene Market.

MR. READY:  Okay.  So the money went into the NBOA

63

bank account and then was transferred to Bene Market when NBOA closed down; is that accurate?

THE WITNESS:  No, it's -- it's not, sir.  The money would have went -- if the -- a loan was taken when NBOA was operational, it would have went into an NBOA's bank account. And if a loan was taken after NBA -- NBOA closed down, it would have went into Bene Market's bank account, sir.

MR. READY:  Okay.  And did any money for any of those loans go anywhere other than NBOA or Bene Market bank account?

THE WITNESS:  No.

MR. READY:  And what about the money that was left over in Bene Market after that?  At the end, when you were closing down Bene Market, where did that money go?

THE WITNESS:  I don't believe there was any money in Bene Market's account, but I can confirm that.  Bene Market was in -- in hard shape with MCA debt when that became defunct, sir.  They're pretty aggressive loans, respectfully to Mr. Kettering.  They were difficult to deal with, Mr. Ready.

MR. READY:  When was the last time that you submitted a payment to Duane Morris LLP?

THE WITNESS:  I have not submitted a payment to -- to Duane Morris myself.

MR. READY:  Ever?

THE WITNESS:  I have not been able to -- to pay Duane Morris myself, sir.

64

MR. READY:  Okay.  What about your wife?  When was the last time she submitted a payment to Duane Morris?

THE WITNESS:  Again, I can assume.  I'd prefer not to. But I -- I believe she paid Duane Morris sometime -- maybe six or seven months ago, but I can -- I can clarify that and provide that information.  I would need to ask her.

MR. READY:  Did Duane Morris enter an appearance for you in any litigation?

THE WITNESS:  Yes, it did, sir.

MR. READY:  Which court, which case?

THE WITNESS:  I'm not exactly sure which court, but Duane Morris and Attorney McSwain were representing me in regards to the indictment that just happened, so in regards to dealing with the -- the FBI and the federal government, Mr. Ready.

MR. READY:  You had disclosed a Holly Smith Miller, Esquire as one of your creditors for 41,000 dollars.  What is that debt for?

THE WITNESS:  That was an amendment that I -- that I added when I was going through this again to try and be accurate and -- and complete.  Holly Miller is the Trustee for National Brokers of America.

MR. READY:  Okay.  So that's a debt that you owe to the NBOA bankruptcy estate; is that correct?

THE WITNESS:  Correct.

65

MR. READY:  Okay.  Just to be clear, you don't owe Holly Smith Miller, I guess, any personal debt, correct?

THE WITNESS:  Yes, yes, it's owed to the -- to the trustee, the estate.

MR. READY:  Okay.  Give me just one more second.  A few more questions here.

What was your full legal name at the time of your birth?

THE WITNESS:  Alan Christopher Redmond.

MR. READY:  Okay.  What is the full legal name of your father?

THE WITNESS:  He goes by Harry (ph.), but it's Henry (ph.), Henry Joseph (ph.) Redmond.

MR. READY:  All right.  And what is your father's date of birth?

THE WITNESS:  Joel, I have no idea.  He's 65, 66 years old.  We -- we don't speak a lot, unfortunately, so that ship sailed, unfortunately, sir.

MR. READY:  Okay.  What is the full legal name of your mother?

THE WITNESS:  Maria (ph.) Geraldine, G-E-R-A-L-D-I-N-E -- Redmond, excuse me, Redmond.

MR. READY:  Okay.  Same -- your mother's date of birth, do you know it?

THE WITNESS:  25th of October.  I believe it's '56 or

66

'57.  I can confirm that.  Please don't tell her, Mr. Ready.
I'll need to confirm that.

MR. READY:  Fair enough.

Do you have any siblings, full or half?

THE WITNESS:  No, sir, I do not.  I was -- I was an
only child.

MR. READY:  Give me one second.

MS. NIGRELLI:  Yeah, Joel, can we start wrapping this
up?  I mean, you have the ability to take a 2004.  But it seems
like you've kind of gone through all of your questions with
respect to the schedules.

MR. READY:  Yeah, we're close.  Give me just one
second.  I'm just going to review the rest of these notes here.

MS. GULASH:  Hey, Joel, do you mind if I jump in with
one question while you're looking at your notes?

HEARING OFFICER:  Go ahead.

MR. READY:  Yeah, no problem.

MS. GULASH:  Mr. Redmond, did your wife pay anything
for her membership interest in Arc Realty, LLC?

THE WITNESS:  I would need to check that, Ms. Gulash,
and I can provide that information to you, ma'am.

MS. GULASH:  Okay.  And when were you and your wife
married?

THE WITNESS:  Oh, goodness.  That would have been the
end of -- (indiscernible) dates.  You're going to get me in

67

trouble with Maria and Shannon.  (Indiscernible).

Just joking.  Sorry, Mr. Callahan.

I believe it was the 28th of August 2021, Ms. Gulash.
I will confirm that --

MS. GULASH:  Okay.  Thank you.

THE WITNESS:  -- for you, Ms. Gulash.  I apologize.
I'll -- I'll confirm that.

MS. GULASH:  Okay.  All right.  Thank you.

THE WITNESS:  Yes, ma'am.

HEARING OFFICER:  Mr. Ready?

MR. READY:  All right.  I don't have anything further
at this time.

HEARING OFFICER:  Okay.  Mr. Redmond, thank you.
You've indicated you are going to talk to your counsel and
amend some of the documents.  And to the extent Mr. Ready has
asked --

THE WITNESS:  Yes, sir.

HEARING OFFICER:  -- questions that you intend to
confirm, you certainly should supply him --

THE WITNESS:  Uh-huh.

HEARING OFFICER:  -- with that information, with any
clarification or correction.  Okay?

THE WITNESS:  Yes, sir.  Thank you for your time, Mr.
Callahan.

HEARING OFFICER:  Mr. Ready can confirm with you what

68

information he wants.

And Mr. Ready, if you want a copy my office, that would be fine, too.

MR. READY:  Sure.

HEARING OFFICER:  All right.  There being no further questions, this meeting is conclu (audio ends mid-sentence).

(Proceedings concluded)

69

C E R T I F I C A T I O N

I, Joseph Burstein, court-approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

December 9, 2024

_____          _____

Joseph Burstein, CDLT-189                   DATE

# Exhibit C

# Exhibit C



**Register of Wills and Clerk of Orphans' Court Division
of the Court of Common Pleas
of Berks County, Pennsylvania**

# MARRIAGE CERTIFICATION

I, Suzanne M. Myers, Clerk of Orphans' Court of Berks County, do hereby certify that:

**SHANNON    KROEMMELBEIN , 39**

**and**

**ALAN  CHRISTOPHER  REDMOND , 39**,

were duly married on December 4th, 2021; and that a return of the solemnization of said marriage is

recorded in marriage Vol. 486    No. 307 and having been solemnized by  REV. BETH PALUBINSKY,

MINISTER OF THE GOSPEL on December 4th, 2021 at PHILADELPHIA, PHILADELPHIA County,

PA.

Witness my hand and seal this 31st day of May, 2024.

_____
Clerk of the Orphan's Court

_____
Asst Clerk of the Orphan's Court

**2022 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L21000299741

**FILED**
**Mar 24, 2022**
**Secretary of State**
**0203028985CC**

**Entity Name:** ABN NETWORK LLC

**Current Principal  Place of Business:**

4960 NE 27TH AVENUE
LIGHTHOUSE POINT,  FL  33064

**Current Mailing Address:**

4960 NE 27TH AVENUE
LIGHTHOUSE POINT,  FL  33064

**FEI Number: 87-1447688**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

LOPEZ, PRISCILLA
4960 NE 27TH AVENUE
LIGHTHOUSE POINT, FL  33064  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                       Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | MGR | | Title | AMBR |
| Name | DIGITAL BRIDGE NETWORK CORPORATION | | Name | LOPEZ, PRISCILLA |
| Address | 30 N. GOULD STREET - SUITE N | | Address | 4960 NE 27TH AVENUE |
| City-State-Zip: | SHERIDAN  WY  82801 | | City-State-Zip: | LIGHTHOUSE POINT  FL  33064 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: PRISCILLA LOPEZ                    MANAGER            03/24/2022

Electronic Signature of Signing Authorized Person(s) Detail                    Date

# Exhibit D

# Exhibit D

# Exhibit E

# Exhibit E



| Site Address | **4960 NE 27 AVENUE, LIGHTHOUSE POINT FL 33064-7803** | | ID # | 4843 07 10 0180 |
|---|---|---|---|---|
| Property Owner | SOK, SENI<br>4960 NE 27TH LAND TR | | Millage | 1411 |
| Mailing Address | 4960 NE 27 AVE LIGHTHOUSE POINT FL 33064 | | Use | 01-01 |
| Abbr Legal Description | CORAL KEY VILLAS 3RD SEC 44-19 B LOT 21 BLK 13 | | | |

**The just values displayed below were set in compliance with Sec. 193.011, Fla. Stat., and include a reduction for costs of sale and other adjustments required by Sec. 193.011(8).**

| * 2025 values are considered "working values" and are subject to change. | | | | | |
|---|---|---|---|---|---|
| **Property Assessment Values** | | | | | |
| Year | Land | Building / Improvement | Just / Market Value | Assessed / SOH Value | Tax |
| **2025** | $400,000 | $4,450,740 | $4,850,740 | $2,407,060 | |
| **2024** | $400,000 | $4,450,740 | $4,850,740 | $2,407,060 | $45,351.95 |
| **2023** | $400,000 | $4,300,650 | $4,700,650 | $2,336,960 | $43,900.63 |

| 2025 Exemptions and Taxable Values by Taxing Authority | | | | |
|---|---|---|---|---|
| | County | School Board | Municipal | Independent |
| **Just Value** | $4,850,740 | $4,850,740 | $4,850,740 | $4,850,740 |
| **Portability** | 0 | 0 | 0 | 0 |
| **Assessed/SOH**  18 | $2,407,060 | $2,407,060 | $2,407,060 | $2,407,060 |
| **Homestead**  100% | $25,000 | $25,000 | $25,000 | $25,000 |
| **Add. Homestead** | $25,000 | 0 | $25,000 | $25,000 |
| **Wid/Vet/Dis** | 0 | 0 | 0 | 0 |
| **Senior** | 0 | 0 | 0 | 0 |
| **Exempt Type** | 0 | 0 | 0 | 0 |
| **Taxable** | $2,357,060 | $2,382,060 | $2,357,060 | $2,357,060 |

| Sales History | | | | | Land Calculations | | |
|---|---|---|---|---|---|---|---|
| Date | Type | Price | Book/Page or CIN | | Price | Factor | Type |
| 12/13/2023 | WD-T | $100 | **119492733** | | $50.00 | 8,000 | SF |
| 11/6/2019 | WD-T | $100 | **116216688** | | | | |
| 4/17/2017 | WD-Q | $2,316,000 | **114349750** | | | | |
| 8/22/2014 | WD-Q-DS | $500,000 | **112494622** | | | | |
| 11/12/2014 | VCT-T | | **112646768** | | **Adj. Bldg. S.F. (Card, Sketch)** | | 5003 |
| | | | | | **Units/Beds/Baths** | | 1/5/6 |
| | | | | | **Eff./Act. Year Built: 2017/2016** | | |

| Special Assessments | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Fire | Garb | Light | Drain | Impr | Safe | Storm | Clean | Misc | |
| 14 | P | | | | | LP | | | |
| R | 1 | | | | | | | | |
| 1 | | | | | | 1 | | | |

# Exhibit F

Exhibit F

Case 24-13093-pmm   Doc 140-3   Filed 12/16/24   Entered 12/16/24 14:28:34   Desc
Exhibit   Page 107 of 108

**Berks County Civil Court Docket Summary**
**Docket Number: 23 13582**

**Judge:** Madelyn S. Fudeman, J.                    **Filed:** 09/05/2023
**SubType:** Complaint

**Attorney(s)**
Gulash, Jessica M

**WBL SPO I LLC**

**\*\*\* VS \*\*\***

**ARC REALTY LLC**

Rush, William R A

Valz, Norman M

| Date | Summary |
|---|---|
| 09/05/2023 | Real Property - Mortgage Foreclosure: Commercial - $1,367,605.27 plus... w/Certification Regarding Status of Foreclosed Premises |
| 09/05/2023 | Property Location: 1198 Reading Boulevard, Wyomissing, PA |
| 09/14/2023 | Sheriff's Service of Mortgage Foreclosure Complaint and Urgent Notice and Certification upon Deft Tenant/Occupant by handing to Arthur Walsh/APIC on 9/12/23; No Sheriff's Service of Mortgage Foreclosure Complain Urgent Notice and Certification upon Deft ARC Realty LLC |
| 09/27/2023 | Praecipe to Reinstate Complaint - Complaint Reinstated |
| 10/04/2023 | Appearance of Norman M Valz Esq. for Deft |
| 10/04/2023 | Certificate of Service |
| 10/04/2023 | Deft's Preliminary Objections to Complaint w/ Cert of Service |
| 10/04/2023 | Proposed Scheduling Order of |
| 10/04/2023 | Proposed Order |
| 10/04/2023 | Notice to Plead/Defend |
| 10/04/2023 | Deft's Brief in Support of Preliminary Objections |
| 10/04/2023 | Affidavit of Verification |
| 10/04/2023 | Certificate of Service |
| 10/06/2023 | Sheriff's Service of Reinstated Mortgage Foreclosure Complaint Urgent Notice and Certification upon Deft ARC Realty LLC by handing to Alyssa Hoffmaster/APIC on 10/4/23 |
| 10/13/2023 | Amended Complaint - $1,434,551.86 plus...  Certification regarding status of foreclosed premises. |
| 10/13/2023 | Certificate of Service of amended complaint in mortgage foreclosure upon William Rush, Esq and Norman Valz, Esq on 10/13/2023 via email and ECF |
| 10/29/2023 | Notice to Defend |
| 10/29/2023 | Deft's Answer with New Matter and Counterclaim to Pltf's Complaint in Mortagage Foreclosure |
| 10/29/2023 | Affidavit of Verification |
| 10/29/2023 | Certificate of Service of Deft's Answer with New Matter and Counterclaim to Pltf's Complaint in Mortagage Foreclosure |
| 11/20/2023 | Pltf's Preliminary Objections to Deft's Answer, New Matter, and Counterclaims w/ prop. Order |
| 11/20/2023 | Pltf's Brief in Support of its Preliminary Objections to Deft's Answer, New Matter and Counterclaims |
| 11/20/2023 | Praecipe for Argument of 12/18/23 RE: Pltf's Preliminary Objections to Deft's Answer, New Matter, and Counterclaims |
| 11/20/2023 | Affidavit of Service for Argument Court |
| 12/12/2023 | Order of 12/7/23 Scheduling PreTrial Conference and Settlement Conference on 2/27/24. Rule 2365 Notice and copies provided on 12/12/23 |
| 12/13/2023 | Appearance of Anton Kaminsky Esq. and Aubrie Linder Esq. for Deft |
| 12/13/2023 | Deft's Amended Answer with New Matter to Pltf's Amended Complaint in Mortgage Foreclosure w/Cert of Service |
| 12/13/2023 | Pltf's Answer to Deft's New Matter |
| 12/13/2023 | Certificate of Service of Pltf's Answer to Deft's New Matter |

| | |
|---|---|
| 12/15/2023 | Withdrawal of Appearance of William Rush Esq. for Deft w/Cert of Service |
| 12/28/2023 | Order of 12/07/23 Returned for Deft. ARC Realty LLC |
| 02/14/2024 | Deft's Unopposed Motion for Continuance w/ Proposed Order and Cert of Service |
| 03/19/2024 | Order of 3/18/24 Scheduling PreTrial and Settlement Conference on 5/9/24. Rule 236 Notice and copies provided on 3/19/24 |
| 05/31/2024 | Order of 5/30/24 scheduling Status Conference for 6/10/24. Rule 236 Notice and copies provided on 5/31/24 |
| 06/11/2024 | Order of 6/10/25 continuing status conference to 8/19/24. Rule 236 notice and copies provided on 6/11/24. |
| 08/06/2024 | Pltf's Motion to Strike Objections and Compel Discovery Responses from Deft |
| 08/06/2024 | Proposed Order |
| 08/06/2024 | Certificate of Service of Pltf's Motion to Strike Objections and Compel Discovery Responses from Deft |
| 08/20/2024 | Order of 8/20/24 continuing status conference to 9/4/24. Rule 236 Notice and copies provided on 8/20/24 |
| 08/21/2024 | Order of 8/20/24 continuing status conference to 9/4/24. Rule 236 Notice and copies provided on 8/21/24 |
| 09/03/2024 | Appearance of William Rush Esq for Deft w/ Cert of Service |
| 09/04/2024 | Withdrawal of Appearance of Anton Kaminsky Esq and Aubrie Linder Esq for Deft w/ Cert of Service |
| 09/06/2024 | Order of 9/5/24 RE: Pltf's Motion to Strike Objections and Compel Discovery. Rule 236 Notice and copies provided on 9/6/24 |
| 09/19/2024 | Order of 9/18/24 scheduling Argument for 9/24/24 re: Pltf's Letter Motion for Sanctions. Rule 236 Notice and copies provided on 9/19/24 |
| 09/23/2024 | Order of 9/18/24 scheduling Argument for 9/24/24 re: Pltf's Letter Motion for Sanctions. Rule 236 Notice and copies provided on 9/23/24 |
| 10/01/2024 | Order of 9/30/24 scheduling Argument for 10/9/24 re: Pltf's Letter Motion for Sanctions. Rule 236 Notice and copies provided on 10/1/24 |
| 10/09/2024 | Order of 10/9/24 Scheduling hearing on 10/21/24 RE: Pltf's Letter Motion for Sanctions against Deft. Rule 236 Notice and copies provided on 10/9/24 |
| 10/17/2024 | Pltf's Motion for Sanctions Against Deft |
| 10/17/2024 | Proposed Order |
| 10/17/2024 | Certificate of Service of Pltf's Motion for Sanctions |
| 10/24/2024 | Order of 10/23/24 RE: Pltf's Motion for Sanctions against Deft. Rule 236 Notice and copies provided on 10/24/24 |