# Exhibit A

Exhibit A



**Date:** June 3, 2025

**Before:** RECORRECTED 41725 - READY - REDMOND

Printed On: June 3, 2025

Sargent's Court Reporting Services, Inc.
Phone: 814-536-8908
Fax: 814-536-4968
Email: schedule@sargents.com
Internet: www.sargents.com

IN THE UNITED STATES

BANKRUPTCY COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

IN RE:            *   Bankruptcy

ALAN CHRISTOPHER  *   No.: 24-13093-PMM

REDMOND,          *   Chapter

    Debtor        *   11

* * * * * * * *

DEPOSITION

OF

ALAN CHRISTOPHER REDMOND

April 17, 2025

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

Page 2

DEPOSITION

OF

ALAN CHRISTOPHER REDMOND, taken on behalf of the Defendant herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Jessica L. Ashman, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the Cornerstone Law Firm, 8500 Allentown Pike, Suite 3, Blandon, Pennsylvania, on Thursday, April 17, 2025, beginning at 9:30 a.m.

Page 4

I N D E X

DISCUSSION AMONG PARTIES        7 - 9
WITNESS: ALAN CHRISTOPHER REDMOND
EXAMINATION
     By Attorney Ready       10 - 379
DISCUSSION AMONG PARTIES    379 - 381
CERTIFICATE                      382

Page 3

A P P E A R A N C E S

ALBERT A. CIARDI, III, ESQUIRE
Ciardi, Ciardi, Astin
1905 Spruce Street
Philadelphia, PA 19103
     COUNSEL FOR PLAINTIFF

JOEL A. READY, ESQUIRE
Cornerstone Law Firm
8500 Allentown Pike
Suite 3
Blandon, PA  19510
     COUNSEL FOR DEFENDANT

Page 5

EXHIBIT PAGE

                              PAGE
NUMBER        DESCRIPTION        IDENTIFIED
Exhibit 1  Court Order/
           Schedule A               13
Exhibit 2  2020 Income Tax
           Return                   244
Exhibit 3  2022 Income Tax
           Return                   375
Exhibit 4  Mid Penn Bank
           Transactions            293
Exhibit 5  Consultation Agreement 321

Page 6

OBJECTION PAGE

ATTORNEY                    PAGE
Ciardi    68, 69, 77, 80, 119, 126,
204, 206, 214, 226, 250, 289

Page 7

S T I P U L A T I O N
---------------------------------------
(It is hereby stipulated and agreed by
and between counsel for the respective
parties that reading, signing,
sealing, certification and filing are
waived.)
---------------------------------------
P R O C E E D I N G S
---------------------------------------
COURT REPORTER:
For your copy of the
 transcript, do you prefer
 regular mail or, like, a
 printed copy?  Or I can email
 it to you.  Whatever you
 prefer?
ATTORNEY READY:
Email's great.
COURT REPORTER:
 Okay.
 I have
 Joel@cornerstonelaw.us?
ATTORNEY READY:
That's perfect.

Page 8

COURT REPORTER:
Okay.
ATTORNEY READY:
Thank you.
COURT REPORTER:
Sure.
Do you need a copy of
 this transcript today?
ATTORNEY CIARDI:
I --- I mean, I need
 just regular delivery,
 probably.
COURT REPORTER:
Sure.  Okay.
And then do you prefer
 that by regular mail or email?
ATTORNEY CIARDI:
Email would be great.
COURT REPORTER:
Okay.
Could I just have your
 email address?
ATTORNEY CIARDI:
Oh, sure.  That would
 have been helpful.

Page 9

It's Aciardi3@gmail.com.
COURT REPORTER:
Like the number three?
ATTORNEY CIARDI:
Yes.
COURT REPORTER:
Okay.
ATTORNEY CIARDI:
Oh, I'm --- no.
COURT REPORTER:
Or the ---
ATTORNEY CIARDI:
Totally wrong one.
 That's fine.
COURT REPORTER:
Oh, okay.
ATTORNEY CIARDI:
It's
 Aciardi@ciardilaw.com.
         ---
(WHEREUPON, A PAUSE IN THE RECORD WAS
HELD.)
         ---
    ALAN CHRISTOPHER REDMOND,
CALLED AS A WITNESS IN THE FOLLOWING

Page 10

PROCEEDING, AND HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS FOLLOWS:

---

DIRECT EXAMINATION

---

BY ATTORNEY READY:

Q. Well, good morning.

A Good morning. How are you?

Q. Would you state your name for the record?

A. Alan Redmond.

Q. All right. Mr. Redmond, you've had your deposition taken before. Is that correct?

A. I have. I have.

Q. Okay. How many times have you had your deposition taken?

A. Oh, that's a broad question. Multiple, I would say. I don't really keep track.

Q. Okay. Is it more than five?

A. I'm not exactly sure, Joel, to

Page 11

be honest.

Q. Okay. So I'm going to run through some rules you've probably heard before.

A. Okay.

Q. You understand that everything you say today will be taken down by our Court Reporter?

A. Yeah.

Q. It'll be important for me to finish each question before you attempt to answer and I'll let you finish each answer before I ask you a question. It's important for you to use ---.

ATTORNEY CIARDI: You have to answer.

THE WITNESS: Yes.

BY ATTORNEY READY:

Q. It's important for you to use non-verbal response --- or to --- to avoid non-verbal responses, excuse me.

Page 12

So yes, no, rather than uh-huh or shaking head so that she can take it down.

A. Understood.

Q. Okay. You understand today this is being recorded. She's taking it down for use in court?

A. Yes, I do.

Q. Okay. At any point you need to take a break. That's fine. You can let me know. I just ask that you finish any questions we're on before we do that.

A. Sure. Probably, maybe 45 minutes to an hour. I'm just getting over the flu, so maybe once or twice. That's it.

Q. Sure. That's fine. You just let us know when you need a break.

A. Beautiful. Beautiful.

Q. All right. So if at any point I ask you a question, all my questions are based on what you know from your personal

Page 13

knowledge. Okay?

A. Yes.

Q. So if at any point I ask you something and it's truly outside of your knowledge, you can answer, I don't know. Okay?

A. Yes.

Q. All right. So, I'm going to show you ---.

ATTORNEY READY: Actually, we'll mark these. This is, I guess, Redmond 1.

---

(Whereupon, Exhibit 1, Court Order/Schedule A, was marked for identification.)

---

(WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

---

BY ATTORNEY READY:

4 (Pages 10 to 13)

Page 14

**Q. Let me ask you first, did you review any documents in preparation for your examination today?**
A. Not really, no.
**Q. Okay. You said not really, are there any documents you did look over?**
A. My attorney sent me a couple of documents. I did not have time to look at them, Attorney Ready.
**Q. Okay. And what documents did he send you?**
A. I thought it was the schedules, the buy proceeds schedules.
**Q. Okay.**
A. I grazed them. I was working late last night, so ---.
**Q. And I assume that you reviewed those to refresh your recollection for today. Is that correct?**
A. Yeah, I don't know if it was much of a refresher. I didn't have much time with the sick kids. But

Page 15

yeah, there's some documents I grazed over for, honestly, five minutes.
**Q. Okay. Other than your attorney, is there anybody else that you discussed your deposition with before you came today?**
A. Just my wife. She wished me luck this morning.
**Q. Okay. Did you talk about the substance of your deposition or what you expected today?**
A. No, I told her I was a little nervous about it because I don't really like these things, to be honest with you. Attorney Ready, is it --- can I --- Joel or Attorney Ready, what do you prefer?
**Q. Yeah, Attorney Ready's fine.**
A. Okay. All right.
**Q. And you --- you said that you spoke with her, you told her you were nervous. Is that correct?**

Page 16

A. I told her it was a little bit --- it's a little bit off putting, you know, that's --- that's really --- really what I --- what I told her. But she's been sick as well, so that's --- not much else.
**Q. Who did you practice with for today's deposition?**
A. I spoke with Albert and Nicole, my attorneys, last night on Zoom for approximately an hour. And getting Albert and Nicole off the phone is tricky, because they like to --- they know it's a stressful time overall, so I think they were more trying to cheer me up than, you know, doing prep, so to speak. If that's what you want to call it.
**Q. Is there anybody else that you spoke with beforehand?**
A. I received a text message from Bill Rush, who's my criminal attorney. But Bill has just had neck surgery, so I could tell he was a little off, to be honest. I didn't want to ask him

Page 17

questions or --- he's been pretty --- pretty unwell. So that was a Bill --- a Bill text. Alan, Nicole, and --- and Shannon.
**Q. Okay. Is there anybody else that you spoke with before today?**
A. No, I think that that's it from my recollection. Yeah.
**Q. Okay. I'm going to show you what we're marking as Redmond 1.**
A. Sure.
**Q. So first, do you recognize this document?**
A. Not right offhand. Would you like me to review it?
**Q. Sure.**
A. Okay.
**Q. Take your time and let me know when you've had a chance to review it.**
A. Sure. Would you like me to review the whole thing?
**Q. Sure.**

Page 18

A. Okay.
It looks --- it looks familiar.
 It's one of the many documents you've sent my attorneys and the court.
**Q. You believe you've seen this document before today?**
A. I don't want to speculate, but it looks familiar.  Yes.
**Q. Okay.**
A. Sorry.
**Q. Attached to this order is something called a schedule.  I think it's listed --- it's listed as schedule A.**
A. Okay.
**Q. Have you seen the items on schedule A?**
A. Well, no, you're holding them, so ---.  Oh, this?  Sorry.  Schedule
A.  Yeah, it looks --- it looks vaguely familiar.
**Q. Okay.**
**You've --- you've received this --- I won't add to that.**
**You've received this and you've**

Page 19

**reviewed the items that are requested here on Schedule A pursuant to this court order.**
**Correct?**
A. Yes, I --- I have.  It looks familiar.
**Q. Okay.**
**And have you provided everything that is on that list that's in your possession?**
A. So, this would have been what you had sent the attorneys --- my attorneys, of course.  I believe this is what my attorneys had me find as many documents as possible, Attorney Ready.  So, yes.  I can remember painstakingly going through emails and my filing cabinets at home, stressing --- you stressing me out about it.
And yeah, I spent a good five, six, seven hours, a couple of days in a row trying to find these documents, the --- what I had.
**Q. Okay.**
**Tell me what you searched in**

Page 20

**looking for these documents?**
A. Could you clarify that?
**Q. Sure.  You said you spent, I think, you said, five, six or seven hours?**
A. Yeah, something like that.
Yeah.
**Q. Tell me what you did during that search?**
A. That was a number of weeks ago.
What date is this document?  2/24, so two weeks --- two months ago, excuse me.  I went through some filing cabinets that I have in my basement, then went through my emails.  That's --- that's about it.
**Q. Okay.**
**So, you went through the filing cabinets in your basement, you said.**
**How many filing cabinets are there?**
A. Oh, goodness.  There's two large filing cabinets and then smaller folders, like, the --- like, the buckets, the Walmart type of buckets.

Page 21

 So, you know, four or five buckets and two larger filing cabinets that myself and my wife share for --- for paperwork.
**Q. Okay.**
**You said Walmart buckets.  Can you describe what you mean by that?**
A. I don't know what you guys call them.  Albert, what are they?  Excuse me.  They're like the ---.
ATTORNEY CIARDI:
File boxes?
THE WITNESS:
Yeah, the --- the plastic $9.99.
BY ATTORNEY READY:
**Q. Like a Rubbermaid type bin of some sort?**
A. There you go, Rubbermaids.
**Q. Okay.  Okay.**
A. Yeah.
**Q. All right.**
**So, you said you went through those, you went through a filing --- filing cabinets?**

Page 22

A. Correct.

Q. And those are where your documents you keep --- you and Shannon both keep documents?

A. Documents are all over the place, to be honest with you. You know, they're --- she's finishing up her doctorate, so they're everywhere. There's kids homework, and our house --- house is pretty messy. We've got a ten year old, soon to be 11 and a three year old and just to finish. The three year old's pretty --- pretty much a handful and an eight year old as well. So, there's --- there's a lot of stuff going on.

Q. And where are --- where else do you keep documents other than in the filing cabinet you referenced and the Rubbermaid bins?

A. I think I just answered that, right? I said the filing cabinets. Yeah. Could you rephrase the question for me?

Page 23

Q. Where else do you keep documents other than in the filing cabinets and the Rubbermaid bins you just referenced?

A. So, as I said --- as I stated, I think it was --- you just rephrasing the question. Is that right, sir?

Q. Where else do you keep documents?

A. Well, are you rephrasing the question?

Q. Okay. So, a minute ago you said keep documents in a lot of places. And I'm saying, other than the filing cabinets and the Rubbermaid bins, where else do you keep documents?

A. Yeah. So, documents would be --- electronic documents would be an email, as I said. And then there's filing cabinets, and that's it. The Rubbermaids boxes, whatever you want to call them.

Page 24

Q. Okay. So, ---.

A. Just --- just to clarify on the record here. I'm not trying to lie. I'm just trying to remember. I think I answered that question already, sir.

Q. Okay. So, your filing cabinets, how --- how many of them are there?

A. But you've asked that.

Q. How many are there?

A. Well, how many did I tell you there were?

Q. I don't know what you said. So, how many are there?

A. No, I said two. You can check that record there.

Q. There are two filing cabinets in your basement?

A. Correct.

Q. Then you said --- I --- I think you said a moment ago you had other filing cabinets?

A. Well, I didn't say that. I said there were Rubbermaids. You

Page 25

actually clarified that point. So, we're going to play this all day. Actually, let's do this, Joel, why don't you answer the question again and I'll give you the answer for the third time. Go on ahead.

Q. So, you have two filing cabinets in your basement?

A. Wait. Just one --- one at a time. Correct. Go on ahead.

Q. Okay. Do you have any filing cabinets anywhere else? Just filing cabinets.

A. So, ---.

ATTORNEY CIARDI: Wait, for him or companies? I --- I just --- just clarify, what --- who you're asking about. Just him or ---?

ATTORNEY READY: I'll break them down one at a time.

BY ATTORNEY READY:

Page 26

Q. You, personally, and that --- that was really what I was asking. You, personally, other than the two in your basement ---.

A. The examination two ---.

ATTORNEY CIARDI: Wait.

THE WITNESS: Please ask the question, again.

ATTORNEY CIARDI: You got to --- you got to let him finish the question.

THE WITNESS: Yeah, go ahead. No problem.

BY ATTORNEY READY:

Q. Other than the two in your basement, ---

A. Sure.

Q. --- do you personally have any other filing cabinets where you keep documents?

A. Where I keep documents?

Q. Yes.

Page 27

A. So, we have two filing cabinets in the basement. I said three to four Rubbermaids, as we're calling them that. You asked me initially where I checked for the documents. I checked them spots and I also checked my email.

Q. Okay. So, just talking right now about physical filing, I understand your answer to be, other than the two filing cabinets in your basement, there are no other filing cabinets where you personally keep information? I understand the Rubbermaids, not asking about that.

A. Okay. Where I would keep information?

Q. Correct. Physical documents for now.

A. Physical documents? No, that's --- that's the --- the --- that's where I searched, and that's where I went to stressed out looking for documents, so ---.

Page 28

Q. And other than the three to four Rubbermaids, are there any other places that you keep --- that you personally keep physical documents?

A. If we're talking about mail, would that be something?

Q. Sure. Any documents that could possibly be responsive to what's on this schedule in front of you.

A. That's on this schedule? May I have a look? Is it okay if I look at it?

Q. Please. Take your time.

A. Great. No, I looked in the basements. I looked in emails, as I said, you know, the place is pretty messy with three young kids, so I looked where I thought there were documents.

Q. Okay. So, again, just talking for a moment about physical documents, there's no other places that you're aware of that you personally store physical documents, other than the two

Page 29

filing cabinets in the basement and the three to four Rubbermaids. Correct?

A. Correct.

Q. All right. How about for any of your businesses, where do you keep documents?

A. Can you be specific? Which businesses?

Q. Any of your businesses.

A. Which ones, though? There's been multiple locations, so you're going to have to narrow the scope, if you don't mind.

Q. Sure.

A. Sure. Thank you.

Q. For the last five years, where have you, personally, kept any documents related to any business that you own, control, work in, serve?

A. Which --- which business in particular? Again, as you know, multiple businesses.

Q. Any.

8 (Pages 26 to 29)

Page 30

A. That's the big question.  So, any documents, any business in particular?

Q. Any business you own, where --- where do you keep documents?

A. Would you like me to give you an example of a business?

Q. I'd like you to run through everything that's responsive to that question.

A. Well, I don't want to lie under oath and certainly I don't want to get tripped up by you, you know, with your cute questions.  So, I'm going to do my best to answer, just for the record here.

I --- we --- we --- I owned the building 4 South 4th Street down in Reading, Pennsylvania.  It was a large building, maybe 35, 40,000 square feet.  Maybe bigger.  I don't really remember.  I actually believe it was an ARC Realty Building.  There were documents in my drawers.  There were documents in my office, you know, my

Page 31

personal office.  Similar to --- I'm sure you have a personal office in your --- your suite here --- your building here.

There were documents in the basement.  Again, pretty large building, so I would say I'm not the best with documents, Joel, you know.

Q. Okay.

So, can you give me the address of that building again?

A. Yeah, it's three --- there's actually two addresses because it's stretched around the corner.  354 Penn Street slash 4 South 4th Street.

Q. I'm sorry, I'm having trouble understanding.  4 Sight 4th Street?

A. South.

Q. 4 South 4th Street?

A. You'll get to Ireland one day, Mr. Ready.

Q. 4 South 4th Street.

A. Are you Irish?  Is that --- honestly, are you Irish?  Is that your heritage?  Scottish?

Page 32

Q. I have no idea.

Your drawers are a reference to the drawers that were in that building?

A. The drawers and the --- the table, yeah.

Q. Okay.

And that table was in your office?

A. Yes.  Yes.

Q. Okay.

So, when you said my office just a moment ago, you were referring to an office that was in that building?

A. As I said, similar to maybe what you have in your office --- in your office building here, you have probably your own office.  So, there's drawers that you can pull out and there documents in there.  It was always very messy to be perfectly honest.  I've never been good at that.  Staying organized with documents.

Q. And when was that building

Page 33

sold?

A. Oh, goodness.  I don't want to speculate.  I believe --- I think it was 2020, 2021.  Don't hold me to that.  But from my recollection, four or five years ago.

Q. When did you buy that building?

A. Again, I hate speculating.  Is that okay if I speculate a little bit?

Q. You can take an educated guess.  I don't want you to speculate.  If you can tell me about when it was, that's fine.

A. An educated guess, would it be maybe two years before.  Maybe two to three years before, you know, it sold.  So, we were in there for maybe two years.

Q. You think 2018 to 2020, roughly?

A. Yes.  That's good.  Thank you for the help.

Q. And ARC Realty owned it solely at that time?

A. Yes.

Page 34

Q. Okay.
Did you have any partners in ARC Realty at that time?
A. I'm not sure when Shannon became a partner. I believe she became a partner at the beginning of 2021. Or tenants in the entirety.
Q. Did she buy into that partnership?
A. I'm not sure. I'm not sure. I can't recollect the contract. Again, I don't want to guess.
ATTORNEY READY:
Just making sure you're okay?
COURT REPORTER:
Yeah.
ATTORNEY READY:
I saw you pause, I just wanted to make sure.
THE WITNESS:
Sorry about the accent, by the way.
COURT REPORTER:
Oh, you're fine.

Page 35

THE WITNESS:
For the first hour, when I'm talking people are looking at me going drawers, you know? So, if you need me to slow down, just tell me.
Thank you.
COURT REPORTER:
Thanks.
BY ATTORNEY READY:
Q. So, you mentioned a contract when Ms. Kroemmelbein bought into ---?
A. Mrs. Redmond.
Q. Mrs. Redmond, I'm sorry.
A. Yeah. Thank you.
Q. When Mrs. Redmond bought into the --- the Arc Royalty?
A. She actually goes by both names. It depends on who she's meeting with, you know. If she wants to sign fancy, she'll say Ms. Kroemmelbein. Redmond is a commoner name in Ireland, so ---.
Q. I see. Okay.
A. Like Ciardi, actually.

Page 36

ATTORNEY CIARDI:
Very common.
THE WITNESS:
Yeah. Although your great, great grandfather was a famous poet. You know that; right?
ATTORNEY CIARDI:
Great, great, great uncle.
THE WITNESS:
Uncle, yes.
BY ATTORNEY READY:
Q. So, Mrs. Redmond bought into it in 2021, but you're not sure what she paid.
Is that correct?
A. Yeah.
Q. Do you remember if she paid or if you just added her to it?
A. I just --- I don't know.
Q. All right.
So, let me go back to 4 South 4th Street.
A. Yeah.

Page 37

Q. And that building, you --- you had a basement and you said there were documents there as well?
A. Big basement. Yeah. I can remember specifically looking for documents and not being able to find them.
Q. Okay.
When you sold that building, where did you move all the documents to from that building?
A. Many of them were --- many of the useless documents were destroyed. We're talking a lot of mail or thrown outs, as we say, in Ireland. So, not burnt, you know, in the backyard, but many of them were --- were useless and it was a quick move. So, yeah, many of them went into the basement of our home. Many of them went to the basement of the --- the new place that we were going to buy or rent. There's --- there's just a lot of documents. You know, I wish I could give you a concrete answer, but things happen

10 (Pages 34 to 37)

Page 38

fast in the Redmond household, Joel.

**Q. So, the documents that survived, where did they go, not ones you destroyed, but where did they go?**

A. Many of them went into the basements. Thankfully, I'm pretty good at email, so, you know, many of them have been in --- in my email. You're just going to scan something to an attorney or mention the contract with Shannon. So, I would say my email is a 99.9999 percent hit rate. I'm actually a little bit OCD about email, to be honest.

**Q. What does that mean?**

A. OCD?

**Q. What do you mean when you say that you're OCD about your email? You mean you organize it in folders? You mean you delete emails? You mean you ---?**

A. It's --- so, Ciardi has its own folder, okay, with its own special notification. It's in green. If I see a Ciardi, I don't want it sitting

Page 39

in my inbox because it's a distraction, you know, when you're consulting or previously building a business, so --- yeah. There's --- there's actually a folder for you, a subfolder under legal. As much as I would love to have you as my attorney, I can't, unfortunately. So, there's a yellow folder for you. So, that --- that's what I mean. It's very organized.

**Q. Okay. What email address is that, that you're referring to?**

A. What do you mean?

**Q. Your email?**

A. My email? Oh, yes. I have multiple emails, but the main email that I use is Alanredmonds23, as in Michael Jordan, @Gmail.com. That's my go to.

**Q. So, when you say that you scan documents and you organize them in folders, is that the email address you're talking about?**

Page 40

A. Yes.

**Q. What other emails do you have?**

A. Acmltd@gmail.com.

**Q. And what other emails do you have?**

A. That's it. That's --- that's the two big ones. There's other emails floating out there. They pop in every now and again. There's like AlanIrishman5126 or some of them from college days, you know, so I still --- I'm OCD. I still have access to that, you know, so ---.

**Q. So, that was what again?**

A. AlanIrishman5126, I believe. Yeah.

**Q. And where is it, at what?**

A. At Gmail, yeah.

**Q. And what other emails do you have?**

A. I have previous business emails.

**Q. Okay. And what ---?**

A. Alan@NBOA. Again, we're going

Page 41

back years here. It was either Alan, A-L-A-N, @NBOAinc or NBOA.com. One or the other. Actually, it could be both.

**Q. What other --- what other emails do you have?**

A. That's --- that's the --- the --- what I can recollect. I don't believe I had a --- a --- like, a corporate email for Bene Markets. I may have at some point, but I didn't use it. I --- I'm not going to try to hide behind an email. If someone wants to email me, I want them to email me personally. Albert still emails me. Alan Redmond, 23. So, all my important documents and emails go to AlanRedmond23.

**Q. Okay. So, as you see here today, you don't remember any other email addresses you've used in the last, we'll say, five years?**

A. It'll probably take me about an hour to ---- to really rack my brain

11 (Pages 38 to 41)

Page 42

and think about it.  Bene Market, no.
It's probably the best I can do.  We
can revisit it if you want, but that's
--- that's --- that's it.
Q. Okay.
I take it from your answer,
tell me if I'm wrong, that there are
no other places in the last five years
that you've stored physical documents
than what you've already testified to.
Is that correct?
A. I'm doing my best to testify
honestly under oath here.  And that's
for my --- my recollection, Joel.  I'm
calling you Joel, by the way, because
Mr. Ready's tricky for me to say, so I
hope you don't mind that.  I'm not
trying to be facetious or capricious.
Q. Your emails, other than email
addresses, are there other places that
you keep digital documents, laptops,
hard drives, flash drives?
A. Oh, sure, absolutely.  You
know, my laptop, absolutely.  Of
course, I didn't think about that.  My

Page 43

laptop my desktop is going to have
things on its hard drive.  It's going
to have documents there, so ---.
Q. Okay.
A. It's all up in the Cloud,
though.  The email's connected to the
Cloud, the desktop's connected to the
--- to the Cloud.  So, if you wanted a
document haul, and you had a hard ---
excuse me --- you were really, really
dying to get documents, which
obviously you are, I would subpoena my
Cloud.  You'd get everything.  That's
everything.
And I don't delete things
either.  You'll be able to see, like,
my graduation certificate from, you
know, where I graduated.  You know,
you'll be able to see my high school
transcript.  I told you I'm OCD about
documents.  I'm OCD about organization
by my emails and about my Clouds.  You
know, that's --- that's what it is.
Q. What type of laptop do you
have?

Page 44

A. I have a MacBook Pro.
Q. Do you know what year?
A. I do not.
Q. Do you know approximately when
you bought it?
A. I do not.  I think Shannon
bought it and I stole it on her.
Yeah, because she got one, a newer
one.
Q. Okay.
So, it was Shannon's
originally, and you ended up with it?
A. I think I --- I think I jigged
out, as we say in Ireland.
Q. Do you remember about what year
you got it?
A. I don't.
Q. How about the desktop?
A. We share a desktop at home.  I
very rarely use it.  I like to be
mobile when I work, so very rarely use
it.
Q. Do you and Shannon put any
bifurcations in your hard drives?
A. I don't know what that is.

Page 45

What is --- what is that?
Q. Okay.
So, I guess not.  Do --- is
there anything that you were locked
out of on your computer or that ---
A. What does it mean, though?  I'm
interested.  I'm going to get
something out of this.
What does it mean?
Q. Sure.  So, sometimes someone
will put in a hard drive, a --- a
wall, essentially, that says, these
documents are yours, these are mine.
You can't see them by logging in
without me logging in?
A. No.
Q. So, you have no bifurcations,
divisions, anything that you're aware
of that keep either of you from seeing
each other's documents?
A. Oh, the theory that it's an
arranged marriage, that's what you're
talking about?  You're fucking nuts.
You're stupid.  No, of course not.  We
just had a daughter three years ago.

12 (Pages 42 to 45)

Page 46

I had to get that off my chest. No, there's no hiding documents. You know, you and your wife do that?

Q. So, your ---

A. Do you?

Q. --- your desktop, do you have --- where is it kept?

A. In the basement.

Q. Okay.

And that's where all the other documents are? The physical documents you referenced earlier?

A. Yeah. That's where the documents for this --- we're talking about this; right? Are we still onto this topic?

Q. Yeah, we're talking about anything that's responsive to Schedule A here.

A. Okay.

So, these documents that we provided to you, it's stressful to get them, because as I said, paper documents, Joel, not the best. But when it comes --- let me finish.

Page 47

Q. Let me repeat the original question. I think we lost it here.

A. Which --- which question?

Q. The question was, the desktop, you're saying it's in the basement with all of your house --- with all the physical documents that you referenced earlier?

A. Sure.

Q. Okay.

And that --- what's the address of that?

A. Again, I just --- I got to put it on there. The questions are a little bit confusing. They're, you know, there's sort of like this attorney tactic thing going on here where you're trying to trip me up. Here's the deal, buddy. You're going to ask me a question. I don't care how you ask it, okay? I'm just going to do the best to answer it. But if you keep on asking the same question five or six different ways, I'm going to call you out on it. And

Page 48

that's what you're doing. You're trying to show that I'm deceptive and I'm not.

Okay.

As you're starting to find out from your clients.

Okay.

So, not to be combative.

Sorry, Al. These documents, okay, where I got these documents were from the basements, okay, are from my email --- and you actually helped me get all the way there. I forgot about this little Cloud, right, which is connected to the email. So, as I said, if you want to subpoena the Cloud, knock yourself out, buddy. That's it. That's where these documents came from. Next question.

Q. What's the address of the house that you're referring to?

A. Two High Road, Wyomissing, PA 19610.

Q. All right.

Where's your laptop typically

Page 49

kept?

A. It's --- I get pretty mobile. So, ---

Q. Where is it right now?

A. My laptop's in my car.

Q. Okay.

And do you take it with you everywhere you go?

A. I'd say everywhere. On vacation, yeah. It's an important element to my life, so that sits with me when I'm in work mode, 50, 60 percent of the time.

Q. Okay.

A. Which I think is a lot.

Q. Okay.

Do you --- do you have any other computers that you regularly keep documents on?

A. Other --- my kids stole my iPad, so I'd love to be able to bring my iPads, but unfortunately, I can't, that is being stolen away from me.

Q. You keep documents on your iPod?

13 (Pages 46 to 49)

Page 50

A. Pad, P-A-D.

**Q. iPad.**

A. I'm just going to get cue cards for you.

**Q. And other than the iPad, are there any other devices where you typically store documents?**

A. Well, you know, my phone here, you know, this phone has my email connected. It doesn't do a great job of --- of downloading documents, but you know, you can probably hook that up to a computer and there'd be documents in my email. But again, it all goes back to the Cloud. You know, hip bone connects to the knee bone and all that fun stuff.

**Q. Are there any other physical devices on which you access or keep documents?**

A. No.

**Q. Okay.**

**Are there any other physical forms of media that you keep documents on, such as hard drives, flash drives?**

Page 51

A. I probably had a couple of documents on a flash drive once or twice in my life over the last, you know --- what age am I? Forty-two (42). Over the last 20 years. Nothing of noteworthiness, maybe for a --- a graduation paper or PowerPoint or something like that, but there's no secretive flash drives that you have not got access to, which is what you're asking.

**Q. When was the last time you used a flash drive?**

A. Again, tricky question. What about yourself?

**Q. When was the last time you used a flash drive?**

A. What about yourself?

**Q. Mr. Redmond, you're here to answer questions today. I'm not.**

ATTORNEY CIARDI:

Just answer him.

BY ATTORNEY READY:

**Q. When was the last time you used a flash drive?**

Page 52

A. We're getting the same questions over and over, Albert, what are we doing here, you know? Within the last five years, Joel. I can't --- I don't keep a diary of when I want to store things in a flash drive. I'm not that OCD, you know.

**Q. Okay.**

**So, let me ask it a different way.**

**Do you regularly use flash drives today?**

A. Absolutely not. That's a waste of time.

**Q. Okay.**

A. It's a redundant technology.

**Q. In the last year, have you used a flash drive?**

A. No, I don't believe so.

**Q. Okay.**

**You mentioned the Cloud a couple times. So, let's talk about the cloud.**

**What cloud services do you have**

Page 53

**a subscription for? A username for? Access to?**

A. Same as my email address. Apple. Excuse me. I almost said iPhone. Apple.

**Q. So, you have the Apple iCloud service?**

A. Yes.

**Q. Okay.**

**How much storage do you have in your Apple iCloud?**

A. I think it's $9.99 a month, approximately. It might be $19.99. I haven't checked recently. Probably between --- I think that's one to two terabytes, you know, something like that. I think I'm using eight or nine percent of it. Something --- something along those lines.

**Q. How do you pay for that?**

A. I pay for it or Shannon pays for it. One of us pay for it.

**Q. Well, so these subscriptions work on like an autopay model. So, what is it hooked to up to? Because I**

14 (Pages 50 to 53)

Page 54

know you told us you don't have a bank account.

Correct?

A. It hooked up to --- well --- well, I --- I have a DIP account, so I believe maybe come --- well, I did have a DIP account, but it may be coming out of that and maybe coming out of Shannon's. You know, we're not the type of family that, you know, separates things. If it's coming out of Shannon's card, it's coming out of Shannon's card. If it's coming out of my card, it's coming out of my card. It is what it is.

Q. When you say my card, what are you referring to?

A. One of the --- the cards that I've had or used in the past. Just a regular debit card, credit card, whatever.

Q. Okay.

So, you're not sure as you sit here today whose account this Apple

Page 55

iCloud is being paid for out of?

A. I have no idea.

Q. What's your Apple username?

A. Is it my email? I don't know.

Q. When you ---?

A. You seem to know more about it than me, so ---.

Q. When you log in --- you have an iPhone.

Is that correct?

A. Yep, that's --- that's what it is.

Q. Do you know what model it is?

A. Maybe an iPhone 13, 14. Again, I'm more of a software guy. I like software rather than hardware.

Q. All right.

So, when you log on to the software on your phone, it lets you download other software, the app store, ---

A. Sure.

Q. --- what's your username there to download that?

Page 56

A. I believe it's the same as my email, I think.

Q. And that would be Alan ---

A. The 23, yeah.

Q. --- AlanRedmond23@gmail?

A. Yes. Yes.

Q. Okay.

Do you have any other Cloud accounts?

A. Any other Cloud accounts? No, just the --- the iClouds.

Q. Okay.

Are there any other places, other than what we've just discussed here, where you keep documents or other data?

A. No.

Q. All right.

So, I take it from your answer earlier that you spent somewhere between five and seven hours searching all of the things we've just mentioned for responsive documents to these requests.

Is that correct?

Page 57

A. Yeah, just to go back to what I actually said, it was over a space of two days, so probably five hours on, I think it was a Tuesday and five to seven hours on a Wednesday. And not to speculate, but it was a --- a two-day haul with --- with Nicole Ridinghart.

Q. Okay.

So, in that five hours, you ran searches on all the email addresses we mentioned.

Is that correct?

A. Yeah, I really looked through my --- my emails. This --- this was a lot of work.

Q. Okay.

And you searched the computer that we talked about, the two computers?

A. I searched my MacBook Pro. I checked the desktop downstairs as well. So, there's nothing on the desktop. Shannon uses that more than me.

Page 58

**Q. And you searched your iCloud account as well?**
A. I had an issue with the iCloud account getting logged in, but yes, I ended up finally getting access. And there's a lot of gobbledygook in there, spreadsheets and stuff, you know, numbers.
**Q. So, to be clear, ---**
A. Uh-huh.
**Q. --- if any of your answers in these schedules was that there wasn't anything, you're saying that you don't have those documents anymore?**
A. Which --- which documents are you talking about?
**Q. So, on this whole schedule, ---**
A. Sure.
**Q. --- if you did not produce a document that's asked for there, your --- your position at this point is that you don't have it anymore. Is that correct?**
A. Which documents in particular?
**Q. Any of them.**

Page 59

A. Do you want me to read it again here?
**Q. Sure. Take your time.**
A. It's documents that we don't provide. I know we spent a lot of time, myself on Shannon finding these documents. Is there any documents in particular?
**Q. Take a minute to read it over. We can repeat the question, if you need to.**
A. Do you have the answers that my attorneys provided to you? Or at least I --- I can --- can compare, you know, compare and contrast.
**Q. My question at this point is if there's anything else out there that you need to search before confirming that you don't have anything else than what you're already provided?**
A. Sure. What I'll say is, is what I've said. I spent five to seven hours on two days, the best that I could to get documents. And that's what you were provided, is what Al and

Page 60

Nicole were provided, so ---.
**Q. Okay.**
A. That's --- that's the answer to the question, the best that I can do. I'm very conscious of telling the truth, and that's the best way I'm going to answer this.
**Q. Okay.**
So, if there is ---?
A. If you're referring to am I being deceptive or I'm --- obviously you are. The answer is absolutely not. It's a stressful two days to try and keep up. I'm not to pose an issue in a meeting like this. It was a lot of work. I provided everything that I could with Shannon's help.
**Q. Okay.**
A. That's a pretty full answer.
**Q. So, there's nothing else then? If --- if there's anything that was not provided, your position is that you don't have a copy anymore?**
A. If there's something --- if there's something that wasn't

Page 61

provided, weren't able to find it in the five to seven hours that we searched on the Tuesday, Wednesday that we searched. If you want to be specific about a document, they can --- I can get very specific and tell you exactly where we looked.
**Q. So, ---**
A. No? Okay.
**Q. --- you don't have any records or invoices for your debts All Web Leads. Is that correct?**
A. For All Web Leads? I'm not sure. I'm --- I'm not sure. I know that we provided a number of documents to Albert and Nicole. It should be in there.
**Q. So, you're --- you believe, you provided your attorneys ---?**
A. No, that's not what I said. I said --- well, you've got 400 documents; right? You got 400 documents of discovery. For the record, you have 400 documents plus a

Page 62

discovery.
correct?
**Q. Mr. Redmond, my question**
**was ---.**
A. You don't know what your
question is. Go ahead. Do it again.
Keep going. Listen. Go ahead.
**Q. We can do this all day.**
A. Oh, I know I can.
**Q. Okay.**
A. I can.
**Q. So, listen for a second.**
**Listen for a second.**
A. No, listen. Just do me a
favor.
ATTORNEY CIARDI:
Just let him --- let him
ask the question and then
you'll answer.
THE WITNESS:
Okay.
Go on then.
BY ATTORNEY READY:
**Q. There were no records or**
**invoices produced for your debts to**

Page 63

**All Web Leads. So, my question to you**
**is, is it your testimony here today**
**that those don't exist?**
A. Sorry, you spoke very quickly
there. Could you say that again?
**Q. Sure.**
A. You also have an accent.
**Q. There were no records or**
**invoices produced for your debt to All**
**Web Leads?**
A. Could you be specific on
records? What --- what do you mean
records?
**Q. Do you not have any records for**
**your debt to All Web Leads that you've**
**listed on your schedules?**
A. Me not have --- what is a
record? What do you mean? Like a ---
a --- an invoice? You have to be ---
records is a broad term. What are you
talking about? Are you talking about
emails? What is a record in your
eyes?
**Q. Your testimony is you don't**
**know what I mean by record?**

Page 64

A. That --- I'm asking you to
clarify because records can mean
numerous things. You know this.
You're an attorney. What is a record?
**Q. So, what's the answer to my**
**question then?**
A. No, what is your question? I'm
asking you to clarify a record. It's
that simple. I need to know what a
record is.
**Q. Okay.**
**So, you don't know what a**
**record is. Got it.**
**Do you have any invoices**
**produced for your debts to All Web**
**Leads?**
A. I do know what a record is.
There's multiple different types of
records.
**Q. Okay.**
**So, answer for all of them. Do**
**you have any records or documents ---?**
A. There's hundreds of records.
There's hundreds of different ---
there's --- there's invoices, there's

Page 65

contracts. There's all different
types of stuff.
**Q. For All Web Leads.**
A. Let me ask. No, you see, you
asked me what a record is, and I'm
listing off the different types of
records.
**Q. I'm going to stop you there.**
**Just to be clear, I didn't ask you**
**what a record is. My question**
**was ---.**
A. Well, you don't know what a
record is, and I'm asking to be
specific.
ATTORNEY CIARDI:
Alan, you have to let
--- she can't take things down
if you two are talking over
each other. So, you got to let
him finish, then you can talk.
And he's going to let you
finish.
THE WITNESS:
Sure. Okay.
BY ATTORNEY READY:

17 (Pages 62 to 65)

Page 66

Q. So, my question is, do you have any records documenting your debt to All Web Leads?

A. I'm asking, could you clarify what records are? What do you mean by records? I need a clarification point on that. I'm dead serious. I need a clarification point on that, sir.

Q. All right. Let's go through some types of records.

Do you have any invoices for your debts to All Web Leads?

A. Not that I can recollect. You don't even need to look again. I don't even know if we provided anything. Again, in regards to the old way, I believe you said we didn't. And as I said, we spent five to seven hours looking, you know, for --- for records and documents.

Q. Just to be clear, I think you told me you spent 10 to 12 hours over two days?

A. No, you see, you're lying,

Page 67

Joel. Because I said five to seven hours, correct, over two days.

Q. Okay. Split over two days, a total of five to seven hours?

A. Oh, come on. Yes, of course.

Q. All right. So, is there anywhere else you need to look for responsive documents to confirm for me whether you have invoices for All Web Leads?

A. No, I think the five to seven hour haul on a Tuesday and a Wednesday was --- was more than enough. And for the record, the 400-plus discovery documents is --- is the best that I can do, you know.

Q. Okay. So, you also have no records or invoices for your debt to Bochetto and Lentz.

Is that correct?

A. Bochetto and Lentz, again, clarify records. What do you ---?

Q. Invoices, emails documenting

Page 68

debt, attempts to collect, anything like that?

A. I honestly ---.

ATTORNEY CIARDI: Okay. One, I'm going to object. Any of his invoices would be covered by attorney/client privilege. But you can answer as to whether there are other records that may not be privileged.

THE WITNESS: Now, what --- what type of records? I don't know if you're asking a question, I don't think you're allowed to. What type of records for Bochetto and Lentz? Invoices and what else?

BY ATTORNEY READY:

Q. So, you don't have any invoices to document your debt to Bochetto and Lentz?

Is that --- is that your

Page 69

testimony?

A. My testimony is we spent five to seven hours on Tuesday, Wednesday looking for these documents. If we were unable to provide the documents, we couldn't find them. It's that simple.

Q. Okay. And that would be true if I go through all the list of all your creditors.

Is that correct?

A. Whatever was provided, Joel, that's what we got.

Q. Who paid your debts to Bochetto and Lentz?

A. What do you mean?

ATTORNEY CIARDI: I'm going to object and ask for a timeframe.

ATTORNEY READY: Sure.

BY ATTORNEY READY:

Q. In the last three years, who's paid your debts to Bochetto and Lentz?

Page 70

A. 2022 to 2025; is that correct?

Q. Correct.

A. Shannon is the breadwinner right now.  She has been for the last number of years.  So, it would have been Shannon.

Q. Okay.

How about your debts to Duane Morris?

A. That would have been Shannon.

Q. Same for Rush Law Group?

A. I believe so, yeah.  I've known Bill for a long time, as you know, Joel, but yes.

Q. When you say Shannon, let me ask this.

How many of those payments came from Shannon versus Seguro Medico?

A. I have no idea.

Q. I'm going to turn your attention to number 34 on the list in front of you.

A. Uh-huh.

Q. It's on the second to last page.

Page 71

A. Okay.  Yeah.

Q. We asked for all documents evidencing the disposition of all money borrowed from Complete Business Solutions Group, Inc.  by National Brokers of America, Inc.  You didn't provide any documents responsive.

Do you have no documents for that?

A. For Complete Business Solutions to loans, I believe.  Yeah?

Q. Correct.

A. Again, we looked.  Did I have documents previously?  Absolutely.  I would have signed the contracts, but there's this thing in a --- an email called purge or delete.  So, I'm assuming if I couldn't find that, it would have been deleted.

It's not a nice thing to look at when you owe a lot of money to someone.  So, yeah, again, whatever --- whatever was provided was what I --- what I had.

Q. What are the settings that

Page 72

you've set up on your Gmail to purge or delete emails?

A. I use an email called Spark Email.  I don't know if you've heard of it.  It's like an email cleaning AI tool.  That was set up years ago.  So, Spark actually downloads the Gmail, you know, from --- from Gmail.  So you have it on your --- your laptop or on your phone.  So, it's an excellent email, you should check it out.  But it does its job to --- to clean.

So, in regards to the settings, I --- I don't know.  I know some days I open my computer and it's lighter, so to speak.  In the emails, it's lighter.

Q. So, it's an AI tool.  What guidance did you give it or parameters did you set on doing deletions?

A. The AI tool is more for writing, to be honest.  It's more for writing.  The cleaning tool is more as your alluding to parameters, I'm not --- I'm not exactly sure.

Page 73

Q. Okay.

So, you installed this program, Spark.

It's a software on your computer?

A. It's an email provider, email client server, yeah.  Like Outlook.

Q. Okay.

And it --- it --- you're saying it deletes emails from time to time?

A. Yeah, like most --- most email servers do.  When you get too heavy, you have to delete emails.  So, maybe some --- maybe, again, hate to speculate on the record, but maybe some of them emails went there, but --- yeah.

Q. But you didn't set parameters for it or say emails that are older than five years get deleted or emails from this person get deleted?  You just installed it, it started deleting emails and it cleans out for you.

Is that what you're saying?

A. I'm sure there's a setup

Page 74

procedure when you're rushing to get an email on your computer because your computer's running slow and you click boxes.  We've all done it.  But there is no intentional --- what you're alluding to is inaccurate.  There was no intentional reason or desire for me to go in and purge documents.  You know, Complete Business Solutions, it's public record, Joel, you know, go look, your --- your client is in this court case now.  So, there's no reason for me to do that, you know, and try and make your life harder.  It's just not what I would do, you know.

**Q. So, just -- again, just to be totally clear, the Spark email solution that deletes things, it's not something you told it to do, it's just a part of the software?**

A. I would say how much I think about Spark is probably less than 0.0000001 percent of my life.  It's pretty to look at.  You can change the

Page 75

colors.  It does a nice job of sorting stuff like the Ciardi folder or, you know, your folders.  It's an email client server.  There's no malicious --- it's not like a FBI tool to purge documents or any of that crap.  You know, it's --- it's an email server that does what email servers do, you know.

**Q. So, when you log on and you said sometimes my email is a little lighter and it's deleted things.**

**How do you know that?**

A. It usually pops up, you know, once every four or five months.  And said things are being purged from your trash.  Yeah, like - well, like in fact, I think like all email servers --- email --- email client providers I think is the actual correct term.

**Q. Okay.**

**So, obviously it may purge from your trash.**

**I think my question is, is it selecting documents to go to your**

Page 76

trash?

A. Is it selecting specific documents?

**Q. What documents --- purging from trash is one thing.**

**Is it selecting what documents are going into the trash and therefore marked for deletion?**

A. It's going to ask, like all email server clients, would you like to delete these hundred emails or 30 emails or whatever?  I think what a hundred percent of the world population does is they scroll through and see if anything's important and then they click delete.  Or they go, no, no, don't want to delete that email from Albert or ---.  It's what happens on a regular human basis, you know.

**Q. Okay.**

**So, any emails that it has purged from your trash bin are emails that you selected for deletion at some point.**

Page 77

**Correct?**

A. I do believe there's also an automated part to it as well, but that's something --- again, it's not something I give --- I could provide you with the --- the website and maybe you could review what Spark does, but that's not something that I particularly pay attention to.

**Q. Okay.**

**How did CBSG send you invoices in the past?**

ATTORNEY CIARDI:
Object.  When you say you, do you mean him, the entity?  What do you mean?

BY ATTORNEY READY:

**Q. You have a debt to CBSG, personally.**

**Is that correct?**

A. That's a disputed debt, from what I understand.

**Q. Okay.**

A. I believe so.

**Q. Okay.**

Page 78

**What's the dispute on that debt?**

A. I --- I wouldn't know the numbers.

**Q. No, I mean, why are you disputing that debt?**

A. There was $35 million of principal taken, Joel. There was approximately $39 to $40 million paid back by myself. I --- you know, recently the CBSG guys went to jail for extortion. So, you'd probably do that, too, if you're being extorted.

**Q. So, you're saying that you don't believe that the debt that they're asserting against you is valid.**

**Is that correct?**

A. I'm not exactly sure what the legal context is, but to me --- I'm not sure what's going on in Philadelphia courts, but to me, the debt is not valid based on the belief system that I have around all the noise and all the theatrics that has

Page 79

went on, you know, with these --- these people.

**Q. Okay.**

**There's $35 million in principle, and you paid back, you said, $39 to $40 million?**

A. Yeah. For the record, just --- I'm guesstimating as you said earlier. I think I'm pretty accurate, but I haven't looked at it in a while.

**Q. Okay.**

A. Uh-huh.

**Q. Are you saying that the rest of the debt that they're asserting is interest?**

A. You nailed it. Absolutely.

**Q. Okay.**

A. Yeah.

**Q. I understand.**

A. Yeah.

**Q. And you don't --- let me go back to the --- the question that got us there.**

**How did you first receive invoices from CBSG?**

Page 80

ATTORNEY CIARDI:

Again, objection. When you mean you, do you mean an invoice directed to Alan, NBOA, Bene Market?

ATTORNEY READY:

Yeah. Okay.

BY ATTORNEY READY:

**Q. How did --- how did you, Alan Redmond, in your --- in --- in your own personal knowledge, first become aware of this debt, regardless of who they first asserted against?**

**When's the first time you heard of CBSG?**

A. This is the first one where I'm actually not debating with you. I'm not trying to be an ass, not on purpose, but you're fun to --- you know, I like you.

Can you really clarify that? Like I lost it with him talking ---

**Q. Okay.**

A. --- and you talking.

**Q. Wait, let me back up.**

Page 81

A. Like, dumb it down, please.

**Q. Let me go back even further.**

A. Yeah.

**Q. You know, when I say CBSG, you know I'm talking about Complete --- Complete Business Solutions Group, Inc.?**

A. Yes, sir. Yes.

**Q. All right.**

**So, when was the first time you ever heard of CBSG?**

A. Oh, it was three to four weeks after a previous partner of mine, Jason Jordan, left the company and the company was --- the company was $250,000 in debt.

**Q. Okay.**

**So, it was --- it was back in --- I think that would have been 2014.**

**Does that sound right?**

A. '14, I believe. July '14. August '14. Somewhere around there, sir. Yeah.

**Q. Okay.**

**You signed up with them for**

Page 82

loans?

A. Yes, it was a --- it was what they call a fast payday, I think in --- in this, like, a quick loan, which a lot of startups or entrepreneurs have to do. They have to borrow that money because they can't get a traditional line of credit or they can't get a --- you know, they can't get a --- a --- a main street loan. And also, being an immigrant, you know, it was really hard for me to --- to --- I kept getting turned down. Let's just say that. Plus the company wasn't doing well, so ---.

Q. Okay.

A. I had to pay the staff and keep the doors open, and that's when I took it.

Q. Okay.

How did they invoice --- and I'll start with NBOA, for their repayments?

A. Okay.

They didn't. You'll find this

Page 83

interesting. They didn't. You would sign a contract, Attorney Ready, National Brokers of America personally guaranteed, which I didn't know what that was, like, what was that? Yeah, we need $50 grand to cover payroll, right? So, take down loans and no invoices. The money would come out daily like that.

You know, being a 31 year old Mick, I'm like, well, this is just regular business. But it would come out every day, no invoices.

Q. So, the money, they had some kind of direct draw on your account?

A. A hundred percent, yes.

Q. And --- and when we say your account, we mean the NBOA account?

A. NBOA, yeah.

Q. Okay.

When did you personally guarantee those loans?

A. Right off the bat.

Q. Okay.

And did anybody else personally

Page 84

guarantee those loans with you?

A. I believe that Jason got --- personally guaranteed one of them loans. Again, I don't want to seem like I'm misleading. It's 11 years ago, but I believe he personally guaranteed one. I don't want to say two. I think it was two. But I don't want to come off as he guaranteed two. It was one or two loans.

Q. Did anybody else guarantee you, personally, any of those loans?

A. No.

Q. You continued taking loans from them after that first one in 2014. Correct?

A. Yes, sir. Yeah.

Q. Okay.

Do you know how many loans you took from them over the years?

A. I --- I don't. It was --- it was considerable.

Q. Did you take them monthly, quarterly, yearly?

A. It would have been --- so,

Page 85

their business model --- can I ---?

Q. Tell me whatever you think you need to explain it.

A. Yeah, I think this might help. Their business model is they want you to get the 55 percent of making the payment back. You know, you get a beautiful law firm here, you take one of these, you are going to take them forever. Forever. You're never going to get rid of them. It's impossible because, you know, the interest --- now, that I know about APR and interest, I finally learned that --- it just keeps stacking.

So, when you take a second loan --- I got to be careful with this because of the FBI investigation, to be honest. But I'm going to be as honest as possible, I'm just getting nervous talking about this stuff. So, can we take a break? Is that all right?

Q. Are you done answering your question?

22 (Pages 82 to 85)

Page 86

A. Yeah. Let me finish it up and then I'm going to take a break, because --- you know. So they get you to like 55, 60 percent, sir, I didn't give it to you. It's almost like they have a mechanism --- they have a mechanism to bust you out. So, you take 100 grand, you get 55 grand back, you --- you pay it back, you know, you get halfway there, they go, oh, we get you a reload, you take the reloads. Being an entrepreneur, you don't know that it's interest upon interest. So, that 30 percent interest is now 60 percent interest. The interest is being interested. If that --- that's not the correct technical term.

Q. It's compounding interest?

A. It's compounding interest, which I learned in the last seven or eight years. You know, thankfully. You know, you're a well educated man.

But, you know, it just kept

Page 87

stacking up to the point when I did the books, Jesus, five, six years ago, we were talking about 40,000 percent, still being able to be the only client that was able to pay off the principal, but --- and interest. But it --- I got off topic there, you know.

That's --- that's --- no invoices, Attorney Ready. They yank it out of your bank account. If they don't yank it out of your bank account and you miss the payments, yeah.

ATTORNEY READY:

So, I've got some more questions on this topic, but we can take a break ---

THE WITNESS:

Thank you.

ATTORNEY READY:

--- if you want. Sure.

THE WITNESS:

Thanks.

--

(WHEREUPON, A PAUSE IN THE RECORD WAS

Page 88

HELD.)

---

BY ATTORNEY READY:

Q. Before we left, we were talking about CBSG. So, as far as CBSG, are there any other reasons, other than what you've already told me, that you believe that this debt is invalid?

A. Well, you know, there --- there's two sides to --- to that. You know, there's the 35 million of principal that's being paid. Okay? And then there's $4 million of interest. I believe it's being disputed. I believe so. But currently it's in --- in litigation, so ---. They're saying we owe it, and we're fighting that.

Q. And I think I understood your testimony earlier, but I just want to confirm that I didn't misunderstand. So, in addition to NBOA never getting an invoice for that money, ---

A. Uh-huh.

Page 89

Q. --- you never got an invoice for that money personally?

A. And again, from my recollection, Attorney Ready, no, I did not. Right out of the bank accounts.

Q. After they gave you funding for NBOA, they continued funding Bene Market. Is that correct?

A. Yes, they did. Oh, I'm sorry. I called the wife. Let me turn this off. My apologies.

Q. And then they continued funding Seguro?

A. No, they --- they did not. No, it was my businesses only, NBOA. Yeah, I can remember having a conversation with Shannon when she opened Seguro, NBOA and Bene Markets.

Q. And what conversation was that?

A. Don't take any fast payday loans. You're going to be in a world of hurt.

Q. Okay.

Page 90

So, as far as you're aware, they never provided funding to Seguro Medico?

A. No, I --- I don't believe so.

Q. Did they provide funding to any of your other businesses?

A. No. It was NBOA and Bene Markets. I think --- Joel, can I --- can I just think, if you don't mind?

Q. Sure. Sure.

A. It was a bit of a long time ago. I know when they drafted the contracts, I had to electronically sign the contracts, there would be NBOA, Inc., Bene Markets, Alan Redmond. They would list everything. There was a company called UC Consolidation, which never made much money at all. You know, maybe less than $10,000. It was a defunct entity. From my --- I can picture it in my head. I believe they were listed on --- on the --- the contracts as well, sir. I believe so. I'm 99 percent

Page 91

sure. Ninety-five (95) to 99 percent sure.

Q. Okay. Did --- did you take funding for UC Consolidation or they just co-signed?

A. Not co-signed. It was just listed on the contract, if that makes sense. It's almost like they would put everybody on the contract that they knew you had anything to do with and --- yeah.

Q. Who was the funding provided to?

A. The funding? Perfect. Thank you. The funding was provided to National Workers of America and also Bene Markets.

Q. Okay. As far as you know, no funding was ever provided to UC Consolidation?

A. No, sir.

Q. As far as you know, no funding was ever provided to you, personally?

Page 92

A. No, sir.

Q. And as far as you know, no money was ever provided to Seguro Medico?

A. No, sir.

Q. All right. And you mentioned a contract. Do you remember how many contracts were signed over the course of that relationship? Was it just the first one?

A. I think you asked me that. I --- I don't want to speculate, but it was --- it was definitely more than a dozen, I think would be a good guesstimate, between 12 and 30. But again, under oath, I don't want to have you think that I'm misleading. It --- it was --- it was more than a dozen.

Q. No, I understand. Okay. So --- so, there were --- there were repetitively, over the course of the relationship, you signed new contracts?

Page 93

A. Yes. Newly signed documents, yeah.

Q. Would that have been every time you got a new loan? Is that right?

A. Yep. It would have been a reload that they --- they called it.

Q. And the total numbers you gave me a few minutes ago reflects all of those loans. Is that right?

A. Again, as I said, it was a guesstimate, but yes.

Q. Yeah. So, in other words --- and I understand these are estimates, but you said 35 million in principal. That reflects all of those loans. correct?

A. $35 million in principal. And then they are claiming, I --- I believe, over $30 million in interest.

Q. Yeah. And in other words, though, just to --- to nail it down, I think if I understand you correctly,

24 (Pages 90 to 93)

Page 94

you're not saying you got, I don't know, $12 to $35 million loans?

A. No.

Q. You got multiple smaller loans that add up to $35?

A. Absolutely.

Q. Okay.

A. And the interest would have been, I believe, $30 million plus.

Q. So, we asked you in number 36 here for all applications for loans, supporting documentation. Asked you about documents related to World Business Lenders, LLC. What records, other than the ones you've already talked about, did you consult to search for responsive documents in number 36?

A. I think I engaged Shannon. I did engage Shannon in that. Many of them ones were --- were hers because she was an owner of Seguro --- excuse me, ARC Realty, and she also owned Seguro, so ---. Yeah, I can't remember what we find. If we find

Page 95

anything.

Q. Do you know what Shannon searched to help you find those documents?

A. I --- she would have looked at her laptop. She also has a MacBook and also her desktop in the basement as well.

Q. And that's the --- the desktop that you use sometimes?

A. Very rarely, but yes, the --- all the time.

Q. And did you look through Seguro Medico's documents to provide that as well?

A. I don't go near that stuff, to be honest. That's --- it's her rodeo. It's way more organized than me.

Q. Are you saying that you don't have access or you just don't look?

A. Sorry, I didn't mean to cut you off. I --- I --- she doesn't want me looking at her documents. That's just --- you'll meet her. She doesn't want me looking at her stuff unless she

Page 96

asks me to.

Q. Okay. All right. Let me transition here a little bit to some of your background information. What was your full name at birth?

A. Alan Redmond, 1st of October '82.

Q. I'm sorry, first of what?

A. October 1982.

Q. Okay. And your middle name is Christopher?

A. Yes, sir.

Q. And it was at birth. Correct?

A. It was.

Q. Okay. Have you ever gone by any other name in your life?

A. I had some people call me A.C. back home . Wanted to play basketball. No. No, that's it. Alan.

Page 97

Q. Okay. How did you first meet Shannon Kroemmelbein?

A. We met in Philadelphia at a bar.

Q. Okay.

A. Ashton Cigar Bar, actually, to be specific.

Q. Have you ever resigned --- and when was that, I'm sorry, roughly, when you first met her?

A. Going to get me in trouble with this one. When did I meet her? I believe it was 20 --- it was before COVID. What year was COVID? 2019. 2016. 2016, 2017.

Q. When did you two move in together?

A. It was --- I'd say it was relatively quick because I had young kids to protect. You know, I had two, being a single father. So, I think it was maybe 2017 --- 2018. Again, speculating. These --- these are not things that I'm good at. And again,

Page 98

not trying to sound deceptive.  But 2017, 2018, she moved in.

Q. When did she first discuss with you the idea of opening her own insurance company?

A. Sure.  Well, I was struggling with mine, as you can see from all the debts.  I was pretty burnt out of --- of that.  And she was in that precarious position where she wanted to make more money and was getting to that point in her --- her career where she didn't want to --- she wanted to make more money.

To be perfectly frank, she wasn't making a lot of money as, you know, a principal.  Maybe 130, 120. So, she had actually started to talk to Arthur Walsh that I knew through the business, and they got along like a house on fire.  They were way more educated than me.  And, you know, they started to talk, and they met through me, and that was --- that was it.  And then they coaxed me into helping them,

Page 99

honestly, and they said, well, as long as it's on a limited basis.  So, that's what I needed, you know, health wise.  So, you know, that's what it was.

Q. Who --- who set up Seguro Medico?

A. I believe that --- so, I would get a lot of --- as a consultant, I would get a lot of tasks to do.  I would get dumped on because they were doing the fancy stuff, the MBA stuff, you know, SOPs and all that stuff.

So, I was involved in that.  I know how to set up an LLC.  That's a pretty menial task, you know, for people who are recruiting.  You know, most of their time in the beginning was spent recruiting and training. So, from my recollection I was --- I was involved in setting that LLC up and helping them out.  And you know, we were all involved, but you know, it was my task they --- they give to me.

Q. Okay.

Page 100

Who drafted the first operating agreement for the LLC?

A. I don't know if that was Arthur or if it was Katherine Downing who was an attorney.  I'm not sure which one. It might have been both.  Again, I was involved in it, but Arthur and --- and Shannon had to make the final decision.

Q. How did you meet Arthur Walsh?

A. Arthur was a previous employee back at Bene Market for a brief time. He's had a lot of health issues, to be honest.  An older educated gentleman, very intelligent, has this way about him, you know, he's a real insurance guy.  But yeah, I thought that he was a superstar.  I thought that him and Shannon --- Shannon needed someone in her business career that could help her be successful as smart as she is, and Arthur was that guy, almost like a mentor, if that makes sense.

So, I thought that they were

Page 101

compatible and I introduced them and that's what happens.

Q. Did you hire Arthur Walsh at Bene Market or NBOA?

A. At Bene Market.  Towards the end of Bene Market, yes.

Q. What was he doing at Bene Market?

A. Brief work.  Not brief --- he was still there 30 to 40 hours a week. But he was training people.  He has great knowledge --- encyclopedic knowledge of the business, especially compliance.  He's just a great coach. He's a hall of fame wrestling coach in Pennsylvania.  Superstar.  I think you're going to be meeting him soon. So, you'll see what I'm talking about, hopefully.

So, yeah, he was training, he was building, scripting things of that nature of Bene Markets.  But unfortunately, it was short lived. And that's --- that's where I was done with the business and I wanted to

26 (Pages 98 to 101)

Page 102

focus on what I like to do. And these two want to give it another shot. I don't think I could give it another shot.

Q. When you say brief work, what do you mean by that?

A. Was I referring to the Arthur there? I talk too much, as Albert told me before. Brief work. Brief work --- things that aren't too strenuous, that are enjoyable, I guess that's how I would say. You know, brief work to an Irish thing would be, my father does brief work back home. He's, you know, sick. So, brief work to him is doing two guitar lessons a day with kids like. I'll rephrase it. Work that isn't too strenuous on the brain or the body, but has a nice output that he can feel good about it.

Q. Got it. So, that's not an insurance industry term? That's a ---.

A. That's just an Irish dumb

Page 103

thing. Yeah, I could probably clarify better.

ATTORNEY CIARDI: So, highway miles, not city miles.

THE WITNESS: Very good. That's --- that's what it sounds like. Yeah, very good. Thank you.

ATTORNEY READY: Okay.

BY ATTORNEY READY:

Q. So --- so, what sort of task was Arthur Walsh doing at Bene Market?

A. Training, recruitment, interacting with the --- the agents and the other employees. He was assisting me with SOPs. He was almost guiding me with SOPs, you know. Just --- just workflows, you know. It was different types of, you know, operations, procedures. You know, how a sale would get to the verification agent for verification. Things of

Page 104

that nature. Stuff that I knew a little bit about but didn't know how to do properly, no matter what I've been told years before, you know, that ended up in --- in compliance issues. So, yeah, he was --- was a real good --- he's great at stepping back and looking at it, going, this is what the business needs. Very good at that. As he was getting his energy back. As I said, he was sick. Yeah, that's ---.

Q. You mentioned SOPs, by which I assume you mean standard operating procedures?

A. Yes.

Q. Okay. Explain just briefly what --- what an SOP is and why it's important in an insurance business?

A. Standard operation procedure, different workflows, different things that need to happen on a daily basis to ensure a company stays compliant. When you're selling someone else's

Page 105

products, which is what I always did, like United Healthcare's product or Washington National's product, they have certain ways to do it since you really need to have strong SOPs in play or you're going to lose your contract, you're going to end up in debt. So, that's just on the compliance side. SOP and hire recruit comes into the building. You know, recruits, it's a real systematic thing. You know, they come in, they sit down, they get a clipboard, they fill out their application, everything's online, you know. They --- they --- they sign the background report. There's --- you know, you can take a simple thing like doing an interview and break it into a thousand parts if you want it to be excellent. So, that's --- that's my interpretation, Attorney Ready.

Q. Well, the biographical questions.

27 (Pages 102 to 105)

Page 106

Do you have any active driver's licenses in the American or foreign jurisdiction?

A. I don't have my --- I actually never got my Irish license, believe it or not. I had a --- for the record, I had a provisional license. I came over here when I was 19, so I have a PA license.

Q. Okay.

A. Yes.

Q. I think you gave us an expired one.

Do you have an active license?

A. I did. I got a new license, like, literally the day after. When I looked at it, I'm like, Nicole, I got an expired license. I hope Joel doesn't give us a hard time over this. I have it with me.

Q. Where were you born?

A. Belfast, Northern Ireland.

Q. Are you --- since moving here at 19, have you resided outside of the United States for 30 days or more at

Page 107

any time?

A. No, I have not.

Q. Okay.

When was the last time you traveled outside the United States?

A. That was Thanksgiving, '25, '24 --- 2023. Two years ago.

Q. And where'd you go?

A. We went home. Yeah.

Q. To Ireland?

A. Yes, sir. Belfast.

Q. How long were you there?

A. Thirteen (13) days. Twelve (12), 13 days, yeah.

Q. Do you conduct any business in Ireland?

A. I do not.

Q. Or in Northern Ireland, I should ask?

A. I wish I could say I did. And I know you think I do, but I do not, Joel. I really don't.

Q. Do you own any real estate outside of the United States?

A. No, I do not.

Page 108

Q. Other than what's disclosed on your schedules, do you own any real estate within the United States?

A. What is disclosed on the schedule as well? Yeah, we --- we can go through that. Our realty owns some properties, and I own a property as well that's in foreclosure.

Q. Which property is that?

A. The property that I own is 2005 Regency Drive.

Q. Okay.

What about any --- any entities that you own? Are there any entities that you own that have property outside of the United States?

A. No.

Q. Okay.

A. Absolutely not.

Q. Other than the ARC Realty properties, are there any other properties that any entity that you own/owned in the United States?

A. No, absolutely not.

Q. Are you the signatory on any

Page 109

bank accounts maintained by a bank or depository situated outside the United States?

A. No.

ATTORNEY READY:

Are you --- sorry, are you okay?

COURT REPORTER:

I'm fine.

ATTORNEY READY:

Let me know if you're okay.

COURT REPORTER:

I'm okay.

ATTORNEY READY:

Yep.

BY ATTORNEY READY:

Q. Are you the signatory on any bank accounts for any entities, corporate LLCs, any type of entity maintained by a bank or depository outside the United States?

A. No, sir.

Q. What bank accounts are you a signatory on today?

28 (Pages 106 to 109)

Page 110

A. There's a lot of old business accounts, Shannon had put me on as the signatory for some of her businesses when I started to get involved in managing cash flow or helping her manage cash flow.  Yeah, I would say there's a good half a dozen to a dozen, to --- to be honest.  But, yeah, she --- when she wants me to do something for her business I'll --- I'll do it, you know.

Q. Which ones are you on?

A. I was on --- I'm not sure if I'm on Seguro or not because I haven't done a lot of work with that.  The --- the company's, you know, a little bit distressed, to be honest, because of the FBI investigation, you know, and all that shit.
I can't say shit on the record.
The Judge won't like that, I'm sure.
But anyway, yeah, the --- the --- I was a signatory around --- the signatory on Seguro Medico for a brief point, or still am.  I don't know if

Page 111

she's removed me or not with that.  Bene Market, of course.  NBOA, it doesn't have any active bank accounts.  The accounts that I had, obviously, I was a signatory on.  So, yeah, I think UC Consolidation had a bank account.  No longer has one.

Q. Any others?

A. I don't believe so.  I don't --- again, I don't want to lie under oath.  I don't believe so, though.

Q. As far as you recollect, you can't think of any other entities that you've been a signatory on for the last, let's say, seven years?

A. NBOA, obviously.  Bene Market, obviously, Joel.  The Seguro, I was a signatory on the payroll account, because I was helping her with payroll.  It's not her speed, you know, so I was trying to help her with payroll.  Getting checks cut.  Taking that off her plate, so --- yeah.  I believe I'm on Seguro, yes.

Q. Where and when did you graduate

Page 112

from high school?

A. Oh my goodness that was 2000 and --- 1999, Jesus.  1999 in Belfast, St. Malachy's College.

Q. Okay.
And what did you do after high school?

A. I came over to America on an academic scholarship.

Q. Okay.
Where did you go?

A. Mercyhurst College.

Q. What --- how --- and you're a citizen of the United States today.
Is that correct?

A. I'm a permanent resident.

Q. I see.

A. Yeah.

Q. Okay.

A. I haven't had time.  It's been a busy couple of years.

Q. Okay.
Are there any --- are there any other bank accounts anywhere else in the world on which you're signatory

Page 113

on, other than the ones we've just discussed?

A. Well, now as you bring up Mercyhurst, you know, there's --- although Shannon controls the --- I can't confirm or deny this, right?  I'm just telling you I believe I could be on the --- the Friends of Hurst accounts, but I've accessed that maybe or seen that maybe once.  She's making that financial decisions.
So I don't know what the --- I don't know what the wife does.  You're going to have to ask her.  She's the boss.

Q. Okay.
What is Friends of Hurst?

A. Friends of Hurst is an NIL.  It's like a charitable donation booster organization.

Q. Okay.

A. Yeah.

Q. NIL would be name, image and likeness?

A. Correct.  That's it, yeah.

Page 114

Q. Okay.

So, that's to support somebody's NIL program?

A. Correct. If Mercyhurst had actually approached me, I didn't have the money, obviously. I didn't think it was a good idea for them to get caught up in my crap. Shannon, who is --- was --- is heavily in education relationships with a number of Mercyhurst folks. Three millions, you know, again, as usual, she comes in and takes over. That's what she does, you know.

Q. What --- what's Shannon's connection to Mercyhurst?

Did she go there?

A. No, she did not. She --- she's a Lehigh grad, I believe. MBA Lehigh and is it DelDall (sic) for her Ph.D.

Q. So, her connection to Mercyhurst is through you.

Is that right?

A. Her initial connection was through me. And as I just alluded to

Page 115

I --- the connection with Mercyhurst to Shannon, which pains me, but, you know, Shannon did her thing. That's what she does. She knew it was important to me. I brought it to her.

They said this would be a really good thing to do for the school. I need an output as well. And she said, well, let me think about it. And that's what happened. You know, she --- she --- she loved the --- the vision and that was it.

Q. Who contributes to Friends of Hurst?

A. Donors, I believe.

Q. Okay.

Do you know who?

A. No, not particular. That would be Shannon's speed.

Q. Okay.

So, you don't know anything about the operations of Friends of Hurst?

A. I know --- I know enough to ---

Page 116

we talk. We're husband and wife, you know. She asked me to --- to --- to --- to call the football coach. I will, you know. But I'm not actively boosting, I think it's called over here, or doing any of that stuff. That's --- that's her --- her --- her role. That's what she does.

Q. Okay.

You wouldn't know anything about the transfers between Friends of Hurst and Seguro Medico?

A. No, that's not --- not my speed.

Q. Who approached you from Mercyhurst?

A. We were approached by a number of former alumni. My alumni, I guess you could say. Then there was, I believe she was approached by the vice president of development --- former vice president of development. So, yeah, that was a couple of years ago. We thought it was a worthy cause, you know.

Page 117

Q. What did they approach you with?

What did they ask you to do?

A. Set up the NIL. Support them. Help them with, not fundraising, but help them with the organization of it. And that's --- that's what happens.

Q. Who is this vice president you mentioned?

A. I'm not too sure. That would be --- again, I'm like the setup guy. I'll put the ball in the tee and then she will go and do her thing. She'll execute. She's a little bit more personable and likable than me.

Q. How did they find you?

A. Mercyhurst?

Q. Yeah.

A. Well, just an alumni, business alumni, you know.

Q. Was this a solicitation sent out to all the alumni or somebody reached out and said, you've been successful, let's --- let's go with you?

Page 118

A. I wouldn't say successful, first of all, but thank you. That was nice of you, Joel. But no, it was --- there --- there's a bit of a reputation of Mercyhurst with Shannon and I, you know, we're a pretty nice couple, honest and genuine, and we wanted to help the school, you know, that was it. They know she's very educated and, you know, she's --- as you'll see, she's very beautiful and, you know, she --- she's a perfect candidate to do stuff like that. She's done stuff like that before, you know. Actively involved with Lehigh, actively involved with wherever else she went. I can't remember what her undergraduate is. Don't tell her that. But she's --- she's the education chick. You know, when you get this type of opportunity to help you try and take it, you know.

Q. So, what --- I can run through --- there's a lot of entities here.

Page 119

A. Sure.

Q. Maybe I can simplify this upfront.

A. Sure.

Q. I'm going to ask you about the bank accounts that you've used for entities that you have either owned, controlled, or worked at.

A. Absolutely.

Q. And what banks have you used?

ATTORNEY CIARDI:
I'm going to object. Can we --- you have a list here, Joel? Can we just work on the list so we have the names in front of him?

ATTORNEY READY:
Yeah, sure. Which --- which list are you looking at? I'm sorry.

ATTORNEY CIARDI:
I was looking at your --- your list of entities here. This was an Exhibit A, the

Page 120

first exhibit.

ATTORNEY READY:
Oh, yeah, sure. We can work off that.

ATTORNEY CIARDI:
I'm just saying so he has something in front of him.

THE WITNESS:
This one right here, right?

ATTORNEY CIARDI:
You can then ask him if he --- yeah, you ---.

ATTORNEY READY:
I can --- I can run through that one. I've got some more to add, I guess. We can --- we can go through them.

ATTORNEY CIARDI:
Whatever's easier. Just if he had it in front of him as a piece of paper, I think it gives him the ability to just

Page 121

say yes, no, this, that, whatever.

ATTORNEY READY:
Okay.

BY ATTORNEY READY:
Q. So, I'm aware you have some accounts that we've received through this process from Mid Penn Bank. So, I guess, let me ask you, have you used any other bank personally in the past ten years?

ATTORNEY CIARDI:
Well, just clarify, you mean him as Alan Redmond not him ---

ATTORNEY READY:
Yeah.

ATTORNEY CIARDI:
--- as an institute?

ATTORNEY READY:
Sure. Fair. Let's start there.

BY ATTORNEY READY:
Q. You personally, as Alan Redmond, has Alan Redmond, on an

31 (Pages 118 to 121)

Page 122

**individual basis, used anything other than Mid Penn bank in the last ten years?**
A. Yes.
**Q. Okay.**
**What banks have you used?**
A. I was a big PNC customer back in '13 to '16, I believe, something like that. You know, hard to remember. We were with --- I was with Santander for a period of time, you know, the DIP accounts, M&T Wells Fargo. I may have had a BB&T bank account, but I can't recollect. I think I did. It might have been Bene Markets or National Brokers of America. But again, they clarified for the record a lot of business bank accounts and maybe close to 150, 100, you know, it's a lot to remember. But for me personally, big PNC went to Mid Penn. Liked Mid Penn, you know, out of any kind. They are no longer ---.
**Q. You believe you've had about 100 to 150 bank accounts.**

Page 123

**Is that correct?**
A. Yeah. Again, for the record, I ---
ATTORNEY CIARDI:
And to be clear, you as an individual or you as an entity owner?
THE WITNESS:
Yeah, to be clear, as I said, you know, there's been 100 to 150 approximately. And I moved my hands for all the entities overall. So, my point was it's a lot of digital savings account for this.
ATTORNEY CIARDI:
So, right now, Joel, is only asking about you, Alan Redmond.
THE WITNESS:
I understand.
ATTORNEY READY:
Yeah, so, --- so, that's --- and I'll circle back to the --- to the total number there

Page 124

in a second.
BY ATTORNEY READY:
**Q. So, you --- you personally have used PNC, Santander, M&T, Wells Fargo and BB&T in the last ten years?**
A. From what I can recollect.
**Q. Okay.**
ATTORNEY CIARDI:
I think you also indicated Mid Penn.
ATTORNEY READY:
Yes.
THE WITNESS:
Mid Penn, of course.
ATTORNEY READY:
You did say Mid Penn, yeah.
BY ATTORNEY READY:
**Q. And so, then you said total for entities you've controlled or been a signatory on or owned, you think it's 100 to 150 total bank accounts, roughly?**
A. Might be exaggerating, but it was a lot. It was a lot --- a lot to

Page 125

manage, but a lot to remember, should I say.
**Q. Okay.**
**And where were those bank accounts held?**
**Any other banks other than the ones you just listed?**
A. Anything here? Go back to --- trying to remember where Bene Market was. I think National Brokers of America, was that Santander for a short period of time? I know they were at Wells Fargo. I believe we were at Wells Fargo. Again, we're thinking 2014, 2015. I think we were Citizens for a period of time as well with Bene Market. That's --- that's probably the best I can do. I'm back to 2016 in my head here.
**Q. Okay.**
**So, I'm going to --- I'm going to run through a long list here.**
A. Sure.
**Q. I'm just going to read them off and then I'll ask you at the end.**

32 (Pages 122 to 125)

Page 126

Unless you think we need to go through them one by one.

A Sure.

Q. National Brokers of America, Inc., Alan Redmond, Charitable Foundation, ABN Health --- sorry, ABN Network, LLC, ---.

ATTORNEY CIARDI: I'm --- I'm going to object. I think you do have to ask him the questions one by one, because otherwise he'll have to go back and remember which one you're asking him about.

ATTORNEY READY: Okay. Sure. Sure. That's fine.

BY ATTORNEY READY:

Q. So, identify all banks which you are aware of that either you were a signatory on or were aware of in your work as a manager or consultant ---

Page 127

A. Sure.

Q. --- or owner for each of these.

A. Yeah. Uh-huh.

Q. Okay. National Brokers of America, you told me Santander. Any others that you recall?

A. I think Wells Fargo, BB&T, which I believe is Truist, now. That's about the height of it that I can remember.

Q. Okay. You don't remember any other banks from that time period for NBOA?

A. I really don't.

Q. Okay. Alan Redmond Charitable Foundation?

A. It's a strange organization. We were trying to set this organization up. There was --- I don't believe there was a bank account that was open. I was told by attorneys that there wasn't an FEIN. You know, that's what I believe told

Page 128

you in discovery. But from what I'm aware, from what my attorneys have told me, and we've argued about this, there's no bank accounts. But Alan Redmond Charitable Foundation never did anything. I was told it was like a press type of junket thing, you know, to get some positive press, but never had a bank account.

ATTORNEY CIARDI: Before you go on, when he said F-E --- he said F-E-I-N. Just so you have it on that.

BY ATTORNEY READY:

Q. And by that, just for our record, you mean the Federal Employer Identification Number?

A. That's what I've been told by attorneys, yes.

Q. Okay.

A. Yeah.

Q. Who did you start the Alan Christopher --- sorry, the Alan Redmond Charitable Foundation with?

Page 129

A. That would have been myself and Shannon that we discussed that. It was actually supposed to be the Redmond Charitable Foundation. Seems to be incompetency going around these days with attorneys.

Q. So, ---

A. And I'm not being facetious towards you.

Q. So, the foundation donated some money at one point, but you don't think there was a bank account?

A. I don't believe --- I think that money came directly from Shannon's account. I --- it did not come from that bank account, though. There --- there was no bank account, from what I understand.

Q. Okay.

A. And again, she --- she's writing her --- not to give myself a back door here, but I believe that came from --- from Shannon.

Q. Okay. Same question about bank

Page 130

accounts for ABN Network, LLC?
A. That's her gig. It's another business of --- of Shannon's. I'm not sure exactly where she banks, Attorney Ready. I can speculate, but you're going to have to ask her that. She wouldn't be too happy if I'm guessing what she's --- what she's doing.
Q. Okay. So, what's your --- what's your personal involvement in ABN Network?
A. Zero. You know, we talk about it. I have a consultative agreement with Seguro. I'll be honest, I have approached Shannon about getting a consultative agreement with ABN, but wait and see, I guess. I guess you could say.
Q. What does ABN Network do?
A. It actually does a lot of --- it's morphing into a third-party administrator, which is --- is a lot different than what National Brokers or Bene Market did. Seguro was a --- it's a completely different company

Page 131

than Bene Market, or it was, you know, before it started to take some hits, I guess you could say.
But ABN is centered on --- from what I understand, her mission is making sure claims are paid extremely quick. I don't know if you've ever filed an insurance claim, and that sounds very small, but it's a pretty large problem.
So, she's had family members, just to digress, over here that have had claims held up for 6 to 12 months. You know, 15 months denied. Seguro went through that lost business because insurance carriers weren't paying claims when they should have. It's a hard battle to fight, sir.
So, her vision was that she wanted to start a company that could be more transparent to make claims, which I thought was great, you know, that was a pretty good idea.
Q. What's the connection between Seguro Medico and ABN Network?

Page 132

Do they work together?
A. Yeah, they do. ABN Network is providing services to --- to Seguro. ABN Network had a partner previously called Priscilla Lopez. Priscilla, pretty sharp cookie, has experience in the insurance business. She and Shannon got along well. So, ABN has a lot of connections. You know, has connections to Blue Cross/Blue Shield for instance. It's --- was a pretty successful company. If you can crack this, then it'll be very successful.
Q. And when you say crack this, what do you mean?
A. Proof of concept. It really works, like it has an impact.
Q. Okay. Is Priscilla Lopez still involved in ABN Network?
A. She's not, no. From what I understand --- again, this is Shannon's business, but she is not.
Q. So, you're not on any bank accounts with ABN Network.

Page 133

Is that right?
A. Again, I've --- I've worked with Shannon on financials. I don't know. I --- I've built a P&L for her before for ABN. But the scope of my activity is not decision making day to day. If she wants something done, I'll --- she needs a hand, I'll do it. Clean the bathrooms if I need to.
Q. Who --- who --- you said that ABN and Seguro do work together they provide --- that ABN provides services to Seguro. Is that right?
A. I believe so. I don't know if it does now, but I believe it did.
Q. It has in the past?
A. It has in the past. It could still be doing some stuff now, but it hasn't come up in conversation. You know, I don't want to say pillow talk, but you know, she hasn't brought it up recently.
Q. Okay. What --- what services has ABN

34 (Pages 130 to 133)

Page 134

provided to Seguro?

A. I'm not a thousand percent sure. The --- the last thing that I believe was prescription card, which paid out very quickly with claims, so. But again, that's --- that's her scope.

Q. What services has Seguro provided to ABN?

A. Seguro has sold products for --- for ABN. I'm --- I'm aware of that because I've been in them meetings. ABN has secured a product, I guess you could say, Joel. You know, ABN is one that got the product and it used Seguro to distribute that product.

Q. Okay. And you mean an insurance product. Correct?

A. Insurance or non-insurance. You know, there's --- there's different things that have been happening in the marketplace ---

Page 135

Q. Okay.

A. --- over the last six, seven years. There's a lot of non-insurance products. I don't want to get too deep unless you ask me. I don't want to bore you, but ---.

Q. Sure. So --- so, though, all of these would be sort of, we might call them insurance adjacent. Is that fair?

A. Yeah. You can say that.

Q. They're not selling, I don't know, mechanical widgets, I take it. Right? These are all products that are either insurance or a replacement for traditional insurance?

A. To an insurance junkie like me, an ex-insurance junkie, they're similar and they're innovative. I don't know how to --- I --- I could probably do better, but ---.

Q. No, that's fine. I think I understand. All right.

Page 136

Next, I'll ask you the same question now about banks with ABN Benefits, LLC. Any banks that you are aware of that that entity has ever held?

A. I've never heard of that entity.

Q. Okay.

A. I --- I don't own it. I don't think she owns it. I've asked her about this. It's ABN Network, LLC that she owns. ABN Health, she swears up and down she doesn't own that. And I --- I would know. She'd tell me, you know. So, no, she ---

Q. Okay.

A. --- she doesn't own that.

Q. Same question, Apollonia Dental, A-P-O-L-L-O-N-I-A, Dental?

A. Saint Apollonia, you know, we are Catholics after all. But she --- she wanted to open a DBA for Seguro that specialized in a dental vertical --- dental insurance and dental discount products that don't require a

Page 137

license to sell. And that's what she did.

Q. And are you aware the bank accounts that are held for that entity?

A. I don't think she had any. But again, you would need to clarify with her. I have never seen --- let me --- I've never seen a bank account with Apollonia.

Q. Okay. And I'm just asking about your personal knowledge. I understand some --- someone else may know.

A. Sure.

Q. Phase One Technology, LLC, are you aware of any banks that have been used by it?

A. Phase One Technologies, no, no banks.

Q. Same question for NextGen Leads, LLC?

A. That was my company. I had a --- yep. I --- I believe --- I want to say BB&T, it had an account for a

35 (Pages 134 to 137)

Page 138

short period of time.  Maybe another bank account, Attorney Ready.  But it was a defunct company.  It really turned into --- turned into like a holding bank account.  It just didn't take off the ground.  So, I would transfer money over there to hold it in case one of these payday loans was being too aggressive.

So, you've seen --- you know, there's this illusion of commingling, but it was, you know, life or death.  So, I moved money into NextGen.  I've used the NextGen card before, but it didn't make any substantial money.

Q. Do you remember when you started using NextGen for that purpose?

A. It would have been around 2016, 2017, I believe.

Q. And how much money would you hold in one of those accounts?

A. I couldn't speculate.  I wouldn't want to.  I really can't remember.

Page 139

Q. Hundreds, thousands, tens of thousands?

A. If you're talking about bank accounts overall, I could answer that.

Q. Sure.

A. There could be $100,000 in a bank account.  There could be a million dollars in a bank account.  There could be five grand in a bank account.  As you're scrambling to get away from payday loans, you sort of have like a scheme, which is a horrible word to say, but you have like a root --- an SOP in your head.  I got to move this over here.  I got to protect that.  I got to --- here comes it.  You know, there's --- just trying to pay your employees, sir, you know.

Q. Yeah.  And you're --- and you're moving your hands just to show the money had to move through accounts?

A. I'm moving my hands to say that there's --- there's things ---

Page 140

movement being done by myself or potentially an accountant or a CFO.

Q. Who --- who did that work for you if it wasn't you?

A. Stephanie Miller did a lot of that for Bene Market.  And Malcolm Smith wasn't heavily involved, but he did move money as well, if requested.

Q. Okay.

Anybody else that would do that for you?

A. For my businesses, it was myself, Stephanie, Malcolm.  I don't believe anybody else had access to the bank account.

Q. Does anybody do that for Shannon's businesses?

A. Yeah, she does a lot of that herself.  Yeah, she's had me stop over to the bank or, you know, log in with her password or whatever, but she's doing 99 percent of that no matter what people think.

Q. NextGen Leads, what operations did it perform?

Page 141

A. The goal was not very --- not a lot defunct company.  The goal was to start generating leads.  And unfortunately, I get hit by a gust of wind in the current business, I believe it was Bene Market at the time.  Gust of wind, meaning another business issue.  I was unable to focus on that.  So, high expectations, as many entrepreneurs have, nothing happens.  You know, it sucked, but ---.

Q. When you say defunct, what do you mean by that in relation to this?

A. Yes.  So, for me, defunct means that it never generated any substantial business.  It was in the infancy, you know, birthing a --- a company.  There was nobody sitting in the lobby waiting for an interview.  It didn't even get that far.  It kept getting pushed off, pushed off, pushed off.  Again, high expectations.  Maybe a payroll account was set up or whatever, but it's not a real

Page 142

business, you know, never did anything substantial or meaningful.

Q. Okay.

**Other than NextGen Leads, what other companies did you use for holding funds the way you described earlier?**

A. Can I look at this list, sir?

**Q. Sure.**

A. Okay.

Let's see here.

ATTORNEY CIARDI:

I mean, in what timeframe, Joel, are we talking about?

ATTORNEY READY:

I guess anytime in the last ten years.

THE WITNESS:

Sure. ARC Realty was a grid holder.

ATTORNEY CIARDI:

Give a time period that you used ---.

THE WITNESS:

Page 143

I would say --- I would say, you know, for the last five years, you know.

Let me see. Bene Market had a number of accounts. Bene Market still has an account. I believe the Lead House had an account because I can remember some paychecks. But the Lead House, most likely. Quick Health is a dba. You want me to keep running through this?

ATTORNEY READY:

Uh-huh.

THE WITNESS:

The Redmond Group goes all the way back to 20 --- between 2008 and 2013. Nothing happened with that. I was --- kids. Redmond Group Investments is not my company. Redmond Holdings is not my company. Redmond Holdings Two is not my company. Redmond Investments, LLC is not my

Page 144

company. Redmond Marketing, I do not believe it had a bank account. Sorcia LLC is not my company.

LLP --- Sorcia LLP is not my company. Sorcia Enterprise LLC is not my company or Shannon's. None of these companies have anything to do with myself or Shannon or anybody, period.

Seguro Medico is Shannon's company. The Turner House of Reading, wasn't a company. It was set up as an LLC, of course. Formation wise, it's a company. It didn't do anything. We were recommended by Katherine Downing when I was buying that building to put it into --- put the building into an LLC, and that's what took place. That was the Turner House of Reading. That was the actual

Page 145

name of the building.

Two High Properties is not our company. Two High Properties, I believe from the mail that I've got and Shannon's got at her house is the former owners of Two High Road, the Shields. So, might have been a little bit confused there.

U.C. Consolidation was my company. I don't know if it was Inc. or LLC, to be honest, Joel. I can't remember. It was a defunct company. You know, it had a --- defunct meaning that it never really got off the ground and might have had one payroll run, but that was it. Big aspirations, didn't impact anybody.

U.S. Trifecta was a --- a limited liability partnership between myself and a partner called Seni Sok. It was going

37 (Pages 142 to 145)

Page 146

well, it was starting to make money, but unfortunately ---.

ATTORNEY CIARDI: How about you put dates on some of these things?

THE WITNESS: I don't know these dates. There's a hundred of them and none of them are my company. You know what I mean?

BY ATTORNEY READY:

Q. Can you estimate?

A. Which one?

Q. Let's talk with U.S. Trifecta.

A. I believe 2019 to 2021, '22.

Q Okay. So, we've run through this list, you've told me which ones --- several you said they're not my company. Are there any of those that used to be your company at any point?

A. Which in particular?

Q. Any of those. Just the --- a

Page 147

number of these you said not my company. I'm just confirming. Does that mean it's not now or it has never been?

A. Let me give you an example, for instance, just to clarify for the record. Saoirse, LLC, Saoirse, LLP, Saoirse Enterprises, Saoirse Holdings, okay. The company that ARC Realty bought 354 Penn Street off was called Saoirse. And the guy who owned that building was an Irish American guy. I have never met him before. A guy called Pierce O'Malley. We got along like a house on fire. He's a Southern Irishman, but, you know, he was --- he's okay. So, he had the name Saoirse looks very conspicuous to you. Completely circumstantial. If you look at the titles and the deeds, you'll see that Pierce O'Malley from Saoirse sold ARC Realty, the building, so ---. But no, no --- no insider,

Page 148

any of that crap. No.

Q. So, again, just to be clear, the times on this list that you've said that's not my company, none of those were ever your company that you said that about. Correct?

A. I need you --- I just ran through it, Joel and I need you to be particular so I don't mess up here.

Q. All right. So, just for the avoidance of doubt, ---

A. Thank you.

Q. --- we're looking at Redmond 1, and we're looking at pages what are really three and four, question 26.

A. Okay.

Q. There's a list of, I guess, it's 28 entities. A moment ago we ran through it, you told me about some of them, but a number of them you said these are not my company. I'm just confirming, are there any companies on this list that you

Page 149

once owned but do not own any longer?

A. You're too smart for me. Again, I'm not being capricious. You need to clarify and say a name if possible. I just ran through them. I thought I just read through them.

Q. Yeah, take your time. You can go ahead and read them to yourself.

A. Do ---

Q. Just tell me ---.

A. --- do you want me to do it again?

Q. Just tell me if there's any of these that you have owned previously and don't own anymore?

A. Sure. Just --- just for the record, here. I'm going to run through them again. Okay. So, ABN Health, that is not my company. I've never owned that company. ABN Network, Alan Redmond's Charitable Foundations, the ones --- see, now I'm getting confused because you're asking the question so many

Page 150

different ways.

**Q. I'm --- I'm ---.**

A. I'm just trying to answer.

**Q. Let me clarify. Let me clarify.**

A. Thank you. I appreciate that.

**Q. You testified of this list of 28, we could go back through the whole thing, but that will take a while.**

A. Sure.

**Q. I'm just asking you, you said some of these were your company or you've been involved with.**

A. Sure.

**Q. Some of you said I --- I --- that's not my company. I'm asking about the ones any of these that you say that's not my company, meaning today it's not, but it was before?**

A. Oh, I could try and recollect.

**Q. I don't know that you need to recollect. I think it's pretty --- it's pretty simple, right? You said, for**

Page 151

**example, I think you said Redmond Holdings Two was not yours. Did you own it previously?**

A. No, I've --- I've never owned that.

**Q. I think you just testified that Saoirse, LLC and LLP that you didn't have any connection to those at any time. Correct?**

A. Correct.

**Q. So, same for the rest of these. There's none of these that you'd say, yeah, I sold that to a guy ten years ago, I gifted it, I don't own anymore, but I did at one point. There's nothing on this list that that would apply to. Right?**

A. Well, again, the Trifecta Limited Liability Company, I did just say under oath that that was a partnership.

**Q. That was the one with Seni Sok.**

A. Thank you. Yeah.

Page 152

**Q. And you're no longer connected to that, you're saying?**

A. No, it's no longer in operation, sir.

**Q. Okay. So, any others that you would say I --- I did have involvement at one point, do no longer?**

A. Two High --- Two High Properties was never my company. Never owned it. And as I said from the mail that I've received at Two High Roads, I believe that that's owned by the previous owners. That's not my company, though.

**Q. Yeah. Okay. Great. So, nothing --- so, I understand you say nothing on this list that you owned before and own no longer?**

A. Nothing on this list you owned before and you own no longer?

**Q. Correct.**

A. You're going to --- you have to clarify, because, Joel, you are

Page 153

sneaky. So, can you just clarify, please, so I don't say the wrong thing? Because now I --- I want to be honest on --- on the record. I don't want to say the wrong thing. It's important to me that I don't, obviously. And I'm confused. Now, you've got me confused. So, maybe we need to go through the list again, sir.

**Q. Sure.**

A. If you want to do that.

**Q. All right. If we need to. All right. So ---.**

A. If you have a particular question --- sorry to cut you off, Attorney Ready. If you have particular questions about any of that --- any of these, that'd be great. You know, that would be very helpful.

**Q. I'm going to run through the full list.**

A. Sure.

**Q. And I'll ask --- I'll ask you**

Page 154

to start with just a yes or no. Okay? And I'm going to ask, have you ever owned, ever, now or ever in the past ---

A. Sure.

Q. --- had any ownership interest? And by that I'm going to define it for a second. I mean, what we'd call legal or equitable ownership, meaning the right to take profits from it, the right to control it, ---

A. Sure.

Q. --- anything like that. Okay?

A. So, the rights --- just to clarify, sir. The right to take profits from it or own it? Can you clarify ---?

Q. Or control.

A. Control it. There you go.

Q. Sure.

A. Profits or control. Got it.

Q. And just a yes or no to each of these, and then I'll go back

Page 155

specifically.

A. Sure.

Q. Okay. So, we'll do them one at a time.

A. Uh-huh.

Q. ABN Health?

A. I have never had the right to own it or control it.

Q. Okay.

A. Excuse me. Say it again. See? Profits. Control or profits. Excuse me.

Q. I'm just confirming that you never owned some of these entities.

A. I never ---.

Q. I'm just going to run through and ---

A. Sure. Sorry to cut you off.

Q. --- if you haven't, you can say no. Okay. ABN Health?

A. Never controlled it or taken profit from it.

Page 156

Q. Or owned it?

A. Or owned it. There's a third one. Okay. Gotcha. No.

Q. Okay. ABN Network, LLC?

A. No.

Q. Alan Redmond Charitable Foundation?

A. No.

Q. ARC Realty, LLC?

A. Yes.

Q. ARC Realty One, LLC?

A. Yes.

Q. Bene Market, LLC?

A. Yes.

Q. Benefits Now, LLC?

A. No.

Q. The Leads House, LLC?

A. Yes.

Q. National Brokers of America, Inc.?

A. Yes.

Q. NextGen Leads, LLC?

Page 157

A. Yes.

Q. Phase One Technology, LLC?

A. No.

Q. Q H, Quick Health?

A. Actually, let me go back to Phase One, if you don't mind.

Q. Sure.

A. I just want to clarify. All right. Phase One Technologies was a --- like a software platform that provided software services like email and stuff. I'm not sure if that got to the finish line as a --- as a company being set up between myself and Seni. And again, for the records, a lot of entities on here. Not trying to be, you know, deceptive. It's just a lot to remember. So, I don't know if that got there or not. And I'm almost certain that someone else owned that. That had nothing to do with me, but little bit confused, to be honest.

Q. So, your testimony is you may

Page 158

have had an ownership interest in Phase One at some point?

A. I'm just confused, Joel. It might come back to me later, but Phase One Technologies was owned by Seni Sok, and I believe that was purchased --- I believe, from my recollection, we were pursuing a partnership. I wanted to get involved. That never took place. Ninety-nine (99) percent sure.

Q. Okay.

A. Yeah.

Q. Q H, Quick Health?

A. Q H, Quick Health is not my company. Never owned it. Never had a controlling interest or took profits.

Q. The Redmond Group, LLC?

A. Yes.

Q. Okay.
Redmond Group Investments, LLC?

A. No.

Q. Redmond Holdings, Inc.?

A. No.

Q. Redmond Holdings Two, Inc.?

Page 159

A. No.

Q. Redmond Holdings, LLC?

A. No.

Q. Redmond Investments, LLC?

A. No.

Q. Redmond Marketing, LLC?

A. Yes.

Q. Saoirse, LLC?

A. No.

Q. Saoirse, LLP.

A. No.

Q. Saoirse Enterprise, LLC?

A. No.

Q. Saoirse Holdings, L --- Saoirse --- sorry.
Saoirse Holdings, Inc.?

A. No.

Q. Seguro Medico, LLC?

A. I did not have a controlling interest or was able to take profits.

Q. Okay.
Have you ever been an owner of Seguro Medico LLC?

A. When the initial paperwork was

Page 160

set up --- well, this is what I do know. I'm not going to speculate, again.
Shannon and Arthur own and operates Seguro. As I stated previously, I was involved in some of the setup. But I've never, never controlled that company or plan to. I've never had an oversight into where profits or distributions are --- are distributed.

Q. Okay.
When --- have you ever been an owner of Seguro Medico, LLC?

A. From my recollection, I don't believe so.

Q. Okay.

A. I've never acted like an owner and I don't believe that I've been an owner before, no.

Q. Okay.
The Turner House of Reading, LLC?

A. I believe that was me. May have been like a subsidiary of like

Page 161

ARC Realty, but I would say, yes.

Q. Two High Properties, LLC?

A. That's not my company.

Q. Okay.
U.C. Consolidation, Inc.?

A. Either Inc or LLC, but I think it was Inc. I think this is correct.

Q. And that --- that was one you owned or still own.
Correct? It's defunct you said, but ---.

A. Defunct for a number of years. Never got off the ground.

Q. Okay.
But you do own it.
Correct?

A. Yes.

Q. And U.S. Trifecta, LLC?

A. It was a partnership.

Q. Okay.
And you were one of the partners at one point?

A. Yep. Correct. Myself and Seni Sok, as I stated.

Q. Okay.

41 (Pages 158 to 161)

Page 162

So, I'm going to switch back over here to bank accounts.

A. Sure.

Q. And again, some of these you --- you testified you didn't own. But just for completeness, I'll run through them and you can tell me where of any --- where the banks --- bank accounts --- excuse me. Aware of any banks that were used for The Turner House of Reading, LLC?

A. I --- I honestly don't recollect. I don't know.

Q. The Turner House of Reading One, LLC?

A. Is that on the list? I never knew there was a Turner House One?

Q. I'm asking. So, if you don't know, you can say ---.

A. Yeah, I don't.

Q. You're not --- you're not aware of any bank accounts owned by Turner House of Reading One, LLC?

A. No, I'm not. No.

Page 163

Q. Okay. Are you aware of ARC Realty, LLC's bank accounts ---

A. Yes.

Q. --- for the last five years?

A. Yes.

Q. Okay. And where has it banked?

A. ARC Realty is currently banking at Mid Penn.

Q. Has it banked anywhere else in the last, let's say, seven years?

A. I don't want to speculate. I --- I don't know. I don't remember.

Q. Okay.

A. I just stated lot of bank accounts.

Q. ARC Realty One, LLC, same question?

A. I don't believe it had a bank account before, but ---.

Q. Okay.

A. Yeah.

Q. High Road Partners?

A. High Road Properties or High

Page 164

Road Partners? Are we on a different page here?

Q. Yeah, I'm --- I'm --- we're not on that page. I'm just asking you about these entities. And if you say ---.

A. High Road Partners?

Q. Yeah.

A. No.

Q. If you say you don't know, then you don't know. But High Road Partners, you said no?

A. Absolutely not. I believe it's someone else's company.

Q. Okay. Two High Properties, LLC, are you aware of any bank accounts and where they're held?

A. No.

Q. How about Bene Market, LLC?

A. Yes.

Q. Where does it bank?

A. That is currently with Mid Penn.

Page 165

Q. Okay. Where has it been in the last seven years, other than Mid Penn?

A. The two that I can recollect fully would be Mid Penn and Truist, BB&T. I want to say Santander there, but again, I don't want to lie on the record. I believe they were at --- it was at Santander there, but Mid Penn currently, I believe.

Q. When did you stop banking at BB&T or Truist for Bene Market?

A. Could you repeat that, please?

Q. Yeah, you mentioned BB&T or Truist as --- as it's now known for Bene Market.

A. Sure. Yeah. Yeah.

Q. When did you stop banking at BB&T or Truist?

A. Bene Market, I believe still has a bank account at Truist.

Q. Okay.

A. I just haven't --- I've been afraid to access that. I don't even know how to look because of this

Page 166

bankruptcy stuff, to be honest with you. It was never really used anyway. There was money. It was used as like a holding accounts, you know, in a number of situations, to be honest with you.

You know, Shannon needed to use a card to buy marketing and her card was maxed out, throw it at Bene Market, you know, go on ahead. She would charge the card and marketing is a daily thing. You know, many times it was --- it was most likely used like all other accounts as an -- an account to charge on, you know.

Q. You said it was used as a holding account. You mean that the same way you described the NextGen Leads account earlier?

A. Maybe holding is the wrong word. You know, money can be --- so --- so, it sits there. Money can sit there, but money goes out from there as well. You know, Seguro's used Bene Market's --- ARC Realty's accounts

Page 167

when her card is maxed out. I see her doing it. You know, I've seen her a million times. Excuse me. Oh, crud. You know, my --- my card's maxed out. I've spent $10,000. She's made a decision to use her ARC Realty card or a Bene Market account to keep things going instead of waiting on a --- on a bank. That might not be the most disciplined approach in the world. It could be misconstrued. But it's what entrepreneurs do, you know.

Q. Seguro Medico?

A. Where do they bank?

Q. Uh-huh.

A. I know they bank at Mid Penn. That's --- that's where they're currently banking.

Q. Where else do they bank?

A. I'm not sure. I believe it's Mid Penn. I think that's the --- the main accounts. I think that's where they're at right now. I haven't done a lot of financial stuff for Seguro. There hasn't been a lot of financial

Page 168

stuff to do for Seguro recently. So, Mid Penn is the --- from --- from what I know, but you need to ask Shannon or Arthur, of course.

Q. Are you aware of any other bank accounts that Seguro Medico is using right now?

A. I'm not, no.

Q. How about in the last five years, any other accounts they've used?

A. I'm trying to think if I've used any statements to create like a P&L or something. Oh, I built a P&L statement off of BB&T --- off of Truist before. I did it ---.

Q. For Seguro?

A. For Seguro, yes.

Q. Okay. Any others?

A. Not from my recollection.

Q. How about Seguro y Futuro, LLC?

A. Say that again, sir.

Q. Seguro y, it's a Y, Futuro, F-U-T-U-R-O, appears to be Insurance

Page 169

and Future, LLC in Spanish?

A. Can I --- can I see it?

Q. I mean, ---.

A. Can I --- can I, like, can I see the document that ---? I don't speak Spanish?

Q. If you can --- I'll write it for you.

A. Thanks. Thanks for that. And then I --- if it's okay, I want to take a quick bathroom break after this. Whenever you're done.

Q. Of course. Show you what I have written, it's Seguro y Futuro, LLC.

A. I don't know.

Q. Okay.

A. I know she was trying to penetrate a --- a Spanish market during COVID, maybe she set this up. But that's --- I --- I don't --- I don't know.

Q. Okay. You know she set it up, but you're not sure for what?

43 (Pages 166 to 169)

Page 170

A. No, I didn't say I --- I don't even know if she set it up.

Q. You're not sure --- you're not familiar immediately with that entity at all?

A. No, I know she had a --- there was something that her and Arthur were working on with a cactus, like, a cactus logo. Like Seguro. I don't know. It's another Spanish name, but it wasn't that Spanish name. That's why my --- I thought I recollected. Yeah.

Q. Understood. You want to take a break?

A. Do you mind?

Q. That's fine.

A. Thank you.

---

(WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

---

BY ATTORNEY READY:

Q. We were talking about bank accounts before we took a break.

Page 171

A. Yes. Yes.

Q. And so I'm going to go now to any bank accounts that you're aware of for Benefits Now, LLC.

A. Not my --- not my company, sir. I wouldn't know.

Q. Okay. Yeah. And the question at this point is just if you know of any bank accounts for these entities. So HIC Group, LLC.

A. That is Seni Sok's company. I do know that he banks with Bank of America.

Q. Okay.

A. But no access. He --- that's his baby.

Q. Okay. All right. Same question. HIC Marketing Group, Inc.

A. I think that's his, too.

Q. And so probably Bank of America, if you were ---.

A. I think so, yeah.

Q. Digital Bridge, LLC.

Page 172

A. Digital Bridge, LLC. I believe that's a Shannon entity.

Q. Okay.

A. I think it has a bank account. Again, I'm speculating, which I'm trying not to do.

Q. But you're not aware of a bank account for it?

A. I'm not.

Q. Okay. And you're not a signer on the bank account for it, I take it?

A. I don't believe so.

Q. Okay. Did you ever have any bank accounts --- I know this might sound odd, but with C. Malcolm Smith and Associates, P.C., or C. Malcolm Smith himself?

A. I didn't have a bank account there, Attorney Ready, but I did have him --- he offered a service, sir. Like, for instance, paying taxes. It's not uncommon for him to offer a service to move money into that ---

Page 173

his escrow account, and then he takes care of the taxes --- or there was one time --- or actually a few times, where I used his escrow account to protect the money from getting seized, which has happened, you know, a few times, so ---. But by the MCA guys. So I said, hey, Malcolm, do you mind if I dump 600 grand in here? I got payroll, and he would allow me to use that service.

Q. When was that, roughly?

A. The last time that I believe I --- it was when there was a large tax payment. I believe that it was $500,000, $600,000 in payroll taxes. And I hope you don't mind me putting this on the record. Might be useful to me. We initially thought that ERC tax credits were being applied during COVID and for some reason they weren't. So I was in a mad scramble to get the taxes paid. Hence the FBI investigation about the taxes, which I'm sure you're aware of. And that's

44 (Pages 170 to 173)

Page 174

when --- that was the last time that I used it.

You know, it made just sense to give it to Malcolm, make sure that he --- he does all the tax stuff. I don't, obviously, do any of that, and he paid the taxes. So that's --- that's --- that's like 2021. At the end of 2021, beginning of 2022.

But then we came to find out that they just didn't apply the ERCs. the six clients on the FBI indictment, they're actually --- they've been paid, Attorney Ready.

Q. Have you used his escrow at other times?

A. Maybe for --- maybe for bills. Again, I keep saying the word speculate. I'm not trying to be deceitful, it's just hard to remember. But I definitely used it for tax payments.

I can physically see the checks, like the checks that he cut out of the escrow because he would

Page 175

send me a copy of that or show me a copy, should I say? But yeah, tax payments. Any debts as well. If I had a promissory note or something that was important.

You know, I've taken, you know, personal liability on that. I would say, hey, listen, this can't go into the business account. I want to move it over here. Not that I don't trust myself, but when you're in the flow of things, as you know, as an entrepreneur, you know, you're trying to pick that and put this over to the side. This is earmarked for this.

So that --- probably the best I can do there, sir.

Q. Do you have money in escrow with him now?

A. No, I don't know. I don't believe so. If it was, it would be maybe 500 bucks, but it's --- I don't --- I don't believe so, sir.

Q. Network Swaps --- sorry. Network Swap Systems

Page 176

Administration. Are you familiar with any bank accounts with that entity?

A. Network as to Leah?

Q. Network Swap Systems Administration.

A. Never. Never heard of it, sir.

Q. Digital Principles Corporation?

A. That's a Shannon company.

Q. Okay.

Are you familiar with where she banks for that?

A. I am not. I am not.

Q. Are you a signer on any accounts with that entity?

A. Maybe she put me on as a signer, but I'm not sure.

Q. Digital Brig --- Digital Bridge Network Corporation?

A. Is it the same thing that you said?

Q. Uh-uh. Digital Bridge Network Corporation. The last one was Digital Principles Corporation.

A. She owns both.

Q. Okay.

Page 177

A. There's DPC and there's DBN. She does with Digital Principles Corp, DPC. And DBN. Yeah.

Q. What do these two entities do?

A. You know, what we were hoping that they would do once the bankruptcy is over, it would give me a place to land, to be perfectly frank, and I could start doing what I actually am good at, believe it or not, which is building --- coding and building software. That was our plan.

Q. Does it have any current business?

A. No, there's --- I don't believe there's any revenue coming in. I don't know if they even have a --- I don't know if they have a bank account. She would be talking about it if it was thriving, and she's not.

Q. Okay.

Redmond Holdings, LLC.

A. This is where I seem deceptive. There's so many of these. May I explain how an LLC would be set up by

45 (Pages 174 to 177)

Page 178

me?

Q. Sure.

A. Would that be helpful?

Q. Sure.

A. Shit. I need to --- excuse me. I need to set up an LLC. I got an idea. I'm 99 percent sure that that is not my company, but you made me a little nervous because I think you're a good attorney. To be honest, I was just telling Albert about that, so I don't want to mislead you. I'm 99 percent sure. But the way I would set up an LLC is I would say, hey, we need an LLC. We're setting up a lead company. Get the LLC paperwork filed. It's very quick, you know. But again, I'm 99 percent sure that that --- that is not my company, sir.

Q. Okay. So you're not familiar with any bank accounts that it holds a ticket.

A. It would never have had a bank account if it was my company, I would

Page 179

remember what it did, and I don't remember what it did. Again, it's likely not my company. Sorry to over talk. It's ---.

Q. It's okay. Redmond Equity Partners?

A. Never heard of it.

Q. And unfamiliar with any bank accounts that it would have?

A. No. Just not my company.

Q. Redmond Group, LLC.

A. That was, I believe, all the way back to 2010, 2011 early. First LLC didn't do much. It was more of a --- like a holding type of company. I had to get my green card, and to get your green card over here without getting married, you need to own a successful company. I opened it and had no other option but to try and stay here, you know, so ---.

Q. Okay.

A. But yes, I --- I think it had a bank account with PNC, but we're talking 2007/2008, 2009/2010.

Page 180

Sorry to speak so fast. I had caffeine. I apologize.

Q. I guess you're here on --- I forget what they call it, an investment visa. Is that --- or something like that. Is that correct?

A. I was on an F1 for academics, and then I moved to an H1B Visa, a sponsorship, and then that started to run out. And to be perfectly frank, it felt like it was being extorted, you know.

Q. So Redmond Group was set up, though, so you could continue residency properly?

A. It was sort of --- it wasn't that binary. It was two things, you know, which I alluded to, but I'll be more specific. The gentleman who was sponsoring me when I came on board in 2007, 2008, he had six licensed insurance agents. By the time I was done with it, he had 6,000 believe it or not, had

Page 181

early success. And because he knew I needed an H1B visa, he started to scam, and --- you know. You know that story. So two things. I needed to be able to open my own business and be a man, Attorney Ready, you know, and the second thing was I --- I needed a visa.

Q. And who was that you're referring to?

A. Peter McCaffrey.

Q. Okay. Bank accounts for U.S. Trifecta, LLC.

A. Just give me a second. I just want to have a picture in my head.

Q. Take your time.

A. It would have been Bank of America. Seni Sok would have set that account up.

Q. Okay. Okay. U.C. Consolidation, Inc.

A. There was a bank account. I hope I didn't say earlier there

Page 182

wasn't, but I can picture a blue check in my head. I'm trying to think, what --- what a blue check ---. I'm not sure. There's no bank account for the last number of years, though.

Q. Okay.

A. Very marginal income.

Q. You remember blue checks at one point?

A. I remember blue checks.

Q. Okay.

This might be the same as the other one. The Redmond Group, LLC. Any memory of that?

A. No.

Q. Okay.

A. It would have been different entities, sir.

Q. Maybe, maybe not. You're saying you don't remember it, it's good enough.

Redmond Group Investments, LLC. Same question.

A. Not my company.

Q. Okay.

Page 183

Red Horizon, LLC?

A. Yes.

Q. Okay.

A. Yes.

Q. When did you form that?

A. That was --- I want to say relatively recently. Like maybe the last two or three years. You know, I had an objective, but I just --- I ---.

Q. What was it for?

A. I wanted to open --- so we --- we had the American House at 354 Penn Street and I wanted to open a company --- you're going to laugh at me --- that provided legal services on the phone. Because if you're getting screwed by attorneys, Joel --- and I can --- listen I can bring leads. I can bring leads to the attorneys. I'm going to be an attorney, for God's sake, Albert. But I know how to generate, Joel. If you need 250 clients, that's what I do. I can do that. One of the

Page 184

only things I can do well, so that's what we wanted to do.

Q. So you wanted to service law firms with leads in some form?

A. Basically, yeah. You're just way too eloquent, and I talk too much, but you're a hundred percent right.

Q. Did it have a bank account?

A. I'm not sure.

Q. Do you have any partners in this entity?

A. I do not believe so.

Q. Okay.

So you --- solely owned by you?

A. Yes, I'm pretty sure of that.

Q. Did you launch a website? Did you have a business plan? How far did you get?

A. Business plan, I think was a PowerPoint or so a couple of spreadsheets. You know, among the thousands of spreadsheets we all keep, you know, pro forma, cash flow analysis, Google analysis, you know, generating leads, things of that

Page 185

nature.

Q. Where did you form it?

A. It would have been --- I would imagine it would have been Delaware or Pennsylvania.

Q. Any reason that it would have been formed in Wyoming?

A. Oh, yes. Okay. Yeah. I have an attorney I think you're familiar with Bill Rush. You know, relatively good attorney. Please put relatively on the record. If he reads this, it'll be great.

Yep. And he had started to give me legal advice about forming companies like the big boys do, whatever that means, which is obviously not me. In states that you can't trace the ownership. He recommended Wyoming. I don't know. I just --- you know.

Q. Sure.

A. Okay.

Q. Okay.

So Red Horizon Ventures, LLC.

Page 186

**Same question.**
A. Not me, sir.
**Q. Oh, okay.**
**Endless Horizons, LLC?**
A. Yes. Yes. I do not believe it had a bank account. Endless Horizons was going to be an insurance agency, but I can't remember. I know it was my idea to branch out into other states. You know, I'm not sure who was on the entity, but it was part of my consultation with Shannon that you should branch out and spread the business out.
**Q. So you don't remember whether it was just you that owned it or both of you?**
A. I really don't, sir.
**Q. I have no idea. Okay.**
**Q. Might have been you. Might have been both of you. Could it have been anybody else?**
A. It could have been Arthur. Arthur Walsh is --- you know, Arthur's --- it might have been Arthur. Arthur

Page 187

has that thinking process of wanted to expand. He's an older guy.
**Q. So he might have joined you as an owner. Is that what you're saying?**
A. I don't think he did.
**Q. Okay.**
A. But I --- it could have been him and Shannon. It could have been myself and Arthur.
**Q. What states were you hoping to expand into?**
A. It would have been nice --- this is what I think. It would have been nice for Shannon to be able --- because her goal was to get this up and running. Okay. She did a good job of it before the FBI stuff happened, you know, which is my fault obviously.
But I wanted to have an office in Wilmington, Delaware and she agrees. She loves that area. We just like Wilmington. We go to a lot of concerts there. She's got family down there. So her goal was to part time

Page 188

Seguro. She was working full time around that time, you know, obviously. To get into Wilmington, Delaware, open another office and slowly merge herself back into the education field. It was really difficult for us to work together.
**Q. Why's that?**
A. Husband and wife stuff. You got a smart Ph.D. and you got me who's coming up with ideas, you know, that's just difficult, you know.
**Q. So why did she stay in and --- why did you stay in and she get out then?**
A. I think that --- I think that it was --- it was pretty successful. Like, it was really cool. It worked. She had some disagreements with Art. She had some disagreements with me. Believe it or not, I have a little bit of leadership experience, conflict resolution all the way down to John C. Maxwell shit, you know. Excuse me. And they just started to

Page 189

butt heads. And that's what happens when people get successful. They started to get really successful. I started to get out of the office and spend more time with the babies, which is what I wanted to do. I told you I needed a break. And they just couldn't ---. Now they get along like a house on fire.
**Q. And when was this?**
A. She really started to kick butt 2020 to 2022. She carried a company through COVID, which was really impressive. That was a difficult time.
But she's --- you're going to meet her. Like, I know everybody says this is a better wife, but she's a badass chick, dude. So, you know, I would say she started to get them hunger pains, I guess you could say, and other stress-related things around her and wanting to get back into education probably 2023. It went from 60 hours a week to 20 hours a week,

48 (Pages 186 to 189)

Page 190

you know.

Now she's --- she's like an absent owner. She comes in to do her thing. At lunch she called me --- there was an employee paycheck that needed to be cut. I called her COO, Tanya. Tanya cut the check because Shannon was in an education meeting. She's dealing with the Department of Education. And she's also in a deposition today doing the same thing.

Q. So what was Endless Horizons, LLC done to target?

A. Yeah, that was it. Sorry, that was the original question. Sorry. Endless Horizons was going to be a clone of Seguro, just in a different state.

Q. What do you mean a clone?

A. Like a franchise almost. If you can make one work, the next thing is to prove to yourself that you can make two work. Three, Cornerstone. It's different dynamics. And Arthur and Shannon wanted to do that and I

Page 191

wanted to help. I wanted to do that, too.

Q. Why wouldn't you do it under the same name?

A. It's a great question. Because the products that are being sold by Seguro, ACA compliance, okay --- got to get this on the record. Licensed training, SOPs, all that good stuff, IVR call recordings, all that stuff. But when you're competing with Obamacare, I said this in the stand, I think, you get a lot of heat from the Department of Insurance. They want you to sell in Pennsylvania. They want you to sell Pennie's, and Pennie's --- you can't run a business selling Pennie's. Pennie's is like the Obamacare plan, Attorney Ready.

Q. Why does starting another LLC allow you to not do that?

A. It sounds deceptive. It's not. To me, it's okay if it sounds like that. It's not supposed to be. But getting to another friendly state with

Page 192

a different name. Agencies are propped up by, like, an MGA license. I used to have one.

Q. What is an MGA license?

A. An MGA is a managing general agency. That's what you morph into. But you need a --- a figurehead who's licensed to prop that agency up. The agency's license is contingent on the MGA license. Okay. So Arthur had got some complaints. It happens when there's policies being written, but you come under more scrutiny by, you know, writing that type of policies. So it just makes sense, business wise to go and open a different company. It sounds like someone's running away from that. That's not the case. It was going and opening something in Delaware for the reasons I said, to Shannon. And also, like, if Arthur loses his license, the company's out of business, you know. I've been through

Page 193

that before. It was difficult. And that was the main reason why. I'm talking too much. But that was the main reason why I brought Stephanie Miller, who was a four percent owner of Bene Market on board because I trusted her. She wasn't going to take advantage of me like some other people, partners. And I was having issues with my license. But by that time, we'd sold hundreds of thousands of policies that were not Obamacare. So anyway, I'm sorry. Too much caffeine. I apologize.

Q. Okay. What was the trade name for Endless Horizons? What did it market itself as?

A. It never got there.

Q. Okay.

A. Brochures would have been created on some flyers to show the insurance card, you know, like a pitchbook.

Page 194

Q. But you're saying that you never sold anything, had any products, anything like that?

A. Did not. No, sir. No money, no income.

Q. You mentioned that you started it when you'd had some trouble with insurance and Arthur had. About what time was that?

A. Arthur started to come under scrutiny --- I don't want to say scrutiny. That's a very strong word. Arthur received a DOI complaint based on a client's claim not being paid. And that was not Seguro's job. Seguro's job was to enroll the policy compliantly. I think it's a word it is now, compliantly. And then assist the client with navigating the murky waters of insurance. Arthur has a great nose and eye for choosing good partners. I don't. And he chose a company called HMA, which was Providence Insurance Company. Joel, it was like phenomenal.

Page 195

It was like the Renaissance. And dude --- excuse me, Attorney Ready, I was working like 10, 15 hours a week. It was awesome. And I was getting to do some cool shit.

Anyway, long story longer. Arthur's license got hit by a DOI complaint and then another one because HMA and Providence were not paying the claims anymore. It just happened overnight.

Q. And when was this?

A. I would say it was right around right before the FBI paid a visit to my home. And also to --- it was right around 20 --- mid-2022. And Shannon was killing at this.

We just bought the High Road house. And when I say we, I mean her. Please don't trip me. We wanted the High Road house. She just bought the High Road house. She was killing it. She was super happy. And then that shit went down with the HMA. They stop paying the claims. And who gets

Page 196

blamed? The agency.

So that's when things started to get difficult, you know. But that's when he got done. Your original question, when his license got done. It's hard to get out of that, you know.

Q. Okay. You've said DOI, that's Department of Insurance.

A. Yes, sir. Department of Insurance.

Q. Your Benefits For You, do you recognize that entity?

A. That was a DB --- was it a DBA? It was another short-lived company, but it --- it did make --- it did make money. I want to say that that was Mr. Sok and I. I knew, I looked for paperwork on it. I couldn't find it. I believe that was Seni and I. I believe so.

Q. What did they do?

A. Very, very similar. It was a --- so again, to clarify, some

Page 197

carriers want a fresh bribe. Let's say Seguro Medical goes to UnitedHealthcare. UnitedHealthcare sees that Arthur has been --- you know, he's got five complaints. They don't like that.

Insurance carriers will recommend that you spin up a new company, get a new license. Because they obviously want to be compliant and they rule the world, UnitedHealthcare.

So this is why this is hard to remember, because a lot of these in my head aren't real companies. They're like spinoffs almost. Again, not to sound deceptive, but it's a spin --- it's like a pop up because UnitedHealthcare wanted that or Blue Cross.

So back to your question. Your Benefits For You, I believe, was Arthur, myself --- or myself and Seni or something along that lines.

Q. Do you remember where you

50 (Pages 194 to 197)

Case 24-13093-pmm   Doc 437-3   Filed 09/16/25   Entered 09/16/25 17:20:23   Desc
Exhibit     Page 53 of 99

Page 198

banked?

A. I don't know if Your Benefits For You had a bank account. I can't --- I don't know.

Q. Okay. You said it made money, though. Correct?

A. It --- excuse me. Let me clarify. It generated money.

Q. Yeah. Where did the money go when it was generated?

A. It would have either went into U.S. Trifecta if it was owned by Seni and I. And again, just trying to remember. Or it would have went down to Seguro. It would have been --- it would have been one of them three entities because that's --- that's what I believe was going at the time.

Q. And roughly, when was this time period?

A. I --- I hate guessing, but I believe it was 2020/2021. The product was a wellness plan with hospitalization. Shannon loved that

Page 199

because her mother was going through cancer. Brief stint, thank God. So, yeah, that's --- it made sense, if I have my timelines right.

Q. Sure. What other entities did you have that generated money that went into Seguro?

A. Attorney Ready, would it be on this list?

Q. I'm just asking in general.

A. Maybe Your Benefits For You, maybe. I think so. Other entities. I'm not sure about that. That would honestly be more of a Shannon question. I know she's talked about money back and forth between ABN and Seguro, so --- I try to stay out of that, to be perfectly honest.

Q. Okay.

A. Try to stay out of her business. Not all the way, but most of the way.

Q. Okay.

Are you currently serving as an

Page 200

officer or manager of any business entity?

A. Could you define --- I know what an officer is. What --- what is --- what do you mean, sir, by a manager.

Q. Do you serve any --- let's start with this. Do you do any work for any companies?

A. Yes, Seguro.

Q. Okay. Any others at this point?

A. There's a little bit of a metamorphosis going on, you know, with Seguro and ABN. It's not official. I did tell Nicole, who's wonderful, that there --- it's hard to pursue a new consultation contract with your wife, but I think that's going to happen. I wouldn't mind be a consultant for ABN if Seguro can get propped back up a little bit. Now that Shannon's starting to work, you know, more than Friday afternoon, Saturday and Sunday. I hope she does.

Page 201

Seguro will be good. Arthur Walsh's wife just died of Stage Five cancer --- Stage 4, Stage 5, whatever it is, cancer. Brutal. So I did find myself with you looking at me, in Seguro a lot. I look like I'm the owner. That was not the case. It was right around the time that the involuntary bankruptcy happened. So do I think that I'll be consulting for any more companies? I think --- I think it's probably going to be ABN. I wouldn't say it's flourishing, but it's --- it's getting there.

Q. Do you do work for any other companies other than Seguro and ABN?

A. No, I do not. I've been offered some consultation agreements, but I don't know if it's the right time.

Q. Okay. Are you currently an officer of any companies?

A. I don't believe I'm an officer

Page 202

of any of these companies or companies that are generating money. Just to clarify, sir.

Q. Yeah, let's start with --- let's start with these companies.

A. Okay.

Do you want me to just ---?

Q. Yeah, you can go through the list. Yeah.

A. The companies that she has active right now that I know are generating money because bills are being paid, right.

ATTORNEY CIARDI:

His question is, are you an officer of any of those companies? That's the only question before you.

THE WITNESS:

Thank you, Albert. Afternoon. I apologize. No. Can you define officer, please? There is different meanings. Again, not trying to be a pain in your ass.

Page 203

BY ATTORNEY READY:

Q. Sure. Do you have any sort of corporate managerial authority, meaning that you can draft bylaws, that you can call a vote of shareholders, that you can convene a board of directors, that you can make decisions binding on a company for any of these entities other than Seguro and ABN?

A. Well, not --- I don't make --- I'm told, what to do at Seguro. I have input, but I'm told --- I don't get to make the final decision in ABN or Seguro.

Q. Well, we'll come back to that in a second. Let me just start with, though. Of the other companies. I'm just excluding them for a minute because you said you do some work with them.

A. Sure.

Q. Of all the companies that I guess now you're saying you don't do any work for, but maybe you're defunct

Page 204

or at various stages. I'm just asking, do you have any officer position with any of those companies?

A. Again, ---.

ATTORNEY CIARDI:

Well, I'm going to object. Officer, president, vice president, treasurer, secretary, ---

ATTORNEY READY:

Sure.

ATTORNEY CIARDI:

--- are you any of those?

THE WITNESS:

Well, Bene Market is technically still open, so yes. There you go. Thank you.

ATTORNEY CIARDI:

Okay.

THE WITNESS:

Sorry about that.

BY ATTORNEY READY:

Q. What is your role at Bene

Page 205

Market?

A. CEO, President, I guess you could say.

Q. How much money still comes into Bene Market?

A. Marginal.

Q. What does that mean?

A. Less than $10,000 to $20,000, I would say a year.

Q. $10,000 to 20,000 a year? I understand you're estimating, but ---.

A. I'm guesstimating. Yeah.

Q. Okay. All right.

Do you have any role --- and this is only a slight distinction in terminology, but as a manager. And I'm using this now in the technical sense of an LLC's president, basically.

A. Understand, as a manager, I'm trying to think what companies are still functioning, I guess you could say.

U.S. Trifecta, no. U.C. Consolidation, no --- no, there's

Page 206

nothing.  This is the easiest way for me to think about it, if you don't mind.  There's nothing that I'm doing apart from spending time with my kids and Shannon, supporting her with the doctorate.  I'm going to Seguro.  I'm doing what I can to get that company back on its feet.

That's --- I don't know if that answers your question.

Q. You're --- let me --- let me see if I can rephrase your answer back and tell me if I'm wrong.

A. Yeah.  Sorry.

Q. You're not aware of any other company that you're an officer or manager in at this time.

Is that correct?

ATTORNEY CIARDI:

So I'm going to object.

THE WITNESS:

Yeah.

ATTORNEY CIARDI:

He said he was in Bene Market.  Do you mean an officer

Page 207

actively doing things or do you mean that there's an entity for which he may be an officer that may exist that, for whatever reason, isn't operating?  I'm just trying to clarify.

ATTORNEY READY:

Yeah, sure.

ATTORNEY CIARDI:

Is it an active office area duty or he was there for a company that may have existed seven years ago and ---.

ATTORNEY READY:

Sure.

BY ATTORNEY READY:

Q. Let me break it into two questions.  I understand.

Let me just confirm, because I think I understood you to testify a minute ago that you're not an officer actively managing any company other than, ---

A. Yeah.

Q. --- to some extent, Bene

Page 208

Market, and we can talk about Seguro and ABN in a minute.

Is that correct?

A. Yeah.  I'm not actively.  He's right.  I got stuck in that.  Sorry about that.

Q. All right.

And now I'll ask you, if you don't know, you don't know.  Are you a --- I'll call it a, you know, passive officer or manager of an entity that is defunct on any of these?

A. Yes.  Yes, sir.

Q. And which ones would that be?

A. I'm going to define defunct.

Q. Well, you defined it earlier.

I mean, I guess I'm just asking, are there any of you that you're aware that you're an officer of, and I think I've got your testimony you're not actively doing work in them.  But I'm asking, are you still listed as a manager ---

A. Absolutely.

Q. --- or officer?

Page 209

A. Yeah, you know, U.C. Consolidation, U.S. Trifecta, and there was --- I'm trying to remember what the --- it was deformed.  Wrong word.  I need to wake up here.  I apologize.  I need more caffeine.

It was --- there was a dissolution on that company.  I don't know if the paperwork was filed, so I'm going to say yes to U.S. Trifecta as an officer.  The Turner House of Reading, LLC, most likely I didn't bankrupt it or shut it down or anything.  Hasn't filed tax returns in years, obviously.  I don't even know if it did file a tax return.

I think it ended up on my personal tax return, however that works.  But I pay accountants for it.

The Redmond Group, it's got to be not just defunct, but it's probably just --- I don't know if LLC numbers expire, that'll be a decade ago.

Q. What did the Redmond Group do?

A. That was the --- that was the

Page 210

Pete McCaffrey immigration play. Trying to move out of my own, sir. Yeah. Right.

Q. Okay.

A. Yes.

Q. Those are the ones you remember today. Is that correct?

A. That's the ones that I remember, yeah.

Q. All right. Any entities I haven't asked you about today that you're aware of that --- that you are an owner, officer, manager of?

A. There was a company that Attorney Downing opened. It was called Secura, or --- it was a play on the Spanish name of --- Seguro is Spanish. But it was like a play there, like a different brand or whatever, because there's a lot of young Spanish kids in Reading, Pennsylvania, that need careers. Hence that play.

Page 211

Similar to Seguro. I don't know if I was --- I was definitely communicating with Katherine on a daily basis on behalf of Arthur and Shannon. I may have been involved in the setup of that company. It didn't make any money, but I just want to get that on the record, although it's probably not helpful, you know?

Q. You think it was called Segura?

A. I don't know what it was called. It was Le something.

Q. Okay. Le something. Okay.

A. Sorry, Joel. I apologize.

Q. Any others that you can remember as you sit here today?

A. No, I don't think so.

Q. Okay. Have you served as an officer or manager of any other business entity that we haven't discussed within the last five years?

A. I'm just checking my memory

Page 212

here. And I want to be right. I'm picturing my tax returns in my head, like, which I don't really review. Attorney Ready, no, not that I can think of, that aren't on this list.

Q. Okay. Are you currently serving as a registered agent for any person or business entity?

A. This is fun. So the registered agent stuff, as we went down this wormhole. Excuse me. As we've been, you know, doing this, this bankruptcy stuff. There were --- I was a registered agent in companies that I shouldn't have been a registered agent on. So the answer is yes.

Q. Okay. Which companies were you a registered agent on?

A. I believe it was on --- the big one that my attorneys are aware of is the Hurston Friends. I should have

Page 213

--- I specifically requested and documented emails that I was --- this is not my company. And I'm not doing the work in this company either. Shannon wants to do this, et cetera. There were emails. I can picture them. Somehow, some way, one of the attorneys had, come to find out in the last two or three weeks, had put my name as a registered agent or an officer --- or when you're getting discovery, sir, you're like, look at this guy scrambling. The attorney made a mistake.

Q. So do you recall which attorney that was that made the mistake?

A. Yes.

Q. Who was that?

A. Attorney Valz.

Q. I'm sorry?

A. Norman Valz.

Q. Oh, Valz. I'm sorry. And ---.

A. Art's going to attempt to throw them under the bus. I'm just telling

54 (Pages 210 to 213)

Page 214

you the truth.
**Q. Sure.**
**Are there any others that you believe you should not have been a registered agent on that you are?**
A. I would imagine that there are. I don't know them, but usually if someone doesn't know how to fill out registered agent paperwork and they're putting my name on it, he --- I'm speculating again. He may have done it again.
**Q. Norman Valz may have?**
A. Potentially, yes.
**Q. Are you aware of him having done that on any others than Friends of Hurst?**
A. I am not.
**Q. Are you aware of any entities that you, let's say, should be a registered agent for?**
ATTORNEY CIARDI:
Objection to the extent that would call for a legal conclusion. But you can

Page 215

answer.
ATTORNEY READY:
Yeah, okay. Let me --- let me rephrase the question. That's fair.
BY ATTORNEY READY:
**Q. I'm asking you, because you said there are a few that you're listed maybe on a registered agent or as a registered agent for that you shouldn't be. I guess I'm asking, have you agreed to serve as a registered agent for any entities or people?**
A. No.
**Q. Okay.**
A. I wouldn't have put myself in that position to be perfectly frank.
**Q. And just to be a hundred percent clear, when I say registered agent, ---**
A. Yeah, please.
**Q. --- you know what I mean, is someone who accepts or receives service for a company or entity?**

Page 216

A. So, you know, you're talking American. I'm doing my best. I've been here 20 years.
What I perceive a registered agent does --- if that's okay if I can just spit this out?
**Q. Sure.**
A. I thought that a registered agent was when you wanted to open --- this is what the attorneys and the accountants do.
Please don't. I can be stupid, but this is not my wheelhouse. Hey, Norman, Shannon or Alan or whatever wants to open a company in Delaware. Do you have a registered address in Delaware? We don't own a building in Delaware. Be nice. But we don't. You need a registered agent. Okay? Go get a registered agent. North --- your stuff, right. Northwestern, Harvard --- I don't mean to chuckle, but all that stuff, Norman would go --- or Mr. Rush, for instance. I don't know if he did it, but

Page 217

I'm using him as an example. He would go and get a registered agent. Or Ms. Downing, Attorney Downing. Get the registered agent set up. Bring it back. The mechanism behind that. There's like a form file that says officer and who signed it? I had no idea that existed until --- I just don't do that stuff. I had no idea that existed, Attorney Ready.
**Q. Okay.**
A. Until recently. Until you brought it to light.
**Q. So let me ask it a different way because I think maybe it was confusing. I'm really asking if you have agreed to be the person who receives service on behalf of any entity. Meaning I'm the guy you serve with a lawsuit paperwork.**
A. I understand. Have I agreed. I would --- them words would never come out of my mouth because it's the first time I've heard someone explain it like that.

55 (Pages 214 to 217)

Page 218

Q. Okay. Fair enough.

So --- okay, so it sounds like no.

So I'll ask now --- and I think it's probably the same answer. You've never served as a registered agent in the last ten years that you know of.

A. Oh, I would have. So for instance, Bene Market, NBOA, companies that I have owned personally. Yes, absolutely. I want to get the service from you because I want to be the first to look at it, you know?

Q. Got it.

So generally you've not agreed to be a registered agent except for companies that you owned.

A. Correct. Yes.

Q. Understand. All right.

Identify any business entities that currently use the 8 Morgan Drive, Spring Township address.

A. Sure. This is another attorney error. So 8 Morgan Drive was purchased by ARC Realty. We were

Page 219

excited about getting out of the city, to be perfectly frank, after COVID. ARC Realty purchased Morgan Drive, the goal was to get Seguro into new beautiful digs like you have here and, you know, start building the business. And Shannon's a little bit posh as well. Again, she's a little ---.

Q. Did you say posh?

A. P-O-S-H. Okay.

Q. Thought you said posh.

A. You guys have that; right?

Q. Yeah.

A. Yeah.

ATTORNEY CIARDI:

British words.

THE WITNESS:

Yeah.

She was just talking about the Brit.

BY ATTORNEY READY:

Q. I thought that's what you said. I was just verifying. Yeah. So ---. Okay.

Page 220

So she --- she wanted the posh building? Okay.

A. Yeah. She wanted to, like, be the --- be an entrepreneurian. So we bought that. ARC Realty. Excuse me? ARC Realty bought that. And Morgan Drive morphed into, oh, we need somewhere where everybody's mail goes.

Q. Who's everybody?

A. Arthur Walsh.

Q. Okay.

A. Alan Redmond, Seguro, Bene Markets. And in going through that process, maybe by your puzzled look in your face, respectfully, who does that? You're not thinking about that stuff. You're just trying to make sure you don't miss a lawsuit or miss mail, you know? So ---.

Q. Why did --- why did your personal mail need to go to 8 Morgan Drive?

A. I'll go back, if you don't mind. I'm horrible at that stuff, but it wasn't all my mail. I'm misleading

Page 221

you. I don't mean to. I don't know if my mail went there or not. My mail comes to our house, so maybe I didn't say that right.

A lot of mail was coming to one location for Ms. Hatmaker to --- to go through, and it was --- Shannon and I, we're not good at that, you know. So it morphed into trying to make life easy instead of it looking like a big commingling, which trying to do, you know, that wasn't the case.

It was --- mail was being missed, dude --- excuse me? Mail was being missed, Attorney Ready. And we didn't want to miss mail, you know, a complaint to Arthur. But that office is functioning for Seguro Medico. That's what it's there for.

Q. Okay.

So Seguro Medico, is that the only business that's running out of that building?

A. No. No.

Q. What else is running out of

56 (Pages 218 to 221)

Page 222

there?

A. Benefits Now.

Q. Okay.

A. Sorry.

Q. Sure.

What is Benefits Now relationship to Seguro Medico?

A. Marginal and limited. Like, very separate entities.

Q. Who owns Benefits Now?

A. That is Shannon. Shannon owns Benefits Now.

Q. What's the difference between Seguro's work and Benefits Now?

A. Zero. I'm being honest. Zero. My --- may I explain?

Q. Sure.

A. The FBI came into our building in 2022 under the premise that I was a criminal, and also under the premise that somehow myself and Arthur Walsh were not paying claims. So just to go back. I know it's boring, but to go back. The HMA issue with the claims not being paid

Page 223

is really spilling over. They just got invested. They're being significantly investigated by --- by the FBI from what I can see online. So when that happens, Attorney Ready, there's a --- there's a significant repercussion. You know, I don't know, maybe equivalent to you guys getting a disciplinary board thing or whatever, you know, I don't know how serious that is. But I imagine it's pretty serious. And the business is based on perception. So you go from an A plus type of company you're proud of to people start investigating.

A. The Department of Insurance believes what they hear, for instance, in PA, and they show up. And then Delaware people show up. So I'm not going to mislead you. Benefits Now is truly a successor of Seguro Medico. It had to. We had to get new licenses.

Q. Yeah, no, I understand. When

Page 224

did it form?

A. I'm not sure, sir.

Q. Is it formed as a separate entity or just a trade name for Seguro?

A. It's a separate. Has its own FEIN number.

Q. Who set it up?

A. I believe I was ordered by Shannon to set that up.

Q. So did you apply for the EIN yourself?

A. Physically? Yeah. I wouldn't know how to do that.

Q. Okay.

A. I'd screw it up, sir.

Q. When you said you were ordered to set it up, what steps did you personally take to get that set up?

A. Come into the office on Saturday or something and go, hey, there's a lot of heat around these licenses. This is some BS.

Q. This was Shannon who told you this?

Page 225

A. This would be Shannon. Yes, sir. What are we doing? I'm like, well, you're talking to the guy who knows what to do. Not perfectly, but when NBOA got a lot of heat from the Department of Insurance in PA, we had to open up Benefits Now just to survive.

Q. You mean Bene Market?

A. Excuse me, Bene Market. My apologies. That's what I did. Now in retrospect, it looks crazy. It looks like leapfrogging, you know.

Q. So you did the same thing for Seguro to Benefits Now that you've done for NBOA to Bene Market?

A. I give her --- I give her advice on that. That's the only thing that I could come up with. And again, you know, your scrambling. There's payroll due on Monday and you're not getting paid. You know what I mean? Like, it's --- so she's stressed and I'm like, Jesus Christ,

57 (Pages 222 to 225)

Page 226

she's about to go through what I went through. Or maybe I put myself through it, who knows? But yeah, she had the --- she had the pop up Benefits Now and make sure that or whatever it is, 50, 60 employees were fed. That's what honestly happened, sir.

Q. You've used this term or some version of it a couple times, pop up. So this is sort of what you're talking about? Like what you did with NBOA to Bene Market. Starting a new entity, ---

A. Yeah.

Q. --- taking the same assets over, that sort of thing.

ATTORNEY CIARDI: I'm going to object.

THE WITNESS: Not taking assets --- I'm sorry, go on ahead.

ATTORNEY CIARDI: Objection to form. You can answer the question.

Page 227

THE WITNESS: Assets can't be done. Let me --- can you clarify the question? What type of assets, sir?

BY ATTORNEY READY:

Q. So you've used this phrase, pop up.

A. It's a flimsy phrase when you say it, and it's just ---.

Q. I don't mean it to be flimsy. I'm just --- I'm just trying to ---.

A. I get it. I understand.

Q. Yeah, I'm trying to understand your term. Yeah. I think you may have called it a spring up or pop up earlier.

A. Oh, you're right.

Q. So you're --- I'm just trying to get a little definition because you explained earlier some of the reasons that sometimes you have to do that for insurance or otherwise.

A. Sure.

Q. I'm just trying to understand

Page 228

that's what you're saying. That's kind of what you've done when you moved from NBOA to Bene Market. Right?

A. Can I clarify?

Q. Sure.

A. Okay. Terminology of pop up is a Lizzie word. It's not like, oh, we got to pop something. It's a stupid word. Let me clarify without changing --- lying under oath, right. So pop up in this context is you got to go and get agency licenses, you got to go through compliance classes, you got to go through FINRA, you got to take tests, you got to go to your registered agent. It's not a pop up, it's --- you have to start up a new business, sir. So it's a stupid word.

Q. Yeah, that's fine. I don't need to hold you to the terminology. I'm just trying to understand ---

A. I just wanted to clarify.

Page 229

Q. --- you're just saying that's --- that's what you advise Shannon to do with Seguro to Benefits Now?

A. Arthur and I --- you know, it's not the first rodeo. So Arthur and I, you know, she came in and said, we've lost --- we're going to lose taxes, we're going to lose this. They're not listening to us about HMA. We just got hit by the federal, the feds, the FBI. What are we going to do? We're struggling --- our reputation went from A star to C minus. A lot of perception in this business, sir. Word travels fast in the insurance business. So she noticed that certain states that you buy leads from or generate leads from, sort of what I do, what I like to do anyway. I did pretty well believe it or not, when you lose taxes, you're losing --- lose as in your license is suspended or whatever. Shannon's losing $20,000 a day. You know, as an example,

Page 230

$10,000 to $20,000 a day. It's a bit steep. So as these things started to happen, revenue starts to go down. The only cure for that is to either shut the business down or --- for want of a better phrase, pop up another agency.

Not just to --- still make it good, you know. Still, like, have a good business, not just flimsy jumping around, but, you know, that's --- that's what Arthur and I says, you know.

**Q. When did Benefits Now start?**

A. I'm not sure, sir. I would say if the FBI stuff, I believe happened in November 2022. Benefits Now started to --- Seguro put up a good fight. But benefits Now started to come to fruition in Shannon's mind, I'm thinking, for maybe mid-2023 into 2024. Early 2024, sir.

**Q. And it --- I guess it took on the same employees from Seguro. Right?**

Page 231

A. Absolutely. It had to. That was --- that was the main reason to keep it going.

**Q. Okay.**

A. Yeah. The employees had to get paid. They're like family.

**Q. And it --- they're at 8 Morgan Drive as well?**

A. Yes, sir.

**Q. Okay.**

**Today, are both of them operating side by side, or it's just Benefits Now operating now?**

A. Benefits Now operations. And there's a lot of new staff as well. That's the other thing. You know, you do this, and then benefits die. It sounds --- I wish this was going on --- it wasn't going on because there's so many lessons from, you know, NBOA to Bene Market, and then the lessons that Arthur and Shannon have learned from Seguro to benefit a nice degree company. It's starting to thrive, you know, which is nice. That's slightly

Page 232

different.

I know I said it was the exact same. It just has a heavier ratio on selling vision and dental plans. Now that I'm thinking about it, looking at their plan and the reason why they chose that and why I recommended it is that it's not as hot as health insurance, which is a --- it's ridiculous in this country. And back home in Ireland as well, so ---.

**Q. What do you mean not as hot?**

A. As in there's not as many regulatory eyes. You're not going to be ostracized or cast out because you don't believe in the concept of socialized healthcare, which is really what the theory is.

**Q. Are there any other business entities that have permission to use 8 Morgan Drive as either their, you know, mailing address, register, agent spot, anything like that?**

A. Yeah, there was one other business that I can recall. It was

Page 233

the Rush Law Group.

**Q. Okay.**

**So Bill Rush operates out of there now?**

A. Bill Rush was operating out of there.

**Q. When did that start?**

A. It's a strange one. Bill moved into the bottom floor in June 2023, July '23, with Rourke Eichton. You know, I guess their partnership didn't work out. That was just. I just don't think it was a cohesive thing for that to happen, you know.

**Q. Gotcha. Did they rent there?**

A. They were beginning to rent, but they did not pay rent.

**Q. Okay.**

**Any other businesses then that use the address there?**

A. I believe the Apollonia Dental is a dba like a brand of Seguro that was there.

**Q. Okay.**

**Any others?**

Page 234

A. I believe ARC Realty has that address registered there.  It might be the two high road.  A lot of scrambling, Attorney Ready, when the FBI knocks at your door.  There's a lot of quick movements instead of thinking about something for ten minutes, but yeah, I get that though.  Yeah.  You know, honestly, this --- not to be deceiving, just there's things get done in a shorter timeframe because you're scared to death, you know?

**Q. Gotcha.**

**And any others that you know of?  Any other than ---?**

A. No, sir.

**Q. I'm not sure if this is a business, but does Norman Valz operate out of 8 Morgan Drive regularly?**

A. He actually had a really good relationship with Shannon.  He was staff attorney.  I can remember seeing payroll and Norman was on payroll.  He was --- he was the Seguro attorney.

Page 235

Shannon and him spent a lot of time with Arthur together because she loves SOPs and compliance and HR and excellent best.

**Q. Are you saying that he's in-house counsel essentially for ---?**

A. There you go that's what you guys call it over --- yes, he was in-house counsel for maybe a year and a half.

**Q. And do you know when that was?**

A. I --- I met with Norman fairly regularly.  That was one of my rules.  It wasn't necessarily --- I can't remember what the consultation agreement said, but I got put with Norman to maximize Norman, you know.  Shannon was paying him good money and I --- so I would --- I think he was there from a year and a half from right before the FBI, maybe July all the way through to recently 2025.  Probably started to wind down at the end of last year, sir.  I want to say October.

Page 236

**Q. So I just try to kind of flesh this out.  He's not renting there as far as you know?**

A. No, sir.  No, no, no.

**Q. He works at Seguro in some capacity.**

A. He was a staff attorney for Seguro.

**Q. Okay. Gotcha.**

**Anybody else or any other company or individual for that matter who operates out of that location?**

A. I'm just going to take a moment to think, if that's right.  I just want to answer the question right.  Right now it's, you know --- no, Turner has --- no, of course not.  It's gone.  No.  I'm going to go with no to the best of my ability.

**Q. Okay.  Understood.**

A. Yeah.

**Q. I'm going to ask you now the same question about 2005, Regency Drive.**

Page 237

A. Yes.

**Q. Any business entities that are registered there?**

A. No, sir.

**Q. Okay.**

**And that's your --- that's your home.**

**Right?  Primary residence?**

A. Yeah.  It was registered under ARC Realty's name initially and trying to get out of the MCA debt.  You may have seen that transfer.  Mr. Rush recommended that I put it in my name to be able to secure that home.  Secure a HELOC, I think it's called.  The HELOC got denied, and it's in my name.  So it was my home.  It is my home, excuse me.  It was rented.  But unfortunately, we lost our renters because they were getting a lot of mail.

**Q. Okay.  Gotcha.**

**So you moved --- you moved back in there at some point?**

A. No, Shannon moved in there.

Page 238

That was right around 20 --- beginning --- end of 2017, 2018. That was my family home for myself and my two kids before we met Shannon.

Q. Got it. When did you move there?

A. Oh, goodness. That was 2015, 2016, I believe. Are you okay? Would you ---?

---

(WHEREUPON, THERE WAS A BRIEF INTERRUPTION IN THE PROCEEDINGS.)

---

BY ATTORNEY READY:

Q. She moved in there, you said --- I'm sorry, 2017 or '18 after that?

A. Yes, sir.

Q. And then ---. Okay. Any business entities use it as their address.

A. There might be mail that goes there.

Q. Do you know of any?

A. I haven't looked at that mail

Page 239

for --- I haven't looked at that mail. You know, Shannon usually grabs the mail, and if there's something there, then, you know, I'm given it. I know there's --- the bank account was going there. I had to put on --- I was advised to put on my home address. My home address, Alan Redmond's. So that's what I listed, sir.

Q. Okay. Same question now for 1198 Reading Boulevard, Wyomissing, Pennsylvania.

A. That was a real family house. A lot of good memories in there. That was an ARC Realty property, and that was right around the time that, you know, Attorney Ready, we started to have some properties.

Q. Did any --- any business entities registered there?

A. When you say registered, sir, what do you mean register? I'm not trying to ---.

ATTORNEY CIARDI:

Page 240

I'm going to ask the question, and I just want you to answer it. He just wants to know if, you know, remember or otherwise, if any company was registered at that address.

THE WITNESS:
I don't know what that means.

ATTORNEY CIARDI:
That's it.

THE WITNESS:
I'm not being --- but you guys ---.

ATTORNEY CIARDI:
What you want to know; right?

ATTORNEY READY:
That's what I'm asking.

THE WITNESS:
But what I hear ---.

ATTORNEY CIARDI:
Answer the man's question.

Page 241

THE WITNESS:
I don't know what that means. Registered as if it's operating out of the house or registered as in the mail is going there? I'm not sure what you mean.

BY ATTORNEY READY:

Q. Let's say either one for starters.

A. There's probably --- there's been business mail that has went to any of the hours. It's not unusual.

Q. Have any --- let's start with this. Have any companies operated out of --- meaning ---?

A. Absolutely not.

Q. Okay.

A. Absolutely never. Highly illegal. No. Yeah, it's illegal to operate a 60-person call center or whatever. 1198. No, sir.

Q. Okay.

A. That would be crazy.

Page 242

Q. Okay.

Yeah. So no companies, you know are using that as their main address for business?

A. Again, there might be some companies that are using 1198 to receive mail. You know, if we go back to what I said about ---.

Q. Do you know of any?

A. I don't know of any.

Q. Okay.

Let's ask about 7901 Fourth Street North, Suite 300, St. Petersburg, Florida?

A. I'm not sure what that's ---.

Q. Are you familiar with that address?

A. St. Petersburg, Florida. I believe ABN was set up by Shannon on Priscilla as a Florida entity. So that might be a registered agent. It's probably a registered agent, but I can't clarify. I just know that's a fact.

Q. Do you recognize that address

Page 243

is the first question?

A. I just recognize Florida. The Florida ---

Q. Okay.

A. --- resonates with me and St. Petersburg resonates with me because of it was ABN's address, I think.

Q. Okay. All right.

Other than ABN, are you familiar with any business entities that would be using that address?

A. No, I'm not.

Q. Okay.

Can you identify any business entities using the 2 High Road Wyomissing address?

A. Yeah, I believe. Well, I have --- perhaps I can confirm this. The ABN bank statements go to 2 High Road. I've seen them in the kitchen. But that would be the scope of this, Attorney Ready.

Q. Okay.

A. Again, I don't really handle the mail.

Page 244

Q. I'm going to show you --- let me just gather all that real quick here.

A. Yeah, yeah.

Q. I'll put that back together.

A. I know this is an early request and I'm not trying to break your rhythm.

Do you mind if I go and call the kids for two minutes?

Q. Yeah, we can take a break.

A. Are you sure?

Q. Sure.

A. Thank you.

---

(WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

---

(Whereupon, Exhibit 2, 2020 Income Tax Return, was marked for identification.)

---

BY ATTORNEY READY:

Q. All right.

Page 245

I'm going to show you what we've marked as Redmond 2. This is your 2020 federal income tax return. I'm going to turn you to Schedule C and it's Bates at the bottom as debtor 2004-0264.

A. Uh-huh.

Q. Just let me know when you get there. Are you there?

A. You spoke really quick. Were you talking to me?

Q. Bottom right is 0264. Is that where you are?

A. Oh, excuse me. Yeah, got it. Yep, here we are.

Q. All right.

I'm going to just point you to line C on this. It says business name and it's blank.

A. Okay.

Q. Is there a reason that was left blank?

A. This is my personal tax return. Correct?

Q. Correct.

Page 246

A. I have no idea.

**Q. I'm going to assume, you tell me if I'm wrong, that probably Mr. Smith does your tax returns and shows them to you in you sign him. Is that what you said earlier?**

A. It'll be a hundred percent. He sends a DocuSign and that's it. I trust Malcolm. He's a good man. He's honest. I just click the button. I never come to things like this. I'm like, what did I make again in 2019, because I have no idea.

**Q. How much time do you generally spend looking at your tax return before you sign it?**

A. Like they get indicted on six tax charges. So, Attorney Ready, three minutes maybe. Honestly, three minutes or less, sir.

**Q. So --- fair enough. And I'll --- I can speed along some of these questions, but I just want to double check. So if I ask you specifics off of this tax return, I**

Page 247

**suppose you're going to tell me that I'd have to ask Mr. Smith, probably. Is that correct?**

A. I will do my best.

**Q. Okay.**

A. Yeah.

**Q. What was the source of the income that's reflected here on Schedule C?**

A. Oh, goodness. I'm allowed to look at this document. Correct?

ATTORNEY CIARDI:
So you're going to be right here.

THE WITNESS:
Uh-huh.

ATTORNEY CIARDI:
On this page.

THE WITNESS:
Sure. 2020.

ATTORNEY CIARDI:
So you're talking about the $2,000 on this page?

ATTORNEY READY:

Page 248

Yeah, that's right.

THE WITNESS:
I would imagine it came from --- see I'm guessing. I'm sorry, I just don't know this stuff, sir.

BY ATTORNEY READY:

**Q. If you don't know, you don't know.**

A. I really don't.

**Q. Okay, fair enough. I'm going to flip you then to page 268, again, on the bottom right.**

A. Sure.

**Q. Same document listed as Form 8995. I see here that you have. It says that you have trade or business names are asked to be listed here.**

A. Sure.

**Q. Looks like 2 and 3 are both Alan C. Redmond. So let me just ask. Do you use your name as a trade name?**

A. I don't think so.

**Q. Okay.**

Page 249

A. I don't believe so.

**Q. Do you know why it's listed on here twice?**

A. Sir, I honestly have no idea.

**Q. Okay. Do you have a separate EIN number for the trade name Alan C. Redmond?**

A. Not that I know of. No, sir.

**Q. Okay. And let me flip it just a little bit. I don't know if he's going to say this, but if I talked to Mr. Smith later and he said that you do have an EIN for one of those, would you have any reason to think that was incorrect?**

A. Mr. Smith would be 1,000 percent right.

**Q. Okay. You would defer to him if he said something differently?**

A. A thousand percent, sir.

**Q. Okay. That's helpful. All right.**

Page 250

Do you know if Shannon Kroemmelbein is using --- or I should say now Mrs. Redmond. Do you know if she's using her name as a trade name?

A. She's Mrs. Redmond. But yes. I don't know why it annoys me. I think it was because of the stand where you want that, you know. But anyway, I apologize. I know you're doing your job. It's fine. Fine.

Q. Whatever name she --- she has ever used, do you know if she's ever used as a trade name?

ATTORNEY CIARDI: Well, I'm going to object to the legal conclusion, but you can answer to the extent you can.

THE WITNESS: I don't believe so, sir.

BY ATTORNEY READY:

Q. Okay.

A. I didn't even know that existed. And I'm pretty sure she

Page 251

didn't know that existed as an option either.

Q. Fair enough. All right. I'll set that one aside then for now. I'm going to ask you about some people, some names I've seen ---.

A. I wish I could have been more helpful. Thank you.

Q. Sorry. I'm going to go through some names and I'll try to spell them for you. How long have you known Chris Kelly at NextGen Leads in San Diego.

A. Chris Kelly? Yeah, we were buying leads. I was, excuse me, for NBOA and Bene Markets probably for a good two, three to four years. But that relationship --- and then it got a little bit contentious. So that's when I sort of --- we can all be facetious when we're younger. Right?

Q. Okay.

A. I'm going to open a NextGen Leads in Pennsylvania to Mexico.

Page 252

That's literally what happened.

Q. Okay.

A. And you have it straight from me.

Q. How long have you known Mr. Kelly?

A. Chris --- I wouldn't say it's a personal relationship. I've probably spoken to Chris maybe 20 times in the last decade.

Q. Okay.

A. I believe he is the CEO of NuGen or NextGen.

Q. Okay. How long have you known Casey Gustus? That's G-U-S-T-U-S.

A. G-U-S-T-U-S. I don't ---

Q. Okay.

A. --- you know.

Q. And if ---.

A. Gustus, G-U-S-T-U-S.

Q. Gotcha. You don't know a Casey Gustus?

A. I honestly never heard that name before, sir.

Page 253

Q. Okay. How long have you known Mark Cipriani, C-I-P-R-I-A-N-I.

A. I know Mark Cipriani. I can see it in my --- I want to check my phone.

Q. If it helps, he works with Erie Insurance as well as ---. Oh, yes, Mark. Yes, yes. He and Shannon. That's a NAIL guy. One of the donors.

Q. For Friends of Hurst?

A. Yeah. Yes, sir.

Q. Okay. How long have you known him? You personally, or do you know him?

A. I don't really know him.

Q. Okay. All right. So tell me about --- do you know Jacob Williams in San Antonio, Texas?

A. I do not.

Q. Okay. Do you have any connection to the NextGen Leads in Kentucky?

A. No, sir.

64 (Pages 250 to 253)

Page 254

Q. How long have you known Wendy Furman, F-U-R-M-A-N?

A. It sounds familiar. I almost want to say it's illegal. There's a lot of people in the last 10, 12 years that are all Americans and they sort of morph together, to be honest with you, sir. But it sounds familiar. Can you give me a hint?

Q. That's okay. If you don't know, then ---.

A. I really ---.

Q. Okay. You don't --- you don't recognize that name at this point?

A. I recognize the name.

Q. You just can't tell me who she is?

A. I can't put --- yeah.

Q. Fair enough. All right. Who's your contact person for All Web Leads?

A. Sarah Odgers was my contact years ago.

Q. Can you spell that last name?

Page 255

A. O-D-G-E-R-S. Wonderful.

Q. Okay. Is that who you go to when you need more leads or need to make a purchase from them?

A. I really haven't not really spoke to Sarah. Before with Bene Market, Sarah and I would talk daily. Became good friends. But the last time she called me was about the bankruptcy, because obviously notices went. I haven't talked to her since. I maybe talked to her once. But her relationship is with Arthur Walsh. He's just for --- the guys who work for Seguro.

Q. When was the last time you talked to Sarah Odgers or corresponded with her in some form?

A. Briefly after she questioned me on the bankruptcy. What was happening. She wanted to report back to her owner, Bill Daniel.

Q. Okay.

A. He was concerned about me,

Page 256

because, you know, obviously I'd given him a lot of business through NBOA and Bene Market, so he wanted to make sure it was okay.

Q. I believe it was All Web Leads that withdrew their claim in this case. Do you know why?

A. Yeah. It's based on relationships, you know, honestly. I know your motion said insider trading, but I've been pretty good to people and I would never do that. I would never ask someone to do that. But you know, there's --- what you're going to find is people are going to withdraw their claims because I've always been as honest as I can. I would --- I'm assuming that All Web did that because, you know, spent $10 million in leads probably with NBOA and Bene Market and they became very good friends.

Q. Are you aware of anybody who made payments to All Web Leads?

A. Absolutely. Yes, sir.

Page 257

Q. To have the claim withdrawn?

A. You added something on there. That's not what happened, sir.

Q. Okay. No. Well, that's what I'm asking. Are you aware of someone who made payments to have the claim withdrawn?

A. Who made payments to have the claim ---?

ATTORNEY CIARDI: So you're asking for the time period in the bankruptcy?

ATTORNEY READY: Right.

ATTORNEY CIARDI: And specifically for the purpose of having the claim withdrawn?

THE WITNESS: Not for the purpose of that --- I can tell you why. Which you'll shutter before, but I can tell you why All Web why it was Shannon, Seguro was

65 (Pages 254 to 257)

Page 258

paying All Web, if that's okay. All Web is a vital part of the business. Like it's leads. So the Bene Market debt that I own, I believe is personally guaranteed. It is personally guaranteed. It behooves Shannon and Arthur to pay All Web Leads to ensure that they're --- I'm sorry. I'll move over here. They --- they wanted to maintain a good relationship. They --- Bill, Daniel and Sarah know that I'm consulting for Seguro and they --- they want to keep their leads going. I know it sounds illogical on maybe this side, but it's just the way people are. It's a game of leverage and interest. And All Web has said Shannon and Seguro in particular Arthur and Jesus, we

Page 259

don't care. You know, you need to make sure that Bene Market gets paid for us to keep leads on. That's --- that's what's happened, sir.

BY ATTORNEY READY:

**Q. So in short, Seguro paid that debt?**

A. Seguro or Shannon would have been paying most of that on behalf of me.

**Q. Okay.**

**Who's your contact person at Mid Penn Bank for your banking?**

A. There's a lot of changes going on over there the last number of years. They seem to be influx. The gentleman that I spoke to the most at Mid Penn was Matthew Assemes, A-S-S-E-M-E-S. I can give you an example. The check issue I think I brought up. You know, Shannon, I made a call and say get this check covered. And I would --- we have a really good

Page 260

relationship. I would call Matthew and say, hey, Shannon wants this check cut or whatever it is. She's up there on other stuff, so ---.

**Q. Okay.**

**So he would be the point of contact for all of your issues, basically, at Mid Penn, your first point of contact.**

**Is that right?**

A. Almost like the office monitor, the general guy, you know? You know what I mean? Like the --- I think he's the bank manager or the VP. There are a few other people, but Shannon deals a lot with them. Although I do talk to the bank when she asks me to. You know, maybe honestly once every two weeks, twice every two weeks, something like that.

**Q. Okay.**

**Has he been --- how long has he been your contact there?**

A. He's been Shannon's --- Shannon has a good relationship with him. I

Page 261

would say he's been Seguro's contact. I don't know what their hierarchy is, Attorney Ready. I think he was hired recently. In the last two years, maybe.

**Q. Did you have a different contact before him?**

A. I --- I did.

**Q. Who was that?**

A. I think it was Jan something. It was a nice lady over there, like another VP type. So that's who I was talking to, I think. Yeah, I was dealing with --- with Bene Market, I believe, or my personal account or whatever the case was.

**Q. Okay.**

**Who's Wayne Fisher?**

A. Wayne Fisher. So in 2015, to give you some context for the record, you know, going through a few things, I got a DUI and had my license suspended. Actually got two DUIs, to be perfectly honest. I can't lie, you know.

66 (Pages 258 to 261)

Page 262

By the time going through a divorce. So I had my license suspended and I needed to be able to get in. Unfortunately, the GSM was no longer there, so, you know, he was dealing with his own stuff. And yeah, I met Wayne, who was an Uber driver, lovely guy. He was also going through a divorce. And, you know, I started to use Wayne to take me to and from, for instance, Regency Drive, seven minutes down to Reading and back, you know, being a single good looking Irishman. Joking, joking. Don't put that on the record. But, you know, once a month, you know, I'd say to Wayne, hey, buddy, I'm freaking lonely. The kids are gone. I didn't have the kids bring me in for a drink or whatever when I was drinking.

**Q. What does he do with you now? Does he still work with you?**

A. Yes, he does. He does. Shannon has hired him, as usual.

Page 263

Stealing all my good ideas. But he brings the kids to school. Not every day, but some days. And to be perfectly frank, money's been very tight with this stuff and the legal fees with the FBI. So maybe once, twice a week. It's my prerogative to go and get the kids. But with Mr. Walsh's wife passing I've been in the Seguro office honestly, more. Yeah.

**Q. Who's Robert --- I'm going to spell it, Struchio, S-T-R-U-C-H-I-O?**

A. That is the infamous Robert Struchio I call him, but you probably ---.

ATTORNEY CIARDI: Struchio (corrects pronunciation).

ATTORNEY CIARDI: Struchio.

ATTORNEY READY: Struchio.

THE WITNESS: He's very Italian. That

Page 264

is Seni Sok's partner in one of his firms. I don't know if he's a partner in the HIC Group, but this is the gentleman who brought the HMA plan to us, so I haven't talked to him in a while. Yeah, he was ignoring Shannon's calls. You know, Shannon owns the business. He was ignoring Arthur's calls. You know, he wrote products that worked at one point and then they didn't.

BY ATTORNEY READY:

**Q. Who introduced you to Mr. Struchio?**

A. Seni Sok. They've been --- they've been childhood friends, from what I understand.

**Q. Okay. Do you have any direct dealings with Mr. Struchio other than what you've just described?**

A. Currently?

Page 265

**Q. Yeah.**

A. No, sir.

**Q. Okay.**

A. We ended n not bad terms, but it just felt like it was out of integrity. I don't think he was telling the truth.

**Q. When did you stop working with him?**

A. It would have been about two years. It would have been right around the time that the --- the FBI came out.

**Q. Okay.**

A. If you're responsible for the product, Mr. Ready, you're responsible for the product, that's --- that --- you brought the product. You said it worked like this. It worked like this for six months. You should be going and talking to the FBI. I mean, I don't make up products anyway. Yeah, that's what happens.

**Q. You said the HMA, is that what you called it?**

67 (Pages 262 to 265)

Page 266

A. HMA. It seems to be all one large conglomerate of commingled bullshit per the insurance business. But like shystier. Like real shysty. Not logical reasons to stay open. I'm talking about HMA is the TPA that pays the claims, sir. And the company is Providence, which is like the insurance carrier, but then they're not an insurance carrier. Real, real strange stuff.

Q. Who sold the product that Mr. Struchio sold to you? Was it --- was that Benefits Now? Was that ---?

A. That was a Seguro Medico product and was immediately ceased when claims stopped being paid.

Q. And that was roughly the same time you're talking about that you stopped dealing with him?

A. We actually --- I believe they --- myself --- we --- myself and Rob just, you know, like oil and water or whatever. Irish and Italian. You know, I always thought that he was

Page 267

full of shit. Not you, Al. You're wonderful. But he's very Italian. He's hard to handle, you know. Like it really was, being honest. I felt like he was selling me all the time. And then he started to sell my wife. And that's not going to happen. Yeah. And that's where I stepped in and said, leave her alone. This product sucks. Find a new product or we're going to have to get Shannon and Arthur something else. And Arthur went and got a new product. And the FBI came in.

Q. Okay. Okay. Who is just T Deleo, D-E-L-E-O?

A. That is one of --- that's one of Sok's disciples.

Q. Disciples?

A. Yeah. I went there, brother.

Q. Okay. What does that mean?

A. I find that the --- the insurance business is --- you don't

Page 268

want me to theorize on this. It's just a bunch of guys who couldn't make it a real business. They --- they have all their --- it's like an MLM, Mr. --- Attorney Ready.

Q. A multi-level marketing.

A. It's like a narcissistic friggin --- they'll drive you crazy where you can't get the truth out of anybody. So anyway, to your point, Justin, Rob, setting these people up. I'm using quotations here. You know what I mean? Like just real sales guys from Florida. That's the best way I can describe it, sir.

Q. So Mr. Deleo, what did he sell to you?

A. Well, he wouldn't have sold anything to me.

Q. Okay. What was your interaction with him about?

A. He at one point, I believe was doing customer service for Arthur and Shannon. At the time I trusted Mr.

Page 269

Sok, you know.

Q. So Mr. Deleo worked with Seguro Medico, is that what you're saying?

A. I believe so. That customer service stuff is over here, sir, and that wasn't my thing.

Q. So you didn't personally have any interactions with Mr. Deleo?

A. Oh, I did.

Q. You did?

A. Very marginal though. I would talk to Mr. Sok at one point daily.

Q. Okay.

A. You know. And Mr. Struchio --- Struchio?

ATTORNEY CIARDI: Struchio (corrects pronunciation).

THE WITNESS: Thank you, Albert. Maybe once a month. And then Justice --- Justin once in the last seven years, maybe, six years, maybe twice. Just --- I didn't know

Page 270

who he really was. I just knew he worked with Mr. Struchio and Seni.

BY ATTORNEY READY:

Q. Okay. I'm going to spell this. I-N-O-V-A. What is Inova Benefit Solutions?

A. That is a third-party administrator.

Q. Do you own it?

A. No, sir.

Q. Does Shannon own it?

A. No, sir.

Q. Okay. Who --- do you know --- it's just a big company you've contacted? Who is it, I guess is what I'm asking?

A. Yes, sir. The owner is a gentleman by the name of Don Kuhn, K-U-H-N. And I can't remember --- another Italian, lovely guy. I can't remember the guy's name. John something or other. I'm sure it's public information. I don't remember

Page 271

his name. Arthur needed a third party administrator to process claims, Attorney Ready, and Dan Kuhn goes all the way back to the Jason Jordan days, meaning, 2014. Don was a call center owner, you know, nice guy. And he had a third-party administrator, and I think it was used actually --- I have to correct myself, I think it was used by U.S. Trifecta and not Seguro. I think it was a U.S. Trifecta venture. Seni and I went and got that, you know, together. I think so. I'm almost positive. Sorry. But that's what I remember --- I can remember talking to Mr. Kuhn and Seni and eventually I had to terminate them because they were incompetent.

Q. Okay. What is Media Alpha?

A. Media Alpha is a lead company. Yeah.

Q. Okay.

A. Large lead company.

Page 272

Q. And did you use it --- have you used it? Is Seguro using it?

A. I never used it. I know what it is. I've seen their back office. Media Office. It's like a lead. It's an auction system, Attorney Ready. So insurance agencies will go online and bid on leads. Problem Media Alpha has is they just got hit about a year and a half ago by, I believe, the federal government and FTC. That's a big company. So there was a lot of noise. I can remember Mr. Barrera calling me at home. I'm sorry to bore you. I know this is lead insurance stuff, but I'm just trying to be thorough in my answer, sir. Yeah. So I know Seguro really was using Media Alpha. Maybe spending, I'm guessing 10,000 to 15,000. I can remember Shannon talking about it. Jesus talking about it. And then they just stopped sending leads.

Page 273

The next thing you know, the front page of the news, billion dollar lawsuit or fines or whatever it is, sir.

Q. Okay. I take it you weren't personally ever involved in Media Alpha?

A. I taught the Media Alpha.

Q. Okay.

A. Yeah. Again, I hate this word, because it doesn't mean anything, but it really was fluid. When I'm at Seguro --- if I walk into Seguro, I'll sit downstairs and then Arthur for instance, or Shannon for instance, would come to me and say, hey, literally startup type of vibe, you know, I'm not as organized as this place, you know, like startup thing going on. Hey, do you know any lead vendors? I got you. Let me research. He's like Chris Kelly guy, you know, I think. But I didn't find Media Alpha. They were recommended, I

69 (Pages 270 to 273)

Page 274

believe, to Mr. Barrera. So yeah, I've talked to them on the phone, you know, and helps guide a conversation about lead integration or --- and that wasn't uncommon.

You know, there's a lot of technical stuff that I don't want to bore you with, but API integration, you know, things of that nature. How to get the lead into the dialer, how to make sure the lead is compliant. You know, how to make sure the JIFA form comes up so you don't get an insurance complaint. I know that stuff now finally.

So you know, I would be part of them calls, but not the decision maker on where to spend.

Q. Okay.

Who is Heidi Kroemmelbein?

A. That's my sister-in-law.

Q. Shannon's sister, I take it?

A. Yes.

Q. Yeah, that makes sense.

A. Yeah. She's like her --- you

Page 275

scare me, Joel. I don't want to lie to you. She's Shannon's cousin, but they're sisters, if you know what I mean. You know, she --- she had issues when she was younger and ---

Q. Got it.

A. --- now they're sisters.

Q. Actual cousins, but like sisters per se.

A. They call each other sister.

Q. Sure. And she works at Seguro Medico.

Is that right?

A. She doesn't. She does a bit of cleaning. Shannon likes the place spotless.

Q. Okay.

A. I mean spotless.

Q. So she's paid to clean the offices at Seguro?

A. She's paid to clean the offices. Yes, sir. Cashapp or something like that.

Q. Okay.

Who is Seni Sok?

Page 276

A. Well, can you talk about Seni?

Q. Yeah.

A. You want my general framing?

Q. How did you first meet him? Let's start there.

A. Oh, I think it was around when Mr. Jordan was with us.

Q. 2014?

A. Yeah, 2014, 2015.

ATTORNEY READY:

Let me spell that for you. Sorry.

S-E-N-I S-O-K.

BY ATTORNEY READY:

Q. Okay.

So you've known him since 2014, you think?

A. Very early. 2014/2015.

Q. Okay.

A. Yes, sir.

Q. And he lives in Florida.

Is that right?

A. Yes, he does.

Q. Okay.

Do you still have business

Page 277

deals with Mr. Sok?

A. No, there's --- I think it was the federal investigation. That's just what I'm thinking about, you know, because I've been blamed for stuff, you know, and it's ---. You know, so I don't mean to be squirrely, but I'm just, you know.

Q. When did you stop having interactions with Mr. Sok?

A. So Mr. Sok is --- Mr. Sok is a good family man. But a lot of the --- a lot of the products that have been brought, a lot of the products that NBOA or Bene Markets or even GSN and I sold, you know, sold, but managed. All the wheels have fallen off them products.

Clarify, I don't mean to try to weave you. I'm just trying to be careful with ---.

Q. What do you mean that the wheels come off?

A. You know, you've got --- you know, six --- and you put a lot of

70 (Pages 274 to 277)

Page 278

effort in. You've set up compliance. You set up IBR systems, which is a voice recording that monitors the client's happiness. I put in AI for Seguro recently, right. You know, to really listen to the calls and do something with analysis. Really cool shit that --- Attorney Ready.

And then all of a sudden, you know, product just dozens clients start to call into customer service and claims aren't covered. That's the whole point of buying insurance, sir.

Like, you buy that for peace of mind. So God forbid, say, you and your beautiful --- one of your kids get sick. You want the product to work. And I find that --- I find that, you know, things didn't have longevity. The agency is always left cleaning up.

A. The agency always gets blamed because they sold the product.

**Q. When did you stop working with Seni Sok?**

Page 279

A. Oh, goodness. It would have been around the time, at the end of Bene Markets. And then Mr. Walsh and Shannon needed a product and, you know, I said, yeah, consider meeting with you and Walsh. And Walsh is a really sharp cookie. He started to bad eye the product. I said, I'm not getting involved in this.

I've had my issues with Mr. Sok. And he had a --- the HMA plan from Providence. And that's --- that went really well for Seguro. Shannon was making good money. It's really cool. She was happy. I was excited.

That went really well for probably about a year. And then went from five customer service calls again a day, Joel, to 500. And I'm like, oh, shit. Okay, let me --- let me go as the consultant and mitigate this. Start getting feedback. It's my job.

What are they complaining about? What in specific? What's happening? And yeah, it's fucking

Page 280

scumbags. Excuse my French. That's what it turned out to be.

**Q. When did Seguro Medico break its relationship with Sok?**

A. That would have been --- I think that was the end of 2022, maybe 2023.

**Q. Okay.**

A. I always believe in trying to repair a relationship, to be honest. That's probably the advice that I give Shannon. Even though I'm a little bit more towards the end of that. I'm 42 years old, you know, I haven't got time for that bullshit.

But yeah, Shannon was upset and the clients were upset and there was a lot of money that was refunded. Like millions of dollars, $70 million. Because what happens, Attorney Ready, is the agency gets paid. They're like 30 percent, let's say, commission, the other 70 percent goes to the carrier. Too much detail, but I want to get it on the record, if you don't mind.

Page 281

The other 70 percent goes towards Providence and HMA, sir. And if the client calls in and cancels, it's on the agency to press the refund button. The liability also --- Jason had problems with this. He always got blamed for things.

The agency guy always gets blamed. So the problem started to come down the hill on the agency. The agency doesn't want to get a DOI. Doesn't want to get in trouble. Doesn't want to have the federal government, the feds, the FBI show up. So the agency presses the refund button.

**Q. In this case, who is the agency?**

A. Seguro, in this instance, I'm sorry, if I ---.

**Q. Okay.**

A. The agency sets a --- a $5,000 a year policy. The agency is only responsible for 30 percent of that. Right? So they only have the sandbag,

71 (Pages 278 to 281)

Page 282

whatever that is. You know, 1,500 bucks. 1,600, 1,700 bucks.

The reason why Seguro started to feel is providence and HMA just disappears. They're gone and the feds are at our door. Seguro is my wife's door, like my door, you know. So that's why Seguro feels --- that's why Seguro is trying to rebuild, to be positive, you know.

The money went out and there was no one there to give the money back. The carrier is responsible for the other 70 percent. If they're not paying claims, where the fuck is the money going? And that's --- this is the insurance business, so ---.

But yeah, Seni Sok ---.

Q. So while you've told me what Seguro Medico has done with Seni Sok's. But I take it you personally haven't been in business with him since 2020.

A. No, that's not --- uh-uh, 2020. Right around Bene Market split. I

Page 283

think there was a brief period, the transition period there where we weren't talking between NBOA and Bene Market, there was a good cooling off period.

But you know, the product drops. You have to serve some --- I serve the clients. So I've done some business dealings with him.

Q. Part of any non-profits with Seni Sok?

A. I don't believe. No, I believe he has a non-profit, but I'm not an owner of that.

Q. You're not involved with his non-profit?

A. No, sir.

Q. Okay. Are you --- what --- what business entities do you own with Stephanie Miller?

A. Stephanie Miller and I owned Bene Market together.

Q. Said she was a four percent owner?

Page 284

A. Correct.

Q. When did that stop?

A. When did it stop?

Q. Did she --- did she at some point divest her four percent ownership?

A. I believe she did. There was a whole attorney thing going on. There was a law --- there was a lawsuit and I just --- I didn't want Stephanie to be involved because I was making the decision, sir, so ---.

Q. Did you buy back her shares?

A. I don't believe so. I think it was just a divestment or whatever.

Q. She gifted them to you or something?

A. I believe that happened, but that was my ---.

Q. When was that?

A. I would imagine that would have been, you know --- I kind of guess. I'm thinking 2021 or 2022. I apologize. A lot of dates.

Q. Was that a Department of Labor

Page 285

lawsuit? Is that what you're referring to?

A. Yes, there was a Department of Labor lawsuit brought over time.

Q. Are you part of any non-profits with her?

A. No. No.

Q. Okay. Do you have any business entities yourself, personally with Arthur Walsh?

A. With Arthur? No.

Q. Okay. How about any non-profits? Are you two part of anything together?

A. No, sir.

Q. Okay. You've mentioned U.S. Trifecta, LLC. Did you sell your interest to Seni or ---?

A. No.

Q. It just stopped operating?

A. Attorney Ready, it just wasn't working. We were on different pages.

Q. Okay.

72 (Pages 282 to 285)

Page 286

**Are you aware of any real estate that Shannon holds title to?**
A. I did see the one on, I think it's one of your discoveries. Shannon is a partner in ARC Realty and she owns 2 High Road. She bought herself.
**Q. Okay.**
**Anything else that you're aware of?**
A. I'm not. You've got the ARC properties and you've got 2 High Road. That's --- that's all I know about.
**Q. Do you and Shannon have a --- sorry, a prenuptial agreement?**
A. No, sir, never.
**Q. Do you have what's sometimes called a mid-nuptial agreement?**
A. What is that?
**Q. That's where you do essentially a prenup but in the middle of your marriage.**
A. You understand, I'm working on this. I'm trying not to get agitated. I feel like it's invasive, but no, sir, we --- that's just --- I don't

Page 287

even --- no.
**Q. Okay.**
A. We're together and we love each other respectfully.
**Q. Okay.**
**Can you tell me, are there any banks or depositories that you know of that Shannon uses other than Mid Penn?**
A. She --- I'm trying to think. I have used her card for gas before. I believe she has a wealth --- she's used my cards when I have it. That's what married couples do. I believe she has an account with Wells Fargo. I believe she has a personal account with Bank of America. I don't want to speculate any --- anything else --- I'm picturing her purse is what I'm trying to do. You know, I'm a visual person. Maybe she has BB&T. I'm not sure, but again, you'd be able to ask her that. She'll tell you.
**Q. So you don't know of any others other than those?**
A. No, sir.

Page 288

**Q. Okay.**
**How about for the last five years? Are you aware of any other bank accounts that she --- any other banks that she banked with?**
A. Let me back up. Thank you for the --- she did --- she did have a really good relationship with Wells Fargo. You know, she was taking distributions from her companies there. She was wrapping two grid. Unfortunately, that was closed down. We believe it was closed down because of the FBI investigation. I don't know if that happens. But like she had --- so she did have an account with Wells, she no longer does. Any other ones? I don't think so.
**Q. I think you said earlier you don't know how to file an EIN application.**
**Is that correct?**
A. You can work it out in five minutes. I just never --- I never have.

Page 289

**Q. Sure.**
A. Sometimes I feel stupid and I defend myself. That's the story of my life.
**Q. Yeah. Let me just rephrase it.**
A. I don't mean to ---.
**Q. To the best of your knowledge, you have personally never gone online and done the EIN application?**
A. Maybe one time in 20 years. Maybe give it a --- maybe the Redmond Group, sir. You know, well, I'd tell you, probably the Redmond Group.
**Q. Okay.**
**And that was in 2010 or something like that?**
A. Yeah, maybe something through the LLC. Get LLC today, you know, and a quick --- you know. You're talking about a ten-minute moment that might have --- I don't know, you know.
**Q. Who would be authorized to fill out an EIN for you? Malcolm Smith?**
ATTORNEY CIARDI:
Objection. Calls for

73 (Pages 286 to 289)

Page 290

legal conclusion. It's not really specific as to him or an entity, but you can answer if you know and maybe you want to rephrase it, Joel.

ATTORNEY READY:
Sure, I'll start there.
BY ATTORNEY READY:
**Q. Is there anybody that you've authorized to file EINs for you?**
A. Malcolm Smith would not be authorized. He's an accountant. I don't even know if accountants can. I would never ask him. You know, he's an accountant. I wouldn't ask him for that stuff. Little stuff. Attorneys, yeah.
**Q. Okay.**
A. Absolutely, attorneys.
**Q. Anyone other than your attorneys that you've ever asked to --- or given a standing permission to file EINs for you?**
A. Maybe, you know, it's a hard one. Attorney Ready, again, I'm not

Page 291

trying to sidestep you. It's probably, what, a 15 to 20-minute process? I'm guessing, in the haste of battle, on a Thursday with leads coming in, anything, you know, like maybe I just can't remember something so, in my head, trivial, honestly.
**Q. So if I understand you correctly, you're saying it's possible, but you don't remember who?**
A. Yeah, I really don't, sir.
**Q. Okay. What service providers have you used to create business entities or sign up for registered agents?**
A. Are you talking about the Harvard --- them?
**Q. So first I'm asking --- I don't know if you used LegalZoom or have you used Rocket Lawyer or have you used --- what service providers have you asked to set up entities for you?**
A. Yeah, I probably use --- I remember using LegalZoom back 15 years ago, sir. You know, probably for the

Page 292

Redmond group or an LLC. I really never set up LLCs or registered agents. You know, again, at the sounds of being conceited, that's for someone that makes 250 bucks an hour. I'm not doing that shit and messing it up, which I probably would. And it's mundane, so I'm not an LLC guy, you know.
**Q. Okay. I'm going to give you what we will mark as ---.**
ATTORNEY READY:
We're on Redmond 3; right?
COURT REPORTER:
Yes.
ATTORNEY READY:
I'm going to go out of order. I'm sorry. We're going to do this as Redmond 4.
---
(Whereupon, Exhibit 4, Mid Penn Bank

Page 293

Transactions, was marked for identification.)
---
COURT REPORTER:
Okay.
---
(WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
---
BY ATTORNEY READY:
**Q. And I will draw your attention to October the 10th, which unfortunately this is not numbered. So it's about four pages in, I believe.**
A. Okay.
**Q. And you're going to see a number of transactions here on October 10th to All Web Leads.**
**Q. Yes.**
A. A lot of transactions. Yes.
**Q. Okay. You see those?**
A. This is the Seguro account. My account. Okay.

Page 294

Q. So this account is in your name.

A. Yes.

Q. Looks like there's a number of payments to All Web Leads.

A. Uh-huh.

ATTORNEY CIARDI: You have to answer yes or no.

THE WITNESS: Yes. Excuse me. Sorry.

ATTORNEY READY: Thanks.

BY ATTORNEY READY:

Q. I'll represent to you, it looks like the total for October the 10th was $20,900 that was paid out that day from your account. You're welcome to take a minute and do the math if you'd like, but ---.

A. It's fine.

Q. So as a rough number.

A. A lot of withdrawals for lead companies, yes.

Q. Yeah. Why were you paying for

Page 295

those leads out of your account?

A. Well, we go back contextually? You can put it in context again.

ATTORNEY CIARDI: I don't see $20,000 on October 10th.

ATTORNEY READY: So I'm just saying if you add all these up.

ATTORNEY CIARDI: Oh, so for the entire month?

ATTORNEY READY: No, no. For October 10th. So you'll look, there's --- just that if you look, there's --- sorry, back on page four you'll see it's recur payment, for example, 10/06, Texas.

ATTORNEY CIARDI: Okay. Now, I see it in the middle of the page.

ATTORNEY READY:

Page 296

Just tons of leads there.

BY ATTORNEY READY:

Q. And again, my rough number was $20,900.

A. That's fine. Yeah, yeah.

Q. So ---.

A. Smart Financial's a lead company as well.

Q. Smart Financial.

A. It is. It is.

Q. Oh, and they're in here also?

A. Yes. Yes.

Q. Okay. So why were you paying for leads to those two companies personally?

A. You've been waiting for this. So it's contextually. Do you have the statement for Seguro for that day? I'm not trying to get in an argument because you'll win. You're an attorney and a good one.

Q. You can just explain whatever you want to explain. Go ahead.

Page 297

A. As I said earlier, Mid Penn --- and I know this from dealing with them. Mid Penn has limits on their cards. Mid Penn --- that's one reason. So Shannon and Artie --- what date is this? So 2023, right after my birthday. So more Artie, you know, in and out. He uses Barrera. Another Seguro employee. The call would be made to Shannon the card isn't working. It's not working. We're out of marketing. All right. That would be one of the reasons why I'm on the accounts, okay, on the Seguro accounts. I'll pick up the phone for Shannon or Arthur would pick up the phone. Obviously he's on the account, the officer of Segura or Jesus Barrera, or whoever. I met him, I'd say --- I don't know, Joel, Matt today or whatever. This is going to take five hours. There's a system. Whatever it is,

75 (Pages 294 to 297)

Page 298

there's a million different things that go on. And as husband and wife I would say use my card. That's it, dudes. Use my card. Put it on my card.

I have a Mid Penn card. Put it on mine. The sales guys are trying to hit numbers. The verification guards are trying to get verifications. Use my card. So contextually, sir --- if you don't mind me finishing because this is important to me.

Q. Go ahead. Sure.

A. Contextually, I think I know where you're going with this, but this is just a regular course of business.

In retrospect, if they had been --- and I'm not blowing smoke up your ass. If I had to be sitting --- if I had known I was sitting in front of you, sir, sharp attorney knows what he's doing, smart dudes, like very smart, there wouldn't be this perception of commingling. That's obviously what you're trying to show.

Page 299

This is a regular course of business. This is me trying to help my wife and Arthur fund their leads. That --- that's it. That's it.

And also, I've got to say, Mr. Ready, if we do put it in context, I'm guaranteeing you that if we pull up Seguro's statement for this period, sir, there's no lead spans.

So when you subpoena --- I looked at some of your records last night. The bank accounts, the transfers to show that I own Seguro, which you're not going to win on by the way because it's not true.

You're going to find that when you contextually look at a startup business trying to get in this PS5 on its feet after --- in 2023, a year after the Feds hit us. Of course I'm going to use my card. The origin of source I'm guessing is probably Seguro. You have to look at the whole picture, sir. You have to look at what was on my tax return. I haven't

Page 300

made millions of dollars in the last two years. You know I haven't. So this is flimsy and you need to look at it. You have to hear me. You have to look at it contextually. Why did this happen? What was I trying to achieve and was I being devious? No, I was trying to serve people.

I was trying to help my wife out and I was trying to help Arthur. I was prepared for that. I hope I didn't come off too strong, but it looks bad. Just increase the sentencing, go from the mid-sentence and look at the whole paragraph and it's a different story.

Q. Do you know how much you transferred to All Web Leads in 2023?

A. Who transferred?

Q. You.

A. Me?

Q. Alan Redmond.

A. From where?

Q. From Alan Redmond.

Page 301

A. How much money that I would have sent to All Web? I have no idea, Mr. Ready.

Q. Do you think it was more than $300,000?

A. I would imagine. As I said to you previously, sir, I think it was explicit on this. All Web Leads is in the bankruptcy, as we know. Right. They're a creditor, as we know. You are alluding to, I think it's called insider trading or trying to get the creditor --- I'm not sure what it's called. Maybe ---.

Q. Let me --- let me stop you for a second.

ATTORNEY CIARDI:

Hold on. Just answer his question.

THE WITNESS:

No, I've been waiting for this. Because this is what this whole story is and it's inaccurate, Albert. So I'm going to talk now. You can ---

76 (Pages 298 to 301)

Page 302

you know.
BY ATTORNEY READY:
**Q. Would you agree it was more than $300,000 in 2023?**
A. I don't want to guess, but I know money was sent from my bank accounts to All Web Leads. Absolutely.
**Q. And what did you do to document those transactions with Seguro, with Shannon, with Artie? Did you have an agreement that they were going to pay it back?**
A. Sure. Absolutely. I think it was bringing --- it's all back to Mr. Smith, Mr. Ready.
**Q. Who's Mr. Smith?**
A. I'm sorry. Malcolm Smith, the accountant. Was the accountant for Seguro. I'm not sure how he would have classified that, okay? He could have classified it as a loan, okay? That --- that could have happened. I just don't know this.
All I know is when you're

Page 303

standing in the office and leads shut down and there's 60 of Shannon's kids, waiting for leads to come in. You know, the work, and she's nervous and Arthur's nervous and the card's maxed out. Throw it in there.
But back to your point about All Web. I said previously, unfortunately, Seguro was between a rock and a hard place. They had to pay All Web to be able to access the or --- I had to pay however you want to slice and dice it. Loan money from Seguro, have Shannon pay it on my behalf. That had to be done or there was no leads coming in. It was not nefarious. It was a conscious decision between Arthur and Shannon to pay that All Web debt. That's just what happens here.
**Q. Well, and you, right?**
A. Pardon?
**Q. It's a conscious decision between them and you to pay those debts.**

Page 304

A. No, it would be --- it's their money. It's a conscious decision for them.
**Q. One, so I'm talking about these in 2023. You're the one who sent this money.**
A. Well, this money here, the 500s?
**Q. Correct. The 20,000 just on this one day.**
A. But can I clarify something?
**Q. Sure.**
A. These amounts are not payments towards the debt.
**Q. No, no, I understand that. What I'm asking is --- so you paid --- again, by my count, $325,000 or so to All Web Leads in 2023. And I'm asking --- so you agreed with Shannon, with Arthur, Artie, you agreed to pay this for them for Seguro; right? That's first question.**
A. I agreed to pay a portion --- no, I didn't agree to pay for Seguro. Seguro wanted to keep. It's not ---

Page 305

dude, I'm not that smart, as you're finding out. These are not paid payments towards that debt.
**Q. I'm not asking about any debt. Just let me be clear.**
A. I'm just looking at what I have, sir.
**Q. So you paid these. I understand from your testimony just a moment ago that these payments that we're looking at from October 10, 2023, just as one example, ---**
A. Sure. Sure.
**Q. --- were made to keep the leads flowing at Seguro Medico.**
A. Absolutely.
**Q. And I'm asking you, what agreement, if any, did you have with Shannon and with Arthur about how they were going to pay you back or not for this money?**
A. Pay who back?
**Q. You.**
ATTORNEY CIARDI:
No, no, no.

77 (Pages 302 to 305)

Page 306

THE WITNESS:
That's not my money. That's Seguro's money. I'm not paying them back. You understand?

Joel, again, I'm not being facetious. The money is being transferred into my personal account, and the money is immediately going out, right, to OLIP or Smart Financial. I'm not paying --- they're not paying me back. They're just using my card because it hasn't hit a $6,000, $5,000, $6,000 limit just to ensure that the employees are getting leads and actually working instead of sitting there making $25 an hour.

BY ATTORNEY READY:

**Q. So you're saying that if we go back far enough, then, we're going to find that all of this money was already reimbursed to your account by**

Page 307

**Seguro Medico?**

ATTORNEY CIARDI:
If you look at the 10/6/23 entry, there's $103,000 entering his account from account 8170. And so there's $204,000 coming in to his account, which, I mean, that's what I could figure out. So, yes, they actually add up. And the money's coming in from whoever owns 8170.

THE WITNESS:
That's Seguro's account.

ATTORNEY CIARDI:
Then money comes in from Seguro and it is paid out.

BY ATTORNEY READY:

**Q. Is that your testimony?**
A. Yes, sir.

**Q. Okay.**
**That the money comes in from Seguro, that you're paying it out to All Web Leads, and that money is --- is --- you're being reimbursed, or**

Page 308

**pre-imbursed perhaps, for these payments?**
A. No, it's not a reimbursement, Mr. Ready. It's not a reimbursement. There's no --- the money is going into --- I understand it says my name; right, and that's fine. Dan Athill. The money comes in and is used by Seguro. My card is being used by Seguro. What am I going to do with $20,000 of leads? Take all them calls myself? That's a thousand calls, sir. That's a thousand call, probably more.

They're using my card. That's it. There's no --- I better stop trying to figure out what you're thinking. I apologize, sir.

**Q. Using your ---.**

ATTORNEY CIARDI:
I just want you to answer his question.

BY ATTORNEY READY:

**Q. They're using your personal credit card ---**

Page 309

A. Debit card. Sorry.

**Q. --- debit card to pay for the leads. I understand. Because you were saying, because there's a card limit that Seguro has, okay?**
A. A hundred percent.

**Q. And then I'm asking you if you're saying that if we go through these fees and compare it to what money is coming in from Seguro, that Seguro paid every dollar of these leads?**
A. Seguro was purchasing leads using my card. This is 2023. I didn't make a lot of money in 2023. I don't know what I made. You can probably check.

But this is not per your --- I think it's whatever. It's not me milking a company. It's me align them, which you're alluding to in your earlier discovery shit. It's me --- Shannon going, I need a card to keep my employees fed. That's what entrepreneurial --- that's what we do.

Page 310

That's what happens.  We need to keep the employees fed.

You're not going to find that nefarious stuff.  It's just not in me.  That is not me trying to pull a quick one.  I'm not that smart.  I want to build a computer system.  It just doesn't exist.

Q. So maybe this question.  I'm less interested in who's ---.

A. I know I'm getting defensive.  I apologize.

Q. I understand.  You know, I'm less interested in whose account it's flowing through.  I'm just asking whose money ultimately paid for these leads.  You're saying Seguro Medico.

A. Well, can we --- I can go through that.  Okay?

Q. Sure.

A. So it says here, transfer from Cash Management checking 8170.  In your discovery request, 817 was not my account.  You said it was.  It's Seguro Medico's account, sir.  It's

Page 311

not my account.  It's Seguro's account.

I didn't even have access to that account at one point because they didn't want me touching payroll because I got indicted on payroll tax charges.  I didn't touch that account.

Q. So again, just to be clear ---.

A. Yes, I know, I'm getting hyped up, but let me relax.  I'm sorry.

Q. The question is, you're telling me ---

A. Yes, sir.

Q. --- that the money that comes from, I guess 8170 from Seguro is what pays for all of these leads ultimately?

A. There's two or three.  I want to be particular.  I'm not dancing around your question.  The 8170 on the other account in Seguro, I don't know if it's still there, is 6145.  And there was another account.  And then right below that account, sir, is ARC Realty.

Page 312

It's how the Mid Penn Commercial Center works.  And right above that account is my account.  I don't even remember I lost the account with six --- whatever it was.

Q. And you'd say all of those are --- when you log in.  All of those are there on the screen is what you're saying?

A. I would log in when they wanted me to log in.  The guy who was logging in was --- well, Walsh attempted to log in.  God bless him.  Get that in the record.  He's not the most computer literate guy.  Shannon would login.  Jesus Barrera would log in ---.

Q. Let me pause you for a second, though.

A. Sure.

Q. So you just talked about how your account and ARC Realty account and Segura account would all be on the screen.

A. Correct.  A hundred percent.

Page 313

Q. So my question is, that was when you logged in through your own login?

A. A hundred percent, yes.  Because --- because I didn't know I was an authorized signer until I find out I was an authorized signer through your discovery.  She put me on as an authorized signer.

Now, I'm not blaming her, but I put her on as an authorized signer in a bank as well.  That's what married couples --- I know I'm getting ahead of myself, but that's where you're going next.  But that's what married couples do.

Q. You didn't know that you were an authorized signer on Seguro Medico's account until you learned about it in this bankruptcy?

A. I knew that I was able to log in, but authorized signer, like I was a signer.  I probably signed a piece of paper and I was doing what I was told.  Transfer this money to this

79 (Pages 310 to 313)

Page 314

money.

It gets very technical when you've got an attorney, you know, grilling you and, oh, shit, I shouldn't have been an authorized signer. It's not my business. And you start thinking all these things. That's --- that's not my ---.

Q. I'm not --- I'm not really casting judgment. I'm just asking. You didn't know that you were an authorized signer until this bankruptcy.

Is that your testimony?

A. Yeah, I --- I didn't know that I had signed a piece of paper or whatever to give me access. Again, Mr. Ready, that happens in --- that happens at 9:01 a.m. on a Tuesday. Sign this paper. Okay. What's this for? It gets you a login and password. Okay.

Q. So same question for Smart Financial, which you referenced earlier. You're going to tell me it's

Page 315

the same process; right? That he was being paid by your card and then Seguro was paying you either back or prepaying it for you into your account so you could do that?

A. No. No, you're frustrating me. And I'm not getting mad at you. I feel like I'm not explaining things correctly to you, but I feel like I am.

The money here, sir, is $103,000 that is coming in from Seguro Medical. That's Seguro Medical's money.

Q. Okay.

A. They're transferring that money into my bank account. And then the expenses. Okay. Are being used by Seguro, for example. And I didn't count it up. I trust you. On 10/10, I think you said $20,000 of leads were spent. What am I missing? Am I communicating? I don't want to waste your time, but ---.

Q. So let me just be clear.

Page 316

A. Yes, sir.

Q. You're saying that if I trace this $103,000 from October 6th as one example.

A. Yeah.

Q. That I'm going to be able to find either before or after this transfer, $103,000 of purchases of leads?

A. Yeah, approximately. You know, I can see in here. So Shannon loved to buy the employees lunch. She would use my card for that. She just wants to give the employees sushi on a Friday.

There's a --- let's see here. There's a direct PayPal, which is the opposite kind. I believe it might actually be the home as well. I've got to be honest, for Internet. There's two more $10,000 transfers in there, Mr. Ready. That is on 10/12.

But if you look at what it was spent on, All Web Leads. Twilio is a lead company. All Web, All Web, All

Page 317

Web. Smart Financial. That's what it was. That's where it was going.

And to answer your question. $103,000 for $103,000, I don't know. Just look at the tax return. You know, like, what did I make that year? And that's what Malcolm --- that's what I got paid from Seguro.

Q. How did you keep track of this for Malcolm?

A. Me?

Q. Yeah. How did you track these expenses? Like, when he goes to your bank account, did you give him a ledger? Does he comb through your bank accounts and trace all this for this stuff?

A. He yells at Shannon and I every year because we're co-mingling accounts. That's what he calls it. This could be a problem in front of a good attorney because he's going to use this. And I'm like, I don't care. The truth is the truth. $10,000 comes in, and there's $10,000 of leads for

80 (Pages 314 to 317)

Page 318

our employees.

**Q. I guess what I'm asking is, how does he trace that in reporting your income? Do you keep a ledger to tell him ---?**

A. He would do that.

**Q. Okay.**

**You just handed the bank records, and he traces and figures it out.**

A. I don't even know how to access. I don't even go near bank records. That's --- he just --- he just pulled out the bank statements off for me.

Now, there was a transition from myself to Shannon, you know, to Shannon's not me making or --- there she was making a lot of money, you know. I think you preferred to deal with her anyway. Sorry.

ATTORNEY CIARDI:

I just want to be clear.

ATTORNEY READY:

Yeah, please.

Page 319

ATTORNEY CIARDI:

I looked at this statement.

THE WITNESS:

I mean, I got hyped up there.

ATTORNEY CIARDI:

Credit in is either from 8170 or 6145 ---

ATTORNEY READY:

Yes.

ATTORNEY CIARDI:

--- for the entire month. So all of the --- the money in is $228,000 is all from Seguro or it's from that --- those two accounts, which you said are Seguro.

The money out is 235 and the net is 25. So just doing very rough math, which a lawyer should never do. 228 came in, and 228 came out.

BY ATTORNEY READY:

**Q. Is that your testimony that the**

Page 320

**money that comes in from Seguro went out to Seguro bills?**

A. Basically, yes, sir. The Seguro bills --- okay, let me be very specific. Have I used my card? You know, I want to, you know, get this. If I've used my card where Shannon went --- run out and get sushi. Yeah. Hey, babe, I'm buying a packet of cigarettes. I'm trying to quit smoking. Of course I bought a pack of cigarettes.

But this is what I love about Malcolm Smith, okay? He will report that on my tax return. I've argued with him about this. Not to be a shyster. I'm like, why can't I write this off? You've had them conversations, I'm guessing, with your --- is this like meals and entertainment? Nope.

When I was a kid, you know, 31. I'm like, why can't I write all this shit off, dude? Isn't that the way America works? He will report every

Page 321

last cent.

I think I can check, but I think --- I don't want to guess. I thought it was like $93,000 in 2023 and $178,000 in 2020. Not including rental income. And Mr. Ready to the cent, he's never going to put something in the wrong category.

**Q. All right.**

**I'm going to show you what we will mark as. I guess it's Redmond 5.**

---

**(Whereupon, Exhibit 5, Consultation Agreement, was marked for identification.)**

---

THE WITNESS:

Do you need this back?

ATTORNEY READY:

Yeah.

THE WITNESS:

Thank you.

BY ATTORNEY READY:

**Q. So do you recognize this**

81 (Pages 318 to 321)

Page 322

document?

A. Yes. This is the consultation agreement.

Q. Okay.

A. Who drafted this? I think Arthur and I drafted this together.

Q. Okay.

A. Oh, I'm sorry. I did very much. They came up. Oh, that's fine. Thanks.

Q. Where were you physically located when you signed this document?

A. I'm not sure. This was 2020. I'm not sure, sir.

Q. Okay.

Do you recall if you and Arthur were in the same room? I can direct you to the last page of this document.

A. Yes, we were.

Q. You were both in the same room and signed it together.

Is that right?

A. Yes, sir.

Q. Okay.

And where was that?

Page 323

A. In 2020 I'm not --- I'm honestly not sure.

Q. Do you remember if you were at an office? Were you at your house? Do you recall?

A. It could have been either. Not to be slippery, but we got into a routine of --- as I was getting out of the business, so to speak, we got into a routine of meeting on a Saturday with Shannon to discuss plans, future plans, and, you know, a bit of excitement. So it could have been, you know, and wherever, you know. I don't know if we were in High Road, then. We weren't. That was 2022.

We were there in Regency, I'm guessing. Well, if I know what the third day of January is, I can probably tell you whether it was Monday to Friday we would have been in an office or if it was the weekend at his house or ---.

Q. Is this your only contract with Seguro Medico?

Page 324

A. I thought I had another superseding contract that I shared with --- that I couldn't find it. And I didn't want to bother Mr. Walsh. This is when you wanted all the discovery. I told the attorneys I couldn't find it. So I think there's a superseding contract.

Q. Okay.

And when would that have been signed, roughly?

A. I'm not sure. I know there was a change in how I was being paid. Seguro couldn't afford to pay me. Profitability is really what it came down to, and they could barely afford to pay me that. So I know there was a shift there, which made sense to take the pressure off. Not so much Shannon, but Arthur. Shannon was, you know, doing her school thing and doing Friday, Saturday, Sunday. You know, she wasn't actively involved. As I said, she needed a break.

So I recommended, to be honest,

Page 325

that it wasn't based on profitability and that it was a flat $8,000 a month. I can't remember when that was.

Q. Are there any amendments to this contract other than that superseding contract you refer to?

A. Was there a previous contract before this? Is that your question?

Q. No, no. I mean, after this was signed. Was there ever an amendment or addendum signed? Sometimes contracts get added.

A. To this one?

Q. Correct.

A. I don't believe so.

Q. Okay.

And were there any contracts before this one with Seguro?

A. There might have been a draft, but not being executed.

Q. Okay.

I'm going to ask you to look at paragraph one. Engagement of consultants.

A. Sure.

Page 326

Q. If you can just briefly read to yourself those bold headings? You can read silently.

A. Sure, sure. Yes.

Q. Is that an accurate description of your work as Seguro?

A. Sort of.

Q. Sort of?

A. I'm being honest. Yeah, sort of. You know, it's ---.

Q. Yeah. What do you do that's not on this list?

A. I probably wouldn't say that it's the Shannon and Arthur, but, you know, I give them a lot of advice about their staff. I know they come to me for a lot of 9-1-1 troubleshooting things. And I like to say at times, like, I'm great with people. I'm not always great with people, Mr. Ready, but, you know, it says HR management there, but there's a whole other subsection of culture

Page 327

there that I really enjoy, you know, trying to bring a team together, you know, with my sporty buds. There's a lot of that stuff that goes on, which can be pretty tedious. I like keeping people happy, but happy and comfortable. So I spend much of my day --- can I give you an example?

Q. Sure.

A. I believe it's still your client, if you don't mind me saying. Ethan came into the interview with Mr. Walsh. Mr. Walsh was on a recruiting spree, and I sat and met with 35, 40 interviewees that day. They also provided Ethan with guidance. And Ethan was really looking for --- he's a lovely --- he's a nice guy, but he was looking for a lot of guidance. And Arthur had asked me, you know, to email him. And that's what I did. Not over the top mentorship, but I thought Ethan was a young guy who wanted to be successful. And

Page 328

that's what Arthur had me do, you know. So there's more --- more of that stuff than anything else, to be honest.

ATTORNEY CIARDI: Joel, I think I'm missing my signature page.

ATTORNEY READY: Oh, yeah. Sorry about that.

BY ATTORNEY READY:

Q. All right. All right. Anybody else that is not on this list of bold items that you would say is a regular part of your job?

A. I just said I've helped with cash flow managing that when they need managed. When it needs managed.

Q. What do you do to help with cash flow?

A. They can use my card. Okay. So we'll be not very technical.

Q. But, you know, are there other ways in which you're involved with helping with cash flow?

Page 329

A. I would say there's --- there's been times --- excuse me? There's been times where I've run cash flow for weeks, you know, like two weeks I hate it. Cash --- I just don't like. I don't like money, you know, so ---.

Q. What does that mean, that you ran cash flow for weeks?

A. I'll give you an example. So I would see where the balance is. For instance, I would build a daily proforma on one of the Seguro servers. I would create, you know, algorithms on return of investment on lead categories. I would, you know, create formulas on the efficiency and the efficacy rates of how leads are performing. I would look at which agents are, you know, successful with, for instance, 37 year olds like yourself, 34 year old like your --- 29 year old like yourself. Who would convert that the most. There's a lot of statistical analysis on how to

83 (Pages 326 to 329)

Page 330

maximize a resource. And the two biggest functions in an insurance agency, again to bore you, is payroll and leads.

So I would always remind Shannon and Arthur of that. Like you have to be maximizing these two things at once. It's really difficult to do that because there's a thousand moving parts in each subcategory.

So you know, the engagement of consultation is --- I can't give you a percentage. We thought about this contract. He thought about it and Shannon thought about it for an hour. And it was more like this. What do you want to do and what do you not want to do before you lose another 20 pounds? I'm like, I want to do tech shit. Excuse me. I want to do technical stuff. I want to build the CRM system. Leave me alone.

Q. In what way does Seguro Medico run differently than Bene Market ran?

A. I would say that Bene Market

Page 331

was like a knockoff brand of Coke, Coca Cola out of Walmart. And when you get surrounded by really talented people who are more talented than you --- I'm sure, you know, some people that are very talented.

So if you're not, you bring in --- I think he's a dual MBA, Arthur and you know, Shannon recruits really like Gaia Gebbia, I think her name is Gaia. Dude, Shannon must have plucked her out of Disney like, you know, like ---. So what's the difference? It's this bullshit Coke to like the real Coke. It's just more effective and efficient and, you know, slightly autistic dudes like me are going to be able to sit in the back and play with leads and shit, you know.

Q. What --- what are the things that are upgraded?

A. Oh, as the company, the verification processes. I can get specific if you want.

Q. Sure. Go ahead.

Page 332

A. So when I'm able to focus on this stuff, sir, like the technology, and I can do that 40 hours a week, 60 hours a week, because I enjoy it. Example, the E signature process was always problematic. At the end of the call, an insurance sales call, the E signature is done. If the client complains against the agents, the agent was able to hold up as well. He signed the E Signature, but the Department of Insurance knows no one reads the E signature and salespeople are salespeople.

So in that short span of time when Arthur and Shannon were building the business and doing all their fancy shit, other SOPs, I was able to sit and build a system that not only gets the E signature, but watches the keystrokes on the other client's computer consensually so that it can show how fast the client has read the E signature. Because you know you're doing this on your lunch break, you're

Page 333

busy, you're going to court. And if they don't do it or read it, then the insurance policy is not submitted. That was the first part of compliance.

And the second part is if you can picture like a wire, it's called --- it's like a string from ear to ear, you know, you and I talking. That's like an IVR, right. The IVR ---.

Q. What is IVR?

A. Visual recording. Interactive visual recording. So it's a three-pronged process with being perfectly compliant, especially against scumbags who give you shitty products. First one is E signature. The second one is E signature speed they call it. That's the slang, you know, are they actually reading it or not? And the third one is I was able to mirror the E signature with the IVR.

So the IVR is the E signature read to the client, not sped up like a pharmaceutical commercial, because

84 (Pages 330 to 333)

Page 334

that's bullshit.  Like --- that's like people get screwed over.  So that 15 to 20 question IVR was a third layer of protection.  And they didn't have any complaints for a year and a half.  We were killing it and then the product blew up.  So it sort of turned into a resume of mine.  That's the type of shit that I like to do.

Q. What other differences are there ---?

A. Sorry to keep saying shit.

Q. What other differences are there between Seguro Medico and the way Bene Market ran?

A. We can talk about products.

Q. Sure.

A. Okay.

So different products in regards to where we got the products as well.  And I hope you don't mind me saying, we?  I'm not saying I own Seguro.  We were a team.  So the Bene Market products were always --- I would say flesh in the pond, some

Page 335

purpose.  But they were always like short term medical policies and hospital indemnity policies.  Meaning there were a little bit watered done.

Not to go out of the way to hurt the client.  But I don't think in mind like you would buy a hospital indemnity plan.  Maybe a 22 year old kid would.  So the product upgrades, I would say Bene Market was a C plus, B minus.  Turning a lot of clients away, because damn clients can't get enough.  It's not right to put them in that policy.  They won't go through the IVR, right.

In Seguro, we had --- we were able to cultivate, you know, some really good products.  Like stuff stays forever, doesn't have rate increases.  So it's a --- it's a tricky question.  You know, it sounds like I'm telling you all these little things, but these are massive things.

Bene Market, I believe ended up $35 million in debt, Mr. Ready.

Page 336

Probably more.  More, I'm guessing, I don't know.  Seguro, if it hadn't gotten hit by the FBI, would be $150 million dollar company a year today and we wouldn't be talking.  That's what it is.

Last thing --- I know, I'm talking too much, but you know, he's a wording guy, right?  Very impressive.  And I know where you went to college as well.  Very impressive.

People were calling to interview because of Shannon and Arthur, because --- from your schools.  We were hiring a Harvard CEO to replace Arthur so we could retire.  Like, it was really cool.  And then the product blew up, you know, so ---.

Again, I'm not dancing.  It's just the difference between --- it's a difference between a little bullshit ten cent Coca Cola, the real thing.  Just spectacular.  It blew up, you know.

Q. Are there other differences in

Page 337

the operations between the two?

A. Yeah, I think operations are led by really good leaders, you know, I think the operation workflow.  I define operations as, you know, like line drawings.  Like departments cross communicate.  You know, hierarchical needs are discussed and yada, yada.

HR, for instance, is a good one.  I put in a system for Paycor.  I wasn't able to build it.  It's Paycor.  But we rented that.  We were able to spin that up real quickly.  Where employees in agencies always --- sales guys always complained about transparency, you know.  Where's my check?  Did the commission, myself and Mr. Jordan had them issues.  It was very hard for two young guys to do everything, you know.  And unfortunately Jason stopped coming in.

But the HR system was spectacular.  It was Fortune 500.  I'm talking about employees could log in from home without breaking any laws

Page 338

check their hours, see what their check was going to be. Request in advance. You don't have follow-up calendars. It was a pretty cool company.

Q. You talk about Paycor?

A. Paycor, yes, sir.

Q. Okay.

A. Yeah, I get excited about this. My apologies, sorry.

Q. Its' all right. The vendors for lead generation, for Seguro Medico, who --- who are they?

A. The last --- so the vendors for Seguro. I got to answer it, if you don't mind from the front. The vendors that parsed over, so to speak, with my connections were All Web Leads. But Seguro was able to cultivate a whole new group of lead vendors and also begin to develop their own leads.

Q. So it started with the folks you'd work with at Bene, and then ---?

Page 339

A. Yes, sir.

Q. And then it evolved from there?

A. Anything that I can do to give her a competitive advantage, I was going to do. Absolutely.

Q. Your paragraph one here that talks about your job, the last one is introduction to various lead and insurance carrier vendors. Correct?

A. Yes, sir.

Q. Okay. So you --- you did all of those introductions upfront?

A. I did not. No. Again, one of the big things with Mr. Valz was --- he was the national marketing director, definitely regional director for AIG. Big wig job. And yeah, he has a lot of connections, brother. So that was a --- thank you. That's another thing. Again, Arthur's a Widener MBA. Is that a school? Is that a good school? Widener guy. And he's been

Page 340

in the business for 20 --- he's not a helpless old man. He's definitely --- he's a badass dude. Yeah.

Q. So he introduced you to other lead or insurance carrier vendors, is that what you're saying?

A. He never introduced me. He would have me on them calls from a technical perspective. He's going to make his decision. He was going to make his decisions based on what products he wanted, and then I was going to make recommendations. Then we're going to argue about it. And I would get reminded by Shannon and Arthur a thousand times a day that it's not my company asked him that. He was brutal. But there was a bit of music that happened and I had a good two year run. The arguments were great and usually Shannon would get her way.

Q. So he introduced Seguro to leading insurance carriers that you didn't know.

Page 341

Is that correct?

A. I knew of them, but I probably didn't have access, sir. I didn't.

Q. Can you give me some examples?

A. Yeah, let me think here. Okay. So Delta Dental is a big product for dental insurance, obviously. VBA is another massive product. Blue Cross/Blue Shields. A lot of new ACA policies. It's nice to have someone on your wife's side and ultimately on my side that can pick up the phone and call the VP of Blue Cross/Blue Shield that he went to school with or whatever. You know, he knows, you know this guy for years. And it can be pretty hard to go in as a young guy, you know, with an Irish accent, because people think you're full of shit usually. Or you're a call center guy, which is not the intent. And Arthur brought credibility, to be perfectly frank, to a little tiny agency out of Reading. And then Shannon brought

Page 342

expertise and people, but more joining the departments together and making sure the lines between the hierarchy. You know, when you write the hierarchy.org chart them lines, that's what she does. She focuses on the little gaps between verification and sales. And then I was in the background building a system.

Q. Agency and producer agreements are generally the source of revenue for an insurance brokerage. Is that right?

A. That is correct. Yes, usually.

Q. And that would be true for both Seguro Medico and Benefits Now?

Q. Yes. Yes.

A. If you're selling someone else's product, of course, yes.

Q. Sure. And that's true for those two. Correct? They're not generating their own product.

A. I feel like I'm getting too technical. If I am just tell me to

Page 343

stop and I'll move on. There was some white label stuff. Not technically your own product, you know, but I would say a knockoff. But it's. Seguro was starting to brand itself. You know, I was getting a dental product. It had enough volume to go on as the dental carrier. Could they put their own name on it, which was going to be segment, you know, probably another name. Quick Health was starting to pop off, you know, brand development. Something that I learned, believe it or not, in college. So I was starting to develop brands that appeal to different demographics, Attorney Ready. Like Quick Health was all about the young millennials and the generation Z. And it just made sense. Did a lot of research on that. So anyway, little technicality. Seguro was starting to sell its own products that were sponsored by someone else in regards to getting its

Page 344

actual own product and being a carrier probably two years out, but we just didn't get there.

Q. Which insurance carriers did Seguro Medico or Benefits Now have agency or producer agreements with since 2020?

A. Seguro Medico, there was the HMA, Providence, Delta, VBA, Blue Cross, Blue Shields, I believe United Healthcare at one point. There'd be more that Arthur would be able to give you, but that would be Seguro.

Q. And what about Benefits Now?

A. Benefits Now right now is selling a lot of vision and dental. And I hate to be rude I need to use the bathroom again. Do you mind?

Q. Sure.

A. I apologize. You feel like we've been talking for like five hours.

Q. Yeah, we can break.

---

(WHEREUPON, A PAUSE IN THE RECORD WAS

Page 345

HELD.)

---

BY ATTORNEY READY:

Q. Okay. I think I asked you about insurance carriers that Seguro Medico had agency or producer agreements with and Benefits Now since it started.

A. Yes.

Q. You gave me a list. I just want to make sure you had a chance to finish. I don't have the list in front of me.

A. Sure.

Q. Was there anything you'd wanted to add to that answer?

A. I think I left off with Delta, maybe. Delta Dental. Again, sorry, Joel. I was up most of the night with the kids.

ATTORNEY CIARDI:
Where were we?

THE WITNESS:
I don't do product. Let me go to Benefits Now, what

Page 346

they're selling, if that's okay.

ATTORNEY READY: Sure.

THE WITNESS: That will refresh my memory. So Benefits --- Benefits Now, Arthur Walsh picked up a program called Netwell Ministry --- Health Ministry program. That's what they were recently selling. Back --- that was around September to --- September to January. And then they --- there's a common theme here, sir. That was nuts. That was not a good product to sell. They were batted out. It's currently in front of the Department of Insurance in Pennsylvania. I think he spoke with Mike Feazell. I'm assuming it. I thought I seen a document with you and Mr.

Page 347

Feazell talking, but I think so. But Mike got involved. He's a great guy, you know, he's a --- he's regulator, you know, so you got to --- got to play nice with him. But Mike is being investigating that well, because that was another carrier that just didn't pan out. Well, they didn't do what they were supposed to do. Typical with claims. The concept was great. So, your question was what changed? You know, what --- what the --- what products were --- were different. The big thing is Bene --- sorry.

ATTORNEY READY: Yeah, let me --- let me actually clarify.

BY ATTORNEY READY:

**Q. What I asked was what --- what insurance carriers that Seguro Medico or Benefits Now have agency or**

Page 348

**producer agreements with or have had in the last couple years?**

A. Yes, yes. Netwell was the first launch I believe for Benefits Now.

**Q. Okay.**

A. Benefits Now is currently selling, it's a vision and dental package through, I believe, it's SBA. I haven't been involved in the product stuff whatsoever. Now that Mr. Walsh is back, it's not my foray, you know, although he's asked me to try and find some new products direct with carriers this time not through a --- a middleman --- Seni Sok. So, I've been actively looking for that. Benefits Now is different from Seguro is based on the fact that Benefits Now is more vision starting to morph into vision, dental, hearing, alternative medicine stuff. It's starting to become a supplementary carrier. It's starting to --- Shannon really wants to get into Medicare as

Page 349

well. She's not as much involved, obviously, as she was with Seguro. I think she'll come back to Benefits Now. She owns the friggin joint. She is still making key decisions, but honestly, it's --- it's me trying to support Mr. Walsh while he gets back on his feet.

**Q. The money that was loaned from the Complete Business Solutions Group in --- with Bene Market, what bank accounts did they go into?**

A. So many bank accounts were lost because of these guys. So aggressive, these loans, you know, banks blow you up real quick. I believe it was BB&T for Bene Markets. Truist.

**Q. Okay.**

A. I believe so. Give me one minute to --- I believe it was BB&T.

**Q. Okay.**

A. Yes.

**Q. Okay.**

A. Yeah.

**Q. Today I understand you still**

88 (Pages 346 to 349)

Page 350

have no current personal bank accounts other than the DIP accounts. Is that correct?

A. That is correct, yeah.

Q. Okay. Do you have access to any bank accounts other than the ones we've talked about already here today?

A. The --- the Mid Penn accounts, Shannon's accounts, I will access that. She'll ask me to check balance. She'll do the same for me, to be perfectly frank. So, Shannon's accounts. As I said, you know, with Seguro there was a payroll issue. I logged in there, you know, moved her money around to make sure that --- that employee's check was taken care of. So, yeah.

Q. Do you have any contracts that are between you and Benefits Now, other than the, I guess, consultation agreement we talked about?

A. The consultation agreement is with Seguro. Sorry to correct you.

Page 351

Q. No, that's fair. Any --- any --- any contracts between you and Benefits Now?

A. Not right now.

Q. Okay.

A. Not right now.

Q. Is there any oral understanding between you and them?

A. No. I --- I would --- I would think this is what's going to happen. I think Seguro is going to wind down. It's been rough since the FBI came in. I believe that I'll end up with a contract with Benefits Now and --- and ABN. And hopefully, when this finishes, I would like to be a business owner again.

Q. And to date there has been no contract --- sorry, you said there are none. So, let me ask, have there been any contracts between you and ABN or you and Benefits Now?

A. No, sir.

Q. Okay.

Page 352

How often are you at Seguro Medico for work?

A. Honestly, I was there until 6:00 a.m. yesterday sitting in the ARC Realty, so I'm extremely tired, kids were sick. So, Mr. Walsh needed a system that I was working on. I --- I looked at the stuff. I wish I had looked at this more so I could have been prepared. I apologize. But he's looking at a new system that he wants me to build in regards to --- you're not going to love this, but I love this shit. It's matching the claims code with exactly how the plan is going to pay. So, there's nine --- essentially my concept, there's 968 claims codes just for dental, in your mouth. So, last night, running ChatGPT, of course, like we all do now, I'm matching what these dental plans did. For instance, at Aetna, I was able to find that Aetna is actually better than Ameritas, which

Page 353

is another carrier. So, anyway, I'm --- I'm pretty heavily involved right now in --- in doing stuff with Benefits Now. It has to work, you know, money's tight, sir, so ---.

Q. So, what's your --- what's your typical day like, at you know?

A. Yeah, yeah, very busy. Benefits Now has been fortunate enough to hire really --- three really talented software developers. If we go back to 2014, if you don't mind me making a comparison. It was Mr. Jordan on the floor. So, good at that before, you know, things happens. He was on the sales floor and I was on the back end working on systems. I was a kid. I didn't know what a system was, but HR and things of that nature. Now, I --- I'm pretty blessed to be able to go in and sit with a Seguro employee called Tom. Three MBAs. That's unbelievable. Like Vietnamese kids. We're building a

89 (Pages 350 to 353)

Page 354

system --- that claims code system. At Seguro Shannon picked up a guy, young guy, Juan Campos, another like brainiac. It was so cool. So, I'm working with these guys. And the final is the --- the new CTO that they've hired. Chuck something or other, older gentleman, bought and sold the software development business. Opposite of me. Very calm, very normal.

And that's what I do 95 percent of my day. And if they need me to support them, I will --- you know. Tanya needed support. You've met Tanya, I believe. I think you cross examined her. She's taking on the COO role. Well, Shannon hopefully is transitioning back, so ---. Still people dynamics, Brother --- Attorney --- Attorney Ready. Sitting with Tanya. Her kid had a seizure. There's a lot of like interpersonal stuff that I feel like I'm pretty good at. And then building systems, so ---

Page 355

.

Q. What's --- how often do you go in to the office?
A. I've been in every day for the last, I want to say about 12 weeks. Mr. Walsh just got back two weeks ago.
Q. Okay.
Has that been a typical pace for you in the past two years?
A. No, sir.
Q. More typical, let's say last year?
A. I don't know if it's ideal.
Q. Typical. Typical than last year.
A. Okay.

Typical last year was Beth, Arthur's wife, uh got diagnosed around March, very fast progressing. Up until March, probably in there three times a week. I'll --- I'll get to it. I promise. Three times a week we go all the way back to 2021. Once Seguro moved into Morgan's Drive, the ARC Realty property. I have the exact

Page 356

number. It was in 87 days. Awesome. Eight-seven (87) days. That was --- it's on a paperwork.
Q. Okay.
A. So, 87 days ---.
Q. So, you're in for a day.
How many hours you typically go in? 8:00 to 5:00? Some less?
A. Eighty-seven (87) days would be 6:00 a.m. until ---
Q. 6:00 a.m.?
A. Like --- like all day.
Q. Like 6:00 a.m. to 6:00 p.m.?
A. No, no, no.
Q. You mean 24 hour period.
A. 100 percent. Eighteen (18) hour shifts. It's just the way developers work. We sit in front of a computer, we drink a bunch of caffeine so you can turn to 87 days. Really and it's not all the time. I'm not bionic. I wish I was. I'm not 20 years old. But working on what they --- they want. They want to spend a night and get paid, you know.

Page 357

Q. Okay.
A. And I enjoy that. I like being on that end.
Q. Okay.
A. 2022 with the FBI investigation all the way up until November 2022, Mr. Ready, maybe 100 days, out of them 100 days, maybe 50 all nighters. Like good work, solid work. And then when the FBI stuff came, you got to get boots in the grounds, you know, people are nervous, for goodness sake. Kids are crying. Shit. You know. So, I was in three, four days a week. And it was --- yeah, it was --- I was there a lot.
Q. Other than 8 Morgan Drive, does Seguro Medico or Benefits Now have any other offices or call centers?
A. No other physical offices, but they do have registered agents, is in my head. You know, addresses that they need for ---.
Q. Is there any place that an employee is working other than 8

Page 358

Morgan Drive?

A. No, sir.

Q. Okay. And who --- could you give me all the names of everybody who has managerial authority?

A. At Benefits Now?

Q. And/or Seguro Medico.

A. It's not really my shtick. But who --- who makes key decisions? What I've observed, Mr. Walsh, Mr. Barrera. Tanya --- Tanya Hatmaker, Chuck, the developer, the CTO. He's morphing into that position. Jaylyn is a new employee. In comparison, Seguro ---

Q. What's Jaylyn's full name?

A. I don't know. I'm not sure.

Q. Is Jaylyn a nickname? A first name?

A. That's a first name.

Q. Okay. Can you spell that for the record?

A. I believe it's J --- J-A-Y-L-Y-N, I think.

Page 359

Q. Okay.

A. He is like a sales manager.

Q. Okay. How many employees are there?

A. For which company?

Q. I think --- I think you told me earlier that it's the same. Right?

A. It --- it --- it ---.

Q. It's all the same people?

A. It's not all the same people if we broke it down. It's probably about 80 percent of people. But perfectly frank, the payroll is running from --- through Seguro. It's all running through Seguro.

Q. So, there's no --- there's no employees at Seguro that aren't at Benefits Now or vice versa?

A. Vice versa. There's no employees of Benefits Now, that aren't --- Benefits Now, I guess you could say right now, Joel, is a new agency that holds contracts. They --- they have MGA --- it's a licensed MGA

Page 360

without employees. And it's set up to be able to go and get --- go and get new products because Seguro struggled with that after, you know, the FBI stuff.

Q. It holds contracts with whom?

A. NetWell was one of them, of course.

Q. With like insurance agents?

A. Oh, yes, sir. I see. I didn't understand.

Q. Some you're saying what it holds, right now is the contracts with these agencies to sell the products?

A. Yeah.

Q. Okay.

A. Correct.

Q. ABN Health Network, is it based at 8 Morgan Drive or somewhere else?

A. Most of the key decisions are based at 8 Morgan Drive. That --- they are. You know, Shannon had a partner, as I believe I mentioned I did.

Q. Who's that?

Page 361

A. Priscilla. Yes. Yep. They were rocking and rolling. You know, just --- she wanted to go and do it on her own.

Q. Okay.

A. So, it's not a company where a lot of key decisions are immediate. It's like --- it's like a holding company, like a --- a merchant processing company that is able to go on and save money in the minuscule amounts like a four percent on your square merchant processor. ABN can get two percent. It's very --- it's like a derivative.

It's a --- it's an added value benefit to an agency. The goal with ABN was to be able to provide agency services. You don't mind me using Jason as an example? Jason Jordan started up an agency when he's 30 years old. He needs a lot of support. So, ABN's vision, hopefully if we get through some of this legal stuff was always to expand and be able to

91 (Pages 358 to 361)

Page 362

provide lead generation, you know, software developments to someone like Mr. Jordan if he was starting up again. But it's just not there yet. There's not a lot of decisions being made there.

Q. If I ask questions about profit and loss for --- let me do it differently.

A. Sure.

Q. Who keeps track of profit and loss for Seguro Medico and Benefits Now? Is that on a document somewhere?

A. P and Ls were being tracked at Malcolm C. Smith's office. I always wanted to get Arthur Walsh into a routine of caring more about that. I know it doesn't sound very capitalistic type of --- he is a capitalist. But we were getting there and then, you know, Seguro got interrupted. So, P and Ls would be down and dirty.

You know, Arthur would pull me in and say, hey, let's look at a bank

Page 363

statement. Pull a bank statement up. If he can access his computer. Shannon or Arthur would sit down and I would build them a P and L the best I could. You know, they had a quick book service at one point that was generating some P and Ls, but it was never implemented. That was around the time that our friends at the FBI came in so ---.

Q. What contracts exist between Seguro Medico or Benefits Now and Bene Market?

A. I don't --- I believe there was a contract with Bene Market and Seguro, Mr. Ready. At one point there was a --- a transition. You know, Shannon and Art were getting up off the ground and it just made sense to piggyback off of some of the Bene Market staff. You know, they kept the really good ones. They re-interviewed and I believe there was a management service agreement on one of the --- yeah, it was something that Mr. Smith

Page 364

Malcolm recommended that, hey, you can keep your payroll going with Bene Market. It'll save Seguro time. You know, that hassle of setting up a new payroll. You can rent these employees. But Walsh and Shannon were probably dying to --- I'm guessing out of 100 employees, maybe 20, 25. And then they scaled themselves.

Q. Who was managing who? You said there's a management agreement. Was it Bene Marketing? Was it Bene managing somebody over there? Or vice versa?

A. I think it's mislabeled wrong, to be honest. That's what Malcolm would call it. What it --- what it means is that Seguro was ranting the employees, paying Bene Markets for the payroll. Does that make sense? I think it does.

Q. So, Seguro Medico at the time was paying Bene Markets who then paid its employees who were working for Seguro Medico?

Page 365

A. Sure.

Q. Okay.

A. Sorry. One --- one or two things that was going to shut down the business. That sounds very commingle-ish. But it was just going to shut it down. So, I go sit by the pool. I was exhausted. So, I thought it was the right thing to do. They thought it was the right thing to do. And I did as well to keep some of the good people on.

I just want to say that out loud, you know, it's not as commingle as it sounds. There was a --- there was a good cause behind this, you know.

Q. What other contracts existed at any time between Seguro and Bene Market?

A. I'm not sure. I'm not sure. 2019, 2020, there might have been service agreements. There was --- obviously, it's not Bene Market, but there was an agreement between myself

Page 366

and Seguro, wasn't that fancy.  Wasn't that, you know, again, it was quick trying to keep people employed and trying to give Shannon and Arthur a --- an opportunity to get together, which they did well with.

**Q. We talked earlier about Saoirse and --- have you ever owned a company with that name?**

A. You know, it's a really famous Irish word.  It means freedom.  It's really important to us Irish Catholics.  And I don't know what it is, and I'm not trying to dodge or not answer your question.  As I keep saying, you have a profound effect on me where you make me doubt myself.  It's like you're very good at it.

ATTORNEY CIARDI:
Alan, if you know, you know and if you don't, you don't.

THE WITNESS:
I already told him.  I --- I bought a building off of

Page 367

Sorcia, LLC, ARC Realty did.  I don't believe I did.  But I don't want to be called a liar again by you, because I'm not.

BY ATTORNEY READY:
**Q. You're not familiar with any company before that you have owned called Saoirse?**

A. Stop.  You're like --- I know we're almost at the end.  I'm going to have a little bit of fun.  I don't --- I --- you're --- I don't think so, no.

**Q. Okay.**

A. Mr. Ready, if I did, I would tell you.  And I will say this, if I did it, it never made any money, ever.  But I'm 99.9 percent sure I did not, sir.

**Q. Okay.**

A. Yeah.

**Q. A couple of pretty simple cleanup questions.**

A. Yes, sir.

**Q. I saw a filing from Ms. Nigrelli earlier today, I just saw**

Page 368

**about an hour ago, saying you have a copy of your license.**

**Do you mind if we take that?**

A. Yeah, it's in the car.  Yep.

**Q. Okay.**

**Well, ---**

A. No problem.

ATTORNEY READY:
That's all right with you?

ATTORNEY CIARDI:
Yeah, that's perfectly fine.

THE WITNESS:
Absolutely.

ATTORNEY READY:
And then second, she mentioned we --- I've already kind of covered this, but I just had a chance to read this on a break.  There's a reference here to the --- what happened with money from CBSG.  I think we've covered this.

BY ATTORNEY READY:

Page 369

**Q. But am I correct that you don't have any documents for showing how that money was used at Bene Market.**

**Is that correct?**

A. I think your initial question, I want to clarify.  I believe your initial question was, did I have the original loan documents?  That's what I interpreted that as.

ATTORNEY CIARDI:
The deposition today, you asked him if he had invoices.

ATTORNEY READY:
Yep.

ATTORNEY CIARDI:
You guys, all I heard was invoices, not ---

THE WITNESS:
Invoices, yes.

ATTORNEY CIARDI:
--- anything else.

THE WITNESS:
Yes.

ATTORNEY READY:

Page 370

Yeah. So, let's --- let's broaden it out a little bit.

THE WITNESS: Sure.

BY ATTORNEY READY:

Q. Do you have any other documents showing what was done with the money that Bene Market received from CBSG?

A. May I --- may I ask you a question that was in the discovery that you requested?

Q. I'm asking now.

A. Oh, okay.

Q. If you have any documents, ---

A. I was just going to read them and say there's a reason --- I'll be able to tell you why I couldn't find them. Documents for CBSG, there would be --- there were original contracts.

ATTORNEY CIARDI: Are you talking about Bene Market or NBOA, because NBOA would be with the trustee.

Page 371

Are we just talking about Bene Market?

ATTORNEY READY: Yeah, yeah, I think I said Bene Market. If I didn't.

BY ATTORNEY READY:

Q. Yes, with Bene Market, CBSG gave loans to Bene Market, as I understand it, I'm asking if you have any documentation about where those loans went, how they were used, all of that?

A. Yeah, they're all going to be in the --- in the tax returns. There's a $15 million loss in 2021, personally guaranteed loans. So, if --- if you look at that, you know, that's again, as I've stated a few times, sir, that's --- that's the accountant's job, you know.

Q. Little different question is though, do you have documents anywhere that show what Bene Market did with the money it received?

A. Like a ledger or ---

Page 372

Q. Sure.

A. --- personal documents? No, that's again, that's --- that's Malcolm's thing. I --- I could call Mr. Smith --- Malcom and say, hey, where did the money go for the month of October for 2020 --- 2020 for CBSG and he'd be able to tell me. That's not something that I would do myself or keep in my possession, if that makes sense.

Q. Okay. Yeah. So, Mr. Smith might have it. Let me ask it a different way. Who has all of the documents, the historical documents of Bene Market's, you know, monthly profit and losses? Is that all with Malcolm Smith as well?

A. Again, as I said, profit and losses were not --- profit and losses were provided by Malcolm. I was trying to secure a loan, for instance. He might have some historical data, but if it's anywhere, it's with the

Page 373

accountant.

Q. Yeah. In other words, you're confident you wouldn't have any documents from Bene Market related to that?

A. I could go through my 75,000 emails or, sorry, 750,000 emails again, but when I was requested, I couldn't find any.

Q. Okay.

A. Yeah, but I could --- yeah.

Q. Okay. And along those lines, you don't have any other copies of the original contract that you signed with CBSG in your possession. Is that correct?

A. CBSG is PAR funding in my head, I would say it is in your head too. The last I seen them documents, Mr. Ready, it was with David Heim. That's what I've got in my head, Mr. Heim.

ATTORNEY CIARDI: They're all attached to the CBSG complaint from what I

Page 374

understand.

BY ATTORNEY READY:

Q. Yeah. So, other than what's attached to the complaint, though, I take it you don't have anything related to the CBSG loans. Is that correct? In your possession? Personal.

A. What type of documents?

Q. Contracts with CBSG or PAR Funding, invoices, records showing how the funds were used, ledgers, any sort of document like that?

A. No, that's --- it would be with the accountant, or it would be with one of the attorneys or the trustee.

Q. Okay.

A. It's not something I would, you know, do or --- or keep or whatever.

Q. I'm going to go back to a prior exhibit.

A. Sure.

ATTORNEY READY:

But I'm going to need just a second to double check

Page 375

that I'm calling on the right one. I think it's 3.

---

(Whereupon, Redmond 3, 2022 Income Tax Return, was marked for identification.)

---

ATTORNEY CIARDI:

If it's his tax return, it's 4.

ATTORNEY READY:

Is it 4?

ATTORNEY CIARDI:

Because you skipped or you skipped something.

COURT REPORTER:

Oh, we never did 3.

ATTORNEY READY:

We didn't. You know, let's do 3. Yeah, you're right.

BY ATTORNEY READY:

Q. All right. So, we've gone just a little

Page 376

out of order, but I'm showing you what we've marked as Redmond 3. And I think this is on at least one of the other exhibits we've looked at. I'm going to show you up to the top right. Says your Social Security number, spouse's Social Security number.

A. Sure.

Q. This may be a straightforward question. What's under that blacked out thing there is a Social Security number. Is that correct?

A. Yeah. It says your Social Security number, spouse's Social Security.

Q. In other words, as far as you know, you've always filed your income tax returns under a social and not under an EIN. Is that correct?

A. My personal taxes?

Q. Correct.

A. Yes, sir.

Q. Okay. All right.

Page 377

A. Same social. Yep.

Q. And the same for Shannon, this would be her social, not an EIN. Correct?

A. Absolutely.

Q. Okay.

A. Yeah.

ATTORNEY CIARDI:

I want to be clear on one thing, though. Some of the things we looked at earlier reference EIN numbers, ---

ATTORNEY READY:

Yep.

ATTORNEY CIARDI:

--- which can be used to report schedule C income for sole member LLC.

ATTORNEY READY:

Yeah, that's fair.

ATTORNEY CIARDI:

So, what we're just looking at is the first page of the 2022 return?

ATTORNEY READY:

95 (Pages 374 to 377)

Page 378

Correct.  Yeah, I actually asked about the other one.

BY ATTORNEY READY:

Q. I'll --- I'll ask about another one.  I'll show you what was marked Redmond 2.  I'll ask you the same question there.

A. Sure.

Q. One second.  I'm sorry.

A. Yeah.

ATTORNEY CIARDI:

This is now 3?

ATTORNEY READY:

What I handed you is 3, yep.  Thanks.  I think that's it right there.

COURT REPORTER:

Yep.

ATTORNEY READY:

I'm going to show you Redmond 2 as another example.  Sorry.

Page 379

COURT REPORTER:

No problem.  I'm good.

BY ATTORNEY READY:

Q. On Redmond 2, you will see similarly in the top right, what appears to be a blacked out Social Security number.  I'm just confirming again that would be a Social and not an EIN.  Correct?

A. I wouldn't --- I can't see it.

Q. Well, that's --- that's why I'm asking.  Yeah.

A. Are you asking me to guess what it is?  I would --- I would say Malcolm prepares the tax returns if he's --- it would be a Social.  Do I have to show my social, for God's sake?

Q. All I'm asking ---.

ATTORNEY CIARDI:

All he's asking is do you think that your Social Security number is under the line that says your Social

Page 380

Security number?

THE WITNESS:

Yes.  Malcolm's a pretty integral guy.  Yeah.

ATTORNEY READY:

Okay.  That's what I would expect.

THE WITNESS:

With you, Joel, I don't know where you're going, Brother, so maybe I need to stop trying to work that out.

ATTORNEY READY:

Just one second here.

THE WITNESS:

Yep, yep, no problem.

ATTORNEY READY:

All right.  Well, I'm happy to tell you I have nothing further.

THE WITNESS:

Thank you, dudes.  Appreciate it.

ATTORNEY READY:

Page 381

I don't know if you have anything.  I assume not, but ---.

ATTORNEY CIARDI:

No.

ATTORNEY READY:

Thank you.

* * * * * * * *

DEPOSITION CONCLUDED AT 4:27 P.M.

* * * * * * * *

Page 382

COMMONWEALTH OF PENNSYLVANIA )
COUNTY OF BERKS          )
CERTIFICATE
I, Jessica L. Ashman, a Notary Public
in and for the Commonwealth of Pennsylvania,
do hereby certify:
That the witness, Alan Christopher
Redmond, whose testimony appears in the
foregoing deposition, was duly sworn by me on
4/17/25 and that the transcribed deposition of
said witness is a true record of the testimony
given by said witness;
That the proceeding is herein recorded
fully and accurately;
That I am neither attorney nor counsel
for, nor related to any of the parties to the
action in which these depositions were taken,
and further that I am not a relative of any
attorney or counsel employed by the parties
hereto, or financially interested in this
action.
Dated the 5th day of May, 2025

Jessica L.  Ashman