# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO. 24-376** |
| v. | : | **DATE FILED: May 8, 2025** |
| **ALAN REDMOND** | : | **VIOLATIONS:** |
| **BENE MARKET LLC** | | **18 U.S.C. § 1349 (wire fraud conspiracy –** |
| **SEGURO MEDICO LLC** | : | **1 count)** |
| **ARTHUR WALSH** | | **18 U.S.C. § 1343 (wire fraud – 19 counts)** |
| **JESUS BARRERA** | : | **26 U.S.C. § 7202 (failure to account for** |
| **ALBERT GROFF** | | **and pay over tax – 7 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |
| | | **Notice of forfeiture** |

## SUPERSEDING INDICTMENT

### COUNT ONE
### (Conspiracy to Commit Wire Fraud)

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At all times material to this superseding indictment:

1. National Brokers of America Inc. ("NBOA") was a company doing business in or near Reading, within the Eastern District of Pennsylvania. NBOA was formed on or about February 22, 2013, and declared bankruptcy on or about September 3, 2019.

2. Defendant BENE MARKET LLC ("BENE MARKET") was a company doing business in or near Reading, within the Eastern District of Pennsylvania. Defendant BENE MARKET was formed on or about May 16, 2016.

3. Defendant SEGURO MEDICO LLC ("SEGURO MEDICO") was a company doing business in or near Reading, within the Eastern District of Pennsylvania. Defendant SEGURO MEDICO was formed on or about December 27, 2019.

4. From at least in or about 2018 through at least in or about 2022, NBOA, defendant BENE MARKET, and defendant SEGURO MEDICO, along with their affiliated entities, operated a call center and purported to act as brokers of insurance, selling discount health and dental plans over the telephone to tens of thousands of individuals throughout the United States.

5. NBOA, defendant BENE MARKET, and defendant SEGURO MEDICO operated through and in conjunction with several affiliated companies, including U.S. Trifecta LLC, Red Horizon LLC, The Lead House LLC, Next Gen Leads LLC, U.C. Consolidation LLC, The Turner House of Reading 1 LLC, The Redmond Group LLC, Redmond Marketing LLC, Benefits Now LLC, ARC Realty LLC, ARC Realty 1, LLC, Benefitz Plus LLC, and Frontera LLC (collectively, along with NBOA, defendant BENE MARKET, and defendant SEGURO MEDICO, the "Bene Market Group"). The Bene Market Group carried out its telemarketing business under various trade names including YourBenefits4U, QuickHealth, Express Benefits, Q Health, Quick Marketing, and Benefits Now. The entities in the Bene Market Group shared common management, operations, and/or control, and funds were transferred back and forth between entities.

6. Defendant ALAN REDMOND was the owner of NBOA, the 96% owner of defendant BENE MARKET, and the de facto owner of defendant SEGURO MEDICO. From at least 2018 through at least 2022, defendant REDMOND directed and controlled the day-to-day and financial operations of the Bene Market Group and was the ultimate decision maker for each

2

of its entities and affiliates. Starting in or about 2022, defendant REDMOND controlled and directed the operations of the Bene Market Group indirectly through nominees, including his spouse, S.K., and defendant ARTHUR WALSH.

7.      Defendant ARTHUR WALSH ran the operations of the Bene Market Group and held various titles, including Chief Operating Officer ("COO") of defendant BENE MARKET and Chief Executive Officer ("CEO") of defendant SEGURO MEDICO. He was also the 4% owner of defendant SEGURO MEDICO. From at least 2018 though at least 2022, defendant WALSH served as a manager and executive for the Bene Market Group and reported to defendant ALAN REDMOND.

8.      Defendant JESUS BARRERA was the Senior Vice President and Director of Business Intelligence for defendants BENE MARKET and SEGURO MEDICO. From at least 2018 though at least 2022, defendant BARRERA served as a manager and executive for the Bene Market Group and reported to defendant ALAN REDMOND.

9.      Defendant ALBERT GROFF was the head sales agent for defendants BENE MARKET and SEGURO MEDICO from at least 2018 through at least 2022, and, at times, trained and supervised the Bene Market Group sales staff. Defendant GROFF reported to defendant ALAN REDMOND.

10.      Major Medical Insurance, also known as Comprehensive Health Insurance, was a type of health insurance that was designed to cover a majority percentage of the medical costs an average American would pay during the year. Major Medical Insurance plans typically had a set amount that the patient was responsible for paying first, called the deductible. After the patient paid the deductible, Major Medical Insurance typically paid a majority percentage of the remainder of the patient's medical bills. Major Medical Insurance was

3

regulated by the Affordable Care Act (the "ACA"), which required that regulated plans have a maximum out-of-pocket limit for the patient's expenses. Once the patient reached the maximum out-of-pocket limit, Major Medical Insurance paid 100% of the patient's in-network care for the remainder of the year.

11.     Hospital Indemnity Plans, also known as Fixed Indemnity or Limited Indemnity Plans, were products different from, and with lower and more restricted benefits than, Major Medical Insurance. Hospital Indemnity Plans typically paid only a limited or fixed dollar amount (i.e., a cap) per day or per medical service, regardless of the actual costs incurred for care, leaving the patient responsible for paying all medical expenses above that fixed cap amount. Hospital Indemnity Plans were not regulated by the ACA, were not designed to be a primary form of insurance, and were meant to operate as a supplement to a patient's Major Medical Insurance.

12.     Group Health Membership Plans, also known as Association or Limited Partnership Plans, were products different from, and with lower and more restricted benefits than, Major Medical Insurance. Group Health Membership Plans purportedly negotiated or obtained discounts, plans, or network benefits for their membership. Group Health Membership Plans often focused on preventive services and were self-insured, and did not cover, or otherwise restricted or capped, coverage for the more expensive hospital, medical, and pharmacy services.

13.     Short Term Medical Plans, also known as Temporary Medical Plans, were products different from, and with lower and more restricted benefits than, Major Medical Insurance. Short Term Medical Plans provided gap coverage for a limited time, and were not regulated by the ACA, so they did not typically cover the same level of benefits and services as

Major Medical Insurance, and they could deny coverage based on medical history and exclude benefits due to pre-existing conditions.

14. The term "Bait and Switch Sales Scheme" as used in this indictment refers to the scheme in which the defendants, both personally and through the Bene Market Group, marketed and sold Hospital Indemnity Plans, Group Health Membership Plans, Short Term Medical Plans, and other restricted or discount health and dental plans and bundles (collectively, "Limited Benefit Plans") to consumers through false, misleading, and deceptive sales practices, including by:

    a. falsely representing to consumers that the Limited Benefit Plans sold by the Bene Market Group were Major Medical Insurance or provided coverage equivalent to Major Medical Insurance at a lower cost;

    b. falsely telling consumers that specific medical conditions, procedures, and medications were covered by the Limited Benefit Plans;

    c. falsely representing to consumers that sales agents had shopped and compared the entire insurance marketplace to find the best plan for the consumers;

    d. fabricating or inflating competitor costs to consumers to make the Limited Benefit Plans being sold appear more affordable or reasonable;

    e. falsely telling consumers that there would not be any up-front out-of-pocket expenses when using the Limited Benefit Plans;

f.  falsely representing to consumers that the Limited Benefit Plans had the federal government's stamp of approval and were compliant with the ACA;

g.  falsely telling consumers that the Bene Market Group's sales agents were licensed and did not receive commissions on their sales;

h.  falsely informing consumers that the Bene Market Group was the National Enrollment Center for Healthcare and worked with over 30 A-rated insurance carriers;

i.  using fake names and aliases when selling Limited Benefit Plans;

j.  falsely representing to consumers that Bene Market Group's sales agents were enrolled in the same Limited Benefit Plan that was being sold and that the agents had personally used the plan without any issues;

k.  falsely telling consumers that they had the ability to cancel the Limited Benefit Plans for a full refund without any cost to them;

l.  concealing, omitting, and telling half-truths about material limitations of the Limited Benefit Plans, including that the plans often lacked a maximum out-of-pocket limit on the patient's expenses;

m.  telling consumers that the Bene Market Group could not share or email the plan or benefit summary until after the consumer completed the purchase by paying for the plan;

n. engaging in "churning" and "policy flipping" of existing consumers by switching them to the same or similar products with limited or no additional material benefit;

o. falsely selling consumers the same or similar product when consumers sought to cancel the Limited Benefit Plans sold to them previously;

p. instructing consumers to ignore or disregard the verification disclaimers and disclosures about the Limited Benefit Plans, including by representing that the verification recordings were generic and not specific to the plan the consumers were purchasing, and also accelerating the speed of the verification recordings;

q. processing consumer payments for Limited Benefit Plans early and before the specified payment date;

r. overbilling or "double banging" consumers by charging them multiple times for the same product;

s. selling Limited Benefit Plans in states where the Bene Market Group and its agents were prohibited from selling, or unlicensed to sell in, and then hiding the unlawful sales by falsifying the consumer's state of residence or recording the sale under another agent's license; and

t. ignoring and not processing complaints, cancellations, and refund requests from consumers, and otherwise making the complaint and cancellation process difficult, including by changing telephone numbers, sending complaining consumers to voicemail or unmanned call desks, delaying or not processing referrals, and routing

complaining consumers to the sales team to be fraudulently pitched and sold additional products.

15. The term "Bait and Switch Sales Scheme" as used in this indictment further refers to systematic and sustained efforts undertaken by the defendants, both personally and through the Bene Market Group, to encourage, facilitate, and ensure that the Bene Market Group staff and sales team regularly employed and used these false, misleading, and deceptive sales practices when selling Limited Benefit Plans to consumers, including by:

    a. bundling Limited Benefit Plans together with other products and add-ons before marketing and selling to consumers so the plans would (i) appear to provide, or appear similar to, Major Medical Insurance coverage, and (ii) cost the consumer more;

    b. preparing, revising, approving, and distributing misleading and deceptive sales scripts to the sales staff;

    c. preparing, revising, approving, and distributing misleading and incomplete benefit summaries to the sales team about the Limited Benefit Plans, and not providing the sales staff with copies of the actual policies or complete benefit packages from the carriers whose products were being sold;

    d. training and practicing misleading sales pitches and tactics with the sales staff, and requiring the sales staff to listen to deceptive sales calls as representative examples of the way the Limited Benefit Plans should be sold;

8

e.  assigning unlicensed agents to the sales team, telling unlicensed sales
    agents that they did not need insurance licenses to sell plans, and
    allowing unlicensed agents to log sales of Limited Benefit Plans under
    the licenses of other agents;

f.  not materially disciplining or correcting sales agents for making
    misleading and deceptive sales pitches to consumers;

g.  directing sales agents to falsely tell consumers that specific conditions,
    medications, and treatments were covered;

h.  instructing administrative staff to complete tasks supposed to be
    performed by sales agents, such as licensure training and testing, and
    responding to consumer complaints;

i.  transferring employees to back-end departments or functions when
    they complained about the fraudulent and misleading sales tactics used
    with consumers;

j.  altering the recorded verification disclaimers and disclosures about the
    Limited Benefit Plans after the fact, to make it appear as though the
    consumer had agreed to or acknowledged a disclaimer or disclosure
    which had not been played;

k.  signing up consumers to sham partnership or group employment
    agreements in an attempt to circumvent ACA requirements and
    regulation by state insurance departments;

l.  disregarding and brushing aside repeated complaints from consumers
    about deceptive and misleading sales practices by Bene Market Group

9

agents, and about the lack of insurance coverage from the Limited Benefit Plans;

m. disregarding and brushing aside requests, sanctions, orders, and investigations by state regulators and insurance boards which attempted to correct the deceptive sales practices of the defendants and of the Bene Market Group and its sales agents;

n. allowing sales agents to continue to sell Limited Benefit Plans, and to serve as supervisors and trainers for the Bene Market Group, after those agents had been being sanctioned and fined by state regulators and insurance boards for improper sales practices;

o. switching entities, trade names, and products to avoid state regulators, carrier issues, consumer complaints, and legal issues; and

p. concealing defendant ALAN REDMOND's control over defendant SEGURO MEDICO, including through the use of nominees and through perjury and false statements.

16.    The term "Victim-Purchasers" as used in this indictment refers to the tens of thousands of individual consumers who were sold and purchased Limited Benefit Plans from the Bene Market Group between 2018 and 2022 as part of the Bait and Switch Sales Scheme.

10

## THE CONSPIRACY

17.    From on or about January 1, 2018, to on or about December 2, 2022, in

Berks County, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ALAN REDMOND,**
**BENE MARKET LLC,**
**SEGURO MEDICO LLC,**
**ARTHUR WALSH,**
**JESUS BARRERA, and**
**ALBERT GROFF**

conspired and agreed with each other, and with others known and unknown to the grand jury, to

commit an offense against the United States, that is, to knowingly execute, and attempt to

execute, a scheme to defraud the Victim-Purchasers by designing, operating, and participating in

the Bait and Switch Sales Scheme, and to obtain money and property from the Victim-

Purchasers by means of materially false and fraudulent pretenses, representations, and promises,

and to use wire communications in interstate commerce to further the scheme to defraud, in

violation of Title 18, United States Code, Section 1343.

18.    The primary object of the Bait and Switch Sales Scheme was for the

defendants to enrich themselves by obtaining and converting to their personal use the money of

the Victim-Purchasers.  The defendants each received significant payments or distributions from

the Bene Market Group, and defendant ALAN REDMOND also used the Bene Market Group to

purchase personal properties, luxury items, commercial properties, jewelry, airline tickets, event

tickets, private school tuition, and limousine services.

19.    Between 2018 and 2022, the defendants, through their operation of the

Bene Market Group and their execution of the Bait and Switch Sales Scheme, received tens of

millions of dollars in commissions out of the premium payments paid by tens of thousands of

Victim-Purchasers who purchased Limited Benefit Plans.

20.    The Limited Benefit Plans sold to Victim Purchasers did not provide the insurance coverage that had been promised and represented by the defendants and the Bene Market Group on the sales calls. The Limited Benefit Plans did not cover a majority percentage of the medical, dental, and prescription costs of the Victim Purchasers, and in many instances, did not cover any of the Victim Purchasers' healthcare costs. In some instances, the Limited Benefit Plans sold by the defendants were not even insurance.

21.    When the Victim-Purchasers attempted to use the Limited Benefit Plans purchased from the Bene Market Group, they were routinely informed by medical providers, dental providers, pharmacies, and billing specialists that the Limited Benefit Plans purchased from the Bene Market Group were not actually insurance, did not provide any coverage, or only provided limited and restricted benefits.

22.    As result of the Bait and Switch Sales Scheme, the Victim-Purchasers were left without insurance coverage for the majority of their medical, dental, and prescription costs. For some Victim-Purchasers with serious health care needs, the lack of coverage from the Limited Benefit Plans sold by the defendants caused financial hardship and left them in significant medical debt in the tens and hundreds of thousands of dollars.

**MANNER AND MEANS**

It was part of the conspiracy and the Bait and Switch Sales Scheme that:

23.    Defendant ALAN REDMOND caused the Bene Market Group to pay lead generation entities and websites ("Paid Lead Generators") for leads on consumers who were looking to purchase healthcare insurance products from licensed insurance agents. These Paid Lead Generators typically advertised and offered consumers a free quote on health insurance if the consumers filled out an online form or provided certain information.

12

24.    The Paid Lead Generators used websites to generate consumer leads that were routed to the Bene Market Group's call center in or near Reading, Pennsylvania, where employees of the Bene Market Group known as "fronters" spoke with the consumers and offered to help them get a health insurance quote. The fronters obtained some basic information from the consumers, touted the products and process, and then transferred the consumers to salespersons at the Bene Market Group known as "closers" or "agents."

25.    Defendants ALAN REDMOND, ARTHUR WALSH, and JESUS BARRERA prepared, revised, approved, and distributed scripts and sales pitches for the Bene Market Group fronters and closers to use in selling the Limited Benefit Plans to the consumers who had been referred by the Paid Lead Generators. These defendants, along with defendant ALBERT GROFF, regularly trained the Bene Market Group fronters and closers on the scripts and the sales pitches used by the Bene Market Group.

26.    These scripts and sales pitches were false and misleading. They were designed to create the false impression that the Limited Benefit Plans sold by the Bene Market Group covered considerably more medical and dental services, and paid larger portions of the consumers' medical bills and prescriptions, than they actually did.

27.    The scripts and sales pitches often required fronters and closers to falsely state that Bene Market Group served as "the national enrollment center" which worked with "over thirty A-rated carriers" in the consumer's state and that the Bene Market Group shopped the entire insurance marketplace for the consumer. These statements created the false impression that the Bene Market Group was functioning as an impartial broker for the top-rated health insurance businesses in the consumer's state and would help the consumer research and choose an insurance policy that best met their needs. In fact, the purpose of the calls was for Bene

13

Market Group to sell the Victim-Purchasers a specific Limited Benefit Plan which Bene Market Group had a specific contract to sell.

28.    As the defendants were well aware, many of the Bene Market Group sales agents, including defendants ALBERT GROFF, JESUS BARRERA, and ARTHUR WALSH, made additional false statements and misrepresentations, beyond those contained in the standard scripts and sales pitch, for the purpose of selling the Limited Benefit Plans. These false statements included fraudulently representing that the plans and bundles sold by the Bene Market Group were comprehensive Major Medical Insurance, mimicked Major Medical Insurance, or provided coverage equivalent to Major Medical Insurance at a lower cost.

29.    In addition to affirmative false statements, the Bene Market Group fronters and closers regularly concealed, omitted, and told half-truths to consumers about material limitations of the Limited Benefit Plans, such as concealing that the plans often only covered consumers' medical expenses up to a limited cap amount, whereas Major Medical Insurance typically covered the majority of consumers' medical expenses after their deductible amounts were reached.

30.    At the conclusion of the sales calls, the Bene Market Group closers typically played a verification recording or transferred the consumers to the verification department, which reviewed various terms and conditions relating to the plans and products sold. The closers often prepped the consumers so that they would agree that they understood the terms and conditions during the verifications. For example, the closers falsely told consumers that the verifications were outdated, that the verifications were generic to all products sold, that the verifications could be ignored, or that the verifications could be passed over by just pressing 1. In other instances, the Bene Market Group simply skipped or shortcut the verification process

14

altogether when selling Limited Benefit Plans to consumers.

31.    Towards the end of the sales pitches, the closers often told consumers if they had any questions or concerns about their plans or benefits, they should call the Bene Market Group, rather than the carriers that issued the plans. The phone number of the Bene Market Group was also frequently included on the emails or materials provided to the Victim-Purchaser following a sale. This was done to prevent the carriers from learning of the Bene Market Group's deceptive and misleading sales tactics, and to give the Bene Market Group an opportunity to prevent the Victim-Purchasers from cancelling their plans and causing the defendants to lose the commissions from those sales.

32.    If the Victim-Purchasers stated that they wanted to cancel their plans, they were typically transferred to the Bene Market Group's Customer Service Department. The goal of the Customer Service Department was to "retain" or "save" the sale and prevent the Victim-Purchasers from cancelling Limited Benefit Plans. For this reason, members of the Customer Service Department were trained by the defendants on "rebuttals" to use with Victim-Purchasers. These rebuttals were designed to mollify the Victim-Purchasers, convince them that the Limited Benefit Plans they had purchased were valuable, and prevent the Victim-Purchasers from cancelling their plans.

33.    At all times between 2018 and 2022, the defendants were aware that the Bait and Switch Sales Scheme employed false and fraudulent sales tactics. Prior to and throughout this five-year period, the defendants disregarded the numerous complaints, requests, cancellations, chargebacks, investigations, lawsuits, sanctions, and orders from Victim-Purchasers, carriers, and state regulators and insurance boards regarding the misleading and deceptive sales practices of (i) NBOA, defendant BENE MARKET, and defendant SEGURO

15

MEDICO, and (ii) the individual defendants and other management and closers of the Bene Market Group.

34.    In furtherance of and as a foreseeable consequence of the conspiracy and scheme to defraud, the defendants caused telephone calls to be transmitted in interstate commerce by means of wire and radio communication between the Eastern District of Pennsylvania and Victim-Purchasers located throughout the United States.

35.    In furtherance of and as a foreseeable consequence of the conspiracy and scheme to defraud, the defendants caused electronic emails to be transmitted in interstate commerce by means of wire and radio communication and those emails were originated or received in the Eastern District of Pennsylvania.

36.    In furtherance of and as a foreseeable consequence of the conspiracy and scheme to defraud, the defendants caused insurance cards, discount cards, and policy information to be sent both via electronic email and the United States Mail to Victim-Purchasers located throughout the United States.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, defendants ALAN REDMOND, BENE MARKET, SEGURO MEDICO, ARTHUR WALSH, JESUS BARRERA, and ALBERT GROFF, along with others known and unknown to the grand jury, committed and caused the commission of the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.    On or about January 1, 2018, defendant ALAN REDMOND transitioned the majority of NBOA's employees to the payroll of defendant BENE MARKET.

2.    On or about September 24, 2018, defendant ALAN REDMOND

16

instructed defendant JESUS BARRERA to build Short Term Medical bundles and add-ons to be sold to consumers.

3.     On or about November 11 or 12, 2018, defendant ARTHUR WALSH trained new fronters with the Bene Market Group. This training included use of a misleading training PowerPoint and call scripts.

4.     On or about February 16, 2019, defendant ALAN REDMOND received an email from a representative of defendant BENE MARKET with an attachment of twenty-five pending insurance licensing issues and regulatory complaints regarding Bene Market Group employees, including complaints against NBOA and against defendants REDMOND and ALBERT GROFF.

5.     On or about March 7, 2019, in a phone call with Victim-Purchaser L.G., a fronter with defendant BENE MARKET misled L.G. in connection with the purchase of a Limited Benefit Plan, including by falsely stating that defendant BENE MARKET "shop[s] the entire market, that's every provider in the United States to get you the most coverage for the most affordable rate," that defendant BENE MARKET "shop[s] all 37 providers, [listing Major Medical carriers], just to name a few," and that L.G. would be transferred to a closer who "has been with the company almost 10 years" to finalize the sale.

6.     On or about March 15, 2019, in a phone call with Victim-Purchaser D.G., a representative with defendant BENE MARKET falsely told P.G. that the Limited Benefit Plan purchased was "absolutely major medical" and a "comprehensive full coverage policy" and "it is major medical coverage, yes, for the second time." The representative of Bene Market Group also falsely told D.G. that "even if you exceed the amount the policy awards you'll be on the network negotiated rate so even after the 6 visits you'll be on the 80/20 split [where] health

17

insurance takes 80% you take the other 20%."

7.    On or about March 26, 2019, in a phone call with Victim-Purchaser G.C., a representative with defendant BENE MARKET misled G.C. in connection with the purchase of a Limited Benefit Plan, including by falsely stating that "there's nothing considered out of network [with this plan because] so everything's in network for you" and that G.C. would receive an insurance card stating that G.C. had insurance coverage with a specific well-known A-rated insurance carrier that G.C. could use anywhere in the United States.

8.    On or about September 13, 2019, defendant ALAN REDMOND emailed a representative of defendant BENE MARKET about dealing with the seven outstanding administrative regulatory actions against defendant ALBERT GROFF, including the revocation of defendant GROFF's insurance sales license in multiple states.

9.    On or about September 18, 2019, defendant JESUS BARRERA emailed defendant ALAN REDMOND to confirm the following day's sales plan for the Bene Market Group, and to confirm that defendant BARRERA had spoken with the sales manager about "each closer and what is expected of them" to increase sales of Limited Benefit Plans to hit sales targets.

10.    On or about October 28, 2019, defendant JESUS BARRERA created and sent defendant ALAN REDMOND a misleading sales brochure for the Limited Benefit Plans being sold by the Bene Market Group.

11.    On or about December 15, 2019, defendant JESUS BARRERA emailed defendant ALAN REDMOND with an outline for the following day's Bene Market Group meeting which contained a misleading new pitch for closers that falsely claimed "we have been granted a special open enrollment extension this is your only option if not you will go without

18

coverage for 2020," and assigned staff to (i) flip existing customers and (ii) sell customers who sought to cancel their Limited Benefit Plans.

12.    On or about December 27, 2019, defendants ALAN REDMOND and ARTHUR WALSH, through Bene Market Group employees working at their direction, registered defendant SEGURO MEDICO as a limited liability company in the State of Delaware.

13.    On or about January 3, 2020, defendants ALAN REDMOND and ARTHUR WALSH, on behalf of defendant SEGURO MEDICO, signed a Consultation Agreement.

14.    On or about April 29, 2020, defendant ALAN REDMOND emailed defendant JESUS BARRERA with the new sale commission levels for the Bene Market Group closers, which was between 7% and 16% depending on the type of Limited Benefit Plan sold, along with a 5% sale commission for the fronters.

15.    On or about May 21, 2020, defendant ALAN REDMOND emailed defendant JESUS BARRERA with the direction to "make sure we are a HIP [Hospital Indemnity Plan] call center. Only special builds w[h]ere we add on STM [Short Term Medical] is if budget is high."

16.    On or about June 23, 2020, defendant ALAN REDMOND emailed defendants JESUS BARRERA and ARTHUR WALSH with instructions to train the sales team with deceptive tactics to pre-emptively combat and mollify consumer concerns about the verification screen disclosure that the Limited Benefit Plans sold by the Bene Market Group were not insurance: "It says – 'this is not insurance' on the [consumer's] verification screen. How do we combat that? Simple! This is an innovative health sharing plan. It is much better than

MM [Major Medical] but mimics health insurance OR ver[ification] says, 'that is for the admin portion[.]'"

17.    On or about July 29, 2020, defendant ALAN REDMOND filed a certificate of organization for U.S. Trifecta LLC with the Pennsylvania Department of State.

18.    On or about September 5, 2020, defendant ARTHUR WALSH signed "Agent Compliance Guidelines" with a carrier to be followed when selling that carrier's healthcare products.

19.    On or about October 12, 2020, and October 13, 2020, defendant BENE MARKET offered monetary cash bonuses to employees if they hit sales volume targets related to new sales transfers and closings.

20.    On or about November 3, 2020, a representative of defendant BENE MARKET emailed a state insurance regulator a copy of a $1,000 check drawn on the account of defendant SEGURO MEDICO to pay a fine associated with the conduct of defendant ALBERT GROFF and copied defendant ALAN REDMOND on the email.

21.    On or about December 7, 2020, defendant ALAN REDMOND sent an email to defendants JESUS BARRERA and ARTHUR WALSH, instructing them to create marketing materials for the Bene Market Group's sales team to sell a new Limited Benefit Plan and then to train the sales team on those marketing materials the following day.

22.    On or about December 18, 2020, defendant ARTHUR WALSH emailed defendant ALAN REDMOND a copy of the executed Consent Order for a Bene Market Group closer who sold or negotiated insurance applications "while unlicensed and made misrepresentations to the consumers when enrolling these consumers into limited benefit and discount medical plans."

20

23.    On or about December 30, 2020, in a phone call with Victim-Purchaser L.F. in connection with the cancellation request of a Limited Benefit Plan sold by defendant ALBERT GROFF, a customer service employee with defendant BENE MARKET made false and misleading claims to L.F., including claiming to be "the compliance officer for the state of California" and stating that defendant GROFF had no obligation to disclose the plan's limitations to L.F. when selling the plan.

24.    On or about December 28, 2020, when Victim-Purchaser R.M. called the Bene Market Group seeking Major Medical Insurance, an unlicensed closer with defendant BENE MARKET sold R.M. a Limited Benefit Plan through false and misleading claims, such as representing that "the only difference between Major Medical and the plans that are through some of the ACA plans here would be the pregnancy benefit," the Limited Benefit Plan offered will "get you a real traditional set of benefits, this is not going to be an indemnity plan like you had previously," and this plan was a "real healthcare plan this time."

25.    On or about January 10, 2021, defendant ALAN REDMOND received from a representative of defendant BENE MARKET and SEGURO MEDICO, an email attachment which "assigned all non-selling licenses to non-licensed agents" so that the non-licensed agents would sell Limited Benefit Plans to consumers by using another agent's insurance license. Of the nineteen closing agents named in the email attachment, seven were listed as being licensed.

26.    On or about January 20, 2021, in a phone call with Victim-Purchaser P.G., a fronter with defendant BENE MARKET falsely told P.G. that "we're an enrollment center" for "major medical plans" and that "with major medical we offer you full major medical with little or no deductible and also eliminating your out of pocket expenses, so you'll just be looking at

21

your monthly premium and that's it." The fronter then transferred P.G. to an unlicensed closer with defendant BENE MARKET and informed the unlicensed closer that P.G. "does not want an indemnity plan . . . she's looking for a full major medical." The unlicensed closer then falsely represented that the Limited Benefit Plan sold by the Bene Market Group to P.G. was "not a supplemental policy" and misled P.G. into believing that the plan was Major Medical Insurance.

27. On or about March 5, 2021, in a phone call with Victim-Purchaser A.S., a closer with defendant BENE MARKET falsely told A.S. that the Limited Benefit Plan sold to her was Major Medical Insurance and would cover Emergency Room visits.

28. On or about March 7, 2021, defendant JESUS BARRERA emailed a schedule of events for the following day to defendants ALBERT GROFF, ALAN REDMOND, and ARTHUR WALSH, which included reviewing a new sales pitch with the Bene Market Group's closers, finding consumers' "pain points" and "use these pain points against them," and reminding closers to falsely tout that "you are going to shop all 32-A rated carriers" to consumers.

29. On or about April 9, 2021, defendant JESUS BARRERA emailed defendant ALAN REDMOND the misleading marketing materials in active use by the Bene Market sales team.

30. On or about April 21, 2021, defendant ARTHUR WALSH told a Bene Market Group manager and defendant ALAN REDMOND that defendant JESUS BARRERA would send over recorded sales calls from defendant ALBERT GROFF to use when training the new closers.

31. On or about April 27, 2021, defendant ARTHUR WALSH created and emailed defendant ALAN REDMOND a misleading sales brochure for the Bene Market Group,

which defendant REDMOND forwarded to defendant JESUS BARRERA.

32. On or about May 14, 2021, defendant JESUS BARRERA sent defendant ALAN REDMOND a verification recording script stating that the Limited Benefit Plan being sold was "not affiliated through the affordable care act and is not a Major Medical Plan."

33. On or about May 17, 2021, defendants ALBERT GROFF and JESUS BARRERA conducted training with the Bene Market Group fronters, and during the training defendants GROFF and BARRERA provided false and misleading sales tactics and phrases to these fronters to use in their calls.

34. On or about May 20, 2021, defendant ALAN REDMOND conducted sales pitch training for Bene Market Group employees.

35. On or about May 21, 2021, defendant ALAN REDMOND instructed the Bene Market Group managers to roll out and begin selling a new carrier the following day, in order to take business away from another one of the Bene Market Group's carriers.

36. On or about May 25, 2021, defendant JESUS BARRERA emailed defendant ALAN REDMOND the content of a text message campaign being sent to consumers the following day, which falsely touted the Bene Market Group to consumers as "the national enrollment center for health insurance."

37. On or about June 16, 2021, defendant JESUS BARRERA emailed to defendants ALAN REDMOND and ARTHUR WALSH new sale brochures for the Limited Benefit Plans being sold by the Bene Market Group.

38. On or about June 26, 2021, defendant ALAN REDMOND emailed defendant ARTHUR WALSH a list of perceived threats to the Bene Market Group's operations along with notes on how to make them go away.

39.    On or about July 5, 2021, defendant ALAN REDMOND emailed defendant ARTHUR WALSH with an instruction stating: "You print – do not let someone else print." The email attached a copy of a draft Consent Order relating to defendant REDMOND's company U.S. Trifecta LLC, which outlined that defendant REDMOND had seven prior administrative actions taken against him between 2017 and 2018, including revocation of his license in four jurisdictions for "transacting business without a license" and for "violations of insurance laws and untrustworthiness."

40.    On or about July 27, 2021, in a phone call with Victim-Purchaser B.B. in connection with the sale of a Limited Benefit Plan, a closer with defendant BENE MARKET misled B.B. into believing the Limited Benefit Plan was not a supplemental or discount plan and falsely told B.B. that the government gave the plan "its stamp of approval that yes, this is health insurance" and that the plan was an "affordable care act policy, that way you know for sure this is actual health insurance and my doctor cannot deny me."

41.    On or about July 28, 2021, while conducting training with the Bene Market Group sales team, defendant ALBERT GROFF provided employees with misleading phrases and rebuttals to use on their sales calls, including that the Limited Benefit Plan sold by the Bene Market Group was an "ACA compliant plan, what that means is that the government has reviewed this policy and has given it their stamp of approval that this is indeed health insurance."

42.    On or about July 30, 2021, defendant ALAN REDMOND instructed a Bene Market Group manager not to refund a Victim-Purchaser's cancellation request until she removed her fraud complaint.

43.    On or about August 18, 2021, in a series of phone calls with Victim-

24

Purchaser P.L., defendant ALBERT GROFF falsely told P.L. that he would be "covered day one dollar one without having to spend any of your own money" and "you won't be able to buy better insurance." When P.L. questioned defendant GROFF about the verification disclaimers, defendant GROFF falsely told P.L. that "the out-of-network [limitation] is just on there [the verification] because it's a technicality" and that defendant GROFF would just "send you straight through so you don't have to go through this dumb recording."

44.     On or about August 20, 2021, defendant ALAN REDMOND instructed Bene Market Group employees to send out emails informing consumers that they were being refunded, while also instructing his employees "but DO NOT REFUND" the complaining consumers.

45.     On or about August 24, 2021, defendant JESUS BARRERA emailed defendants ALAN REDMOND and ARTHUR WALSH a "plan to hit 100 deals," which included rolling out a new "POP" with the sales team that included using consumers' "pain against them" to get the deals closed and paid.

46.     In or about August 2021, defendant BENE MARKET did not cancel the Limited Benefit Plan purchased by Victim-Purchaser T.J., despite T.J.'s multiple calls and emails requesting cancellation and refund because the Limited Benefit Plan sold to T.J. did not cover cancer removal or medical care for his bladder cancer.

47.     On or about September 2, 2021, in a phone call with Victim-Purchaser C.S. in connection with the sale of a Limited Benefit Plan, a closer with defendant BENE MARKET misled C.S. about the upcoming verification recording, including by stating: "I just want to get over this little hurdle with you. The first thing they say in the [verification] recording is this policy is not ACA compliant. What they mean by that is the government is not sponsoring

25

this plan" and "do us both a favor and as they go through it press 1 at the end of each statement" so the recording would not stop. Based on these instructions, C.S. then agreed to the verification recording, including the statement: "You understand this policy does not meet the minimum requirements of the Affordable Care Act."

48.    On or about September 2, 2021, in a phone call with Victim-Purchaser T.M. in connection with the sale of a Limited Benefit Plan, a closer with defendant BENE MARKET falsely told T.M.:

   a. "I shop the entire market for you. So I don't work for just one insurance provider. I'll take a look at the entire market."

   b. The offered plan "is through the Affordable Care Act. So it does have that stamp of approval from the government that yes, this is legitimate insurance and that, yes, this is going to cover what it needs to cover."

   c. Maternity visits and eventual birth of T.M.'s child with his girlfriend would be covered by the Limited Benefit Plan and that with the infant's birth "you would have no deductible and no co-insurance for you would have no up-front out of pocket expenses" because with this policy "they're not going to deny her. They don't care if she's pregnant."

   d. When T.M. asked "so our maternity visits would only be what'd you say $50 a visit?" the closer responded "Correct. Exactly." And when T.M. followed up asking "and the birth is nothing?" the closer responded "Correct. You would have no up-front out of pocket expenses. Correct."

49.    On or about October 4, 2021, when Victim-Purchaser B.B. called the Bene Market Group from the hospital after B.B. had suffered a stroke, and after B.B. complained that the plan the Bene Market Group previously sold her did not cover any of her hospital or medication expenses and requested to cancel the plan, a representative of defendant BENE MARKET twice attempted to sell B.B. another Limited Benefit Plan before agreeing to cancel.

50.    On or about October 23, 2021, in a phone call with Victim-Purchaser R.S.

26

in connection with the sale of a Limited Benefit Plan, defendant JESUS BARRERA misled R.S.,
including by falsely telling R.S. that "back in 2008, when they came out with the ACA, they
rebranded health insurance as policies that are only sold by the government, ok, so this policy
here isn't sold by the government and has been reclassified as a health share program. Now it's
the exact same thing as insurance, just not sold by the government" and that with the plan R.S.
would only "have a co-pay of only $20 whenever you go to the doctor, ok. That's one of the
lowest copays out on the market. It's $20 whenever you go and no bill in the mail that you have
to worry about."

51.    On or about November 6, 2021, in a phone call with Victim-Purchaser
B.C. in connection with the sale of a Limited Benefit Plan, defendant JESUS BARRERA misled
B.C., including by falsely telling B.C. that his name was "Jerry" and that "I'm going to shop the
entire market here, I'm going to shop all 32 of the A rated carriers in your state."

52.    On or about November 9, 2021, in a phone call with Victim-Purchaser
J.R., defendant ALBERT GROFF misled J.R., including by falsely telling J.R. that he, defendant
GROFF, had personally been on the same plan for the past two years, and that defendant GROFF
successfully used the plan to cover a $50,000 cornea transplant while only paying $350.
Defendant GROFF also misrepresented that the Limited Benefit Plan was pretty much the same
as a specific well-known Major Medical carrier but "better" because there was no deductible and
the plan covered 100% of services instead of 80%, and that "no matter what curveball life throws
you, the most you'll ever spend is $350."

53.    On or about November 17, 2021, in a phone call with Victim-Purchaser
E.T., who was seeking health insurance for her husband, defendant ALBERT GROFF misled
E.T., including by falsely telling E.T. that defendant GROFF's company worked with 30 of the

top A-rated insurance companies and then listed five well-known Major Medical insurance carriers. Defendant GROFF also falsely told E.T. that with the Limited Benefit Plan offered, the "only thing [her husband] would pay on a hospitalization is a $350 dollars co-pay and then the insurance would pay 100% after that. It's literally as good as it gets. Like if he had a heart attack got two stents put in his heart and ended up having $80,000 bill once he pays $350 the insurance is paying everything after that, it's literally as good as it gets . . . . It's a privatized insurance that meets all the credentials of Obamacare . . . . The only thing you're gonna find comparable [in price similar to this] is like hospital discount plans, which aren't real health care. They're gonna be like glorified accident plans. That's the only thing you'll be able to find" at a similar price point.

54.    On or about November 18, 2021, defendant ALAN REDMOND instructed a Bene Market Group employee to refund a complaining Victim-Purchaser but only if the Victim-Purchaser first retracted the complaint filed with the state department of insurance about the sale.

55.    On or about November 29, 2021, in a phone call with Victim-Purchaser R.W., a closer with defendant BENE MARKET misled R.W., including by falsely telling R.W. that the Bene Market Group "work[ed] with over 127 A-rated carriers and we have hundreds and hundreds of policies" and that "we are like a Kayak[.com] of insurance, we search all the carriers" after filtering based on the consumers' information.

56.    On or about December 11, 2021, in a phone call with Victim-Purchaser L.R., defendant ALBERT GROFF misled L.R., including by falsely telling L.R. that he was a salaried employee and non-commissioned: "I don't get paid a commission, alright." Defendant GROFF also falsely told L.R. that the Limited Benefit Plan pitched to L.R. was the "same plan I

28

use" and that defendant GROFF used the plan to cover an $80,000 cornea transplant while only paying $350. In addition, defendant GROFF falsely represented that the "government had reviewed" the Limited Benefit Plan which would "cover pre-existing conditions, it covers hospital benefits, there's a prescription plan, this meets all the criteria" and that "there's no cap on the coverage either" because "you're getting a comprehensive Major Medical health insurance," "which is getting accepted everywhere," and "you're going to have no issues with this insurance."

57.     On or about January 3, 2022, in a phone call with Victim-Purchaser R.C., defendant ARTHUR WALSH misleadingly solicited R.C. to purchase a Limited Benefit Plan with the Bene Market Group, including by falsely telling R.C.: "[W]e're actually the largest health insurance enrollment center in the County, we work with all the major carriers, [listing multiple Major Medical insurance carriers along with one discount carrier,] all the ones I'm sure you've heard of before. And what I do is I have a database that shows me pretty much everything that's out there and available to you, and I try to get you the best set of benefits at the most affordable rates that I can." During the call, defendant WALSH also misrepresented the Limited Benefit Plan sold to R.C. to be a "pretty solid, pretty comprehensive plan" where "once you pay your copay then everything after that is covered at 100%" and that "99.9% of [doctors] accept this plan."

58.     On or about January 3, 2022, in a phone call with Victim-Purchaser J.S., defendant ARTHUR WALSH fraudulently solicited J.S. to purchase a Limited Benefit Plan with the Bene Market Group through misrepresentations and half-truths, including by falsely instructing J.S. to "keep pressing 1 after each prompt" in the verification recording because it was a "very generic" recording used for all plans and did not necessarily pertain to the specific

29

plan purchased by J.S.

59.    On or about January 3 and 4, 2022, defendant JESUS BARRERA prepared and revised a response for defendant ALBERT GROFF to a consumer complaint submitted to the state department of insurance by Victim-Purchaser P.L., and defendant BARRERA also materially edited and altered a recording of the sales verification portion of P.L.'s sales call after the fact in order to support defendant GROFF's false response to state regulators.

60.    On or about January 6, 2022, in a phone call with Victim-Purchaser R.T., defendant ALBERT GROFF misled R.T. in connection with the purchase of a Limited Benefit Plan, including by falsely telling R.T. that "we are the largest enrollment center in the United States. We work with over 30 different insurance companies. What I do is filter through them to get you the best coverage at the lowest cost." Defendant GROFF also falsely represented to R.T. that "what I'm selling you is called a comprehensive Major Medical," which is "legitimate insurance" and "significantly better [than a specific Major Medical carrier]," and "it does cover pre-existing conditions." In addition, defendant GROFF misrepresented that if R.T.'s spouse "was admitted into the hospital, you have no annual deductible, the co-insurance is 100%, the only thing you would be financially responsible for is a one-time hospital admission co-pay of $350, after that your insurance would pay 100% of the bill," and defendant GROFF falsely claimed that he personally used the same plan to cover a $90,000 Cornea transplant which only cost him $350.

61.    On or about January 7, 2022, defendant ALAN REDMOND requested a "full list of closers" for the Bene Market Group, and the following day a Bene Market Group representative emailed defendants REDMOND and JESUS BARRERA the requested list of the

30

closing agents, which noted that only four of the sixteen closers at the Bene Market Group were

licensed.

62. On or about January 15, 2022, in a phone call with Victim-Purchaser

E.M., a fronter with defendant BENE MARKET misled E.M. in connection with the purchase of

a Limited Benefit Plan, including by falsely telling E.M. that the Limited Benefit Plan would

cover her pre-existing conditions of stage two brain cancer and herpes simplex encephalitis

("HSE") so that she would "just be able to walk into a hospital walk in wherever you need to go

and be covered without having to pay little to anything out of pocket." The fronter then

transferred E.M. to a closer with defendant BENE MARKET who also misled E.M. into

believing her pre-existing brain cancer and brain disease would be covered by the Limited

Benefit Plan.

63. On or about January 24, 2022, in a phone call with Victim-Purchaser A.C.,

defendant ALBERT GROFF misled A.C. in connection with the purchase of a Limited Benefit

Plan, including by falsely telling A.C. that the Limited Benefit Plan was a "full-fledged,

comprehensive, Major Medical" plan and that if A.C. was "admitted in [to the hospital] the most

you're paying is $350, she has a heart-attack, stroke, whatever the case may be, $350" and that

no more than $350 will ever come out of A.C.'s pocket, even if A.C. was placed on a ventilator

for ten years. Defendant GROFF then relayed the false claim that he personally had used the

same Limited Benefit Plan to cover a $120,000 Cornea transplant, which had only cost him

$350. Defendant GROFF also falsely instructed A.C. that she "can ignore" the verification

recording relating to pre-existing conditions and to just let the verification "go in one ear and out

the other."

64. On or about February 2, 2022, in a phone call with Victim-Purchaser D.P.,

defendant ALBERT GROFF falsely told D.P. that the Limited Benefit Plan sold to D.P.'s spouse on January 28, 2022, was a "a comprehensive major medical" plan that "meets all the criteria of the Affordable Care Act so this is health insurance, this is nothing of the discount or any of that nonsense." When D.P. continued to express concern and question what the plan covered, defendant GROFF falsely stated that "what that lady [at D.P.'s doctor's office] told you [about your plan's limited benefits] was incorrect. She is wrong. You have an extremely comprehensive plan. If you were to have a heart attack and be in the hospital for a week and have a $200,000 bill, you would pay $350 on it." Defendant GROFF also falsely stated that D.P.'s plan "covers pre-existing conditions, it gives you all the things that you and I would consider ordinary and customary in an insurance policy" and "once you meet your $350 [co-pay], the hospital pays 100% after that."

65. On or about April 1, 2022, defendant ALAN REDMOND transitioned the majority of defendant BENE MARKET's employees to the payroll of defendant SEGURO MEDICO.

66. On or about April 25, 2022, defendant ALAN REDMOND directed an employee of defendant SEGURO MEDICO to withhold a refund to a Victim-Purchaser who had overpaid the Bene Market Group due to being double-enrolled in the same plan, and further instructed that the Victim-Purchaser should not be paid back until she first provided proof that she had removed her complaint with the department of insurance.

67. On or about May 22, 2022, defendant ALAN REDMOND directed and ordered defendants ARTHUR WALSH and JESUS BARRERA regarding the operation of defendant SEGURO MEDICO and threatened to dock their paychecks if they did not implement defendant REDMOND's directives.

68.     On or about May 31, 2022, defendant JESUS BARRERA falsely testified in a sworn deposition in Civil Case No. 20-4265 in the United States District Court for the Eastern District of Pennsylvania. Defendant BARRERA testified that he no longer had a working relationship with defendant ALAN REDMOND, he did not know where defendant REDMOND worked currently, only two to six people transitioned from defendant BENE MARKET to defendant SEGURO MEDICO, and that defendant ARTHUR WALSH was in charge of defendant SEGURO MEDICO.

69.     On or about June 7, 2022, defendant ALAN REDMOND instructed the senior managers at defendant SEGURO MEDICO that if anyone outside the entity made a request, "to seek approval from me first before doing anything. EVER. . . . Nothing external is done unless run through me. ZERO. No interviews. No look ups. No nothing. Simply forward me the emails/chats that you may receive." Defendants ARTHUR WALSH and JESUS BARRERA replied to defendant REDMOND's email with "confirmed" and "confirm," respectively.

70.     On or about July 11, 2022, defendant JESUS BARRERA directed defendant ARTHUR WALSH and another manager to train defendant SEGURO MEDICO's sales employees with scripts, rebuttals, internal sales brochures, and the "blue chip pitch (competitive analysis)."

71.     On or about August 15, 2022, defendant ARTHUR WALSH forwarded defendant JESUS BARRERA misleading scripts to rebut frequent consumer complaints.

72.     On or about September 1, 2022, defendant ALAN REDMOND falsely testified in a sworn deposition in Civil Case No. 20-4265 in the United States District Court for the Eastern District of Pennsylvania. Defendant REDMOND testified that the employees of

33

defendant BENE MARKET "were terminated and let go" in March 2020 and that only "10 to

15%" of defendant BENE MARKET's employees went to work for defendant SEGURO

MEDICO.

All in violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, and the

offense victimized ten or more persons over the age of 55, in violation of the SCAMS Act,

punishable under Title 18, United States Code, Section 2326.

## COUNTS TWO THROUGH TWENTY
### (Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs 1 through 16 and 18 through 22 and Overt Acts 1 through 72

of Count One are incorporated here.

### THE SCHEME TO DEFRAUD

2.    From on or about January 1, 2018, to on or about December 2, 2022, in

Berks County, in the Eastern District of Pennsylvania, and elsewhere, defendants

### ALAN REDMOND,
### BENE MARKET LLC,
### SEGURO MEDICO LLC,
### ARTHUR WALSH,
### JESUS BARRERA, and
### ALBERT GROFF

devised and intended to devise a scheme to defraud the Victim-Purchasers and to obtain money

and property by means of knowingly false and fraudulent pretenses, representations, and

promises through the Bait and Switch Sales Scheme.

### MANNER AND MEANS

It was part of the scheme that:

1.    Paragraphs 23 through 36 of Count One are incorporated here.

### THE WIRINGS

2.    On or about each of the dates and in the locations set forth below, in the

Eastern District of Pennsylvania, and elsewhere, having devised and intending to devise the Bait

and Switch Sales Scheme, defendants

35

**ALAN REDMOND,**
**BENE MARKET LLC,**
**SEGURO MEDICO LLC,**
**ARTHUR WALSH,**
**JESUS BARRERA, and**
**ALBERT GROFF,**

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce the signals and signs

described below, each transmission constituting a separate offense:

| COUNT | DATE | DESCRIPTION OF INTERSTATE WIRE |
|---|---|---|
| 2 | 06/23/20 | Email from defendant ALAN REDMOND to representatives of defendant BENE MARKET, including defendants JESUS BARRERA and ARTHUR WALSH, with instructions to train the Bene Market Group closers with fraudulent and misleading sales tactics |
| 3 | 12/30/20 | Telephone call between representative of defendant BENE MARKET in Pennsylvania and Victim-Purchaser L.F. in California, in connection with L.F.'s attempted cancellation of a Limited Benefit Plan, in which a representative from the Bene Market Group misled L.F. |
| 4 | 01/10/21 | Email from a representative of defendants BENE MARKET and SEGURO MEDICO to defendant ALAN REDMOND with an attached "agents list" which "assigned all non-selling licenses to non-licensed agents" so the non-licensed employees at the Bene Market Group would sell products under the licenses of the licensed agents |
| 5 | 01/20/21 | Telephone call between an unlicensed closer with defendant BENE MARKET in Pennsylvania and Victim-Purchaser P.G. in Florida, in which the unlicensed closer fraudulently solicited P.G. to purchase a Limited Benefit Plan through numerous misrepresentations and half-truths |
| 6 | 04/21/21 | Email from defendant ARTHUR WALSH to defendant ALAN REDMOND and a representative of the Bene Market Group confirming that defendant JESUS BARRERA would "pull the Albert [defendant ALBERT GROFF] calls for you and email them over to you for training" with the new Bene Market Group sales agents |

| COUNT | DATE | DESCRIPTION OF INTERSTATE WIRE |
|---|---|---|
| 7 | 04/27/21 | Email from defendant ALAN REDMOND to defendant JESUS BARRERA forwarding an email from defendant ARTHUR WALSH and attaching a misleading internal sales brochure summary titled "KISS Principles" for the Bene Market Group employees to use when selling the Limited Benefit Plans |
| 8 | 05/25/21 | Email from defendant JESUS BARRERA to defendant ALAN REDMOND and other representatives of the Bene Market Group which contained the content of text messages to be sent to 2,000 unsold consumers the following day and which falsely stated, "I am reaching out from the national enrollment center for health insurance." |
| 9 | 07/27/21 | Telephone call between a closer with defendant BENE MARKET in Pennsylvania and Victim-Purchaser B.B. in Delaware, in which the closer fraudulently solicited B.B. to purchase a Limited Benefit Plan with the Bene Market Group through numerous misrepresentations and half-truths |
| 10 | 08/18/21 | Telephone calls between defendant ALBERT GROFF in Pennsylvania and Victim-Purchaser P.L. in Maryland, in which defendant GROFF fraudulently solicited P.L. to purchase a Limited Benefit Plan with the Bene Market Group through numerous misrepresentations and half-truths |
| 11 | 09/02/21 | Telephone call between a closer with defendant BENE MARKET in Pennsylvania and Victim-Purchaser T.M. in Maine, in which the closer fraudulently solicited T.M. to purchase a Limited Benefit Plan through numerous misrepresentations and half-truths |
| 12 | 10/23/21 | Telephone call between defendant JESUS BARRERA in Pennsylvania and Victim-Purchaser R.S. in Rhode Island, in which defendant BARRERA fraudulently solicited R.S. to purchase a Limited Benefit Plan with the Bene Market Group through numerous misrepresentations and half-truths |
| 13 | 11/17/21 | Telephone call between defendant ALBERT GROFF in Pennsylvania and Victim-Purchaser E.T. in Texas, in which defendant GROFF fraudulently solicited E.T. to purchase a Limited Benefit Plan with the Bene Market Group for her husband G.T. through numerous misrepresentations and half-truths |
| 14 | 12/11/21 | Telephone call between defendant ALBERT GROFF in Pennsylvania and Victim-Purchaser L.R. in New York, in which defendant GROFF fraudulently solicited L.R. to purchase a Limited Benefit Plan with the Bene Market Group through numerous misrepresentations and half-truths |

| COUNT | DATE | DESCRIPTION OF INTERSTATE WIRE |
|---|---|---|
| 15 | 01/03/22 | Telephone call between defendant ARTHUR WALSH in Pennsylvania and Victim-Purchaser R.C. in Massachusetts, in which defendant WALSH fraudulently solicited R.C. to purchase a Limited Benefit Plan with the Bene Market Group through numerous misrepresentations and half-truths |
| 16 | 01/03/22 | Telephone call between defendant ARTHUR WALSH in Pennsylvania and Victim-Purchaser J.S. in California, in which defendant WALSH fraudulently solicited J.S. to purchase a Limited Benefit Plan with the Bene Market Group through misrepresentations and half-truths |
| 17 | 01/24/22 | Telephone call between defendant ALBERT GROFF in Pennsylvania and Victim-Purchaser A.C. and A.C.'s spouse in Maine, in which defendant GROFF fraudulently solicited A.C. to purchase a Limited Benefit Plan with the Bene Market Group through numerous misrepresentations and half-truths |
| 18 | 02/22/22 | Telephone call between defendant ALBERT GROFF in Pennsylvania and Victim-Purchaser D.P. in New York, in which defendant GROFF made numerous misrepresentations and half-truths to D.P. in connection with a Limited Benefit Plan sold to D.P.'s spouse on January 28, 2022 |
| 19 | 06/07/22 | Email from defendant ARTHUR WALSH to the senior management team of defendant SEGURO MEDICO confirming defendant ALAN REDMOND's instruction that if anyone outside of the office made a request they must "seek approval from me first before doing anything. EVER. . . . Nothing external is done unless run through me. ZERO. No interviews. No look ups. No nothing." |
| 20 | 06/07/22 | Email from defendant JESUS BARRERA to the senior management team of defendant SEGURO MEDICO confirming defendant ALAN REDMOND's instruction that if anyone outside of the office made a request they must "seek approval from me first before doing anything. EVER. . . . Nothing external is done unless run through me. ZERO. No interviews. No look ups. No nothing." |

All in violation of Title 18, United States Code, Section 1343 and 2.

The offenses occurred in connection with the conduct of telemarketing, and the offenses victimized ten or more persons over the age of 55, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326.

## COUNTS TWENTY-ONE THROUGH TWENTY-SEVEN
### (Failure to Account for and Pay Over Tax)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1.      Paragraphs 2 through 6 of Count One are incorporated here.

2.      The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

3.      Pursuant to the Internal Revenue Code and associated statutes and regulations, employers were required to withhold amounts from their employees' gross pay including Federal Insurance and Contribution Act ("FICA") taxes, which represent Social Security and Medicare taxes, and federal income taxes. Employers were required to remit these taxes (referred to in this indictment collectively as "trust fund taxes" because employers hold the withheld amounts in trust until paid over to the United States) to the IRS on a quarterly basis, no later than the last day of the month following the end of the quarter.

4.      In addition to the trust fund taxes that must be withheld from pay, employers were separately required to make contributions under FICA for Social Security and Medicare in amounts matching the amounts withheld from their employees' pay for those purposes. Such employer contributions were likewise required to be remitted to the IRS no later than the last day of the month following the end of the quarter. Collectively, these five components required to be remitted quarterly were commonly referred to as "employment taxes," made up of the trust fund taxes withheld from the employee's paycheck (individual income, Social Security, and Medicare taxes) and the matching amounts contributed by the employer.

5.    Employers were required to file, one month after the conclusion of the calendar quarter, an Employer's Quarterly Federal Tax Return, Form 941 ("Form 941"), setting forth the total amount of income taxes withheld, the total amount of Social Security and Medicare taxes due, and the total tax deposits.

6.    A person was responsible for collecting, accounting for, and paying over the employment taxes if he or she had the authority required to exercise significant control over the employer's financial affairs, regardless of whether the individual exercised such control in fact. More than one person may be considered a "responsible person" for the purpose of collecting, accounting for, and paying over employment taxes, including trust fund amounts and employers' matching amounts.

7.    Defendant ALAN REDMOND, in addition to being the 96% owner of defendant BENE MARKET, ran the day-to-day operations of defendants BENE MARKET and SEGURO MEDICO between at least 2018 and 2022 and directed control over the financial affairs of these entities by, among other acts, directing employees and managers, approving payments, controlling bank accounts, approving employee payroll and bonuses, signing forms submitted to the IRS, and making financial decisions. Ultimate and final decision-making authority regarding the business activities and financial affairs of defendants BENE MARKET and SEGURO MEDICO rested with defendant REDMOND. Thus, defendant REDMOND was a responsible person for collecting trust fund taxes, accounting for the employment taxes by filing Forms 941 with the IRS, and paying over to the IRS the employment taxes for the employees of defendants BENE MARKET and SEGURO MEDICO.

8.    From at least in or about April 2019 through at least in or about June 2022, defendant ALAN REDMOND, and his agents working at his direction, caused defendants BENE

40

MARKET and SEGURO MEDICO to pay wages to their employees. During this same period, defendant REDMOND, and his agents working at his direction, also caused defendants BENE MARKET and SEGURO MEDICO to withhold trust fund taxes from these wages and to issue Wage and Tax Statements ("W-2" forms) to the employees of defendants BENE MARKET and SEGURO MEDICO indicating that trust fund taxes had been withheld from those wages and implying that those trust fund taxes had been paid over to the IRS.

9.    As a result, during the period from the second quarter of 2019 through the second quarter of 2022, defendant ALAN REDMOND caused defendants BENE MARKET and SEGURO MEDICO to withhold trust fund taxes from their employees' paychecks and file Forms 941 reporting these taxes with the IRS for each tax quarter, but over this same period, defendant REDMOND caused defendants BENE MARKET and SEGURO MEDICO to fail to pay over all of the trust fund taxes due and owing to the IRS on behalf of their employees.

10.    During the period from the second quarter of 2019 through the second quarter of 2022, defendant ALAN REDMOND caused defendants BENE MARKET and SEGURO MEDICO to make thousands of dollars of expenditures for his own personal benefit, including purchases of real property, airline tickets, event tickets, limousine services, vehicle purchases, mortgage payments, and partnership distributions, while, at the same time, failing to pay over to the IRS the trust fund taxes withheld from the paychecks of the employees of defendants BENE MARKET and SEGURO MEDICO.

11.    Altogether, during the seven calendar quarters alleged in Counts Twenty-One through Twenty-Seven of this superseding indictment, defendant ALAN REDMOND caused defendants BENE MARKET and SEGURO MEDICO to fail to pay over approximately $1,230,048.42 in trust fund taxes to the IRS.

41

12.     On or about the dates listed in the table below, for each of the calendar

quarters listed below, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALAN REDMOND**

willfully failed to pay over the trust fund taxes due and owing to the IRS on behalf of the

employees of defendants BENE MARKET and SEGURO MEDICO, with each quarter

constituting a separate count:

| COUNT | Quarter (Year-Month) | Entity | Date of Offense (i.e., Filing Date for Form 941) | Approximate Trust Fund Taxes Due and Owing |
|---|---|---|---|---|
| 21 | 2019-06 | Defendant BENE MARKET | July 29, 2019 | $142,665.72 |
| 22 | 2019-09 | Defendant BENE MARKET | October 30, 2019 | $143,591.46 |
| 23 | 2019-12 | Defendant BENE MARKET | January 30, 2020 | $228,125.75 |
| 24 | 2020-03 | Defendant BENE MARKET | April 29, 2020 | $188,953.17 |
| 25 | 2020-12 | Defendant BENE MARKET | January 30, 2021 | $149,298.17 |
| 26 | 2021-12 | Defendant BENE MARKET | January 31, 2022 | $216,046.20 |
| 27 | 2022-06 | Defendant SEGURO MEDICO | July 31, 2022 | $161,367.95 |

All in violation of Title 26, United States Code, Section 7202.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Sections 1343 and 1349, set forth in this indictment, defendants

**ALAN REDMOND,**
**BENE MARKET LLC,**
**SEGURO MEDICO LLC,**
**ARTHUR WALSH,**
**JESUS BARRERA, and**
**ALBERT GROFF**

shall forfeit to the United States of America any property that constitutes or is derived from proceeds traceable to the commission of such violations including, but not limited to, the sum of at least $30 million, and:

(a)      the real property commonly known as 8 Morgan Drive, Sinking Spring, Pennsylvania;

(b)      the real property commonly known as 2005 Regency Drive, Wyomissing, Pennsylvania;

(c)      the real property commonly known as 1198 Reading Blvd., Reading, Pennsylvania, and

(d)      the real property commonly known as 2 High Road, Wyomissing, Pennsylvania.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided

43

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c), and Title 18,

United States Code, Section 981(a)(1)(C).

A TRUE BILL:

_Derek Hines_ FOR
DAVID METCALF
UNITED STATES ATTORNEY

No._____

## UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

Criminal Division

### THE UNITED STATES OF AMERICA

vs.

ALAN REDMOND
BENE MARKET LLC
SEGURO MEDICO LLC
ARTHUR WALSH
JESUS BARRERA
ALBERT GROFF

SUPERSEDING INDICTMENT

18 U.S.C. § 1349 (wire fraud conspiracy – 1 count)
18 U.S.C. § 1343 (wire fraud – 19 counts)
26 U.S.C. § 7202 (failure to account for and pay over tax – 7 counts)
18 U.S.C. § 2 (aiding and abetting)



Filed