# UNITED STATES BANKRUPTCY COURT

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                        )   Case No. 24-13093-PMM
                              )   Reading, Pennsylvania
ALAN CHRISTOPHER REDMOND,     )
                              )   March 10, 2026
            Debtor.           )   11:07 A.M.


Pages:    1 through 76

Place:    Reading, Pennsylvania

Date:     March 10, 2026

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1150 Connecticut Avenue, N.W., Suite 305
Washington, D.C.  20036
(202) 628-4888
contracts@hrcreporters.com

1

                    UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                          )   Case No. 24-13093-PMM
                                )   Reading, Pennsylvania
ALAN CHRISTOPHER REDMOND,       )
                                )   March 10, 2026
                Debtor.         )   11:07 A.M.

                    TRANSCRIPT OF HEARING
   ORDER TO APPEAR AND SHOW CAUSE WHY THE ATTORNEY WILLIAM
     RUSH SHOULD NOT BE SANCTIONED AND/OR DISCIPLINED;
    OBJECTION TO DEBTOR'S CLAIM OF EXEMPTIONS FILED BY
   CORNERSTONE LAW FIRM, LLC (related document(s) 126)
         BEFORE THE HONORABLE PATRICIA M. MAYER
             UNITED STATES BANKRUPTCY JUDGE

        APPEARANCES:

FOR ATTORNEY WILLIAM RUSH: Bentley Kopecki Smith, P.C.
                           By:  William Kopecki, Esquire
                           1118 Penn Avenue
                           Reading, PA  19610
                           (610) 685-8000

FOR THE MOVANT:            Cornerstone Law Firm
                           By:  Benjamin J. Lewis,
                           Esquire
                           519 Walnut Street
                           Reading, Pennsylvania
                           (610) 926-7875

TRANSCRIPTION SERVICES:    Heritage Reporting Corporation
                           1150 Connecticut Avenue, N.W.
                           Suite 305
                           Washington, D.C.  20036
                           (202) 628-4888

Proceedings recorded by electronic sound recording.
Transcript produced with computer.

2

# C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Respondent: | | | | | |
| William Rush | 6 | -- | -- | -- | -- |

Heritage Reporting Corporation
(202) 628-4888

3

<u>E X H I B I T S</u>

| <u>EXHIBITS:</u> | <u>IDENTIFIED</u> | <u>RECEIVED</u> |
|---|---|---|
| 1 | 10 | 69 |
| 2 | 13 | 69 |
| 3 | 18 | 69 |
| 4 | 43 | 69 |
| 5 | 39 | 69 |
| 9 | 36 | 69 |
| 13 | 34 | 69 |

4

P R O C E E D I N G S

(11:07 a.m.)

THE CLERK:  So we will start with No. 21, 22, Alan Christopher Redmond, Order to Show Cause Why the Attorney, William Rush, Should Not Be Sanctioned and/or Disciplined and Objection to Debtor's Claim of Exemptions.

JUDGE MAYER:  All right.  Let's get everyone's appearances.  Counsel?

MR. LEWIS:  Yes.  Good morning, Your Honor.  My name is Benjamin Lewis.  I represent the petitioning creditors, specifically Jason Scott Jordan, Ethan Shalter, and Cornerstone Law Firm.

JUDGE MAYER:  Okay.  And, counsel?

MR. KOPECKI:  My name's Matthew Kopecki.  I represent Attorney William Rush with respect to this matter, present before the Court today.

JUDGE MAYER:  Okay.  So a little bit of history since your client wasn't here for the previous hearings.  I had at least two other hearings with respect to vacating the sanctions against both Ms. Kroemmelbein and Ms. Miller.  Those were sanctions, obviously, related to discovery that was not complied with after several hearings and motions.  At those hearings, there was testimony that both Ms. Miller and Ms. Kroemmelbein had indicated, I'll paraphrase, that either they were not clear that they were being represented by Mr. Rush,

5

and if they were being represented by Mr. Rush, they were not given the information needed to make a decision with respect to complying with discovery.  I'm paraphrasing all of that. I'm sure that the transcript is available, but that is my recollection of what the testimony was.

As a result of those two hearings, I set this up, and the reason that we're here today, obviously, is to determine whether or not Mr. Rush, number one, represented these two individuals, whether there was a clear engagement of his services, and if there were, what happened with respect to those motions and the failure to comply with them, which, actually, then resulted in the sanctions.  So I am happy to give you an opportunity to present your client's case, and then we'll take it from there.

MR. KOPECKI:  Okay.

JUDGE MAYER:  Okay.

MR. KOPECKI:  Thank you, Your Honor.

JUDGE MAYER:  All right.

MR. KOPECKI:  So, Your Honor, I would first call my client, William Rush.

JUDGE MAYER:  Okay.  Come on up.

MR. RUSH:  May I approach?  Okay.

JUDGE MAYER:  I assume that this is a binder of exhibits that --

MR. KOPECKI:  It is, Your Honor.

6

JUDGE MAYER:  Okay.

MALE VOICE:  May we provide you with a copy?

JUDGE MAYER:  That would be great.  It's a large binder, but sure.

FEMALE VOICE:  Did you not get (inaudible)?

JUDGE MAYER:  No, I did not get anything, nothing. I got nothing.

THE CLERK:  If you could remain standing.  Please raise your right hand.

MR. RUSH:  Yes.

Whereupon,

WILLIAM RUSH

having been duly sworn, was called as a witness and was examined and testified as follows:

THE CLERK:  State your name and spell your whole name for the record.

THE WITNESS:  William Rush, W-I-L-L-I-A-M, R-U-S-H.

JUDGE MAYER:  All right.  Mr. Kopecki?

MR. KOPECKI:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. KOPECKI:

Q     Mr. Rush, how are you employed?

A     I am a solo practitioner at Rush Law Group, LLC.

Q     And what types of experience have you had as far as

7

your practice areas?

A     A wide range, criminal law, of course, defense primarily, civil litigation of all stripes, family law, and general civil litigation.

Q     And prior to your work as a solo practitioner, were you employed?

A     Yes, I worked for two different local law firms, and my first job was as a law clerk to the Honorable Jeffrey L. Schmehl.

Q     Okay.  So I think you mentioned, but you have prior employment or experience in bankruptcy cases, correct?

A     I do, yes.

Q     All right.  So I want to jump to the matter at hand. Are you familiar with Ms. Kroemmelbein and Ms. Miller?

A     Yes, very much so.

Q     And how do you know these individuals?

A     I've known Mr. Kroemmelbein since approximately 2019, when she first met Alan Redmond.  She had asked me at that time -- this is prior to them being married to be perfectly clear.  She had asked me at that time to handle a somewhat complicated lease issue regarding a property in Philadelphia.

Q     Okay.  And is she now married to Mr. Redmond?

A     She is, yes.

Q     And how do you know Ms. Miller?

A     Ms. Miller I would have met in 2015 or 2016 when she

8

was hired by a company owned by Alan Redmond and Jason Jordan called National Brokers of America.  I believe she was hired as the Chief Financial Officer if memory serves.

Q      Okay.  Now, with respect to this case in particular, does this -- what company does this deal with?

A      This deals with Seguro Medico, LLC.  To be clear, the matter is over an involuntary bankruptcy initially over Debtor Alan Redmond.

Q      But your involvement was through Seguro Medico, LLC, correct?

A      Yes, that's correct.

Q      And who was the CEO or primary shareholder for that company?

A      At the time my representation was engaged and to now, as far as I'm aware, the primary would have been Shannon Kroemmelbein as she owned 96 percent of the company.  A gentleman named Arthur Walsh owned 4 percent.

Q      And was Ms. Miller also associated with this company?

A      She was.

Q      How so?

A      Well, that depends.  There have been conflicting statements from both Ms. Miller and from the company in general.  At times, she has been referred to as the CFO, at other times an employee, and other times -- I can't remember exactly how they phrased it, but a payroll specialist,

9

something along those lines.

Q      But, to be clear, she was an employee of the company?

A      Oh, absolutely, yes.

Q      Okay.  And she was an employee at a fairly -- at a manage -- at least management or higher position?

A      Oh, yes.  Most definitely, yes.

Q      Okay.  You have a binder in front of you full of exhibits, correct?

A      Yes, I do.

Q      And this, is this a binder that you put together to address the issues that are raised at this hearing?

A      Yes.  I mean, it's certainly not every document that would be applicable.  However, after consulting with my attorneys, you know, regarding privilege and various other ethical rules and out of an absolute abundance of caution, a couple thousand pages were eliminated as, even though they are likely unprivileged, it was better to be safe than sorry, which is how we condensed this down to -- I understand the Judge said it was big, but to a reasonable-sized binder.

MR. KOPECKI:  Understood.  And, Your Honor, before I continue, I did want to point out I have not been involved in the litigation prior to this, so I can't speak to that, but I want to make sure that the parties understand, by raising this issue, they are going to be waiving some attorney-client privilege with respect to the communications because,

10

essentially, they're saying that he wasn't involved.  In order to prove his involvement, I have to put on evidence showing his contact and the nature of that contact between the parties.

JUDGE MAYER:  Understood.

MR. KOPECKI:  Okay.

(The document referred to was marked for identification as Exhibit No. 1.)

BY MR. KOPECKI:

Q     Mr. Rush, I'm going to refer you to Tab 1 of your binder.

A     Okay.  Yes.

Q     And it would be Exhibit A.  Do you see that?

A     I do see that, yes.

Q     Okay.  And that document there, what is that document?

A     Yes.  So this was a retainer agreement with Seguro Medico, LLC, to serve as outside general counsel.

Q     Okay.  And what are the Bates numbers on that document?

A     The Bates numbers -- the first Bates number on the fee agreement document is 502.

Q     Okay.

A     Page 2.

Q     Okay.  And the last?

A     The last Bates number on the fee agreement is number 8,

11

page 8.

MR. KOPECKI:  Okay.  And, Your Honor, that would be Respondent's Exhibit 1.

JUDGE MAYER:  Okay.

BY MR. KOPECKI:

Q     With respect to this fee agreement, who signed -- if we can go to the last page, who signed this fee agreement?

A     Shannon Kroemmelbein.

Q     All right.  And she did it as head of Seguro Medico?

A     Yeah, as 96 percent owner.

Q     Okay.  And her signature here is notarized?

A     Yes, it is.

Q     Okay.  Now, as far as this, when was this fee agreement signed?

A     It was signed by me on July 29, 2023, and by Ms. Kroemmelbein on July 30.

Q     And what was the scope?  I understand you were outside general counsel, but what was the intended scope of your representation of the company?

A     Well, the company, first of all, was engaged in essentially insurance sales.  Now that branches off into a bunch of different realms, such as there could be, you know, regulatory matters or certain compliance standards.  If a complaint was made by a customer or a department of insurance, you'd handle that.  Of course, there were day-to-day, everyday

12

legal matters that any company would face reviewing contracts, you know, checking various agreements, lease agreements, loan agreements, things of that nature, and as with a lot of companies, they wanted to ensure that (a) somebody was there to do those various tasks but also that somebody was ready, willing, and available to defend executives, employees, managers, et cetera, who may incur legal costs or need legal representation specifically related to their responsibilities and work performed for the company.

Q    So, in short, would this fee agreement also -- would the scope of this fee agreement also include a bankruptcy case?

A    It would if Seguro Medico was directly involved with it and if any individual was brought into the case for any reason whatsoever.

Q    Okay.  So can you tell the Court at what -- did any -- well, let me back up.  Did someone reach out to you at some point from Seguro Medico with respect to the ongoing bankruptcy action?

A    Yes, around September 3, 2024, I believe.

Q    And who was that?

A    The first person that reached out to me was Shannon Kroemmelbein.

Q    All right.  And what was the nature of that conversation?

13

A        There were multiple attorneys on that call.  The general gist of the conversation that I feel is appropriate to testify to today was that individuals within Seguro would need representation.  Those individuals were discussed, and, ultimately, a few of the individuals discussed did end up requiring representation due to 2004 examination requests and various subpoenas that we at that time, and by that time, I mean September 3, we anticipated would be forthcoming.

(The document referred to was marked for identification as Exhibit No. 2.)

BY MR. KOPECKI:

Q        Okay.  If you could turn to Tab 2?  That would be Exhibit B.

A        Yes.

Q        The first page there, what's the Bates numbering on that?

A        It's page 10.

Q        Okay.  All right.  And what is that document?

A        This is an email from Alan Redmond dated Friday, December 20, 2024.

Q        Okay.  And what's the nature of this email?

A        The email is to Attorney Albert Ciardi and it says that Bill has been retained by Seguro, Shannon, Stephanie, Art -- that would refer to Arthur Walsh -- and potentially Malcolm,

14

which would refer to Malcolm Smith, parentheses working on that, and then he says, I will be buzzing Ready today.  That means I will be -- it's misspelled, but I will be calling Attorney Joel Ready to meet and confer along with Mr. Ciardi that day, which that call did happen, and I would note that there are emails under the Attorney Ready correspondence tab as well as a corresponding call log, which is lengthy, but it does confirm the times and places of phone calls and to whom they were made or who they came from, so that's what that is about --

Q    Okay.

A    -- saying that I represent them and it's saying that I was to call Attorney Ready that day.

Q    Okay.  So let's, before we get too far into the weeds there, let's start with the fact what did Alan Redmond, what role did he play at this point?

A    He was the Debtor, but at the same time, at this point, he was also serving as, I believe it was either consulting manager or chief consultant, essentially running the day-to-day operations.

Q    For Seguro Medico?

A    Of Seguro Medico.

Q    Okay.  So he was involved and he was one of the decision-making entities at the company?

A    I would say yes.  Yes, he was one of the decision-

15

making entities.

Q       Okay.  And when he's referring to Bill has been retained by Seguro, Shannon, and Stephanie, I just want to be clear that would be Shannon Kroemmelbein and Stephanie Miller, correct?

A       That's correct, yes.

Q       All right.  Now, at some point moving forward, did you learn about an outstanding discovery request or subpoena that was issued?

A       No, I -- well, by moving forward from September 3, yes, absolutely.  I heard that there had been 2004 requests and -- or examination requests, rather, and subpoenas issued to -- this may not be an exhaustive list, but, certainly, to Seguro's corporate designee, Shannon Kroemmelbein, Stephanie Miller, Arthur Walsh, Malcolm Smith, and Norman Valz.

Q       Okay.  So you were aware that those were outstanding at some point after you were retained on the case in September of 2004?

A       They weren't outstanding.  They were -- they had been sent.

Q       Okay.  But that was a present issue during your representation, correct?

A       Yes, absolutely.

Q       Okay.  And so what did you do when you were aware -- made aware of the 2004 request?  What actions did you take?

16

A       Well, the first thing I did because -- and I want to be clear on this.  There were multiple matters that Seguro had. The first involvement with this proceeding and the only involvement was when the 2004s were issued, so the first thing that happened was Shannon had retained me in September.  That was related to the anticipation of them.  When they were actually issued, I was in very quick succession, per the 2023 Seguro fee agreement, retained by, in order, Arthur Walsh, Stephanie Miller, so it went Kroemmelbein, Walsh, Miller, and then Smith, and, of course, there were discussions held internally, and as he was a 4 percent owner, everybody agreed that Arthur Walsh would serve as the corporate designee.

Q       Okay.  So -- and I jumped over this, so I want to go back real quick.  You said Mr. Redmond did play a role in the company.  At this point, was he also married to Mrs. Kroemmelbein?

A       Yes.  He remains married to Mrs. Kroemmelbein.

Q       And the email that you're referencing to retain you is an email from Alan Redmond.  It's not an email from Ms. Kroemmelbein or Stephanie, correct?

A       That is correct.

Q       So what would -- what led you to believe that an email from Mr. Redmond would have essentially hired you for these matters for these individuals?

A       Well, that would be a series of prior emails, phone

17

communications, and in-person meetings where Ms. Kroemmelbein made it very clear, sometimes angrily, that any communications regarding this or any proceeding in which she was directly involved should go directly to her husband.  I did frequently violate that "rule" to make sure Ms. Kroemmelbein knew, and there's multiple emails going back and forth to indicate it, but she does repeatedly bring up that I am to speak to Mr. Redmond about these matters.

Q       And to be fair, I mean, they're married, so Mr. Redmond and Ms. Kroemmelbein are presumably having communication on a regular basis, correct?

A       Yes.  Oh, yes, absolutely.

Q       And Ms. Miller, she's still actively involved at this time with Mr. Redmond?

A       Actively involved with Mr. Redmond, yes, they have a relationship, but at this time, she had left, as far as I'm aware, Seguro Medico.

Q       Okay.  But would she still be in communication with Mr. Redmond regarding these outstanding -- this outstanding litigation?

A       Yes, absolutely, and as the 2004 examination request and subpoenas dealt with documents and information related to Seguro and occurring over a timeframe in which Ms. Miller was actively working for the company on a very regular basis, it would cover those documents and those actions and thus be

18

covered under the retainer agreement from 2023.

(The document referred to was marked for identification as Exhibit No. 3.)

BY MR. KOPECKI:

Q     Okay.  I'm going to ask that you turn to Tab 3, which would be Exhibit C.

A     Yes.

Q     That first page there, what is that?

A     That would be Stephanie Miller's telephone contact information as well as two email addresses.  The phone number listed on the contact is 717-357-4117.

Q     And what's the Bates numbering on that page?

A     That's 15.

Q     Okay.  And on the next page, it would be Bates 16, what are we looking at?

A     So this was after a chain email that included the Debtor, the parties I represented apart from Ms. Miller, and various attorneys, and following that, it was accepted by all that I would reach out to Ms. Miller to see if she wanted to utilize my representation in this matter per the fee agreement that she was protected under.

Q     And did she respond to that?

A     She did.  I texted her.  This would have been December 19.  Steph, are you free for a call today to discuss

19

a Bankruptcy subpoena you may get or have already gotten, as well as other discovery in different cases.  If so, just let me know what time (Bill Rush here, by the way).  Stephanie responded, hey, Bill, sure.  I could do a call at 3:45.  I have to be somewhere at 4:30 with my family.  Does that work, to which I said sure.  I will not be stealing more than five or 10 minutes, but sure, I'll call you then.  Thanks, Steph.  And then I replied -- we had a phone conversation that day, which is in the call logs that corresponds to December 19.

Q       Okay.  And that phone conversation was with respect to the pending discovery request?

A       Yes, it was.  We discussed the -- first of all, we discussed what the subpoena looked like.  It was already in our possession at that time.  And we discussed what a Rule 2004 examination was.  I explained it in very simple terms, which is you're being asked to produce documents related to your work at Seguro, and at some point you will sit for an examination by the attorneys for various creditors, who are going to feel free to ask you questions about that exact material.  And she stated she understood.  She's a CPA.  She's a very smart woman, so she was more than ready.

Q       Okay.  But then, on the next day, you're asking her did you ever do any work for Seguro, correct?

A       Yes.  That was just to double-check that indeed that she worked for Seguro specifically during the timeframe that

20

was established in Attorney Ready's subpoenas.

Q     Did you ever file any motions on behalf of Ms. Miller in this case?

A     Yes, absolutely, I did.  Once she emailed me confirming this and confirming that she had a physical copy of the subpoena, she expressed, you know, on the phone that when she got it, she would like me to file a motion to quash the subpoena, which I did in January.

Q     Okay.  And that motion would be a part of the record in the case, correct?

A     Yes, absolutely.

Q     All right.  So moving forward, what was the disposition on that motion?

A     The motion -- well, in between the filing of the motion and the argument on the motion, Attorney Ready had to send out a corrective letter, I believe, due to some improper service. However, the argument remained scheduled as far as the breadth and scope, and there was a hearing held before Your Honor, and I believe I attended and made brief argument, as did Attorneys Ciardi and Nigrelli.

Q     And was Ms. Miller aware of this filing?

A     Oh, yes, absolutely.

Q     Was she aware of the arguments that you made on her behalf?

A     Yes, absolutely.  In fact, she was vested, you could

21

say, in making sure the filing happened because she was concerned as her original examination date, I believe, was scheduled for February 7, 2025, and she was going to be out of the country, so she wanted to make sure that she wouldn't be in violation of anything if she had been out of the country.

Q       Okay.  And so you contact her -- contacted her about producing these documents, correct?

A       Yes, absolutely.

Q       And did she ever respond to those -- that request?

A       She did, via email, yes.

Q       And what was her response?

A       Well, essentially, her response was that she had absolutely none of the documents requested, and there were a couple handwritten notes that indicated who might have those documents and where they might be, and she had already indicated to me over the phone she didn't know anything about this stuff anyway, so she wasn't too concerned.  She was mainly concerned with the trip out of the country.

Q       Okay.  So, if I have you turn to what is Bates number 20, I believe, in the same section --

A       Sure.

Q       -- Tab 3, there's an email there, correct?

A       Yes, January 21, 2025.

Q       And, actually, going back, this is a whole email chain.

A       Oh, email chain, sure, so 19 to 21.

22

Q      Okay.  And so who is this email conversation with?

A      This email conversation is with Stephanie Miller.

Q      Okay.  And what's the nature of this conversation?

A      On December 30, 2024, she asks to use this email address for correspondence because she has not really used the other email since she retired.

Q      Mm-hmm.

A      She also confirmed she received the attached documents in the mail and she just wanted to let me know.

Q      So, when you say "the attached documents," what is she referring to?

A      I believe she was referring to -- I believe she was mistakenly referring to the 2004 examination rules, but I was slightly confused by that because she attached the subpoena and the 2004 examination, which she had received, per her email, from Ciardi Ciardi & Astin.

Q      Okay.  And on January 21, you sent an email to her, correct?

A      Yes, I did.

Q      And what are you asking her to do?

A      I asked her to go through the requested items and the information and tell me what you do not have, and that is the language I use for everyone, and that was under the guidance of previous communications, written and verbal, with Ciardi and Nigrelli.

23

Q        Okay.  And what was her response?

A        Her response was -- she says basically with a couple exceptions as noted, the answer to most everything is no to the majority of the items, and she again reiterates that she'll be out of the country from February 1st to the 8th.

Q        Okay.  So, obviously, email is not your only communication with Ms. Miller, correct?

A        That's correct.

Q        You're also talking over the phone?

A        Oh, yes.

Q        Text message?

A        Text messages, yes.

Q        Okay.  And so -- but, when we're looking at this email chain, she's letting you know that she will be out of the country from February 1 to February 8.  We don't really have any context in this email, so can you explain to the Court why she's telling you this?

A        Oh, yes, because I told her that her scheduled examination date was February 7, I believe, and she would have to attend depending on what the outcome was of the motion to quash.

Q        Okay.  So you were making her aware of her obligations under the discovery request?

A        Yes, I was, but in response to this also, I mean, I also had numerous conversations with Mr. Ready to let him know

24

that this one particular individual may have to move their examination.

Q     Okay.  And would those conversations be collectively presented in Exhibit G of this binder?

A     Some may be, but at least one of those was over the phone to Attorney Ready.  Another was actually in this courthouse, as I recall.  I recall, certainly, having conversations with Mr. Ready in this courthouse very well.

Q     Okay.  But, to be clear, you informed Mr. Ready that she would not be available on that date and you were looking to reschedule?

A     Yes, he said it was -- yeah, it's a bridge we'd cross when we come to it, but he didn't think that would be any problem whatsoever.

Q     Okay.  Now, moving forward, did you send -- so I'm going to have you go to the end of Exhibit 3, just before the subpoena itself.  There's a U.S. Postal Service receipt.

A     Yes.  Yes, I see that.

Q     Yes.  So this was sent out May 1, 2025.  I'm going to jump ahead a little bit, but I'll come back.  What is this?

A     Okay.  So now, ultimately, the motion to quash as far as the oral argument that was held, the Court suggested the idea of potentially limiting the scope, but, of course, there were further motions proceedings, several of them argued by other counsel, and the Judge ultimately made the determination

25

that no, they're -- you know, the subpoenas are the subpoenas. If you have a issue, try your best to work it out with other counsel.

Q     Let me stop you right there.  Did you reach out to Mr. Ready in order to attempt to work out these differences?

A     Oh, yes, I sent him a letter on March 6, 2025, regarding the scope.  I had assistants draft the letter because, obviously, I didn't want to make any mistakes.  I've got some of the best bankruptcy attorneys around.  I might as well do some, you know, consulting with them.  I sent the appropriate letter to attempt to limit the scope, and I do believe that's March 5 or March 6, 2025.

Q     Okay.  And that was again on behalf of Ms. Miller, correct?

A     It was on behalf of everybody I represented at that time, yes.

Q     All right.  And on March 8, you're sending this letter out to another law firm, van der Veen Hartshorn Levin & Lindheim, correct?

A     March 8 was the print date, sorry.  May 1 was the date I sent that out.

Q     Okay.  And what was that?

A     So that was the updated subpoena for Rule 2004 examination.

Q     Okay.  So, after the Court had said, hey, you guys got

26

to work out your differences and you tried to do that,

ultimately, the 2004 was still pending, correct?

A       That's correct, yes.

Q       And so this was basically you letting -- well, let me

back up.  Who -- what role did van der Veen -- what role did

this law firm play in this litigation?

A       They had been Ms. Miller's attorneys since sometime in

mid-April, though I was not made aware of that from Ms. Miller

until May 1.  I should note that, because it does bear

considerable consideration in this case, which is why I've

attached personal medical records with very intimate

information, that I had made aware to all my clients,

including Ms. Miller, that I was suffering some very extreme

injuries and pain.  I informed former counsel, and the reason

this was mailed May 1 is because that's the day we physically

received it in the mail.  From about mid -- early, early April

until well into the summer, I could no longer physically go to

my office, so we had to make sure the mail got to me so I

could respond to it.  So the moment we got this, we mailed out

those subpoenas to who we knew to be her attorney.

Q       Okay.  So backing up, if I could have you go back to

the text messages on the beginning of Exhibit C, on the second

page, which would at the top be "Perfect.  Thank you, Steph."

A       "Perfect.  Thank you, Steph."

Q       Yes.  Now there's a text message there of January 24,

27

2025, correct?

A        Yes.  Yes, I see it.

Q        And what is that text message?

A        "Steph, are you free for a call today?"

Q        Actually, no, back up.

A        Oh.

Q        January 24.

A        Hi, Bill.  I just sent you an email in regards to the document request which you sent over.  I also wanted to let you know that I will be out of the country from February 1 through February 8, and to the best of my knowledge, I will not have any cell phone reception or accessibility.  Please confirm that you have received the email.  Thanks.  Got it, and got you covered was my response.

Q        Okay.  So --

A        Her response was thanks.

Q        So, here, she is again reiterating with respect to her obligations under the 2004 request that she's not going to be around, and she's asking essentially for you to handle it, right?

A        Yes.

Q        Okay.  Now, moving forward, you had explained you had some medical issues, some ongoing medical issues, right?

A        Severe, yes.

Q        Yes, and did those medical issues -- did the severity

28

grow over time, or did it start bad from the beginning?

A       Ironically, it happened shortly before I appeared before this Court at Mr. Ready's request.  I fell at my house.  It was, to my knowledge, not a big deal.  Trying to put up some Christmas ornaments I got a concussion.  I wasn't feeling great because of it.  By early December, it was clear I had to see a physician just to make sure that I hadn't injured anything.  By late January, it was clear that through luck or bad luck, whatever you want to call it, that hit to the head triggered the symptoms of what was a severely damaged neck upon MRI imaging, and my physical condition deteriorated considerably from mid-January to February when I, for a period of time, lost the ability to use my right hand.

Q       So, at some point, did you reach out to Ms. Miller and let her know that you were no longer able to continue as her legal counsel?

A       That came later.  I was still -- I mean, I was in pain, but I explained in the email there would be phone calls, here's what we're doing.  We had many, many phone calls, they were almost always group calls or from a work cell or from an office, the offices at Seguro Medico, to explain the situation jointly to everybody.  One of the things discussed is you're going to be getting some more calls and less texts.  I can't text left-handed particularly well.  Emailing and things have trouble, but, listen, this is what it is.  This is still the

29

order.  The next thing you can expect, reiterated again, is you will get a date upon which you'll have to submit to an examination, and you'll have to provide any documents requested as part of that.

Q    And as part of that, did she ever provide any documents to you?

A    No, she provided me what was attached in the email, which was essentially that she had no documents.  She suggested that they were either with Seguro or with C. Malcolm Smith or with some other person.

Q    Okay.  So at what point did your medical condition get so bad that you decided that you could no longer continue as her attorney?

A    That was April 18 when I had the last hope injection in my cervical spine.

Q    Okay.  And so what actions did you take in order to ensure that both the Court and the parties knew that you were no longer going to continue as their counsel?

A    I spoke to Ms. Kroemmelbein and Mr. Redmond right away. I spoke with Mr. Walsh.  I believe that was actually a three-way call.  I spoke to Norman Valz.  I was not able to reach Stephanie, so -- and I knew Norman was still in contact with her at that time.  I told everyone that, you know, considering everything and that my attempts to get them scheduled for their examinations multiple times had failed up to that point

30

that it was very clear that I was going to be out of commission for a while and physically, because that was a fairly disastrous procedure, I would not be able to continue to perform my duties.

Q      Okay.  And so looking at this same text message, you have a text message here to Ms. Miller on May 1.  Do you see that?

A      Yes, I do see that.

Q      And so you're saying, "Steph, are you free for a call today?"  Why are you reaching out to her at this point?

A      I'm reaching out to try and get a hold of her by text. By this time, I figured out an option for texting, and I had, for the first time in a while, had some limited ability in my right hand, so I was --

Q      Why were you reaching out to her on May 1, though?  So you had already filed the motion to withdraw, correct?

A      Yes.

Q      And I believe the Court did not approve it but, essentially, said that it was not needed to be filed based on the scope of your representation.

A      Well, yes, I knew it was a moot point, and I knew it was procedurally not necessary to file, but I felt it was important to record it for the fact that at least from that time until a couple weeks later, you know --

Q      So why on May 1 are you reaching out to Ms. Miller

31

then?

A      Because everything had -- I failed to reach her previously, and I received her subpoena from Attorney Ready's office in the mail that day.  Physically, that is when I received it.

Q      And when was that scheduled for?

A      It was scheduled for May 2.

Q      So the next day?

A      It was, but that was no fault of Attorney Ready's. They sent it out, I believe, something like April 22.  By the time it made its way to my hands, it was May 1, and I wanted to make sure Ms. Miller was aware of it, and if she could not attend for any reason whatsoever, I needed to let Attorney Ready know.  Of course, I've been filling in Attorney Ready and everyone else as to my condition and my limitations at that time.

Q      So, to be fair, in an abundance of caution, even though you were still technically not on the case, you wanted to make sure that Ms. Miller was covered and aware of what was going on?

A      Oh, absolutely, and, of course, you know, pursuant to the rules, there was a check from Cornerstone Law Firm made out to Stephanie Miller included with that, and I also was aware that she had retained new counsel sometime a couple weeks prior, and it had come to me, so I wanted to absolutely

32

make sure, so when we received it on May 1, we sent it out immediately.

Q      So the interesting thing here is Ms. Miller's response to you, "are you free for a call today?"  What did she say?

A      I am being represented by Attorney Dan Devlin.  He may be reached at 215-546-1000.

Q      So, based on her response, would you assume that she was aware that you were calling her about a legal matter and she was referring you to this new attorney?

A      Yeah, that was my assumption.

Q      Okay.

A      But I wanted to be sure.

Q      Sure.  And then, on the next page, you continue -- well, actually, at the bottom, I believe you say -- you asked her for the bankruptcy matter, correct?

A      Yes, I did.

Q      All right.  And then she says, what bankruptcy?

A      And I said Alan's bankruptcy, yes.

Q      Okay.  And then she says, I believe so, correct?

A      Yes, and then I asked her if she had the physical address for her attorney.

Q      And did you attempt to reach out to that attorney?

A      I did.  I made a phone call to the office, yes.

Q      Okay.  Were you able, ever able to speak with him?

A      No.

33

Q      So moving forward, did you have any other interaction with Ms. Miller after this date?

A      After this date?  No, I did not, but since she confirmed her attorney was Dan Devlin, I looked up Dan Devlin Philadelphia attorney and the phone number, which brought up Attorney van der Veen's practice, so I forwarded the subpoenaed materials to them on -- well, later that day.  I don't know if there's a time.  It was very shortly after this text exchange.  I do recall that.

Q      Okay.  And you're aware that now Ms. Miller is alleging that you actually never represented her or she was never aware of your representation of her?

A      Oh, I'm well aware of that, yes.

Q      Okay.  Has this happened before with Ms. Miller?

A      Well, yes.  Initially, I thought it happened once before, but it turned out it's happened twice before that she's made this exact argument.

Q      And what was that in reference to?

A      The first time she made the argument that she had never heard of a case that she was involved in and had no idea about its existence and had no idea somebody was representing her was United States Department of Labor versus Bene Market, LLC, as I recall.

//

//

34

(The document referred to was marked for identification as Exhibit No. 13.)

BY MR. KOPECKI:

Q        Okay.  And I believe, to expedite matters a little bit, on Exhibit M, which would be Tab 13, did you provide a transcript of your representation of Ms. Miller with respect to that action?

A        Yes. I did, and that's Bates -- well, the Bates is kind of lost here.  It looks like Bates 394.  There's a Bates on the deposition transcript as well in there.  Yeah, it's 380 -- oh, it is 390 -- it remains 394.  Yes, Bates 394.

Q        Okay.  And did you also provide a letter regarding this issue?

A        I did.  I mean, I included a letter.  I did not generate the letter.

Q        So who generated the letter?

A        It was the attorney for the Department of Labor and involving the -- well, it's captioned at the time as Martin J. Walsh versus Bene Market, but that's based on who the acting or current Secretary of Labor is, so the case has changed names over time, but it would be fair to call it the Department of Labor versus Bene Market, docketed at 5:20-cv-04265.

Q        Okay.  And the letter that I referenced, what was that

35

letter -- how was that letter -- what was the relevance of that letter to that case?

A       The letter from the Department of Labor in response to Ms. Miller's motion for relief --

Q       Let me stop you there just so we can get on the same page.  I'm referring to Tab 3, Exhibit C, and it'll be towards the back right before the post -- Postal Service receipt.

A       I see.  I see it, yes.

Q       What Bates number is that?

A       The Bates number on that is 39.

Q       Okay.  And this is the letter we're talking about, correct?

A       This is the letter we're talking about, which was sent to the Honorable Jeffrey L. Schmehl on -- it appears to be May -- it was filed May 21, 2025.

Q       Okay.  But, in this letter essentially or prior to -- this is a letter in response to Ms. Miller's argument that she wasn't represented or adequately represented at the time in this case, in this Bene Market case, correct?

A       Yes, in the Department of Labor case, that's correct.

Q       And the Department of Labor is essentially arguing here that she had counsel, she was adequately represented, and you would have been the counsel in that matter?

A       That is correct.  I would have been one of them, but I believe the exact term the Department of Labor used in this

36

letter filed with the court was that Defendant Miller has been thoroughly represented throughout this litigation.

Q      Okay.  And as a result, was that motion denied?

A      I do not know if that motion was denied or is still pending with that court.

Q      Okay.

A      My appearance remains entered, but the representation was taken over by Attorney Valz when he took over various cases for Bene Market and Seguro as their in-house counsel.  I don't know exactly what year that was, but I believe it would have been early 2022 or late 2021.

                              (The document referred to was
                              marked for identification as
                              Exhibit No. 9.)

BY MR. KOPECKI:

Q      Okay.  And I'm not going to go through this because it's pretty exhaustive, but on Tab 9, Exhibit I, is you title that Index of Corresponding Calls.

A      Yes.

Q      And so just briefly tell the Court what is that.

A      Sure.  The Index of Corresponding Calls, the first one, the first page, rather, states the total minutes of time I spent over the period of essentially this matter specifically. These are from my personal cell phone.  They do not include work calls only as those are named and indexed, and producing

37

them would require a rather massive redaction to protect clients that I represent in many other matters.

What this shows is that the players in this case, times I spoke to them, when I spoke to them, how long I spoke with them, month by month and minute by minute and what dates those calls took place on, bearing in mind that the first entry that if you look at the total number of hours spent on the phone with Mr. Redmond, which is 76.13 over the course of this time, a multitude of those telephone calls included third parties, be they counsel or be they the parties in this case that filed these actions, Ms. Miller, you know, Mr. Smith and Ms. Kroemmelbein, Mr. Walsh.

Q    So they would have been included as parties on those calls?

A    Oftentimes, yes, not -- I didn't spend 76, you know, hours of my life solely on the phone with Alan Redmond.

Q    And was it custom of Mr. Redmond to do three-way calls?

A    Yes, if not more.  Yes, there were --

Q    When if you say "if not more," what do you mean?

A    Well, there could be seven or eight or --

Q    Oh, you mean multiple people beyond three people on the call?

A    Yes.

Q    Okay.

A    But he would also -- what this fails to include is the

38

roughly 50 to 60 meetings at Seguro Medico offices with Mr.

Redmond, Ms. Kroemmelbein, occasionally Ms. Miller, very

rarely but occasionally Ms. Miller, Mr. Smith, John Sardella

from Malcolm Smith's office, various attorneys.

Q     Okay.

A     And it also doesn't include any combination of those

wherein somebody placed a call on their phone and put it on

speaker for everybody in the room to hear.

Q     Now you touched on this, and I just want to be clear

for the Court.  You mentioned John Sardella.  You said he's an

employee for Mr. Malcolm Smith?

A     If I said employee, that was a misstatement.  He's a

partner with Malcolm Smith at C. Malcolm Smith & Company,

which is an accounting firm.

Q     Okay.  And just to take a few minutes, what was your

relationship with Mr. Smith?

A     Mr. Smith, I've known him since 2014.  He was the

accountant for National Brokers of America, Bene Market,

Seguro Medico, LLC, and they're -- as far as I'm aware, he's

the accountant for every entity over which Ms. Kroemmelbein or

Mr. Redmond has any controlling or ownership interest at all.

Q     And so did you represent him with respect to this

matter?

A     I did, yes.

Q     And what was the nature of your representation of him?

39

A       The entirety of my -- the scope of my representation with him was to file a motion to quash the 2004 examination requests.

Q       Okay.  And with respect to Mr. Smith, did you also notify him and update him on his obligations under that request?

A       Oh, yes, he was well aware of them, and, of course, this would have hardly been the first time where I represented Mr. Smith in a, you know, deposition or any type of examination under oath.  I had done so, you know, based upon his accounting services for National Brokers of America, for Bene Market, in trial both before the Counties of -- or the County of Berks and the Eastern District of Pennsylvania, multiple locations.

                        (The document referred to was
                        marked for identification as
                        Exhibit No. 5.)

BY MR. KOPECKI:

Q       And just to touch on this, on Tab 5 of Exhibit E, I believe, you provide documents, including Mr. Smith's contact information, as well as correspondence between you, him, and Mr. Sardella, correct?

A       That is correct, yes.

Q       And are these documents provided to show that you had had communication with Mr. Smith regarding his obligations

40

under the discovery order?

A        Oh, yes, and in particular, you know, I noticed the first email that we have there appears to be Wednesday, September 4, 2024, which I believe was in the -- within 24 hours, maybe a little later, of this involuntary action against debtor being filed.

Q        Okay.  At some point did Mr. Smith obtain replacement counsel?

A        Well, he always maintained Barley Snyder up until I filed a motion to quash, at which point they remained in the case, and as far as I'm aware, based on their email, they remained in the case formally until roughly March 15, at which time they essentially reached out saying we acknowledge we're getting, you know, receipts of all the filings, but since Mr. Rush is handling, and this is their quote, the subpoena matter, that's what I was there to handle.

Q        So everybody acknowledged that you were handling that matter for Mr. Smith?

A        Yes, absolutely.

Q        All right.  And when you withdrew from all of your cases, did you also inform Mr. Smith of your inability to continue as his counsel?

A        Oh, yes, absolutely.

Q        All right.  Now I think you explained this, but I want to be very clear, in your total phone minutes, you note that

41

you only spoke with Stephanie Miller for 11 minutes and this is just a portion of the phone calls, correct?

A     That's correct.

Q     And so -- but did you speak with Ms. Miller in other situations or was she also involved in some of these three-way or eight-way calls that you were describing?

A     Yes, numerous times.

Q     And did Ms. Miller a lot of times defer to Mr. Redmond?

A     What would you mean by "a lot of times"?

Q     Were there times where the parties were all in communication with respect to putting discovery together and prepping for this case?

A     Yes.

Q     Okay.

A     I mean, but, I mean, by percentage, how often did she defer, I --

Q     Well, when I use the word "defer," what I'm trying to say is would she correspond with Mr. Redmond with respect to all of this litigation?

A     Yes.

Q     Everything, her duties and everything else that's going on?

A     Oh, yes, both with me, you know, as part of that communication and without me as part of that communication.

Q     Okay.  Now I want to move on, but before I move on,

42

with respect to Ms. Miller, is there anything else that we haven't talked about that you would like to present to the Court to show as evidence of your representation of her?

A      Well, no, I think it's very, very clear I represented her.  What I would note is, as I stated to the Court, when I first received notice of this rule cause and saw Ms. Miller's argument that she had no knowledge of this case, I knew of one other time she had made that representation, and that was, of course, the Department of Labor versus Bene Market case.  Obviously, I pulled the transcript where it's noted that I am sitting in the same room with her and representing her in that litigation.  I read through the transcript once more to see if I had performed a competent, adequate job.

I believe I very much did because, when I got to a rather blistering argument between myself and Attorney Bluer for the Department of Labor, I possibly overly aggressively argued based on the information Ms. Miller provided me in that transcript, which is attached and highlighted, that Ms. Miller was unaware of the complaint at all and had not been informed by the prior counsel that it ever existed.  I fully believed her and I placed that argument on the record, so I saw the argument again, of course, with the Department of Labor, and then I saw the same exact argument made for this proceeding today.

Q      Okay.  So, with respect to Ms. Kroemmelbein, now,

43

again, that's Mr. Redmond's wife currently, correct?

A        Yes.  I don't know exactly when they got married, but they were certainly married at the time Ms. Kroemmelbein executed our fee agreement, and they absolutely remain married today.

                              (The document referred to was

                              marked for identification as

                              Exhibit No. 4.)

BY MR. KOPECKI:

Q        So if you could turn to Exhibit D under Tab 4 for me?

A        Yes.

Q        And what's the Bates number there?

A        The first Bates number, which is her contact information, is 46.

Q        Okay.  And, again, I think you've stated this.  It's her contact information and this is how you would reach out to her?

A        Yes, and there's a purple -- a pinkish-purple highlighter circle on Bates 46.  That indicates -- if any of the phone records are highlighted with that color, that represents a phone call to Ms. Kroemmelbein.

Q        Okay.  So there's -- you have this -- on the next page, you have a text message, correct?

A        I do from April 10.

Q        Okay.

44

A       Deposition -- she's talking about the deposition.

Q       Okay.

A       April 10 of -- this would be 2025 to be clear.

Q       Okay.  And the -- what is -- I know there are some attachments here.  Obviously, we can't see the attachments.  Can you explain what the conversation is at this point between you and Ms. Kroemmelbein?

A       Well, Ms. Kroemmelbein then, as for a long while before, did not want to do the deposition.

Q       Okay.  And she had asked you to file a motion to quash, right?

A       Well, she asked me to file a lot of things.  The one that I felt was legally appropriate and non-frivolous was the motion to quash.

Q       Okay.  And so she is communicating with you here.  What is -- what was the purpose of this communication?

A       She wants -- I mean, it's hard to tell from that, but, at this point, she wants me to get her out of the deposition.

Q       Okay.  And at this point, a deposition is scheduled?

A       A deposition had been -- well, no, at this point, it was -- it had been scheduled, but I had sort of reached a breaking point with the parties and had reached out to Mr. Ready basically asking for four days in a row, telling these guys you have to sit for these examinations, and that email to Attorney Ready is attached.

45

Q      Okay.  And also at this time, this is shortly before and after, if you will go to the bottom of April 28, when you actually formally withdraw from the case?

A      Yes, that's true, but in between -- I should note, in between April 11 and April 28, Ms. Kroemmelbein informed me that she had hired other counsel from Allentown and did not provide me that counsel's name.  I do not know if she did, in fact, do that.  She represented that she paid a retainer to an Allentown attorney to take over my representation because these depositions needed to not happen and I was not doing my job by allowing them to happen.

Q      Okay.  So let's back up a little bit.  We have the -- kind of the broad brush, but if we go back, there's a series of emails between you, Shannon, and Mr. Redmond, correct?

A      Yes.

Q      So what is the nature of your conversations here?

A      Which tab are we --

Q      Still under Tab 4.

A      Okay.

Q      I don't have the Bates numbering, but it would have been the --

A      Oh, yes, they're chronological.  Okay.  Yep, I see. Bates number is 50 on when the emails begin.

Q      Okay.  So looking at -- just one moment.  All right. So they're in chronological order starting from the first to

46

the most recent, correct?

A      That is correct, bearing in mind again that multiple emails have been excluded from this period of time due to what I believe are matters of privilege that even these motions do not breach.

Q      Okay.  But, on September 12 specifically, you see that email?

A      Yes, I do.

Q      And you're CC:'d on this email?

A      Yes, I am.

Q      And what is Ms. Kroemmelbein asking in this email?

A      She's saying -- the highlighted portion is "We need Seguro protected and myself and Art protected.  Seguro's staff attorney has been accused of fraud."  That refers to Attorney Valz, "as Art and I have.  We just ended the federal investigation."

Q      Okay.  And then there's another email chain going on to the next page.

A      It's from the same chain, same day.  She says, Norman, as staff attorney for Seguro, and Bill, as my personal attorney.

Q      And what did she mean by -- what did you believe she meant by that as far as what you were retained to handle?

A      What she was attempting to do there was have Norman represent any staff of the company, so anyone we couldn't

47

think of, essentially, that might receive a 2004 examination notice, and me as her personal attorney means her personally as it relates to the Rule 2004 examinations, any discovery, any reference in this bankruptcy proceeding.

Q        And this email, if you look at the second bullet point, can you read that out loud for me?

A        "We've been named in an involuntary bankruptcy proceeding that involves Alan Redmond and not Seguro.  This concerns us as we just finalized a federal investigation and a number of false allegations that could overflow."

Q        Okay.  And so, at this point, it's clear that this email is addressing the involuntary bankruptcy proceeding?

A        Oh, yes.

Q        All right.  And you were involved in this at this point as her personal attorney?

A        As a personal attorney for anything involving the bankruptcy and, you know, specifically Seguro.

Q        And at some point, were you -- I notice in these emails there's a number of people attached.  Did you have direct communication with Ms. Kroemmelbein, or was it always with various either other attorneys or other individuals?

A        I did have direct communications with Ms. Kroemmelbein, but she and others did not like having direct communication, so they preferred either group communication, such as you see in the emails, or that whatever my issue is, I take it

48

directly to Mr. Redmond.

Q    And so we were just talking about emails from the 12th. If you go forward a few pages to Saturday, 9/14?

A    Yes, I see it.

Q    And that's from Ms. Kroemmelbein to David Heim and CC:'s you, correct?

A    Yes, CC:'s me and several others, yes.

Q    And she states "I give authority to Alan," referring to Alan Redmond, correct?

A    Yes.

Q    "To discuss my legal issues with you and the team, and he will debrief me."

A    Yes.

Q    When you received that, what was your understanding of Mr. Redmond's involvement in this?

A    Well, my understanding of what she meant was I was going to contact him directly for any legal-related matters affiliated with this case, but, as the email thread shows, I did not agree with that.  Now, of course, if there were multiple attorneys involved in a conversation or, you know, she chose to have third parties present, that was one thing, but I wanted to absolutely ensure that everything vital that had to be communicated to her in my opinion legally was communicated directly to her, heard by her ears.

Q    Okay.  And did you communicate to her her obligations

49

under the 2004 request?

A       Ad nauseam.

Q       All right.  And did you send her a copy of the subpoena?

A       Yeah, on multiple -- well, that's -- technically, no. The first one was, I believe, received directly from the mail at 8 Morgan Drive, so that one I did not receive for her. However, I authorized Attorney Ready to serve me any subpoenas.  I agreed to accept service for any subpoenas for any of the parties represented in this in order to expedite matters, and those emails are documented as well under the Attorney Ready emails.

Q       Okay.  And also, at the very end of subsection 4 of this same exhibit, do you have receipts from the post office and shipping label receipts dated May 1?

A       Yes.  May 1 was the day I received all the subpoenas with the corresponding checks and mailed them all out the moment I received them, yeah.

Q       And who did you mail them to?

A       These ones -- well, there are technically three here. There's Arthur Walsh individually.  There is Arthur Walsh as the corporate designee for Seguro Medico, LLC.  And there's Shannon Kroemmelbein.  These all related to Seguro.  I mailed them all directly to the Seguro building, but they knew these were getting sent no later than April.  Early April they knew

50

for sure that these were coming.

Q       Okay.  So, at that point, you had told them that you were no longer going to be their counsel, right?

A       Oh, yes.

Q       But you had continued to act in their best interest to make them aware of their obligations?

A       Yes, I did, and in the case of at least three of the others, I'd been specifically told that they had other counsel.

Q       Okay.  Now I also want to go to an email.  I don't, again, don't have the Bates numbering, but it's dated February 3, 2025.  It starts off with "Dear Attorneys, David Heim, Bill Rush."

A       Did you say February --

Q       Or --

A       Yep, I see it.

Q       And that second paragraph --

A       Yes.

Q       -- what does that say?

A       This is an email from Shannon on February 3.  It's directed to me, David Heim, and the law firm of Bochetto & Lentz for whom David Heim works.  "I am writing to formally authorize my spouse, Alan Redmond, to communicate with you and your firms on my behalf regarding any legal matters.  I trust Alan's judgment entirely, and there are no limitations to this

51

authorization to act in my stead.  Please feel free to provide Alan with any information he requests as he will be assisting me in understanding and making decisions regarding my legal affairs."

Q      So how many times did Ms. Kroemmelbein indicate to you that you needed to loop in Mr. Redmond?

A      In these emails provided?  Five or six.  Overall? Dozens.  And in addition to that, most every phone call I placed to Ms. Redmond she would either patch Mr. -- or sorry, Ms. Kroemmelbein.  She would either patch Mr. Redmond in or put it on speaker if they were in the same place.

Q      Okay.  And then there's a -- if you flip back, there's an email in the emails right before this dated February 1, 2025.

A      Yes.

Q      What is the -- this is quite a long email, so I'm not going to have you read the whole thing, but what is the context here?

A      Well, this essentially is the foundation of why the parties collectively were going to essentially refuse regardless of what I did or what the Court --

Q      Refuse what?

A      Refuse to comply with the 2004 examination notices, and this is when, in particular, Ms. Kroemmelbein and Mr. Redmond became very angry with me.  They wanted me to take multiple

52

actions, including, as I said before, file a motion to quash, which this Court had already ruled could not be filed. I --

Q     That would have been a second motion to quash, correct?

A     That would have been a second motion to quash.

Q     Okay.

A     But the Judge had already made the ruling, so they were, at this particular point, they were arguing that the attorney-client privilege between Shannon, her businesses, and Alan and their attorneys had been violated because Attorney Ready had issued a subpoena to corporate designee or, you know, authorized, you know, representatives, basically, the offices where you have to have a place --

Q     For service?

A     For service, exactly. He emailed these places for publicly known entities that he suspected the parties here may have ownership interest in.

Q     Mr. Ready did that?

A     Yes, he did.

Q     Okay.

A     It was a legal and proper subpoena insofar as I could tell. There was absolutely nothing wrong with it, and everyone to which he issued a subpoena that had relevant information provided it. They made the determination that that was a violation of their attorney-client privilege and that, therefore, Mr. Ready must be removed from this case.

53

This action had to be dropped, and anything this Court issued thereupon after was a legal nullity.  This email is a reference to that after attempts over Zoom and Teams to quell those notions, and it says it appears, and this is from Shannon, again, to myself, Attorneys Heim, McCarry, Bochetto, and Valz.  "It appears that my personal information and business information has been illegally obtained via Attorney Ready with an improper subpoena that was served on various registered agents that I have used in the past, who then released personal and business information under the watchful gaze of one Judge Patricia Meyer.  I have been consulting with my husband, and what I plan to have us do is sue each registered agent, sue little Mr. Ready, and, of course, sue" -- do I have to read that line?

Q     That's fine.

THE WITNESS:  Your Honor?

JUDGE MAYER:  No.

THE WITNESS:  Thank you.

JUDGE MAYER:  I got the gist.

THE WITNESS:  A few other points include the violation of client-attorney privilege, in particular, with Norman and Bill, and at the bottom, she says, "communicate through Alan, please," and it rambles over the next page. There's things I would prefer not to say in Court.  I believe they are appropriate to present --

54

BY MR. KOPECKI:

Q       Well --

A       -- but they are highlighted.

Q       -- I do want you to say the very first sentence.  What does that say?

A       "I believe I am represented by Rush."

Q       Okay.  So this email is a conversation about essentially legal strategy with respect to the involuntary bankruptcy case?

A       Specifically and exclusively that is what this email is about.

Q       And she is stating in this email that she believes that she is represented by you, correct?

A       Yes.

Q       All right.  Now, moving forward, obviously, this is around February of 2025, correct?

A       That's correct.

Q       So what steps did you take as a result of Ms. Kroemmelbein and, you know, to an extent Mr. Redmond pushing you to take actions that you didn't feel were appropriate?

A       I explained to them for the better part of two months that there was no action to be taken against Attorney Ready for issuing valid subpoenas.  I didn't see any issue against the individual entities who provided the information.  I did not see any legal action against Mr. Ready whatsoever.  I

55

explained that you did not "file" a Dragonetti action against somebody.  You sent them a letter outlining the reasons to support a Dragonetti action and then, should you prevail ultimately, you may file a Dragonetti action.  However, I did not see any evidence supporting a Dragonetti action.

I explained to them you could not sue a federal court for making a ruling.  I also explained to them on numerous occasions that, once again, we cannot file a motion to quash.  It has been done.  It's ruled upon.  You must sit for these examinations.  But this point about attorney-client privilege being violated by subpoenas sent to non-parties, non-witnesses to this case regarding publicly available documents, they simply would not let that issue rest.

Q      So at any point did Ms. Kroemmelbein provide any documentation pursuant to the 2004 request or did she willingly sit for an examination?

A      Well, I asked her to provide the documents and I told her she would need to sit.  However, I gave certain instructions to her about both providing documents and sitting for examination.  That said, all she provided me by way of information requested, and I do mean all, is a single email wherein she says she has her ID and her passport and those are the only responsive documents that she had to Attorney Ready's subpoena, 2004 examination request.  That email is included amongst these emails.

56

Q       Okay.  And to expedite things a little bit here, even moving forward to March 16 --

A       Yes, on March 16, Alan notified me that my personal information, including Seguro's, was released to Joel Ready, misspelled.  Do we have a plan?  Again, I must emphasize the subpoenas issued by Attorney Ready were not illegal and they did not, and I am very clear on this, contain any attorney-client privilege.  I saw the documents that Attorney Ready obtained through these subpoenas.  They were provided.  I reviewed them.  Nothing in there whatsoever contained -- I don't know what she means by "personal information," but they contained nothing protected by attorney-client privilege. Further, to the point if it had, I can all but guarantee because I can't speak for the man, but I can all but guarantee that Attorney Ready would have contacted me immediately to let me know he accidentally obtained attorney-client information.

            MR. KOPECKI:  Your Honor, may I approach briefly?

            JUDGE MAYER:  Yes.

BY MR. KOPECKI:

Q       So, also on 3/16, do you see the email?

A       Yes, I do, Bates 66.

Q       Bates 66.  Who is that email from?

A       It's from Alan Redmond.

Q       And that email is to you?

A       It is to me, Attorneys Ciardi and Nigrelli.

57

Q      And what is he asking you?

A      Bill, Shannon's attorney, what do we do here?

Q      So, at that time, was there an understanding that you were representing Shannon on March 16?

A      Yes, that was never ever in dispute at any time.

Q      Okay.  And moving forward, if I go to March 18?

A      Yes.

Q      It starts with an email from you.

A      Yep.

Q      And then it's a email chain, correct?

A      Yes, it is.

Q      And then going back to March 17?

A      Yes.

Q      And this is from Shannon as well, correct?  Ms. Kroemmelbein, excuse me.

A      It is.  Yes, it is.

Q      And she notes here.  She says, "Good morning," and then has the facts, colon, and notes Shannon is represented by Rush and B&L, correct?

A      That's correct, although I was the only one entered in the bankruptcy as I recall for her, but B&L certainly represented her in other matters.

Q      And on March 17, same email, if you scroll down to a bullet point that says, Bill, you should take the lead as I am balancing cash flow and you have been paid the most this year,

58

correct?

A       That is what she has said, yes.

Q       Okay.  So she was indicating as of March 17 that you should continue to act on her behalf as her counsel?

A       Yes.

Q       Okay.  And moving forward, on March 28 --

A       Yes.

Q       -- was there continued communication about your actions as counsel for her?

A       Yeah, there is.

Q       Okay.

A       Can I address the highlighted portions?

Q       Absolutely.

A       This is from Shannon.  Hi, Bill, drop me an email on the plan forward.  Again, this is March 28, and the deadline for filing the quash and protective order Alan said Monday, and this is the puzzling thing.  I've seen the quash motion, and it looks excellent.  When will it be filed?  I did not prepare a second motion to quash.  I prepared and filed the one and only motion to quash.  However, from this email, it appears somebody has reviewed a motion to quash the subpoena, circulated it to God knows who, and made it clear to the other parties in this case that such existed even though I maintained it had not.  I had even gone so far as to reach out, but looking like an idiot, frankly, to Attorney Nigrelli

59

a couple of days prior to this to say, am I good to file a motion to quash, and she said no, the Judge has already ruled on it, and I have that in writing then to show my clients.

Q    And just to be clear, what is Attorney Nigrelli's role in the litigation?

A    She was, at that time, she was one of the attorneys -- the attorney for the Debtor, Alan Redmond.  It was her, her firm.  There were several people in the firm, so she was one of those attorneys.  She's not represented anyone else, and I believe she and Ciardi's firm had been out of this case for a while.

Q    Okay.  But she was aware of what was going on in the litigation?

A    She would have been.  I think she would have been far more focused on the Debtor at that time, but she was certainly aware of bankruptcy procedure, everything, and their desire to avoid examination.  She was aware of that, so I reached out to her as she -- I thought, if she emailed me and said no, you can't do this, and I said, look, I can't do this, that would be the end of it, but two days later is this email.

Q    All right.  And moving forward, there's an email on September 23, '25.  It's a significantly long email --

A    Yes.

Q    -- I think dealing with answers to discovery.

A    Yes, it is.

60

Q      And so, as of this point on September 23, 2025, you and a number of other people are included in this email, and what does the discovery pertain to?  Is that this case or a separate case?

A      It is this case, but I want to note that I had withdrawn and new counsel had firmly been established.  Prior to this email put in writing, Ms. Kroemmelbein reached out to me on numerous occasions after retaining new counsel to discuss the bankruptcy.  I explained to her very patiently many times we can talk about any other case you have going on, including cases where I represented her interests that are ongoing right now, but I cannot discuss the bankruptcy.

On September 23, I get this very, very long email which certainly involves the bankruptcy.  It was sent from Shannon to Alan and then a bunch of attorneys CC:'d, including her own attorneys, I believe, on this.  It appears to have started at 4:07 that night with Mr. Redmond saying something to the effect as to Ms. Kroemmelbein's discovery answers that they would not align with discovery and testimony that have been presented by Attorney Rush and explained Heim to FBI, George to FBI, McSwain to FBI, you two attorneys, et cetera, et cetera.  Mr. Weir -- Shannon, I would recommend you consult with myself, Rush, George Bochetto, or David Heim, former personal counsel or former counsel for Seguro.  Shannon, again, her reply, which is to all the attorneys mentioned,

61

said, I would fully agree and trust the previous counsel.

Q      So did you reply or take any action as a result of this email?

A      I did not, and it merely stayed in the designated folder of my Outlook.

Q      Okay.  So -- but my understanding is that at this point Shannon had -- or Ms. Kroemmelbein, excuse me, had presented answers to the list of requests, had CC:'d her husband, Mr. Redmond, who then talked about whether or not those answers were appropriate or not appropriate answers.  Is that fair to say?

A      That's what was forwarded to me.  I don't know what the context was or what any internal communication was.  This was an out-of-the-blue email.

Q      Okay.

A      And it ran counter to my prior advice regarding discovery and examinations.

Q      But, to be clear, you were CC:'d on this email along with her current attorney, Mr. Weir?

A      I was, yes.

Q      Okay.  And at any point in time did Mr. Weir ever reach out to you with regards to your involvement in the case?

A      No, he has not.

Q      But would he presumably have been aware of your involvement at least to the extent that you are included on

62

what would have otherwise possibly been a confidential communication?

A    Yes, especially since this was not the first time I was included on a confidential communication.  I would see an email pop up from Ms. Kroemmelbein or Mr. Redmond with Mr. Weir CC:'d on it, and it would appear -- it was nothing as definitive as this.  It was minor disagreements, and I would just again push it into the Kroemmelbein folder BK on -- you can make your own folders in Outlook.

Q    Okay.

A    So that's where this would go.

Q    So just to reiterate, to be clear, you had a fee agreement with Ms. Kroemmelbein dating back to 2023, correct?

A    Yes, yes.

Q    And as a result of that fee agreement, there were emails and communications between you, her, and Mr. Redmond recognizing your role as her attorney in the involuntary bankruptcy, correct?

A    Yes.

Q    And moving forward, you had some concerns about your health, right?

A    Yes, serious ones, yeah.

Q    And --

A    And to be clear, I still do.  I've provided the Court medical records so the timeline is established.

63

Q        Right.  And you were also concerned whether or not you could continue to represent the individuals based on some of their requests as to how you should handle the case?

A        Yes.  That being said, I had concerns beyond the medical, all the medical concerns, and the reason I wanted to make sure it was documented in a, yes, admittedly, procedurally pointless petition to withdraw was to have something on the record since I was dealing with non-responsiveness as far as what I deemed to be an extraordinarily simple issue, which is a 2004 examination subpoena.

Q        And do you believe that you took all actions to inform Ms. Kroemmelbein of her obligations under the 2004 request?

A        There is no question, repeatedly told literally everyone affiliated you must sit for these exams.  You must provide the information requested.  Discovery is pretty much the simplest thing you could do and this is possibly the simplest form of it.

Q        And to be clear, there was email conversations about strategically how to handle those requests?

A        There were, yes.

Q        And you were involved in those?

A        Yes.

Q        Okay.  Now there's also an allegation that you did not provide adequate representation because you failed to instruct

64

Ms. Kroemmelbein on whether or not she had a Fifth Amendment privilege. Are you aware of that?

A       I am aware of it, yes.

Q       So this obviously raises some very sensitive issues.

A       Certainly.

Q       But do you believe that Ms. Kroemmelbein may have had a Fifth Amendment issue?

A       I did and do believe, yes.

Q       And how did you communicate that concern to her?

A       Without getting into the nitty gritty of the details, I told her that it was my belief that she had a Fifth Amendment privilege that she could and should assert. Beyond that, I said it applied both to testimony and to documents. My suggested plan was to go through the documents because she certainly could not be compelled to produce anything whatsoever that could implicate her in any criminal matter. I personally didn't believe any such documents existed, and I never saw them if they did. However, if that was even the remotest concern, my instruction was to decline the specific request item by item, asserting a Fifth Amendment privilege and acknowledging that she was aware that this being a civil proceeding, a negative inference could be established or ruled by the Court in doing so with the documents.

With regard to the examination, I did what I have done, and I've done this a lot of times, I advised her that she

65

should treat the testimony given as testimony to the Court, and the example I use every single time is you shouldn't just be writing in to the attorney on the other side of a deposition and saying I'm pleading the Fifth to everything and not show up.  I compare that to being called to court and speak in front of the judge.  You don't just get to send an email to the court saying Fifth Amendment.

So what I advised her to do and what I advise every client to do is go to the examination on the date, answer what your name is, state it for the record, address, biographical information, and when you move beyond the opening pleasantries, every single question, look to me for a yea or nay.  And are those tedious depositions?  Yes, they often go on for an exceptionally long time, and it's almost always, on the advice of counsel, I am invoking my Fifth Amendment privileges at this time.  That's it.  They're boring transcripts to read, but that way the person has appeared of record.  There's no chance for contempt about that person not appearing, be it civil, criminal, or otherwise.  There is absolutely no basis in that case for a motion to compel and certainly no basis for sanctions.

That is how I advised this client.  That is how I advise other clients, and that is how I watched another attorney on an opposite case do it just last month where he is facing criminal, actual criminal charges in one case that

66

correspond to allegations made against him in a civil case.
It is the safest way to do it, and that is what I recommended,
that I -- I recommended it then.  I would recommend it now.  I
would recommend that tomorrow.

Q     So, to be clear, do you remember how this was conveyed
to her, via in person, email, phone?

A     It was in person on multiple occasions.  It was in, you
know, those all-hands-on-deck multiple attorney meetings.  It
was in Zoom and Teams meetings.  It was in person.  It was
over the phone.  I conveyed it to Mr. Redmond exactly as I
just conveyed it to you.

Q     Okay.  And was -- and correct me if I'm wrong, but did
Ms. Kroemmelbein ever attempt to use the Fifth Amendment as a
basis to avoid a deposition or avoid compliance with the
discovery requests?

A     Not to my knowledge, unless she ultimately chose to do
so in this matter.

Q     Okay.  Now, with respect to Ms. Kroemmelbein, we've
gone through a lot of evidence, and I know there's a lot of
evidence here, so I don't want to proverbially beat the dead
horse, but is there any other information that you could
present to the Court besides what we have testified to today
regarding your representation of Ms. Kroemmelbein?

A     It was thorough.  I provided correct advice.  You know,
as with some clients, you face a client who let's say gets a

67

lawful arrest and wants you to sue the prosecutor.  This, frankly, comes up far more often than it should, and you patiently explain the things you can do and the things you can't, and there are some clients that will understand that they can't sue the prosecutor who's prosecuting their criminal case, and there are some clients who will understand you can't just file a random lawsuit against the Congress, but there are some who will never understand those things or they will force -- try to force you, I should say, to take actions you don't want to take.

In my experience, when you refuse to take an action because it's unlawful, and my duty of candor is to this Court, and I've explained that on numerous occasions, to explain why I couldn't file something I felt was inappropriate to file. This was all explained to Ms. Kroemmelbein repeatedly.  And I would note to the Court that I was very surprised by the Court's rule in October when it was issued.  I hadn't read the motions.  My name wasn't in the caption.  I had been out of the case.  No attorneys had reached out to me, but I was particularly surprised because Ms. Kroemmelbein had become the point of contact for me almost exclusively for custody of her stepchildren and support and was providing me information to handle matters involving her own children literally the week that that rule came down, both before and after, and that's in addition to other matters where she requested my legal help.

68

I did not confront her about the rule even after it was issued, but she did come to me about it and say, I didn't know any of that stuff was going to be in there.  None of that's true.  She could have been just saying that for my benefit, but that is what she spoke to me, and I continued to represent her and competently or else I assume something else like this may have been filed in other matters after she filed the motion that brings us here today.

Q       And I probably should have led with this, but I want to make sure we cover this.  Are you aware of your obligations under a 2004 request?

A       Oh, yeah, the same as I have presented to the Court that I presented to my clients, absolutely.

Q       And how often have you either sent out your own requests or responded to those requests during your tenure as an attorney?

A       I haven't sent them out very often, if at all.  I've certainly received them on behalf of my clients a number of times in this case, and, obviously, I've seen numerous ones over the course of a case that I still get notice on because it's still ongoing, Worley Obetz.  It's an old bankruptcy case.

Q       And, recently, were you -- did you receive such a request?

A       I did receive a 2004 request recently, yes.

69

Q       And how long did it take you to provide the information requested?

A       It was within three business days.

Q       Okay.

A       And I also sat for a deposition within three business days.

MR. KOPECKI:  Understood.  All right.  That's all I have, Your Honor.  Thank you.

JUDGE MAYER:  Okay.  You can step down.

THE WITNESS:  Okay.  Thank you.

JUDGE MAYER:  Unless you -- I don't think that you were a part of this, but if you have --

MR. LEWIS:  No.  No, that's okay.  I don't have anything for Mr. Rush.

JUDGE MAYER:  Okay.

MR. KOPECKI:  Your Honor, I would just ask for the formal admittance of the evidence that is included in the binder provided to counsel and the Court.

JUDGE MAYER:  Okay.  It'll be admitted.

MR. KOPECKI:  Thank you.

                    (The documents referred to,

                     previously identified as Exhibit

                     Nos. 1 through 5, 9 and 13, were

                     received in evidence.)

THE WITNESS:  May I step down?

70

JUDGE MAYER:  Yes.

(Witness excused.)

JUDGE MAYER:  Mr. Kopecki, did you want to make argument before I rule?

MR. KOPECKI:  If I may, Your Honor, yes, briefly.

JUDGE MAYER:  Mm-hmm.

MR. KOPECKI:  Your Honor, as the Court noted, it's a big binder.  There's a lot in there, and, clearly, we would be here for days to go through every single page, but I wanted to highlight for the Court the evidence that strongly shows that my client was actively representing these individuals, that these people understood that he was actively representing them, that he filed motions on their behalf in which they had conversations about, that they had conversations about their obligations under the 2004 discovery request, that they had conversations about their obligation to present for a deposition, and that my client also had, again, filed a motion to quash, and that was again part of their legal strategy, which he was forwarding at that time, and then things seemed to have broken down.

It seemed everybody was happy at the beginning where things stood.  My client had filed a motion to quash per their request, but then we start to see my client saying, listen, you need to follow up.  You need to do these things.  You need to provide this information.  And he even explained

71

in detail, I understand you may have a Fifth Amendment privilege, but this is how we handle it.  We don't ignore it.  We don't stick our head in the sand, we address it.  And that's where the parties started to hit a brick wall because you could see from the emails the emails became a little bit more antagonistic, belittling.  They also -- more demanding, and it seemed like -- I think it's clear that they were asking my client to do things that were not allowed or would have been either frivolous or potentially illegal under the law, and he did not do that.

At the same time, it's kind of a perfect storm for my client, unfortunately, because he's got this medical issue that is ramping up with his back to the point where it's forcing him to get out of this case and actually focus on his own health for a little bit, but also, as he stated, there was -- he also was aware that at this point his representation was becoming tenuous.  He was pushing them to do -- to comply.  They were not doing it.  He was at wits end, so he also, I think, made the correct decision to withdraw from the case at that time, and I think, realistically, what we have here is we can show, you know, unfortunately, attorney-client had to be presented, but it shows a clear indication of these parties trying to look for a way around compliance with this order and that then we get your -- they get Your Honor's sanctions.  Your Honor grants the sanctions.  He's no longer their

72

attorney.

Now the new attorneys step in.  They have to represent their client.  I don't know what those conversations are, but then now we get a motion saying we had no idea this was going on.  Please, we can't be responsible for these sanctions.  I think, when you look at the evidence as a whole, Your Honor, it's clear that my client did his best to represent all of these individuals as best he could under the circumstances and realized that when he could no longer do that, he withdrew, as he should, under the rules of professional responsibility and that these people have a motive at this point to avoid sanctions, and they have the perfect scapegoat, which they believed to be the perfect scapegoat, but I am confident, Your Honor, that the evidence there shows that my client did act as counsel, did his best to represent these individuals, did his best to give them competent legal advice, and, unfortunately, due to the nature of the case, we're here today for this matter.  Thank you.

JUDGE MAYER:  Okay.  Thank you.

Okay.  I will tell you that after the testimony today I'm incredibly troubled about the testimony that was presented at the previous hearings by Ms. Miller and Ms. Kroemmelbein.  That being what it is, the order to show cause was issued as a result of those hearings because my concern was that perhaps representation was not being adequately

presented to them because of perhaps the Debtor's involvement, Mr. Redmond's involvement, because that seemed to be the case throughout this case in terms of him leading sort of the way through all of this.

As I reflect on the testimony, it is my understanding that there was a general retainer obviously that was entered with respect to Seguro Medico that essentially allowed you to represent these individuals.  That was never presented at any of the previous hearings, so I was unaware of the scope of the representation until today and unaware that the parties had had several conversations because that was not the testimony.

I credit your testimony today.  I think it was credible, and based on that, I am willing to discharge the order to show cause without any sanctions and without any disciplinary action because I do believe that you did everything that you needed to do under the rules, and at some point, it became a contentious relationship, which happens often, but that rules were not violated, so for that reason, I'll discharge it without any further proceedings.  Thank you.

MR. KOPECKI:  Thank you, Your Honor.

MR. RUSH:  Thank you, Your Honor.

THE CLERK:  Judge, are we going to visit Number 22, the Objection to Debtor's Claim of Exemptions?

JUDGE MAYER:  Oh.

74

MR. LEWIS:  Your Honor, I have what I hope will be good news for you.  We spoke.  We were contacted by Trustee Feldman earlier.

JUDGE MAYER:  Yes.

MR. LEWIS:  Mr. Redmond has still failed to appear for his 341 on this, so we would move to --

JUDGE MAYER:  I think it's scheduled for the 17th, isn't it?  No?  Let me see.

MR. LEWIS:  There may be another one rescheduled.

JUDGE MAYER:  I think it is rescheduled.

MR. LEWIS:  So we're -- what we would do is just move to continue this issue until the 341 with Mr. Redmond ultimately takes place.

JUDGE MAYER:  Okay.

THE CLERK:  It's on the 17th, Judge.

JUDGE MAYER:  I think -- right.  Our hearing is the 17th, but when is the 341?

THE CLERK:  End of February, I think.

JUDGE MAYER:  The 16th, so the 341 is on the 16th. There's a continued order to show cause on the 17th for dismissal, so I can continue this to the 17th if you'd prefer, and then we can deal with it all at the time.  I think, at that point, the Trustee is either going to move to dismiss or will perhaps have had a 341.  Don't know.

MR. LEWIS:  Sure.

75

JUDGE MAYER:  Okay.

MR. LEWIS:  Understood.

JUDGE MAYER:  All right.  Then I'll put it on for that same date, the 17th.  I think it's at 11 a.m.

MR. LEWIS:  Okay.

JUDGE MAYER:  All right.  Thank you.

MR. LEWIS:  Thank you, Your Honor.

(Whereupon, at 12:49 p.m. the hearing in the above-entitled matter was adjourned.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

76

<u>CERTIFICATE</u>

DOCKET NO.:         24-13093-PMM

CASE TITLE:        Alan Christopher Redmond

HEARING DATE:      March 10, 2026

LOCATION:          Reading, Pennsylvania


      I, court approved transcriber, certify that the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


Date:  March 10, 2026


_Lori Sherman_
_____

Lori Sherman
Transcriber
Heritage Reporting Corporation
1150 Connecticut Avenue, N.W.
Suite 305
Washington, D.C.  20036